# Exhibit A

Todd C. Emerson, A8175
SkyWest Airlines, Inc.
444 S. River Road
St. George, UT 84790
Telephone: (435) 634-3530

Scott M. Petersen, A7599
David N. Kelley, A9137
FABIAN & CLENDENIN,
A Professional Corporation
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah 84151
Telephone: (801) 531-8900

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANDREW DAVID CALLAWAY<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST AIRLINES INC., a Utah Corporation,<br><br>Defendant. | **AFFIDAVIT OF JACQUELINE NIELSEN**<br><br>Civil No. 2:04CV00179<br><br>Judge Ted Stewart |

STATE OF UTAH )
) ss.
COUNTY OF WASHINGTON )

JACQUELINE NIELSEN, having been duly sworn, deposes and says as follows:

1. I am a Manager in SkyWest's People Department. I have previously given my deposition in this matter and I am competent to testify about the facts contained herein.

2. It has been my job to review and respond to almost every PRIA request sent into SkyWest for the past three years. I have also reviewed the files where PRIA requests are kept, and specifically, the files where all PRIA requests for David Andrew Callaway are kept.

3. In June 2004 SkyWest received a PRIA request for David Andrew Callaway, a former SkyWest pilot.

4. SkyWest has received no other PRIA Requests for Mr. Callaway in the past twelve months.

5. The Callaway PRIA was prepared on a Federal Aviation Administration form. It identified Tiffany Cotter as the SIF Representative of AAWH, the air carrier. It also listed YEN789J as the air carrier's FAA certificate number.

6. I was instructed by Todd Emerson, SkyWest's General Counsel, to hold off on answering this PRIA request because Mr. Callaway and SkyWest were negotiating a settlement that might call for a change in Mr. Callaway's employment status.

7. On or about October 22, 2004, Mr. Emerson informed me that those negotiations had failed and instructed me to fax the PRIA information to A.A.W.H.

8. I used the fax number provided on the PRIA request form and faxed the information to Tiffany Cotter at A.A.W.H.

9. It was my belief that the information was going to Polar Air's parent company; Air Atlas World Holdings ("AAWH").

10. To ensure that the fax was received, I called Polar Air's HR department to confirm receipt of the information. Polar denied receiving a fax from SkyWest and informed me that they had not sent SkyWest the identified PRIA Request and that Tiffany Cotter was

not a Polar Air employee. Polar also verified that the mailing address provided on the PRIA did not correspond to Polar Air.

11. I then contacted the FAA and learned that AAWH is not a registered air carrier and that certificate number YEN789J did not match any known air carrier.

12. I then traced the fax number to a machine located at the Staples Corporate Headquarters in Framingham, Massachusetts. I called the reception desk for Staples and was told that Tiffany Cotter was a Staples employee.

13. I ended my investigation and reported my findings to Todd Emerson.

Dated this 27 day of December 2004.

JACQUELINE NIELSEN

SUBSCRIBED AND SWORN to before me this 27 day of December 2004.

JILL E JONES
Notary Public
State of Utah
My Commission Expires Oct. 10, 2008
3280 Inca Circle, St George, UT 84790

Notary Public

# Exhibit B

STRINDBERG SCHOLNICK & CHAMNESS, LLC
*Attorneys at Law*

October 8, 2004

***Via Fax and U.S. Mail***

Todd C. Emerson
SkyWest Airlines, Inc.
444 South River Road
St. George, Utah 84790

Re: *Andy Callaway vs. SkyWest Airlines*

Dear Todd:

I am in receipt, finally, of the documents which SkyWest intends on sending in response to Polar Air's request under PRIA. I have several concerns with how SkyWest has handled that request and with the documents that it intends on producing.

First, SkyWest has not responded to Polar Air within the time set forth in 49 U.S.C. § 44703(h)(5). Under that code section SkyWest had 30 days to provide the information to the airline and 20 days to notify Mr. Callaway of the request and right to receive a copy of those records (see 49 U.S.C. § 44703(h)(6)(A)). Considerably more time than that has past. I wrote to Scott Peterson on September 9th to remind SkyWest of it obligation to provide the information, yet received no response until I received the documents from you earlier this week. The failure to provide Mr. Callaway with those documents within 30 days of that request also violates the Act, specifically 49 U.S.C. § 44703(h)(6)(B). In addition, Mr. Callaway has not been given a reasonable opportunity to "submit written comments" to correct any inaccuracies contained in the records. 49 U.S.C. § 44703(h)(9).

It also seems problematic that the first three pages you sent me (the Notice of Termination, the Counseling Statement, and the Statement of Alleged Incident) should be sent to Polar Air, or any other airline for that matter. None of these documents pertain to Mr. Callaway's performance as a pilot. Advisory Circular No. 120-68C specifies that records that do not pertain to "performance as a pilot" are not to be included in any response. See also 49 U.S.C. § 44703(h)(1)(B)(ii). Even if Skywest were to argue that disciplinary records of any type are to be produced, which I believe is a misinterpretation of the statute and the Circular, neither the Counseling Statement nor the Statement of

Alleged Incident constitute a record of disciplinary action. The former is merely a counseling statement and Mr. Callaway received no discipline at that time. The latter is merely a description of an "alleged" and never proven incident. Additionally, the Notice of Termination does not accurately reflect why Mr. Callaway was terminated. The precipitating incident, according to SkyWest, was Mr. Callaway's misuse of the company's intranet. The Notice doesn't even mention that incident and instead refers to unproven allegations and conflicts.

Demand is hereby made that those three documents be removed from the group of documents which will be sent out to Polar Air or in response to any request under PRIA. Instead, a document which accurately reflects the real reason for his discharge should be substituted. In addition, SkyWest needs to write to Polar Air and apologize for failing to respond to its PRIA request, and provide Mr. Callaway with a positive recommendation. Finally, we will be providing a response to the accusations against Mr. Callaway which needs to be included in any PRIA response that SkyWest sends out. I would anticipate having that response to you by next Wednesday. Of course, the content is dependent upon your response to this letter and the issues raised herein.

