FILED
[illegible] P 5:33
U.S. [illegible] COURT
DISTRICT OF UTAH

Todd C. Emerson, A8175
SkyWest Airlines, Inc.
444 S. River Road
St. George, UT 84790
Telephone: (435) 634-3530

Scott M. Petersen, A7599
David N. Kelley, A9137
FABIAN & CLENDENIN,
A Professional Corporation
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah 84151
Telephone: (801) 531-8900

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ANDREW DAVID CALLAWAY<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST AIRLINES INC., a Utah Corporation,<br><br>Defendant. | **MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 2:04CV00179<br><br>Judge Ted Stewart |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant SkyWest Airlines hereby submits its Memorandum Supporting its Motion for Summary Judgment.

## INTRODUCTION

This case involves plaintiff's claims of wrongful termination in violation of the Railway Labor Act ("RLA") and public policy, breach of an alleged implied employment contract, and

violations of federal wiretapping laws. Plaintiff David Andrew Callaway claims he was wrongfully terminated as a pilot for Defendant SkyWest Airlines, Inc. ("SkyWest"). However, his termination was based upon his violation of company policy as well as his arrogant, disrespectful and abusive behavior toward SkyWest management and other employees. His termination did not violate the law in any way.

## STATEMENT OF MATERIAL FACTS

SkyWest sets forth the following facts as undisputed for the purposes of its Motion for Summary Judgment.

1. Mr. Callaway applied for a job as an airline pilot with SkyWest in 1996. (Deposition of David Andrew Callaway at 27, attached as Exhibit "A," hereafter "Callaway Dep.").

2. SkyWest interviewed Mr. Callaway for the position in January of 1998. (Callaway Dep. at 28).

3. As part of the hiring process, Mr. Callaway was scheduled for pilot training in February 1998, but failed to attend. (Callaway Dep. at 31 & 41).

4. Five months later, in July of 1998, Mr. Callaway sent a letter to SkyWest requesting that he be allowed another opportunity to attend training. *Id.* at 37. A copy of Callaway's July 1998 letter is attached hereto as Exhibit "B".

5. Those who received his request were of the opinion not to hire Callaway; however, Jim Breeze, SkyWest's Systems Chief Pilot,[1] made the decision to give Callaway

[1] For convenience of the Court and the parties, attached hereto as Exhibit "C" is an organizational chart demonstrating the line of authority from Brad Holt to Jim Breeze to Kelvin Hyatt to Mr. Callaway.

another chance. (Deposition of Jim Breeze at 23, attached as Exhibit "D," hereafter "Breeze Dep.").

6. Accordingly, after receiving a response letter from SkyWest, Mr. Callaway submitted a new application for employment, was scheduled for and attended training, and began working for SkyWest as a pilot on January 13, 1999. (See Complaint at ¶ 6; *see also* Callaway Dep. at 41).

7. Mr. Callaway was hired by SkyWest as an "at-will" employee, meaning that he could be fired with or without cause and with or without notice. (Callaway Dep. at 286-87 & 336). The deposition testimony proceeded as follows:

Q. Do you have an understanding as to whether – at the time you were hired you could quit at any time?
**A. Yes.**
Q. You could, right?
**A. You could quit, yes.**
Q. And you didn't have to give notice to the company, you just quit.
**A. I believe two weeks' notice was requested.**
Q. Do you know whether it was required?
**A. I don't recall.**
Q. Do you have an understanding as to whether the company could terminate you at any time?
**A. Yes.**
Q. And that understanding is that they could?
**A. Yes.**
Q. With or without notice?
**A. Yes.**
Q. And with or without cause?
**A. Yes.**

(Callaway Dep. at 286-87).

Q. Now, yesterday you testified that you were aware that the handbook has language saying that your employment with SkyWest is at-will, correct?
**A. Yes.**
Q. And that you could quit at any time with any—for any reason, right?
**A. Yes.**

Q. You also testified yesterday that, for example, if a pilot tests positive for alcohol or drug use, that they are terminated automatically without any procedures. Is that right?

**A. I would assume so, yes.**

(Callaway Dep. at 336).

8. SkyWest's Employee Handbook states, "Employment with SkyWest is voluntarily entered into and the employee is free to resign at-will at any time, with or without cause or notice. Similarly, the employer may terminate the employment relationship at will at any time, with or without cause or notice." (Employee Handbook at 9; attached hereto as Exhibit "E").

9. The Employee Handbook further states in reference to SkyWest's general disciplinary actions: "Any of the above steps may or may not be used when dealing with disciplinary problems. Every case will be considered individually and reviewed based on employment history, attitude, and severity of incident. The use of published disciplinary procedures does not change an employee's at-will status or in any way restrict the Company's right to terminate such an employee." (Employee Handbook at 18).

10. SkyWest's Company Policy Manual, Standard Practice 56 states, "SkyWest Airlines promotes a productive work environment and does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment." (Policy Manual, Standard Practice 56, relevant portions of the Policy Manual are attached as Exhibit "F"). The Policy Manual further states, "Employees are expected to maintain a productive work environment <u>free of harassment</u>." (Exhibit "F") (emphasis added).

11. SkyWest's Policy Manual, Standard Practice 306(30) states, "Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and/or within any other work related circumstances." (Exhibit "F").

**<u>Abuse of Schedulers</u>**

12. On or about December 7, 2000, Kelvin Hyatt, a Chief Pilot at SkyWest, and Mr. Callaway's immediate supervisor, was informed by Anita Spencer, the Director of Crew Scheduling, that Mr. Callaway had mistreated certain SkyWest crew schedulers under her supervision. (Deposition of Kelvin Hyatt at 132-133, attached as Exhibit "G," hereafter "Hyatt Dep.").

13. Ms. Spencer informed Mr. Hyatt that Mr. Callaway was verbally harassing her crew schedulers over an "open time" issue. According to Ms. Spencer, Mr. Callaway wanted a particular flight that he was not entitled to according to company policy. (Hyatt Dep. at 132-133; *see also* Handwritten note from Nicki McDonald attached hereto as Exhibit "H"). "There had been several complaints from the crew schedulers on calls. The whole gamut from whining, complaining, disagreeing. And it was just unacceptable, and he was told so." (Breeze Dep. at 23).

14. Given the complaint, Mr. Hyatt arranged for a meeting with Mr. Callaway. The meeting also included Mr. Hyatt's superior, Jim Breeze (System Chief Pilot), and Mr. Breeze's superior, Brad Holt (Vice President of Flight Operations). The meeting was set for December 11, 2000. (Callaway Dep. at 50-51; Breeze Dep. at 23).

15. During the meeting, Mr. Callaway was confronted with the complaints about his behavior toward the crew schedulers. (Callaway Dep. at 72).

