# Exhibit "A"

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY (VOL. I)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT: The Law Offices of Fabian & Clendenin, 215 South State Street, Suite 1200, Salt Lake City, Utah

DATE: Wednesday, December 8, 2004

TIME: 9:16 a.m.

REPORTED BY: Scott M. Knight, RPR



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City | Washington, DC | New York | Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

www.thackerco.com

Page 21

Q. Have you ever been?
A. No.
Q. What are the names of your parents?
A. David and Sarah.
Q. Are they both living?
A. Yes.
Q. Are they married to each other?
A. Not to each other, no.
Q. All right. Tell me where David lives.
A. He lives in New York and Florida.
Q. Does he have a phone number?
A. He does.
Q. What's the phone number?
A. 561-833-2628.
Q. And is that a Florida or a New York number?
A. That's Florida.
Q. And how about Sarah?
A. It's 423-282-4095.
Q. Where does Sarah live?
A. Tennessee.
Q. Do you have brothers and sisters?
A. I do. One brother.
Q. What's his name?
A. Christopher.

Page 22

Q. Where does he live?
A. Park City, Utah.
Q. Is he older or younger than you?
A. Older.
Q. Does he have a number?
A. Yes. 435-649-2431.
Q. He's your only sibling.
A. Yes.
Q. I'm waiting for documents to get here, which should be here any second.
Tell me--you said you were--you began to apply at SkyWest, I think you said in 1998. Is that right?
A. I applied in 1997.
Q. And we'll see, I think, in a second here, but--
A. Actually, it might have been prior to that that I--my first application. I don't remember now.
Q. I'll show it to you here in a second.
MR. PETERSEN: In fact, let's take a two-minute break while I find out where my documents are.
THE VIDEOGRAPHER: We're going off the record. Time is 9:32 a.m.

Page 23

(Recess taken, 9:32-9:40 a.m.)
THE VIDEOGRAPHER: We're back on the record. Time is 9:40 a.m.
BY MR. PETERSEN:
Q. Mr. Callaway, you realize you're still under oath.
A. Yes.
Q. All right. I'm going to show you--
MR. STRINDBERG: So, Counsel, we're not following in the same order. Is that correct?
MR. PETERSEN: Well, I debated that. And then I figured that what we would do is you would have your exhibits based on those that you depose, which I'm assuming would go in order, then I'd have my own stack, because my stack's going to be fairly hefty. I debated doing letters and was dissuaded by the court reporter that letters isn't as nice as numbers, so . . .
MR. STRINDBERG: I would prefer that we just continued numbering from where we were.
MR. EMERSON: What you're saying actually makes sense. Do you see what I'm saying?
MR. PETERSEN: Yeah.

Page 24

MR. EMERSON: Just keep going.
MR. PETERSEN: What are you on? Thirty-three?
MR. EMERSON: Let's go off the record for a second.
THE VIDEOGRAPHER: We're going off the record. Time is 9:41 a.m.
(Recess taken 9:41-9:43 a.m.)
THE VIDEOGRAPHER: We're back on the record. Time is 9:43 a.m.
BY MR. PETERSEN:
Q. All right. Mr. Callaway, we're still under oath, right?
A. Yes.
Q. Okay. I want to--
MR. STRINDBERG: The oath doesn't wear off after a minute or two.
MR. PETERSEN: It may in your world, but it doesn't in mine.
MR. STRINDBERG: Okay. I think Mr. Callaway's aware that he's under oath. You don't have to keep repeating that.
MR. PETERSEN: Sixty-three through sixty-eight.
Exhibit-33 marked

Page 25

BY MR. PETERSEN:
Q. Mr. Callaway, I'm showing you what's been marked as Exhibit 33. Do you recognize that document?
A. Yes.
Q. Tell me what it is.
A. It's an application for employment.
Q. Is that the one--
MR. STRINDBERG: Take a moment to look through it to make sure it is your complete application.
BY MR. PETERSEN:
Q. Look at what's been Bates numbered SW067. You see there are Bates numbers at the bottom right corners of the documents, Mr. Callaway. Do you see those?
A. This right here, yes.
Q. I'm going to refer to those to help us figure out which pages we're talking about on various exhibits.
A. Okay.
Q. Look at No. 68. Do you see that?
A. Yes.
Q. Is that your signature down at the bottom?

Page 26

A. Yes.
Q. There's a date there. What's that date?
A. July 30, 1998.
Q. Now, having--have you had a chance to review this document?
A. Not right now, no.
Q. Take a second to look at it, then.
There's a paper clip for you if you want to put it together, or I mean--yeah. Are you reading the important section of the last page, Mr. Callaway?
A. I'm reading the last page.
Q. All right. Well, I'll--just to let you know, I'm not going to ask you any specific questions on the details of that. What I want to know is if you recognize this as your application for employment with SkyWest in '98.
A. Yes, I recognize this as one of them.
Q. All right. You filled this out.
A. Yes, I did.
Q. And that's your signature.
A. Yes, it is.
Q. This is what you submitted to SkyWest seeking employment in--on or about August of '98,

Page 27

August 5, the one that shows "Received" at the top. Is that about when you think they got it?
A. Yes.
Q. All right. Were you hired based on this document or based on this application?
A. I was not.
Q. Do you know why not?
A. I had applied earlier. My first application was what I was offered the position for.
Q. All right.
Exhibit-34 marked
BY MR. PETERSEN:
Q. All right. Hold on to that, Mr. Callaway. And I'm going to show you what's been marked as Exhibit 34. Would you look at that document? That's SW69 through 74. That's your first application. Is that right?
A. That's correct. Excuse me. That's correct.
Q. If you look at No. 74, is that your signature at the bottom?
A. Yes, it is.
Q. And the date, what's the date?
A. July 29, 1996.

Page 28

Q. So you applied at SkyWest in 1996.
A. That's correct.
Q. Were you hired in '96?
A. No.
Q. Do you know why not?
A. I was not interviewed until 1998.
Q. You submitted an application and then just never heard back.
A. That's correct.
Q. All right. And you're not sure why--nobody ever told you why your application in '96 was not selected for an interview?
A. To the best of my knowledge, I don't know if the--what the hiring situation was in 1996.
Q. Okay. So then looking at Exhibit 33--
A. Uh-huh (affirmative.)
Q. --were you given an interview shortly after that application was submitted in 1998?
A. No.
Q. In fact, you submitted several letters requesting an interview. Isn't that right?
A. I don't remember that.
Q. Do you remember sending a letter by Mike Jones at Jet Sales and Services to Mr. Jim



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 29

Breeze that was a letter of recommendation?
A. Yes.
Q. And you also had another one sent by a Scott Jacox--from Alpine Air--
A. Yes.
Q. --to Mr. Overbaugh. Do you remember that?
A. Yes. These were letters included in the application, I believe.
Q. Okay. So that I understand it, what you've got is an application that you get--you fill it out, you submit it, and you attached a couple of letters of recommendation.
A. That's correct.
Q. You eventually were given an interview, right?
A. Yes.
Q. Do you know who told you you were approved for an interview?
A. I received a letter--and I don't remember who it was from--inviting me to interview.
Q. And so, did you go interview?
A. Yes, I did.
Q. Who did you interview with?

Page 30

A. There was several individuals the day of the interview.
Q. Do you remember any of them?
A. I believe Lorraine Cauldwall was one.
Q. All right.
A. And I believe Dan Ence was another. And those are the only ones I remember that day.
Q. Did they tell you they'd get back with you?
A. Yes.
Q. And did they?
A. Yes.
Q. Tell me who contacted you thereafter.
A. I received another letter selecting me for employment. I'm not sure who though. I believe maybe Kim Ence wrote that letter.
Q. Was there any condition to your employment that you recall in the letter that was sent to you?
A. I don't recall.
Q. Nothing that said, for example, you needed to have a medical certification or anything like that? Does that ring a bell?
A. I don't recall.
Q. Were you asked to attend some training

Page 31

at that point?
A. Yes. Yes, it was--
Q. Tell me what that's all about.
A. Invited me to a class in early 1998. January, I believe--January or February of 1998.
Q. All right. And did you attend?
A. I did not attend.
Q. Why not?
A. I was informed that my father had cancer. And I was unable to attend.
Q. How were you informed that your father had cancer?
A. My father called me.
Q. What did he say?
A. He was going in the hospital for cancer--for surgery.
Q. Was this after or before you were selected for employment?
A. This was after selected for employment.
Q. And what did you do at that point?
A. I made the decision to take care of my family obligations, notified SkyWest I was unable to attend the training.
Q. What kind of cancer did your father have?

Page 32

A. Thyroid cancer.
Q. Where was he at at the time?
A. He was in surgery in New York.
Q. Do you recall the hospital?
A. I don't.
Q. And you attended to family matters meaning you went to be by his side.
A. Yes.
Q. Is that in a nutshell? Were your parents divorced at the time?
A. Yes.
Q. Did your brother go as well?
A. At the time, my brother was not living out here.
Q. Where was he at?
A. He was back East. Or no. Excuse me. Where was he? I believe he was in Tennessee at the time.
Q. And nonetheless, you made the decision that you would go be with your father.
A. That's correct.
Q. What kind of treatment was your father to receive? Do you recall?
A. He underwent surgery to remove the cancer and then followed by radiation surgery.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 41

too, but you can set that aside for a minute.
All right. Looking at Exhibit 35, the first bullet point says, "No-showed to ground school on February 2, 1998." That's the first time when you went to be with your father.
A. That's correct.
Q. Does that seem right?
A. Yes.
Q. And then after that, it says, "After numerous letters from Andy and a new application, Andy was allowed to come to training in January of 1999." Is it true that you went in for training the second time in January of '99?
A. Yes.
Q. And it's also accurate, isn't it, that after the no-show for ground school, the--you sent several letters requesting that you be reconsidered based on your father's illness.
A. That's correct.
Q. And then you had a discussion with Jim Breeze at that time. And he said, "Submit a new application."
A. That's correct.
Q. And you did that, and you were selected.

Page 42

A. That's correct.
Q. All right. So those two bullet points are accurate, correct?
A. Yes.
Q. All right. The third one says, "In June 2000 Andy was summoned to headquarters to meet with Brad Holt and Jim Breeze because of comments made on the company Web site." Were you summoned in June 2000 to headquarters to meet with Brad Holt and Jim Breeze?
A. No.
Q. Where are headquarters?
A. St George, Utah.
Q. Do you recall ever being summoned to headquarters?
A. Yes.
Q. And you're saying it didn't happen in June of 2000.
A. That's correct.
Q. All right. Tell me when the first time you were summoned to headquarters?
A. I believe it was December of 2000.
Q. All right. And you were asked to meet with Brad Holt and Jim Breeze.
A. That's correct.

Page 43

Q. And were you asked to meet with them because of some comments that were made on a company Web site?
A. At the time, I was not told why I was meeting with them. It was--
Q. When you were summoned, you were not told why.
A. Right.
Q. All right. When you got there were you told that you had made comments on a company Web site that were inappropriate?
A. That's correct.
Q. And that was with Brad Holt and Jim Breeze.
A. Yes. And Chris Abell.
Q. Now, when you were working at SkyWest--who was your immediate supervisor in December of 2000?
A. That would have been Kelvin.
Q. Kelvin Hyatt?
A. Hyatt.
Q. Sorry. I pronounced that wrong.
And so when you went--who was it that asked you to go in in December of 2000?
A. Brad Holt phoned me at home and said he

Page 44

wanted to see me in St. George.
Q. Did you say "Why"?
A. I did.
Q. And what did he tell you?
A. He said, We'll talk about it when you come down. He also mentioned if I was talking about his house.
Q. So did that indicate to you why he was concerned?
A. I could--I did not know what he was talking about.
Q. All right. Tell me as best you can recall exactly how the conversation went.
MR. STRINDBERG: What conversation?
MR. PETERSEN: The one he said he just had with Mr. Holt on the telephone.
THE WITNESS: Yes. He called and asked if I had been talking about his house.
BY MR. PETERSEN:
Q. Did he say to whom?
A. No.
Q. Did he say in what context?
A. No.
Q. He just said, Have you been talking about my house?

Page 49

A. Yes.
Q. --and said, I have a meeting with Kelvin--or with Brad Holt on Monday. Will you be there?
A. To the best of my recollection, yes.
Q. And did Mr. Abell tell you, Why are you being summoned?
A. He did not know either.
Q. So you said, I don't know why I'm being summoned, to Mr. Abell.
A. That's what I said, yes.
Q. You guys didn't talk about what you thought it might be about.
A. Well, that was mentioned, but he didn't understand it either.
Q. All right. So when you show up--whose office are you in?
A. Brad Holt's office.
Q. Tell me what happens in that meeting.
A. The meeting started off with--I was presented a calculator, asked to add up some numbers and read those numbers back out. Those numbers then--he referred to those numbers as, This is how many time you pilots call down to crew scheduling and we have a complaint from a

Page 50

crew scheduler.
Q. What was the complaint?
A. I was not given any documentation about the complaint.
Q. You weren't told, though, what the complaint was in crew schedule.
A. There was a complaint, I believe, that the--they said that I--that's when I was told that I had made a comment about Mr. Holt's house.
Q. Did you--did they tell you who at crew scheduling said you made the comment?
A. No, they did not.
Q. Was there a reference to comments made on a company Web site?
A. Yes, there was.
Q. Tell me what that was about.
A. I was asked why I was making posts on the Web site, which was the SAPA Web site, which was not a company Web site.
Q. All right. Tell me about the SAPA Web site.
A. The SAPA Web site was a message forum, message board that the pilots could use to communicate and discuss issues.
Q. You said it's not a company Web site.

