# Exhibit “G”

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, vs. SKYWEST AIRLINES, INC., Defendant. | CIVIL NO. 2:04CV00179<br>DEPOSITION OF: KELVIN HYATT<br>Held November 5, 2004<br>REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of KELVIN HYATT, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 9:35 a.m. on November 5, 2004, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *



Depomax REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

things where pilots can print messages and stuff on there.
A They have some forums that I'm aware of.
Q But you don't know if the SAPA has its own web site?
A I don't know. I'm not allowed to participate, as management, in SAPA's web site.
Q Have you ever tried to?
A Not as management, no.
Q So you just referred to SAPA web site, so you're aware that there is a SAPA web site?
A They have a forum. That is all that I'm aware of.
Q What's, in your mind, different between a forum and a web site?
A Web site would be a formal log-in SAPA.com type of web site. As far as I know, they do not have such a thing. They do have some message boards under a web site known as SkyWestPilot.com, but that contains areas for management and pilots in general, as well as other employees, to participate in communications, back and forth open forum discussion.
Q And this -- what was the web site called?
A SkyWestPilot.com.
Q And who, do you know, owns that web site?



A I believe it's owned by a gentleman by the name of Bob Novak.
Q So it's not owned by SkyWest?
A No.
Q And there's different sections on this -- his web site -- which allows different access to different levels of people?
A Yes.
Q How many different forums are there on that?
A I believe there's at least four different group forums. And as far as how many specifically, I don't know. I don't spend much time on it.
Q And when did Bob Novak start these --
A It's been around -- probably prior to SkyWestOnLine implementation.
Q Does SkyWestOnLine have any of these same type of on-line forums?
A Yes.
Q And who has access to them?
A All employees.
Q Now, if I, as a consumer and not an employee of SkyWest, type in "SkyWest" in the computer, do I end up at SkyWestOnLine, or is there a public --



A There is a SkyWest.com, which is for public use.
Q Okay.
A SkyWestOnLine is not for public use. Unless you had a password and an employee number to access it, you would not have access to that site.
Q Who runs SkyWest -- www.SkyWestOnLine?
A SkyWest Airlines.
Q Who at SkyWest Airlines?
A Specifically, I don't know who. It's probably overseen by the internal IT department.
Q Who is the head of the IT department?
A Jim Jensen.
Q Does the IT department also manage and control the public web site?
A For SkyWest.com, I believe so.
Q When did you -- well, let me put it this way: How did you learn that Kristen Wiley had a complaint or a concern about Andy?
A I was approached by the in-flight administrative assistant indicating that a flight attendant had some issues that she wanted to discuss with me concerning an RJ captain.
Q And who was this person who -- this administrative assistant?



A Amy Smith.
Q And where does she work out of?
A Salt Lake International.
Q Does she report to you or --
A No. She reports to Harold Allen.
Q Who is Harold Allen?
A He's the chief flight attendant.
Q And did Amy approach you in person or --
A Yes.
Q What did she say to you?
A She said, "I have a flight attendant out here who wants to discuss an issue with you concerning one of your pilots."
Q And what did you -- when did this occur?
A I don't remember the specific date. It was in the morning.
Q Where did it occur?
A In my office in Salt Lake.
Q Was there anyone else present besides you and her?
A No.
Q What was the next thing that happened?
A I agreed to talk with her about the situation. And she explained to me what was troubling her and she broke down and started crying

and --
Q Did Kristen come in that day?
A Yeah. She was standing outside.
Q Oh, okay. Okay.
A She was in the office, yes.
Q Okay. So Kristen then came into your office?
A Yes.
Q Did Amy Smith stay in your office?
A No.
Q So it was just the two of you?
A Yes.
Q Did you take any notes or anything?
A No. A few notes about who it was she was talking about. I did ask her -- she was complaining that she felt she was being harassed on the company message system.
Q Okay. And I'm going to ask about what was said. I'm just asking if you took any notes, and your answer is you took a few?
A I took basically notes to the point of noting who it was, noting employee ID numbers, who she was, employee ID number, but as far as other notes, no.
Q What have you done with those notes?



A I have no idea. I have many, many notebooks around and probably they went away with a lot of other operational at-the-moment type notes.
Q What do you mean you have a lot of notebooks?
A Well, when I get phone calls or people come in, I'll write a note to myself, and then as things are dealt with, they go away. I chuck them.
Q Okay. Tell me what Kristen said to you and what you said to her.
A Kristen indicated to me that she was receiving harassing E-messages via SkyWest messaging from Andy Callaway over some money that he felt she owed him; however, she felt that she did not owe this to him. She was feeling to the point that she was not wanting to even read her messages, which we do require crew members to read messages via the messaging on SkyWestOnLine.
She was upset to the point that she said she was fearful of him coming to work, due to harassment from Mr. Callaway over the monies that he alleged she owed him.
Q What did you say?
A I said, "Well, I will see what I can do about stopping that, but we don't allow employees to



harass other employees."
Q Now, you didn't interpret the word "harassing" or "harassment" to mean sexual harassment, did you?
A No, I did not.
Q Is there -- were there some guidelines anywhere about what could be sent over the -- what kind of messages could be left?
A As far as messages specifically, no, not that I'm aware of. However, harassment -- certainly if somebody is harassing somebody, whether or not it is sexual, you still can be harassed, and if you feel that that harassing issue is contrary to a good work environment, yes, the airline has to deal with that.
Q Even though it involved a private matter, private dispute?
A A private dispute on company property is still a company problem.
Q What company property was being used?
A The SkyWestOnLine messaging. That is a total intranet function.
Q Intranet?
A Intranet.
Q Okay. So how long did this conversation with Kristen last?



A Five, maybe ten minutes. I did ask her to print off the messages and bring them in to me.
Q Okay. And did she do that?
A She did.
Q And when did she do that?
A Within minutes of me asking her to do so.
Q How did she do it so quickly?
A She was able to walk out into the crew area where the computers -- a number of computers exist -- and log in and print those messages on the printer.
Q Okay. And then what did she do?
A She brought them back to me.
Q What did you do?
A I then sent a message to Andy asking -- well, I did open his file and noted that there was a counseling statement in there from the incident in Butte where he was abusing fellow employees and --
Q When you say you opened his file, what did you open?
A The paper file in Salt Lake.
Q Did you open the electronic file?
A Yes.
Q And what was in the electronic file?
A I don't remember specifically which file contained what.

issues."
A I don't recall what I wrote back to him at this point.
Q Do you remember whether you communicated back to Andy at all?
A I think that there was some communication going on. I do know that Andy was leaving town, but I don't recall exactly the nature of that communication.
Q I've not seen any -- copies of any follow-up communications from you to Andy after he sent his letter. Do you know if, in fact, such exists if you said to him what you've just said to me?
A Again, I -- at this point, I do not have any documentation that I wrote to Andy. There was another matter that was being pursued in regards to a SAD by my assistant with Andy that we were chasing down at the same time.
Q Is that the one about whether he received a phone call or not?
A No. That one was a separate issue. This one had to do with when he was on reserve. We were unable to contact him, and his response was that he was in court.



Q Look at, in Exhibit 2, SW 202. Two-thirds of the way down it says, "I was taken aback by Andy's response." Do you have any evidence that you told Andy that you were taken aback by his response?
A No. This was a running commentary that I put together for the review board.
Q Right. I understand that. I'm just wondering if you ever told Andy that you were taken aback by his response.
A Not that I recall, no.
Q Why not?
A I did not.
Q Any reason why you didn't?
A Nothing that I can think of particularly, no, other than the opportunity wasn't there.
Q Well, you could have always sent him another E-mail?
A I could have.
Q But chose not to?
A I chose not to.
Q Okay. When did you get the printout from IT which is connected to Exhibit 3?
A I made the request, and I probably had the printout within several hours of making the request.
Q The request to IT?



A Yes.
Q Okay. But that begs the question, when did you make the request of IT?
A Again, I don't -- I don't have any -- it would have been very shortly after a discussion with Kristen, but I don't have any recollection as far as exactly what time that was.
Q Was it before or after you received the response from Andy that you got the information from IT?
A It was before.
Q Did you send Andy a copy of these messages that you had received from IT?
A No.
Q Did you ever send them to him?
A No. Well, I take that back. He was given a copy of his file, which I believe contained these, during the review board.
Q After he was terminated?
A Yes.
Q Okay. Before he was terminated, did you ever send him the information that you had received from IT?
A No.
Q Okay. So you get Andy's response on August



29th. Okay. What's the next thing you do in regards to Kristen's complaint?
A Actually, Kristen had done a few things which involved HR, and I don't have total information about that. She did take herself off line due to stress. And you'd have to ask somebody else about that part of it. That went through her chief pilot.
Q How did you learn that she had taken herself off line?
A I had learned that through the people department through Jacque.
Q Did Jacque call you or what?
A There was communications back and forth between the two of us on this situation. She was quite concerned. When you have a female employee take themselves off due to the actions of a captain, the company has a lot of interest to make sure that things are conducted properly, to make sure that we understand what's going on. We have a female crew member who has taken herself off line due to what she calls harassment from a fellow employee, a captain. That's a serious situation.
Q Okay. Explain to me how Jacque Nielsen found out about Kristen's complaint that she was being harassed.

A I believe she found out about it through Harold Allen, Kristen's chief pilot -- or chief flight attendant.
Q Harold Allen. So do you know how Harold found -- what's Harold's last name again?
A Allen.
Q Allen. Do you know how Harold Allen found out about it?
A I assume that Kristen talked to him.
Q Well, I thought you said that Kristen found out about it through Harold Allen.
A Kristen is the one who complained.
Q Oh, okay.
A Harold is her supervisor.
Q Okay. Do you know when Harold contacted Jacque?
A I don't.
Q When and how did Jacque contact you about this?
A She probably called me on the phone.
Q Do you have any records of when that occurred?
A No.
Q At any point -- because I've not seen any -- was there any E-mail communications between



you and Jacque?
A Any E-mail communications, as far as I know, you have a copy of it. I was asked to provide any copies months ago.
Q But I haven't seen any between you and Jacque.
A Probably we talked on the phone.
Q Do you recall E-mailing to her?
A I can't say particularly yes or no. I know that we did have a lot of conversations on the phone, sometimes dealing with this issue, sometimes dealing with other issues. Not huge amounts of E-mail, no. Some people like E-mail; some people don't.
Q The paperwork which led to the -- you know, the termination paperwork -- I think it has a date on it of being completed on September 29th.
A Uh-huh.
Q So about a month after -- exactly a month after you got this E-mail from Andy back. What did you do in regards to Andy in between August 29th and September 29th?
A Some of this was -- research was happening during this time frame. Also, Andy was out of the country during this time frame.
Q What kind of research?



A Checking with documentation that we had. There was discussion amongst the chief pilots, management, what we considered was a continuation of behavior that we saw exhibited and issued a counseling statement concerning in Butte, and there was discussions -- anytime you're looking to take serious action against a pilot, which is certainly a big expense to the company, we want to make sure that there's no other method we can deal with it.
Q Who was checking documents?
A Certainly myself with what I had in paper files and electronic files. HR was looking at their files in St. George as well.
Q Do you recall what you had in your paper files regarding Andy?
A Pretty much what I put together for the review board was, in total, what I had in my paper files and electronic files in Salt Lake.
Q Do you recall receiving any additional information from personnel regarding Andy from their research?
A For this issue?
Q Yeah.
A No.
Q Well, for the termination.



A Nothing specific. I had a lot of different things in the file concerning Andy, some of which was put there prior to me, some of which was put there by me, but as far as any additional paperwork supplied by the people department for the termination, not that I'm aware of.
Q You said there was a SAD that you were investigating?
A Uh-huh.
Q Who was doing the investigation?
A The investigation primarily had been done. And I don't know if I have that paperwork. We were looking for Andy to sign basically a verbal warning for a SAD, and my assistant was the one charged with getting that paperwork complied with.
Q And did he sign it?
A I don't know if we ever got a signed copy from Andy or not on that.
Q And what had he done that warranted a verbal warning?
A Well, he received a SAD for -- while being on reserve, crew support tried to contact him to give him an assignment, and he was unavailable per policy, did not return the phone call until much later in the afternoon, outside of what policy allows, and the

excuse was that he was in -- I believe he said the Judge's chambers -- and couldn't use his cell phone.
Q If a pilot has something going on like that, what is he or she supposed to do?
A Well, they should try to get time off to cover it. While they're on reserve, the company is paying them, and so, if they're not available, we consider that they're taking pay without working.
MR. STRINDBERG: Let's take a break here.
(Lunch recess.)
(Whereupon Deposition Exhibits 5 and 6 were marked for identification.)
Q I'm going to hand you what's marked as Exhibit 5 and what's marked as Exhibit 6. Are those the two policies that were referred to in your E-mail to Andy?
A Yes.
Q Okay. I was asking you what had happened between when you received Andy's E-mail on August 29th, 2003 and when the termination records were prepared on September 29th, 2003. You've indicated there was checking of documentation. Was this documentation in Andy's files?
A Well, it would have included any documentation that was in Andy's file, including the



counseling statement, looking over, of course, policy, and at the same time -- or during that time frame, I believe I was notified that Kristen had pulled herself off line due to a hostile working environment that she felt these messages were causing her. And I believe she was off for a period of at least two months.
Q Did you ever talk with Kristen after that first meeting?
A No.
Q Did you ever send her any E-mails?
A No.
Q You never asked her why getting an E-mail asking her to pay money was so upsetting that she --
A That would not be my --
Q Let me finish -- that she had to take two months off?
A No. That would not be my position, as chief pilot, to discuss that with her.
Q Do you know if your counter- -- I guess your counterpart was this Harold Allen.
A Yes.
Q Did Harold ever do that?
A To my knowledge, I don't know exactly what Harold did do. I know that Jacque Nielsen was



involved with it, so I assumed that any discussions that happened between Kristen and Harold, Jacque would have that information.
Q Do you know if Jacque talked with Kristen during that month period?
A I believe that Jacque had discussed with -- things with Kristen, yes.
Q Did you ever see an E-mail from Jacque indicating that she had discussions?
A No.
Q You said you had a conversation or conversations during that one-month period with the chief pilots, including Jim Breeze. At how many of these phone conversation conferences was Andy or Andy's situation discussed?
A I would believe at least two different times. Andy was well known to senior management at this point. He had several invites to talk with the vice-president in St. George due to complaints the vice-president had received concerning his attitude, concerning how he treated fellow employees, concerning how he treated employees in crew support on the phone, so there were several conversations with Jim Breeze over this situation.
Q How about with the other chief pilots?



