# Exhibit "P"

On the night of August 27th in the Marriot hotel in El Paso, while I was in room 238, at about 22:50 local time, I was just about to fall asleep when the person in the room next to me {240} made a phone call. He was very loud and from the inflection of his voice, very angry. I remember thinking how very rude to call someone at almost 11:00 and be loud and generally obnoxious in a hotel room. I was about to put in earplugs and turn up the air conditioner to drown out his voice, when my attention was grabbed by this statement," IF THEY DO THAT I'LL SUE THE SHIT OUT OF SKYWEST". He went on to say "I'LL SUE BRAD, JIM AND KELVIN" Not knowing that there was another crew for Skywest in the hotel, I thought this was a disgruntled passenger or customer, and I was curious to hear more. He then went on to say that his basis of his lawsuit would be similar to that of the pilots at Cathay Pacific. This lawsuit was by the non oriental pilots suing Cathay Pacific for what is known as a hostile work environment and general harassment in the workplace. He stated that were about 30 or 40 non-oriental pilots out of about 2000 or so, and that they stood a good chance of winning their lawsuit. He also stated that he would settle for 10 thousand dollars if he does sue. He went on to say that he would contact a lawyer named Ed Collins in SLC tomorrow {Thursday 28th}, because his "report" was due on Jim Breeze's desk on Friday at 3 o'clock. The person on the other line must have asked him what was the company going after him for because his next remark was "THEIR TRYING TO GET ME ON A PERSONAL VIOLATION OF THE COMPANY POLICY ON THE COMPANY E-MAIL" He went on to say that the only thing the company had on him was a "counseling statement about an incident in Butte". He then also stated that he was looking for a new job, and has an interview with Jet Blue Airlines on Oct 14th. At this point the person on the other line must have asked him what SAPA was doing for him, because his next statement was this "CHRIS ABELL SAID TO ME "YOU KNOW MORE THAN YOU'RE SAYING". The person in the room then said " SAPA WON'T DO ANYTHING FOR ME UNTIL THE COMPANY [Skywest] TAKES DISCIPLINARY ACTION". He said this with disgust in his tone and something about them {SAPA} not being very effective. He then said some other things that sounded like complaints and the conversation ended at about 11:20. He said to the person on the other line "THANKS DAN" and hung up. I then called down to the front desk and explained that I was the Assistant Chief Pilot at Skywest and I thought I might know the person in the next room and asked Eddie who was in the room next to mine.

Eddie said that it was indeed a Skywest pilot and his name was Andy Calloway. I then Called Crew Scheduling and asked if a pilot named Andy Calloway was working and if he was indeed on an overnight here in El Paso. Crew Sked confirmed that Andy Calloway was in ELP and he had flown in from DFW.

In closing, let me say that I have heard employees talk about their company, or their boss in a negative tone. This does not usually bother me, I think we all blow off steam from time to time,

especially when we think we are in the confines or privacy of our hotel room or house. However, this Andy Calloway was whining and complaining, and sneering about subjects and people that he was just plain WRONG about. He was saying how he had set up 2 interviews with some small company and was PROUD that he had not showed up for either one of them and had the audacity to say he might set up a 3rd interview just to see if "THEY HAD LEARNED THEIR LESSON". Although I have never met this Andy

Ex. 30

Calloway. he reminds me of a spoiled rotten kid and just thinks everybody else is wrong and he is right. If he does have another interview, I say good riddance and good luck. By the way I was also wondering if this is what he says about Skywest and it's employees and it's managers in a hotel room loud enough for me to hear, I wonder how many other people or PASSENGERS hear him or if the other room overheard him talking bad about Skywest. Very unprofessional.

Sincerely

Donley E. Watkins III

Donley E. Watkins III
Assistant Chief Pilot

Denver

# Exhibit "Q"

SkyWest AIRLINES

☐ Voluntary Termination ☐ Furlough

☑ Termination ☐ Retirement **(Complete Retirement Eligibility Checklist form)**
*Located under Employee forms*

Actual Termination Date: 10/1/2003 Date Paperwork Completed: 9/30/2003

Employee Name: David Andrew Callaway

Employee Number: 10957

Department or Station: SLC FLT OPS

**Company Property Returned**
☑ SkyWest ID Badge
☑ SIDA Badge
☐ Company Keys
☐ Uniform
☐ Pilot/InFlight Ops Manual(s)

Reason for separation:
Mr. Callaway is being terminated due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees. He has repeatedly declared his dissatisfaction with SkyWest and his desire to work elsewhere. Although he has been counseled on these issues, he has not made a good faith effort to change and avoid conflict. As a pilot, he occupies a high-profile position and represents SkyWest wherever he travels. His hostile attitude and repeated conflicts with SkyWest employees, supervisors and security personnel make him a tremendous liability to the company.

Department Manager's Remarks:
Not eligible for rehire

Eligible for rehire: ☐ Yes ☒ No

Last day scheduled: 9/29/2003

Date last worked: 9/5/2003

DEPOSITION EXHIBIT 9 Hyatt
PENGAD 800-631-6989

Separated Employee's Signature

Department Manager's Signature

**Copy of this action must be sent immediately to the Payroll Office in St. George, Utah.**

# Exhibit "R"

EXHIBIT 35

SkyWest AIRLINES

| REVIEW BOARD SUMMATION FOR ANDREW CALLAWAY | |
|---|---|
| October 24, 2003 | Salt Lake City, UT |
| **MANAGEMENT** | |
| Jon Tenpas - LAX Chief Pilot | Bill Dykes - SLC Manager of Maintenance |
| **PEERS** | |
| Robert Donohoe – SMF RJ Captain | John Wangensteen – PDX EMB Captain |
| **MODERATOR** | |
| Jacqueline Nielsen - Employee Relations Manager | |

## BACKGROUND

Date of Hire: January 13, 1999
Date of Termination: October 1, 2003

Reason for Termination: Due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees.

