FILED
U.S. DISTRICT COURT

2005 JUN 20 P 12: 13

DISTRICT OF UTAH

BY: ______
DEPUTY CLERK

Erik Strindberg (Bar No. 4154)
Ralph E. Chamness (Bar No. 6511)
**STRINDBERG SCHOLNICK & CHAMNESS, LLC**
44 Exchange Place, 2nd Floor
Salt Lake City, UT 84111
Telephone: (801) 359-4169
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DAVID ANDREW CALLAWAY**<br><br>Plaintiff,<br><br>vs.<br><br>**SKYWEST AIRLINES, INC.,**<br><br>Defendant. | **MEMORANDUM IN OPPOSITION TO OBJECTIONS TO MAGISTRATE ORDER GRANTING ONLY LIMITED DISCOVERY FROM POLAR AIR**<br><br>Case No. 2:04CV00179<br><br>Judge Ted Stewart<br>Magistrate Judge Alba |

Plaintiff David Andrew Callaway ("Mr. Callaway"), by and through his undersigned counsel, hereby submits the following Memorandum in Opposition to Defendant SkyWest Airlines, Inc.'s ("SkyWest") Objections to Magistrate Order Granting Only Limited Discovery from Polar Air. Judge Alba's Order properly precludes SkyWest from engaging in a fishing expedition which will harm Mr. Callaway while still allowing it to obtain the evidence it claims is relevant. Accordingly, the Court should deny SkyWest's motion and sustain Judge Alba's Order.

## INTRODUCTION

Mr. Callaway is a pilot who began working for SkyWest in 1999. He was initially employed as a First Officer on the Ebraer Brasila aircraft. At the time of his termination in October 2003, Mr. Callaway was serving as a Captain in a Canadair Regional Jet. During Mr. Callaway's employment with SkyWest, SkyWest never had a problem with Mr. Callaway's performance as a pilot.

Unfortunately, after Mr. Callaway and other pilots contacted the Air Line Pilots Association ("ALPA") about the possibility of organizing a new union for the pilots at Skywest, SkyWest manufactured several incidents in an attempt to find a reason to terminate Mr. Callaway's employment. Mr. Callaway was one of the Skywest pilots who actively supported the ALPA organizing committee's efforts. As part of his union organizing activities, Mr. Callaway frequently posted information on a pilots' website. SkyWest management chastised Mr. Callaway for his activities and began to gather information which they believed they could use to discharge Mr. Callaway. Despite their failure to discover a legitimate basis to terminate Mr. Callaway, SkyWest ultimately terminated Mr. Callaway. This lawsuit seeks damages and other relief based upon Skywest's firing Mr. Callaway for engaging in Union organizing activities. Mr. Callaway has brought claims for Skywest's: (1) violation of the Railway Labor Act, 45 U.S.C. § 151, *et seq,* ("Act"); (2) violation of the Wire And Electronic Communication

Interception and Interception of Oral Communications Act; (3) termination in violation of public policy; and, (4) breach of implied contract.

Since SkyWest terminated him, Mr. Callaway has diligently tried to find another pilot's position, but has been unsuccessful. Mr. Callaway has applied for numerous pilot's positions, including one with Polar Air. Mr. Callaway informed SkyWest of his application with Polar Air on October 25, 2004 when he responded to Interrogatory No. 4 of SkyWest's first set of written discovery. A copy of the relevant Interrogatory Answer is attached as Exhibit "A." SkyWest asked Mr. Callaway about his application and interview with Polar Air during his first deposition which took place over a two day period from December 8-9, 2004. Relevant pages of the December 8, 2004 Deposition of David Andrew Callaway are attached as Exhibit "B." On the second day of his deposition, Mr. Callaway answered questions concerning his attempts to find alternate employment, including his efforts to obtain additional training which he believed would make him a more attractive candidate for employment. December 9, 2004 Deposition of David Andrew Callaway, pages 328-335, 354-362, copies are attached as Exhibit "C."

At the end of Mr. Callaway's second day of deposition, Mr. Callaway's counsel expressed concern to SkyWest's counsel that SkyWest might take steps to interfere with Mr. Callaway's attempt to find alternative employment by contacting the companies Mr. Callaway had identified in his deposition and in Interrogatory 4. Counsel's concern was

based upon his understanding that the number of pilots applying for positions greatly exceeds the number of positions which are open. Given the competitive nature of these positions, the potential for Mr. Callaway to receive an offer is greatly lessened if a potential employer receives notice of pending litigation between Mr. Callaway and SkyWest.

After Mr. Callaway's counsel expressed his concern, SkyWest's counsel indicated that it was too late. SkyWest's counsel informed Mr. Callaway's counsel that SkyWest had already issued a subpoena to Polar Air and that the subpoena had already been served.[1]

Mr. Callaway's counsel immediately informed SkyWest's counsel that their actions violated the Federal Rules of Civil Procedure because he had not received prior notice of the subpoena. SkyWest's counsel claimed that their actions were appropriate, but, Mr. Callaway's counsel subsequently received a fax from SkyWest's counsel at approximately 4:21 p.m. on Thursday, December 10, 2004 which proved belated notice of subpoena's issuance. A copy of that fax is attached as Exhibit "E." Additionally, SkyWest's counsel left a voicemail for Mr. Callaway's counsel indicating that he would

[1]The subpoena commanded that Polar Air produce, "Any and all documents you have in your control and/or possession regarding David Andrew Callaway, SSN [REDACTED], Airman Certificate number [REDACTED], including but not limited to any applications for employment, PRIA requests, letters of introduction or any other document." A copy of the proposed subpoena is attached as Exhibit "D."

wait one day for Mr. Callaway's counsel to file a Motion to Quash, but that if the motion were not filed within that time frame, that he would direct service of the subpoena.[2] Mr. Callaway's counsel left a voicemail indicating that he would file a motion to quash and requested that SkyWest not serve the subpoena prior to a ruling on that motion. A Motion to Quash was immediately filed.