Sincerely,

STRINDBERG SCHOLNICK
& CHAMNESS, LLC

ERIK STRINDBERG

cc: Callaway
Scott Peterson

U:\current clients\Callaway_DA\Correspondence\emerson_pria.wpd

# Exhibit C

STRINDBERG SCHOLNICK & CHAMNESS, LLC
Attorneys at Law

October 8, 2004

***Fax and U.S. Mail***

Scott Petersen
Fabian & Clendenin
215 S. State, 12th Floor
Salt Lake City, Utah 84111

Re: *Callaway v. SkyWest Airlines, Inc.*

Dear Scott:

I am in receipt of you letter of October 7, 2004. The week of October 25th is, as of this writing, going to be difficult. What is your schedule like in November? Additionally, I believe that I am entitled to depose those individuals I previously identified, Kristen Wiley, Jacque Nielsen and Karalee Smith, before you depose Mr. Callaway.

For your information Mr. Callaway did not go for "training" because SkyWest never responded to the PRIA request. Therefore, he was never extended a job offer.

Sincerely,

STRINDBERG SCHOLNICK & CHAMNESS, LLC

ERIK STRINDBERG

cc: Callaway

U:\current clients\Callaway_DA\Correspondence\petersen_depo.wpd

Breeze that was a letter of recommendation?
A. Yes.
Q. And you also had another one sent by a Scott Jacox--from Alpine Air--
A. Yes.
Q. --to Mr. Overbaugh. Do you remember that?
A. Yes. These were letters included in the application, I believe.
Q. Okay. So that I understand it, what you've got is an application that you get--you fill it out, you submit it, and you attached a couple of letters of recommendation.
A. That's correct.
Q. You eventually were given an interview, right?
A. Yes.
Q. Do you know who told you you were approved for an interview?
A. I received a letter--and I don't remember who it was from--inviting me to interview.
Q. And so, did you go interview?
A. Yes, I did.
Q. Who did you interview with?



A. There was several individuals the day of the interview.
Q. Do you remember any of them?
A. I believe Lorraine Cauldwall was one.
Q. All right.
A. And I believe Dan Ence was another. And those are the only ones I remember that day.
Q. Did they tell you they'd get back with you?
A. Yes.
Q. And did they?
A. Yes.
Q. Tell me who contacted you thereafter.
A. I received another letter selecting me for employment. I'm not sure who though. I believe maybe Kim Ence wrote that letter.
Q. Was there any condition to your employment that you recall in the letter that was sent to you?
A. I don't recall.
Q. Nothing that said, for example, you needed to have a medical certification or anything like that? Does that ring a bell?
A. I don't recall.
Q. Were you asked to attend some training



at that point?
A. Yes. Yes, it was--
Q. Tell me what that's all about.
A. Invited me to a class in early 1998. January, I believe--January or February of 1998.
Q. All right. And did you attend?
A. I did not attend.
Q. Why not?
A. I was informed that my father had cancer. And I was unable to attend.
Q. How were you informed that your father had cancer?
A. My father called me.
Q. What did he say?
A. He was going in the hospital for cancer--for surgery.
Q. Was this after or before you were selected for employment?
A. This was after selected for employment.
Q. And what did you do at that point?
A. I made the decision to take care of my family obligations, notified SkyWest I was unable to attend the training.
Q. What kind of cancer did your father have?



A. Thyroid cancer.
Q. Where was he at at the time?
A. He was in surgery in New York.
Q. Do you recall the hospital?
A. I don't.
Q. And you attended to family matters meaning you went to be by his side.
A. Yes.
Q. Is that in a nutshell? Were your parents divorced at the time?
A. Yes.
Q. Did your brother go as well?
A. At the time, my brother was not living out here.
Q. Where was he at?
A. He was back East. Or no. Excuse me. Where was he? I believe he was in Tennessee at the time.
Q. And nonetheless, you made the decision that you would go be with your father.
A. That's correct.
Q. What kind of treatment was your father to receive? Do you recall?
A. He underwent surgery to remove the cancer and then followed by radiation surgery.

# Exhibit D

too, but you can set that aside for a minute.
All right. Looking at Exhibit 35, the first bullet point says, "No-showed to ground school on February 2, 1998." That's the first time when you went to be with your father.
A. That's correct.
Q. Does that seem right?
A. Yes.
Q. And then after that, it says, "After numerous letters from Andy and a new application, Andy was allowed to come to training in January of 1999." Is it true that you went in for training the second time in January of '99?
A. Yes.
Q. And it's also accurate, isn't it, that after the no-show for ground school, the--you sent several letters requesting that you be reconsidered based on your father's illness.
A. That's correct.
Q. And then you had a discussion with Jim Breeze at that time. And he said, "Submit a new application."
A. That's correct.
Q. And you did that, and you were selected.



A. That's correct.
Q. All right. So those two bullet points are accurate, correct?
A. Yes.
Q. All right. The third one says, "In June 2000 Andy was summoned to headquarters to meet with Brad Holt and Jim Breeze because of comments made on the company Web site." Were you summoned in June 2000 to headquarters to meet with Brad Holt and Jim Breeze?
A. No.
Q. Where are headquarters?
A. St George, Utah.
Q. Do you recall ever being summoned to headquarters?
A. Yes.
Q. And you're saying it didn't happen in June of 2000.
A. That's correct.
Q. All right. Tell me when the first time you were summoned to headquarters?
A. I believe it was December of 2000.
Q. All right. And you were asked to meet with Brad Holt and Jim Breeze.
A. That's correct.