**Derogatory Remarks About SkyWest**

16. Also, during the December 2000 meeting, SkyWest questioned Mr. Callaway about comments he made on the SkyWest Airline Pilots Association ("SAPA") website regarding SkyWest and SkyWest management. (*See* Callaway Dep. at 50-51).

17. The SAPA website is an independent website that is not sponsored by SkyWest, but which is maintained and used by SkyWest pilots to discuss work and work-related issues. (Callaway Dep. at 50-51).

18. Regarding the statements that are posted on this site, Mr. Callaway testified, "You know, anybody can, you know, print this stuff out, send it down to St. George. They could gain access to the message boards if they had a, you know, friend that was, let's say, anti-union, decided to give their password to management." (Callaway Dep. at 349-50).

19. When asked whether Mr. Callaway knew if somebody printed out the website postings and gave them to somebody in SkyWest management he testified, "I don't know." (Callaway Dep. at 350).

20. Mr. Callaway testified that he suspected that pilots print postings from the website, fax them in to SkyWest management, and post hardcopies of them on bulletin boards. Mr. Callaway believes it is primarily the anti-union pilots that do this. (Callaway Dep. at 87).

**Problems With Neighbors**

21. In October 2001, Customer Service Relations received a phone call from a Mr. Brandt, who indicated he was the owner and landlord of property neighboring Mr. Callaway's residence in Salt Lake City. Mr. Brandt indicated that his tenants had complained to him about loud parties, unbearable noise, and property damage from Mr. Callaway. SkyWest

was also informed that neighbors stated they had seen drugs being used at Mr. Callaway's house. The neighbors knew Mr. Callaway was a SkyWest pilot and Mr. Brandt wanted SkyWest to do something about the problem. (Callaway Dep. at 93-94, 98; Deposition of Jacque Nielsen at 111-112, attached hereto as Exhibit "I," hereafter "Nielsen Dep.").

22. Jacque Nielsen, from SkyWest Human Resources, called Mr. Brandt who indicated that he wanted SkyWest to stop the parties and drug use. Mr. Brandt also suggested that Ms. Nielsen call Kim Guess, an employee of the Salt Lake City Police Department. (Nielsen Dep. at 111).

23. Ms. Nielsen called Ms. Guess, who told Ms. Nielsen about the repeated complaints from Mr. Callaway's neighbors. (Nielsen Dep. at 111).

24. Mr. Hyatt contacted Mr. Callaway about the complaints. Mr. Callaway told Mr. Hyatt that he had sued both the neighbor and city for harassment and defamation of character. (Callaway Dep. at 100; Nielsen Dep. at 115-116).

25. Mr. Brandt again called SkyWest and informed it that Mr. Callaway had another party on Saturday, November 10 from 4:00 p.m. until 4:00 a.m. SkyWest was also informed that the police had been called to Mr. Callaway's house again. (David Andrew Callaway – Review Board document attached hereto as Exhibit "J").

**<u>More Attitude Problems</u>**

26. Sometime prior to November 2001, Mr. Callaway was required to attend classroom instruction and testing related to SkyWest's regional jets. (Deposition of Kelly Dixon at 13-14, and 24-25, attached hereto as Exhibit "U", hereafter "Dixon Dep.").

27. During the course of his classroom instruction, Mr. Callaway exhibited a "poor

display of attitude" toward the instructor, Kelly Dixon. (Dixon Dep. at 22-23).

28. Specifically, after having taken a required test, when Mr. Dixon was reviewing the test, Mr. Callaway;

> Unlike I'd ever seen before, and different from any other student in any other class I'd ever had, Andy decides to stand up, walk over to the wall, walk up the side of the classroom, walk across the front of the classroom in front of all my students, takes the test, throws it down on the podium and says, 'I don't need to go over my test.' At that point, I thought to myself, 'Who does this guy think he is?'

(Dixon Dep. at 25).

29. In November, Mr. Dixon prepared a written summary of the occurrence and submitted to SkyWest. (Dixon Dep. at 16-17; a copy of the written summary is attached hereto as Exhibit "V").

**<u>Altercation with Montana Airport Security</u>**

30. On or about November 13, 2001, SkyWest received complaints from the airport in Butte, Montana stating that Mr. Callaway had exhibited inappropriate behavior toward agents, and security personnel. (Callaway Dep. at 113-114).

31. Mr. Hyatt also received word that three SkyWest agents witnessed Mr. Callaway's behavior. (A copy of the Customer Service Irregularity Form is attached hereto as Exhibit "K"; Hyatt Dep. at 152-153).

32. Shortly thereafter, Mr. Callaway met with Brad Holt, Bill Boice, Tony Thompson, Kelvin Hyatt, Dave Faddis, and Mike Eisenstat because of Mr. Callaway's behavior at the Butte station. (Callaway Dep. at 112-113, 117).

33. Mr. Callaway was given a counseling statement citing his "extremely inappropriate behavior" and was placed on administrative leave for three weeks without pay.

(Callaway Dep. at 114-116. A copy of the November 30, 2001 Counseling Statement is attached hereto as Exhibit "L").

34. Mr. Callaway requested and was provided a review board regarding the counseling statement. The review board upheld the counseling statement but removed the word "extremely" from the statement regarding Mr. Callaway's inappropriate behavior. (Callaway Dep. at 122-123).

**Problems with Scheduling**

35. On March 26, 2002, Mr. Callaway was given a Scheduled Assignment Deviation ("SAD") for telling crew scheduling that he did not want to be placed on a multiple day trip because he was recovering from a cold. (Callaway Dep. at 186-187).

36. On or about June 30, 2003, Mr. Callaway received another SAD for his failure to respond to calls from crew scheduling while he was on reserve. (Hyatt Dep. at 100; Callaway Dep. at 189). Mr. Callaway failed to return calls to crew support who attempted to give him an assignment. Mr. Callaway should have let SkyWest know that he was not available because he is paid by SkyWest while on reserve. (Hyatt Dep. at 101). Mr. Callaway accepted responsibility for the SAD. (Callaway Dep. at 189-190; a copy of Callaway's Statement Regarding SAD June 2003 is attached hereto as Exhibit "M").

**Improper Use of SkyWest Email to Harass Co-Employee**

37. On August 12, 2003, Mr. Hyatt was approached by Kristen Wiley, a flight attendant working at SkyWest, who broke down crying while speaking to Mr. Hyatt. Ms. Wiley said she had received threatening emails from Mr. Callaway through her SkyWest email account concerning money Mr. Callaway claimed she owed him. (Hyatt Dep. at 80-81; and see

Deposition of Kristin Wiley at 61, 65, 92, & 96-97, attached hereto as Exhibit "N," hereafter "Wiley Dep." ).

38. Apparently, Mr. Callaway had invited Ms. Wiley to go to Spain with Mr. Callaway and some friends in September 2002. (Wiley Dep. at 38).