Page 51

A. That's correct.
Q. How do you know that?
A. The SAPA site is owned by Bob Novak. It is not part of SkyWest.
Q. Who pays for the hardware? Do you know?
A. Bob Novak does, to my--best of my knowledge. There's also a disclaimer page on there that says it has no affiliation with SkyWest or is not property of SkyWest.
Q. Do you have to--can anybody access this Web site?
A. Only SAPA members. And they are given a pass word by Bob Novak.
Q. Were you given--you had a password in December of 2000.
A. Yes.
Q. And were you regularly posting messages on the message board?
A. Yes, I was.
Q. What kinds of messages were you posting?
A. We were posting messages regarding the ALPA, Airline Pilots Association, union organizing efforts.

Page 52

Q. So you were talking about union organizing in 2000.
A. That's correct.
Q. December of 2000.
A. That's correct.
Q. What kind of things were you saying?
A. I would provide, you know, opinions, research, statistics regarding our contract or lack thereof compared to other airlines and issues that affected the pilots and arguments as to why we should unionize.
Q. Is that Web site in 2000--is that basically solely a place for posting messages about union activity or union organizing?
A. It could be for anything.
Q. But your--did you have other types of messages that you posted other than union-related activity messages?
A. To the best of my knowledge, most of my posts, if not all, were regarding the union organizing.
Q. Were you part of the union drive at all?
A. Yes, I was.
Q. Were you on an organizing committee?



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 69

(A telephone call was placed and the following proceedings were had:)

THE COURT: This is Dave Nuffer.

MR. PETERSEN: Yes, Your Honor. This is Scott Petersen. I've got Erik Strindberg with me.

THE COURT: Okay.

MR. PETERSEN: We've been referred to you, I think, by Judge Stewart's chambers.

THE COURT: Right.

MR. PETERSEN: We are in the middle of a deposition. I represent SkyWest. And I'm deposing Mr. Callaway, who is a Plaintiff. It's a case involving claims of retaliation in violation of the Railway Labor Act and some other claims.

THE COURT: Uh-huh (affirmative.)

MR. PETERSEN: The reason that we're calling--we apologize to bother you--but I asked Mr. Callaway--I showed Mr. Callaway a letter that is not obviously written by him, asked him if he had read the letter, which he said he had, and then I asked him whether or not he had any basis to believe that it was not written by the person who signed it and whether--and if he had any

Page 70

basis to believe that that person was not the person who had made this complaint about him, which was the substance of this letter.

THE COURT: So who's the deponent?

MR. PETERSEN: That's the Plaintiff.

THE COURT: Okay.

MR. PETERSEN: And Mr. Strindberg--and he can pipe in at any time--he objected and then instructed Mr. Callaway not to answer the question.

THE COURT: The question, again, is whether the deponent has any basis to believe the letter was not written by--

MR. PETERSEN: Ms. McDonald, and that it did not constitute the complaint for which he was being questioned by his superiors.

THE COURT: Okay. And this letter was written when?

MR. PETERSEN: It was written--it's dated contemporaneous with a time that he was being disciplined or at least spoken to by his superiors while he was employed.

THE COURT: Did he say when he'd seen the letter previously?

MR. PETERSEN: I hadn't asked him that

Page 71

question, Your Honor.

THE COURT: Okay. And roughly what's that date that the letter was dated?

MR. PETERSEN: The letter's dated December 7 of 2000.

THE COURT: Okay. Mr. Strindberg?

MR. STRINDBERG: Yes, Your Honor.

THE COURT: If I understand it right, the question is whether the witness has any reason to believe it wasn't written by the person that purported to write it.

MR. STRINDBERG: Yeah. And, Your Honor, if I may give you a little background. First of all, that wasn't the question that we first started arguing about.

THE COURT: Okay.

MR. STRINDBERG: Mr. Callaway has answered that question.

THE COURT: And what did he say about that?

MR. STRINDBERG: He says--he said, Well, it appears to have a signature of Nicki McDonald on it. And he has no other evidence one way or the other about the document.

THE COURT: Okay.

Page 72

MR. STRINDBERG: What--the background to all of this is my client was called down to headquarters at a certain time around--around this time, end of 2000. And he was told that there was a complaint about him from crew scheduling. As he's testified here today, he was not given any other details, wasn't shown any documents or anything. This document was then handed to him. It had been marked in a previous deposition, but it's never been identified. There's no indication who it came from, when it was produced. There's been nothing tying this document into the complaint that was referred to in this meeting in 2000.

Mr. Callaway has also testified that he doesn't even know if he ever spoke with Nicki McDonald. So that's the background of this.

MR. PETERSEN: Can I--

THE COURT: The questioning, then, that you object to--if he's already said that he has no reason to believe it wasn't written by McDonald, what was the question that drew your objection?

MR. STRINDBERG: Well, he said--the question--and I objected because it's an unfair



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 85

A. Absolutely, yeah.
Q. Probably not hear what's being said on the other side.
A. I don't know if they could or not. Probably not.
Q. Did you have--
A. It depends on how loud the phone was.
Q. Did you have discussions with them, either one of them, after your conversations with scheduling?
A. The pilot I was flying with, I was talking to him about what happened. It was a non-issue.
Q. Who was that?
A. It was either Lee Vance or Lynn Redd.
Q. You're not sure.
A. I don't remember exactly who I was flying with at that day.
Q. What did you tell--
A. It was one of those two.
Q. One of those two. What did you tell them?
A. I just told them that I was assigned a captain's trip, it was taken off my schedule--or what I thought was for a first officer. I told

Page 86

him that I did--
was able to pick up the open time. It wasn't on my schedule anymore. And it turned out to be a captain's trip, which was why it was taken off my schedule. Makes perfect sense.
Q. Were you upset when you talked to this captain?
A. No.
Q. All right. So at the end of the meeting you were told--I believe you said that nothing was going to be placed in your file, right?
A. Yes.
Q. So in your understanding, was--were you disciplined at all for this incident?
A. No.
Q. Did you have any understanding as to--I think you said that somebody hinted or suggested that you were posting things on the SAPA site. Did you ask them how it is they knew you were posting things on the SAPA site?
A. Yes, I did.
Q. And what were--which one did you ask, or did you ask it to all three?
A. I asked it to the room. But I think my

Page 87

questioning was--you know, targeted to Mr. Holt since he was conducting the meeting.
Q. Tell me what you asked. What did you say?
A. To the best of my knowledge, I mentioned that the SAPA board was--message board was for SAPA members only and that it was not to be viewed by management. And that was the end of the discussion.
Q. So were you upset when you said that to Mr. Holt?
A. I was surprised. I was--I wouldn't say I was upset, but I was pretty surprised that that had been--my messages were viewed by management when the message board clearly states that it's not for management's viewing.
Q. And did they respond as to how they found out?
A. No, they did not.
Q. Do you know how it is they did?
A. I have no idea how they found out, but I have my suspicions.
Q. All right. What are your suspicions?
A. Plenty of pilots who print things out and fax them in and post them up on bulletin

Page 88

boards. It's--you know, it's not unknown now to know that they have access to the SAPA pages.
Q. So if I'm just Joe pilot with you and I don't like what you're putting on the SAPA site, I can just print it off and then go give it to your supervisor, your superior.
A. If they want--if another SAPA member feels that that's what they want to do, that's certainly--they have access to do that.
Q. Is that what you think happened here?
A. It's possible.
Q. Do you have any idea who it was you think--
A. I have no idea.
Q. Do you have any suspicions?
A. I have no suspicions. I have heard that the SAPA pages were on computers in St. George. People were viewing them in St. George.
Q. You can access them from any Internet site.
A. That's correct, right.
Q. So you don't necessarily need a particular monitor.
A. Well, you can access the Web site, but then you need a password to gain access to the

Page 93

Q. It's your testimony you only met with Brad and Jim once to talk about crew schedulers by--prior to October of 2001.
A. That's correct. There was only one meeting.
Q. Then going to No. 6 it says, "In approximately October 2001, human resources received phone calls from neighbors of Andy's in Salt Lake City complaining about Andy's party house. The neighbors knew Andy was a pilot for SkyWest. The police department was called to Andy's house numerous times for loud party and disturbance." Where were you living in October of 2001?
A. October 30--October 2000. October 31, 2001, I purchased my home at 581 West Capitol Street and moved into that home.
Q. Were you living in that home prior to that time?
A. Absolutely not.
Q. All right. Was there a time in which your attention was drawn by your superiors at SkyWest in relation to allegations--
A. Actually--
Q. --by your neighbors?

Page 94

A. (To Mr. Strindberg) Can I correct something?
MR. STRINDBERG: Yes, absolutely.
THE WITNESS: It was October 31, 2000, that I purchased my home--
BY MR. PETERSEN:
Q. All right.
A. --in 581, so . . .
Q. So in October of 2001 you were there
A. That's correct, yes.
Q. Okay. Were there--had you ever had some complaints made to the City, Salt Lake City about events that took place at your house?
A. There was a neighbor who made numerous complaints.
Q. All right. What was the person's name?
A. Heidi--I don't remember her last name. Heidi--oh, Heidi Borgensen, I believe, Borgesen.
Q. What were the nature of the complaints? Do you know?
A. She had numerous complaints. Very outrageous complaints.
Q. Okay. Tell me the substance of the complaints.
A. Drug dealing, because black people were

Page 95

in my house, was the main complaint. Loud noise, loud parties.
Q. Did you have parties at your house during October 2001?
A. No, I did not.
Q. Prior to that time?
A. You know, I've had people at my house. I have a pilot that stays at my house. Every complaint that was filed, when the police would come to my house, would result in no further investigation because there was no party going on.
Q. Did--while you were at your house, are you aware as to whether illegal drugs were ever either bought, sold, or consumed--
A. Never.
Q. --in your house?
A. Never. Was I aware? Never.
Q. Yes.
Did you ever turn your music up really loud?
A. No. I mean, my music is--you know, you can turn it up. But if you go outside, you cannot hear it.
Q. So it's your belief, if I understand this, that neighbors complained because you had an

Page 96

African American that visited your house at times.
A. Heidi did complain to the police department that there was--behavior of black people coming and going to my house was indicative of drug use and dealing.
Q. Okay. I'm going to show you--this is 9 through 14.
MR. PETERSEN: I don't think it's in our exhibit list, is it?
MR. EMERSON: I don't see it.
Exhibit-37 marked
BY MR. PETERSEN:
Q. Mr. Callaway, I'm showing you what's been marked as Exhibit 37. It's SW9 through SW014, 14.
A. Uh-huh (affirmative.)
Q. Have you ever seen those documents before?
A. Yes. The first time I saw these was after I was terminated.
Q. Look at the first page, No. 9. It--you know, I know you--these were not prepared by you. If I represent to you that these were documents received by the Salt Lake City Police Department--
what I want to look at is--

Page 97

MR. STRINDBERG: I think that's incorrect. I think they were received from the Salt Lake Police Department.
MR. PETERSEN: Thank you. That's right.
BY MR. PETERSEN:
Q. Look at the--there's a list of dates. Do you see that?
A. Yes.
Q. And look down where it says, "Type of case," under that column, it says "Disturbance." There are several that say "Disturbance."
A. Uh-huh (affirmative.)
Q. And there are some dates attributed to that.
A. Uh-huh (affirmative.) Yes, I see those.
Q. Would those more or less, in your recollection, correspond to times that a police officer was dispatched to your house based on a complaint by your neighbors?
A. It's possible.
Q. So I would say--one, two, three, four, five, six, seven--eight more or less--nine. This shows nine references to what are listed as a

Page 98

disturbance or a loud party.
MR. STRINDBERG: What period of time?
BY MR. PETERSEN:
Q. Well, I'm looking at the whole list. We're talking November 3, 2000, through January 7, 2001. Look at that whole list. I'm just adding up the type of case references in there.
A. Uh-huh (affirmative.)
Q. Is it fair to say that the police went to your house based on a complaint nine times from November of 2000 to January of 2001?
A. Oh, yes. They came to my house.
Q. And it was, in your understanding, all based on the same neighbor.
A. Yes, they were all based on the same neighbor.
Q. Were you eventually contacted by somebody at SkyWest in relation to the complaints that were being made by this neighbor?
A. I was advised by Mr. Hyatt on--I don't know the date exactly when I signed a counseling statement that he had received or someone in human resources had received a complaint from a neighbor regarding drug use.
Q. You would agree, wouldn't you, Mr.