A It was brought up during chief pilot conference calls.
Q Did you have telephone conversations during that month with Jim Breeze about Andy Callaway outside of these conference calls?
A There may have been some. I was given direction to put together a summary, file summary, which I did do, and E-mailed to the vice-president. The E-mail would certainly include Jim Breeze as well.
Q The vice-president is Brad Holt?
A Brad Holt, yes.
Q And was the summary something different than Exhibit 2, or is that --
A Yes, it was different than that. In many ways it contained the same information, but it was a different document.
Q What did it look like, because I don't --
A It was an E-mail document that basically summarized his file.
Q Did you save a copy of that somewhere?
A Not specifically, no. I believe that Jacque did have a copy of that E-mail, but I don't know for certain. Typically E-mail was purged automatically. I did not keep all of the E-mail. My

company.
Q When did you first start getting complaints?
A I certainly started receiving phone calls when I took the position. As far as when Jim Breeze and Brad received complaints, I don't know that date.
Q And you took over the chief pilot position in March of --
A 2000.
Q -- 2000? It's your contention that you immediately started receiving phone calls about Andy?
A I can't say the minute I walked in the office the phone was ringing, but I did receive a number of complaints over the ensuing months.
Q Do you recall any specifics about any of these alleged complaints, other than what's detailed on Exhibit 2?
A Most of them were around the theme that he's abusive on the phone, that he's argumentative, that he's accusatory, that they're not complying with company policy, things of those nature.
Q Did you ever sit and talk with Andy about that?
A I mentioned in passing to Andy that I had been receiving complaints.



Q Other than in passing, did you ever say, "Andy, I want to give you a little advice"?
A No.
Q Why not?
A I typically expected him to be professional, and in passing should be sufficient.
(Whereupon Deposition Exhibit No. 13 was marked for identification.)
Q Can you tell us what Exhibit 13 is?
A It appears to be a letter from Andy to Gary Overbaugh.
Q Who is Gary Overbaugh?
A Gary Overbaugh at the time was assistant chief pilot.
Q In the second paragraph Andy indicates that he talked with -- he "advised Ms. Ence of my situation prior to the February class date." Before making a presentation to the review board, did you ever talk with Ms. Ence?
A No, I did not.
Q Do you know if anyone did? About Andy.
A I believe that she was talked to probably during the time this letter was received, and I think that Jacque also indicated that she had talked with Camielle -- or with Kim Ence.



Q When did Jacque tell you she had talked with Kim Ence?
A When I was preparing this document.
Q And did she tell you when she had talked with Kim Ence?
A No.
Q Did she tell you what Kim Ence had said?
A She told me, as near as I can recall, that it wasn't a phone call.
Q Did Gary Overbaugh approve the hiring of Mr. Callaway?
A I don't know.
Q Okay. There's an entry on Exhibit 2 for 6-2000. It says "Meeting in SGU." Is that St. George?
A That is.
Q Okay. Where did you learn about that supposed meeting?
A I was simply instructed to inform Andy and set up his positive space travel to St. George to meet with Jim and Brad.
Q When or how did you learn why he was going to St. George?
A I don't know that I was ever really given information as to why he was being summoned to



St. George.
Q Where did you get the information that's contained in Exhibit 2 about the meeting in St. George in June of 2000?
A I believe I made a note or Jim Breeze made a note, and it was in the file.
(Whereupon Deposition Exhibit No. 14 was marked for identification.)
Q Is this the note you were just referring to?
A Yep.
Q Do you know when Jim Breeze prepared this?
A I do not.
Q Do you know anything more about what supposedly occurred in this meeting, June of 2000, other than what's on this paper?
A The only thing that I was given after the fact is that it was a good meeting.
Q Who told you that?
A Jim Breeze.
Q Was that over the phone or what?
A Over the phone.
Q There's an entry from December 7th of 2000. What is that about?
A Looks like that I had received a call from

Anita Spencer indicating that he was verbally harassing one of her schedulers over an open time issue.

Q What's open time?

A Open time was time that was -- flight time that was not scheduled are assigned to a specific pilot.

Q What did you mean by the fact that open time is not always -- open -- it says that open time as depicted in SBS is not always open time. What does that mean?

A SBS was a computer-based system at the time that handled all the crew scheduling. If time exists -- in other words, a flight -- a series of trips from point A to B to C, so on, so forth, obviously those have to exist and they are in the system. If they are not assigned to somebody, they are in an open time pool.

Now, in some of those cases, because they can only exist in one or two places -- either they are assigned to somebody or they are in this open time pool -- if crew support is working to assign those to somebody -- they may be working on that particular schedule -- it still shows up in open time. So, in other words, it does show up in open



time, but it's not truly open time. It is time that is being worked on.

Q And by "worked on," you mean in the process of being assigned to someone else?

A Yes. Or parsed or whatever.

Q Let me take a quick break. I don't have -- for some reason, I don't have the -- I gather, since there's a number 2 next to it, that there's a document that responds to -- or corresponds to that.

A I would think so, yes.

(Recess.)

(Whereupon Deposition Exhibit No. 15 was marked for identification.)

MR. EMERSON: I'd like to put something on the record. You guys were concerned that you weren't served with standard practices and policies earlier. You'll notice that Standard Practice 56 was produced as SkyWest document 220, as was 306, as well as 222, and you did have those prior to today's deposition.

MR. STRINDBERG: Okay. Thank you.

Q And I'm sorry I don't have copies of this. This, I'll represent to you -- it's marked as Exhibit 15 -- is a copy of what Andy was given at the review board in '03. Okay? I think it was bound differently, but -- I mean, do these kind of pages --



the 1 and the 2, does that look familiar?

A As near as I can recall, yes. Without having another document to compare it to, I can't say for certain that that's what it is.

Q Okay. Well, that --

Is that correct, Andy?

MR. CALLAWAY: Yes.

MR. STRINDBERG: I think the one Andy gave me was in a red binder. That's why I was remembering red.

MR. CALLAWAY: It was red paper.

MR. STRINDBERG: Red paper. And we then copied it and went for the more sedate blue.

Q But, anyway, looking at Exhibit 2, there's a -- on the first page there's a little box number 2, and I assume that that relates to the number 2 in Exhibit 15.

A That was the intended design, yes.

Q Okay.

MR. EMERSON: Why don't you compare the note with the exhibit, to be sure.

Q (BY MR. STRINDBERG) Yeah. I'm not trying to trick you at all. I'm just trying to make sure we're...

A Yeah, I agree. I would agree that that's



what this was about.

Q What item number 2 on Exhibit 2 was referring to?

A Well, in addition, too, there was verbal conversation with Anita that is not reflected in this. This was the write-up of her employee.

Q Okay. I'm somewhat confused, and this is -- this document, which is under tab number 2 in Exhibit 15 -- and you know what? Let's make it a little easier.

(Whereupon Deposition Exhibit No. 16 was marked for identification.)

Q I'm going to hand you Exhibit 16, which is the same document that's in tab number 2, Exhibit 15. The only difference is there's not that circled word, and the date, December 2001, is not handwritten on it. Okay. But otherwise it's the same document. This is dated 12-17-01.

MR. EMERSON: I object to the characterization that this document is dated 12-17-01.

Q (BY MR. STRINDBERG) Well, there's a fax date on it. Do you have any idea when this document was created?

A I do not.

moment and read the document.
Q (BY MR. STRINDBERG) Yeah, read the document. That's fine.
(Discussion off the record.)
(Recess.)
Q Okay. Did you have a chance to look through Exhibit 2?
A I browsed through it, yes.
Q Is there anything in there, except perhaps this entry on 10-01-01, that doesn't reflect poorly on Mr. Callaway?
A I don't see anything directly that you would consider accolades on him, no.
Q And at the bottom of these five entries regarding the situation with the neighbors and the Salt Lake City Police Department, you have a -- I guess a comment that you made, "Crew Member Policy Manual SP 307 2.(A), You will appear well groomed and business-like." So that's the policy you set forth?
A That is the company's policy, SP 307 2.
Q Okay. And then your comment following that is that certainly owning and condoning what the police call a party house does not follow the above policy. So you were basically telling the board that Andy -- in your opinion, Andy was in violation of



that policy back in 2001?
A That was the information that was presented to the company. That was not the basis for his termination.
Q But I'm just talking about your comment there. You told the review board that Andy's conduct was in violation of SP 307 2.(A)?
MR. EMERSON: Objection. That mischaracterizes his testimony and the words on this page.
Q (BY MR. STRINDBERG) Is that what you were telling the review board?
A This document I prepared for the review board.
Q Why did you make the comment, "Certainly owning/condoning what the police call a party house does not follow the above policy"? What was your purpose in saying that to the review board?
A I don't recall my mind-set when I wrote this, but, again, this is what was in his file. It was consideration of all of the items that were in his file as to what type of profile Andy is and as to whether or not that was the profile that we needed or wanted to maintain employment.
Q You would agree that if you made the



statement, "Certainly owning/condoning what the police call a party house does not follow the above policy," making that statement certainly would leave the impression to the hearer of that statement that you believe that Andy had violated SP 307 2.(A)?
A With the information that I had on hand, that was a violation of that policy.
Q Okay. And that was what you intended to convey to the review board?
A Yes.
Q Okay. That's all I'm asking. And Exhibit 15 is coming back to me and we'll look at it in a second, but did anyone else besides Jacque contact the Salt Lake Police Department?
A On this one it may have been Karalee. It looks like it was a combination of Karalee and Jacque that was dealing with this particular situation.
Q And Karalee works for Jacque?
A Karalee was, I believe -- I don't recall when the changes took place, but Karalee, I believe, was Jacque's supervisor.
Q Is Karalee still with the company?
A Yes.
Q What is she doing now?
A I believe she works with the people



department as the customer service employee rep.
Q Was Andy ever disciplined in October or November of '01 for violating SP 307 2.(A)?
A No.
Q Okay. The next entry, 11-13-01, refers to "Received a report from Michelle Lott." What was the report you received?
A The report -- this had to do with the Butte operations, and it was her report sent to me concerning Andy's behavior in Butte, Montana.
(Whereupon Deposition Exhibit No. 18 was marked for identification.)
Q Is this the report?
A It appears to be, yes.
Q So it appears that the report was not faxed -- that's from Butte. 406 is Montana, that prefix. It was not faxed until December 14th. Did you -- and it's regarding an incident on 11-13. Did you receive some kind of a verbal report or anything like that?
A I may have received it in a different format.
Q What do you mean "in a different format"?
A It may have even been E-mailed; it may have been verbal.

Q Did you ask her, then, to prepare -- put it on this customer service irregularity form?
A I did not ask her to prepare the report.
Q Do you know why she prepared a report after she first contacted you either by E-mail or otherwise?
A I think that I heard about this situation through her boss. I don't recall exactly how I received the information, but I never did talk to Michelle Lott.
Q On the next page it says, "During the investigation into this incident" --
(Interruption.)
Q Okay. So tab number 5 in Exhibit 15 is the document we were just looking at. It's the same thing, I believe, as Exhibit 18. And then the next page says -- we just looked at it -- says, "During the investigation into this incident." What investigation did you do into that incident?
A Compiled reports. One thing to bear in mind, during this time frame, I was not Andy's supervisor.
Q Who was?
A He would have been under the training department. That would have been Bill Boice.



Q Well, the next line on the top of the third page of Exhibit 2 says, "During the investigation into this incident, I received a report from Kelly Dixon."
A Uh-huh.
Q Did you not do the investigation? Is that what you're telling me?
A No. I --
Q You had someone else do it?
A I compiled this -- I was charged with putting it together, but it actually was something that was a training department issue under Bill Boice.
Q Okay. So you did not investigate the incident in Montana?
A As far as calling and talking to the people, no. I had reports that were sent to me, and I put it together, as I was instructed to do so.
Q You put together the counseling statement? Is that what you mean?
A Parts of the counseling statement, yes. It was a group action by chief pilots. None of us do things solely on our own.
Q Do you know if this Boice guy did look into it? Did he talk with anyone?



A I assume that he requested this write-up from his ground instructor.
Q That's --
A In fact, it states here that Bill did request Kelly to write up his contact with Andy.
Q Okay. But on the top of this third page it says, "I received a report from Kelly Dixon."
A Yes.
Q Who is the "I" who is referred to there, you or Bill Boice?
A That would have been me. This report was forwarded to me.
Q The Kelly Dixon report?
A Yes.
Q Okay. And that's what's under tab 6 in Exhibit --
A Yes.
Q This letter from Kelly Dixon starts out saying, "I am writing this letter in response to a request received from St. George management on November 13th." Do you know who in St. George management requested that report from Kelly?
A I would assume that it would be Bill Boice.
Q But you're not sure?
A I'm not certain, no.



Q Look at -- I guess the next tab under Exhibit 15 is tab number 7. This is referring to a meeting at the SkyWest hangar on 11-13-01, and it indicates that you were present.
A Yes.
Q Who called that meeting?
A Brad Holt.
Q And which hangar was it at?
A It's at the SkyWest training facility in Salt Lake City.
Q These notes which are dated 11-14-01 which are under tab 7 of Exhibit 15, whose notes are they?
A Tony Thompson.
Q What position did Tony Thompson have at the time?
A He was Salt Lake City assistant chief pilot.
Q Was Andy on duty that day?
A Which day?
Q 11-13.
A I believe he was under training. As to whether or not he was scheduled training that day, I don't know.
Q Do you know why there's a reference to wearing jeans and a shirt with no collar?

even think of any specifics that I may have brought up, but the idea was, we would talk about what's going on in the various domiciles --
Q As far as union activities?
A -- during our calls. Certainly. In some cases there may be fliers that were found in a certain domicile. There may be registration cards that were found in this domicile. "Has this showed up in your domicile?" So on and so forth. But that was generally the extent of it, is just information back to St. George about what's going on in various domiciles.
Q Was there discussion about any of the pilots and their involvement in union organizing activities?
A Not in general. We knew generally who the pilots were at times.
Q And who do you believe those pilots were?
A If they signed their name to a document, we knew who they were.
Q Okay. So if they signed their name to an organizing card, you would know who they were?
A If that was distributed and it was something that made it across my desk, certainly I would know who that was.