## COMPANY'S PRESENTATION

SLC Chief Pilot Kelvin Hyatt presented for the company. Captain Hyatt presented a history of Andy's employment with SkyWest:

- No showed to ground school on February 2, 1998.
- After numerous letters from Andy and a new application, Andy was allowed to come to training in January 1999.
- In June 2000 Andy was summoned to Headquarters to meet with Brad Holt and Jim Breeze because of comments made on the company website. And because of behavior towards crew schedulers such as berating the schedulers over scheduling or pay issues.
- At the end of 2000, Captain Hyatt met with Andy about his behavior towards a crew scheduler. Andy was arguing about open time.
- Once again Andy met with Brad Holt and Jim Breeze to go over his behavior with crew schedulers.
- In approximately October 2001, Human Resources received phone calls from neighbors of Andy's in SLC complaining about Andy's party house. The neighbors knew Andy was a pilot for SkyWest. The police department was called to Andy's house numerous times for loud party and disturbance.
- Andy violated SP 307.2.A. – "Your personal conduct and appearance, both on and off duty, shall be such as to maintain or improve the image of the Company."
- On November 13, 2001, Andy met with Brad Holt, Bill Boice and Tony Thompson because of Andy's behavior in upgrade training and at the Butte station. Captain Hyatt read Tony Thompson's write up from the meeting.
- November 30, 2001 Andy received a counseling statement for inappropriate behavior towards

Security Screeners and Butte agents. Andy received three weeks off without pay.

- There was a review board for the counseling statement. The counseling statement was upheld. The only change was to strike extremely from the statement.
- On March 26, 2002 Andy received a SAD.
- All pilots needed to be fingerprinted, and Andy had a conviction which Captain Hyatt informed Andy SkyWest had that information.
- Andy received another SAD on June 30, 2003.
- On August 12, 2003, Flight Attendant Kristen Wiley told Captain Hyatt she had concerns she was receiving threatening emails from Andy regarding money he said she owed him. Andy had invited Kristen to go with him and a group of people to Spain. According to Kristen, Andy told her she only needed to worry about her plane ticket and food, and everything else would be paid for. Now almost a year later, Andy was using skywestonline.com to send messages demanding payment of the shared expenses from the trip. Kristen felt threatened to even check her messages, and asked Captain Hyatt if there was anything he could do to stop these messages. Captain Hyatt said he would look into this matter.
- Captain Hyatt sent a message to Andy asking for explanation. Andy responded saying the matter was a personal and private matter and didn't concern SkyWest. Captain Hyatt read the email. Kristen felt threatened and harassed because of the emails sent by Andy.
- Captain Hyatt read a letter by the Assistant Chief Pilot Don Watkins. Captain Watkins was in a hotel when the person next door, speaking loudly made comments about SkyWest. Captain Watkins listened to the conversation, wrote his letter and gave to management. Andy was the person in the room next to Captain Watkins.
- Andy was terminated because of attitudinal and interpersonal conflicts with others. Management reviewed everything, and the only thing left was to terminate employment.

Panel Member Question Period.

## ANDREW CALLAWAY'S PRESENTATION

Andrew Callaway presented for himself. Andy thanked everyone for coming. Andy started with going over the package Captain Hyatt presented.

- The verbal warning from Jim Breeze, Andy was not aware of. Andy did go to St. George, and did admit his comments could have been misconstrued and may have been a little abrasive. Andy remembers going to St. George in December 2000 and not June 2000.
- Andy went over his counseling statement, but he was not rude and arrogant to security or to crew scheduling. He apologized if he was, but he only asked security questions, and never was rude to crew scheduling.
- Regarding the letter from Kelly Dixon, Andy apologized for appearing like he was not interested in the class. He did not think his posture would look this way.
- Andy went over the complaints from his neighbors. Andy purchased his home in October 2000. There was a lawsuit brought against the neighbor and city. The neighbor was evicted from her home, and the lawsuit settled with the city.
- Andy felt like the letter from Tony Thompson was cut off.
- Andy went over the SAD. He was sick and should have called crew scheduling to take him off. Andy admitted he was at fault for the SAD.
- The background check Captain Hyatt went over with Andy, Andy said the DUI was dismissed and he didn't understand why it did not come up as dismissed.
- Andy explained his no show to class. His father was diagnosed with cancer, and Andy did not find out until his father was placed in the hospital. Apparently there was a miscommunication.

Larraine Caldwell, who doesn't work at SkyWest anymore, did tell Andy there was a miscommunication between the hangar and St. George regarding his no show. As soon as that was clarified, a class date was scheduled.

- Andy accepted the SAD received in June 2003. Andy was in court, but as soon as he received the call from scheduling, he explained the situation and was told to call every half hour. At 4:30 he noticed the SAD. Andy explained why Lew Bodkin or Kelvin Hyatt did not receive the signed verbal warning. Andy's show times were before the office opened, and Andy did fax it at one time, but was never received. Andy showed a log of his fax machine.
- Andy explained the situation regarding Kristen Wiley. Andy did not intend for this situation to happen. Andy was simply intending to collect a personal debt, and this had nothing to do with SkyWest. Andy felt he perhaps had a lapse in judgment by using company resources such as skywestonline.com to contact Kristen. Andy did not intend to create a hostile work environment. Kristen is a friend of Andy's, and did not tell him she was intimidated by the emails. Andy would have stopped. This was a last resort in trying to contact Kristen. Andy was simply trying as a friend to give her one last chance to pay the debt and retain her integrity. Taking Kristen to court was an option Andy reluctantly pursued. While Andy won the judgment, he sadly lost a friendship and his job in the process.
- On the response to Captain Hyatt, Andy was using the policies quoted him. He was not aware of an email policy. Andy went over the emails from Kristen. Andy denies harassing Kristen on the emails.
- The Don Watkins letter references matters Andy has no knowledge of and Andy provided a receipt from Appleby's where he was at getting a quick snack. The receipt provided a time.