Magistrate Judge Alba heard the parties' argument on Mr. Callaway's Motion to Quash on January 12, 2005. Judge Alba denied the Motion, but allowed Mr. Callaway to file a Motion for Protective Order on the same issue. After the briefing was completed, Judge Alba heard oral argument on February 1, 2005. After reviewing the pleadings and hearing counsel's arguments, Judge Alba entered a Protective Order dated February 8, 2005. A copy of the Order is attached as Exhibit "F" Judge Alba's Order was as follows:

1. Plaintiff's Motion for Protective Order is GRANTED.
2. Defendant may not seek any information from Polar Air, any of its related entities, or any entity identified by Plaintiff as a potential employer, by way of subpoena or any other method of discovery allowed under the Federal Rules of Civil Procedure.
3. Defendants may file a Motion to Compel seeking the information covered by this Protective Order after re-deposing Plaintiff, deposing Tiffany Cotter and after Plaintiff has provided Defendant with a copy of the taped voice mails in Plaintiff's possession.

---

[2]This was contrary to the statements SkyWest's corporate counsel earlier in the day that the subpoena had already been served.

Prior to the third day of his deposition, Mr. Callaway provided SkyWest with an email from Polar Air indicating that there was still no position for him. Mr. Callaway further provided SkyWest with recordings of voice mail messages from Polar Air. Mr. Callaway also answered all of SkyWest's questions about the Polar Air PRIA request, his efforts to obtain employment and his relationship with Tiffany Cotter. February 14, 2005 Deposition of David Andrew Callaway, pages 410-423, 432-444, 446-482, copies are attached as Exhibit "G."

During the December 9, 2004 deposition, Mr. Callaway testified that he did not know Ms. Cotter's telephone number, her address, or who she currently works for. Exhibit "C," page 341-344. Shortly after his deposition, Mr. Callaway emailed Ms. Cotter and told her that SkyWest may attempt to contact her. He said, "I believe in the e-mail, I said if you do not wish to be served, you don't have to answer your door." *See* Exhibit "G," page 415. Ms. Cotter did not respond to the email. *Id.* page 416. Mr. Callaway further testified that he did not "know what the process does" and that "I'm sure they could, you know, figure a way to serve her." *Id.* 416-417. While Mr. Callaway saw Ms. Cotter in January 2005, he did not speak to her about the subpoena and only "said hello in passing." *Id.* Further, since September 2004, Mr. Callaway and Ms. Cotter have not spoken in depth and their friendship is over. *Id.* 434, 472-474; Exhibit "G," pages 341-344.

Despite Mr. Callaway's extensive and truthful testimony about his interactions with Polar Air, SkyWest again went to Judge Alba requesting that he vacate the Protective Order and allow it to seek more information directly from Polar Air. While Judge Alba granted SkyWest's request to conduct a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), he limited the extent of that deposition. Judge Alba ordered:

> IT IS HEREBY ORDERED that SkyWest's Motion to Vacate the Protective Order dated March 18, 2005 is hereby granted in part as follows: SkyWest may serve on Polar Air, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, a subpoena for deposition upon written questions to obtain valid responses to (a) why Polar Air has not provided Mr. Callaway any subsequent pilot training and (b) why Polar Air has not hired Mr. Callaway for the position of pilot for which he applied at Polar Air. SkyWest is to provide Mr. Callaway with its proposed questions, allowing sufficient time for Mr. Callaway to object, prior to serving Polar Air with the questions.

A copy of Judge Alba's Order is attached as Exhibit "H."

Instead of providing Mr. Callaway with its proposed questions for Polar Air, SkyWest objected to Judge Alba's Order, claiming that it cannot obtain the information it needs from Polar Air without conducting a full deposition of Polar Air. As outlined below, there is no reason for the Court to vacate Judge Alba's balanced approach of allowing SkyWest to obtain the information it claims it needs, while trying to limit the negative impact that contact will have on Mr. Callaway. Accordingly, the Court should deny SkyWest's motion and sustain Judge Alba's Order.

## ARGUMENT

### A. Standard of Review

For non-dispositive pretrial matters, such as discovery and scheduling matters, the Court reviews any objection to an order of the Magistrate Judge under a "clearly erroneous or contrary to law" standard of review. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a) and DUCivR 74-1(a)(1). Under the clearly erroneous standard, the Court should affirm Judge Alba's ruling "unless it 'on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Ocelot Oil Corp. v. Sparrow Industries*, 847 F.2d 1458, 1464 (10th Cir. 1988) (*quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395(1948)). Moreover, wide discretion is given the Magistrate Judge in discovery rulings. *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1300 (10th Cir. 1999). Here, Judge Alba analylzed SkyWest's request on two separate occasions, balanced the claimed need for the information with Mr. Callaway's own interest in procuring employment, and determined that written deposition questions would allow SkyWest to obtain the discovery it seeks while minimizing the impact on Mr. Callaway.[3]

[3]Of course, Mr. Callaway would have preferred that Judge Alba refuse to allow SkyWest to contact Polar Air in any way. However, he did not object to that Order and is willing to accept Judge Alba's ruling.