Q. And were you asked to meet with them because of some comments that were made on a company Web site?
A. At the time, I was not told why I was meeting with them. It was--
Q. When you were summoned, you were not told why.
A. Right.
Q. All right. When you got there were you told that you had made comments on a company Web site that were inappropriate?
A. That's correct.
Q. And that was with Brad Holt and Jim Breeze.
A. Yes. And Chris Abell.
Q. Now, when you were working at SkyWest--who was your immediate supervisor in December of 2000?
A. That would have been Kelvin.
Q. Kelvin Hyatt?
A. Hyatt.
Q. Sorry. I pronounced that wrong.
And so when you went--who was it that asked you to go in in December of 2000?
A. Brad Holt phoned me at home and said he



wanted to see me in St. George.
Q. Did you say "Why"?
A. I did.
Q. And what did he tell you?
A. He said, We'll talk about it when you come down. He also mentioned if I was talking about his house.
Q. So did that indicate to you why he was concerned?
A. I could--I did not know what he was talking about.
Q. All right. Tell me as best you can recall exactly how the conversation went.
MR. STRINDBERG: What conversation?
MR. PETERSEN: The one he said he just had with Mr. Holt on the telephone.
THE WITNESS: Yes. He called and asked if I had been talking about his house.
BY MR. PETERSEN:
Q. Did he say to whom?
A. No.
Q. Did he say in what context?
A. No.
Q. He just said, Have you been talking about my house?

saying is, if there's a better document than this, where is it? I don't--you didn't produce it to us.
A. Okay. Well, hold on. Now that I read this more, I believe this was my closing statement to the review board that I read--
Q. Okay.
A. --at the end of the review board.
Q. Look at the third--
A. So this was not a letter that was written. This was simply for my reference in the review board.
Q. So this is just--did you submit this to the review board, or is this just something you used to read from during your closing argument?
A. I used it to read from during my closing arguments.
Q. Okay.
Exhibit-47 marked
BY MR. PETERSEN:
Q. All right. I'm showing you now what's been marked as Exhibit 47. It's CAL0133. Do you recognize that document?
A. It appears to be a prior request page or document.



Q. Okay. There's a Part I and a Part II in there. Do you see that? First box says, "Part I: Air Carrier and Other Records Request (PRIA); Part II: Airman Consent to Release of Records." Is that your signature in Part II?
A. Yes, it is.
Q. Dated 6/12/2004, correct?
A. That's correct.
Q. And did you prepare Part II?
A. Yes, I did.
Q. The Part I, do you know who prepared that?
A. Yes, I do.
Q. Who is it?
A. Tiffany Cotter.
Q. Who is Tiffany Cotter?
A. Tiffany Cotter is a friend of mine.
Q. All right. And who does she work for?
A. She works for a company in Boston.
Q. What's the company called?
A. I don't know.
Q. Does she work for Polar Air?
A. No.
Q. Do you see where it says "AAWH" under--over the "Air Carrier Name"?



A. Yes, I do.
Q. What is that in reference to? Do you know?
A. I don't know. I did not fill out Part I.
Q. Does Tiffany Cotter work for an airline at all?
A. No, she does not.
Q. Okay. That's the 64 dollar question, then, why would you have your friend Tiffany Cotter fill out an air carrier request?
A. Because I had not received my PRIA records from Polar Air. They had not received PRIA records that were requested during an interview I had. And I wanted to see why and if I would be able to obtain my own records, which I am allowed to do.
Q. So you had her falsify a PRIA request.
MR. STRINDBERG: Objection. It's argumentative.
MR. PETERSEN: Okay. Go ahead. Answer.
MR. STRINDBERG: Just a second. Give me a moment.
THE VIDEOGRAPHER: We're going off the record. Time is 5:08 p.m.



(Recess taken 5:08-5:11 p.m.)
THE VIDEOGRAPHER: We're back on the record. Time is 5:11 p.m.
MR. PETERSEN: Could I get you to read back the question?
(The last question was read.)
MR. STRINDBERG: And I'm going to--before he answers, I have advised him that he has a constitutional right not to answer that question. The reason I've advised him is because Mr. Emerson in prior conversations has gone on and on about submitting some kind of a PRIA application if your not a member of an airline as a criminal offense.
So, I don't know whether it is or not, but I think under those circumstances it's apparent to me that SkyWest wants to make some issue out of it. So I've told Mr. Callaway he doesn't have to answer if he doesn't want to based on his Fifth Amendment right.
BY MR. PETERSEN:
Q. Do you want me to ask the question again?
MR. STRINDBERG: It's up to you.
THE WITNESS: I'm going to abide by

Page 328

there when he's 80 years old, I don't see an issue with that.
Q. If in lieu of the money you've talked about, would you prefer to be reinstated? Did that make sense? Did you understand that question?
A. Yes.
Q. So what's the answer?
A. I'd have to think about it. It would depend.
Q. All right. Look at page 3 of your interrogatory answers. It's Interrogatory No. 4. It says, "Describe in detail all attempts you have made to obtain employment since being terminated at [sic] SkyWest." Your answer is, "On an everyday basis I check the Internet to determine if there are any new openings for pilots. In particular, I check the Web site climbto350.com." Do you mean that, that every single day you check that, or is that sort of a little fluff that--
A. Every single day I check that. I checked it this morning while I was eating breakfast.
Q. And what is climbto350.com?
A. The Web site that posts job openings.

Page 329

Q. For pilots?
A. For pilots as well as other aviation areas, mainly pilots.
Q. Okay. You have a list of airlines that you have sent resumes to. Have you since sent resumes to additional airlines other than those you have listed?
A. No. I believe those are about all the airlines that are hiring right now.
Q. And have you interviewed additional airlines other than Polar Air and Atlas Air?
A. I have never interviewed at Atlas Air.
Q. Okay. Your answer says, "I have had interviews at Polar Air and Atlas Air." Do you see that?
A. Atlas Air owns Polar Air. Maybe that was the confusion there.
Q. So you've really had one interview.
A. One interview.
Q. And that was with Polar Air.
A. Polar Air. And then in October of last year I interviewed with Jet Blue.
Q. Okay. Is there a trend, a type of airline that you're looking to be hired with? Do you understand that? It's not a trick question.

Page 330

I may be phrasing it poorly. I'm--I guess what I'm asking is, are you looking to be hired with a cargo company, with a passenger company? Is there a type of airline that you want?
A. There's no preference. I want to be working for a good company who provides a good quality of life and is stable.
Q. All right. The next one says, "I have attempted to contact by phone, e-mail, and regular mail, friends and others who I know who are involved in the industry." Who specifically have you contacted in the industry that you know?
A. I don't have their names and phone numbers and all that right now. I have friends that are all around the world right now that work for various airlines.
Q. When you interviewed with Polar Air, when did you interview with them?
A. July of--or excuse me. June of 2004, I believe.
Q. And who was it that you interviewed with?
A. I don't recall their names right now.
Q. Was it one person or more than one person?