39. Ms. Wiley believed that because she was to take the place of another girl whom Mr. Callaway had already paid for, she would not have to pay for the trip. (Wiley Dep. at 28).

40. In approximately November 2002, Mr. Callaway began to ask Ms. Wiley to reimburse him for her costs of the trip. (Wiley Dep. at 35).

41. By the summer of 2003, Mr. Callaway began sending Ms. Wiley emails, through the SkyWest network, demanding that she pay him the money. (Wiley Dep. at 39-40).

42. One of the emails sent by Mr. Callaway stated, "Come on, Kristen. I'm tired of this. I need my money now or I'll get it the hard way. Thanks. Andy." (Wiley Dep. at 90).

43. Ms. Wiley thought Mr. Callaway meant he would do something physically to her to recover the money. (Wiley Dep. at 90).

44. Ms. Wiley did not feel safe about going to work. She felt she had to avoid Mr. Callaway. Ms. Wiley was also afraid to read her email messages. (Hyatt Dep. at 81-82; Wiley Dep. at 61).

45. Ms. Wiley told Mr. Hyatt what was happening and asked him, "can you help me take care of it, get it to stop?" (Wiley Dep. at 62).

46. The stress and anxiety of her dealings with Mr. Callaway caused Ms. Wiley to seek medical treatment. She began taking Xanax as a result of the stress from Mr. Callaway's behavior. (Wiley Dep. at 23).

47. In fact, Ms. Wiley eventually stopped working for approximately two months due to her stress. (Hyatt Dep. at 96, Nielsen Dep. at 45-46; Wiley Dep. at 71-72).

48. As part of his investigation into Ms. Wiley's claims, Mr. Hyatt sent an email to Mr. Callaway asking him to address his treatment of Ms. Wiley. Mr. Callaway responded that it was none of SkyWest's business. (Callaway Dep. at 214-25; Nielsen Dep. at 47; A copy of Mr. Callaway's response email is attached hereto as Exhibit "O").

49. Mr. Callaway testified that he believes he was terminated because of the response email he wrote to Mr. Hyatt. (Callaway Dep. at 223).

**More Derogatory Remarks About SkyWest**

50. Also during September 2003, Mr. Hyatt received a call from Denver Asst. Chief Pilot Don Watkins. Mr. Watkins informed Mr. Hyatt that he overheard Mr. Callaway say many negative things about SkyWest and its management. (Hyatt Dep. at 179-180).

51. Mr. Hyatt asked Mr. Watkins for a write-up of what he heard. (Hyatt Dep. at 180). Mr. Watkins complied. A copy of the write-up is attached hereto as Exhibit "P".

**Termination**

52. After all of these reported instances, Mr. Callaway was terminated on October 1, 2003, "due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees." (Callaway Dep. at 234). A copy of the termination notice is attached hereto as Exhibit "Q".

53. Mr. Callaway requested a Review Board Hearing on or about October 3, 2003, claiming that he believed his termination was unfair. (Callaway Dep. at 274).

54. Mr. Callaway's review board request was approved and he was provided with a

hearing on October 24, 2003. During the hearing, Mr. Callaway addressed allegations, facts, and evidence, and was provided the opportunity to introduce his own evidence. A copy of the Review Board Summation is attached hereto as Exhibit "R". At no time during his hearing did Mr. Callaway complain that he had been disciplined for any union activity.

55. The Review Board upheld Mr. Callaway's termination but decided to give Mr. Callaway the option of resigning and being made eligible for rehire. Mr. Callaway refused this offer, opting instead for termination. (Callaway Dep. at 268-269).

56. While Mr. Callaway claims that he has some evidence that Jim Breeze wanted him fired, he cannot identify what that evidence is. Moreover, he has no evidence to suggest that Breeze's alleged desire to terminate Mr. Callaway had anything to do with Mr. Callaway's union activity. (Callaway Dep. at 240-245). Mr. Callaway testified as follows:

Q. So help me understand your theory as to why they fired you.
A. I'm not quite sure. Again, I think a lot can attribute it back to Jim Breeze.
...
Q. So you believe that the review board and those involved – by that, I mean Mr. Hyatt and Mr. Holt ultimately as the VP – that they were being coerced in – or that they were being influenced into doing something that had an ulterior motive by Jim Breeze.
A. Yes, It's possible, yes.
Q. And the factual basis for that belief is what? Is it just a belief theory you have, or do you have evidence?
A. Well, Mr. Hyatt testified that he – Jim Breeze ever regretted hiring me. And he also testified that he did not recommend my termination.
...
Q. But the theory you've proposed is that it's Jim Breeze who is the one who set you up for termination.
A. Yes.
Q. And the factual basis for that is Mr. Hyatt suggesting that he initially did not want you terminated.
A. Mr. Hyatt did not –
Q. Right.
A. --testified that he did not recommend termination.
Q. And that's one of the factual bases for you believing that it was Jim Breeze that

was trying to get you fired.
A. It certainly points that direction.
Q. So is the answer yes?
A. Yes.
Q. And what else? What other facts?
A. Well, the facts that's several correspondence in here from Jim Breeze, e-mails requesting and soliciting documents against me that have been backdated by one to two years.

(Callaway Dep. at 240-245).

57. Mr. Callaway testified that he was fired because of the response email he wrote to Mr. Hyatt regarding his treatment of Ms. Wiley. (Callaway Dep. at 23). Mr. Callaway stated the following:

Q. Why do you think you were terminated?
A. Well, I believe I was terminated because of this e-mail.

(Callaway Dep. at 223).

58. SkyWest had a policy whereby upon an adverse employment action, employees could request a review board comprised of management and co-workers, including fellow pilots. This was not an absolute right, but was up to the discretion of SkyWest management. (Nielsen Dep. at 88-89; Callaway Dep. at 336; Employee Handbook at 18).

59. John Wangensteen, a pilot for SkyWest who has worked for SkyWest for approximately fourteen years was asked to be a member of Mr. Callaway's final review board. (Deposition of John Wangensteen at 30, attached hereto as Exhibit "S", hereafter "Wangensteen Dep.").

60. Mr. Wangensteen was a member of the SkyWest Airline Pilots Association ("SAPA"). (Wangensteen Dep. at 12).

61. Robert Donahoe is also a member of SAPA and was asked to participate in the

review board. (Deposition of Robert Donahoe at 28-29, attached hereto as Exhibit "T", hereafter "Donahoe Dep.").

62. During Mr. Callaway's presentation to the review board, he never told the board that he thought he had been terminated because he was a union organizer. (Wangensteen Dep. at 85; Donahoe Dep. at 65-67).

63. In fact, Mr. Callaway's direct supervisor, Kelvin Hyatt, did not even know that Mr. Callaway was involved in any union organizing. (Hyatt Dep. at 175).