Page 99

Callaway, that a pilot that was using drugs, whether on or off of work time, would be a significant concern to SkyWest?
A. Yes.
Q. In fact, isn't it your understanding that somebody who is a pilot and tests positive for an illegal drug or use is automatically terminated?
A. Yes.
MR. STRINDBERG: Is this by SkyWest?
MR. PETERSEN: Yes.
BY MR. PETERSEN:
Q. Still same answer?
A. Yes.
Q. Would it be fair to say, then, Mr. Callaway, that if somebody claims, whether right or wrong, that there are drugs being used in your home as a SkyWest pilot and that information was provided to SkyWest employees, wouldn't it be fair to say that SkyWest would be acting appropriately to investigate?
A. If they investigated it, yes.
Q. Were you contacted, then, in relation to alleged drug use in your home?
MR. STRINDBERG: Objection. Question's

Page 100

ambiguous.
BY MR. PETERSEN:
Q. Were you contacted by Mr. Hyatt in relation to drug use at your home in 2001?
A. As I said before, when I signed--the exact date was when I signed the counseling statement. After signing such counseling statement, Mr. Hyatt advised me that he had received phone calls and to make sure that the activity stopped. I advised him, though, of the problems we have had with the neighbor, the ongoing litigation and case that was filed against her and the City for harassment and defamation of character.
Q. All right. So you sued the City.
A. Yes, I did.
Q. And when did you sue the City?
A. January of 2000--it was stemming from the January 7 incident right here. So it would have been the first part of January 2001 or first part of 2001.
Q. And you sued your neighbor as well.
A. Yes, we did.
Q. Tell me what happened in that lawsuit. What--



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 109

A. Yes.
Q. Look at the top of the right-hand side of the page, the right column there. Do you see the top of that?
A. Yes.
Q. It--well, it actually starts on the left at the bottom, "The Company Look," under No. 2.
A. Yes.
Q. Do you see that?
A. Yes.
Q. And under A there's a paragraph that starts, "Professionalism is required at all times."
A. Yes.
Q. The end of that paragraph, which is on the next page, says, "Your personal conduct and appearance, both on and off duty, shall be such as to maintain or improve the image of the company." Do you see that?
A. Yes.
Q. And that makes sense, doesn't it, when it talks about that quote on your Exhibit 35? That would be an accurate statement.
A. That seems to match, yes.

Page 110

Q. SP 307.
MR. STRINDBERG: Again, Andy, let him finish his question before you start answering.
BY MR. PETERSEN:
Q. Yeah, that actually would be helpful.
Did Mr. Hyatt suggest to you that you comport your conduct in accordance with SP 307?
A. When?
Q. At the time that he mentioned the complaints about your neighbors.
A. No, he did not.
Q. Did he tell you why he was informing you about the neighbor's complaints?
A. I believe he was telling me because I should know about them.
Q. So tell me, then, how--how did that conversation come about? What took place?
A. I was in his office signing a counseling statement. At the end of that meeting, he advised me of it. And I told him exactly what I just said, that there was a lawsuit against the neighbor and--not the neighbor--but the City for all this.
Q. Did--
A. And that I would make sure that it, you

Page 111

know, would stop or, you know, find out what the problem was. At this time, I did not know about the neighbor calling.
Q. But the police had shown up at your house several times prior, right?
A. Prior to January 7, yes.
Q. But it's your testimony that there wasn't loud music or any real basis for sending the police to your house on any of these occasions.
A. That's correct.
Q. Do you think that the neighbor didn't like that you had a black man at your house?
A. That's one of the reasons.
Q. Was that--who was the black man?
MR. STRINDBERG: You can answer.
THE WITNESS: Okay. He's another pilot, Andy Bharath.
BY MR. PETERSEN:
Q. Andy Bharath.
A. Yes.
Q. And was Mr. Bharath at your house on all of the occasions the police were sent, that you recall?
A. I do have another African-American

Page 112

friend, but Andy happens to reside at my house as a--when he commutes to Salt Lake City for his trips. So he was there on a fairly regular basis.
Q. And he's in addition to the other gentleman you referred to as your roommate.
A. The roommate that I mentioned earlier was only in my house for a few months.
Q. Okay.
A. I don't have a roommate now. That was right after I purchased the home.
Q. And when you were apprised of the complaints by the neighbor by Mr. Hyatt, you said that that was--I said Hyatt again. Hyatt. You said that was when you were signing a counseling statement, correct?
A. Yes.
Q. So would that have been on or around November 2001, November 30 of 2001? Does that ring a bell to you?
A. For--yes, for the counseling statement, yes.
Q. Okay. Look at the next bullet point on Exhibit 35. It says, "On November 13, 2001, Andy met with Brad Holt, Bill Boice, and Tony Thompson



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 113

because of Andy's behavior in upgrade training and at the Butte station. Captain Hyatt read Tony Thompson's write up from the meeting." Do you recall meeting with Brad Holt, Bill Boice, and Tony Thompson on November 13, 2001?
A. Yes, I do. Among other people, yes.
Q. Tell me how you came about to meet with them.
A. On November 13, in the morning, I was up in Butte, Montana conducting flight training. I was returning to Salt Lake City to conduct my type ride later that evening, on the 13th. When I arrived back to Salt Lake City, I was advised that there had been a reported incident in Butte, Montana. And I was, I believe, placed on administrative leave at that time until further notice.
A meeting was then arranged that afternoon in Salt Lake City, I believe, only because everyone in management happened to be in Salt Lake City at that time for a ceremony, if I remember correctly, of some sort. And that's when that meeting took place.
Q. Did it surprise you that you had been asked to meet with them?

Page 114

A. Absolute--well, it surprised me--the whole thing surprised me, yes.
Q. The whole thing, meaning the incident in Butte.
A. That's correct.
Q. Tell me what happened in Butte.
A. It was reported that I had been--you know, created a problem with the security personnel in Butte.
Q. Actually, to make it easier on you, let me mark another exhibit. And I'll go over that with you.
MR. STRINDBERG: What number is that, Counsel?
MR. PETERSEN: It's 19.
THE REPORTER: Thirty-nine.
MR. PETERSEN: It's Exhibit 7.
BY MR. PETERSEN:
Q. All right. I'm going to show you what has been previously marked as Exhibit 7. Do you recognize that document?
A. Yes, I do.
Q. Tell me what it is?
A. It's a counseling statement.
Q. Is this what you received on or around

Page 115

November 30 of 2001?
A. Yes.
Q. At the time you received it, were you asked to read it?
A. Yes.
Q. And review it?
A. Yes.
Q. Were you asked if you had any questions about it?
A. Yes.
Q. And you--is that your signature down--
A. That's correct.
Q. --at the bottom? And then there are some words underneath your signature.
A. Yes.
Q. What do those words say?
A. "Under protest. Please see attachment."
Q. Okay. Let's go over this. Is this what you were given at the time you met in Salt Lake City with Brad, Bill, and Tony?
MR. STRINDBERG: Objection. Assumes facts not in evidence.
BY MR. PETERSEN:
Q. Go ahead.

Page 116

A. No.
Q. All right. Then let's--were you ever provided a counseling--you said you signed the counseling statement. So you were given it at some point, right?
A. Yes, yes.
Q. But you met with Brad, Bill, and Tony on the 13th of November.
MR. STRINDBERG: Objection. Misstates his testimony.
BY MR. PETERSEN:
Q. Is that right?
A. To the best of my knowledge, there was a meeting in the afternoon. I don't know if it was the 13th, but I think it was.
Q. All right. On or about two weeks prior--
A. That seems--
Q. --to the time you received the counseling statement. I'm not trying to trick you. I'm just trying to get a chronology here.
A. I'm sorry.
Q. So about two weeks, maybe a little more than two weeks prior to you receiving the counseling statement you met with these gentlemen.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 117

A. Yes.
Q. Okay. And at the meeting, then, you show up and you don't have--you know you're there because of alleged complaints regarding Butte, Montana, right?
A. Yes.
Q. Okay. Tell me what happens. You walk in the office, and what happens next?
A. I walked into a conference room at the Salt Lake SkyWest hangar. At the meeting was Brad Holt, Bill Boice, Tony Thompson, Kelvin Hyatt, Dave Faddis, Mike Eisenstat--
Q. Why was Mike there?
A. --and Tony--and maybe Tony Fizer.
I'm sorry. Why was who there?
Q. Why was Mike there?
A. I had requested Mike, who was with SAPA, to be there on my behalf.
Q. Why didn't you request Chris Abell?
A. I spoke to Chris. Chris assigned this responsibility to Mike, who was, I believe, vice president of SAPA.
Q. Why did you feel you needed SAPA representation?
A. Because I felt intimidated. And I

Page 118

wanted someone there to witness what was to take place.
Q. Did you know you were going to be in trouble?
A. I honestly did not know what this--was stemmed from, other than what I was told earlier that day that there had been an incident with security personnel in Butte.
Q. Well, you knew it couldn't have been a good thing that you were meeting with them, right?
MR. STRINDBERG: Objection. Argumentative.
BY MR. PETERSEN:
Q. Go ahead.
A. I don't know.
Q. Well, you asked for a SAPA representative.
A. Yes.
Q. And you wouldn't ask for a SAPA representative if you were about to be promoted, would you?
A. Probably not.
Q. Generally would ask for a SAPA representative when you had an idea that it would be potentially adverse to your employment.

Page 119

A. Yes. Well, I assumed that only because I was taking--I was placed on administrative leave--
Q. Okay.
A. --with pay.
Q. And so you then met with this group of people. Tell me who led the meeting.
A. I believe the meeting was led mostly by Brad Holt.
Q. What did Mr. Holt say?
A. He wanted to talk about what happened in Butte. And he asked if--you know, what happened.
Q. What did you say?
A. I told him that nothing had happened.
Q. So you don't recall anything unusual about your time in Butte on November 12, 2001, or thereabout.
A. That was nothing that happened in Butte. I asked the security screener why empty bags had been--were being emptied--or excuse me--not emptied, being X-rayed. They were emptying the contents of the bag, X-raying the bag separately from the contents. I simply asked a security screener why that was being done, because

Page 120

I had never seen that process done before.
Q. And did the screener respond?
A. I believe she did. And I don't remember the answer.
Q. Was it in any form that caused you to think she was concerned--
A. Absolutely not.
Q. --or upset?
A. Absolutely not.
Q. You didn't get upset at the screeners.
A. Absolutely not.
Q. The screeners--tell me--in Butte, Montana during this time period--so I'm talking November 12, 2001--who employed them? Do you know?
A. At the time--to my knowledge, it was all SkyWest personnel, but . . .
Q. So you thought that the people who were checking your bags in Butte were also SkyWest employees.
A. That's correct.
Q. Are you aware as to whether there are other companies who employ those who do security at the airport?
A. I did not know if that was the case at



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 121

SkyWest--or excuse me--at Butte.
Q. Did they have SkyWest uniforms on, that you're aware of?
A. I believe so. And they had SkyWest ID badges.
Q. You ever heard of Horizon?
A. Yes.
Q. What do you understand that company to be?
A. That's another regional airline.
Q. Do you know whether any of the Horizon employees were conducting screening at the Butte place on this November 12 date?
A. I did not notice.
Q. Did you ever find out later on whether that was the case?
A. Yes.
Q. And what did you understand the result to be? That there were some Horizon people?
A. Yes, there were some Horizon employees there. They're the other airline that serves Butte.
Q. Horizon's not SkyWest, right?
A. No.
Q. All right. Let's look at this

Page 122

Exhibit--what is it--7. I want to go over each sentence and ask you if you agree or disagree. Okay?
A. Okay.
Q. First sentence says, "On November 12, 2001, while returning from BTM"--I'm assuming that's Butte, Montana--
A. Yes.
Q. --"you had conducted flight training, you were reported as exhibiting inappropriate behavior." Now, what I want to ask is, November 12, 2001, is when you were returning from the Butte, Montana--
A. That's correct.
Q. --place. You were doing flight training there, correct?
A. That's correct. That previous evening, yes.
Q. All right. Do you agree with the statement, "You were reported as exhibiting inappropriate behavior"?
A. No, I do not.
Q. There's something that's been blacked out. Do you see that?
A. Yes, I do.