173

Q And would you keep track of those names?
A No.
Q What would you do with those cards?
A Generally I would destroy cards.
Q Why?
A We weren't in the business of having union cards sitting around in the domiciles.
Q How about signed cards? Would you --
A I never saw any signed cards.
Q So when would you find documents that had people's names on them?
A The only time I would have seen the document would be if a union organizer or group had sent out E-mail messages to the employee group at large and included their name on them.
Q And would you receive those E-mails?
A Not generally directly, no, but I would have -- I would see them laying around, people would bring them in to the chief pilot, they would have questions about them, things of that nature, but as far as being distributed to me, no.
Q How many of these E-mails did you see in the four years you were chief pilot?
A Probably less than a handful.
Q What are the names of the pilots who

174

brought them to your attention?
A I don't recall that I even had somebody bring it in and say, "Look at this on the desk." Usually those type of things were pinned to the bulletin board. I did not have somebody bring it to me.
Q Okay. I guess I misunderstood your testimony.
A Other chief pilots did, but I did not.
Q Did you see Andy's name on any of those E-mails?
A No.
Q Were you aware that Andy was in support of the union organizing activities?
A I was not aware of that, no.
Q Did you ever ask him?
A No.
Q Did you ever talk about it with Jim Breeze?
A No.
Q So you don't know the extent of Jim Breeze's knowledge about Andy?
A I do not know what Jim -- I do not know Jim Breeze's background knowledge, no.
Q How about Brad Holt? Did you ever talk with Brad Holt about Andy's activities as far as

175

organizing?
A No.
Q Have you ever seen any E-mails sent around saying we have to be careful of person X, Y and Z because they're involved in organizing activities?
A No.
Q Would you get E-mails from corporate in St. George telling you how to combat organizing activities?
A We did receive our legal responsibilities as management during a union drive. We did receive direction from corporate in St. George that they would conduct most of the formal communication. We did receive training in two different instances of just exactly what we can and cannot do as managers during a union drive.
Q When was the first of that training?
A I don't recall a specific date. It was the previous drive. It was in -- conducted in Las Vegas.
Q The training was?
A Yeah. Ford & Harrison.
Q Ford & --
A Law group --
Q Ford & Harris?
A -- that the company had retained to advise

176

us.
Q Okay. And when was the second training?
A The second was just within the company, and that was during the most recent union drive, in-house union drive.
Q Who conducted that?
A I believe that came at the direction -- from the people department.
Q And did you have a meeting you attended or a training session you attended somewhere?
A No. It was more of a reminder of what we can and cannot do. It was the same group of individuals that had received training before.
Q When you went to the training in Las Vegas, did you receive any materials, handouts?
A I think there were a few fliers, but that was about the extent of -- it was not booklets.
Q This last time, you received some written instructions?
A I don't recall if I received written instructions as much as it was brought up during a chief pilot conference call reminding the employee group, the managers of what we can and cannot do during the union drive.
Q And in this chief pilots conversation, who



raised it? Jim Breeze?
A I think Jim invited somebody in from the people department, or he may have conducted -- I think he invited somebody in during that conference call, but I can't say who.
Q And they did some sort of a presentation?
A They talked about it during the conference call, yes.
Q What do you remember about what they told you?
A It was more of a reminder that during a union drive, remember, you know, the rules involved with union drives, what we can and cannot do, how we should conduct ourselves as managers during a union drive. If somebody comes in, we can answer questions, certainly, but we're not going to grill people, we're not going to question people, we're not going to hide, to follow, to intimidate, to coerce, or anything of that nature.
(Whereupon Deposition Exhibit No. 21 was marked for identification.)
Q Have you looked through Exhibit 21?
A Yes.
Q Can you tell us what that is?
A This is what I had sent to Jim Breeze after



researching documents that Andy provided to me as arguments against a SAD that was assigned onto his schedule.
Q And was the SAD removed?
A Yes, it was.
Q And why was it removed?
A Because I found, based upon the information that he provided me, that it was assigned in error, or against policy.
Q Was that because no one had tried to call him?
A No. I believe they tried to call him, but they did not try to call all of the numbers, which they are required to do so.
Q On the third to last page of Exhibit 2, there's a notation about a conversation you had received from Denver assistant chief pilot Don Watkins.
A Yes.
Q Now -- so this occurred after -- you got the call after Kristen had made the complaint, correct?
A Yes, it looks like it.
Q And did chief -- was the assistant chief pilot Don Watkins -- did he take part in your chief



pilot conferences that you had weekly?
A No.
Q What did he say to you when he called you the first part of September?
A He just said that he had overheard a conversation while at the hotel on an overnight, and I asked him to document it. He did give me some of the highlights of what this document states.
Q Tell me what he told you in the phone call.
A He indicated that it was very loud. He indicated that the conversation -- he did say this statement here, "If they do that, I'll sue the shit out of SkyWest. "He went on to say, 'I'll sue Brad. I'll sue Jim Kelvin.'" He touched on various parts of this, but I don't remember exactly everything that he said in the conversation, but it did follow pretty much what he wrote down here.
Q Did he tell you why he was calling you?
A Donley Watkins called me basically because he was concerned that we had an employee out there who was violating policy again in public, talking about the company in a manner that -- and Donley is very sensitive. He thinks the world of SkyWest and he was personally affronted by overhearing this conversation.

# Exhibit "H"

DEPOSITION EXHIBIT 22 Hyatt
PENGAD 800-631-6989

Andy Callaway called & wanted to pick up a trip in open time on the 14th. We had about 14 or 15 resvs so I told him I couldnt give it to him because I had alot of resrs - He went off on me about how he wanted the trip he was going to get it if he had to talk to The top guy of the company because it was no fair that they cant get overtime/jr. man pay when they decide they want it. He said he just sat when he was a resv & it won't hurt them to just sit now - I told him it states in the policy manual that we could put it on a resv if we had enough of them - He said It says that you can do either/or you can either give it to us and/or put it on a resv so he says so just take it off the resr you put it on & give it to me. I told him that I couldnt do that I had just gotten a passdown from Kay the night before that states per Anita that we must explain why, who, & who caused the jr man. She needs this info for Brad. (See Dress) I DID NOT state Brad wrote a memo to us. He still went on about how it is Bull that we have to do all that & that he couldnt pick up whatever he wanted & the only reason we couldnt give out any jr. man anymore is so Brad could build his big ole house & he doesnt give a crap about us & the wages that we make as

SW 3(

long as he gets everything he wants & it's no fair. I told him they didnt say we couldnt jr man at all but we can only jr man when there is no other option - which is what we have been told - I said I can transfer you to Brad or Anita if thats what you want to do but I dont want to take the wrap for giving you a trip that we have a ton of resvs for. Well I tranferred him & both lines were on forward - He calls me back a little while after that & says he really wants that trip, he will send me a box of chocolates if i just take it off of the resv & give it to him (Kay heard this conversation) Because both phones are on forward so Brad could go build his big house. I told him I could only do what I was told in here & was not going to take a chance on getting in trouble so "No" I'm not taking it off the resv. He said what do i need to do because im not giving up on this untill i get that trip. I said the 14th is still a ways away so keep trying Anita she is the only one authorized to do it - he said im leaving town tomorrow & I wont have a chance & I will never do you guys another favor Ever if you dont give it to me - I said well i cant give it to you so please be nice to me - He kept insisting he was not going to be nice until he got that trip & I didnt have to do what a memo said I have to do what the policy manual says.

Nicki McDonald

12/7/00

# Exhibit "I"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

ID ANDREW CALLAWAY, )
)
Plaintiff, )
) Case No. 2:04CV00179
)
) Judge Ted Stewart
IEST AIRLINES, INC., )
)
Defendant. )
______________________)

DEPOSITION OF JACQUE NIELSEN

Taken at the Holiday Inn Conference Room

850 South Bluff

St. George, Utah

On Monday, November 29, 2004

at 10:50 a.m.

RTED BY: JENNIFER SULLIVAN, RPR

Depomax REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F.
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

also went out on a leave of absence. That was another problem in the situation is she went out on a leave for stress.
Q. How did you learn that?
A. Because I was involved in the -- I mean, the situation that was going on, and I think I talked with Kristen.
Q. Okay. That's what I'm trying to find out, I mean, what your involvement was. I'm not trying to trick you or anything. I mean, so you've talked with Kristen. You talked with Kelvin.
The next thing that you recall is that Kristen called you or someone told you she was going out on leave?
A. I think her manager, her -- because if someone goes out on leave, they notify their chief that they're taking a leave of absence, Here is my information, my medical certification, the request for a leave of absence, and I got notified. I don't know if it was Kristen or if it was Harold Allen that told me this, that this was going on.
Q. Were you told why she was going out on a leave of absence?
A. I would be privy to that information, the why.


Q. What were you told was the reason?
A. That she was stressed because of what was going on at work between her and Andy.
Q. What's the next thing that happened in regards to Kristen's complaint about Andy?
A. Andy responded, and then we decided to look at his response and how he was acting and if he actually responded to it, to Kelvin's question.
Q. Okay. So you then looked at what's Document 19 as part of Exhibit 15?
A. That's correct.
Q. Did Kelvin forward that to you?
A. Yes.
Q. Did you and Kelvin then have a discussion?
A. We would have discussed, you know, what was it he meant by --
Q. Tell me what you remember talking with Kelvin about.
A. That the response was not what Kelvin wanted to know. He wanted to know why Andy had -- wanted to know why Andy thought this wasn't in violation of his counseling statement that he received in 2001.
I looked at Andy's response, and to me, it was not a response to Kelvin's question.


Q. Why do you think it was not a response?
A. Because he --
MR. PETERSEN: If you need to look at it to review it, go ahead.
THE WITNESS: I think I do.
BY MR. STRINDBERG:
Q. Take whatever time you need.
A. Kelvin had asked him in his mymessage to have him respond explaining as to why we should not find him in violation of SP 56, and Andy's response is, It's none of SkyWest's business; it's a private matter. He quotes some Fair Debt Collection Practice Act and some sections. And it was not, I'm not in violation because I'm not harassing her or anything like that. He's telling us it's a personal matter and SkyWest to stay out of it.
We just wanted to know, it's not a personal matter when you use SkyWest's computers. You're harassing another employee. She has to log onto this computer and see these messages every time she checks in. She felt she was being harassed. It wasn't up to Andy. We wanted him to respond as to why he didn't think he was in violation. He did the best, I guess, he knows how to, but it was not acceptable.


Q. So is that what you and Kelvin discussed and decided that it was not an acceptable answer?
A. That's as far as I can remember.
Q. Did you or Kelvin then call Andy and say, Andy, we're not satisfied with your response?
A. That was up to Kelvin if he was going to respond -- I mean, if he was going to call him. It wasn't up to me to call him.
Q. Did you tell Kelvin that?
A. No. I didn't feel like we had to call Andy again and go, Okay, Andy, you didn't answer this correctly. Here we go again. You need to respond as to why -- Kelvin's question was really simple, and Andy didn't -- to me, Andy didn't respond. He pretty much told SkyWest to stay out of it, and he had every right to do what he was doing. I mean, this is coming from his chief, this is coming from his manager to explain his actions.
Q. Well, do you know if Kelvin called him back and said, Andy, it does involve SkyWest because you're using our messaging system?
MR. PETERSEN: Asked and answered.
Go ahead.
THE WITNESS: I just lost my train of thought. What was the question again?

Page 85

BY MR. STRINDBERG:
Q. The response to Kelvin's e-mail.
A. I wouldn't know if they had that either.
Q. But it was discussed, you said.
A. I'm sure it was discussed because of we're looking at what to do with Andy.
Q. Who raised the issue of Andy's so-called history with crew scheduling?
A. If anybody, it would have been Kelvin that would have raised, because he's his chief. He would have received any of the discipline -- I mean any complaints would have gone to him in regards to Andy.
Q. Anything else you recall about this conference call?
A. No.
Q. What's the next thing that happened in regards to Andy. That you know about, obviously.
A. That I know about, we terminated him.
Q. How did that come about?
A. How did it come about? Well, the normal course of action where the chiefs would have discussed it and Jim Breeze, and they would have brought it to Brad. Brad would have thought about it, and then they would have followed through with

Page 86

either the termination or putting him back to work, one or the other.
Q. Okay. But look at Exhibit 9.
Did you prepare this?
A. No.
Q. At some point did someone, Kelvin or Jim, talk with you and say, We've terminated Andy, or did they say, We're going to terminate him? What happened?
A. I don't remember the specifics, but I do know that we were going to terminate him. I don't know if Kelvin told me, Jim told me. I would say Kelvin was the one who would have told me that they decided to terminate.
Q. You don't have a recollection of that?
A. Not specific person. I would say it would have been Kelvin because that's who I had most of my conversations with.
Q. After the conference call, did you have any conversations with Jim Breeze about Andy?
A. Not that I recall.
Q. How about with Brad Holt?
A. No.
(Deposition Exhibit 25 was marked for identification.)

Page 87

BY MR. STRINDBERG:
Q. Do you recall seeing Exhibit 25 --
A. Yes.
Q. -- from Andy?
Did you know by October 3rd that he had been terminated?
A. Yes.
Q. Did you see a copy of Exhibit 9 before it was given to Andy?
A. Yes.
Q. Who showed it to you?
A. I don't recall. I imagine it was Kelvin.
Q. Did Kelvin come to St. George and show it to you?
A. No. I mean, we discussed what was going to be in it. I mean, I don't know -- no, he didn't come to St. George. I could have seen it on -- could have e-mailed it to me. I don't recall, but I did see it.
Q. Look at Exhibit 10.
Do you know who crossed out that second sentence?
A. No.
Q. Do you know what that second sentence is referring to?

Page 88

A. I mean, I can assume --
MR. PETERSEN: Don't guess.
THE WITNESS: But I'm not going to. I mean, that's what I want to tell you is --
MR. PETERSEN: It doesn't help anyone.
BY MR. STRINDBERG:
Q. Unless you make a wild guess that happens to be helpful to my case. I mean, if you want to do that, go ahead.
A. No, I do not.
Q. So it was Kelvin who drafted this reason for separation?
A. It was Kelvin -- no.
Q. Who drafted that?
A. I think it was Todd, Todd Emerson who drafted it.
Q. Great. That means I can depose Todd.
(Deposition Exhibit 26 was marked for identification.)
BY MR. STRINDBERG:
Q. Is Exhibit 26 the letter that you sent back to Mr. Callaway?
A. Yeah, it was sent to Andy. It's a form letter that we send to anybody that requests a review board and they've been granted one.