Andy stated he has been a dedicated SkyWest employee for almost five years, and during that time he has performed his duties as a first officer and captain flawlessly. His training records will show he approached his duties as a pilot very seriously. As a result he was never been involved with any safety related or FAR violation nor caused unnecessary tension for his crew or company. During his employment at SkyWest, Andy has made many friends. Andy provided character references. Unfortunately there are a few individuals Andy may have offended or his demeanor or personality may have been misinterpreted as arrogant, rude, intimidating, harassing or rude. These opinions were formed during brief contacts with the individuals. Andy does love his job with SkyWest. Andy has never been intentionally rude to anyone. There are many who do not see Andy this way. Andy feels he is a nice guy, but he is direct, and people misconstrue that. He wants his job back. Andy did mention being interviewed by Jet Blue. The interview was unsuccessful.

Panel Member Question Period.

**REBUTTAL**

Kelvin: Andy was terminated because of continual behavior that was not acceptable, not because of one incident. Andy did not accept responsibility for any of his behavior. The company did not have any place to go, but to terminate. The letter from Tony Thompson is only one page. Regarding the SAD, Andy said he would do the trip, but he put conditions on what he would do. This is not how the company runs. The background check was down in 2002, and if this has been expunged then Andy needs to look into that. Larraine Caldwell does still work for SkyWest in the People Department. Kelvin spoke with her, and she recalls receiving no phone calls in St. George indicating why Andy no showed for class. The information about why Andy no showed came in letters received after the class started. Regarding the letter from Donley Watkins, Donley called his Chief Pilot Bob Venturella explaining what he had heard. Donley is an Assistant Chief Pilot, and as this is part of management, he can call the front desk to ask for information on a SkyWest crewmember. Andy has coworkers who like him and coworkers who do not. He has been talked to and counseled about his behavior, and

chose not to change. Therefore, SkyWest had no alternative, but to terminate.

Andrew: Andy hasn't had any run ins with anyone. Andy called the Marriott for their policy about releasing information, and they do not give any out. Regarding the SAD, Andy did not put any pressure on the scheduler. He just wanted to stay close to home. The letter from the crew scheduler may have him confused with someone else. Andy claims he has never used abusive language with a crew scheduler. He has accepted the responsibility of the SAD's and the counseling statement.

Panel Member Question Period.

**DECISION**

After careful consideration, the panel members upheld the termination, but Andy was given the option to resign and be made eligible for rehire. Andy did not agree to the modified solution.

# Exhibit "S"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, | CIVIL NO. 2:04CV00179 |
| vs. | VIDEOCONFERENCE DEPO OF: JOHN WANGENSTEEN |
| SKYWEST AIRLINES, INC., | Held February 14, 2005 |
| Defendant. | REPORTED BY: RENEE L. STACY, CSR, RPR |

Videoconference deposition of JOHN WANGENSTEEN, taken on behalf of the Plaintiff, at 299 South Main Street, 18th Floor, Salt Lake City, Utah, commencing at 9:23 a.m. on February 14, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *



Depomax[SM]
REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

cost with that, like hotels and things like that.
Q And those costs are paid for by SkyWest?
A Yes.
Q What, if anything, does SAPA do in regards to pilot discipline? What is SAPA's role in that?
A Nothing. We're not -- I can't discipline anybody. There's no one in our group that can discipline pilots, so, I mean, I don't think that we have any role in disciplining pilots.
Q Okay. And I asked a poor question. How about if a pilot is being called in by one of the chief pilots? Does SAPA provide someone to go with that pilot to that meeting?
A I would say that the -- generally, no. Has that happened before? I know that I haven't participated in that at all. It's possible that a SAPA member may have accompanied another pilot if they were, for example, required to see their chief pilot. That's possible. I don't think that that's an official function that we have.
(Interruption.)
MR. STRINDBERG: One second.
THE WITNESS: Sure.
(Discussion off the record.)
Q (BY MR. STRINDBERG) How about as far as

29

these review boards that are held by SkyWest? What role does SAPA have in regards to those review boards?
A Well, the review boards, I think, consist of generally four people, and two of those people -- or two people on the review board are peers of the pilot and two people are like peers of management, and those are the members that make up a review board.
Q Okay. And are the SAPA members who sit on those boards, are they taken from those 19 people you were talking about?
A Generally, yes. I believe that the two people that are peers of the pilot can be any pilot that generally are members of SAPA.
Q Okay. You were obviously on the review board when Andy Callaway was terminated; is that correct?
A That is correct.
Q Was that the first review board you had ever sat on?
A Yes.
Q Who asked you to be on that review board?
A I believe it was Mike Eisenstat.
Q What position did Mike Eisenstat have at

30

the time?
A Staff secretary.
Q And did he -- did Mike call you up or send you a letter?
A He called me up, yes. He called me up.
Q What did he tell you?
A "We have a review board. I was wondering if there's any chance that you could attend, depending on schedules and things like that," and I said yes, I could attend it.
Q The date I have for the review board was October 24th, 2003. How much before that did Mike call you?
A I'm not exactly sure. I'm thinking of a time frame, you know, short. Less than a week, would be my guess.
Q Do you know why Mike called you?
A I've always been under the impression and belief that he doesn't pick out any one person, but just kind of -- I don't know if he randomly calls SAPA members. I don't know if that's a good term, but I don't -- I haven't seen any evidence that he prefers any one person over any other person, so, you know, why he called me, I'm not exactly sure why, if it was like -- kind of like a random thing and my