### B. Judge Alba's Order Allows SkyWest to Obtain the Requested Information.

SkyWest complains that it needs to obtain information from Polar Air in order to determine if Mr. Callaway has properly mitigated his damages. However, it fails to demonstrate how Judge Alba's Order will prevent it from obtaining the relevant evidence. As outlined above, Judge Alba ruled that SkyWest may present written deposition questions to Polar Air asking why Mr. Callaway did not obtain training and why he was not hired. These questions will provide SkyWest all the relevant information it SkyWest needs. SkyWest has not, and cannot, show that the use of written deposition questions will prevent it from obtaining the information set forth in Judge Alba's Order. Indeed, SkyWest needs to do little more than paraphrase Judge Alba's Order when drafting the written questions. It is impossible to conclude that Judge Alba's approach is mistaken until Polar Air has provided answers to those questions.

Further, while SkyWest claims that it needs the discovery in order to find out "why Callaway has not been hired by Polar Air," that question is irrelevant to the issue of whether or not SkyWest can prove its affirmative defense of failure to mitigate. The mitigation defense is not based on whether or not Mr. Callaway *actually* found a job, but whether Mr. Callaway has made *reasonable efforts* to find a job.

The Tenth Circuit has held that, "[a] claimant need only make a reasonable and good faith effort [to mitigate] and is not held to the highest standards of diligence."

*Spulak v. K Mart Corp.*, 894 F.2d 1150, 1158 (10th Cir. 1990). Once Mr. Callaway has presented evidence that he has engaged in such a good faith effort, SkyWest must show:

> "(1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position."

*Equal Employment Opportunity Commission v. Sandia Corporation*, 639 F.2d 600, 627 (10th Cir. 1980) *quoting Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978).

Mr. Callaway has presented an abundance of evidence that he has made, and is continuing to make, reasonable efforts to obtain alternative employment. Further, once Mr. Callaway has demonstrated evidence of his reasonable attempts to find alternate employment, SkyWest has the burden of demonstrating that there were alternate open positions which Mr. Callaway unreasonably failed to find. Polar Air's answers to written deposition questions will more than satisfy these inquiries.

Indeed, it is because Mr. Callaway wants to obtain employment that he has repeatedly objected to SkyWest's attempts to contact Polar Air and/or any other potential employer. As discussed at oral argument on Mr. Callaway's Motion for Protective Order before Judge Alba, the law, and common sense, recognize the harm that will occur if Polar Air is subjected to a deposition by SkyWest probing the reasons why it has not yet

hired Mr. Callaway.[4] Any such discovery will all but guarantee that Polar Air will not hire Mr. Callaway. Indeed, under SkyWest's argument, it would be entitled to subpoena *every* potential employer Mr. Callaway has identified to probe why Mr. Callaway did not obtain a job. Clearly, such an inquiry is beyond what is necessary to assert its failure to mitigate defense. Because any additional information that Polar Air may have is unnecessary, SkyWest has failed to demonstrate that Judge Alba's Order is "clearly erroneous or contrary to law."

### C. Mr. Callaway did not Interfere With SkyWest's Attempts to Depose Ms. Cotter.

SkyWest claims that the Court should amend Judge Alba's Order because Mr. Callaway allegedly "interfered" with its efforts to subpoena Tiffany Cotter. Simply put, SkyWest is wrong. The mere fact that SkyWest has been unable to serve Ms. Cotter does not mean that it should be able to subpoena Polar Air. Nor does its failure to depose Ms. Cotter, a fact which Judge Alba considered, demonstrate that Judge Alba's Order is clearly erroneous.

---

[4]None of the parties have been able to locate a case directly addressing a situation where a former employer is attempting to obtain discovery from a potential employer. However, the courts have recognized and limited discovery, from an employee's other former employers and current employer. *See, e.g., Graham v. Casey's General Store*, 206 F.R.D. 251 (S.D. Ind. 2002); *Terwilliger v. York International Corporation*, 176 F.R.D. 214 (D. Va. 1997); *Stewart v. Mitchell Transport*, 2002 U.S. Dist. LEXIS 12958, *58 (D. Kan. 2002). (A copy of the *Stewart* case is attached as Exhibit "I."

First, contrary to SkyWest's assertion that Mr. Callaway interfered with its attempts to subpoena Ms. Cotter by emailing Ms. Cotter in January 2005, Mr. Callaway simply emailed Ms. Cotter and told her that SkyWest may attempt to contact her. He said, "I believe in the e-mail, I said if you do not wish to be served, you don't have to answer your door." *See* Exhibit "C," page 415. Ms. Cotter did not respond to the email. *Id.* page 416. He further testified that he did not "know what the process does" and that "I'm sure they could, you know, figure a way to serve her." *Id.* 416-417. While Mr. Callaway saw Ms. Cotter in January 2005, he did not speak to her about the subpoena and only "said hello in passing." *Id.* Further, since September 2004, Mr. Callaway and Ms. Cotter have not spoken in depth and their friendship is over. *Id.* 434, 472-474; Exhibit "G," pages 341-344.

Neither Mr. Callaway, nor his counsel, in any way misled Judge Alba about SkyWest's ability to contact, or subpoena Ms. Cotter. If Mr. Callaway had any knowledge about how to contact Ms. Cotter, he would have answered SkyWest's questions. However, he cannot provide information which he does not have. Interestingly, SkyWest does not claim that it has made any further attempt to serve Ms. Cotter since it filed its Motion to Vacate the Protective Order.