Page 331

A. It was two individuals.
Q. Male or female?
A. Both.
Q. So one man, one woman.
A. Yes.
Q. Do you recall what their titles were?
A. I do not. I have all that information written down at home.
Q. Do you have any problem producing to us copies of the information you received from Polar Air?
A. No.
MR. PETERSEN: All right. We'd request, then, Mr. Strindberg--
MR. STRINDBERG: Request what?
MR. PETERSEN: --that we get the information--he says he has written documents from his interviews with Polar Air.
THE WITNESS: No. I didn't say I had written documents.
BY MR. PETERSEN:
Q. Well, you've got something written, right?
A. I have the names of the people I interviewed with written down.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Q. Okay.
A. I don't have written documents from them.
Q. All right. You didn't receive any letters or anything regarding your interview.
A. No. I have voice mails that are still saved on my phone.
Q. What is your current status--
A. I can play those for you right now if you would like.
Q. What is your current status at Polar Air?
A. There is no status.
Q. Were you turned down for the job?
A. I--best of my knowledge, yes.
Q. You didn't, though, receive a formal letter telling you thanks for playing.
A. No, I did not.
Q. Are you aware as to whether Polar Air sent a PRIA request to SkyWest?
A. Best of my knowledge, they did.
Q. Who was it at Polar Air that informed you that they sent a PRIA request?
A. It was an admin woman that was in the interview that took our forms and went to the fax



machine and faxed them.
Q. The same woman that you interviewed with?
A. She was--no, not the same woman that I interviewed with.
Q. Do you know the name of this person who made the request?
A. No, I don't.
Q. Do you know what department she worked in?
A. No, I don't. I would assume she works in the human resource department.
Q. Could you describe her to us, as best you can?
A. No, I cannot.
Q. Where did you interview at Polar Air?
A. Miami, Florida.
Q. And is that where the woman was who faxed the--
A. Yes.
Q. --PRIA request?
A. Yes.
Q. Have you been contacted by anyone at Polar Air in relation to the PRIA requests that they made?



A. I have not.
Q. Did you actually see a document that showed that the PRIA request was, in fact, sent?
A. Did I see a document showing it was sent?
Q. Yes.
A. What would that be?
Q. Like a fax confirmation sheet.
A. No, I did not.
Q. So the basis for you saying that they in fact sent a PRIA request to SkyWest is that you spoke with a woman who in front of you actually put it on the fax machine and sent it off.
A. That's correct.
Q. What fax number did they send it to? Do you know?
A. I don't recall.
Q. Did you provide them with the fax number?
A. No, I did not.
Q. All right. What is a 737 type rating course?
A. That's training for the Boeing 737 aircraft.



Q. You completed that course in July of 2004.
A. That's correct.
Q. And the purpose of that was what?
A. To further my qualifications. Also to further my qualifications specifically for Southwest Airlines who require the type rating.
Q. So that makes you more marketable to some of the airlines.
A. In particular, Southwest Airlines.
Q. Are those the planes they fly?
A. Yes.
Q. Okay. Those aren't the planes that SkyWest flies.
A. No.
Q. Do you have an understanding as to whether that kind of a course would make you more valuable to SkyWest?
A. I have no idea if it would make me more valuable to SkyWest. It wouldn't hurt.
Q. All right. Look at the answer to Interrogatory 5, which is on 3--page 3 to 4. That's--asks for your factual basis for the claim that you think you had implied in fact contract with SkyWest. Your answer indicates, "The

Page 407

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,
Plaintiff,
Case No. 2:04CV00179
vs.
Judge Ted Stewart
SKYWEST AIRLINES, INC.,
Defendant.

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY
(VOLUME III)

TAKEN AT: Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, Utah

DATE: February 14, 2005

TIME: 2:06 p.m.

REPORTED BY: Scott M. Knight, RPR

Page 408

APPEARANCES

FOR PLAINTIFF:
ERIK STRINDBERG, ESQ.,
STRINDBERG, SCHOLNICK & CHAMNESS
44 Exchange Place
Salt Lake City, Utah 84111

FOR DEFENDANT:
SCOTT M. PETERSEN, ESQ.,
FABIAN & CLENDENIN
215 South State Street, Suite 1200
Salt Lake City, Utah 84151

Videographer: Keith Hall

INDEX


| Witness | Page |
|---|---|
| DAVID ANDREW CALLAWAY | |
| EXAMINATION (CONTINUED) | |
| BY-MR.PETERSEN | 410 |


EXHIBITS

| Number | Description | Page |
|---|---|---|
| 49 | Letter from Erik Strindberg to Scott Petersen, dated October 8, 2004 | 474 |

Page 409

Deposition of David Andrew Callaway (Vol. III)
February 14, 2005
PROCEEDINGS

THE VIDEOGRAPHER: This is the videotape deposition of David Andrew Callaway, taken by the Defendant in the matter of David Andrew Callaway vs. SkyWest Airlines, Inc., in the United States District Court, District of Utah, Central Division.

This deposition is being held at the offices of Fabian & Clendenin, 215 South State Street, Suite 1200, Salt Lake City, Utah, on February 14, 2005.

My name is Keith Hall from the firm of Thacker & Company, with office at 50 West Broadway, Salt Lake City. I'm the video specialist. The reporter is Scott Knight from Thacker & Company.

We are going on the record at 2:06 p.m. Counsel will now state their appearance for the record. And the witness will be sworn.

MR. PETERSEN: Scott Petersen for SkyWest.

MR. STRINDBERG: Erik Strindberg representing Mr. Callaway.