## ARGUMENT

### I. SUMMARY JUDGMENT IS APPROPRIATE.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287, 1291 (10th Cir. 1999). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Richmond v. ONEOK, Inc,* 120 F.3d 205, 208 (10th Cir. 1997).

SkyWest is entitled to summary judgment because Mr. Callaway, after taking twelve depositions and requesting thousands of pages of records, has failed to produce any evidence in support of his theories. In fact, his extensive discovery has only verified, through undisputed fact, that SkyWest's decision to terminate Mr. Callaway's employment was proper and did not violate any laws.

Mr. Callaway's allegation that SkyWest violated the Wire Communication and Interception of Oral Communication Act (the "Wiretap Act") comes too late as the statute of limitations has run. Even if the claim were not time bared, the web site at issue is a public forum and Mr. Callaway has no evidence that an "intercept" took place under the act.

Mr. Callaway's claim for wrongful termination in violation of public policy fails because (1) he does not identify a clear and substantial public policy that has been violated, (2) his alleged conduct does not, as a matter of law, implicate any such public policy, and (3) his

termination was not caused by any alleged exercise of his alleged public policy rights.

Next, Mr. Callaway's claim for breach of an implied contract fails as he admits he was an "at-will" employee, and even if he were not, SkyWest did not commit any breach. SkyWest policy clearly states that its system of progressive discipline is not and may not be construed as an implied contract and that management has the right to terminate any employee, at any time, without cause.

Finally, Mr. Callaway's Railway Labor Act claim fails because (1) SkyWest had no knowledge of his alleged union organizing activities, (2) SkyWest did not "harbor animus" toward Mr. Callaway's union activities, (3) it did not terminate Mr. Callaway due to his union activities, and (4) Mr. Callaway's termination was motivated by lawful causes: his arrogant, disrespectful and abusive behavior toward fellow employees. Accordingly, summary judgment in favor of SkyWest on all of Mr. Callaway's claims is appropriate.

## II. MR. CALLAWAY'S CLAIM FOR VIOLATION OF THE WIRETAP ACT FAILS AS A MATTER OF LAW.

Mr. Callaway claims that SkyWest violated the Wiretap Act by accessing the SkyWest Airline Pilots Association ("SAPA") website in which Mr. Callaway allegedly made pro-union statements. There are multiple problems with this claim. Primarily, there is no evidence that SkyWest ever accessed or attempted to access the SAPA web site. This site is essentially a forum for SkyWest pilots to share news and discuss employment related issues.

As Mr. Callaway testified, "anybody can, you know, print this stuff out, send it down to St. George. They could gain access to the message boards if they had a, you know, friend that was, let's say, anti-union, decided to give their password to management." (Callaway Dep., at 349-50). When asked whether Mr. Callaway knew if somebody printed out the web site postings

and gave them to somebody in management he testified, "I don't know." (Callaway Dep., at 350). In short, there is no evidence to support Mr. Callaway's claim that SkyWest accessed the SAPA website. On this basis alone, the Wiretap claim fails.

Beyond his unsupported allegations, Mr. Callaway's wiretap claim fails on the further grounds that; (1) the statute of limitations has run, (2) SkyWest never intercepted an electronic communication as defined by the Wiretap Act, and (3) the website was a public forum accessed by hundreds of pilots with varying opinions as to whether the SkyWest pilots should seek to create a union.

### A. The Two-Year Statute of Limitations Bars Mr. Callaway's Claim for Violation of the Wiretap Act.

The Wiretap Act allows "any person whose wire, oral, or electronic communication is intercepted, disclosed or intentionally used in violation of this chapter in a civil action [to] recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a). "A civil action under this section may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e).

Mr. Callaway testified that during his December 2000 meeting with Kelvin Hyatt, Jim Breeze and Brad Holt, he was questioned about comments he made on the SAPA site. (*See* Callaway Dep. at 50-51). If true, Mr. Callaway had more than "a reasonable opportunity to discover the violation;" he had *knowledge* that SkyWest had allegedly obtained a copy of Mr. Callaway's postings on the SAPA web site at least as early as December 2000. This started the running of the two-year statute of limitations. Pursuant to 18 U.S.C. § 2520(e), Mr. Callaway had until December 2002 to file this particular claim. Mr. Callaway did not file this claim,

however, until February 18, 2004, over a year after the statute of limitations had run. Summary judgment on this point is required by the statute of limitations.

### B. Mr. Callaway has no Evidence that an "Intercept" Took Place, as Defined in the Wiretap Act.

Mr. Callaway's Wiretap Act claim also fails because he cannot establish that SkyWest "intercepted" the alleged electronic communications. "Intercept" is defined in the Wiretap Act as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Even if Mr. Callaway had some evidence that a member of SkyWest management accessed the SAPA website, it is not a violation of the Wiretap Act for an employer or its agent to access information that is "stored" electronically. The act of inputting a password and accessing stored information does not constitute an "interception" of an electronic communication. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002) (holding that airline employer did not "intercept" airline pilot's postings on secure website that were critical of employer in violation of Wiretap Act because employer's agent accessed postings some time after pilot actually "transmitted" them); *United States v. Smith*, 155 F.3d 1051, 1055 (9th Cir. 1998) (defining "intercept" narrowly in context of electronic communications to mean receipt of transmission while it was being made or sent); *Steve Jackson Games, Inc. v. United States Secret Serv.*, 36 F.3d 457, 460 (5th Cir. 1994) (holding that government's acquisition of email messages stored on electronic bulletin board system, but not yet retrieved by intended recipients, was not "interception" in violation of Wiretap Act).

The *Konop* case is instructive. In *Konop*, the plaintiff, a pilot, set up a website for other airline employees to view and post messages, including pilot posted messages that were critical

of their employer, Hawaiian Airlines. *Konop*, 302 F.3d 872. The plaintiff attempted to get his fellow employees to consider an alternative to their existing union, the Air Line Pilots Association. *Id.* He controlled access to the website by setting up a user name and password system and created a list of eligible viewers, which were mostly pilots. *Id.* The vice president of Hawaiian Airlines heard about the postings and asked one of the pilots if he could borrow the pilot's name and password which he used to access the site. *Id.* The vice president then contacted the union chairman, who contacted the plaintiff and told him that Hawaiian management was aware of the postings. *Id.* The vice president had logged in under the informer pilot's username and password over twenty times. *Id.* The plaintiff then filed suit under the Wiretap Act. *Id.* The Ninth Circuit held that accessing stored information was not an "interception" under the Wiretap Act. *Id.*

Here, Mr. Callaway's testimony is that SkyWest obtained information from the SAPA website when someone with access printed off Mr. Callaway's postings and gave them to SkyWest Management. Obtaining information in this fashion, however, does not constitute an "intercept" as that term is defined by the statute.

### C. A Party to the Communication Gave Permission for the Intercept.

Finally, Mr. Callaway's Wiretap claim is improper for the additional reason that a party with proper access to the communication provided print-outs of Mr. Callaway's postings to SkyWest. The Wiretap Act states:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2510(4) (emphasis added).