Page 123

Q. Do you know what was under that?
A. Yes, I do.
Q. What did it say?
A. "Extremely."
Q. Do you know why it was blacked out?
A. The review board that I requested requested that that word be removed.
Q. Was that at your request?
A. No. That was their request.
Q. They were just floating you a bone on that one.
MR. STRINDBERG: Objection.
BY MR. PETERSEN:
Q. Were they just doing that gratuitously?
A. That was the decision of the review board.
Q. Okay. Then it says, "Three SkyWest Airlines ramp agents witnessed this behavior." Do you know who the ramp agents that would be referring to?
A. Well, there weren't three SkyWest ramp agents. There was a SkyWest ticket agent, a SkyWest--the employee--the SkyWest employee that was conducting the security screening and then the Horizon employee conducting the security

Page 124

screening.
Q. Okay.
A. So I don't know who the three SkyWest airline agents are.
Q. At the time, though, I think you said you believed that all involved were SkyWest employees.
A. At the time I did, yes.
Q. All right. And so it says then, "It is reported to have begun at the ticket counter when 'must ride' authorization was not present for your travel." What is must ride authorization?
A. Must ride is a method to, I guess, ensure that the employee is--gets a seat on the aircraft, a confirmed seat. There's usually authorization that's given to people that the pilots or employees that are in training events or on company business.
Q. When you were there on November 12 was it your belief that you were to have a must ride for that--for your travel from Butte to Salt Lake or--
A. Yes.
Q. --wherever it was you were headed?
A. Yes, it was.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 185

Q. That says, "After careful consideration, the panel members upheld the counseling statement but asked to have extremely marked out of the statement." Is that what you understood the result of this review board to be?
A. My understanding is the review board split. The two pilots favored my side, and the management did not. And the compromise was what is written there in the decision.
Q. So by compromising, they then had a four-zero decision. Is that what you understood?
A. I had no idea how the deliberations take place or who makes that final decision. I know that the decision can be overturned by Mr. Holt.
Q. So why did you say "compromise," then?
A. I'm just using that word as an example. I believe that's--you know, would be a compromised outcome. Certainly not a favorable outcome.
Q. Sure. But I guess my question is if your--if it's your testimony that it was split two to two, and then you said there was a compromise that ended up with this--eliminating this one word, how is it that you know there was a compromise?

Page 186

A. I had spoke to Tony Fizer.
Q. And he told you that they compromised.
A. Yes, he did.
Q. Did he tell you then that it was a four-zero compromise?
A. No. He didn't tell me what the compromise was. He just said it split.
Q. And then he said by eliminating that word, what?
A. I have no idea what. At this point, I have no further action that I can take on that. The decision's made.
Q. All right. Let's go back to SW002, which is Exhibit 35. Actually, go to 003. The second bullet point down on 003 says, "On March 26, 2002, Andy received a SAD," an S-A-D. What's an SAD?
A. SAD is a scheduled assignment deviation.
Q. All right. What do you understand the purpose of a SAD to be?
A. A SAD is when a crew member's not available or deviates from a schedule.
Q. Do you recall receiving a SAD on March 26, 2002?

Page 187

A. I recall initially receiving a sick notation, which was later changed to a SAD.
Q. All right. Why do you say it was a sick notation changed to a SAD?
A. Crew scheduling had contacted me for a ready reserve assignment to sit at the airport on the morning of the 26th. I had been very sick. And the scheduler offered to take me off sick. And then I believe, if I remember reading the notes correctly, that it was--a supervisor changed it to a SAD.
Q. Okay.
MR. STRINDBERG: When--Counsel, when it's appropriate, let's take a break.
MR. PETERSEN: All right. We can take a break now if you like. Let's go ahead and go off.
MR. STRINDBERG: And convenient.
MR. PETERSEN: Yeah.
THE VIDEOGRAPHER: We're going off the record. Time is 2:48 p.m.
(Recess taken 2:48-2:54 p.m.)
THE VIDEOGRAPHER: We're back on the record. Time is 2:54 p.m.
BY MR. PETERSEN:

Page 188

Q. All right. Mr. Callaway, we're still looking at Exhibit 35, page .3, or SW003. Underneath the third bullet point, it says, "All pilots needed to be fingerprinted, and Andy had a conviction which Captain Hyatt informed Andy SkyWest had that information." Does that ring any bells? What was that all about? Do you know?
A. I believe that was required by the--I don't know if it's the TSA--but we all be re-fingerprinted. And if there was a disqualifying crime that a transportation employee had committed that they would unfortunately be terminated.
Q. Do you recall what the conviction was that they had show up your record?
A. It was a reckless driving that was dismissed and updated, but not updated from the sources this was derived from.
Q. So you're saying that it was, in fact, not a conviction.
A. That's correct. It was cleared and expunged off my record.
Q. It wasn't really expunged, was it, if they showed up on your record?
A. It had not been sent to the FBI.
Q. Okay. The next one says, next bullet



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 189

point, "Andy received another SAD on June 30, 2003." Do you recall that?
A. Yes, I do.
Q. Tell me what that was about.
A. June 30. Okay. That was--I submitted request for a day off to attend to some court matters regarding the--my litigation with the City. The date was wrong. I submitted a request, canceled it, and submitted a request for another day. And it was never processed. And I was contacted by scheduling, not for an assignment, but they said, Please call us every 30 minutes to see if there's any scheduling changes. I complied with their request. I was still issued the SAD.
Q. So would it be your testimony that you should not have received a SAD on June 30?
A. I understand why the SAD was issued and agreed to why it was issued, but I also followed their instructions as well.
Q. All right. Why do you say, you understand why it was issued? Why do you understand it was issued?
A. Well, the definition of a SAD is when a crew member is not--cannot be contacted within ten

Page 190

minutes of leaving a message. A message was left. And I did not return the phone call until, I believe, 30 minutes later. And that's when I was instructed to keep calling back every half hour.
Q. So that justified the SAD, whether--
A. Sure.
Q. --you want to give weight to how good or bad?
A. Sure. I have no issue with that.
Q. Okay. How about the March 26, 2002, SAD? Do you have any issue with the appropriateness of issuing that one?
A. I did, I believe, at the time, only because the scheduler told me that I would be taking off--she would put me down as sick. In fact, the documentation--she offered to do that in the documentation.
Q. So--but--so is it your opinion that a SAD should not have been issued on March 26?
A. That's correct.
Q. Because if you had called in sick, then even though you miss a particular flight, there's not a SAD that's--
A. If I had called in sick, it would not

Page 191

have been a SAD.
Q. Okay.
A. What happened there is I went to bed early the night before because I was sick, and either lack of my own, you know, setting the alarm and all that, I just--didn't hear the phone ring in the morning. And that's when scheduling advised me of this.
Q. On--going to the fifth bullet point down, it says, "On August 12, 2003, Flight Attendant Kristen Wiley told Captain Hyatt she had concerns she was receiving threatening e-mails from Andy regarding money he said she owed him. Andy had invited Kristen to go with him and a group of people to Spain. According to Kristen, Andy told her she only needed to worry about her plane ticket and food, and everything else would be paid for. Now almost a year later, Andy was using skywestonline.com to send messages demanding payment of the shared expenses from the trip. Kristen felt threatened to even check her messages and asked Captain Hyatt if there was anything he could do to stop these messages. Captain Hyatt said he would look into this matter."
Did you and Kristen Wiley go to Spain?

Page 192

A. She attended a group trip to Spain in September of 2002.
Q. Okay. And who else was on the trip other than you and Kristen?
A. There was--I believe ten of us. None from--she was the only other coworker, colleague--friend of mine.
Q. The others--who were they?
A. Friends of mine outside work.
Q. What are their names?
A. I would have to sit here and think about it, because a lot don't live here.
Q. All right. Can you think of any of them?
A. Let's see. Jed Arveseth.
Q. Where does he live?
A. Salt Lake City.
Q. Do you have a phone number for him?
A. I don't--you know, it's in my cell phone. I don't--you know, I don't know--I don't have these memorized.
Christina Hill. Christina Cruz.
Q. Also both living in Salt Lake?
A. Christina Hill, yes. Christina Cruz, no. And I don't know where she lives now. I



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

financial affairs?
A. I don't know what you're getting at here. Company stamp? Company--
Q. Answer the question if you--if you can answer the question.
A. Repeat it then.
Q. All right. If you sat down in a company office and you turned on the company computer, you typed up a demand letter demanding payment for something, a debt owed to you about by another employee--
A. Uh-huh (affirmative.)
Q. --and you printed it on the printer down the hall, on a white piece of paper, you took it and you put it in a blank envelope that was purchased by SkyWest and put a stamp on it that you got out of the SkyWest office and sent it to this crew member, would that violate 34?
A. I don't believe it would.
Q. Because you're not actually involving a representative of the company?
A. I'm not involving the company. I'm not representing the company. There's no SkyWest letterhead or graphic or anything of the such that



is being represented.
Q. But you used company property in that scenario.
A. A computer is an inanimate object. It cannot be used.
Q. Use my scenario, please. My scenario with the paper and the stamp and the letter and the computer and the printer, that in your opinion does not involve the company.
MR. STRINDBERG: Counsel, it's asked and answered. He already--
THE WITNESS: No.
MR. STRINDBERG: --gave you an opinion. He answered the question.
MR. PETERSEN: He just did.
MR. STRINDBERG: Well, he did before, too.
BY MR. PETERSEN:
Q. All right. Getting back to Exhibit 35, six bullet points down, it says, "Captain Hyatt sent a message to Andy asking for explanation." Do you recall receiving a message from Captain Hyatt asking you to explain what happened in regards to Kristen Wiley?
A. Yes, I do.



Q. Was that an e-mail you received?
A. Yes, it was.
Q. Tell me what it said in essence.
A. I don't recall exactly without looking at it, which I'm sure you're about to produce.
Q. I've got it. I was just hoping you could tell me.
A. It said that I had been--well, I'll just wait, because I don't recall the wording.
Q. Okay.
Exhibit-42 marked
MR. PETERSEN: I don't think this is in your exhibit, is it?
MR. EMERSON: I think it is.
MR. PETERSEN: Do you?
MR. EMERSON: Uh-huh (affirmative.)
BY MR. PETERSEN:
Q. I'm showing you what has been marked Exhibit 42. Do you see that?
A. Yes.
Q. Is that the message you received from Mr. Hyatt?
A. Yes, it is.
Q. Were you shocked when you got this?
A. Yes, I was.



Q. Why?
A. For one, it didn't mention who it was. And I had absolutely no idea what this complaint was regarding.
Q. Did you call Mr. Hyatt?
A. No, I did not.
Q. Well, if you were requested to respond, would it be important to clarify to know what he was talking about?
A. Perhaps.
Q. But you didn't--you chose not to call him.
A. No. I--after reading these policies that were in here, I assumed it regarded Kristen.
Q. So you figured it out.
A. Yes, figured it out and then answered the--these allegations in a letter back to Kelvin.
Q. I'm showing you what has been marked as Exhibit 3, I believe. Do you see this? Is this the response you prepared for Mr. Hyatt?
A. Yes, it is.
Q. I have read through this. And I don't note any apology anywhere in here. Was it your position when you wrote this to Mr. Hyatt that you in no way believed you had sent anything

inappropriate to Ms. Wiley?
A. That's correct. I don't also recall being asked to apologize, because at the time I did not know what the allegations were specifically. I simply responded on why I felt that I did not violate the three questions that Mr. Hyatt asks in his e-mail.
Q. Did you talk to Andy Bharath about this?
A. I don't recall.
Q. How about Fred Alford?
A. No.
MR. EMERSON: Phil.
BY MR. PETERSEN:
Q. Phil.
A. No.
Q. Did you talk to anyone else about this before you responded to Mr. Hyatt?
A. No.
Q. What did you think was going to happen when you sent this letter?
A. I thought that this would clear everything up. This would explain my point and why I did not--why I felt I did not violate the policies stated, and that would be the end of it.



Also, it would explain that Kristen had owed me money, was being taken to small claims court, and was simply trying to use the company, involve the company in order to get out of paying the debt.
Q. Look at the last sentence of the third paragraph. It says, "In addition, my notice followed all Federal regulations under the Fair Debt Collection Practices Act, Title VIII, Section 805 and 806 with regards to harassment and communication, as well as Utah Code 76-5-106 and 20A-3-502."
A. Uh-huh (affirmative.)
Q. How did you know what those sections were?
A. I looked them up online.
Q. How did you know that you followed them?
A. This is not the first small claims lawsuit that I've had to go collect on. I've had a lot of money that's been owed to me and not been paid back. I was quite familiar with my rights in the process.
Q. Have you ever been arrested?
A. Yes, I have.
Q. How many times have you been arrested?



A. The one time when they kicked in the doors.
Q. Is that the only time?
A. There was the charge for the reckless driving, which was dismissed. But that wasn't, I believe, an arrest. That was a detain--being detained.
Q. Never been arrested outside of those.
A. No.
Q. How many times have you been involved in a lawsuit other than this one?
A. I have--let's see.
Q. You sued the neighbor. We have that one, right?
A. Right.
Q. You sued Salt Lake City.
A. Right.
Q. Sued Kristen Wiley.
A. (Witness moves head up and down.)
Q. Who else? As a Plaintiff. Who else have you sued as a Plaintiff?
A. As a Plaintiff?
Q. Uh-huh (affirmative.)
A. The assistant attorney general of Utah, as a landlord, who owed me considerable amount of



money.
Q. Who was that?
A. Lynn Nichols, or Nicholas.
Q. When was that?
A. That was in fall of 2000, November maybe.
Q. What was the outcome of that?
A. I won.
Q. How much?
A. I don't recall. 1,500, maybe $2,000.
Q. That was a small claims case.
A. Yes.
Q. He was your tenant.
A. No. I was her tenant. She did not return money owed to me.
Q. That was a deposit of some kind.
A. Deposits. She also had charged me for repainting the house. I--you know, replacing toilet seats, all sorts of crazy stuff.
Q. Okay. Who else have you sued?
A. The only other one was a former roommate of mine who also owed me money, who did not pay rent per his rental agreement.
Q. Who was that?
A. Ian Biggs.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 221

Q. When was that?
A. That was 2000--well, when was that? 2001.
Q. It was after he left your house.
A. Yes. Yes. That's why he left. He was asked to leave the house because he did not pay his rent.
Q. Have you ever been sued?
A. No, I have not.
Q. Have you ever been charged with a crime other than the reckless driving?
A. No, I have not.
Q. Were you charged with anything when you were arrested in relation to your neighbor and the loud party allegations?
A. I believe they tried to use disturbing the peace. Or maybe it was interfering with an officer, I believe, for not opening the door. Both were dismissed.
Q. Those are the only times you've been charged with a crime.
A. Yes.
Q. Looking at this exhibit, this SW191, your response, there's little tiny different print in that.