Page 89

Q. It says, You will be notified in writing within ten business days whether or not a review board will be granted.
A. That's correct.
Q. Who makes the decision -- who made the decision in this case as to whether or not to grant Andy the review board?
A. It's the VP that makes the decision, and that would be Brad Holt.
(Deposition Exhibit 27 was marked for identification.)
BY MR. STRINDBERG:
Q. I gather that Exhibit 27 was the form that you sent to Andy along with your letters, which is Exhibit 26.
A. That's correct.
Q. And did Andy then fill in at least the top part of it and send it back to you?
A. Andy filled in -- I filled in where the "Department use only," and Brad Holt's the one who signed at the very bottom, but Andy filled in the rest of the form.
Q. Did you present this form, this request for a review board hearing form to Brad Holt?
A. Yes.

Page 90

Q. What did you say to him when you gave it to him?
A. I didn't say anything. I gave it to him and said to please let me know as soon as possible whether or not we're going to have a review board.
Q. Did he ask you any questions?
A. No.
Q. Did he ask to look at any information or materials?
A. No.
Q. Do you know if he talked with anyone about the situation before he signed off on this?
A. I do not.
Q. You before had said that when someone complains of harassment, you do your investigation.
What investigation did you do in this situation in regards to Kristen's complaint?
MR. PETERSEN: Asked and answered.
THE WITNESS: I contacted Kristen, and Kelvin did his -- because Kelvin is his chief, Kelvin proceeded to discuss it with Andy.
BY MR. STRINDBERG:
Q. You never contacted Andy directly, though?
A. No, that was Kelvin's.
Q. Do you know if Kelvin ever talked with

Page 91

Andy about it or whether it was just limited to those e-mails we've seen?
A. I couldn't answer that.
Q. Anything else you did to investigate her complaint?
A. Not that I can -- no.
(Deposition Exhibit 28 was marked for identification.)
BY MR. STRINDBERG:
Q. Can you tell me what Exhibit 28 is.
A. It is a copy of the e-mail that Kelvin sending us a copy -- it's an e-mail from Kelvin to Jim Breeze, and I'm cc'd in of his copy of his online message he sent to Andy.
Q. The bottom part under the title "Original message," I guess that's when Kelvin sent an e-mail to Jim and to you; is that correct?
A. That's correct.
Q. Why was Jim Breeze forwarding or sending you this e-mail on April 30th, 2004?
A. I wanted all copies of e-mails, correspondence between Kelvin and Jim and anything in regards to Andy, so that's why there's that, because Jim sent it to me.
Q. So had you asked Jim to send anything he

Page 92

had to you?
A. Yes.
Q. Why did you want to get copies of all e-mails at that time?
A. Because of what was -- because I was doing work in regards to this lawsuit, any correspondence that we had.
MR. PETERSEN: I think that's in our initial disclosure, procedure that we're talking about.
THE WITNESS: Yeah.
MR. PETERSEN: So I suppose we could have cut that out.
(Deposition Exhibit 29 was marked for identification.)
BY MR. STRINDBERG:
Q. Can you tell us what Exhibit 29 is.
A. This is -- it looks like it was a message from -- starts with a message from Patty Mitchell, who's in Career Payroll, to Virginia Abbott, who's in Career Payroll, in regards to getting Andy's medical. And then they sent -- because I guess he hasn't answered back, they sent it to Jim, and this is in regards to when I asked him for, in the initial disclosures, any e-mails he had in regards

Page 109

Over the course of several months, at the end of last year and beginning of this year, Andy Callaway's phone calls were repeatedly and progressively more rude.
Do you have any idea why Ashley's statement was written apparently many months after the phone calls?
A. I don't know when this was written.
Q. Did you ever talk with Ashley about the situation?
A. No.
Q. Did you ever talk with Anita Spencer?
A. No.
Q. I gather Ashley reports to Anita; is that correct?
A. She does.
Q. Going back to Exhibit 2, there's an entry for 12/11/00, Talked with Jim Breeze in his meeting with Jim and Brad in St. George.
Do you know, is that referring to a separate meeting than the one referenced on 6/2000, or is it the same meeting?
MR. PETERSEN: If you know.
THE WITNESS: I think it's referencing the meeting on 12/11 of 2000 in St. George.

Page 110

BY MR. STRINDBERG:
Q. Have you ever asked Jim if he met with Andy more than once in St. George?
A. Have I asked him? Jim says he's met with him twice.
Q. When did you get that information?
A. At the time that we were having the review board or setting up for the review board is what I remember.
Q. What else did Jim tell you?
A. I don't recall what else he told me. I mean, I didn't talk with Jim.
Q. You just said Jim told you, and now you're saying you didn't talk with Jim?
A. I didn't have any more conversations. If I had a conversation, it could have been with the -- when we had the conference call. I mean, I didn't specifically go and track down Jim and say, Hey, let's talk about Andy. It was probably in the course of with the conference call with the pilots.
Q. Okay. But you didn't -- you weren't involved in -- whether there was one or two meetings in St. George, you weren't involved in either of them?
A. No, I was not.

Page 111

Q. On to the next page, there is a series of entries regarding phone calls from a neighbor and whatnot.
I gather you were involved in these to some extent?
A. That's correct.
Q. How did you get involved in this issue of these complaints by Mr. Brandt?
A. Mr. Brandt called SkyWest and told -- he left a message saying that he had some complaints in regards to a pilot, and so I called him back and --
Q. Who directed you to call him back?
A. Who directed me? If someone calls and has complaints, serious allegations regarding an employee, it's my job to call them back.
So I called him back, and he proceeded to tell me that we have a pilot, Andy Callaway, who lives next to a house that he owns, but he has renters. And he says they have a lot of parties, there's been drug use observed by his renters, and they wanted us to stop it. They wanted SkyWest to put an end. He says, I know he's a pilot. I don't think you want a pilot who is not supposed to be using drugs using drugs.
And he gave me a number to call. He says,

Page 112

Call Kim Guess at the Salt Lake Police Department, and she'll tell you everything, or whatever. So I mean, following -- I needed to follow it. There were serious allegations of drug use.
Q. This information that's -- you just told me about this telephone conference that's referenced under 10/15/01.
Did you make notes of that or something? I mean, how did Kelvin get ahold of this information?
A. I told him about it and there was --
Q. When did you tell him about it?
A. At the time that he was going to get -- when we were putting everything together -- when he was putting everything together of Andy's history of SkyWest, this was part of what was in his file, and it was -- I mean, I told him about it.
Q. Okay. This -- did you make notes of this phone call with Mr. Brandt?
A. I did make notes, and I think I found them the other day, actually, and there was -- just pretty much that's what was in the notes was what was on 10/15.
Q. Okay. That's what I'm asking.
A. That's all that I had. I had a

conversation with Claude Brandt. He made these allegations. I mean, and that's what they were, and I called Kim Guess because he gave me the phone number to call her.

Q. Do you remember anything about your conversation with Kim Guess that's not contained on the note of 10/16?

A. No.

MR. PETERSEN: Read 10/16 before you answer that. Just to be sure.

THE WITNESS: That's pretty much the conversation. Kim is not a police officer. She -- I'm not sure what her title is, but before she sent us anything, she okayed it with her boss and then sent us what she could.

BY MR. STRINDBERG:

Q. I gather what she sent to you is contained under Tab 3 of Exhibit 15; is that correct?

A. That's correct.

Q. Did she send you anything else?

A. No.

Q. What did you do when you received this information from Kim Guess?

A. When I received it, I gave it to Karalee Smith, who was my boss at the time, and then she



either talked to -- if -- I don't know who was in charge of Jim Breeze. Yeah, he was in charge. So she would have told Jim, and then I contacted -- I contacted Kelvin and just told him the situation, told him to tell Andy this is what his -- what the phone calls we got or the phone call and to pretty much -- you know, we don't care if it's true because we can't substantiate it. We've got some neighbors that are calling complaining and to just tell him to stop it.

Q. Do you know if Kelvin ever did that?

A. Yes, my understanding, Kelvin did call and talk to him.

Q. These documents which you received from the police department which are under Tab 3 --

A. Uh-huh.

Q. -- they obviously were kept somewhere.

Where were they kept?

A. My understanding is they were in his personnel file, but I also had them in an Employee Relations file.

Q. So do you have a separate Employee Relations file on Andy Callaway?

A. We would have had it -- it would have been -- the way I keep my files is I keep them in



domiciles and under Salt Lake. I don't know if this was -- I know it was in his personnel file. I don't know if it was in any other file other than his personnel file, but I do have other Employee Relations files.

Q. Have the files that you had on Andy Callaway been turned over to us?

A. They have, as far as I know.

MR. PETERSEN: Except the secret ones.

MR. EMERSON: The ones with smoke coming out?

MR. PETERSEN: It's a just a joke, for the record.

BY MR. STRINDBERG:

Q. On 11/1/01 it says, Contacted Kim Guess and asked her to contact the writers of the letter regarding Andrew. Karalee wanted to be contacted if Andrew had another party.

Were you the one who called Kim Guess back and told her that?

A. It probably would have been me because I was the one that had the contact with Kim Guess, because Karalee wanted to know if any other parties took place. There were serious allegations of drug use.



Q. Were you aware that in the next week or two Karalee was called again by Mr. Brandt on at least two occasions?

A. Was I aware? I would have been aware of the -- of him calling, but not of what exactly they said to each other.

Q. Under -- on the second page underneath the 11/9/01 entry, there's some bolded type, and it says, I talked to Andy about this. His answer was that he was suing his neighbor and his neighbor should not have called SkyWest.

Have you at any time made an attempt to find out what happened -- well, to find out if, in fact, Andy had sued his neighbor, and if so, the outcome of that?

A. Did I look into seeing if he had sued his neighbor?

Q. Yes.

A. No, I did not.

Q. Do you know if anyone at SkyWest has?

A. Not that I'm aware of.

Q. Are you aware that there was litigation with the City because the police were harassing Andy?

A. Not that I'm aware of.

# Exhibit “J”

DEPOSITION EXHIBIT 2 Hyatt PENGAD 800-631-6989

David Andrew Callaway – Review Board

Kelvin Hyatt – Chief Pilot

Opening:

Thanks for the opportunity to explain the Company's perspective on the termination of Andy Callaway.
The company will present a complete work history on Capt. Callaway, the bases for our determination that he does not meet the profile we wish to retain.

File History:

2/2/98 - No Showed for Pilot Training.

7/13/98 - Andrew sent Jim Breeze a letter requesting to be allowed to come to training.

7/20/98 - Message written by Karalee Smith: Jim Breeze will call and tell Andrew no. He no showed on Feb 2, 1998 for class.

7/30/98 - Letter from Andrew to Larraine Caldwell with a new application.

8/24/98 - Letter from Andrew to Gary Overbaugh requesting to be considered for a pilot position. Andrew stated his father had thyroid cancer, and that is why he no showed to class. SkyWest never asked for the documentation. There is no correspondence from this time until he started training.

**It is curious to note, there are such things as telephones. We have had new hires call and postpone class dates due to personal or family emergencies.**

1/13/99 - Started training for SkyWest.

**Andy was given a second chance at SkyWest.**

06/2000- Meeting in SGU with Jim Breeze and Brad Holt over inflammatory and unfair statements on the company website and comments and language used with crew schedulers. 1

**Andy was called to meet with Jim Breeze and Brad Holt in SGU concerning messages he left of the website and reports of abusive treatment of crew schedulers.**

12/7/00 - Received a call from Anita Spencer concerning Andy. She indicated that he was verbally harassing one of her schedulers over an open time issue. I talked with Andy, educating him on the fact that open time as depicted in SBS, is not always open time. Also to the fact that if the reserve compliment is above the minimum, a reserve must be assigned to the open time as per the policy manual. I felt that this was the end of the issue and the end of the conversation. According to Anita, Andy then called back and again demanded the open time, made derogatory comments about the company and company officials. This information then was forwarded to Brad Holt, as some of the alleged comments were about him. Brad felt that he wanted to have a discussion with Andy and a meeting was set for 12-11-00 in SGU. (12-13-00 Hyatt) 2

12/11/00 - Talked with Jim Breeze about Andy and his meeting with Jim and Brad in SGU. Jim indicated that the meeting went well, Andy was cordial and seemed to understand the concerns that Brad had with his attitude. (12-13-00 Hyatt)

10/01/01 - Began Upgrade training in the CRJ this date. (10/03/01 Woody)

10/12/01 - Customer Service Relations received a phone call from Claude Brandt in regards to a pilot for SkyWest - Andrew Callaway.

10/15/01 - Jacque Nielsen called Mr. Brandt. Mr. Brandt told Jacque he owned an apartment house neighboring Andy Callaway. The renters are asking for help in getting Andy to be more considerate of the neighborhood. Andy throws wild parties and the noise is unbearable. Mr. Brandt stated his renters have seen drugs being used (snorting cocaine around the kitchen table), and Andy disregards the noise ordinance. Andy disregards everyone. The renters have had property damage, and blame Andy. Mr. Brandt gave Jacque a name (Kim Guess) at the SLC Police Department and her phone number. Ms. Guess would be able to tell Jacque what a nuisance Andrew Callaway has been.

10/16/01 - Jacque called and talked with Kim Guess at the SLC Police Department. Kim is not a police officer. Kim works for the police department as a go between with the citizens of the community and the police. Kim stated Andrew has been uncooperative and obstinate towards his neighbors and the police department. Andrew owns his house and therefore can do whatever he wants to do. The neighborhood has made complaints, and Kim has tried to talk with Andrew, but Andrew disregards anything said to him. Kim said she would try to send Jacque whatever she could on Andrew. Kim stated the neighbors have stopped complaining because nothing has happened, other than retaliation towards property. Cars have been keyed, tires slashed, Christmas ornaments destroyed.

10/30/01 - Received a fax from Kim Guess regarding Andrew. There was two letters from the tenants of Mr. Brandt. The tenants gave the police department permission to send SkyWest a copy. 3

11/1/01 - Contacted Kim Guess and asked her to contact the writers of the letters regarding Andrew. Karalee wanted to be contacted if Andrew had another party.