31

name kind of came up or -- I've -- you know, as far as I can tell, he just -- you know, he has called a lot of different people on SAPA who attend review boards, but I haven't found -- other than being -- I can't be anything -- I can't come up with anything other than it being a random call. I can't be any more specific than that because I don't know of any -- anything other than really, I guess, just calling whoever he is in the mood for or -- it seems very random.
Q Okay. Did you know what a review board was at that time?
A Yeah. I mean, I can't say that I know all the details. I probably don't know all the details today.
Q But you had heard about it?
A I'd heard of a review board for some time and knew something about it, I think.
Q Okay. Have you sat on any review boards since the one --
A I have not, no.
Q After Mike called you, did you have to coordinate with anyone at SkyWest?
A I believe that I personally didn't have to do anything. I think that if there were any schedule

32

Q Was Ben still there a month and a half ago?
A Yes.
Q Anyone else you recall?
A Excuse me?
Q Anyone else you recall?
A Quite honestly, I'm not a very good person with names. If you mention names, I could probably say yea or nay. At this very second, I don't recall any more names.
Q We're here on this lawsuit involving Andy Callaway. Have you ever met Andy?
A To the best of my recollection, the first time I met him would have been during the review board.
Q Is that the only time you've personally met Andy?
A I believe so.
Q And at the time of the review board, which was October, late October of 2003, where were you living at the time?
A Vancouver, Washington.
Q What, if anything, do you know about Mr. Callaway's lawsuit?
A Probably very little, except I believe I read in the newspaper -- I believe there was an



article in one of the Salt Lake City newspapers, I believe, that stated that something maybe -- that he believed that he was terminated from SkyWest Airlines because of union organization activities, something to that effect, and so -- and I believe it might have said something about a lawsuit, I'm not sure, but certainly that's when I would have been first -- my first knowledge of -- that something might be happening --
Q Okay.
A -- in terms of a court case or...
Q And how did you come to read the Salt Lake paper? Did someone bring it to your attention or --
A That's a good point. No one -- I don't believe that anyone brought it to my attention. I'm not sure. It's possible that maybe I read that on our forums, maybe, or -- I mean, that's probably -- that's probably my best guess. I mean, no one brought me a newspaper article and said, "Hey, read this." I believe that I came across it somehow or another. Maybe it was in the forums. You know, I'm not exactly sure, but I'm pretty confident that I came across it versus someone handing it to me.
Q Okay. John, when you say "forums," what are you referring to?



A The forums would be a site where different groups of the company can discuss things, like there's a forum for like pilots, there's a forum for mechanics and a forum for flight attendants, and so I believe this would have possibly -- and, again, this is a guess -- that I possibly came across an article that someone may have posted on the forums for pilots.
Q Are you talking about a web site or, I guess, a chat room maintained by the company?
A It's a forum, and I'm not sure if the company -- I mean, certainly I can go through SkyWest on line, which is a company web site, and from there I can get -- click on a link that goes to these forums, and I'm not exactly sure if SkyWest pays for that forum. I would assume that they do. I'm not sure if they run it. I know that these different groups that I was talking about before -- in other words, like pilots -- you know, there's a pilot forum, there's a flight attendant forum, that they have moderators, you know, a different person that, I think, oversees those different forums.
Q And do you know who is the moderator on the pilot forum?
A I think Dave Caine is one. That's the only



name that I can recall that is a moderator of the pilots' forums that only pilots participate in.
Q Okay. Have you heard of SAPA?
A I'm on SAPA, so yes.
Q Okay. What does SAPA stand for?
A SkyWest Airlines Pilots Association.
Q When you say you're on SAPA, what do you mean, John?
A We consist of a group of people -- I couldn't tell you exactly how many people are on there right now. I'm going to guess 19. And these -- our group represents the pilots for our company, and we discuss issues, mostly amongst ourselves, of which -- like the president or the vice-president, which I am not. I'm not on the executive board. And then after we have our meetings where everyone discusses topics, then normally that is relayed to management through the executive board, and then occasionally a member from management will speak to the entire group.
Q Okay. And I'll ask you a little bit more about them in a second, but this forum that you're talking about, the pilots' forum, is that something that's run by SAPA?
A I'm not -- do you clarify more what you

was advised by Mr. Hyatt that he should be terminated. Everything that I can recall is that Jon Tenpas himself thought that Andy should be terminated.

Q Okay. But he didn't tell you that he had been involved in conversations with Mr. Hyatt about the situation before the termination decision was made? He didn't tell you that?

A I do not recall that Jon Tenpas said then that Kelvin Hyatt had told him that he should be terminated, and I don't know if that answers the -- I mean, I would assume that that probably did happen. My only point right now of what I'm trying to say is I -- I feel or know that Jon Tenpas, himself, completely on his own, felt that Andy should be terminated.

Q Did he tell you, though, that he and Mr. Hyatt and the other chief pilots had discussed the matter at their -- at the chief pilot meetings prior to the termination decision being made?

A I don't recall that being true.

Q You don't recall him telling you that?

A I mean, I believe that that could be true, that they had prior meetings and they were like, "Oh, yeah, he should be terminated."



Q But he didn't tell you they had had those meetings?

A No, just because -- not that I can recall, because, as the four members were in that room and were, you know, talking about what should happen, everything that I got from Jon Tenpas was like what he felt. At least that's what I think.

Q I just wanted to know if -- and I gather the answer is no -- if Jon had told you that he was part of the termination decision itself. And I gather he didn't tell you that.

A Well, that question, as far as was Jon Tenpas part of the terminating -- was he part of making that decision, I'm just -- I'm trying to think here. Yeah, I don't know if he was -- I felt that he -- I felt that Jon Tenpas thought that he should be terminated.

Q Right. But he didn't --

A And I would assume that he was maybe part of that decision-making process.