## CONCLUSION

SkyWest has failed to demonstrate that Judge Alba's Order is clearly erroneous and the Court should deny SkyWest's motion.

DATED this 20th day of June, 2005.

**STRINDBERG SCHOLNICK & CHAMNESS, LLC**

Erik Strindberg
Ralph E. Chamness
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing **MEMORANDUM IN OPPOSITION TO OBJECTIONS TO MAGISTRATE ORDER GRANTING ONLY LIMITED DISCOVERY FROM POLAR AIR** was mailed this 20th day of June, 2005 to:

Scott M. Petersen
David N. Kelley
FABIAN & CLENDENIN
215 South State Street, 12th Floor
Salt Lake City, Utah 84111
Facsimile: 596-2814

Todd C. Emerson
SKYWEST AIRLINES,
444 South River Road
St. George, Utah 84790

______________________________

U:\current clients\Callaway_DA\Pleadings Federal\Opp_Memo_Obj.wpd

**EXHIBIT "A"**

10/85

Erik Strindberg (Bar No. 4154)
**STRINDBERG & SCHOLNICK, LLC**
44 Exchange Place, 2nd Floor
Salt Lake City, UT 84111
Telephone: (801) 359-4169
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DAVID ANDREW CALLAWAY**<br><br>Plaintiff,<br><br>vs.<br><br>**SKYWEST AIRLINES, INC.,**<br><br>Defendant. | **PLAINTIFF'S ANSWER TO DEFENDANT'S FIRST SET OF WRITTEN DISCOVERY REQUESTS**<br><br>Case No. 2:04CV00179<br><br>Judge Ted Stewart |

INTERROGATORY NO. 1

Identify all individuals, other than counsel, assisting in answering these interrogatories.

**Answer:** David Andrew Callaway.

INTERROGATORY NO. 2

Identify each person you expect to call as a factual witness at trial or other proceeding in this matter. With respect to each person, set forth a narrative of what you expect each witness to testify concerning and any documentary evidence you expect to introduce through each witness,

**Answer:** Plaintiff has not made a decision as to what witnesses he will call at trial.

INTERROGATORY NO. 3

Set forth in detail the amount you claim to have been damaged by SkyWest's actions, including:

a. back wages and benefits

b. future lost wages and benefits

c. compensatory damages

**Answer:** a. and b. - October through December of 2003 losses (not including benefits) total $18718.87. This breaks down as follows: Flight pay - $16, 138.95 ($63.29/hour x avg. 85 hours per month); User time - $410.12 (avg 80 hours per month x .027 accrual rate); Vacation time - $584.80 (avg. 80 hours per month x .0385 accrual rate); Holiday pay - $145.00; per diem (avg. 300 hours per month at $1.60 per hour away from base).

From January 1, 2004, through the present (and continuing into the future) losses average $6468.65 per month. This breaks down as follows: Flight pay at $65.25 per hours x 85 hours per month; User time - average 80 hours per month x .0386 accrual rate; Vacation Time - average 80 hours per month x .0462 accrual rate; Per diem at 300 hours per month x $1.60 per hour. In addition, there will be losses for holiday pay. Future losses will need to be increased to account for shifts in the general pay scale for SkyWest pilots and for increased earnings I would have made as my seniority increased.

In addition to these losses, there is the value of the lost benefits, contributions to 401k plan and lost stock options.

c. It is not possible to give an absolute dollar figure for compensatory damages.

) )

INTERROGATORY NO. 4

Describe, in detail, all attempts you have made to obtain employment since being terminated by SkyWest.

**Answer:** On an everyday basis I check the internet to determine if there are any new openings for pilots. In particular I check the web site "climbto350.com."

I also am continually updating my resume and sending it to all airlines and other companies that are, or may be hiring. I have sent resumes to the following: Southwest, America West, Cathay Pacific, AirTran, Jet Blue, Fed Ex, UPS, Alaska, ASA, ComAir, Frontier, Atlas Air, Polar Air, ATA, Net Jets, Numerous Crew Leasing Companies, Emirate Air Lines.

I have had interviews at Polar Air and Atlas Air.

I have attempted to contact by phone, email and regular mail, friends and others who I know who are involved in the industry.

In any effort to improve my qualifications I completed, in July of 2004, a 737 Type Rating Course.

INTERROGATORY NO. 5

Set forth all the facts that support your claim that you employment relationship with SkyWest was an implied in fact contract, including the terms of such implied in fact contract.

**Answer:** We object to this interrogatory as it calls for a legal conclusion. Without waiving this objection, Plaintiff responds that the employee handbook sets forth certain terms and conditions of employment which may constitute an implied in fact contract as well as the

practices of the airline. These practices include not terminating pilots except for cause and giving them the opportunity to appear before a Review Board.

REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST NO. 1

All documents identified, referred to, or utilized in preparing your answers in the foregoing interrogatories.

**Answer:** All documents responsive to these requests have been included and are labeled CAL 0111 through CAL 0450.

REQUEST NO. 2

All documents upon which you relied or referred to in your Complaint.

**Answer:** See the response to Request No. 1.

REQUEST NO. 3

All documents you will or may seek to introduce as exhibits at any trial or hearing in this action.

**Answer:** Plaintiff has not decided what documents he will offer as exhibits at trial.

REQUEST NO. 4

All correspondence or other documents related to communications between you and SkyWest.

**Answer:** See the response to Request No. 1.

REQUEST NO. 5

All documents upon which you intend to rely to establish proof of claims and/or damages.

**Answer:** See the response to Request No. 1.

## REQUEST NO. 6

All expert reports or other documents relating to your proposed expert witnesses, if any, including Curriculum Vitae.