Page 410

DAVID ANDREW CALLAWAY, called as a witness for and on behalf of the Defendant, being first duly sworn, was deposed and testified as follows:

EXAMINATION
BY-MR.PETERSEN:

Q. All right. Mr. Callaway, we've been down this path before. So I'll just jump right into it. I'm showing you what's been previously marked as Exhibit 47. I think we talked about this briefly before. But do you recognize that document?
A. Yes, I do.
Q. Tell me what it is.
A. It is a document to request the background records.
Q. Is it--what's often referred to as a PRIA request.
A. Yes.
Q. And this is--do you have an understanding as to where somebody obtains a form like this?
A. You can download them off the Internet. You can--I think they're readily available. I mean, that's where this was.

Page 411

Q. Did you obtain this form before it was filled out?
A. Yes, I did.
Q. And how did you get it?
A. Downloaded it off the Internet.
Q. All right. And what site did you get it from?
A. I don't recall.
Q. Was it a government site? Do you know?
A. I don't recall. It was--you know, you type in a search for the form. And, you know, many web sites were listed, you know, where you could access the form.
Q. All right. Tell me the circumstances--what--if you look at the air carrier, the Part I section, there's a date there. Do you see that?
A. The handwritten date?
Q. That's right.
A. Yes.
Q. Next to Tiffany Cotter's signature.
A. Yes.
Q. It looks to me like it's 6/17/02--or '04. I'm sorry.
A. Right.
Q. And then below where your signature is

Page 412

in the Part II section it says six--is that 12/04? Is that--
A. No. I do a seven with a line through it. That looks like a seven to me.
Q. Okay. So do you recall whether or not--
A. I believe. I think it is.
Q. All right. Do you recall whether or not you obtained this form on or around June 17, 2004?
A. I don't remember the exact date, but it was sometime in the middle--towards the end of June.
Q. And why did you download this particular form?
A. I wanted to see what SkyWest was releasing regarding my background records.
Q. So did you contact anyone at SkyWest to see if they had released any particular records?
A. No, I did not.
Q. This is what you downloaded and then eventually had prepared in order to respond to what? I mean, why would you want to know what SkyWest was releasing?
A. Well, because I--I don't--well, I

Page 413

wanted to see what they were releasing to someone else. I wanted--you know, you could release anything to me. I wanted to see exactly what was being--what someone else would be seeing to make sure that it was accurate.
Q. So to do that you then download this form and then--I think we talked about this before--you filled out the Part II section. Is that right?
A. That's correct.
Q. Did you fill that out prior to Part I being filled out?
A. I don't remember. I don't know. I think it was just filled--the whole form was filled out.
Q. And you testified before, I believe, that Tiffany Cotter is a friend of yours.
A. That's correct.
Q. And where does she reside?
A. Last I know, I think she was in Boston. I heard that she might have been or was in the process, perhaps, of moving overseas. But I'm not sure.
Q. When is the last time that you spoke to Ms. Cotter?

Page 414

A. I spoke to her in passing, maybe, as she was visiting in January.
Q. Of 2005?
A. Five. Five, yes.
Q. Did you tell her she was going to be subpoenaed for a deposition?
A. No, I didn't.
Q. Do you know whether or not she has any idea that she is--that SkyWest would like to depose her?
A. Yes, I do.
Q. And how do you know that?
A. I sent an e-mail to her.
Q. All right. Do you--what did you say in the e-mail?
A. I just gave her a heads-up of what might be happening. I did not know if the subpoena was being issued or not. This was after the last deposition.
Q. Tell me as best as you can exactly what you put in the e-mail.
A. I don't remember.
Q. Do you remember anything at all?
A. No.
Q. Did you tell her that she would be

subpoenaed?
A. I don't remember. I might have.
Q. Did she respond to your e-mail?
A. No.
Q. You got no response at all from her.
A. No.
Q. Did you tell her to avoid answering her door at her apartment?
A. In the e-mail?
Q. At any time.
A. Yes. I believe in the e-mail I said if you do not wish to be served, you don't have to answer your door.
Q. Did you tell her to instruct somebody at work not to accept or to avoid allowing her to be served at work?
A. I don't know anyone at her work. I don't know where she works.
Q. Why did you tell her to avoid--to not answer the door?
MR. STRINDBERG: Objection. Misstates his testimony.
THE WITNESS: Well, if she doesn't want to be involved, she doesn't have to. That's her decision.



BY MR. PETERSEN:
Q. So are you suggesting to her that she avoid being served with legal process?
A. If that's her decision.
Q. I know. But is that what you told her to do?
A. If she wanted to. It's her decision. I don't live there. I can't--you know--
Q. Why would you ask her if she didn't want to be served to avoid answering the door?
A. Why would I what?
Q. Why would you make a statement that you just told me? Why did you do that?
A. Like I said, if she doesn't want to be involved, that's her decision.
Q. Do you understand that by telling her to avoid answering the door, that's going to cause problems for a process server to give her a subpoena?
A. I don't know what the process does. I don't know.
Q. Well, wouldn't that be the case or--or else why would you say, If you don't want to be served, don't answer the door?
A. Well, I'm sure they could, you know,



figure a way to serve her. But that is what I've been told, if you don't answer the door you can't serve--be served.
Q. Were you told that by somebody that was not an attorney?
A. I don't know who told me that, but . . .
Q. Other than the e-mail that you sent to her, tell me what you talked about in January.
A. When I saw her?
Q. Yes.
A. I didn't talk to her. I said hello in passing.
Q. Was that after you sent the e-mail?
A. I don't recall.
Q. When do you--
A. I don't know the exact date that she was out here, when the e-mail was sent.
Q. Did you send the e-mail, do you recall, shortly after your last deposition?
A. That's correct. So I--when was that? I don't even remember when that was.
Q. What was the e-mail address that you used?
A. I don't recall. I don't know e-mail



address.
Q. Well, how did you obtain her e-mail address?
A. It's in my address book.
Q. Would you have any objections to producing it to us?
A. Her e-mail address?
Q. Yes.
A. I don't know what it is. You just type in Tiffany in the "To" box. And that's what it spits out.
Q. Right. So whatever that spits out, would you have any objection to producing that to us?
A. Her e-mail address?
Q. Yes.
A. I don't see why you can't get that from her. She owns the e-mail address.
Q. Just answer the question. Would you produce that to us so that we can contact her by e-mail?
MR. STRINDBERG: We'll discuss it, Counsel.
MR. PETERSEN: All right. I want to be able to serve her. And it seems to me that she's