Again, Mr. Callaway has never alleged that a real-time intercept occurred. Rather, Mr. Callaway testified that he believed the information was likely printed from the website by one of the pilots with permission to access the website and then given to SkyWest management. If it is not a violation for SkyWest to intercept a live communication if a party to that communication gives consent, then it cannot be a violation if the party later shares the stored information with SkyWest. In other words, a party with prior consent properly accessed the site and then, for his or her own reasons, printed the information and submitted it in hardcopy to SkyWest. Under these facts, § 2510(4) is applicable and no violation occurred.

Mr. Callaway's claim that SkyWest violated the Wiretap Act fails on both the law and the facts and should be dismissed on summary judgment.

## III. MR. CALLAWAY CANNOT ESTABLISH A CASE OF WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY.

Mr. Callaway next claims that he was terminated by SkyWest in violation of Utah public policy. In order to establish a prima facie case, Mr. Callaway must show: "(1) [his] employment was terminated; (2) a clear and substantial public policy existed; (3) [his] conduct implicated that clear and substantial public policy; and (4) the termination and conduct in furtherance of public policy are causally connected." *Rackley v. Fairview Care Ctrs., Inc.*, 23 P.3d 1022, 1026 (Utah 2001). As a matter of law, Mr. Callaway cannot establish elements (2) through (4).

### A. Mr. Callaway Fails to Identify a Clear and Substantial Public Policy.

The second element of a prima facie case requires Mr. Callaway to identify a public policy that is both "clear" and "substantial." *Id.* at 1026-27. The "public policy exception may be invoked only sparingly in circumstances where the cause of an employee's discharge

implicates a public policy of such clarity and substance to impose on the employer a legal duty independent of contract rights inherent in the at-will doctrine." *Hansen v. America Online, Inc.* 96 P.3d 950, 955 (Utah 2004). In addition to the general rule that the employer-employee relationship is presumed to be at-will (*see Fox v. MCI Communications, Corp.*, 931 P.2d 857, 859 (Utah 1997)), it should be noted that *both* Mr. Callaway and SkyWest have testified that the employment relationship was at-will. The Utah Supreme Court has set forth four categories of public policies eligible for consideration under the exception. These are:

> (i) refusing to commit an illegal or wrongful act, such as refusing to violate the antitrust laws; (ii) performing a public obligation, such as accepting jury duty; (iii) exercising a legal right or privilege, such as filing a workers' compensation claim; or (iv) reporting to a public authority criminal activity of the employer.

*Hansen,* 96 P.3d at 952.

### 1. Mr. Callaway fails to identify a legitimate "public policy."

In the present case, Mr. Callaway has indicated that the public policy that was violated by his termination was his right to collect a debt. (Amended Compl., ¶¶ 51-54). Specifically, in his Amended Complaint, he alleges, "Article I § 11 of the Constitution of Utah specifically provides that 'no person shall be barred from prosecuting or defending before any tribunal in this State … any civil cause to which he is a party.'" (*See* Amended Complaint, ¶ 51). This is the provision that allegedly provides his "public policy."

Claiming that one has a right to go to court does not implicate any relevant public policy, let alone one in favor of collecting a personal debt on company time and premises. Nothing precluded Mr. Callaway from collecting his own personal debt on his own time pursuant to law. What he was not entitled to do is collect his debt on SkyWest's time, at SkyWest's place of business, and using SkyWest's equipment. Having failed to identify a relevant public policy,

this claim fails.

### 2. Mr. Callaway's alleged public policy is neither "clear" nor "substantial."

Mr. Callaway also fails to show that the alleged public policy is "clear" or "substantial" as required to state a prima facie case. "[N]ot every employment termination that has the effect of violating some public policy is actionable." *Fox v. MCI Communs. Corp.*, 931 P.2d 857, 860 (Utah 1997). Rather, the Utah Supreme Court has explained: "A public policy is 'clear' if it is plainly defined by one of three sources: (1) legislative enactments, (2) constitutional standards, or (3) judicial decisions." *Rackley*, 23 P.3d at 1027. As noted above, Mr. Callaway's alleged public policy is not "clear" because neither the Utah Constitution nor any statute or judicial standard authorizes him to collect a personal debt at work.

To determine the "substantial" requirement of Utah law, the Court must determine (1) "whether the policy in question is one of overarching importance to the public, as opposed to the parties only," and (2) "whether the public interest is so strong and the policy so clear and weighty that [the Court] should place the policy beyond the reach of contract . . . ." *Id.* "Statutes that simply regulate conduct between private individuals or impose requirements whose fulfillment does not implicate fundamental public policy concerns are not sufficient to require an exception to the at-will presumption." *Id.* Mr. Callaway's claim does not approach this high burden. If anything, public policy would be furthered by precluding employees from trying to collect personal debts at work. Such behavior is facially disruptive, negatively affects employee morale, and costs the employer money in lost productivity.

*Hansen v. America Online, Inc.,* 96 P.3d 950 (Utah 2004), is instructive. In *Hansen,* plaintiffs were terminated for bringing firearms onto the property of the employer. Those

plaintiffs claimed that the right to bear arms, as set forth in Article I § 6 of the Utah Constitution, as well as legislative enactment (*see* Utah Code Ann. § 63-98-102), constituted a clear and substantial public policy for purposes of wrongful termination.

The Utah Supreme Court disagreed. After a detailed analysis of the balance between the constitutional and statutory provisions and Utah's at-will law the Court determined that the constitutional and statutory provisions did not constitute a clear and substantial public policy such that they altered the at-will doctrine. The Court affirmed the district court's motion for summary judgment against the plaintiffs. *Hansen,* 96 P.3d at 952.

Like Mr. Callaway, the plaintiffs in *Hansen* claimed they were terminated for exercising a right specifically provided to them in the Utah Constitution. In addition, the *Hansen* plaintiffs were able to cite to legislative enactments bolstering their right to behave as they did. Nevertheless, the *Hansen* court ruled that the plaintiffs were not protected from termination despite the supporting constitutional and legislative provisions because they did not rise to the level of a clear and substantial public policy.

This case is even less favorable for Mr. Callaway than the losing plaintiffs in *Hansen.* Article I § 11 of the Utah Constitution does not give Mr. Callaway any right to harass a coworker for money using company property and Mr. Callaway cites no legislative enactments at all to support his claim. To the contrary, debt collection is heavily regulated by both state and federal law to eliminate intrusions in the workplace and to curtail threatening and menacing acts by creditors toward the debtor. Simply put, Mr. Callaway's behavior at work does not implicate any public policy at all, let alone one that is clear and substantial. Mr. Callaway's attempt to collect a personal debt from a coworker while at work is a far cry from "those shared expectations and

standards of conduct which have acquired both widespread and deeply held allegiance among the citizenry generally." *Id.* at 953.