Page 222

A. Yes.
Q. Do you know why that is?
A. I believe that's the formatting that the e-mail Microsoft Outlook did, because this was typed--I typed the document in Microsoft Word and then did cut and paste and pasted into an Outlook e-mail. And I--from my end, it didn't look like this. But when this was presented to me from Mr. Hyatt, that's--there was that one paragraph in a different font. It's the only my--only explanation I have for that.
Q. Okay. And then you say, "I have provided the e-mail thread from skywestonline for your reference." That's in the last paragraph on this page.
A. Yes.
Q. Is that the summary of e-mails that we've already gone over?
A. Yes.
Q. You didn't reference other e-mails to Ms. Wiley that you sent not on skywestonline.com.
A. I don't believe so.
Q. Why not?
A. They were irrelevant. They were repeated in the skywestonline e-mail.

Page 223

Q. So if you had threatened her but not on a SkyWest e-mail, you didn't think that had anything to do with why you were being asked to respond.
A. No.
Q. All right. Tell me what happened. You sent this to Kelvin. Then what?
A. I sent this to Kelvin. Left on vacation, and came back, and was on administrative leave, and then terminated.
Q. Why do you think you were terminated?
A. Well, I believe I was terminated because of this e-mail.
Q. It's not your testimony, is it, that Jim Breeze had a call with Kelvin Hyatt that he should talk to Kristen Wiley about saying something bad about you?
A. I'm sorry. What was that?
Q. Do you think that Jim Breeze contacted Kristen Wiley to get her to say that you were threatening her?
A. I don't know where you get that.
Q. It's just a question. Yes or no, do you believe that or not?
A. I have no idea.

Page 224

Q. You have nothing that would suggest that he did, do you?
A. I have nothing to suggest that he did. And I also have nothing to suggest that this was investigated.
Q. You don't have anything to suggest that Jim Breeze contacted Captain Hyatt to terminate you as a result of this Kristen Wiley incident.
A. It's possible.
Q. Why do you say it's possible?
A. Because anything's possible.
Q. Right. So other than pigs flying, is there any other basis that you would have for that?
A. No. And the reference here to the counseling statement that mentions arrogant or abusive treatment of fellow employees, I could see how Kristen could have manipulated the situation to make it seem that I was threatening her. So that is why--
Q. Do you think Kristen knew that you had a counseling statement talking about threatening and abusive and whatever you just described?
A. Yes.
Q. How do you know she knew that?

A. Because we were friends when I went through that whole ordeal.
Q. So do you think that she wanted to get back at you because you were asking her for money?
A. I would not put it past her.
Q. Do you believe that's what she was doing, making more of an issue of this than existed because she didn't--she was wanting to get back at you?
A. Yes, I do. I believe that she was trying to get out of a debt, paying a debt.
Q. And so she used SkyWest and inflated her feelings about this whole deal in order to get out of paying you the 200 and change that you said she owed you.
A. Yes.
Q. Apparently it worked. Did she ever pay you?
A. Her paycheck was garnished.
Q. That was after the small claims judgment.
A. Yes.
Q. All right.
A. Not only that, she admitted in small



claims court that she had me fired.
Q. So you believe that she's--she wanted to have you fired.
A. I don't know if she wanted to at the time. But after I was fired, that's what she said.
Q. And you believe her.
A. I believe a lot of different things as to why I was fired.
Q. All right. Do you believe that she had you fired?
A. It's a part of the reason, yes.
Q. All right. It says in here, seven bullet points down on this SW003, "Captain Hyatt read a letter by the assistant chief pilot Don Watkins." Do you know what letter that's referencing?
A. Yes.
Q. Tell me what you understand that letter to be.
A. There's a letter from Don Watkins saying that he overheard me in a hotel room making comments about the company and employees and this and that and--
Q. Have you seen a copy of the letter that



he wrote?
A. I saw the copy of the letter after I was terminated.
Q. You didn't see it during the process of your termination.
A. No, I did not. I saw it right before the review board.
Q. Do you disagree with what it said?
A. I disagree 100 percent with what it says. I was not in the hotel.
Q. All right. I'm showing you what has been previously marked as Exhibit 30. Do you see that document?
A. Yes, I do.
Q. Is that the copy of the statement by Mr. Watkins?
A. Yes, it is.
Q. That's the one you saw prior to your review board.
A. Yes, it is.
(To Mr. Strindberg) Do you have the original?
Q. Is your testimony that in fact you had no conversation at all in your hotel room in reference to SkyWest with somebody on the phone?



A. Yes.
Q. Your testimony is that you were at an Applebees.
A. That's correct.
Q. So your statement is you don't have any idea what--who this is referring to.
A. That's correct. I have a receipt from Applebees.
Q. Does your receipt have a time on it?
A. Yes, it does.
Q. What was the time on the receipt?
A. I don't have it in front of me. But I believe it was 11:06 or 11:10. I'm not exactly sure on the time.
Q. That would be the time you paid.
A. That I paid.
Q. Were you in El Paso on the night of August 27?
A. I believe I was, yes.
Q. And did you stay at the Marriott hotel that night?
A. Yes, I did.
Q. Do you recall whether or not--have you ever met Mr. Watkins?
A. No, I have not.

Page 233

SW003, the last bullet point before your presentation. It says, "Andy was terminated because of attitudinal and interpersonal conflicts with others. Management reviewed everything, and the only thing left was to terminate employment." Now, I understand your testimony is that you didn't have attitudinal and interpersonal conflicts with others. Is that fair? That's your testimony.
A. That's fair.
Q. But it's true that that's what you were told was the reason for your termination, correct?
A. That's what it says there.
Q. And that's what, in fact, you were told by those who terminated you, right?
A. That's correct.
Q. In fact, if we look at Exhibit 36--look at Exhibit 36, which is your termination notice. Do you see that?
A. Yes.
Q. Look at--it says, "Reason for separation." It says--do you see that?
A. Yes.
Q. What does that say?
A. Do you want me to read that or--

Page 234

Q. Yes.
A. "Mr. Callaway is being terminated due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees. He has repeatedly declared his dissatisfaction with"--now this is different than the one I received.
Q. All right. Look at the bottom.
A. In fact, that sentence was not in there.
Q. Look at the bottom. Is that your signature?
A. That is my signature.
Q. Are you saying you signed--you didn't sign it or you signed it--tell me--
A. I signed this, then the review board took place. But there was another termination letter that did not have that sentence there.
Q. Okay. So you're saying they eliminated that second sentence.
A. I believe so, yes.
Q. All right. But this was at least given to you initially before your review board.
A. Yes.
Q. All right. Well, skip that second

Page 235

sentence.
A. "Although he has been counseled on these issues, he has not made a good-faith effort to change and avoid conflict. As a pilot, he occupies a high-profile position and represents SkyWest wherever he travels. His hostile attitude and repeated conflicts with SkyWest employees, supervisors, and security personnel make him a tremendous liability to the company."
Q. That's what you were told was the reason for your termination, correct?
A. Yes.
Q. If, in fact, those were true, would you agree that there would be a really good reason to terminate you? Would that justify termination, in your understanding--
A. Would that just--
Q. --if what you just read was true?
MR. STRINDBERG: Well, objection. Calls for a legal conclusion.
THE WITNESS: I don't know.
BY MR. PETERSEN:
Q. Go ahead.
A. I don't know.
Q. You don't have any idea?

Page 236

A. No. I know pilots that have done much more serious infractions that have--that are still working there. I don't know what the basis is and who judges on that.
Q. What's a more serious infraction than this?
A. Flying violations. I mean, you know, conflicts with employees. You know, it could be any number of things.
Q. Okay. Tell me who you think has done worse than what you've read and is still working for SkyWest?
A. Well, alleged?
Q. You just indicated that you know employees who have done worse than this and are still working. I want to know who they are and what they--
A. One comes to mind is Ben Palmer.
Q. All right. What has Ben Palmer done?
A. He has been alleged to have been handing out union cards, arguing with gate agents, coercing other employees.
Q. Coercing them to what?
A. Sign a union card to ride in the jump seat. Maybe a couple other things. He was

Page 237

terminated and rehired.
Q. So coercing employees to sign union cards you believe is worse than--is more just reason for termination than what you've read as to the reasons given for your termination.
A. Like I said, I don't know who weighs in what level of discipline to administer.
Q. Right. But my question to you was, did this justify it? And you indicated there were worse things that others had done and were not terminated. And I asked you what was worse. So I'm assuming, then, you indicated Mr. Palmer did certain things. Do you consider his behavior to be worse than what yours was?
A. I consider that the things that he did are very similar to what was alleged that I had done.
Q. Why do you think, then, that you were terminated and he was not?
A. I think it's--it goes back to Mr. Breeze and the theory that was presented to me from SAPA that initially I was--embarrassed him by posting union organizing subject matter on the Internet. And it stemmed from there.
Q. You identified Mr. Palmer as one of the

Page 238

union targets.
A. Yes.
Q. He still works for SkyWest.
A. He did--well, he was terminated and then rehired, yes.
Q. Okay. You indicated that Mr. Palmer tried to coerce people into signing union cards.
A. That was alleged, yes.
Q. He still works for SkyWest though.
A. Yes.
Q. So if SkyWest was out to get someone who tried to coerce people for signing union cards, wouldn't they fire Mr. Palmer?
MR. STRINDBERG: Objection. It's argumentative.
BY MR. PETERSEN:
Q. Go ahead.
MR. STRINDBERG: That's exactly what they did, though, Counsel.
BY MR. PETERSEN:
Q. Go ahead. Answer the question.
A. They did fire him.
Q. But he's still working for them.
A. Well, you--in his termination paperwork it said that that was one of the reasons. I

Page 239

don't think that would hold weight.
Q. You understand my question, that if SkyWest doesn't want somebody working for them who coerces people into signing union cards, it wouldn't make a lot of sense, would it, to rehire Mr. Palmer if that's what he did?
A. Wouldn't make a lot of sense to fire him either and admit to firing for union organizing.
Q. Who else has done worse--in your mind, worse behavior, performed worse behavior and not been fired?
A. Phil Alford has had run-ins with--alleged run-ins with gate agents, conflicts. I don't know the details exactly without looking at my notes. Chip Drane.
Q. He still works for SkyWest.
A. He does.
Q. He's also one you identified as a target.
A. Yes.
Q. Why--if he's done the same things you had and the target is to get the union people, wouldn't they fire Mr. Alford?
A. Maybe.

Page 240

Q. They haven't.
A. No.
Q. So help me understand your theory as to why they fired you.
A. I'm not quite sure. Again, I think a lot can attribute it back to Jim Breeze.
Q. And the reason that you think Jim Breeze is out to get you is because of what you said about Brad Holt.
A. I think that might have influenced Mr. Holt's decisions as well, is that that was initially part of the reason for a lot of this was that and the bases that Mr. Breeze had.
Q. So you believe that the review board and those involved--by that, I mean Mr. Hyatt and Mr. Holt ultimately as the VP--that they were being coerced in--or that they were being influenced into doing something that had an ulterior motive by Jim Breeze.
A. Yes. It's possible, yes.
Q. And the factual basis for that belief is what? Is it just a belief theory you have, or do you have evidence?
A. Well, Mr. Hyatt testified that he--Jim Breeze ever regretted hiring me. And he also

testified that he did not recommend my termination.
Q. Okay. And who is it that you believe has the authority ultimately to terminate you?
A. Either Jim Breeze or Brad Holt.
Q. If Jim Breeze did not have the authority, then wouldn't that suggest that he wasn't behind your termination?
A. I don't know if it was Jim Breeze or Brad Holt that made that ultimate decision.
Q. But the theory you've proposed is that it's Jim Breeze who is the one who set you up for termination.
A. Yes.
Q. And the factual basis for that is Mr. Hyatt suggesting that he initially did not want you terminated.
A. Mr. Hyatt did not--
Q. Right.
A. --testified that he did not recommend termination.
Q. And that's one of the factual bases for you believing that it was Jim Breeze that was trying to get you fired.
A. It certainly points that direction.