11/09/01 - Karalee contacted Mr. Brandt, and told him SkyWest was certainly concerned about the unprofessional portrayal of a SkyWest Pilot. Karalee assured Mr. Brandt SkyWest does not tolerate drug use, and we have one of the safest records in the industry. It was upsetting to learn from him about all the problems Andrew has created in his neighborhood. We have letters from the neighbors to substantiate these undesirable activities. Karalee asked Mr. Brandt to let her know if he had any other problems arise. 4

**Crewmember policy manual SP 307 2. (A) You will appear well groomed and business-like while in uniform. Your personal conduct and appearance, both on and off duty, shall be such to maintain or improve the image of the Company.**

**Certainly owning/condoning what the police call a "party house" does not follow the above policy. I talked to Andy about this, his answer was that he was suing his neighbor and his neighbor should not have called SkyWest.**

11/12/01 - Mr. Brandt called and informed Karalee that Andrew had a party on Saturday November 10th that started at 4 p.m. and lasted until 4 a.m. The police were called again.

11/13/01 - Received a report from Michelle Lott SkyWest BTM Operations. 5

During the investigation into this incident, I received a report from Kelly Dixon, CRJ Ground Instructor. He had mentioned to Ben Crawford and Verdean Heiner that he had a difficult time with Andy when he was a student in his class. They in turn mentioned it to Bill Boice. Bill requested Kelly to write up his experience with Andy during his ground school and forward it to Andy's Chief. 6

Brad Holt was informed of these issues, remembering that he and Jim Breeze had counceled Andy in SGU the prior summer, Brad decided he wanted to talk to Andy again. Meeting was conducted at the SLC Training facility on 11-13-01. Here are the notes taken by Tony Thompson, SLC Asst. CP and Bill Boice Dir. of Flight Standards. 7 8

11/30/01 - Andrew received a counseling statement and three weeks admin without pay 9

Andrew provided a written statement, which was attached to the Counseling Statement. 10

**It should be noted that in Andy's statement he does not acknowledge any responsibility for his actions, in fact goes on to say nothing happened.**

12/17/01 – Review board held for the counseling statement received for the BTM situation. Review board upheld the counseling statement with one change to the counseling statement. The word "extremely" was removed. 11

03/26/02 - Comments from CrewTrac regarding Cp Callaway's SAD:

MOST JUNIOR ON FOR MULTIPLE DAYS.
15488 03/26/02 08:45
called to tell him he was on rdy 10:30-0500,he said he could fly but didn't want to fly multiple
days he was getting over cold and wanted to stay in SLC so he could get over his sickness closer to
home. He asked if he was most jr. and I told him he was most jr for multiple trip. He was willing to fly and sit rdy but didn't want to be called for multiple day trip. I asked him if he wanted to
be taken off sick. He said yes.5-5 rsv Jill
15050 03/26/02 09:10 12

op's should be a SAD not sick. Jill
15050 03/26/02 09:14

**Sick call was changed to a SAD as per policy. Crewmember reported sick when called while on reserve.** 13

05/07/02 - Neglected to sign and/or include employee ID with signature on A/C Log. (5-24-2002 EY for KH).

07/16/02 - Received paperwork from US Investigations office notifying us of driving convictions on his record. Andy had been arrested in Dec 1998 for DUI & Open container. Charges had been reduced to Misdemeanor reckless driving. Talked to Andy informing him that we had this on file and that it did not affect his security clearance. 14

07/17/03 - SAD on file, following message sent to Andy:

**Andy received a SAD on his schedule on Jun 30, 2003. While on reserve, contact was attempted no response. Crewtrac comments entered were:**

lm to nt of trip on the first...1st attempt 0939
trev
16206 06/30/03 09:41

lm's again on 801-699-0849 and 866-532-6550 at
0959 it has been 20 minutes......trev
16206 06/30/03 09:59

assigned sad didn't call us back. This was a duty
day no vac nor onp was assigned.....Trev
16206 06/30/03 10:07
CALLED BACK ONCE HE GOT MSGS TTO TREV, INDICATED
NO SIGNAL ON PHONE, HE WAS IN COURT, SINCE THEN
HAS CALLED BACK EVERY HOUR TO CHECK ON SCHEDULE.
15858 06/30/03 16:37

**I was notified of this by crew support. It was noted to me that he had put in a request for ONP or USR if ONP was not available. That request had been sent on Jun 28. Crew support did not get to the request until Jul 1 at which time is was denied. After having been notified of the SAD, Andy logged on and cancelled the time off request for Jun 30. He then entered a request for Jul 1 USR or VAC, for "have a court deposition". This was denied due to lack of coverage.** 15

**After reviewing this documentation I sent the following message to Andy:**

Capt. Callaway,

I've researched your SAD and find that it appears to have been issued according to policy. Skywestonline records show that on June 28, you applied for June 30 off, however it was not processed until July 1 and was denied. The records also so that you cancelled this request on June 30. With the information that I have currently, I cannot excuse this SAD. If you have further information, please provide and I will consider it.

Kelvin 16

**Response:**

Kelvin,
I submitted a second request for the next day off as well that included the 30th, rather than having several requests in at the same time. Everytime I logged onto online, I experienced several problems after attempting to submit requests. I even emailed you the errors I recieved from online. It should not take so long to process, and Crew Support acknowledged in a company wide email that they were continuing to experience problems processing time off requests. Further, I complied with EVERY instruction from Donna regarding this issue and was not even informed a SAD was issued until after 4:30pm, after I had contacted Crew Support every hour, all day!! Why does everything have to be so hostile these days?

Respectfully, Andy ---- Original Message ---- From: Kelvin Hyatt Sent: 2003-07-17 16:31:35 To: Andrew Callaway Subject: SAD

08/12/03 - On August 12, 2003, FA Kristen Wiley approached me, she had with concerns that she was receiving threatening emails from Andy Callaway concerning money Andy said she owed him.

Kristen told a tale of how Andy had invited her to accompany him to Spain for a vacation with several other and other couples. This had happened just after Andy had broken off with his girlfriend whom he had intended to accompany him on this trip. According to Kristen, he indicated that she would only need to pay for food and show up as everything else was already paid for. She purchased tickets through the travel center and two days later was in Spain. Now almost a year after the trip, Andy has been sending e-messages to Kristen via SkyWestOnline demanding payment for a share of the villa expenses. Kristen expressed to me that she felt threatened to even check her email and was there anything I could do to stop these messages. I informed her that I would look into the matter.

**After hearing this story, I felt that it indicated behavior that went against the Counseling Statement that was issued on November 30, 2001. I referred to the document and noted the following wording:**

*"In fact this is the third time your behavior has been called into question. Any further behavior problems such as:*

- *Arrogant and abusive treatment of fellow employees.*
- *Disregard or refusal to comply with company policies and direction.* 9
- *Any conduct that would constitute an embarrassment to SkyWest Airlines or its employees."*

**I also noted that the Crewmember Policy manual has the following direction to crewmembers, Personnel files, rules of conduct and crewmember reliability, SP 306**
**(30) Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and /or within any other work related circumstances.**

**(34) Crewmembers shall not involve the Company in the crewmember's personal financial affairs.**

**Also I noted the Company Policy Manual SP 56: 1. Purpose A. SkyWest Airlines promotes a productive work environment and does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment....**

**It appeared to me that Andy's conduct violated each of these documents in some form or another, I sent the following message to Andy requesting a written response:**

Andy,
I have received a complaint from a fellow employee that you are sending harassing and threatening emails using the company email system. 17

Please refer to the Company Policy Manual SP 56, Crew Member Policy Manual SP 306, 30 and 34 as well as the counseling statement you received on November 30, 2001. I am requiring you to respond in writing within 7 days of receipt of this notice, explanations as to why we should not find you in violation of SP56 and your counseling statement dated November 30, 2001. 18
Kelvin Hyatt Chief Pilot

**Andy's response to the above message is as follows:**

August 29, 2003

Kelvin:
Without knowing the exact accusations you refer to in your email dated August 22, I will be unable to answer your request in an accurate manner. However, I will assume you are referring to a personal and private matter with Kristen Wiley and therefore submit the following explanation. 19

This is a personal matter that does not involve SkyWest in any form whatsoever. Kristen Wiley has a financial obligation to repay a debt from a vacation she attended in 2002. She has defaulted on this agreement and as a result, a Small Claims Affidavit & Order was filed in the Third District Court on August 22, under case number 038905345. Before this suit was filed, I made a final attempt to collect the debt by emailing her the procedures that would take place if this debt were not satisfied on a personal level. This email contained the legal rights I have, as a citizen, to recover the unpaid debt, and the actions the court would take to enforce the judgment. Kristen has had almost one year to repay this financial obligation. I sent the email through SkyWest Online after she disconnected her personal email and her mailing address is unknown. This email did not contain any offensive language or create an intimidating or hostile work environment, or include any references to violence. Further, there is absolutely nothing in my email that could be construed as sexual harassment.

These actions do not violate SP56 because they do not contain any illegal language that constitutes harassment. There was no systematic or continued action taken by myself, other than a final email indicating her options to repay a debt. There was no threatening message that contained any language designed to extort money or obtain property through threatening letters. In addition, my notice followed all federal regulations under the Fair Debt Collection Practices Act, Title VIII, Section 805 and 806 with regards to Harassment and Communication, as well as Utah Code 76-5-106 and 20A-3-502.

This email also does not violate my Counseling Statement of 2001 because it contained no abusive language or abusive treatment of a fellow employee. Kristen Wiley is a friend of mine, who I have never worked with, who took advantage of my financial position and refused to fulfill her legal obligation to repay a debt. In addition, SkyWest was never asked to mediate this matter, nor was SkyWest asked to intervene on my behalf.

I have provided the email thread from SkyWest Online for your reference. If you have any questions, please contact me at 699-0849 or through this email address. Thank you for your understanding.

Sincerely,
Andrew Callaway

**I was taken aback by Andy's response, it was apparent he had not even looked at the manuals that I had referred to in my message. His assertion that this is a "personal matter that does not involve SkyWest in any form whatsoever" was not correct. SkyWest property was being used to hunt and harass a fellow employee for payment of a private debt. Andy's response not only completely ignores this fact it goes on to paint the picture that somehow SkyWest is interfering with his rights as a citizen.**

**Date:**Jul 03 2003 8:09 PM
**From:**Andrew Callaway - 010957
**Subject:**????
**To:** Kristen Wiley - 014321

20

Hola,
I need to get the full amount asap!!! I still never hear from you! I have been around, so you can drop it in my door mailbox at home, mail it to me at 581 W. Capitol 84103, or call me.

hope to see you at W on july 12 and 19 for more ibiza madness.
thanks, ac

**Date:**Aug 04 2003 9:12 PM
**From:**Andrew Callaway - 010957
**Subject:**hola
**To:** Kristen Wiley - 014321

---

Bonus checks are here! How about signing it over to me? Call me when you are around so we can catch up and do a lunch or something.
thanks!!
**Date:**Aug 11 2003 6:28 AM
**From:**Andrew Callaway - 010957
**Subject:**???
**To:** Kristen Wiley - 014321

---

BONUS CHECK?
Come on Kristen, Im tired of this!
i need my money now or i'll get it the hard way!
thanks, andy
**Date:**Aug 11 2003 9:10 AM
**From:**Kristen Wiley - 014321
**Subject:**RE: ???
**To:** Andrew Callaway - 010957

---

you know, money is so tight right now and looking back you told me that I wouldn't need to pay. the only thing I needed to pay was for food and other things. sorry andy
**Date:**Aug 12 2003 8:23 AM
**From:**Andrew Callaway - 010957
**Subject:**RE: ???
**To:** Kristen Wiley - 014321

---

actually kristen, i have an email from you that says you WILL pay and you also told me you would sign over your bonus check! I never said you did not have to pay for the villa/car. I dont mean to be mean about this, but I am not a bank. Your first check is considered partial payment of a debt that you agreed to repay. Now, you can continue ignoring this, or I will sue you and have garnish your paycheck! Your choice.
**Date:**Aug 12 2003 8:29 AM
**From:**Kristen Wiley - 014321
**Subject:**RE: ???
**To:** Andrew Callaway - 010957

---

if you feel that is necessary. ----- Original Message ----- From: Andrew Callaway Sent: 2003-08-12 08:23:10 To: Kristen Wiley Subject: RE: ???
**Date:**Aug 12 2003 8:55 AM
**From:**Andrew Callaway - 010957
**Subject:**RE: ???
**To:** Kristen Wiley - 014321

---

you have already acknowledged the debt, so why do you not sign over the bonus check like you promised and get it over with. or, you can have a garnishment put on your paycheck for 3 times what you owe me and be forced to pay and have a collection placed on your credit report for 10 years. is this worth $270 to you, or would you rather pay $810 plus court costs? the choice is yours! friends dont screw each other like this kristen!