Q Yeah. I mean, Mr. Hyatt said that Mr. Callaway was discussed -- the chief pilots would have these conference calls and Mr. Callaway's situation was discussed, and Mr. Hyatt asked the other chief pilots, including Mr. Tenpas, what they



thought, you know, what he should do. I gather Mr. Tenpas didn't discuss that with you.

A No. If he did, I don't recall. I mean, I don't -- and I don't think that he did.

Q Do you know if Kristen Wiley is still working for SkyWest?

A I don't.

Q So no one has told you that she's been fired?

A No.

Q Would it surprise you to learn that she was fired for dishonesty?

A That's news to me. I really don't know that person, so it's kind of like, you know, if I said that, you know, Jack Smith, which is someone -- just a name I'm just making up --

Q I understand -- I understand that, John, but what -- I mean, in fact, she was terminated for dishonesty, forging someone's name on expense reports. Doesn't that concern you that the person who made these accusations against Andy was later found to be dishonest?

A I would have to say yes.

Q I mean, it makes you --

A I think that -- certainly, if a person is



lying -- you know, if someone accuses somebody of something and then is later found to have been, you know, lying about things, I mean, I think that's -- that's bad.

Q Were you aware that Kristen told the company, when she complained about Andy, that Andy had told her she didn't have to pay the money when, in fact, just the opposite was the truth, that she admitted to Andy that she owed the money to him? Were you aware of that?

A Would you say that again? Could you say that again?

Q Well, when Kristen complained about Andy, she said that Andy had told her she didn't have to pay the money when, in fact, she admitted in an E-mail in writing to Andy that she was going to pay him. So were you aware that she had lied to the company?

A No.

Q That didn't come out at the hearing?

A I was not -- I'm not aware of that.

Q Does that concern you that the complaint she made about Andy was a fabrication?

MR. EMERSON: Objection. That assumes facts not in evidence.

# Exhibit "T"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

---oOo---

DAVID ANDREW CALLAWAY,

Plaintiff,

v. Civil No. 2:04CV00179

SKYWEST AIRLINES, INC.,

Defendants.

________________________________/

---oOo---

TUESDAY, FEBRUARY 15, 2005

---oOo---

DEPOSITION OF

ROBERT DONOHOE

---oOo---

F-0232
Reported by: LINDSEY R. PERRY, CSR License No. 12806

PAGE 26

effort, and I -- I gave it some thought, and I decided at the time that I would simply give it some time to see how the -- see what direction the drive went into, whether this was going to be a positive thing, negative thing, did I want to be a part of this? And as time went by, it seemed as though it took off in negative directions, and I'm basically interested in -- in doing positive things. I -- so I elected not to take part in the --
Q You're referring to the --
A The drive, yes.
Q -- UPA drive?
A Uh-huh.
Q In what way did you consider it to be negative?
A It seemed -- the way the organizers were taking it, is that it was more along the lines of, "We want to do this because the company is doing bad things," rather than what I would consider a positive effort, that, "Okay. We want to form a union in order to do these positive things." So it took off in a negative direction, and I chose not to participate.
Q What do you understand your employment status with the company to be right now?
MR. EMERSON: Objection; vague and ambiguous.
Q BY MR. STRINDBERG: Did you understand my question?



PAGE 27

A Perhaps you could rephrase it.
Q Well, did you -- have you ever heard the term employee at will?
A Yes, I have.
Q And what is your understanding of what that means?
A My understanding is that that term has fairly little meaning, at least here in California. Simply because you're an at-will employee doesn't mean that you can be discharged for reasons that are unfounded. The employer still has to follow applicable employment law.
Q So do you believe you're an employee at will with the company?
A Yes.
Q But you believe that you cannot be terminated unless there's some cause for termination?
A Yes.
Q And what would you consider cause as sufficient to warrant your termination?
A Well, some easy ones as a pilot would be to show

altercation, safety violation. Those are all fireable offenses.
Q What else did you know about Andy Callaway before the review board meeting?



PAGE 28

A That's all. I didn't know Andy Callaway at all.
Q Had you ever corresponded with him?
A No, I -- no.
Q And I gather you'd never flown with him?
A No.
Q Had you been in any training classes with him?
A No. I had no acquaintance with him.
MR. STRINDBERG: Excuse me.
(Off the record.)
Q BY MR. STRINDBERG: Who asked you to be on the review board?
A The SAPA secretary, Mike Eisenstat.
Q And did Mike call you, e-mail you? How did he get ahold of you?
A I think he called me on the telephone.
Q Now, the review board notes have a date of October 24th, 2003, on them.
A Okay.
Q Based on that date, how much before then did Mike call you?
A Somewhere maybe a week before, at most. May have been a little less than a week.
Q What did he say to you?
A He said, "Bob, there's going to be a review board. Would you like to be on it?" I had never been on



PAGE 29

one before or since, so I said sure. I felt it as part of my responsibility as a representative to -- to do the job when asked.
Q Did Mike give you any idea how he had chosen you and John Wangensteen to be on the board?
A No, not -- other than the fact that I understand that it's a -- they try to rotate the representatives that are on review boards so that you don't have the same people on time after time. And apparently it was my turn in rotation, and also it fit into my schedule.
Q When you say they try to rotate people, do they have some kind of a chart that they go down?
A I don't know how formal the process is. I just understand that it was my turn. I hadn't done one before.
Q And did you know what a review board was when he called you?
A I had some idea of what it was. It's in our policy manual.
Q Did he tell you anything besides --
A No.