**Answer:** See the response to Request No. 1.

## REQUEST NO. 7

Copies of any and all submissions you made to the SAPA website as set forth in Paragraph 19 of the Complaint.

**Answer:** See the response to Request No. 1.

## REQUEST NO. 8

All other documents not previously requested relating to the pending action between the parties.

Answer: Plaintiff objects to this request as being over-broad, burdensome and calling for a legal conclusion. Without waiving that objection see the response to Request No. 1.

David Callaway appeared this date 22 of October, 2004

[signature]

STATE OF UTAH )
: ss.
County of Salt Lake)

On the 22 day of October, 2004 personally appeared before me ______________ who being first duly sworn upon his/her oath or affirmation signed the foregoing declaring its contents to be true and correct to the best of his/her knowledge.

NOTARY PUBLIC
GERALDINE L. RICE
44 Exchange Place 2nd FL
Salt Lake City, UT 84111
COMMISSION EXPIRES
December 2, 2006
STATE OF UTAH

Geraldine L. Rice
NOTARY PUBLIC

DATED this 25 day of October, 2004.

**STRINDBERG SCHOLNICK & CHAMNESS, LLC**

Erik Strindberg
Attorneys for Plaintiff

U:\current clients\Callaway_DA\FirstDiscovtoDef.wpd

# EXHIBIT "B"

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY (VOL. I)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT: The Law Offices of
Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, Utah

DATE: Wednesday, December 8, 2004

TIME: 9:16 a.m.

REPORTED BY: Scott M. Knight, RPR



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City | Washington, DC | New York | Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180 | Toll Free: 877-441-2180 | Fax: 801-983-2181

www.thackerco.com

Page 289

the Utah Code on the appropriateness of a background check.
A. There's certain individuals who are allowed to conduct a background check. And Mr. Breeze is not one.
Q. All right. It's not Mr. Breeze that's doing the checking, correct?
A. This right here pretty much says it's Mr. Breeze.
Q. Isn't it Mr. Odor who's being asked to do the check?
A. Mr. Breeze is requesting Mr. Odor to do the check, correct.
Q. Okay.
A. But it also--you know, he's not allowed to do it either.
Q. Is this--this is in October of 2001 that this request was being made, as you understand it.
A. That's correct.
Q. Is it--
A. Well, that's what it says here.
Q. It's also true, isn't it, that that's the time when you had the issue with SkyWest regarding allegations of parties and drug use at

Page 290

your house?
A. That's not true.
Q. All right. Tell me when that was.
A. That was the end of 2000, beginning of January--to 2001 is when I had the issues with the neighbor. October 2001 was when I started ground training for upgrade. Mr. Breeze also contacted Dave Moxam and told him to keep an eye on me during upgrade training.
Q. How do you know that?
A. I've been told by Mr. Moxam.
Q. Who contacted him?
A. Mr. Breeze.
Q. Do you see--Exhibit 35 again. It's on the sixth bullet point down. It says, "In approximately October 2001, human resources received phone calls from neighbors of Andy's in Salt Lake City." Does that refresh your recollection?
A. That could be it. But the problems that were with the neighbor and the police department took place the end of 2000, early 2001.
Q. Okay. But that--it may be, then, that it was when SkyWest was contacted in relation to that.

Page 291

A. Could be.
Q. All right. So it's possible that those are contemporaneous.
A. Could be, yeah.
Q. All right. I'm going to show you--
MR. PETERSEN: Let's get this next one marked.
Exhibit-46 marked
BY MR. PETERSEN:
Q. I'm showing you what's been marked as Exhibit 46. It's CAL0114. Do you see that document?
A. Yes, I do.
Q. Tell me what it is.
A. This is a letter I wrote. Again, I'm a little puzzled by why my name and address and date aren't on here.
Q. Well, you produced this document, didn't you, Mr. Callaway?
A. Yes, I did. But I also when I wrote any correspondence had my address, name, and date on it.
Q. So you're not sure why you produced us a document without your information on it.
A. That's--I'm not sure why you presented

Page 292

me a document without my name on it.
Q. Do you see the little number down on the bottom right there? It says "CAL0114."
A. Uh-huh (affirmative.)
Q. That means it came from you.
A. This came from the documents I received from SkyWest.
Q. So this isn't a document that you had in your possession--
A. This was--
Q. --at the time you filed this lawsuit.
A. This was faxed to me before my review board.
Q. Okay. Is there another document that has your signature on it?
A. I'm sure it does. I mean, I wouldn't write anything without signing it.
Q. Are you aware as to whether you have produced in this litigation or at any time your-- well, in this litigation, this letter with your signature and any other information that's not there now?
A. I'm sorry. I don't--I was trying to read here when you were asking me that question.
Q. I'm not trying to trick you. What I'm



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*
**Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101**
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

saying is, if there's a better document than this, where is it? I don't--you didn't produce it to us.
A. Okay. Well, hold on. Now that I read this more, I believe this was my closing statement to the review board that I read--
Q. Okay.
A. --at the end of the review board.
Q. Look at the third--
A. So this was not a letter that was written. This was simply for my reference in the review board.
Q. So this is just--did you submit this to the review board, or is this just something you used to read from during your closing argument?
A. I used it to read from during my closing arguments.
Q. Okay.
Exhibit-47 marked
BY MR. PETERSEN:
Q. All right. I'm showing you now what's been marked as Exhibit 47. It's CAL0133. Do you recognize that document?
A. It appears to be a prior request page or document.