Page 435

friend anymore.
Q. Does that have anything to do with this lawsuit?
A. Absolutely not.
Q. Have anything to do with SkyWest?
A. Absolutely not.
Q. How about her sending this PRIA request?
A. Absolutely not.
Q. All right. What did you tell her to do exactly?
A. I didn't tell her to do anything.
Q. Is she familiar with PRIA requests?
A. No. I asked her to submit this request.
Q. All right. Tell me how that went about. I want to know what you said.
A. I don't recall the exact conversation. Best of my recollection, I just simply said that there's a form we can send in that will get my background records. That's all.
Q. And what was her response?
A. She said, No problem.
Q. So then how did she got a copy of the form?

Page 436

A. There was a brief fax to her. I don't remember actually.
Q. Okay. This "Mail Records to," do you see that under Part I, underneath Tiffany Cotter's signature?
A. Right.
Q. It says, "ACS-Verification Department."
A. Yes.
Q. You wrote that in.
A. Yes.
Q. What does that mean?
A. It means absolutely nothing.
Q. So you just made that up.
A. Yes.
Q. What was the intent of putting "ACS-Verification Department"?
A. No rhyme or reason.
Q. Well, when SkyWest received this PRIA request what did you think they would think when they saw ACS-Verification Department?
A. I don't know what they would think. I'm not SkyWest. I don't know what they would think.
Q. Did you intend for them to think that this was an airline that was submitting this

Page 437

request?
A. I don't know what--a company, yes, a company submitting a request.
Q. An airline company.
A. Well, that's what these records pertain to.
Q. So you intended that when SkyWest received this PRIA request that they believed it would come from an airline--that was coming from an airline.
A. Well, that's the only kind of company that would be requesting airline background check, or records.
Q. Right. The answer's yes, right?
A. Right. Yes. It wouldn't be a grocery store, you know, calling to get my airman records.
Q. And then you have listed--
MR. STRINDBERG: You never can tell.
BY MR. PETERSEN:
Q. --an address, 510 East 3d Street.
A. Right.
Q. Where is that from?
A. I don't know. That's the address she gave me. I don't know if that's her work address, if that's where she lives. I have

Page 438

absolutely no idea, you know, what that address is. I don't know where she lives in Boston. I never visited her in Boston, so I don't know.
Q. Did you ask her for an address?
A. She gave it to me.
Q. So you filled this out while you were speaking to her over the phone.
A. I don't recall, actually, how it was--when--if I was talking to her at the time when this was filled out. I don't remember.
Q. All right. Then there's a fax number down there.
A. Yes.
Q. Tell me where that fax corresponds.
A. I have no idea where that fax numbers goes to. That's the fax number she provided me.
Q. Are you aware today that that's a fax that goes to Staples headquarters in Boston?
A. I have absolutely no idea.
Q. Are you aware that that address goes to the Staples headquarters in Boston?
A. I have absolutely no idea.
Q. Do you know whether or not Ms. Cotter works for Staples?
A. I know for a fact that she doesn't work

Page 455

Q. Go ahead. Answer the question, please.
MR. STRINDBERG: You don't have to answer.
MR. PETERSEN: He dang well--yes, he does have to answer the question.
THE WITNESS: I don't know why Tiffany would, you know--just so Tiffany knew what was being sent to them.
BY MR. PETERSEN:
Q. So she would know how to respond when an airline contacted her?
A. I don't know how she would respond. She's a smart girl. She's smarter than all of us.
Q. Does she know how to--does she know what's in the regulations governing PRIA request?
A. I believe she does.
Q. Where would she learn that information?
A. From the list that was page .2.
Q. That you gave her.
A. Yeah.
Q. For the purpose of . . .
A. I have no idea. I don't--actually, I don't know if she has it. I don't know if I faxed it to her.

Page 456

Q. All right. What's the current status of your employment with Polar Air?
A. I'm not employed by Polar Air.
Q. Do you have a copy of your application?
A. I do not have a copy of my application.
Q. Have you asked for one?
A. No.
Q. Did you obtain a copy of it?
A. I just answered that. I said I don't have a copy of my application.
Q. Do you have any information from Polar Air other than two voice mails?
A. I have some e-mails.
Q. From them?
A. Yes.
Q. Have they been produced?
A. Have they? I believe one was produced.
Q. Are there others?
A. There was a recent e-mail. I don't know if that was produced.
MR. STRINDBERG: I don't know. We'll certainly produce it if it's--
THE WITNESS: You have the first one, because in the first deposition he--you showed it.
MR. STRINDBERG: Right.

Page 457

BY MR. PETERSEN:
Q. Are there any e-mails or correspondence from Polar Air since your last deposition?
A. Yes. There's one e-mail.
Q. And what does say?
A. It says, "We will contact you when we have something available for you."
Q. There was a reference in a voice mail that your attorneys produced that purports to be from Polar Air indicating something about training.
A. Uh-huh (affirmative.)
Q. Were you scheduled to be--to go through training at Polar Air at some point?
A. I was offered a class, which I was unable to attend. They said they would put me in the next class.
Q. Why were you unable to attend?
A. I was currently undergoing a 737 type rating class. And the next training--the training date that Polar offered was right in the middle of that. And the second class was going to be soon after that. By the matter of--I was told, you know, within the week to two, three weeks.
Q. What's the 737 class you're talking

Page 458

about?
A. I was obtaining a type rating to add to my pilot's license to fly the 737.
Q. Is that something Polar Air flies?
A. No.
Q. And when somebody in your industry, based on your experience, is offered a training program, isn't that pretty much an indication that you've tentatively been offered a job?
A. Tentatively, yes.
Q. And it is subject to you satisfactorily performing your training. Isn't that right?
A. Probably a multiple of things. I know it's also--
Q. But that's one of the contingencies.
A. --pending, you know, the background check as well.
Q. But that's one of the contingencies, correct?
A. That's correct.
Q. And then you do have some background and some medical tests and things like that that you also have to go through, right?
A. I--no, I don't believe you have to go through medical tests. You already have a medical