### 3. Mr. Callaway's conduct does not implicate any clear and substantial public policy.

The third element of a prima facie case requires Mr. Callaway to show that his conduct "implicated that clear and substantial public policy." *Rackley*, 23 P.3d at 1026. As the *Hansen* court explained: "An employer owes a duty to an employee, independent of any duty imposed by the contract of employment, not to exploit the employment relationship by demanding that an employee *choose* between continued employment and *violating a law or failing to perform a public obligation of clear and substantial public import.*" *Id.* at 952 (emphasis added). "Implicating" the public policy exception requires Mr. Callaway to show that SkyWest forced him to make such a choice. The undisputed facts, however, provide no basis for this cause of action. In fact, Mr. Callaway was not required to "choose" between anything. Absent a "Hobson's choice," Mr. Callaway cannot as a matter of law, invoke the public policy exception to the at-will doctrine.

Instead, as explained in detail above, there is no evidence to suggest that Mr. Callaway's termination implicated Article I § 11 of the Utah Constitution at all. Mr. Callaway was terminated for his improper workplace behavior and poor attitude toward other SkyWest employees, not because he was seeking access to Utah's courts. Thus, his conduct did not implicate any clear and substantial public policy.

### 4. Mr. Callaway cannot show that exercising his public policy rights was the cause of his termination.

The final element of his wrongful termination claim requires Mr. Callaway to show that

his discharge and the conduct bringing the policy into play are causally connected. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998). Because Mr. Callaway does not allege that SkyWest denied him access to the courts, it is hard to see how the public policy and the termination are related.

Even assuming Mr. Callaway has discovered a heretofore unknown public policy right to collect a personal debt at work under Article I § 11 of the Utah Constitution, he still fails to meet a prima facie case *because he was not fired for trying to collect a debt.* Rather, he was fired as a result of a long pattern of unprofessional and abusive behavior exhibited to people both inside and outside of SkyWest. His inappropriate behavior culminated in the repeated use of SkyWest's email system to coerce money from Ms. Wiley allegedly for her lodging expenses incurred while traveling with Mr. Callaway in Spain. When she refused to pay, he threatened to "get it the hard way." His threats drove Ms. Wiley to Kelvin Hyatt, Mr. Callaway's Chief Pilot, to whom Ms. Wiley complained of harassment in the workplace.

SkyWest does not tolerate this type of behavior among its employees. Indeed, Mr. Callaway exposed SkyWest to the only real threat of legal exposure in this matter: a workplace harassment claim from Ms. Wiley. Already on probation for an altercation with airport security in Montana, Mr. Callaway knew that his behavior was at issue, and that any further violation of company policy may result in termination. (Exhibit "L"). This knowledge did not prevent him from violating SkyWest Standard Practice 56 which forbids verbal or physical conduct that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment; or from violating Standard Practice 306(2)(B)(30) which forbids crewmembers from threatening, coercing, intimidating or assaulting others on Company

property or within any other work related circumstances. Finally, Standard Practice 306(2)(B)(34) forbids employees from entangling SkyWest in their private financial matters. Mr. Callaway ignored all these rules entirely.

All the evidence produced in this matter clearly shows that Mr. Callaway was terminated, in substantial part, for violating these three policies – none of which prevented him from legally and lawfully collecting his debt by way of the court system. Thus, Mr. Callaway fails to establish a prima facie case of wrongful termination in violation of public policy.

## IV. MR. CALLAWAY WAS AN "AT-WILL" EMPLOYEE, THEREFORE HIS CLAIM FOR BREACH OF AN IMPLIED CONTRACT FAILS AS A MATTER OF LAW.

### A. SkyWest's Policies Regarding Review Boards Did Nothing To Change Mr. Callaway's Status as an "At-Will" Employee.

Mr. Callaway was an "at-will" employee with no promised duration of employment; therefore his claim for breach of an implied contract fails as a matter of law. "Utah's employment law presumes that all employment relationships entered into for an indefinite period of time are at-will, where the employer or the employee may terminate the employment for any reason (or no reason) except where prohibited by law." *Hansen,* 96 P.3d at 952. Beyond this legal presumption, both parties have admitted that the relationship was at-will. (Callaway Dep. at 286-87 & 336)

In order to overcome the "at-will" presumption, Mr. Callaway is required to submit evidence that "must be strong enough to overcome the presumption of at-will employment and any inconsistent written policies and disclaimers." *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 333 (Utah 1992). As the Utah Supreme Court noted in *Hodgson,* "this court has never held that an employer's conduct and oral disclosures alone created an implied-in-fact contract of

employment." *Id.* To the contrary, where an employee handbook clearly indicates that an employee is "at-will", the plaintiff's burden to overcome this presumption is that much greater. "[T]his court has held that when an employee handbook contains a clear and conspicuous disclaimer of contractual liability, any other agreement terms must be construed in light of the disclaimer." *Id.*

Mr. Callaway has no evidence sufficient to rebut the statements contained in the Employee Handbook[2], which clearly indicates that Mr. Callaway's employment is "at-will." (Callaway Dep. at 336). Furthermore, Mr. Callaway admits in his Complaint that according to SkyWest, all employees are "at-will" and could be fired for any or no reason whatsoever. (*See* Complaint, ¶ 56). Finally, in his deposition Mr. Callaway admitted that he was an "at-will" employee and that he could have been terminated at any time with or without cause. His testimony went as follows:

Q. Do you have an understanding as to whether – at the time you were hired you could quit at any time?
A. Yes.
Q. You could, right?
A. You could quit, yes.
Q. And you didn't have to give notice to the company, you just quit.
A. I believe two weeks' notice was requested.
Q. Do you know whether it was required?
A. I don't recall.
Q. Do you have an understanding as to whether the company could terminate you at any time?
A. Yes.
Q. And that understanding is that they could?
A. Yes.
Q. With or without notice?
A. Yes.
Q. And with or without cause?
A. Yes.

---

[2] (*See* Employee Handbook at 9 and 18, Exhibit "E").

(Callaway Dep. at 286-87).

Q. Now, yesterday you testified that you were aware that the handbook has language saying that your employment with SkyWest is at-will, correct?
A. Yes.
Q. And that you could quit at any time with any—for any reason, right?
A. Yes.
Q. You also testified yesterday that, for example, if a pilot tests positive for alcohol or drug use, that they are terminated automatically without any procedures. Is that right?
A. I would assume so, yes.

(Callaway Dep. at 336). Mr. Callaway knew and understood that his employment with SkyWest was "at-will" and that the existence of a progressive discipline system did not create an implied contract. Accordingly, as a matter of law and undisputed fact, his claim for breach of an implied contract fails.