Q. So is the answer yes?
A. Yes.
Q. And what else? What other facts?
A. Well, the facts that that's several correspondence in here from Jim Breeze, e-mails requesting and soliciting documents against me that have been backdated by one to two years.
Q. What documents? Are we talking about documents that are dated 2004?
A. There are documents in there I did see from 2004. There are also documents written in 2000--November of 2001 back dating information to the early part of 2000, a year and-a-half prior.
Q. What documents are we talking about?
A. There were some e-mails that Jim Breeze wrote. One was referencing this will serve as a verbal summary of his visit to St. George. There was also some e-mails from schedulers that did not accurately portray me.
Q. All right. Let's take a look at Exhibit 14. Show you that here in a second.
All right. I'm showing you what was previously marked as Exhibit 14. Do you see that?
A. Yes, I do.



Q. Is that the summary of verbal warning that you're saying Jim Breeze prepared?
A. Yes. He wrote that in the end of 2001.
Q. How do you know that?
A. Because we have a copy of the actual e-mail that you sent us.
Q. And this, you believe, is evidence that Jim Breeze wanted you fired.
A. Yes. This is him trying to document a case, I believe. First of all, it's completely inaccurate. The dates are inaccurate. And it was backdated a year and-a-half.
Q. But isn't this just a summary of what we've already talked about was talked to you about in December of 2000?
A. December of 2000. Sorry.
Q. Do you remember in--you indicated that you were called in to St. George corporate headquarters in December of 2000, right?
A. Yes, yes.
Q. And the allegations at the time were that you had made certain inappropriate statements on a Web site.
A. Uh-huh (affirmative.)
Q. And that you had made comments about



Brad Holt's house and that there was some inappropriate behavior toward the schedulers. Those were the allegations, right?
A. Yes.
Q. Isn't this simply a summary of that?
A. It is a summary that is written a year later with inaccurate information. There's accusations in here that are not substantiated in any other document.
Q. And you're--and it's your testimony that you have the original e-mail that had the date on it.
A. Yes, I do.
You have it right there.
Q. I do. Tell me where.
A. It's in this binder right here.
Q. All right. Show me where in the binder.
A. (To Mr. Strindberg) If that's the same copy as the one you gave me.
THE VIDEOGRAPHER: We're going off the record. Time is 3:54 p.m. This is the end of Tape 2.
(Recess taken 3:54-4:03 p.m.)
THE VIDEOGRAPHER: We're back the

Page 245

record. Time is 4:03 p.m. This is the beginning of Tape 3.
BY MR. PETERSEN:
Q. All right. Mr. Callaway, you've taken a break. I think you were going to find us a date for this exhibit. Did you find a copy that has a date on it?
A. Yes. It's 17, SW259.
Q. So based on this exhibit, is it your testimony that that's the first time this was written?
A. Yes.
Q. And how is it that you know that?
A. Because it was sent December 14. There's--2001. There's nothing in the record prior to that. If there was something written, wouldn't it be in the thousands of pages we have? And it also shows, you know, a solicitation for more people to write up stuff, in this case, Anita. And there seems to be quite a disdain for me in the tone of the voice where it says, This should be at our convenience, not his.
Q. Okay. And is that the factual basis that you have that you believe Jim Breeze wanted you fired?

Page 246

MR. STRINDBERG: Objection. Misstates his prior testimony.
BY MR. PETERSEN:
Q. Is it?
A. This is part of the reason why I believe Jim Breeze might have it out for me, if you--for lack of a better term.
Q. And why is it that you think he wanted to have you fired? Is it because of the December 2000 meeting?
A. The December 2000 meeting and the counseling statement, you know, mentioned my posts on--that I authored on the Web site for union organizing.
Q. The ones that you were counseled about in December of 2000.
A. That's correct. I believe that those activities pissed them off.
Q. And that's what--that supports, in your mind, the theory that Chris Abell voiced to you about-- .
A. That's part of it. Another part of it is Mr. Breeze approached a employee in the security department who is also a sheriff to have him conduct an illegal background check on me.

Page 247

Q. How do you know that?
A. The sheriff has written a statement.
Q. All right.
A. I also had to get a subpoena to get my home phone records to prove that I was not contacted by Jim Breeze regarding my medical license.
Q. All right. Tell me what that has to do with anything.
A. It shows that Mr. Breeze was pushing to find something to put on me on my record.
Q. So that's--I understand the basis that you think he wanted to fire you. And is it your testimony that he couldn't just up and fire you?
A. I don't know what the procedures are. I'm sure it would be a lot more--a lot easier to fire someone if they had a record rather than not have one.
Q. But you don't know whether or not you could have just--he could have just fired you anyway.
A. I don't know what he's thinking. I'm not sure how the exact termination--you know, who calls that--makes that call.
Q. All right. Let's go over--at some

Page 248

point you received the termination letter that's Exhibit 36, and you requested a review board, correct?
A. Yes.
Q. And you--why did you request a review board?
A. Because I thought the termination was unfair, unwarranted, and based on fabrication.
Q. All right. And so you thought, I'll go prove my case, right?
A. That is correct. That is one of the rights that the employee is guaranteed in the policy manual.
Q. Okay. Let's look at Exhibit 35, then, the SW003 where it says "Andrew Callaway's Presentation." It says, "Andrew Callaway presented for himself." You represented yourself in the review board, correct?
A. That's correct.
Q. You had as peer people, Robert Donohoe and John--how do you say that, Wangensteen?
MR. HYATT: Wangensteen.
BY MR. PETERSEN:
Q. "WAGON-steen." Did you object to having Mr. Donohoe or Wangensteen appear for--on



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 265

A. The posts on the Web site.
Q. Okay. Tell me where it mentions union activity.
A. Well, that's what I was discussing when I was talking about the visit to St. George. And I did mention in the review board my union organizing involvement.
Q. Did you mention--
A. Why--
Q. Go ahead.
A. Why it's not in here, I don't know.
Q. Did you mention to the review board that you thought any of the disciplinary actions that you received were related to your union postings?
A. I did mention the union post--
Q. Okay. But that wasn't my question.
A. --as the reason for me receiving the first counseling statement.
Q. So my question is, did you tell the panel that you--your first counseling statement was because you posted union?
A. That was my belief.
Q. Right. But what did you tell the panel during the review board?

Page 266

A. I don't remember the exact words.
Q. Is it possible that you did not mention anything about you being counseled because of union postings?
A. The recollection--my--best of my recollection is I did mention the posts regarding the union activities and the counseling statement.
Q. If we go to the tapes and transcribe them, that would answer that, wouldn't it?
A. Of course it would answer them.
Q. What you told them.
A. It would refresh all of our memories, I'm sure.
Q. Looking at--under where it says "Rebuttal" on SW004--do you see that?--
A. Yes.
Q. --it says, "Andy was terminated because of continual behavior that was not acceptable, not because of one incident." Why did--do you know why Kelvin responded like that?
A. I don't.
Q. Did you tell the panel that you believed you were being terminated because of the Kristen Wiley incident?
A. I believe that was the catalyst that

Page 267

caused the termination. It was like the last straw that they were going to deal with. I believe that all these incidents passed that were made to believe--to, you know, show a pattern were based on fabrication and documents that were false, with false allegations.
Q. And your belief that these are false and fabricated is just your theory.
MR. STRINDBERG: Objection. It misstates his testimony.
BY MR. PETERSEN:
Q. Go ahead.
MR. STRINDBERG: It's argumentative.
THE WITNESS: It's my belief, yes. There are documents in there that don't even resemble me, that talk about someone else.
BY MR. PETERSEN:
Q. And you believe they were fabricated or created to terminate you because what?
A. They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And they're going to build whatever they can to show a pattern of this type of behavior.

Page 268

Q. "They" being Jim Breeze.
A. Yes.
Q. It says--
A. When you have every document that says "Per Jim Breeze's request," I have no other reason to believe it was Jim Breeze.
Q. It says, "Andy did not accept responsibility for any of his behavior." Is that inaccurate?
A. Well, that would be inaccurate, because I did accept the two SADs that were given.
Q. Outside of that, you didn't accept responsibility for anything else. Is that fair?
A. That is fair. I didn't accept responsibility because also my evidence was never investigated.
Q. All right. Look at the next page where it says the "Decision." It's SW005. Do you see that?
A. Yes.
Q. It says, "After careful consideration, the panel members upheld the termination, but Andy was given the option to resign and be made eligible for rehire." Were you offered an opportunity to resign?



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 269

A. Yes, I was.
Q. It says, "Andy did not agree to the modified solution." You chose not to accept the resignation.
A. That's correct.
Q. And you knew at the time, didn't you, that if you didn't accept the resignation, you would not be eligible for rehire at SkyWest?
A. Well, why would I reapply to SkyWest? If I was forced to resign, which is what this was, how could I be eligible for rehire?
Q. Because that's what you were given as an option, if you resigned, you would be made eligible for rehire. Isn't that what you were told?
A. That's what I was told. I was forced--either forced to resign, be made eligible for rehire when there was absolutely no intention for the company to rehire me.
Q. And your--the basis for your belief on that is what?
A. The basis on my belief of what?
Q. Well, you were told--is it your--you admit, don't you, that you were given the option to resign and made--to be made eligible for rehire

Page 270

at SkyWest?
A. Uh-huh (affirmative.)
Q. You were told that, right?
A. Yes, I was.
Q. All right. And you're telling me now, as I understand it, that even though you were told you would be eligible for rehire you would never be rehired.
A. That's correct.
Q. And your factual basis for that is what? Do you have one?
A. I think it's been detailed in the thousands of pages we have here.
Q. Well, I would like some direction as to why it is you think that if you're told you would be eligible for rehire you, in fact, would never be rehired?
A. I would never be eligible for rehire because I don't think Jim Breeze would ever allow that to happen again after, you know, my postings pissed him off.
Q. And other than your belief, do you have anything else to support that?
A. Recently, I guess the--I understand that the--this was--this modified solution was the

Page 271

result of a split review board, where the pilots favored my reinstatement, and it was not granted.
Q. Jim Breeze was not part of that review board, was he?
A. No.
Q. So that decision wasn't made with his input.
A. The review board can be--decision can be overturned by management.
Q. All right. My question was, though, he didn't have input into the decision by the review board.
A. I don't know if he did. And I believe Mr. Hyatt's testimony said that the decision was made before the review board took place.
Q. I want to know what your testimony is. So is it your testimony that the review board did not come up with this modified solution on its own?
A. I don't know. Those are behind closed doors. I don't--I'm not privileged to who decides what.
Q. Do you have any evidence that would suggest that it was--that they were influenced by anything outside of themselves?

Page 272

A. No.
Q. Nonetheless, you opted to be terminated, right?
A. That's correct.
Q. Why?
A. Because I felt that resignation and rehire was not a good--an offer. My--again, my evidence was not weighed in. It was not reviewed. And I believe it was strictly to get rid of someone who was vocal on union activities.
Q. They didn't fire any of the other target people you identified, though.
A. They fired Ben Palmer. They fired Randy Chappell.
Q. Right, but they rehired Ben Palmer.
A. Right, they did rehire him. I--you know, this goes back to Jim Breeze, I believe, and maybe others that were not happy with my vocal posts on the union drives.
Q. And how is it that you know Jim Breeze read any of your postings?
A. Why else was I summoned to St. George to discuss posts I authored on the message boards? Somebody read them, and that was discussed with Brad Holt and Jim Breeze.

Page 273

Q. And at the meeting it was told to you it had to do with union activity.
A. That's what the posts were. And that's what I indicated them to be.
Q. Right. But were you told that by Brad Holt and Jim Breeze at the meeting?
A. I don't recall. We were right in the middle of a union drive. I believe it was mentioned. What my--
Q. Who told it to you? Who said to you, Your postings are about union drives?
A. I don't recall. Mr. Holt conducted most of that meeting.
Q. Okay. And you're aware, aren't you, that if you are terminated from SkyWest, that has an adverse effect on your ability to get a job with another airline as opposed to resigning from SkyWest?
A. From my perspective, a resignation for no apparent reason is just as bad. I could not have--any possible explanation as to why I would resign as a captain of SkyWest Airlines, especially when no one was hiring.
Q. So it's your testimony that either way is the same result.

Page 274

A. That's correct.
Q. I'm going to show you--
Exhibit-43 marked
BY MR. PETERSEN:
Q. --what's been marked as Exhibit 43. Do you see that document?
A. Yes.
Q. What is that?
A. I believe this is the request for review board hearing that I had to fill out to get the review board.
Q. So you prepared this document.
A. Yes, I did.
Q. That's your signature at the bottom.
A. Yes, it is.
Q. Toward the bottom before the department head comments.
A. Yes.
Q. And it says, "Date Appeal Requested: 10/3/03." Is that when you requested your review board?
A. It appears that way.
Q. Well, under the "Reason for Appeal," did you write that in?
A. Yes, I did.