**During the first part of September 2003, I received a call from DEN Asst. Chief Pilot Don Watkins. He informed me about a conversation that he was forced to listen to on his overnight in El Paso on August 27th. He said the conversation was so loud, anybody in adjoining rooms could have followed the conversation as he did. I asked him to write it down for me. Here is his write-up.**

On the night of August 27th in the Marriot hotel in El Paso, while I was in room 238, at about 22:50 local time, I was just about to fall asleep when the person in the room next to me (240) made a phone call. He was very loud and from the inflection of his voice, very angry. I remember thinking how very rude to call someone at almost 11:00 and be loud and generally obnoxious in a hotel room. I was about to put in earplugs and turn up the air conditioner to drown out his voice, when my attention was grabbed by this statement, "IF THEY DO THAT I'LL SUE THE SHIT OUT OF SKYWEST." He went on to say, "I'LL SUE BRAD, JIM AND KELVIN." Not knowing that there was another crew for SkyWest in the hotel, I thought this was a disgruntled passenger or customer, and I was curious to hear more. He then went on to say that his basis of his lawsuit would be similar to that of the pilots at Cathay Pacific. This lawsuit was by the non oriental pilots suing in the workplace. He stated that were about 30 or 40 non-oriental pilots out of about 2000 or so, and that they stood a good chance of winning their lawsuit. He also stated that he would settle for 10 thousand dollars if he does sue. He went on to say that he would contact a lawyer named Ed Collins in SLC tomorrow (Thursday 28th), because his "report" was due on Jim Breeze's desk on Friday at 3 o'clock. The person on the other line must have asked him what was the company going after him for because his next remark was "THEIR TRYING TO GET ME ON A PERSONAL VIOLATION OF THE COMPANY POLICY ON THE COMPANY E-MAIL." He went on to say that the only thing the company had on him was a "counseling statement about an incident in Butte." He then also stated that he was looking for a new job, and has an interview with Jet Blue Airlines on Oct 14th. At this point the person on the other line must have asked him what SAPA was doing for him, because his next statement was this "CHRIS ABELL SAID TO ME "YOU KNOW MORE THAN YOU'RE SAYING." The person in the room then said "SAPA WON'T DO ANYTHING FOR ME UNTIL THE COMPANY [SkyWest] TAKES DISCIPLINARY ACTION." He said this with disgust in his tone and something about them (SAPA) not being very effective. He then said some other things that sounded like complaints and the conversation ended at about 11:20. He said to the person on the other line "THANKS DAN" and hung up. I then called down to the front desk and explained that I was the Assistant Chief Pilot at SkyWest and I thought I might know the person in the next room and asked Eddie who was in the room next to mine. Eddie said that it was indeed a SkyWest pilot and his name was Andy Calloway. I then called Crew Scheduling and asked if a pilot named Andy Calloway was working and if he was indeed on an overnight here in El Paso. Crew Sked confirmed that Andy Calloway was in ELP and he had flown in from DFW.
In closing, let me say that I have heard employees talk about their company, or their boss in a negative tone. This doesn't usually bother me, I think we all blow off steam from time to time, especially when we think we are in the confines or privacy of our hotel room or house. However, this Andy Calloway was whining and complaining, and sneering about subjects and people that he was just plain WRONG about. He was saying how he had set up 2 interviews with some small company and was PROUD that he had not showed up for either one of them and he had the audacity to say he might set up a 3rd interview just to see if "THEY HAD LEARNED THEIR LESSON". Although I have never met this Andy Calloway, he reminds me of a spoiled rotten kid and just thinks everybody else is wrong and he is right. If he does have another interview, I say good riddance and good luck. By the way I was wondering if this is what he says about SkyWest and it's employees and it's managers in a hotel room loud enough for me to hear, I wonder how many other people or PASSENGERS hear him or if the other room overheard him talking bad about SkyWest. Very unprofessional.

21

Sincerely,

Donley E. Watkins III
Assistant Chief Pilot
Denver

After looking over Donley's write-up, I felt as did others, that this action on the part of Andy had violated SP 306 2. (21) Crewmembers may not make or publish false, vicious or malicious statements concerning any employee, management representative of the Company, or which has the potential to adversely affect the Company's relationship with customers, suppliers, employees, or the public.

Summary:

No showed for his initial class.

First year of employ he is summoned to SGU because of abusive writings on the website and comments to crew support. He is warned his behavior will not be tolerated.

A call to SkyWest from his neighbors concerning loud and noisy parties, Andy is verbally notified that this needs to stop.

Abusive treatment to fellow SkyWest and Horizon employee's in BTM, disregard to a bulletin issued by Brad Holt concerning compliance with screener directions.

Write-up from Ground Instructor concerning his arrogant attitude.

Another meeting with Brad Holt, the third in his three year employment, concerning his attitude and abusive treatment of fellow employees

Counseling statement issued for abusive treatment of fellow employees and screening agents including three weeks unpaid leave.

Counseling and time off was upheld by review board.

SAD for sick after call from reserve

SAD for not returning call while on reserve, did not accept responsibility. Non compliance for return of written verbal warning.

Harassment of fellow employee using SkyWest property in violation of company policy manual and crewmember policy.

Violation of crewmember policy in making vicious or malicious statements concerning any employee, management representative of the company.

SkyWest Airlines reserves the right to employ those individuals that it feels meets the personnel profile maintained for specific positions. Once the employment selection has been made, SkyWest strives to maintain a productive interaction with its employees. SkyWest maintains various employee work group representatives. Working with these work group representatives, SkyWest jointly crafts work rules and policies specific to each work group. SkyWest also maintains an overall corporate employee policy manual.

Each employee is subject to the rules of conduct outlined in these manuals. We feel Andrew Callaway has violated and shown disregard for these rules a number of times through out his

employment. The Company has taken a number of actions as stipulated by policy to effect corrections to his behavior. We did not see the required behavioral correction, in fact we see a continued thread of behavior that has been addressed before. The company feels that we have followed policy to the limit, verbal warnings, personal meetings with department VP and counseling statement with associated time off have did not have a corrective effect. Therefore the only solution we had left was termination.

# Exhibit “K”

5

SkyWest AIRLINES

# Customer Service Irregularity Form

City BTM Date Time 635[illegible] AM

SkyWest Airlines Rep. MICHELLE LOTT/BTM SU

Flight # 3556 Date of Travel 11/13/01 Itinerary

Aircraft number: 406

Passenger Name:Callaway/David Andrew

Home Address:

Telephone Numbers: Home Business

Company Name or Business Type: SKYWEST AIRLINES

Brief Description of Occurrence:
Mr Callaway is a SkyWest Airline employee #10957/DOE 01/13/99. Mr Callaway was in BTM for flight training the evening of Nov 12, traveling back to SLC on the flight the following morning. He advised Marc Kelly, SkyWest ticket agent, that he was a mustride. Marc advised him he wasn't a mustride or even listed to travel standby. Mr Callaway commented that he should be a mustride he had trained all night and that he should have been taken care of. Marc advised him that inorder to travel mustride we need a PNR with an authorization code and that their wasn't a problem with space on the flight. He was listed as a standby, and assigned a seat, at this point becoming a selectee.
At the BTM Security Checkpoint with a very long line and a flight delay due to security, Haley Craddock , Horizon Screener, and I were the Screeners In Charge as we processed the passengers, at our discretion we were doing physical searches of bags in question and all selectee bags. As Haley handwanded Mr Callaway who is a selectee he ask her, "Who we thought we were going through everyones bags". As an airline employee and someone who should be aware of increased security measures these comments to security agents are not acceptable and in fact had Haley let us know sooner he would have been denied travel on this flight.

I Haley Craddock / BTM QX
Michelle Lott / BTM Supervisor

**Please keep a copy on file at station. If necessary forward one copy to Customer Relations with a copy of the PNR.**

PENGAD 800-631-6989 DEPOSITION EXHIBIT 18 Hyatt

SW 164

# Exhibit "L"

**SkyWest Airlines, Inc. Crewmember Policy Manual**
**Appendix "E"**

# Counseling Statement

DEPOSITION EXHIBIT
7
Hyatt
PENGAD 800-631-6989

Employee: Andrew David Callaway

Job Title: Flight Officer

Manager: Bill Boice, Kelvin Hyatt

Date: 11-30-01

Subject: Behavior

---

On November 12, 2001 while returning from BTM where you had conducted flight training, you were reported as exhibiting [redacted] inappropriate behavior. Three SkyWest Airlines ramp agents witnessed this behavior. It is reported to have begun at the ticket counter when "mustride" authorization was not present for your travel. It continued and escalated during passenger screening. This behavior is reported as "arrogant, disrespectful and abusive" and was displayed in front of other passengers.

On September 27, 2001, VP of Flight Operations Brad Holt issued an ITL Bulletin 01-36 to all flight crewmembers. This bulletin contained specific direction as to the conduct of crewmembers passing through security checkpoints. *"At no time will a crewmember or non-revenue traveler question the decisions of, or refuse to comply with requests from airport security personnel."* Your reported conduct does not comply with this direction.

This is not the first time you have been counseled on your behavior. During the summer of 2000, you were summoned to Corporate Headquarters for verbal consultation in reference to abusive treatment of crew support personnel and posts you authored on the Web Boards. In fact this is the third time your behavior has been called into question. Any further behavior problems such as:

- Arrogant and abusive treatment of fellow employees.
- Disregard or refusal to comply with company policies and direction.
- Any conduct that would constitute an embarrassment to SkyWest Airlines or it's employees.

could result in further disciplinary action up to and including termination.

[signature]
Kelvin L Hyatt, Chief Pilot – SLC

[signature] 11/30/01
Employee's Signature Date

under protest pls. see attachmen

[signature]
Witnessed by:

This documentation is a Counseling Statement. The above-described problem should be corrected immediately. Failure to correct this problem will result in further disciplinary action up to and including termination of employment. Your Chief Pilot will be responsible to follow up with the above-mentioned crewmember. A copy of this letter will be placed in your permanent personnel file.

# Exhibit "M"

STATEMENT REGARDING SAD JUNE 2003

On June 30, 2003, I received a SAD for not answering my cell phone while on reserve. Crew Scheduling attempted to contact me in the morning on June 30 to notify me of a future assignment later in the week.

I accept full responsibility for this SAD. I did try to make a request for a user day, but had problems with SkyWest Online. These requests were not read until after June 30. However, at the time of the call, my cell phone had no signal while I was in a court office building during a deposition. When I realized this, I immediately called Crew Scheduling and spoke to Donna about my situation. She advised me to call her every 30-60 minutes until my meeting was over to check in with her. I complied with her request, and was not aware of the SAD until the end of the day.

Under the circumstances, I decided I would not dispute this SAD and agreed to accept the verbal warning that was to be issued. Mr. Hyatt instructed me to sign a copy of the IOR and return it to him. I forgot to do this a timely manner because my show times where before Mr. Hyatt's office opened. When I was reminded of this, I faxed this verbal warning to Mr. Bodkin. I then left town and did not receive notice that it was not received until mid-September. I replied that I would definitely drop this off when I returned home, as I have already signed the notice.

PENGAD 800-631-6989 DEPOSITION EXHIBIT 19 Hyatt

# Exhibit "N"

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, | CIVIL NO. 2:04CV00179 |
| vs. | DEPOSITION OF: KRISTEN WILEY |
| SKYWEST AIRLINES, INC., Defendant. | Held March 15, 2005 |
| | REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of KRISTEN WILEY, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 9:31 a.m. on March 15, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *



Depomax REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

attendants? Would you get written up for things if you did something wrong?
A Yeah.
Q What were they called?
A I seriously don't remember, it's been so long.
Q Do you recall ever being written up for doing something wrong or --
A I don't recall being written up for doing anything wrong. If you have something, I might remember it, but personally, I don't remember. But I know I've talked with them before about different things, like when I've had problems with passengers, but I don't think I got written up for any of that.
Q If you had a problem with a passenger, were you supposed to file an incident report?
A Incident report, yes.
Q So you recall that you at times filed incident reports?
A Yes, sir.
Q Do you remember the term SADs, S-A-D-S?
A No, I don't recall.
Q What would happen if you were late for a flight?
A Oh, the SADs where they -- you get so many



strikes? Is that what it was?
Q I believe so.
A I'm not sure.
MR. PETERSEN: Go off of your memory as opposed to Mr. Strindberg's.
Q (BY MR. STRINDBERG) Did you ever get a SAD?
A I might have for being -- for having to miss some flights. I remember I had a urinary tract infection that turned into a kidney infection and I had to leave a flight early, and I think they wrote me up until I got a doctor's note, so...
Q Were you ever suspended from your job?
A During the time when -- the first week of December when they were putting everything together.
Q How about prior to that time?
A Huh-uh. Other than my leave of absence, I was working continually.
Q When did you take a leave of absence?
A August -- no. September through November.
Q Of what year?
A Of 2003. To the beginning week of November, so about two months.
Q And what was the reason for this leave of absence?



A I had to -- I was on medication.
Q What medication were you on?
A Xanax.
Q And who put you on Xanax?
A A doctor.
Q What doctor?
A Lisa French, I think is her name.
Q Is she a general practitioner or --
A She's a counselor, psychologist.
Q And why did she put you on Xanax?
A Because of my anxiety attacks.
Q And when did these anxiety attacks start?
A In about June -- July, August.
Q You said June and then you --
A No. It was July and August.
Q And what happened in July and August that caused you to start having anxiety attacks?
A Just stress. Stress from work, stress from personal life. And they got worse during -- when I was at work, so -- they were only -- my anxiety attacks were only affecting me while I was at work, and it prevented me from flying because I had to take the Xanax, so -- and you cannot fly on Xanax.
Q Okay. And what at work was causing you the stress?



A Basically the harassment from Andy. When I would get the E-mails it threw me into a worse anxiety attack and I'd have a really hard time flying my flights.
Q Anything else at work that caused you stress?
A No.
Q You said you were also experiencing stress in your personal life. What was going on there?
A During -- just like outside of -- like when we'd go out to the bars and stuff, you know, I'd see Andy, too. But not just Andy alone. I moved out for the first time and -- by myself, so that might have been it. But I wasn't having any problems living on my own. It's just normal kid stress, I guess.
Q How many -- you said also that it might have been when you'd see Andy at bars. How many times during July and August of that year did you see Andy at a bar?
A Quite a bit, I think, from what I recall. We always saw each other at the bars, because I was dating a guy at a bar that he frequented and --
Q What bar?
A W.
Q So what's "quite frequently"?

A Well, he was always holding his Ibiza nights there every Friday night.
Q Say that again.
A His Ibiza nights. He would bring in different DJs.
Q Who would bring in different --
A Andy.
Q Okay.
A And just -- I felt like I couldn't go there to be with my friends because of the harassment, and then other people that he knew and I knew would kind of do the same thing, so...
Q Do what?
A Just harass me about it. You know, "Why don't you pay Andy? Why don't you pay Andy?" And they didn't know the whole story, so...
Q Who were these other people who harassed you?
A I cannot remember her name. She went to court with him when we had our own personal trial. I'd kind of get shunned by other people, so it's just not a great atmosphere. And basically those were all my friends that hung out there. And then all of his friends would be there as well, so that wasn't fun.
Q So did you just stop going to the bar?



A Yep.
Q Did you have any other contact with Andy outside of work --
A No.
Q -- besides seeing him occasionally at a bar?
A No.
MR. PETERSEN: You're talking in the July, August time period?
MR. STRINDBERG: Yeah.
THE WITNESS: Not that I recall.
Q (BY MR. STRINDBERG) Okay. Tell me -- this debt that became an issue between the two of you was -- came out of a trip you took to Spain, correct?
A Correct.
Q Let's go back. First of all, how did you first meet or get to know Andy?
A Andy Bharath was his roommate. I'd been flying with Andy for my first month back --
MR. PETERSEN: Which Andy?
THE WITNESS: -- from Santa Barbara. Andy Bharath.
Q (BY MR. STRINDBERG) So this would be --
A August of 2001, when I first came back from Santa Barbara.