A He was rather pointed in not giving me any details. He simply told me who it was, and there's a review board. This is the time and the place.
Q At the time he called, did you already know that

# Exhibit "U"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, | CIVIL NO. 2:04CV00179 |
| vs. | DEPOSITION OF: KELLY DIXON |
| SKYWEST AIRLINES, INC., Defendant. | Held February 11, 2005 |
| | REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of KELLY DIXON, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 1:00 p.m. on February 11, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

1

A P P E A R A N C E S

FOR THE PLAINTIFF: ERIK STRINDBERG
Attorney at Law
STRINDBERG SCHOLNICK & CHAMNESS
44 Exchange Place
Second Floor
Salt Lake City, UT 84111

FOR THE DEFENDANT: TODD EMERSON
Attorney at Law
SKYWEST AIRLINES
444 South River Road
St. George, UT 84790

ALSO PRESENT: DAVID ANDREW CALLAWAY

2

I N D E X

EXAMINATION
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . 4
BY MR. EMERSON . . . . . . . . . . . . . . . . . . 45
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . 50

E X H I B I T S



| Exhibit No. | | Marked | Discussed |
|---|---|---|---|
| 7 | 11-30-01 counseling statement | -- | 46 |
| 9 | Termination document | -- | 49 |
| 78 | "To Whom It May Concern" letter | -- | 15 |



3

February 11, 2005
1:00 p.m.

P R O C E E D I N G S

KELLY DIXON

called as a witness at the instance and request of the Plaintiff, having been first duly sworn, was examined and testified as follows:

BY MR. STRINDBERG:

Q Please state your full name.

A Kelly Terrence Dixon.

Q Mr. Dixon, have you ever had your deposition taken before?

A This is the first time.

Q It's a wonderful experience, I assure you. A couple of ground rules. First of all, you're under oath, so you need to tell the truth.

A Okay.

Q Is there anything that would prevent you from doing so? Medication, undue stress?

A No.

Q Okay.

MR. EMERSON: I mean, do you believe that your employment for the company prevents you from telling the truth?

4

period.
Q And how long does the ground school last for someone who is transitioning from the Brasilia to the RJ?
A It's roughly a three-week course.
Q And is that three-week course taught by one person or --
A Generally not, although it could be. Generally with a three-week class you'll have a given instructor take each of -- take one of the three weeks.
Q Okay. How about upgrade training? I gather -- if someone is upgrading from first officer to a pilot, do they have to go to ground school?
A Yes.
Q And what's involved in that? Is it also three weeks?
A It depends on which airplane you're talking about.
Q Let's talk about the RJ.
A Okay. So on the RJ at SkyWest -- and different companies don't do it this way, but at SkyWest the upgrade training is identical to the transition training. In other words, we'll have a class with both upgraders and transitioners in the



same classroom.
Q Okay. So if someone started at SkyWest on the Brasilia and then they transitioned to the RJ, they'd go through this training at that time?
A Yes.
Q And then say that person was upgrading to a captain's position. Would he or she have to go through the same training a second time?
A Yes.
Q Is there anything different between the transition training and the upgrade training?
A Contrary to my recommendations, no. There is one thing that's different. It's called -- they have a command pilot course or a left seat course. I'm not exactly sure what they're calling it now, but that is not part of that three-week curriculum and happens later on. They call the captains back in for this command pilot course.
Q How long is that command --
A Generally they wait for like -- I want to say about six months or something. And that's not a hard and fast rule, either. It's just -- the philosophy is to allow the guys to get out and get a little experience as a captain in the left seat so that the training will be more meaningful to them.



Q In the end of 2001, who were the other instructors that you were working with?
A Let's see. At that time -- well, and let me make sure. I'm not even sure I was in the RJ program at that point. Probably. The other instructors in the RJ department would have been Verdean Heiner, Dave Moxham -- David Moxham, myself, and -- let's see. I can't remember if Orion had come over from the Brasilia yet or not, so I'll just say those three.
Q How about Ben Crawford?
A Ben Crawford, here again, was the chief ground instructor, and although he oversaw Verdean Heiner, who was the training specialist of the RJ side of the house, Ben was actually quite unfamiliar with the RJ systems, procedures, so on and so forth.
Q And was Verdean a -- what position did Verdean have?
A Verdean had the training specialist position on the RJ side of the house, so he would be Andy Neill's contemporary, so to speak.
Q Okay. Kelly, I'm going to show you what's been previously marked as Exhibit 78. Is that your handwriting and your signature on the bottom of that?
A It is.



Q When did you write this?
MR. EMERSON: Take a moment to review it. Go ahead and read it all.
THE WITNESS: Can I just read it here?
Q (BY MR. STRINDBERG) Absolutely.
A Okay. Can you just restate the question, please?
Q Did you write this?
A Yes.
Q When did you write it?
A Oh, I'm not exactly sure if it was November 13th, 2001 or if that's when I received the request from Kelvin Hyatt to do it, but it was right in that neighborhood.
Q So somewhere around --
A November 13th.
Q -- mid November?
A Yeah.
Q And it was Kelvin Hyatt who requested it?
A Kelvin Hyatt, yes. He was the chief pilot for the Salt Lake City domicile at the time.
Q Okay. Your first sentence, though, says you received a request from St. George management.
A Probably that just means that Kelvin is in management at SkyWest Airlines and he, in concert

with somebody else at the people department -- you see, it was someone else at the people department that called up and asked Ben to give an opinion of an Andy Callaway when I had him in class, and so probably that's my thinking relating to when I wrote this relating to a request that was probably a joint request from Kelvin and her.

Q Did you talk with Kelvin directly?

A Yes. He talked to me on the phone. And he's the -- that's why I put his name down there, because he's the one -- no. Wait a minute. Kelvin is the one that specifically, on the phone, asked me to write it, if I remember correctly.

Q Okay. What did he ask you?

A He just wanted to get the same story that St. George had got from me, which was, you know, my experience with Andy, and then said something to the effect of, "Would you be willing to, you know, put that on paper?" And I said, "Yes."

Q So you had already talked with someone from St. George?

A Yes.

Q Who was that?

A I can't remember. Someone from the people department.