Q. Okay. There's a Part I and a Part II in there. Do you see that? First box says, "Part I: Air Carrier and Other Records Request (PRIA); Part II: Airman Consent to Release of Records." Is that your signature in Part II?
A. Yes, it is.
Q. Dated 6/12/2004, correct?
A. That's correct.
Q. And did you prepare Part II?
A. Yes, I did.
Q. The Part I, do you know who prepared that?
A. Yes, I do.
Q. Who is it?
A. Tiffany Cotter.
Q. Who is Tiffany Cotter?
A. Tiffany Cotter is a friend of mine.
Q. All right. And who does she work for?
A. She works for a company in Boston.
Q. What's the company called?
A. I don't know.
Q. Does she work for Polar Air?
A. No.
Q. Do you see where it says "AAWH" under--over the "Air Carrier Name"?



A. Yes, I do.
Q. What is that in reference to? Do you know?
A. I don't know. I did not fill out Part I.
Q. Does Tiffany Cotter work for an airline at all?
A. No, she does not.
Q. Okay. That's the 64 dollar question, then, why would you have your friend Tiffany Cotter fill out an air carrier request?
A. Because I had not received my PRIA records from Polar Air. They had not received PRIA records that were requested during an interview I had. And I wanted to see why and if I would be able to obtain my own records, which I am allowed to do.
Q. So you had her falsify a PRIA request.
MR. STRINDBERG: Objection. It's argumentative.
MR. PETERSEN: Okay. Go ahead. Answer.
MR. STRINDBERG: Just a second. Give me a moment.
THE VIDEOGRAPHER: We're going off the record. Time is 5:08 p.m.



(Recess taken 5:08-5:11 p.m.)
THE VIDEOGRAPHER: We're back on the record. Time is 5:11 p.m.
MR. PETERSEN: Could I get you to read back the question?
(The last question was read.)
MR. STRINDBERG: And I'm going to--before he answers, I have advised him that he has a constitutional right not to answer that question. The reason I've advised him is because Mr. Emerson in prior conversations has gone on and on about submitting some kind of a PRIA application if your not a member of an airline as a criminal offense.
So, I don't know whether it is or not, but I think under those circumstances it's apparent to me that SkyWest wants to make some issue out of it. So I've told Mr. Callaway he doesn't have to answer if he doesn't want to based on his Fifth Amendment right.
BY MR. PETERSEN:
Q. Do you want me to ask the question again?
MR. STRINDBERG: It's up to you.
THE WITNESS: I'm going to abide by



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

his--
BY MR. PETERSEN:
Q. So you're going to invoke the Fifth Amendment.
A. Yes.
MR. STRINDBERG: And he's not going to answer anymore questions about this document.
MR. PETERSEN: I think even under the Fifth Amendment I'm entitled to ask him about the details. I just will not ask him the question that is the magic question.
MR. STRINDBERG: Technically, no. He invokes his Fifth Amendment rights. If he answers any other questions about this document, it could be interpreted as a waiver of that Fifth Amendment right.
MR. EMERSON: We can get him on the record. We can lay the foundation for this document. If you want to raise it--the answer might tend to incriminate him if he verifies who this person is, where she lives, who she works for.
MR. STRINDBERG: If you want to add--
MR. EMERSON: Every one of those--each and every one of those tends to incriminate him.



And you want to raise that objection. Then we have the right to get on the record, and you have the right to object.
MR. STRINDBERG: I don't think that any of it incriminates him. Okay.
MR. EMERSON: Then the Fifth Amendment privilege is not appropriately asserted here if the answer to that question would tend to--
MR. STRINDBERG: No. There's a problem, though, Todd, that if you--you were the one who raised this issue to begin with. Okay? My understanding is that if you answer any questions, it may be a waiver. So he's not going to answer any more. I understand--I don't think we have to take the time, but if you want to answer a whole series of questions to get him on the record, go ahead. I understand, though, that you have more questions that you want to ask him about this document. As far as I'm concerned, that's a good enough record. But he's not going to answer any more.
MR. PETERSEN: All right. My questions go to the air carrier certificate number, the identification of Tiffany Cotter as an SIF representative, what the meaning of ACS-



Verification Department is, the address, this Boston, Massachusetts address, where does that lead. And the fax number and whose fax number that is. I also have questions as to who instructed Ms. Cotter to prepare this, whether Ms. Cotter received any remuneration for her efforts, and whether or not Ms. Cotter made any other attempts either by telephone, by e-mail, or otherwise to obtain the information that is requested in Part I.
MR. STRINDBERG: And so the record's clear, if asked those series of questions, Mr. Callaway would decline to answer.
MR. EMERSON: And if asked at trial, he'll do the same thing. He's not going to then come up with information.
MR. STRINDBERG: Haven't said that.
MR. EMERSON: All right. Then we're entitled to know now what he's going to say in trial.
MR. STRINDBERG: Nope.
MR. PETERSEN: We will go ahead and file a motion. And I think that may necessitate this anyway, because I--given the timing, it's already ten after five. We need to continue this



to tomorrow or another time to finish it. I don't have a lot left. But I'm assuming you're going to have some questions or maybe you won't. But I expect that I could have another hour, unless you want to stay till ten after six.
MR. STRINDBERG: No, I can't stay till ten after six.
MR. PETERSEN: And I think that we at that point may need to raise this with the Court and see where we get on your Fifth Amendment privilege.
In addition to that, just so you know, Counsel, I have a--the next document, which is a letter from Tiffany Cotter, I also want to ask him about, are you going to have him invoke the same privilege.
MR. STRINDBERG: As long as there are these threats out there that Counsel has made, yes. If there's an agreement that the issues regarding this certificate and anything related to it are to be used only for the purpose of this litigation, and neither the documents nor his answers are going to be shared with anyone for any purposes besides this litigation, I'd let him answer. So you guys need to talk about that.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 301