Page 459

certificate.
Q. So as long as your medical certificate is in good standing, that fulfills that requirement.
A. I--I'm sure it does, yeah.
Q. And so you were scheduled by Polar Air to actually go through training because they intended to--
A. No, I was not scheduled.
Q. --offer you a job. You were not scheduled.
A. I was not scheduled. Who said I was scheduled?
Q. Well, the voice mail that I listened to suggested that there was training that had been scheduled for you.
A. The voice mail says, We'd like to invite you to a--whatever the date was--class.
Q. Okay. So why didn't you go?
A. I just told you why I didn't go. I was undergoing training for another program at the time. And they were going to put me in the next class. It happens all the time.
Q. Okay. So let's say that you had canceled your 737.

Page 460

A. I couldn't cancel. I was already in it.
Q. Well, let's say you just didn't show.
A. I was already in it.
Q. Can't you physically leave?
A. Why would I do that?
Q. So that you could secure a job with Polar Air by going through training?
A. I was going to do that at the next class.
Q. All right. But trust me on the hypothetical here. Let's say that you had left your training and gone to Polar Air. Would you have been able to go through training at the time they offered you?
A. What? That didn't make any sense.
Q. You said they were wanting to schedule you for training, correct?
A. They wanted to invite me to a class.
Q. All right. Did they tell you when the class was?
A. Yes. There was a date on the voice mail. I don't remember the exact date.
Q. Right. And let's say you had been free that time.

Page 461

A. Yes.
Q. Do you have anything that would indicate to you that you couldn't have attended training at that time?
A. If I was free, I would have attended.
Q. But nothing other than this other class you were taking precluded you from going to training.
A. No.
Q. Okay. And instead, you called Polar Air and told them you were not going to attend class at that time because you were already in this other training.
A. I called--no.
MR. STRINDBERG: Objection. Misstates his testimony.
THE WITNESS: I didn't say that. I called them and asked them--I had some obligations and if I was able to attend the next future class. They said that would be no problem.
BY MR. PETERSEN:
Q. Who flies 737s?
A. Southwest. It's a requirement for their airline.
Q. Have you had an interview with

Page 462

Southwest?
A. No, I haven't. You have to have the rating to be selected to interview.
Q. Have you had any interviews with anyone other than Polar Air--
A. No.
Q. --since your last deposition?
A. No.
Q. And then why were you not given a subsequent training time period for Polar Air?
A. I have absolutely no idea.
Q. So when you told them that you were not going to go for training, they did not offer you another training session.
A. Yes, they did offer me another training session. They didn't have a date scheduled yet for the other training session.
Q. All right.
A. That's why--
Q. Tell me when they offered it to you.
A. When I talked to them.
Q. The second--
A. Sorry.
Q. The second training session, they--you said they offered it to you.

been marked as Exhibit 49. Have you ever seen that document?
A. Yes, I've seen this document.
Q. It's a letter that was sent by your attorney to me sometime in October.
A. Uh-huh (affirmative.)
Q. Yes?
A. Yes.
Q. And the last sentence of the letter, do you see that?
A. Yes.
Q. It says, "For your information, Mr. Callaway did not go for 'training' because SkyWest never responded to the PRIA request."
A. Yeah.
Q. Is that true?
A. Seems likely. I don't know if that's the exact--you know, if that's the reason or not.
Q. It's not what you said earlier today, though, is it?
A. What did I say earlier today?
Q. I think we just covered that. You indicated that you didn't go for training because you were at 737 training, or 737 class, right?
A. Yes. And I was to be offered the next



training date.
Q. But the training that you did not attend had nothing to do with a PRIA request, in your understanding, correct?
MR. PETERSEN: Don't nod your head, please.
MR. STRINDBERG: He's not looking at me, Counsel.
MR. PETERSEN: Okay. Well, then I'd still appreciate it, then, if you didn't do that.
THE WITNESS: Say it again.
MR. PETERSEN: What was the question?
MR. STRINDBERG: And, Counsel, you're asking him about a letter that he didn't author. So you need to establish some background really if you're going to question him about it, such as, you know, did he review it before it went out, things like that. There's a lack of foundation.
MR. PETERSEN: I can ask those questions or I can do it in the order that I prefer. And what I'm asking is--well, I can't remember my question
(The following was read:
"Q But the training that you did not attend had nothing to do with a PRIA request, in



your understanding, correct?")
THE WITNESS: The training that I did not attend did not have anything to do with the PRIA request.
BY MR. PETERSEN:
Q. All right. I'll rephrase it.
A. Please.
Q. It's simple. You testified earlier that you did not go to training the first time it was offered to you because you were currently in a class to be certified for 737--
A. Yes.
Q. --flying.
A. Yes.
Q. That has nothing to do with a PRIA request, correct?
A. No.
Q. And so when you were going the second time for training, you indicated you had no idea why you had not been given a second training date. Isn't that what you said earlier today?
A. I have my suspicions, yes. But I don't--I've not been told specifically why I've not been, you know, selected. Like I said, I received e-mails saying--you know, giving me the



runaround, so . . .
Q. You received e-mails from Polar Air giving you the runaround.
A. I believe I'm getting the runaround, yes.
Q. All right. You testified earlier that you received one e-mail since--you've only received two e-mails from Polar Air entirely, correct?
A. That's right.
Q. One of which you've given us, and one that you have not.
A. Correct.
Q. All right. Are there any other communications that would lead you to conclude that there's a runaround, as you've said, going on?
A. No. That's it.
Q. So two e-mails.
A. Right.
Q. How about phone calls? You produced--your Counsel has produced two alleged voice mail messages from Polar Air.
A. Correct.
Q. Are there any other communications



T Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 479

other than those four?
A. No.
Q. And any phone calls or e-mails you have sent to them that you have not produced to us that you have copies of?
A. Well, I told you that last e-mail you don't have.
Q. That was from them to you, though, right?
A. Right.
Q. I'm talking about from you to them.
A. Well, it's--I sent them an e-mail asking when, you know, the next class is, what--you know, I forgot what exactly I asked. And they replied saying, We'll call you when we have something available for you.
Q. And it's your belief that they're giving you the runaround.
A. Yes. Because they're--from my knowledge, there have been classes and there are classes that have been, you know, conducted. And I have not been--you know, was not offered that class.
Q. What would your suspicions be, as you indicated?