**B. SkyWest Followed Its Review Board Policy With Respect to Mr. Callaway.**

Mr. Callaway claims SkyWest failed to provide Mr. Callaway with the appropriate procedures he was entitled to before being terminated. (Amended Compl., ¶¶ 56-65). This is flatly confusing, considering the fact that he received all of the disciplinary procedures set forth in the SkyWest Policy Manual. While SkyWest had no obligation to provide Mr. Callaway with a review board, it nevertheless granted his request for one. As shown by Mr. Callaway's testimony, SkyWest had a policy whereby upon termination, employees could request a Review Board comprised of management and pilots. However, the policy did not provide employees with an absolute right to a Review Board; rather, the issue was left to the discretion of SkyWest management. (Nielsen Dep. at 88-89; Callaway Dep., at 336.). Once again, neither the law nor the facts support this claim.

Mr. Callaway next claims SkyWest could terminate him only "for cause." (Amended

Compl., ¶ 57). Mr. Callaway provides no specific definition for this phrase. Nonetheless, the Utah Court of Appeals recently held that "for cause" means "an objective good faith reason supported by facts reasonably believed to be true by the employer." *Uintah Basin Med. Center v. Hardy*, 110 P.3d 168, 175 (Utah Ct. App. 2005). Here, as indicated in detail above, SkyWest had an objective good faith reason to terminate Mr. Callaway.

Mr. Callaway had a history of inappropriate behavior that culminated in his harassment and intimidation of a coworker in an effort to collect money from her. Mr. Callaway tries to respond to this history by painting a conspiracy of sorts in which he, in essence, claims that nothing is as it appears. Yet, his conspiracy is simply speculation and has no factual support. Moreover, the several events at issue involve many different people from different departments at SkyWest and even some who are not SkyWest employees at all. They constitute the facts that SkyWest had before it and form a reasonable basis for SkyWest's decision. Thus, even if Mr. Callaway could establish that he was not at-will (and he cannot), his breach of contract claim still fails because SkyWest simply did not breach any alleged implied contract.

## V. THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR SKYWEST ON MR. CALLAWAY'S RAILWAY LABOR ACT CLAIM.

The Railway Labor Act ("RLA") prohibits "interference, influence, or coercion by either party over the designation of representatives by the other." 45 U.S.C. § 152 (Third) (1951). It also states that "it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining . . . ." *Id.*, § 152 (Fourth). The "burden-shifting method employed in unlawful discharge claims brought under the National Labor Relations Act (NLRA) [also] applies to claims brought under the

RLA." *Lebow v. Am. Trans Air*, 86 F.3d 661, 665 (7th Cir. 1996).

Under this analytical framework, "the employee bears the burden of 'proving by a preponderance of evidence that ... [his] protected conduct was a substantial or motivating factor in [his] discharge.'" *Id.* at 666 (quoting *ALPA v. E. Airlines, Inc.*, 863 F.2d 891, 902 (D.C. Cir. 1988)). "If the employee does so, 'the burden shifts to the employer to prove by a preponderance of the evidence that the employee would have been fired anyway for a valid reason.'" *Lebow*, 86 F.3d at 666 (quoting *Union-Tribune Publ'g Co. v. NLRB,* 1 F.3d 486, 490 (7th Cir.1993)). Thus, to establish a prima facie case, Mr. Callaway must demonstrate all of the following: (1) he was engaged in activity protected by the RLA; (2) the defendant was aware of that activity; (3) the defendant harbored animus toward the protected activity; and (4) the animus was a causal factor in Callaway's termination. *Lebow*, 86 F.3d at 666; *Beckett v. Atlas Air, Inc.*, 968 F. Supp. 814, 817 (E.D.N.Y. 1997). After extensive discovery, Mr. Callaway has found no evidence that would establish elements (2) through (4). Therefore, he fails to establish a prima facie case and his claim fails as a matter of law.

### A. SkyWest Did Not Know Mr. Callaway was a Union Organizer.

Mr. Callaway claims he was terminated for posting pro-union statements on the SAPA website in 2000. (Amended Compl., ¶¶ 18-26). However, as explained above in relation to Mr. Callaway's Wiretap claim, there is no evidence that SkyWest was aware of these alleged pro-union statements or that SkyWest ever accessed the SAPA site to obtain them. It is significant that Mr. Callaway cannot produce a copy of what he claims he posted in 2000, and when asked whether someone printed off his pro-union statements and gave them to SkyWest, he responded: "I don't know." (Callaway Dep. at 350). There is simply no support for the second prong of his

RLA claim.

**B. SkyWest Did Not Harbor Animus Toward Mr. Callaway's Activities.**

Mr. Callaway has no evidence that SkyWest "harbored animus" toward his union-organizing activities. Although he points to SkyWest's union free statement, declarations about the company's desire to remain union free do not constitute "animus." *Webco Indus., Inc. v. N.L.R.B.*, 217 F.3d 1306, 1317 (10th Cir. 2000). It is only when an employer's statement "carries with it the seed of a threat . . . that the statement becomes coercive and unlawful." *Id.* (internal quotations omitted).

Here, there is no evidence that SkyWest's general union free statement was personally threatening to Mr. Callaway or that SkyWest threatened Callaway with termination or any other adverse employment action due to his union organizing. To the contrary, Mr. Callaway's superiors did not know that he was a union organizer until after he filed suit. Moreover, Mr. Callaway's claim that his Internet postings in December 2000 somehow caused SkyWest to terminate him nearly three years later in October 2003 is simply unreasonable. As a matter of law, Mr. Callaway's termination is too remote in time to his alleged postings to be actionable. The evidence shows that Mr. Callaway's alleged union activity and his termination were simply not related.

In *General Electric Co. v. NLRB,* 627 F.3d 117 (D.C. Cir. 1997), the court held that because the employee at issue had been fired nearly two years after his alleged union activity, and ten months after giving testimony against his employer during administrative hearings, the activity and the firing "did not follow the election or proceedings so closely as to be remotely suspect." Thus, for the *General Electric* court, neither two-years, nor even ten months was

sufficiently close in time to establish a nexus between the union activity and the firing.

Similarly, the Fourth Circuit held that two years between union organizing activity and termination is too remote to support a claim under the National Labor Relations Act. *See Goldtex, Inc. v. NLRB,* 14 F.3d 1008 (4th Cir. 1994). In *Goldtex,* the evidence suggesting that the employer knew of the employee's pro-union attitude was a 1990 statement wherein he told a supervisor of his pro-union position. *Id.* The termination occurred in 1992. *Id.* The court stated, "[i]t is difficult to imagine, however, that [the employer] would seize upon that statement nearly two years later to lay off an employee who was never close to vocal in his support for unionization." *Id.* at 1011.