Page 275

Q. All right. Tell me--if I look at the third sentence--fourth sentence, it says, "According to her admission in court, the recent complaint from Kristen Wiley was made in retaliation for a small claims lawsuit I filed against her to collect a debt. I believe my termination for collecting a debt I was owed is unfair because it does not reflect poorly on SkyWest."
You wrote that, right?
A. Yes.
Q. And as I read that, you're saying--this is consistent with what you testified to earlier where you said that Kristen admitted she got you fired.
A. That's correct.
Q. And you say in here that it is retaliation by Ms. Wiley because of you suing her in small claims.
A. That was part of the reason, yes.
Q. Well, do you--
A. This was the catalyst that I believe was used to fire me.
Q. This reason for appeal statement says nothing about union activity, does it?

Page 276

A. No, it does not.
Q. It doesn't mention anything, in fact, related to any postings at all, does it?
A. I was not aware of the scope of the files that were faxed to me after--you know, prior to the review board. As soon as I read all of that material, my opinion changed.
Q. Okay. But at least by 10/3/03, your belief was that you were terminated for collecting a debt.
A. On 10/3, yes. As soon as I reviewed all the material, no.
MR. STRINDBERG: Objection. It also misstates his prior testimony. He said it was a catalyst or an excuse.
BY MR. PETERSEN:
Q. Well, let me have you read the last sentence. Doesn't that state your belief?
A. Yes, this is the catalyst I believe was used to fire me.
Q. Right. But you believed that you were a target for union activity--
A. Oh, yes, absolutely.
Q. --clear back in 2000.
A. Absolutely.

Page 285

references was accusing me of being arrogant and a liar.
Q. So when it says, ". . . and feel that there are areas that I would like to become more sensitive in and understanding towards," is that something you meant to say or was that something you simply said because you wanted to save your job?
A. No, that's something that--if someone keeps--you know, accusing me of being arrogant, you know, I'm going to do something to maybe change that perception. But that perception is an individual opinion.
Q. So is the answer that, yes, you did feel that there were areas that I would like to become more sensitive in and understanding towards, or is your answer that, no, you did not feel that?
MR. STRINDBERG: Objection. Asked and answered.
BY MR. PETERSEN:
Q. Go ahead.
A. I've answered it.
Q. Answer it again, please.
A. What was the question?

Page 286

Q. All right. It's a simple question, Mr. Callaway. And you've not answered it. I said to you, when you wrote the sentence, "I have thought about everything that was said to me when we met and feel that there are areas that I would like to become more sensitive in and understanding towards," my question is, did you mean what you say there?
A. Yes.
Q. Okay. Did you get an employee handbook when you were first hired on at SkyWest, Mr. Callaway?
A. Yes, I did.
Q. Do you recall whether that handbook had anything referencing something that is referred to as at-will language?
A. Yes.
Q. What do you recall that that language indicated to you?
A. I don't recall. I don't have a copy in front of me, and I don't know what it says.
Q. Do you have an understanding as to whether--at the time you were hired you could quit at any time?
A. Yes.

Page 287

Q. You could, right?
A. You could quit, yes.
Q. And you didn't have to give notice to the company, you just quit.
A. I believe two weeks' notice was requested.
Q. Do you know whether it was required?
A. I don't recall.
Q. Do you have an understanding as to whether the company could terminate you at any time?
A. Yes.
Q. And that understanding is that they could?
A. Yes.
Q. With or without notice?
A. Yes.
Q. And with or without cause?
A. Yes.
MR. PETERSEN: I'm about done with my questions. So let's take a two or three minute break. And I'll get to the end here.
THE VIDEOGRAPHER: We're going off the record. Time is 4:51 p.m.
(Recess taken, 4:51-4:58 p.m.)

Page 288

THE VIDEOGRAPHER: We're back on the record. Time is 4:58 p.m.
BY MR. PETERSEN:
Q. All right. Mr. Callaway, I'm going to show you what's been marked as Exhibit 45.
Exhibit-45 marked
BY MR. PETERSEN:
Q. Do you recognize that document?
A. Yes.
Q. Tell me what it is.
A. It's a letter from Robert Odor, who was approached by Mr. Breeze to conduct an illegal background check on me.
Q. Why do you say "illegal background check"?
A. It mentions it right there that-- "Highly unusual considering it would be illegal and outside the scope of my duties." Also, background check is--cannot be conducted without the employee's consent.
Q. And the basis for your belief of that.
A. I've researched the Utah Code regarding that.
Q. Okay. So you're making a determination--so you think the legal effect is of

Page 336

employee handbook sets forth certain terms and conditions of employment which may constitute an implied in fact contract as well as the practices of the airline. These practices include not terminating pilots except for cause and giving them the opportunity to appear before a review board."

Now, yesterday you testified that you were aware that the handbook has language saying that your employment with SkyWest is at-will, correct?

A. Yes.

Q. And that you could quit at any time with any--for any reason, right?

A. Yes.

Q. And that, in fact, it explains that you can be fired at any time and for any reason, right?

A. Yes.

Q. You also testified yesterday that, for example, if a pilot tests positive for alcohol or drug use, that they are terminated automatically without any procedures. Is that right?

A. I would assume so, yes.

Q. Are there--is there anything outside of

Page 337

what you've testified to that you would add to your answer to Interrogatory No. 5?

MR. STRINDBERG: Objection. It calls for a legal conclusion.

THE WITNESS: I have no idea.

BY MR. PETERSEN:

Q. So there's nothing additional, factual--

A. There might be.

MR. STRINDBERG: Objection. It calls for a legal conclusion.

BY MR. PETERSEN:

Q. All right. So I--what I would like to know is, as you sit here today, is there any facts other than what you've already testified to that you would like to add to this particular answer?

A. There might be. There might not be. I don't know.

Q. Well, if you have an idea as you sit here today, I am entitled to know it. And if you don't, then you can say, I don't have any more.

A. Well, I don't have any more today.

Q. Okay. Mr. Callaway, if you look at Request No. 3, which is on page .4, it says,

Page 338

"Please"--what it's requesting is all documents you will or may seek to introduce as exhibits at any trial or hearing in this action. And the answer says, "Plaintiff has not decided what documents he will offer as exhibits at trial." Is that still your position today?

A. Yes, it is.

Q. Have you produced to us, other than the names of the people that you were in touch with at Polar Air--have you produced with us--to us today all documents that you believe are relevant to the claims you have against SkyWest?

A. As--

MR. STRINDBERG: Objection. It misstates his prior testimony.

BY MR. PETERSEN:

Q. Go ahead.

A. As of today, it seems to be that way.

Q. All right. Do you anticipate that you--this isn't a trick question--do you have any idea as you sit here today that you anticipate having additional documents that you intend to submit as evidence in this case?

A. Yes.

Q. All right. What documents do you

Page 339

anticipate you'll be submitting in addition to what you've already produced?

A. I don't know right now. I don't have those documents in front of me. I don't have an answer to that question.

MR. EMERSON: Mr. Strindberg, I think we need to have a quick discussion. Discovery deadline here is in six days. If we're unable to identify the witnesses that'll be called at trial or identify any of the exhibits that are going to be used at trial, I think we have a right to know what those are by the end of discovery. So we either need to extend discovery so you have time to figure that out or get these questions answered today.

MR. STRINDBERG: Well, I--Scott and I have already some time ago talked--had had a discussion about extending discovery.

MR. PETERSEN: We need to--

MR. STRINDBERG: And I think we need to follow up on that. I don't disagree with you. They are--you know, we have produced, you know, witnesses and documents, you know, already. I mean, the witnesses are listed in our initial disclosures, as I recall. I don't know if it's



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

interpret the docs for me. Tell me what it is.
A. I--well--start on page .1 and go to 181.
Q. If that's what you need to do. I don't need a page by page. What I want to know is, what do you believe the significance is in relation to your claims against SkyWest?
A. A lot of these--
MR. STRINDBERG: Counsel--just a second. Counsel, you asked for these documents. We provided them. You asked for all submissions to the SAPA Web site. We--they were printed out. They were in a string of e-mails. Okay? Some of them are from people other than Mr. Callaway. We included those because that's how they--one, how they printed out and you could gather--you know, the threads of conversations about them. So I . . .
BY MR. PETERSEN:
Q. All right. Do you understand my question?
MR. STRINDBERG: Well, I'm going to object to the question. It's unclear and ambiguous. What do you mean?
BY MR. PETERSEN:
Q. Do these 181 or so pages--are they



probative of anything--of any of your claims against SkyWest?
MR. STRINDBERG: Objection. Calls for a legal conclusion.
THE WITNESS: These posts are--regard a lot of union organizing activities. Our arguments as to why we should be unionized. There's discussion between other pilots on here.
BY MR. PETERSEN:
Q. Right.
A. That's it.
Q. Okay. Are you saying that SkyWest had copies of this?
A. I'm sure SkyWest has read these, yes.
Q. How do you know that?
A. It's no known secret that management has access to the SAPA boards.
Q. How do they have access to the SAPA boards?
A. You asked that question yesterday. And I answered it.
Q. All right. Refresh my recollection. What was your answer?
A. You know, anybody can, you know, print this stuff out, send it down to St. George. They



could gain access to the message boards if they had a, you know, friend that was, let's say, anti-union, decided to give their password to management.
Q. Do you know whether somebody specifically printed out these documents and gave them to somebody at management at SkyWest?
A. I have no idea.
Q. All right. Did you print these off of your home computer?
A. Yes, I did.
Q. And you said that you think that Mr. Novak purged the postings prior to this date or thereabouts.
A. Yes. There's nothing on the current message board that goes prior to these dates.
Q. And do you know why Mr. Novak purged those?
A. I believe it has--is more of an issue of storage capacity.
Q. Okay. So it's just at some point he starts--the memory builds up, or whatever, the storage, and he wants to get rid of them because they're old.
A. That would be my guess. You'd have to



ask him.
Q. Do you know whether or not there's a policy that he has about, you know, after X years, I'm purging it?
A. I don't know if he has a policy on that.
Q. Okay.
A. I don't know if he makes a backup or not.
Q. So when you say you print this off, this isn't on your hard drive at home. This is on the SAPA server.
A. This is from the SAPA--skywestpilot.com SAPA, you know, Web page.
Q. You access that SAPA site, and then you download to your home printer, I guess, this stuff. Is that how it works?
A. That's correct.
Q. Okay.
MR. STRINDBERG: One second.
(Attorney-witness discussion held off the record.)
BY MR. PETERSEN:
Q. Other than what you've printed here, do you have downloaded on your home computer any prior e-mails or postings?

# Exhibit "B"

Jim Breeze will call & tell him no! He no showed on Feb 2, 1998 for class. Karalee 7/20/98

David Andrew Callaway
1921 Mahre Drive
Park City, UT 84098

July 13, 1998

Capt. Jim Breeze
SkyWest Airlines
Salt Lake International Airport
AMF Box 22151
Salt Lake City, UT 84122

Dear Capt. Breeze:

I met you in October after my colleague and good friend Mike Jones contacted you on my behalf. I was offered a flight officer position in February after interviewing on January 6. Unfortunately, I was faced with great disappointment when I was unable to accept the initial class date due to a family medical problem that required my immediate attention in Tennessee. In the interim I have maintained my flying currency, including a third transatlantic flight, and would like to express my continued strong desire to work with the SkyWest team and further my aviation career.

However, due to the rather sudden and untimely situation with my family member, I hope that I have not jeopardized my standing as a qualified flight officer with SkyWest. If the position is still available or can be extended again, I will show my enthusiasm with great dedication. I will appreciate any effort on your behalf to assist me with my success. If you have any questions, please contact me at 435-647-0541. Thank you again for your time and consideration. I look forward to hearing from you in the near future.

Let me know if I can bring this guy in or not.

Sincerely,

Andrew Callaway

File in his file in the No's

No showed for class!!

DEPOSITION EXHIBIT 11 Hyatt

PENGAD 800-631-6989

| Post-it® Fax Note 7671 | | Date | # of pages |
|---|---|---|---|
| To Lorraine C. | | From [illegible] | |
| Co./Dept. What do you | | Co. | |
| Phone # think? | | Phone # | |
| Fax # 3306 | | Fax # | |

# Exhibit “C”

# Flight Operations Organization
October 2003



# Exhibit "D"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

COPY

DAVID ANDREW CALLAWAY, )
Plaintiff, )
vs. ) Case No. 2:04CV00179
SKYWEST AIRLINES, INC., ) Judge Ted Stewart
Defendant. )

DEPOSITION OF JAMES BREEZE

Taken at the Holiday Inn Conference Room
850 South Bluff
St. George, Utah

On Monday, November 29, 2004
at 4:50 p.m.
AND RESUMING ON
Tuesday, November 30, 2004
at 9:05 a.m.

REPORTED BY: JENNIFER SULLIVAN, RPR

Depomax℠
REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

A. On two occasions.
Q. Where was the first meeting?
A. In St. George, corporate offices.
Q. Who was involved in the meeting?
A. Brad Holt and myself and Andy.
Q. Had you asked Andy to come down to St. George?
A. I don't think I asked him directly. I think I asked Kelvin to have him come down.
Q. Why did you ask Kelvin to have Andy come down to St. George?
A. There had been complaints about Andy's abrasiveness with crew scheduling. We wanted to have him come down and have a visit with him. This isn't how we treat each other in this company.
Q. What time of year was that meeting?
A. I don't recall.
Q. What was discussed at that meeting?
A. Just his -- his contact with crew scheduling, and there had been several complaints from the crew schedulers on calls. The whole gamut from whining, complaining, disagreeing. And it was just unacceptable, and he was told so.
Q. Pardon?
A. And he was told that, to not do it again.