Q Okay. Go ahead.
A And Andy was away in Spain.
Q Andy Callaway?
A Andy Callaway was away in Spain, and Andy Bharath had had like a party at Andy Callaway's house, so after that, Andy Bharath and I started hanging out and then introduced me to Andy Callaway and --
Q When were you introduced to Andy Callaway?
A I'm not sure. Probably October of 2001.
Q When you say you started hanging out with Andy Bharath, you mean you started dating him or --
A No, no. Just friends.
Q Were you -- what were the circumstances under which you were introduced to Andy?
A Callaway?
Q Yes.
A I'm not sure exactly what the circumstances are. I mean, they always got me into bars when I was 19. Eighteen, 19. I turned 19 in -- no, 20. I was 19, and then I turned 20 November 7th of 2001, and so we'd always go out to the bars, and being with older people, I'd always be able to get in without being ID'd.
Q So did you meet Mr. Callaway at a bar at



some point?
A It might have been at his house first and then go to a bar, because that's what would always happen. We'd always meet at their house, and then later on in the night we'd go to a bar.
Q Who is "we"?
A Just all of the friends that hung out at his house, so...
Q Who was that group of -- who was in that group of friends?
A I'm not sure. I can't remember names. There were so many different people that just always frequented the bars, so -- sorry.
Q Were they all SkyWest people?
A Not all of them.
Q But a number of them were?
A Not all of -- no. Probably mostly just Salt Lake people that he knew before.
Q Do you recall the names of any of those people?
MR. PETERSEN: Asked and answered.
THE WITNESS: I don't. I don't remember. Probably just Andy Bharath, whenever he was in town, and then maybe Jed every once in a while.
Q (BY MR. STRINDBERG) Who is Jed?

only thing. I don't recall the trip at all.
Q What do you remember Andy liked in his tea?
A Like three sugars, something like that.
Q How do you recall that?
A Because he was very picky about it.
Q How was it that you came to go to Spain with Mr. Callaway? And I probably phrased that wrong, but how was it you came to go to Spain in September of 2002?
A Well, the girl that he was paying for to go decided not to go, so he had already paid for her spot, said he had an open spot, and I went.
Q What else did he -- how did he contact you about it?
A What do you mean?
Q Did he call you, did he send you an E-mail, what?
A Probably when we were just going out. I don't recall exactly how.
Q What did he say to you?
A I don't recall. Sorry.
Q Well, what generally do you recall?
A I recall that there was an open spot that had been paid for that could be filled, and I needed to buy my ticket and go, so I did.



Q And how much time elapsed between when he told you that and when you went?
A Not very long. Probably about a week, because I had little time to get my tickets sent up from St. George. I requested the tickets and they needed to hurry and send them up so I could make the trip with him.
Q Did you fly in the same airplane?
A Yes.
Q And there were a number of people who went on this trip, correct?
A Correct.
Q Do you remember if all of you rented some large house or something?
A Uh-huh.
Q That's "yes"?
A Yes.
Q Where was this house?
A In Ibiza.
Q How many people stayed there?
A I want to say eight.
Q And how long were you there?
A I was only going to stay a little bit because I only had a little bit of money, so I was only going to stay for about three or four days, but



then ended up staying the whole two weeks.
Q And why did you end up staying the whole two weeks?
A I have no idea. Probably because I was having fun.
Q Now, after you got back, there were several occasions that you paid money to Andy; isn't that correct?
A No. There was only once.
Q When was that?
A In November, I think, when I wrote him the check for $50.
Q And why did you write him a check for $50?
A For money that I borrowed from him on Wednesday.
Q At some point Andy -- well, strike that.
At some time the issue arose as to whether or not you owed Andy additional money; is that correct?
A Correct.
Q When did that first arise?
A Probably around November. After we stopped hanging out, from what I recall.
Q And what do you mean you stopped hanging out?



A I stopped going to the bars with that group of people.
Q And why did you stop going to the bars with that group of people?
A Just was getting old, the partying.
Q Did you start dating someone by the name of Jess?
A Uh-huh.
Q That's "yes"?
A Jess Leonard.
Q When did you start dating Jess Leonard?
A I met him probably the beginning of December of 2002 and we started dating towards the end of December.
Q And where did you meet Jess?
A At W. He was a bartender there.
Q And how long did you date Jess?
A About six months.
Q Is that when you stopped hanging out with Mr. Callaway?
A When I met Jess? No. I stopped hanging out with Callaway before.
Q Was there some reason other than you just got tired of partying?
A No.

Q Okay. What did Andy say to you in regards to the additional money?
A Well, there was obviously misinterpretation between the two of us that I felt that I didn't owe him money and he felt that I did.
Q Okay. I understand that. I'm just asking you what he said to you in November of 2002 about this money.
A I don't recall.
Q When you say you don't recall, do you mean you don't remember the exact words or you have no recollection whatsoever?
A No recollection. I've put everything behind me. I've forgotten everything.
Q How much money did Andy tell you he felt you owed?
A In the area of two or three hundred dollars. I'm not sure.
Q And what was this misunderstanding that you believe existed?
A Well, the reason --
MR. PETERSEN: Hold on. I'm going to object. It's asked and answered. Go ahead.
THE WITNESS: Can you --
Q (BY MR. STRINDBERG) Well, tell me the



basis of this misunderstanding. You said there was a misunderstanding between you and Andy.
A He -- I felt -- I thought that when he invited me to go to Spain in place of the girl that he had already paid for, meaning that he had paid for her place and I was to take her place, so I wouldn't have to pay, and there was no previous agreement for me to pay before the trip, so that's where the misunderstanding came in.
Q And this was what, payment for rental of the house you guys stayed in?
A Yes.
Q Did Andy Bharath go on that trip to Spain?
A No, he didn't.
Q Anyone else from SkyWest?
A No.
Q Do you know why Mr. Callaway asked you to go with this group to Spain?
A Probably because I was his friend and I could easily get the ticket right away. I'm not sure.
Q So sometime in November Andy raised this issue of paying a share of the rental cost of the house with you; is that correct?
A I don't recall.



Q Well, you said earlier that you thought it was in November when you stopped hanging out.
A Well, that's when I paid him the $50 for the food costs that I borrowed from him.
Q When did he raise the issue of you owing other monies?
A I don't recall.
Q Was it around the same time?
A I honestly don't recall.
Q Do you recall any conversations between when you returned from Spain and when you started getting E-mails from Andy about the money?
A No.
Q Did you see Andy at all during that period of time?
A Between what period of time?
Q Between when you returned from Spain and --
A Yes.
Q -- when he sent you an E-mail about the money.
A I'm pretty sure we saw each other, because we hung out during October and the beginning of November, so -- I know he didn't send an E-mail before that. And then the first E-mails I remember are just the ones that -- during like the summertime.



Those are the only ones that I recall.
Q The summer of '03?
A Yes, sir.
Q Do you recall any contacts with Andy between the time you stopped hanging out in November of 2002 and when you got an E-mail from him in the summer of 2003?
A Yeah. Always -- at W, he'd always make comments about it.
Q And what would he say?
A He'd say, "When are you going to pay me my money?" Stuff like that.
Q And what did you say?
A I'd just tell him, "I don't owe you." It was always just a big argument over it. And then after the harassment just kept getting worse and worse, and so finally I'm like, "Whatever. I'm done." So that's when I said, "Hey, I'll start paying you what I can."
Q When did you tell Andy that?
A I don't recall. Probably -- what do those E-mails say? Unless I could read them, I cannot tell you for sure.
Q When you say the harassment got worse, what do you mean?

Q Did you ever tell SkyWest that Lei Frase harassed you at the clubs?
A No, because that was outside of work. I don't think I would have said that. I might have said, "Yeah, she's" -- you know, that's not why I would take it to my supervisor, because that's outside of work, but -- I don't recall ever going straight -- "Hey, I have personal problems. Take care of it." Never anything like that. It was just when it came inside of work where I was trying to work. When it was interfering with my work, I would take it to a supervisor.
Q When you say "it came inside of work," you mean you received these E-mails?
A Yeah. When I didn't feel safe about going to work where I'd have to avoid him and her.
Q Did you ever tell anyone at SkyWest that you were afraid of Lei Frase?
A No, I don't think I would tell them I was afraid of her. I just didn't like confrontation.
Q Did you tell her that you -- did you ever tell SkyWest that you were having any problems with Lei Frase?
A I might have mentioned it, but I don't recall.



Q Do you recall mentioning it?
A No, I don't recall.
Q Kelvin recalls you coming to see him on August 12th. Does that sound right?
A Yes.
Q What did you say to Kelvin?
A I said, "Here's what's" -- probably, "Here's what's going on, and can you help me take care of it, get it to stop?"
Q Tell me what you recall saying to him.
A I don't recall, then.
Q Tell me to the best of your recollection.
A I really don't know.
Q You brought in the E-mails; you remember that?
A Yes.
Q You have no recollection of what you said to him?
A I don't remember any of this.
Q How long did the meeting with Kelvin last?
A I don't know.
Q Did you at any point tell Kelvin that Andy was harassing you because you wouldn't date him?
A I don't remember.
MR. STRINDBERG: Do you want to take a



break?
THE WITNESS: Yes.
(Recess.)
Q (BY MR. STRINDBERG) We were talking about your conversation with Kelvin. Kelvin made some notes and said that you told him that Andy had broken off with his girlfriend and that was the point he asked you to come with him to Spain. Does that refresh your recollection at all?
A Yes.
Q Did you tell Kelvin that?
A (Witness nods.)
Q What was Andy's girlfriend's --
A Jennifer Barret.
Q And how -- did you know Jennifer Barret?
A Yeah.
Q And how did you know Jennifer?
A She was a flight attendant. And I basically got them together. Like I was hanging out with Andy and I was also hanging out with Jennifer, and then they started hanging out together.
Q How long did Jennifer and Andy go out, if you know?
A I don't recall.
Q I mean, when you told this to Kelvin, were



you trying to imply that Andy asked you to go to Spain because he had romantic intentions toward you?
A I don't recall. I always heard that, you know, Andy had interest in me, but it never manifested itself, so I don't -- I don't recall if I had implied that or not at the time, because that might have been the way I felt then.
Q What do you --
A That I might have felt that Andy had been trying to start a romantic relationship, but I just -- I don't remember.
Q But when you were in Spain, did he do anything which would indicate that he was? Did he ever make a pass at you or anything like that?
A No.
Q After talking with Kelvin -- what do you recall Kelvin saying to you?
A I don't recall what the conversation was.
Q Did you talk with anyone else at SkyWest about these E-mails?
A Other than the pilots, no, I don't recall talking -- they might have made me talk to Harold, but I don't remember.
Q Do you recall at some point talking with Jacque Nielsen about it?

A Yeah. I think probably in November when I came back, or maybe when everything happened. I was on leave when I heard Andy was fired, and then that's when everyone started contacting me, when I came back and --
Q So you --
A -- to give my side of the story of what was going on.
Q Okay. So you remember talking with Kelvin in August --
A Uh-huh.
Q -- of 2003. How much time elapsed then, Kristen, before you went on leave?
A Probably two weeks.
MR. PETERSEN: You mean from the time she spoke to Kelvin?
MR. STRINDBERG: Right.
Q So it was about a two-week --
A When did I talk to Kelvin exactly?
Q He says August 12th, I believe.
A So it would have been two to three weeks, because I took leave in the beginning of September.
Q And what is the process that you had to go through to get leave?
A I had to make my request known to Harold,



and then I had to get paperwork from Lisa French, so I had to make an appointment with Lisa French to get that taken care of and fax it in.
Q Was there some form you had to fill out and give to Harold?
A It was the form that Lisa French filled out. I don't know if it was her own form or if it was a SkyWest one, but I vaguely recall a big thick packet that was sent in.
Q Now, you'd said earlier that, you know, there were some tensions in your personal life, such as, you know, general stress of being out on your own.
A For the first time, yeah.
Q Was there anything else going on?
A No.
Q Were you dating anyone in August of '03?
A Huh-uh.
MR. PETERSEN: "No"?
THE WITNESS: No. Sorry.
Q (BY MR. STRINDBERG) Do you have any -- do you know who Jacque Nielsen is?
A People department?
Q Right.
A Okay.



Q Do you have any recollection of talking with her in August?
A I remember -- not in August, no. I don't have recollection of that. I don't remember when I talked to her first, but I remember talking to her, and her and I exchanging phone calls back and forth.
Q Look at -- in that book that's in front of you, look at Exhibit 8.
A Okay.
Q That's -- did you draft this E-mail?
A Yes, I wrote that.
Q And --
A That was just a quick summary of what happened.
Q Okay. So in relationship to this E-mail, when was it that you talked with Jacque?
A It was probably before, because I think she's the one that asked for me to write up a brief summary and E-mail it to her.
Q How much before?
A I don't recall.
Q Jacque Nielsen recalls that after you talked with Kelvin Hyatt, he apparently called Jacque Nielsen, and then she called you --
A Okay.



Q -- in August. Do you have any recollection of that?
A I don't.
Q So your recollection is that the first time you talked with Jacque Nielsen was sometime in November after you got back from your --
A Leave?
Q -- leave?
A Well, just from looking at that, that's -- I remember her asking me to write up a brief summary of what happened.
Q Okay. But going back to the timing issue, you recall talking with Jacque -- is it correct that you recall talking with Jacque Nielsen for the first time after you got back from leave?
A Yes.
Q And was that in person or on the phone?
A On the phone.
Q And did she call you or did you call her?
A I don't recall if she got ahold of me or if I got ahold of her. Or it might have even been E-mail. I'm not sure, now thinking about it.
Q Does your E-mail, which is Exhibit 8, summarize what you told Jacque when you talked with her?

A Sorry?
Q Does this summarize -- does this E-mail, Exhibit 8, summarize what you told Jacque when you talked with her after you got back from leave?
A I'm pretty sure, from what I remember. Just her asking me to write it up and give her a brief summary of what happened, so yes. That's what she asked me to do, is just hurry and summarize what I just told her and E-mail it to her so she has it down.
Q Now, in here you indicate that you felt he was trying to start a relationship with you, and someone told you that --
A Uh-huh.
Q -- as well? But you indicate that when you were in Spain he didn't --
A He didn't do anything that he hasn't ever done.
Q Didn't ask you to sleep with him or anything like that?
A No. No, not at all.
Q And then you started hanging out more often when you came back from Spain?
A Uh-huh.
MR. PETERSEN: Is that a "yes"?