Q And did they call you or --

A What happened is they called Ben Crawford, who was the chief ground instructor, who came in and got me out of class one day and had me come in, and said, "St. George is interested in your opinion of this particular individual, Andy Callaway, and he's going to be in class here in the next little while, and they're interested in your opinion as" -- "in general."

And I said, "Well, what's the deal?" And they said, "Well, we don't want to say because we don't want to bias you in any way. Just interested in your opinion." To which I said, "If it's the person that I think it is, you have your facts incorrect. He's not going to be in class in the next couple of classes. He's already been in class. And I can tell you what I think of him right now."

So I told Ben, and I reminded Ben that I had come in on the particular day of this test that we took and told -- and complained to Ben about this -- about Andy Callaway, his poor attitude and what I would consider to be insubordination, and reminded him that I had done so, and he said, "Oh. That was him." And I said, "I believe so, but let's make sure."



So we looked on SkyWest on line, and there's a way for us to pull up a picture of any given pilot. Pulled up a picture. Sure enough, it was Andy Callaway. I said, "You need to tell St. George and the people department that he's not going to be in class. He's already been in class. I'm not sure exactly where he is in the process, but this is what happened," and so I related to them what had happened.

And then shortly thereafter, maybe not even the same day, maybe the next day, Kelvin Hyatt called and wanted to hear the story again from me. Asked me if I was willing to write it down. I said, "Yes."

Q Okay. Did you talk with someone in the people department at St. George?

A Yes. On a conference call with Ben Crawford.

Q Okay.

A Speaker phone in Ben's office.

Q How did Ben ask you about it? Did he come to your office or did he call you?

A Which time? Just initially after he had received the phone call from St. George?

Q Yes.

A Yeah, he just -- if I remember correctly, I was in teaching class, and he came in, as he often did, in the back of the classroom when he needed to talk to you and said, "Come see me on your next break," something like that. So I walked into his office on my next break.



Q Okay. You said that you had been in a class with Andy administering a test; is that correct?

A Yes.

Q So had you actually taught one of his classes or had you just administered the test?

A No. I taught a full week of class that Andy was in.

Q Are you sure of that?

A Yes.

Q And you administered a test then?

A At the end of that week, yes.

Q When had that class occurred in relationship to November 13th?

A Previous to November 13th. Here again, I could find out the dates for you, but I don't recall.

Q What, months earlier, weeks earlier?

A Probably not months, plural. Probably -- I can't imagine it being more than a few weeks or -- maybe -- I mean, the longest would be two months, I

think, but I'm not sure. I'd have to verify that. But it wasn't a long period of time, relatively speaking, I guess, depending on how you want to define that.

Q Let's go back to that class.

A Okay.

Q You said that you were concerned about Mr. Callaway's behavior --

A Yes.

Q -- at a testing session; is that correct? And you went and talked with Ben --

A Yes. What happened is I was to teach that particular week. I was assigned to teach that week, went into class, as I always would, for that particular week, and instructed for the -- I can't remember if I flew one day or not during that week, but probably not. I probably just taught the whole week. So during that week, as an instructor -- I think I mentioned there, and it was at the time, I had instructed in ground school settings. This would now be the third different company for about five years. Had taught many ground schools, had many students.

And, of course, as an instructor, I always gauge the classroom and look at the students and look



at their reaction, and had much experience dealing with people that were upgrading and had already been exposed to the majority of that information before, and always analyzed, you know, people in the class. It was my job to make sure that they were understanding and learning all of the information that we could possibly put out.

During the course of that week, I noticed a poor display of attitude from Andy Callaway.

Q What do you mean by that?

A What I mean by that is I would look back at him and he would have his arms folded and kind of be staring off to the wall on one side of the classroom.

Q Did you say anything to him?

A I didn't say anything to him.

Q Was he disruptive?

A He was not disruptive in the sense that he would interrupt, nor would he -- nor was he boisterous in any way.

Q So he just sat there?

A Nor would he talk with his classmates.

Q So he didn't interrupt the class to talk with his classmates, is what you're saying?

A No. He used -- all I'm saying is that he specifically used body language, in my estimation, on



purpose to show disapproval for what was happening there, for the fact that he had to be there.

Q And this body language was he sat there with his arms folded?

A His arms folded with what appeared to me to be kind of a scowl on his face. Certainly different from behavior that I had seen from him in the hall or down on the hangar floor.

Q But you never talked with him and asked him if there was a problem?

A No.

Q Did you ask the other instructors who were teaching at the time if they'd had any problems?

A I don't recall having done that.

Q Okay.

A The worst part of it, of course -- I mean, had that just been it, I would have left it alone. Had he just sat there and, in my mind, displayed poor attitude, in that he didn't participate in the class like we encourage the students to do and so on and so forth, had that been it, I wouldn't have thought much about it.

Q Okay. But this episode, as you describe it, he supposedly threw a test down on the podium; is that correct?



A Yes.

Q Did you say anything to him at that time?

A No.

Q Why not?

A I guess I probably didn't want to confront him in front of the class.

Q Did you ask him after the class?

A I probably wanted to gather my thoughts and think about what would be an appropriate course of action, given what I had seen.

Q Once you collected your thoughts, did you talk with Andy?

A No.

Q Why was he up at the podium?

A After administering any test -- and we always administered at least a midterm test and/or a final test during this three-week class, and the test that we administered at the end of that week was customary and the same test that I had administered throughout the whole time in the RJ classroom, and always -- partly because the FAA requires it and partly because it's just good educational practice. At the conclusion of a test after everyone has completed the test, I would always take the test -- both the test and the answer sheet, pass it back out

to all of the students so that we could make sure that they understood all of the different things that we went over.

Here again, the FAA requires that we pass tests with 80 percent corrected to a hundred percent, which means that I wouldn't be doing what I should be doing if we just kind of let them --

Q Okay. Let me interrupt you, Kelly.