MR. EMERSON: I need to clarify for the record that he and I had a telephone conversation. And I made no threats whatsoever against your client. I did advise you that I had what was in front of me, what appeared to be a falsified document, and that you needed to explore that with your client. You also told me that you would get back to me as to where this comes from, who Tiffany Cotter was, and answer the questions I posed to you in that telephone conversation--

And it's now December. None of those questions have been answered. Also, these are not our claims to bring. They would belong to a Federal prosecutor. And my judgment of whether or not the law has been broken does not dictate whether a Fifth Amendment privilege is properly raised. That's your legal opinion and decision based on the answer your client has confided in with you. So I don't think it's proper for you to cite me in my opinions as your reason for raising a Fifth Amendment privilege. It either exists or it doesn't under your analysis, Mr. Strindberg, not mine.

MR. STRINDBERG: I don't have an opinion at this moment as to that. However, you

Page 302

are the one who raised the issue of it being a falsified document. And you said, you know, It's a crime to falsify Federal documents. Based on that, I have had to advise my client as to certain rights he might have.

MR. EMERSON: You've advised him as to his rights based on my legal opinion, not yours.

MR. STRINDBERG: I respect you so highly that I would, but very frankly, the way you said it was--wasn't, I'm going to go out and get the prosecutor and have him prosecute Mr. Callaway. But you made it pretty clear that--from what I was hearing in that conversation was that you were angry about it and you were going to try to use it against Mr. Callaway. So . . .

MR. EMERSON: By the way, I'd like to let the record reflect that no prosecutors have been contacted and that I pointed it out to you as a professional courtesy so that you wouldn't feel blindsided and be able to be prepared.

MR. STRINDBERG: I appreciate that. And again, if you want to--you know, if you want to enter into an agreement that this is only for use in this litigation, it's not going to be shared with anyone or the information given to

Page 303

anyone at least of any--at least of all, any sort of a law enforcement agency, somewhat like a Garrity warning that they give to police officers, fine. Then it's a non-issue, and he'll answer whatever questions you have about it.

Exhibit-48 marked

MR. PETERSEN: I think we're not going to be able to answer that right now. I think we have to think about what has happened. And, in fact, I think that Tiffany Cotter is a very important witness at this point. And our ability to contact her is also part of all this.

So I want to make sure that we have in the record that I intend to ask questions about Exhibit 48. So I want to show that to you, Mr. Callaway, which is--purports to be a letter from Tiffany Cotter to SkyWest. And if you'd take a look at that. And then whether or not you would be willing to answer questions without any promises, I would like to ask. So if you're going to invoke the same privilege, fine. I just want to make sure we've got on the record that this document I want to ask about as well.

MR. STRINDBERG: Invoking the privilege is up to you. I can't invoke it for you, but my

Page 304

recommendation as an attorney is that.

THE WITNESS: Sure.

MR. STRINDBERG: At this time we should.

THE WITNESS: Okay.

MR. PETERSEN: All right. And I would like to ask you as to this document similar things to the last--that is, who prepared it, under whose direction, whether Ms. Cotter was paid for having prepared it, the circumstances surrounding its preparation, who it was sent to, why, and the details of what it says. I also would like to ask about who the person Marion that's in the Re line, the attention line, who that is, and why it says three pages. So there you go. Maybe this is a time to end for the day and schedule when we can finish it. We can keep going if you'd like. But I'm happy to end. But I--

MR. STRINDBERG: I can't go for another hour. I have certain familial responsibility.

MR. PETERSEN: I actually do too, which is why I'd like to end.

MR. STRINDBERG: What's your schedule? Let's go off the record.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

# EXHIBIT "C"

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY (VOL. II)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | |
|---|---|
| TAKEN AT: | The Law Offices of<br>Fabian & Clendenin<br>215 South State Street, Suite 1200<br>Salt Lake City, Utah |
| DATE: | Thursday, December 9, 2004 |
| TIME: | 9:42 a.m. |
| REPORTED BY: | Scott M. Knight, RPR |



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City | Washington, DC | New York | Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180 | Toll Free: 877-441-2180 | Fax: 801-983-2181

www.thackerco.com

Q. All right. So my question is, what difference, if any, do you see between what you were offered that you did not agree to accept and voluntary termination as that box is listed on Exhibit 36?

A. There's no difference.

Q. And so today, if you could get your wish in court, you would have the termination box erased and the voluntary termination box checked.

A. Yes.

Q. Is that right? Okay.

A. I think, also, a reinstatement would be a preference as well.

Q. So you would like to be reinstated.

A. Yes, I would. And it says that in there somewhere.

Q. Okay. Here's a--if Jim Breeze, you believe, is out to get you, why would you want to be reinstated with a company wherein he would be at some point in your chain of supervisory command?

A. Well, as long as it didn't continue and I didn't have to, you know, believe or feel intimidated or threatened by that, I wouldn't have a problem with it. Unless Jim Breeze plans to be

there when he's 80 years old, I don't see an issue with that.

Q. If in lieu of the money you've talked about, would you prefer to be reinstated? Did that make sense? Did you understand that question?