Page 480

A. Well, the one--the PRIA request, if that--you know, if-- sent the background records back to them, they would have put me in service.
Q. Why do you have that understanding?
A. That's what I understand.
Q. Are you aware that a--an airline can put you in service pending the receipt of PRIA information?
A. Pending receipt? Yes. They can't put you in service until they have it.
Q. That's your--no. My question was, are you aware that an airline can put you into service pending receipt of PRIA information?
A. Well, that might be what the regulation says. But why would an airline spend tons of money training someone without completing a background check. And then if something were to come back in that background check that disqualified the individual, then they've wasted all that money. So I don't believe that. I don't know any company that does that.
Q. It's not your understanding that that happens on a regular basis.
A. I don't know what--you know, I don't believe it does, no.

Page 481

Q. Okay. Did you help Mr. Strindberg prepare this October 8 letter?
A. No.
Q. Do you have any idea why it says, "For your information, Mr. Callaway did not go for training"--quote/unquote--"because SkyWest never responded to the PRIA request"?
A. I have no idea. I didn't write that.
Q. Did you approve that?
A. I didn't see it.
Q. All right. Is that correct?
A. It's a belief. It's a possible belief.
Q. Whose belief?
A. Mine.
Q. And that belief has, as a factual basis, what?
A. It's what I believe.
Q. All right. I understand that. Tell me why you believe that. What facts do you have--
A. I just told you why I believe. An airline is not going to spend all the money training a pilot and then to be--you know, throw him out because the background check doesn't come back. That's why I believe that.
Q. You're assuming that if SkyWest didn't

Page 482

send a PRIA response to Polar Air, that's why you have been given the runaround by Polar Air.
A. I believe the runaround from Polar Air is because you guys called them.
Q. That's why you believe it is.
A. I'm sure--you know, I'm trying to lay very low with Polar Air. And when you guys called them up, start asking questions, you know, trying to subpoena them and all that other garbage you were trying to do, yes.
Q. Do you know why they were called?
A. No. I don't know why you guys do half the stuff you do.
Q. Just answer the questions.
A. I don't.
Q. All right. You don't have an understanding that it was because we had received the false PRIA request that we called Polar Air to confirm receipt of a PRIA response.
A. No. Because when this was faxed in June, or whenever it was faxed to you, you had no idea that I interviewed at Polar Air.
Q. Okay.
A. And this letter's dated October 8.
MR. PETERSEN: All right. Mr.

# Exhibit E

Page 21

A. Got my license in '65, so 30, 31 years.
Q. More than that. 39.
A. Yeah.
Q. How did you get your job -- your first job at SkyWest?
A. I knew -- the vice president of Operations used to work for me before SkyWest, and so he encouraged me to come to work here.
Q. That was Brad Holt?
A. No. Earl Snow.
Q. Does Brad Holt now have the position that Earl Snow held at the time?
A. Yes.
Q. When did Earl Snow leave or step down, whatever?
A. Say about 12 years ago.
Q. Has Brad Holt been the VP of Operations since then?
A. Yes.
Q. Have you ever met Andy Callaway?
A. Yes.
Q. When was the first time?
A. I don't recall.
MR. PETERSEN: Just housekeeping. How [illegible]e do you plan on going? It's quarter after five.

Page 22

MR. STRINDBERG: We can stop now.
(The deposition adjourned at 5:17 p.m.)
* * * * *
(Continuation of the deposition of James Breeze on Tuesday, November 30, 2004, at 9:05 a.m.)
BY MR. STRINDBERG:
Q. Mr. Breeze, you understand you're still under oath?
A. Yes.
Q. I'd asked you when you first met Andy Callaway.
A. I don't recall.
Q. What do you mean by that? You don't recall the date --
A. I don't recall the date.
Q. What do you recall about that first meeting?
A. I just don't -- the only thing that comes [illegible] mind is when I had meetings with he and Brad Holt. I don't -- I very well possibly met him casually in Salt Lake. I don't recall.
Q. So you remember a meeting with you and Brad Holt?

Page 23

A. On two occasions.
Q. Where was the first meeting?
A. In St. George, corporate offices.
Q. Who was involved in the meeting?
A. Brad Holt and myself and Andy.
Q. Had you asked Andy to come down to St. George?
A. I don't think I asked him directly. I think I asked Kelvin to have him come down.
Q. Why did you ask Kelvin to have Andy come down to St. George?
A. There had been complaints about Andy's abrasiveness with crew scheduling. We wanted to have him come down and have a visit with him. This isn't how we treat each other in this company.
Q. What time of year was that meeting?
A. I don't recall.
Q. What was discussed at that meeting?
A. Just his -- his contact with crew scheduling, and there had been several complaints from the crew schedulers on calls. The whole gamut from whining, complaining, disagreeing. And it was just unacceptable, and he was told so.
Q. Pardon?
A. And he was told that, to not do it again.

Page 24

He was put on notice.
Q. What did Andy say in that meeting?
A. He just nodded, and as I recall, you know, said, Okay. I didn't think I came across like that. And just I don't recall that conversation. It wasn't recorded.
Q. Did you take notes?
A. No.
Q. Did Brad take notes?
A. I don't know. You'd have to ask him.
Q. Was he in the room with you?
A. Yes.
Q. Did you see him taking notes?
A. I don't recall.
Q. Was it in Brad's office?
A. Yes.
Q. Who -- from whom had you received the complaints?
A. From Anita Spencer.
Q. What position does Anita Spencer --
A. She's director of crew scheduling. There might have been casual conversation with some of the individual schedulers. It was -- it was an important event that were transpiring.
Q. What was important event?