As in *General Electric* and *Goldtex,* here, the alleged union activity that Mr. Callaway claims SkyWest knew about was his December 2000 SAPA website postings and the subsequent meeting with Mr. Holt, and Mr. Breeze. Mr. Callaway claims that at that time, SkyWest management questioned him about comments he made on the SAPA web site regarding SkyWest and SkyWest management. (*See* Callaway Dep. at 50-51). Yet, where Mr. Callaway's termination did not occur until nearly three years later, there is no reasonable nexus between his alleged pro-union postings and Mr. Callaway's termination. Thus, Mr. Callaway fails to show animus.

### C. Mr. Callaway Has No Evidence That His Termination Was a Result of His Union Organizing Activities.

To establish the fourth element of a prima facie case under the RLA Mr. Callaway must show that he was terminated because of SkyWest's animus toward Mr. Callaway's union activity. There is simply no evidence that Mr. Callaway's union activity (i.e., his three year old SAPA website postings) had anything to do with SkyWest's decision to terminate him. In fact,

Mr. Callaway's own deposition testimony belies this claim.

As explained above, in his deposition, Mr. Callaway testified that he believed he was fired because of the response email he wrote to his superior Kelvin Hyatt regarding Mr. Callaway's treatment of Ms. Wiley. The deposition testimony is as follows:

Q. Why do you think you were terminated?
A. Well, I believe I was terminated because of this e-mail.

(Callaway Dep. at 223). Later in his deposition, Mr. Callaway testified that he did not know why he was fired.

Q. So help me understand your theory as to why they fired you.
A. I'm not quite sure. Again, I think a lot can attribute it back to Jim Breeze.
. . .
Q. So you believe that the review board and those involved – by that, I mean Mr. Hyatt and Mr. Holt ultimately as the VP – that they were being coerced in – or that they were being influenced into doing something that had an ulterior motive by Jim Breeze.
A. Yes, It's possible, yes.
Q. And the factual basis for that belief is what? Is it just a belief theory you have, or do you have evidence?
A. Well, Mr. Hyatt testified that he – Jim Breeze ever regretted hiring me. And he also testified that he did not recommend my termination.
. . .
Q. But the theory you've proposed is that it's Jim Breeze who is the one who set you up for termination.
A. Yes.
Q. And the factual basis for that is Mr. Hyatt suggesting that he initially did not want you terminated.
A. Mr. Hyatt did not –
Q. Right.
A. --testified that he did not recommend termination.
Q. And that's one of the factual bases for you believing that it was Jim Breeze that was trying to get you fired.
A. It certainly points that direction.
Q. So is the answer yes?
A. Yes.
Q. And what else? What other facts?
A. Well, the facts that's several correspondence in here from Jim Breeze, e-mails requesting and soliciting documents against me that have been backdated by one

to two years.

(Callaway Dep. at 240-245). Mr. Callaway may claim that Jim Breeze wanted him fired, but he cannot support that claim with any actual, admissible evidence. Moreover, even if he could show that Mr. Breeze wanted him fired, there is no evidence that Mr. Breeze's alleged desire to terminate Mr. Callaway was motivated by Mr. Callaway's union organizing activity, or SkyWest animus toward such activity. Therefore, Mr. Callaway's RLA claim fails.

### D. Mr. Callaway's Termination Was A Result of His Arrogant, Disrespectful and Abusive Attitude.

Mr. Callaway fails to establish three of the four elements of a prima facie case under the RLA. The evidence shows that Mr. Callaway was terminated because of his arrogant, disrespectful and abusive behavior. Thus, even if Mr. Callaway could establish a prima facie case under the RLA, the undisputed evidence shows that Mr. Callaway would have been fired anyway, and his claim therefore fails nonetheless. *See N.L.R.B. v. Interstate Builders, Inc.*, 351 F.3d 1020, 1027 (10th Cir. 2003) (applying test under NLRA); *Lebow*, 86 F.3d at 666. As set forth in the review board statement, Mr. Callaway was terminated due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees.

Mr. Callaway was counseled on multiple occasions regarding his arrogant, disrespectful and abusive attitude and had numerous opportunities to change his behavior. He was counseled by Mr. Hyatt regarding his abusive treatment of the crew schedulers. After refusing to change the way he treated crew schedulers, Mr. Callaway was called to St. George to speak with Mr. Holt regarding his disrespectful and abusive behavior. SkyWest also received calls and letters from Mr. Callaway's neighbors in Salt Lake City regarding loud parties at Mr. Callaway's home. Shortly thereafter a ground instructor complained that Mr. Callaway was rude and insubordinate

in class. SkyWest also received reports that Mr. Callaway instigated an altercation with airport security personnel in Butte, Montana, less than two months after the events of September 11, 2001.

Finally, Mr. Callaway violated company policy when he used the SkyWest intranet to harass and ultimately threaten a SkyWest flight attendant, Ms. Wiley, in an attempt to collect money from her. SkyWest's Company Policy Manual clearly prohibits such conduct. The manual states, "SkyWest Airlines promotes a productive work environment and does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment." (Policy Manual, Standard 56, Exhibit "F"). The Policy Manual further states, "Employees are expected to maintain a productive work environment free of harassment." (Policy Manual, Standard 56, Exhibit "F"). Finally, the Policy Manual, Standard Practice 306(30), states, "Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and/or within any other work related circumstances." (Exhibit "F"). Mr. Callaway violated all of these policies. In fact, the threatened flight attendant, Ms. Wiley, was so distressed by Mr. Callaway's communications over the SkyWest email system that her doctor placed her on medication and advised her to take a leave of absence from SkyWest.

Mr. Callaway had a history of personal problems for which he was disciplined on several occasions. It was only after repeated violations of policy and procedure, as well as the abusive and disrespectful attitude shown by Mr. Callaway, that SkyWest terminated his employment. He then requested, and received, an employee review board where his case was re-heard by three fellow pilots and a maintenance manager. At no time during his review board or his presentation

during that process did he claim the true motivation for his termination was anti-union animus. The employee panel upheld SkyWest's decision to sever the employment relationship and the members of the panel later testified under oath that their decision was based on Mr. Callaway's dreadful professional behavior and repeated policy violations. All evidence produced in this matter underlines the fact that Mr. Callaway's alleged union activity had nothing to do with SkyWest's decision.

## CONCLUSION

For the foregoing reasons, the Court should grant SkyWest's Motion for Summary Judgment and dismiss all of Callaway's claims with prejudice and upon the merits.

DATED this 6th day of June, 2005.

Scott M. Petersen
David N. Kelley
FABIAN & CLENDENIN,
a Professional Corporation
Attorneys for Defendant SkyWest Airlines

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing **MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT** to be mailed, postage prepaid, this 6th day of June, 2005, to the following:

Erik Strindberg, Esq.
Lauren I. Scholnick, Esq.
Ralph Chamness, Esq.
STRINDBERG SCHOLNICK & CHAMNESS, LLC
44 Exchange Place, 2nd Floor
Salt Lake City, UT 84111

Susanne Judd