# Exhibit "E"

SkyWest AIRLINES®

# HANDBOOK

Includes Benefits Guide and Tips for SkyWest Online

# 2004

Case 2:04-cv-00179-TS Document 51-2 Filed 06/06/05 PageID.415 Page 41 of 48



# Work Environment

More detailed information regarding the content covered in this handbook can be found in the Company Policy Manual.

**More Online** - Our SkyWest > Our Policies > Company Policy



**Safety**

Safety is top priority at SkyWest. Each of us must think, plan, communicate and act appropriately to prevent injury or illness to ourselves, our fellow employees and our customers.

The SkyWest Airlines Safety Program is designed to prevent personal injury and property losses resulting from accidents and incidents. Attention to safety is a basic consideration of employment and each of us must be accountable for our actions. We truly live by our mission to practice health and safety first. It is the responsibility of each employee to ensure that safe practices are implemented in everything we do. This includes the responsibility to report any mishap, injury, or illness to your immediate supervisor. Violations of our Safety Policy will result in appropriate disciplinary action.

**Nature of Employment**

Employment with SkyWest is voluntarily entered into and the employee is free to resign at-will at any time, with or without cause or notice. Similarly the employer may terminate the employment relationship at will at any time, with or without cause or notice.

**Equal Employment**

SkyWest is committed to providing an equal employment opportunity to all applicants and employees in all aspects of the employer-employee relationship, including but not limited to recruiting, hiring, promotions, training, compensation and benefits, transfers and termination of employment. Discrimination or harassment on the basis of race, religion, color, sex, age, national origin, affinity orientation or disability is prohibited. Questions or concerns regarding our equal employment policy should be directed to the People Department.

**Americans with Disabilities Act (ADA)**

SkyWest is committed to complying with the Americans with Disabilities Act (ADA). The ADA prohibits discrimination against qualified individuals with disabilities who, with or without reasonable accommodation, could perform the essential functions of the employment position. These accommodations should enable the employee to perform the essential functions of the job without creating an "undue hardship" on the employer. Accommodation requests should be directed to the People Department.

Case 2:04-cv-00179-TS Document 51-2 Filed 06/06/05 PageID.416 Page 42 of 48

FINAL WARNING –Following a counseling statement, a final warning may be issued which may include time-off or other disciplinary action up to and including termination.
SUSPENSION – This action is reserved for situations when further investigation is required pending a final decision.
DISCHARGE – This may occur if the offense is of serious nature or when prior warnings have failed to correct a performance or behavioral problem.

Any of the above steps may or may not be used when dealing with disciplinary problems. Every case will be considered individually and reviewed based on employment history, attitude, and severity of incident. The use of published disciplinary procedures does not change an employee's at-will status or in any way restrict the Company's right to terminate such an employee.



## Employee Appeals Process

Terminated employees will have the opportunity to have disciplinary actions resulting in termination reviewed. The terminated employee will be provided with an opportunity to present his/her issues and appeal the decision through a formal complaint and appeals process. All review processes will remain confidential. The appeals review committee will review all available facts surrounding the termination appeal and make a decision based on the information presented.

## Employee Separation Procedures

**Voluntary Resignation** - In the case of a voluntary resignation, please provide two week's notice to allow time for transfer of duties and responsibilities. A letter of resignation is also requested.

**Furlough** - This is defined as the release of an employee or employees, through no fault of the employee, due to lack of work or business necessity. In the case of a furlough, the possibility exists the employee may be recalled to work.

**Layoff** - Layoff is a permanent reduction in the workforce due to business necessity where the release is no fault of the employee.

## Property Clearance Procedures

When an employee terminates employment with SkyWest, all company property must be returned to his/her supervisor or a People Department representative by the last day worked. The following items must be returned:

ID Badge (Airport and Company)
Parking Pass
Uniform
Keys
Equipment (laptop computer, cell phone, pager, etc)
Credit and Calling Cards
Other items of SkyWest property

An employee who fails to return SkyWest property will owe the Company the amount equal to the replacement of such property.

# Exhibit "F"

Paragraph Page

1. Purpose ....................................................................................................1
2. Harassment ...............................................................................................1
3. Sexual Harassment....................................................................................1
4. Reporting Harassment ...............................................................................2
5. Disciplinary Consequences .........................................................................2

## 1. Purpose

A. SkyWest Airlines promotes a productive work environment and does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment. This policy establishes guidelines for ensuring a productive work environment, and provides procedures to follow if an employee has been the victim of harassment.

## 2. Harassment

A. Employees are expected to maintain a productive work environment free of harassment. This includes not only sexual harassment but also harassment based on race, gender, sexual orientation, national origin, religion, disability, pregnancy, age or military status.

B. Each manager and supervisor has a responsibility to maintain a workplace free of harassment and, in particular, sexual harassment.

## 3. Sexual Harassment

A. Sexual harassment includes, but is not limited to, the following conduct by any employee, manager, supervisor or non-employee:

1) Threats or insinuations, either explicitly or implicitly, that an employee's refusal to submit to sexual advances will adversely affect the employee's employment evaluation, wages, advancement, assigned duties, shifts, or any other condition of employment or career development.

2) Physical harassment including offensive touching, grabbing, and/or suggestive gestures.

3) Verbal harassment such as lewd comments, sexual flirtations, offensive or inappropriate personal questions, or degrading words.

4) Visual harassment including the display in the workplace of sexually suggestive objects or pictures, including nude photographs.

5) Offensive written materials including letters, email messages or graffiti.

17a



**4. Reporting Harassment**

A. Any employee who believes/perceives that he/she has been the subject of harassment, sexual or other, has a responsibility to report or complain, as soon as possible, to their immediate supervisor or to the Manager of Employee Relations.

B. All complaints of harassment will be investigated promptly and in an impartial and confidential manner. Employees are required to cooperate with any investigation. A timely resolution of each complaint will be reached and communicated to all parties involved.

C. If an employee is not satisfied with the handling of a complaint or the action taken by the Manager of Employee Relations, the employee should bring the complaint to the attention of the Vice President of People. In all cases, the employee and Vice President of People are to be advised of the findings and conclusion in writing.

**5. Disciplinary Consequences**

A. Any employee, supervisor, or manager who is found, after appropriate investigation, to have violated the harassment policy will be subject to appropriate disciplinary action, depending on the circumstances, up to and including termination. SkyWest prohibits retaliation against employees for bringing bona fide complaints or providing information about harassment.

14)All Crewmembers will report fit for duty. In order to ensure that each crewmember is fit for duty, the following must be adhered to:

a) As a general policy, Crewmembers should avoid drugs when flying. Pilots will clear all use of medication with his/her Chief Pilot or an aviation medical examiner. Flight Attendants should ask their physician if the medication prescribed would affect their ability to perform as a Flight Attendant. If in the opinion of the physician the prescription would affect their ability to fly they must notify their Chief Flight Attendant/Assistant Chief Flight Attendant. The use of any non-prescribed drugs including all medications prohibited by FAA for use while flying or the use of any unlawful agent or drug is considered cause for immediate dismissal.

b) It is recommended that crewmembers not give blood unless it is absolutely necessary. A crewmember may return to work seventy-two (72) hours after giving blood provided that after donation a physician must perform a hematocrit test to determine that the crewmember's blood is no less than three percent (3%) lower than his/her hematocrit prior to donation. This test need not be accomplished if fourteen (14) days has elapsed since donation.

c) To avoid decompression sickness, crewmembers will not begin a flight within twenty-four (24) hours of the end of SCUBA diving.

15)If a crewmember becomes ill and is unable to perform his/her normal duties, crew support or flight control shall be notified as soon as possible by that crewmember. This notification shall include the nature of the illness and the length of time expected to be off duty. If, for any reason, the length of time must be exceeded, the Company shall be notified immediately.

16)Flight Attendants shall insure the safety, order and cleanliness within the cabin.

17)Crewmembers will not release any information, regardless of intent, to the press or news media. All requests for information will be directed to the Vice President of Flight Operations or other authorized personnel.

18)Crewmembers shall not discriminate because of age, gender, race, color or creed to fellow employees or passengers.

19)Crewmembers are expected to follow direct (legal) orders given by a member of management or other person in authority. Full cooperation is necessary, when asked, to provide information to the Company in an investigation.

20)Crewmembers may not restrict work output or encourage others to do so.

21)Crewmembers may not make or publish false, vicious or malicious statements concerning any employee, management representative of the Company, or which has the potential to adversely affect the Company's relationship with customers, suppliers, employees, or the public.



22)Crewmembers may not possess, use, sell, or distribute any medically unauthorized or illegal drugs while employed with the Company or on Company property.

23)Unauthorized, attempted possession, or removal of any Company property including records, private information, property of employees, property of customers or others with whom the Company does business will not be tolerated.

24)Crewmembers may not abuse or misuse any travel benefits (free, reduced rate or while on Company business) and/or obtain or conspire to obtain travel benefits for which you are not entitled or for individuals who are not entitled.

25)Crewmembers will be held responsible for any misconduct of employees/relatives and or persons traveling on a buddy pass while traveling or attempting to travel on a pass or reduced fare ticket on Company flights or any other carrier.

26)Crewmembers will submit only true and accurate information on all Company records and reports.

27)Crewmembers may not transport, attempt to transport, or allow to be transported, unauthorized individuals, or prohibited or illegal articles on which appropriate charges, taxes or duty have not been paid.

28)Crewmembers may not deliberately destroy, deface, misplace or damage any Company property, the property of others, or property for which the Company bears responsibility.

29)Crewmembers may not misuse or permit others to misuse Company computer equipment, including computer terminals, printers and related support equipment, whether the Company's property or other property for which the Company bears responsibility. The misuse, destruction, distortion of information, data of or instruction codes will not be tolerated.

30)Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and/or within any other work related circumstances.

31)Crewmembers may not gamble on Company property.

32)Improper or negligent behavior while on Company property and/or in other work related circumstances will not be allowed.

33)Unauthorized absence from work and/or repeated failure to properly notify the Company of any absence will not be tolerated.

34)Crewmembers shall not involve the Company in the crewmember's personal financial affairs.

35)Crewmembers shall not chew gum while in uniform in view of passengers or the public.

17b

B. Computer software may only be installed or upgraded on SkyWest computer systems by or under the specific direction of SkyWest IT personnel. This allows us to license software properly, maintain system integrity and limit the introduction of computer viruses. Under no circumstances should anyone load personal software (any software not purchased/licensed by SkyWest) on SkyWest computer systems.

**5. Data Protection**

A. Backup copies of your data should be maintained in case of system hardware failure or data corruption. Personal computer users should ensure that any critical company data is stored on network servers where the SkyWest IT Department will periodically backup the information to magnetic tape. If storage on a network server is not feasible then computer users are responsible for performing their own regular data backups. The IT Department should be contacted if assistance in developing a data backup plan is required.

**6. Hardware Protection**

A. Automation equipment provided by SkyWest Airlines and our code-share partners is very costly. Care should be taken to prevent theft or damage when transporting or using it. Particular care must be used with portable computers and video projection equipment. If at all possible, computer equipment should not be checked as luggage or placed in luggage compartments.

**7. Internet and Electronic Mail Policy** — For your reference. I am not being charged with violating this policy.

A. Electronic Mail (e-mail) and Internet/Intranet Access is provided according to management approval. These tools can enhance our ability to gather information and communicate with employees, customers and trading partners. The following policies have been established regarding their use:

1) Internet and Intranet access is provided for SkyWest business purposes and we reserve the right to restrict access accordingly.

2) Our systems can monitor each web-site that has been visited, each electronic mail message that has been sent or received, and each file transfer into or out of our internal networks, and we reserve the right to do so at any time.

3) Use of the Internet to access online radio stations and online video materials without a valid business purpose is forbidden.

4) Internet based electronic mail (Hotmail, Yahoo, AOL, etc.) may not be accessed from company owned equipment.

5) Files attached to e-mail messages should not be opened unless the receiver is expecting them. Executable (.exe) or visual basic (.vbs) files that have been received via e-mail should never be opened.

6) E-mail messages from unknown senders should not be opened and should be deleted from your system.

7) E-mail jokes, chain letters or attachments that have no business purpose should not be sent or forwarded.

8) The display of any sexually explicit image or document on any company system is a violation of our company policy on sexual harassment.

9) SkyWest Internet facilities and computing resources must not be used to violate the laws or regulations of any city, state, or nation. This includes adherence to all intellectual property, obscenity, security and privacy laws.

10) SkyWest reserve the right to inspect all electronic files stored on SkyWest network servers, personal computers and magnetic storage media.

11) Any files downloaded via the Internet into the SkyWest network and all e-mail messages created, sent, or received become the property of the SkyWest.

12) Files or programs may not be downloaded from the Internet unless specifically authorized by IT personnel.