THE WITNESS: Yes.
Q (BY MR. STRINDBERG) And then it says, "After November start" -- I guess it's probably "started" -- "I lost interest."
A Uh-huh.
Q Were you interested in having a relationship with Andy?
A No. What I was referring to is I lost interest in just all the partying and drinking every night and on the weekends and --
Q Did you make that clear to Jacque when you talked with her, that what you were losing interest in is the partying?
A I don't recall if I did make that clear to her.
Q Where would you check your E-mail from?
A SkyWest.
Q What, when you reported to work?
A Uh-huh.
Q "Yes"?
A Yes. In the crew lounge.
Q Could you access the E-mails from home?
A Could I access SkyWest E-mails from home?
Q Yes.
A Yes.



Q Did you ever?
A I don't think I did. I didn't have Internet access at my own home, but I had it at my mom's house, but I don't recall going to her house to check them.
Q Did you, during this period of time, have a computer at home with Internet access?
A At my --
MR. PETERSEN: She said "no."
MR. STRINDBERG: No, she didn't. I didn't ask her that question.
THE WITNESS: At my mother's house, she had access, but -- yeah.
Q (BY MR. STRINDBERG) This E-mail to Jacque says, "After we stopped hanging out completely, he started sending me E-mails requesting payments." Do you recall any E-mails from Andy about payments prior to that May 2nd one we looked at, which is Exhibit 81?
A I don't recall. I don't remember any E-mails before that one, unless I were to read it and it would refresh my memory.
Q Well, we don't have any. That's why I'm asking. So you were out from the beginning of September until the end of October; is that correct?



A Beginning of November. Probably about November 5th or 6th.
Q So a few days before you wrote this E-mail to Jacque?
A Yes.
Q And did you then have to get a release or something from Lisa French?
A Just a physician, showing that I was okay.
Q And which physician?
A It was just a family practice. I don't remember who it was.
Q So you stopped taking --
A Uh-huh.
Q -- the Xanax?
A And the Prozac.
Q Since that time, have you taken any medicine for anxiety or depression?
A No.
Q You said while you were off you heard that Andy had been terminated.
A Uh-huh.
Q Who did you hear that from?
A I don't recall who it was from. I had a lot of friends at SkyWest, so it could be any number of them.

you had been trying to call him, so you must have known his phone number.
A I'm not sure. I don't remember. I really honestly don't remember any of it.
MR. STRINDBERG: I don't have anything further.

EXAMINATION

BY MR. PETERSEN:
Q All right. I just have a few questions. Ms. Wiley, you testified earlier, I believe, that you spent a fair amount of time meeting at Mr. Callaway's residence, and then from there you would go to bars with a group of people; is that right?
A During which time frame? During the --
Q During the September 2002 and the summer of 2002.
A Yes.
Q And when you were at Mr. Callaway's house, did you ever observe drug use taking place at his house?
MR. STRINDBERG: Objection. That's irrelevant.
Q (BY MR. PETERSEN) Go ahead.
A No, I didn't ever.
Q All right. Let's look at Exhibit 15, sub



20. These are the E-mails that have been produced between you and Mr. Callaway, right?
A Correct.
Q I'm looking at the second page, the second E-mail down. Do you see that? It's the one that's dated August 11th --
A Yes.
Q -- of 2003.
A Uh-huh.
Q What does that E-mail say?
A "Come on, Kristen. I'm tired of this. I need my money now or I'll get it the hard way. Thanks. Andy."
Q And do you recall receiving that E-mail?
A Yes.
Q Do you recall what you understood him to mean by what he says in that E-mail?
A Yeah.
Q What did you -- what did you think he meant?
A Physically.
Q That he would hurt you?
A Or something to that extent.
Q Were you afraid when you received that E-mail?



A Uh-huh.
Q Is that "yes"?
A Yes.
Q That wasn't the first E-mail you had received at the time asking for the money; is that right?
A I don't think it was. It wasn't the first, no.
Q Did you feel intimidated by Mr. Callaway?
A Yes.
Q Why?
A Because of his actions, his words, what he can do.
Q Had you observed him get upset with other people?
A Oh, yeah.
Q And what is your -- how would you describe him when he gets upset?
A Very confrontational.
Q Have you ever seen him get violent with somebody?
A No.
Q At the time that you received that particular E-mail, you were afraid that he might be violent with you?



A Violent or confrontational. I knew I just was scared and I needed to stay away from him.
Q Do you recall when, after that particular E-mail, you spoke to -- you tried to get ahold of Harold Allen?
A Of when exactly?
Q Was it shortly thereafter?
A Yeah.
Q It was like a few weeks?
A That was the breaking point.
Q And then you were unable to get ahold of Mr. Allen?
A Uh-huh.
Q Is that right?
A Yes.
Q So then you contacted Kelvin Hyatt?
A Yes.
Q And did you go to his office personally or --
A Yeah.
Q Were you upset at the time?
A Yeah.
Q Describe your demeanor when you went into Kelvin Hyatt's office, if you recall.
A I was crying.

Q You testified earlier that you hung out at -- with Andy and others often at various bars and at Mr. Callaway's house; is that right?
A Yes.
Q Did you have discussions with Andy about work and other things when you would meet with him, just regular chitchat kind of things?
A I don't recall specific times, but I always remember comments made by Andy.
Q Did Andy ever talk to you about disciplinary action that he had received from SkyWest?
A I remember one time when he got in trouble at the security, the TSA agents, and I remember him talking about that incident.
Q Do you recall what he said?
A I don't recall specifically.
Q Do you recall what his attitude was when he talked to you about it?
A What was -- pardon?
Q His attitude.
A Very arrogant.
Q And why do you say "arrogant"?
A Because he always felt that SkyWest could never do anything to get him fired, or he always had



the right of way. No matter what he did, he wouldn't get in trouble.
Q Did he ever seem apologetic for any of the discipline he received at SkyWest?
A No.
Q He didn't feel sorry for anything he'd done or remorseful?
A No.
Q I'm going to show you what was marked as Exhibit 8 previously. This is the E-mail from you to Jacque Nielsen, right?
A Correct.
Q And you've had a chance to read that over?
A Yes.
Q Does it fairly and accurately give a summary of what it is that you talked to Ms. Nielsen about?
A Yes.
Q Did Ms. Nielsen ever tell you specifically what to tell -- what to say?
A No.
Q Did she -- what did she ask for? Do you recall?
A She just wanted my side of the story.
Q Has anyone at SkyWest ever told you to say



anything, particularly about Mr. Callaway?
A No.
Q At all times from the documents we've looked at today and those you've spoken to at SkyWest, have you simply explained what you recall the facts to be?
A Yes.
Q When you complained to Mr. Hyatt, were you intending to get Mr. Callaway fired for pursuing money that he thought you owed him?
A No.
Q Did you ever say -- or did you ever tell a lie about -- let me rephrase that.
Other than the $50 that you testified to earlier that you borrowed from Mr. Callaway, was it your belief that you owed Mr. Callaway money based on the trip to Spain?
A I don't believe I owed him any money.
Q So, by complaining, it wasn't your intention to, in essence, get back at Mr. Callaway for asking for the money?
A No. I had no intention of that.
Q Other than the incident that he explained to you about with the TSA people, did he ever talk to you about any other disciplinary incidents with



SkyWest?
A No, not that I recall.
Q Did you ever admit that you got him fired for filing a small claims action?
A No.
MR. PETERSEN: I think that's all I have for now.

FURTHER EXAMINATION

BY MR. STRINDBERG:
Q Okay. Kristen, just to follow up, a few things. Andy was trying to collect money from you, correct?
A Uh-huh.
Q He was sending you a series of E-mails?
A Yes.
Q And you called and talked with -- or, excuse me, you talked with Kelvin because you wanted SkyWest to stop Andy from trying to collect the money?
A No. I talked to Kelvin because I wanted his threats to stop.
Q What threats?
A Like this one.
Q Okay. Let's talk about that. You said first that you thought he was going to hurt you

physically?
A I don't know how he was going to hurt me, but I took it in the worst possible way, and it really knocked me off my guard, and I was very intimidated by that E-mail.
Q But -- let's see. Let's look at that E-mail where he says, "I need my money now or I'll get it the hard way." Turn to the next page. Or that shows you -- he sent it on August 11th, 6:30. You read it at 9:09. Okay?
A Uh-huh.
Q Looking at, then, the next page, the bottom of the next page, there's an E-mail from you on 8-11, at 9:10, so I guess a minute after you read this you replied to him, and you said, "You know, money is tight right now. Looking back, you told me that I wouldn't need to pay. The only thing I needed to pay was for food and other things." Is that the first time you had told Andy that you didn't need to pay, that you thought you only had to pay for food?
A No. I told him so many times before when all the other harassment.
Q Okay. So you wrote him back right after seeing his E-mail. You didn't mention anything in there about feeling threatened, did you?

97

A Well, I'm not going to come out and say, you know, "You're scaring me, Andy." This is just kind of a deterrent.
Q You didn't ask him to stop, did you?
A No, I guess I didn't.
Q Okay. Then go back to the first page of this. Up on top there's then an E-mail from Andy which appears to be four minutes after you sent him your E-mail complaining about money being tight, and he says, "Actually, Kristen, I have an E-mail from you that says you will pay, and you also told me you would sign over the bonus." Do you see that? It's at the top here.
A So that was the next day.
Q Well, no. That was the same day. It was four minutes after you sent him the E-mail saying money was tight.
MR. PETERSEN: The 11th is the "hard way" E-mail, and then that's the 12th.
MR. STRINDBERG: Okay.
THE WITNESS: The 12th was the next day.
Q (BY MR. STRINDBERG) Okay. But this was read -- it's sent on the 11th. It's read the next day, on 8-12 at 8:19. And then at 8:23 on August 12th, he sends you this saying, "Actually, I have an

98

E-mail from you that says you will pay." So four minutes after he read it, he sent you this saying, "I have an E-mail saying you will pay." And it appears to be cut off. "Your first check" something.
MR. PETERSEN: Look at the next page at the top.
Q (BY MR. STRINDBERG) Oh. It says, "Your first check is considered partial payment of a debt that you agreed to pay. Now, you can continue ignoring this or I will sue you and garnish your paycheck. Your choice." So the next day he made it clear that what his intentions were was to bring a lawsuit against you; is that correct?
A It doesn't make it clear that he wasn't going to do other things, though, like the intimidation, the harassment.
Q Okay. Well, he sends you an E-mail saying --
MR. PETERSEN: Hold on, hold on. I want the record to reflect that you guys are making comments. I hear heavy breathing from Mr. Callaway.
MR. STRINDBERG: Andy didn't make any comments.
MR. PETERSEN: He's making a statement about this, and it affected the witness, and I want

99

to make that clear on the record. And Mr. Strindberg dropped his pen in a harsh manner in an attempt, I believe, to intimidate the witness.
MR. STRINDBERG: Oh, Scott, you're dreaming.
MR. PETERSEN: Okay.
Q (BY MR. STRINDBERG) So you sent him an E-mail saying, "I don't have money." He sent one back to you four minutes after he read it the following day saying, you know, "You've paid part of it. If you have to" -- "If you continue ignoring this, I will sue you." Is that correct?
A That's what it says.
Q And then you -- go back to the first page. You sent him an E-mail, at the bottom of the first page, which says, "If you feel this is necessary," and that was sent --
MR. PETERSEN: Where is that at?
MR. STRINDBERG: Bottom of the first page.
Q Now there's this E-mail Andy sends at 8:23 on 8-12. It was read by Kristen at 8:28 on the same day. The next minute she sends an E-mail to Andy saying, "If you feel that is necessary." Do you see that?
A (Witness nods.)

100

# Exhibit "O"

19

## Kelvin Hyatt

**From:** AC [dacallaway@comcast.net]
**Sent:** Friday, August 29, 2003 5:01 PM
**To:** Kelvin Hyatt
**Subject:** explanation
**Importance:** High

August 29, 2003

Kelvin:

Without knowing the exact accusations you refer to in your email dated August 22, I will be unable to answer your request in an accurate manner. However, I will assume you are referring to a personal and private matter with Kristen Wiley and therefore submit the following explanation.

This is a personal matter that does not involve SkyWest in any form whatsoever. Kristen Wiley has a financial obligation to repay a debt from a vacation she attended in 2002. She has defaulted on this agreement and as a result, a Small Claims Affidavit & Order was filed in the Third District Court on August 22, under case number 038905345. Before this suit was filed, I made a final attempt to collect the debt by emailing her the procedures that would take place if this debt were not satisfied on a personal level. This email contained the legal rights I have, as a citizen, to recover the unpaid debt, and the actions the court would take to enforce the judgment. Kristen has had almost one year to repay this financial obligation. I sent the email through SkyWest Online after she disconnected her personal email and her mailing address is unknown. This email did not contain any offensive language or create an intimidating or hostile work environment, or include any references to violence. Further, there is absolutely nothing in my email that could be construed as sexual harassment.

These actions do not violate SP56 because they do not contain any illegal language that constitutes harassment. There was no systematic or continued action taken by myself, other than a final email indicating her options to repay a debt. There was no threatening message that contained any language designed to extort money or obtain property through threatening letters. In addition, my notice followed all federal regulations under the Fair Debt Collection Practices Act, Title VIII, Section 805 and 806 with regards to Harassment and Communication, as well as Utah Code 76-5-106 and 20A-3-502.

This email also does not violate my Counseling Statement of 2001 because it contained no abusive language or abusive treatment of a fellow employee. Kristen Wiley is a friend of mine, who I have never worked with, who took advantage of my financial position and refused to fulfill her legal obligation to repay a debt. In addition, SkyWest was never asked to mediate this matter, nor was SkyWest asked to intervene on my behalf.

I have provided the email thread from SkyWest Online for your reference. If you have any questions, please contact me at 699-0849 or through this email address. Thank you for your understanding.

Sincerely,

Andrew Callaway

DEPOSITION EXHIBIT 3 Hyatt
PENGAD 800-631-6989

**Date:**Jul 03 2003 8:09 PM
**From:**Andrew Callaway - 010957
**Subject:**????
**To:** Kristen Wiley - 014321

Hola,