A Yeah. Go ahead.

Q Why was he at the podium?

A Okay. So after the test was over and I had passed out the answer sheet and the exam, stood up there, said, "We're going to go over the test," unlike I'd ever seen before, and different from any other student in any other class I'd ever had, Andy decides to stand up, walk over to the wall, walk up the side of the classroom, walk across the front of the classroom in front of all my students, takes the test, throws it down on the podium and says, "I don't need to go over my test."

At that point, I thought to myself, "Who does this guy think he is?"

Q But you didn't say anything to him?

A No.

Q And then he went and sat down in his seat?



A And then he turned around, went, sat back down in his chair.

Q Do you know why no one else in the classroom remembers that?

MR. EMERSON: I object. That assumes facts not in evidence.

Q (BY MR. STRINDBERG) Do you know why no one else in the classroom recalls that?

MR. EMERSON: And lacks foundation as well.

MR. EMERSON: Go ahead and answer, if you can. Do you know whether or not anybody else has reported this?

THE WITNESS: First of all, I don't know that anybody else would recall it or not. I find it interesting that it would be disputed at all, seeing as how we're all supposed to be telling the truth. Having said that, no, I don't know how anybody else --

Q (BY MR. STRINDBERG) When did you mention whatever you mentioned to Verdean Heiner?

A Oh, let's see. First I went to Ben and mentioned it to him.

Q What did you say to Ben?

A Basically just what I told you.

Q Okay.



A And that I thought it was inappropriate. And I even mentioned that, you know, had he aced the test and just been stellar, in my opinion, compared to his classmates, that maybe he could have believed that there was reason to be cocky, yet even if that was the case, to blatantly get up in front of all the rest of the students and show open insubordination like that when what he could have done was just sat there at his desk and decided not to review the test --

Q You said all of this to Ben?

A Yes.

Q I'm having a hard time following you. What did Ben say?

A Ben just simply agreed with me that that was a display of poor attitude. I can't remember exactly what was said, but we probably just commiserated about how that was a unique experience in both of our teaching careers, which included a lot of students and a lot of classrooms.

Q When did you speak with Verdean Heiner?

A Following -- after I talked with -- I don't know. Probably a few days, maybe. Maybe the same day. I can't remember if it was the same day or the next day, but --



Q Why did you talk with Verdean with it?

A Just because Verdean was my training specialist and I wanted to make sure that he was aware of things that had been going on in the classroom. In fact, I asked him at the same time if he'd had the same experience with Andy. Had Andy displayed any kind of -- the same, what I would term "bad attitude" with him, and he said that he had not.

Q Did you make some report to the people department or to someone in management about this incident, you know, other than talking with Ben?

A I don't recall, but I don't think so.

Q Do you know how the people department knew about it, then?

A I think that -- this is just a supposition on my part, but I believe the way they knew about it is because they had had previous experience with Andy Callaway and specifically had called Ben Crawford to ask Ben to ask me to give an opinion about Andy Callaway.

Q So you don't -- that's just a supposition on your part?

A Restate the question for me.

Q Well, let me ask it this way: What did Ben tell you they had asked him when they called him?

# Exhibit "V"

To Whom It May Concern:

I am writing this letter in response to a request received from St. George Management on November 13, 2001. It was requested that I give a report of my experience with Andy Callaway who was assumed to be in class at the time. I replied that I had him in class approximately two classes previously. His name stuck out in my mind as a student displaying a very poor attitude. I have taught professional pilots in the classroom setting for five years and never seen anyone act quite like he did. I guess that's why I remembered him. In fact, after the class was over, I mentioned to two of my bosses, Verdean Heiner, and Ben Crawford that he had been a difficult student to have in class. The particulars are as follows: He began class on October the first and completed ground school three weeks later. I instructed him for the third week of his ground school. It should be noted that I was only with him for his final week of school and two other instructors taught him the other two weeks. After talking with Verdean Heiner about him, Verdean mentioned that he hadn't had any problems with him. Dave Moxham, his other instructor, hasn't been available for questioning. It should also be noted in his defense that he was not unruly in the sense that he would interrupt during class. He was not loud or boisterous. Just the opposite is true. He didn't participate very much at all. He sat in the back of the room (because that was where he was assigned to sit) and folded his arms with a defying scowl on his face. He stared somewhere else as if to purposefully show me he wasn't listening. It wasn't that he was daydreaming. He seemed to display an attitude that suggested to me that he didn't think he needed to be there or that we were wasting his time. He didn't participate very much at all through making comments or questions. The worst though was the day of the final test. After having administered the tests (Both the final systems exams and the final EP's and Limits tests), I make it a point to pass the tests and the answer sheets back to the class so they have the opportunity to clarify anything they missed or make suggestions on ways to improve the test. We had finished taking the tests and I then passed a copy of the test and each students answer sheet back to them. Then I explained that we would review the test and answer any questions. Andy got up and proceeded to the front of the classroom in front of all the other students and half set and half threw his test down on the podium and said something like, "I don't need to go over the test". He turned around and walked back to his seat. I didn't say anything although was offended by his action. His test score was 92.7% on the final which was below average for the class. I thought to myself that if he had aced the test, maybe he could have acted so arrogant, but for one, who was in the bottom half of the class for that particular test, I thought it was very inappropriate. He could have stayed at his seat and not reviewed it if he wanted but to make a scene like that was very unprofessional. I noted when we went out to do the walkaround of the airplane with Tony Fizer, another instructor, that Andy was smiling and laughing with the guys and thought that it must have been on purpose and to show his disapproval of the training process by acting this way, because out of the classroom, he appears to be a nice guy. P.S. If possible, during discussions with Andy, please don't use my name. But if you need to, that's okay to.

Sincerely

Kelly T. Dixon

Ex. 78