A. Yes.

Q. So what's the answer?

A. I'd have to think about it. It would depend.

Q. All right. Look at page 3 of your interrogatory answers. It's Interrogatory No. 4. It says, "Describe in detail all attempts you have made to obtain employment since being terminated at [sic] SkyWest." Your answer is, "On an everyday basis I check the Internet to determine if there are any new openings for pilots. In particular, I check the Web site climbto350.com." Do you mean that, that every single day you check that, or is that sort of a little fluff that--

A. Every single day I check that. I checked it this morning while I was eating breakfast.

Q. And what is climbto350.com?

A. The Web site that posts job openings.

Q. For pilots?
A. For pilots as well as other aviation areas, mainly pilots.
Q. Okay. You have a list of airlines that you have sent resumes to. Have you since sent resumes to additional airlines other than those you have listed?
A. No. I believe those are about all the airlines that are hiring right now.
Q. And have you interviewed additional airlines other than Polar Air and Atlas Air?
A. I have never interviewed at Atlas Air.
Q. Okay. Your answer says, "I have had interviews at Polar Air and Atlas Air." Do you see that?
A. Atlas Air owns Polar Air. Maybe that was the confusion there.
Q. So you've really had one interview.
A. One interview.
Q. And that was with Polar Air.
A. Polar Air. And then in October of last year I interviewed with Jet Blue.
Q. Okay. Is there a trend, a type of airline that you're looking to be hired with? Do you understand that? It's not a trick question.

I may be phrasing it poorly. I'm--I guess what I'm asking is, are you looking to be hired with a cargo company, with a passenger company? Is there a type of airline that you want?

A. There's no preference. I want to be working for a good company who provides a good quality of life and is stable.

Q. All right. The next one says, "I have attempted to contact by phone, e-mail, and regular mail, friends and others who I know who are involved in the industry." Who specifically have you contacted in the industry that you know?

A. I don't have their names and phone numbers and all that right now. I have friends that are all around the world right now that work for various airlines.

Q. When you interviewed with Polar Air, when did you interview with them?

A. July of--or excuse me. June of 2004, I believe.

Q. And who was it that you interviewed with?

A. I don't recall their names right now.

Q. Was it one person or more than one person?

A. It was two individuals.
Q. Male or female?
A. Both.
Q. So one man, one woman.
A. Yes.
Q. Do you recall what their titles were?
A. I do not. I have all that information written down at home.
Q. Do you have any problem producing to us copies of the information you received from Polar Air?
A. No.
MR. PETERSEN: All right. We'd request, then, Mr. Strindberg--
MR. STRINDBERG: Request what?
MR. PETERSEN: --that we get the information--he says he has written documents from his interviews with Polar Air.
THE WITNESS: No. I didn't say I had written documents.
BY MR. PETERSEN:
Q. Well, you've got something written, right?
A. I have the names of the people I interviewed with written down.

Q. Okay.
A. I don't have written documents from them.
Q. All right. You didn't receive any letters or anything regarding your interview.
A. No. I have voice mails that are still saved on my phone.
Q. What is your current status--
A. I can play those for you right now if you would like.
Q. What is your current status at Polar Air?
A. There is no status.
Q. Were you turned down for the job?
A. I--best of my knowledge, yes.
Q. You didn't, though, receive a formal letter telling you thanks for playing.
A. No, I did not.
Q. Are you aware as to whether Polar Air sent a PRIA request to SkyWest?
A. Best of my knowledge, they did.
Q. Who was it at Polar Air that informed you that they sent a PRIA request?
A. It was an admin woman that was in the interview that took our forms and went to the fax

machine and faxed them.

Q. The same woman that you interviewed with?

A. She was--no, not the same woman that I interviewed with.

Q. Do you know the name of this person who made the request?

A. No, I don't.

Q. Do you know what department she worked in?

A. No, I don't. I would assume she works in the human resource department.

Q. Could you describe her to us, as best you can?

A. No, I cannot.

Q. Where did you interview at Polar Air?

A. Miami, Florida.

Q. And is that where the woman was who faxed the--

A. Yes.

Q. --PRIA request?

A. Yes.

Q. Have you been contacted by anyone at Polar Air in relation to the PRIA requests that they made?

A. I have not.
Q. Did you actually see a document that showed that the PRIA request was, in fact, sent?
A. Did I see a document showing it was sent?
Q. Yes.
A. What would that be?
Q. Like a fax confirmation sheet.
A. No, I did not.
Q. So the basis for you saying that they in fact sent a PRIA request to SkyWest is that you spoke with a woman who in front of you actually put it on the fax machine and sent it off.
A. That's correct.
Q. What fax number did they send it to? Do you know?
A. I don't recall.
Q. Did you provide them with the fax number?
A. No, I did not.
Q. All right. What is a 737 type rating course?
A. That's training for the Boeing 737 aircraft.

Q. You completed that course in July of 2004.

A. That's correct.

Q. And the purpose of that was what?

A. To further my qualifications. Also to further my qualifications specifically for Southwest Airlines who require the type rating.

Q. So that makes you more marketable to some of the airlines.

A. In particular, Southwest Airlines.

Q. Are those the planes they fly?

A. Yes.

Q. Okay. Those aren't the planes that SkyWest flies.

A. No.

Q. Do you have an understanding as to whether that kind of a course would make you more valuable to SkyWest?

A. I have no idea if it would make me more valuable to SkyWest. It wouldn't hurt.

Q. All right. Look at the answer to Interrogatory 5, which is on 3--page 3 to 4. That's--asks for your factual basis for the claim that you think you had implied in fact contract with SkyWest. Your answer indicates, "The