# EXHIBIT "G"

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY
(VOLUME III)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT: Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, Utah

DATE: February 14, 2005

TIME: 2:06 p.m.

REPORTED BY: Scott M. Knight, RPR

DAVID ANDREW CALLAWAY, called as a witness for and on behalf of the Defendant, being first duly sworn, was deposed and testified as follows:

EXAMINATION

BY-MR.PETERSEN:

Q. All right. Mr. Callaway, we've been down this path before. So I'll just jump right into it. I'm showing you what's been previously marked as Exhibit 47. I think we talked about this briefly before. But do you recognize that document?

A. Yes, I do.

Q. Tell me what it is.

A. It is a document to request the background records.

Q. Is it--what's often referred to as a PRIA request.

A. Yes.

Q. And this is--do you have an understanding as to where somebody obtains a form like this?

A. You can download them off the Internet. You can--I think they're readily available. I mean, that's where this was.

Q. Did you obtain this form before it was filled out?
A. Yes, I did.
Q. And how did you get it?
A. Downloaded it off the Internet.
Q. All right. And what site did you get it from?
A. I don't recall.
Q. Was it a government site? Do you know?
A. I don't recall. It was--you know, you type in a search for the form. And, you know, many web sites were listed, you know, where you could access the form.
Q. All right. Tell me the circumstances--what--if you look at the air carrier, the Part I section, there's a date there. Do you see that?
A. The handwritten date?
Q. That's right.
A. Yes.
Q. Next to Tiffany Cotter's signature.
A. Yes.
Q. It looks to me like it's 6/17/02--or '04. I'm sorry.
A. Right.
Q. And then below where your signature is

in the Part II section it says six--is that 12/04? Is that--

A. No. I do a seven with a line through it. That looks like a seven to me.

Q. Okay. So do you recall whether or not--

A. I believe. I think it is.

Q. All right. Do you recall whether or not you obtained this form on or around June 17, 2004?

A. I don't remember the exact date, but it was sometime in the middle--towards the end of June.

Q. And why did you download this particular form?

A. I wanted to see what SkyWest was releasing regarding my background records.

Q. So did you contact anyone at SkyWest to see if they had released any particular records?

A. No, I did not.

Q. This is what you downloaded and then eventually had prepared in order to respond to what? I mean, why would you want to know what SkyWest was releasing?

A. Well, because I--I don't--well, I

wanted to see what they were releasing to someone else. I wanted--you know, you could release anything to me. I wanted to see exactly what was being--what someone else would be seeing to make sure that it was accurate.

Q. So to do that you then download this form and then--I think we talked about this before--you filled out the Part II section. Is that right?

A. That's correct.

Q. Did you fill that out prior to Part I being filled out?

A. I don't remember. I don't know. I think it was just filled--the whole form was filled out.

Q. And you testified before, I believe, that Tiffany Cotter is a friend of yours.

A. That's correct.

Q. And where does she reside?

A. Last I know, I think she was in Boston. I heard that she might have been or was in the process, perhaps, of moving overseas. But I'm not sure.

Q. When is the last time that you spoke to Ms. Cotter?

A. I spoke to her in passing, maybe, as she was visiting in January.
Q. Of 2005?
A. Five. Five, yes.
Q. Did you tell her she was going to be subpoenaed for a deposition?
A. No, I didn't.
Q. Do you know whether or not she has any idea that she is--that SkyWest would like to depose her?
A. Yes, I do.
Q. And how do you know that?
A. I sent an e-mail to her.
Q. All right. Do you--what did you say in the e-mail?
A. I just gave her a heads-up of what might be happening. I did not know if the subpoena was being issued or not. This was after the last deposition.
Q. Tell me as best as you can exactly what you put in the e-mail.
A. I don't remember.
Q. Do you remember anything at all?
A. No.
Q. Did you tell her that she would be

subpoenaed?
A. I don't remember. I might have.
Q. Did she respond to your e-mail?
A. No.
Q. You got no response at all from her.
A. No.
Q. Did you tell her to avoid answering her door at her apartment?
A. In the e-mail?
Q. At any time.
A. Yes. I believe in the e-mail I said if you do not wish to be served, you don't have to answer your door.
Q. Did you tell her to instruct somebody at work not to accept or to avoid allowing her to be served at work?
A. I don't know anyone at her work. I don't know where she works.
Q. Why did you tell her to avoid--to not answer the door?
MR. STRINDBERG: Objection. Misstates his testimony.
THE WITNESS: Well, if she doesn't want to be involved, she doesn't have to. That's her decision.

BY MR. PETERSEN:
Q. So are you suggesting to her that she avoid being served with legal process?
A. If that's her decision.
Q. I know. But is that what you told her to do?
A. If she wanted to. It's her decision. I don't live there. I can't--you know--
Q. Why would you ask her if she didn't want to be served to avoid answering the door?
A. Why would I what?
Q. Why would you make a statement that you just told me? Why did you do that?
A. Like I said, if she doesn't want to be involved, that's her decision.
Q. Do you understand that by telling her to avoid answering the door, that's going to cause problems for a process server to give her a subpoena?
A. I don't know what the process does. I don't know.
Q. Well, wouldn't that be the case or--or else why would you say, If you don't want to be served, don't answer the door?
A. Well, I'm sure they could, you know,

figure a way to serve her. But that is what I've been told, if you don't answer the door you can't serve--be served.

Q. Were you told that by somebody that was not an attorney?

A. I don't know who told me that, but . . .

Q. Other than the e-mail that you sent to her, tell me what you talked about in January.

A. When I saw her?

Q. Yes.

A. I didn't talk to her. I said hello in passing.

Q. Was that after you sent the e-mail?

A. I don't recall.

Q. When do you--

A. I don't know the exact date that she was out here, when the e-mail was sent.

Q. Did you send the e-mail, do you recall, shortly after your last deposition?

A. That's correct. So I--when was that? I don't even remember when that was.

Q. What was the e-mail address that you used?

A. I don't recall. I don't know e-mail

address.

Q. Well, how did you obtain her e-mail address?

A. It's in my address book.

Q. Would you have any objections to producing it to us?

A. Her e-mail address?

Q. Yes.

A. I don't know what it is. You just type in Tiffany in the "To" box. And that's what it spits out.

Q. Right. So whatever that spits out, would you have any objection to producing that to us?

A. Her e-mail address?

Q. Yes.

A. I don't see why you can't get that from her. She owns the e-mail address.

Q. Just answer the question. Would you produce that to us so that we can contact her by e-mail?

MR. STRINDBERG: We'll discuss it, Counsel.

MR. PETERSEN: All right. I want to be able to serve her. And it seems to me that she's

avoiding service, probably at the behest of Mr. Callaway.

MR. STRINDBERG: Bullshit. Bullshit.

BY MR. PETERSEN:

Q. All right. Tell me about how you came to have her prepare Part I of Exhibit 47.

MR. STRINDBERG: Objection. Assumes facts not in evidence.

BY MR. PETERSEN:

Q. Go ahead.

A. Say it again, please.

Q. How did she come about to fill this out?

A. I filled this out.

Q. You filled out the Part I--

A. Yes, I did.

Q. --section.

A. Yes, I did.

Q. As I recall--and you can correct me if I'm wrong--when we deposed you before you said that Ms. Cotter filled out Part I.

A. I don't recall that. I don't know.

Q. All right. Where did you get the-- let's go through Part I line by line, if you don't mind. Do you see where it says "To"?

A. Yes.
Q. And then it says "SkyWest Airlines," and there's an address.
A. That's correct.
Q. Where did you get that information?
A. Well, I worked for SkyWest. I know their address.
Q. All right. So you knew that off the top of your head.
A. Yes.
Q. Is this something that you can fill out online, or did you print it off and then put it in a typewriter?
A. I believe this was--you could fill it out online. That's why it's typed. I don't have a typewriter. I don't know anyone that does have typewriters anymore.
Q. All right. Now, look underneath the address, "AAWH" Do you see that?
A. Yes.
Q. Under that it says "Air Carrier Name." Where did you get that AAWH?
A. Just made up.
Q. Why did you pick those letters?
A. Probably saw it somewhere. Just typed

in letters, numbers. Doesn't mean anything to me.

Q. You didn't intend that to stand for Atlas Air World Holding.

A. No.

Q. Do you know if there's an entity that goes by that name?

A. I know there's Atlas Air.

Q. And you didn't intend "AA" to stand for "Atlas Air."

A. No. This is, like I said, something I've seen before. I don't know what it means.

Q. It says "Air Carrier" underneath that. Wouldn't that be whoever you're sending this to, you're indicating the air carrier name by those initials?

A. Well, I could put anything there. I could put, you know, "Air Andy." Like I said, I just want to find out what's being sent out. I don't care what that says.

Q. So you just randomly picked letters.

A. That's right.

Q. All right. Go to the next blank. It says, "Air Carrier Certificate Number." Do you see that?

A. Yes.

Q. And there are three letters, YEN. Then there are three numbers, 789, and then the letter J.

A. Yes.

Q. All right. Where did you get that?

A. Again, it's made up.

Q. Why did you use three letters, three numbers, and then a letter?

A. I've seen that listed before and the format before. And I just punched--you know, typed it in. There's no rhyme or reason to any of that.

Q. So the letters and the numbers you've just randomly picked.

A. That's correct.

Q. Are you aware that is remarkably close to Jet Blue's air carrier number?

A. No, I'm not.

Q. Then you put in Tiffany Cotter's name.

A. That's correct.

Q. Why did you put in her name?

A. Because she offered to help.

Q. Okay. Tell me the conversation that you had with her in which this whole circumstance came up.

A. I was telling her that--you know, I don't trust what SkyWest is sending. I'd like to know what is being sent out and if she would help. She mentioned that she had some experience in human resources and would offer her assistance.

Q. When did you have that conversation with her?

A. Sometime in June.

Q. Why did you--at the time believe that SkyWest--that you didn't trust SkyWest? What was it that you were concerned that they were doing?

A. Well, after seeing my employee file and how everything almost--everything in there's been fabricated, I was very concerned that that is what's being sent or would be sent to someone else.

Q. You believe that SkyWest has made up your employee file.

A. Absolutely.

Q. You haven't seen copies of what's in your employee file as it was prepared.

A. I've seen several versions of my employee file.

Q. So you believe there are versions of your employee file, not all of which are

recall, that the reason you contacted her was because you didn't trust SkyWest because you believed that 90 or 90-some-odd percent of your employment file was made up by SkyWest. Is that right?

A. Yes.

Q. So not only--it's your testimony that not only have they--did they create the documents in your employee file, but that the substance of what those documents say, in fact, did not occur.

A. That's correct.

MR. PETERSEN: I think I'm entitled to go there, because--

MR. STRINDBERG: That's fine.

MR. PETERSEN: --this is entirely off of what he said.

MR. STRINDBERG: That's fine. I didn't object.

BY MR. PETERSEN:

Q. All right. Tell me then--when you first contacted Tiffany, how did you contact her?

A. Telephone.

Q. And why--was she living in Boston at the time?

A. Yes.

friend anymore.
Q. Does that have anything to do with this lawsuit?
A. Absolutely not.
Q. Have anything to do with SkyWest?
A. Absolutely not.
Q. How about her sending this PRIA request?
A. Absolutely not.
Q. All right. What did you tell her to do exactly?
A. I didn't tell her to do anything.
Q. Is she familiar with PRIA requests?
A. No. I asked her to submit this request.
Q. All right. Tell me how that went about. I want to know what you said.
A. I don't recall the exact conversation. Best of my recollection, I just simply said that there's a form we can send in that will get my background records. That's all.
Q. And what was her response?
A. She said, No problem.
Q. So then how did she got a copy of the form?

A. There was a brief fax to her. I don't remember actually.

Q. Okay. This "Mail Records to," do you see that under Part I, underneath Tiffany Cotter's signature?

A. Right.

Q. It says, "ACS-Verification Department."

A. Yes.

Q. You wrote that in.

A. Yes.

Q. What does that mean?

A. It means absolutely nothing.

Q. So you just made that up.

A. Yes.

Q. What was the intent of putting "ACS-Verification Department"?

A. No rhyme or reason.

Q. Well, when SkyWest received this PRIA request what did you think they would think when they saw ACS-Verification Department?

A. I don't know what they would think. I'm not SkyWest. I don't know what they would think.

Q. Did you intend for them to think that this was an airline that was submitting this

request?
A. I don't know what--a company, yes, a company submitting a request.
Q. An airline company.
A. Well, that's what these records pertain to.
Q. So you intended that when SkyWest received this PRIA request that they believed it would come from an airline--that was coming from an airline.
A. Well, that's the only kind of company that would be requesting airline background check, or records.
Q. Right. The answer's yes, right?
A. Right. Yes. It wouldn't be a grocery store, you know, calling to get my airman records.
Q. And then you have listed--
MR. STRINDBERG: You never can tell.
BY MR. PETERSEN:
Q. --an address, 510 East 3d Street.
A. Right.
Q. Where is that from?
A. I don't know. That's the address she gave me. I don't know if that's her work address, if that's where she lives. I have

absolutely no idea, you know, what that address is. I don't know where she lives in Boston. I never visited her in Boston, so I don't know.

Q. Did you ask her for an address?

A. She gave it to me.

Q. So you filled this out while you were speaking to her over the phone.

A. I don't recall, actually, how it was--when--if I was talking to her at the time when this was filled out. I don't remember.

Q. All right. Then there's a fax number down there.

A. Yes.

Q. Tell me where that fax corresponds.

A. I have no idea where that fax numbers goes to. That's the fax number she provided me.

Q. Are you aware today that that's a fax that goes to Staples headquarters in Boston?

A. I have absolutely no idea.

Q. Are you aware that that address goes to the Staples headquarters in Boston?

A. I have absolutely no idea.

Q. Do you know whether or not Ms. Cotter works for Staples?

A. I know for a fact that she doesn't work

for Staples.

Q. Who does she work for?

A. I don't--not Staples.

Q. Why is it that you know that but you don't know who she works for?

A. Well, I would have remembered if she worked for Staples. That's a pretty big company. I believe she's a financial analyst and, you know, has many clients.

Q. But you're confident she does not work for Staples.

MR. STRINDBERG: "Confident," I think you mean.

MR. PETERSEN: What?

MR. STRINDBERG: You said "competent."

MR. PETERSEN: I said "confident."

THE WITNESS: To the best of my knowledge, she doesn't work for Staples. She works for a company. And Staples might be their client. I mean, my father's company has an account with Staples. So I don't--you know . . .

BY MR. PETERSEN:

Q. So then when you filled this out and you signed it, then did you fax it to her? Did you send it in the mail. What did you do?

MR. STRINDBERG: Asked--
BY MR. PETERSEN:
Q. How did you get it to her?
MR. STRINDBERG: Asked and answered.
THE WITNESS: I believe it was faxed to her. It was faxed to her, or I faxed it to SkyWest. I don't recall the exact method.
BY MR. PETERSEN:
Q. Do you see at the top "Please Fax"? Is that your writing?
A. Yes, that's my writing.
Q. Did you write that on there before you gave this to Ms. Cotter?
A. I don't know why I wrote that.
Q. And do you see above that there's a little fax print off--on the top of the paper?
A. Yeah.
Q. Do you recognize that at all?
A. Oh, yeah.
Q. What is it?
A. Well, that's a fax header from my fax machine to Mr. Strindberg's fax machine, October, when he wanted to look at it.
Q. Okay. The telephone--and let's go to Part II. The airman certificate number, is that

yours?

A. Yes.

Q. And your mailing address. Is that your current mailing address?

A. Yes.

Q. Is that your phone number at the bottom of Part II?

A. Yes.

Q. What did you think you would get from this?

A. I don't know. That's why I was requesting them.

Q. You just wanted to see what SkyWest would produce if given a PRIA request?

A. That's correct. That's absolutely correct.

Q. Did you think that SkyWest would try to figure out who exactly they were sending their information to?

A. I have no idea. I just wanted my background records.

Q. All right. I'm showing you what's been marked as Exhibit 48 previously.

(Cell phone interruption)

THE WITNESS: Turn that off.

Okay.

BY MR. PETERSEN:

Q. Do you recognize that document?

A. Yes, I do.

Q. What is it?

A. It's a letter to SkyWest asking, you know, what the letter says.

Q. Did you ask Ms. Cotter to prepare a letter?

A. I prepared this letter. I faxed it to SkyWest. Tiffany had called me on about that date right there that's listed and said that she had spoke to a Marion in St. George. And they claim that they never got a request to re-fax the request. She called back. They then claim that they didn't know what exactly she wanted in the form--in the documents. That's why this letter was written. They were giving her the runaround.

Q. Why would they be giving her the runaround? Do you have any idea?

A. You will have to ask Marion that.

Q. Why do you characterize it as a runaround? What do you mean by that?

A. Well, I--I'm sure SkyWest is familiar with how--what records are to be furnished in a

PRIA request, yet when Tiffany spoke to them they claim that they didn't know what she was talking about.

Q. So this is what Tiffany told you.

A. That's exactly what Tiffany told me.

Q. Okay. Tell me about--when did that conversation with Tiffany take place?

A. On or about that date.

Q. On about July 21.

A. Yes. Give--you know, maybe a day early. I don't know, you know.

Q. So how does that conversation come about? Does she call you and say, I've got a phone call? What--tell me what happened. What--after you sent this to Tiffany, the--

A. I don't know if that was sent to Tiffany or directly to SkyWest. I can't remember exactly.

Q. The Exhibit 47? Look at--

A. Right.

Q. --Exhibit 47.

A. Yes. I already answered it that way.

Q. Wait a minute. So there are two signatures on Exhibit 47, right?

A. That's correct.

Q. One of them is yours, and one of them is Ms. Cotter's.

A. Right.

Q. You filled out--at some point here in Utah, right?

A. Right.

Q. And then you sent it to her to have her sign, I am assuming, and date it, at least.

A. Right.

Q. And then was it sent from her fax machine?

A. I can't remember if she faxed it back to me. And maybe I--I don't remember the exact, you know, order of--if she faxed it back to me or if I faxed it to them. I don't remember exactly.

Q. It's possible that you faxed it in to SkyWest.

A. It is possible, because I--yes, it is possible.

Q. But you don't recall.

A. I don't.

MR. STRINDBERG: Counsel, just so that it's clear, this document which has been marked as Exhibit 47 is not the document that either Mr. Callaway or Ms. Cotter sent in in June. This is

a document we produced to you guys as part of this litigation later on.

MR. PETERSEN: Well, what is this document, then, if it's not--

MR. STRINDBERG: It's a--

MR. PETERSEN: --item that was faxed?

MR. STRINDBERG: --it's a copy of the document that was faxed. In other words, this is a document, I believe--and I don't remember exactly--but I think I sent this to Todd. And then later we stamped it and numbered it, as I recall. I could be wrong. It's an exact copy of what was sent. I'm just saying it's not a copy of the actual--so it's a copy of the document, but it's a copy that came through my office. SkyWest has never produced their copy of this document.

MR. PETERSEN: Right. Right. Because it's SkyWest's position that this was never received by them.

BY MR. PETERSEN:

Q. So my point to you, though, is whatever was sent to SkyWest, is it any different than Exhibit 47 with the exception of the Bates number and the little exhibit label?

A. No. This is the exact--this is it.
Q. And it was faxed, as far as you can recall.
A. It was faxed to 33--3206 I believe is the extension, which is payroll, which was Marion.
Q. And you know that because you faxed it or--
A. Yes. I had the fax number somewhere--
Q. So once--
A. --for payroll.
Q. --Tiffany signed it, she faxed it to you, and you faxed it in to SkyWest.
MR. STRINDBERG: Objection. Asked and answered. He said he doesn't recall.
THE WITNESS: I don't remember the order.
BY MR. PETERSEN:
Q. And then you had--you prepared Exhibit 48.
A. That's correct.
Q. And you sent that in to SkyWest--
A. That's correct.
Q. --after having a phone call with Ms. Cotter.
A. Yes. I believe I called Tiffany to

find out if she had received the background records. She said no. So she called Marion, who told her they never received the request and to fax it again.

Q. So did she fax it again?

A. I faxed it--now I think I remember--I faxed the second request down there. She called back, spoke to Marion, who acknowledged receipt, but then didn't know what to send her, gave her the runaround about what exactly she was requesting. And still nothing was sent out until three months later.

Q. All right. I want to look at Exhibit 48. You have the same ACS-Verification Department at the top. The purpose of having that with that address, is that simply to be consistent with your prior PRIA request?

A. It's because it's--you know, it's--I'm writing that on behalf of Tiffany.

Q. Yeah. From an entity that doesn't exist, right?

A. Sure.

Q. Does "ACS-Verification Department" stand for anything?

A. It doesn't stand for anything.

Q. And you state in the first sentence, "I am not sure if there is a misunderstanding in our request, but I am sure SkyWest Airlines is well familiar with the Pilot Records Improvement Act of 1996 and what documents are required to be furnished." You say "in our request." What is the "our" intending to refer to?

A. I have no idea. That's just how it's written. I--you know.

Q. Because you're intending--

A. It could be "my." I mean--

Q. Isn't it true that you're intending that SkyWest believe that it's coming from an airline?

A. Our, my, I don't know what--that's how it's written.

Q. Well, it doesn't say "my," which means it's referring to more than Tiffany, right?

A. Well, I--

Q. Right?

A. Let me get my grammar out. I don't recall. I don't know--I mean, this is silly.

Q. Well, in the next sentence you say, "We have never had to clarify this request in the past."

A. Okay. So it's me and Tiffany.
Q. When you--have you ever made a request prior to this?
A. What?
Q. You say, "We have never had to clarify this request in the past." Aren't you trying to tell SkyWest that you and Tiffany are an airline that in fact doesn't exist? Isn't that what this is about?
MR. STRINDBERG: Objection. This is argumentative.
THE WITNESS: No. It's about getting my background records. It's about seeing what you--SkyWest is sending out.
BY MR. PETERSEN:
Q. But you're doing it by representing yourself as a company that you're not.
A. Well, yeah. I'll tell you why. Because if you send--you could send me anything that I want to see. I want to know what you're sending someone else. I'm sure I could have hired a background company to do it for me, which are--which exist. There's many of them that exist.
Q. But instead--

A. But Tiffany offered to help out. Big deal.

Q. So you and Tiffany lied to SkyWest about who you were, right?

MR. STRINDBERG: Objection. It's argumentative. He's told you what he did, Counsel.

BY MR. PETERSEN:

Q. Is that right?

A. No.

MR. STRINDBERG: He doesn't have to answer.

MR. PETERSEN: He sure does.

THE WITNESS: No.

BY MR. PETERSEN:

Q. You did not lie?

A. I didn't--it's not lying.

Q. You've represented that you are an airline of some kind. And that's not lying?

MR. STRINDBERG: Counsel, you're being argumentative with the client. Move on. You've already asked him.

MR. PETERSEN: I believe he's lied to SkyWest.

MR. STRINDBERG: Fine.

MR. PETERSEN: And I want to ask him about it. And if he's telling me he's not lied, I want to know why he believes he's not lied.

MR. STRINDBERG: Counsel, you're being argumentative. You're entitled to your opinion. He's told you he doesn't think it was a lie. Move on.

BY MR. PETERSEN:

Q. Okay. So answer the question, then.

A. No.

Q. You're not going to answer the question?

A. No. I already answered it.

Q. It's not a lie?

A. No, I don't think it is.

Q. All right. Because this letter represents you and Tiffany Cotter. Is that the basis for you saying it's not a lie?

A. Where does it say it represents anyone?

Q. You indicated before, as I recall, that it was you and Tiffany.

A. No.

Q. That's what you mean by the "our" and the "we."

A. No. That's--you're the one that said

that, not me.

Q. All right. So who is the "we" you're referencing?

A. It's--that's the way it's written. That's the way--

Q. Why is it written that way?

A. I don't know. I don't recall why I said the word "we" or "I" or "they" or "us."

Q. Well, you have "we" and you have "our." And I want to know why you picked those words.

A. I don't know. I don't know why there's a period right there.

Q. It's not because you intended SkyWest to believe that you guys were an airline?

A. No. No. It was intended to be Tiffany requesting my background records. That's what it was intended to be. We wouldn't be having this discussion if you guys were honest in releasing correctly--you know, correct information.

Q. The second paragraph says, "For your reference, I have provided below the required documents that are covered under PRIA." What does that reference?

A. I believe it was a page 2 that was a list of what documents are required to be

furnished under the PRIA act.

Q. So you're saying that accompanying this letter was another document.

A. If Erik didn't clear it before, I faxed these two documents to Erik on October 18. This is not what you received in St. George.

Q. Where's the required documents referenced in the second paragraph?

A. I didn't--I don't have it. I think it was thrown out.

Q. But your--

A. All it was was a list, you know.

Q. Are you confident that it was provided to SkyWest?

A. Absolutely. I told you I faxed this Exhibit 48 (indicating), along with two other pages. And one of the pages was this one here, Exhibit 47. And then the second page was the list of documents required. It says on here, "Pages: 3."

Q. And then at the last line it says, "If you require further clarification, please consult the FAA or contact me"--me being Tiffany Cotter--

A. Uh-huh (affirmative.)

Q. --"at"--and it gives a number.

A. That's correct.
Q. Whose number is that?
A. That's the number I have for Tiffany.
Q. All right. Whose number is it?
A. I don't know whose number it is. That's the number that Tiffany provides. That's her number, I would assume.
Q. So you expected that if they decided to call this number they would reach Tiffany.
A. Well, they had already been in contact with each other.
Q. Did Tiffany know what they were supposed to produce?
A. Absolutely. She had a list, too, of what was supposed to be provided.
Q. Why did you give her the list?
A. Because--I have no idea why I gave her the list.
Q. So that when they called she could pretend to be from an airline and--
A. Oh, please.
Q. --tell them what they had to produce?
MR. STRINDBERG: Objection. It's argumentative.
BY MR. PETERSEN:

Q. Go ahead. Answer the question, please.
MR. STRINDBERG: You don't have to answer.
MR. PETERSEN: He dang well--yes, he does have to answer the question.
THE WITNESS: I don't know why Tiffany would, you know--just so Tiffany knew what was being sent to them.
BY MR. PETERSEN:
Q. So she would know how to respond when an airline contacted her?
A. I don't know how she would respond. She's a smart girl. She's smarter than all of us.
Q. Does she know how to--does she know what's in the regulations governing PRIA request?
A. I believe she does.
Q. Where would she learn that information?
A. From the list that was page 2.
Q. That you gave her.
A. Yeah.
Q. For the purpose of . . .
A. I have no idea. I don't--actually, I don't know if she has it. I don't know if I faxed it to her.

Q. All right. What's the current status of your employment with Polar Air?
A. I'm not employed by Polar Air.
Q. Do you have a copy of your application?
A. I do not have a copy of my application.
Q. Have you asked for one?
A. No.
Q. Did you obtain a copy of it?
A. I just answered that. I said I don't have a copy of my application.
Q. Do you have any information from Polar Air other than two voice mails?
A. I have some e-mails.
Q. From them?
A. Yes.
Q. Have they been produced?
A. Have they? I believe one was produced.
Q. Are there others?
A. There was a recent e-mail. I don't know if that was produced.
MR. STRINDBERG: I don't know. We'll certainly produce it if it's--
THE WITNESS: You have the first one, because in the first deposition he--you showed it.
MR. STRINDBERG: Right.

BY MR. PETERSEN:
Q. Are there any e-mails or correspondence from Polar Air since your last deposition?
A. Yes. There's one e-mail.
Q. And what does say?
A. It says, "We will contact you when we have something available for you."
Q. There was a reference in a voice mail that your attorneys produced that purports to be from Polar Air indicating something about training.
A. Uh-huh (affirmative.)
Q. Were you scheduled to be--to go through training at Polar Air at some point?
A. I was offered a class, which I was unable to attend. They said they would put me in the next class.
Q. Why were you unable to attend?
A. I was currently undergoing a 737 type rating class. And the next training--the training date that Polar offered was right in the middle of that. And the second class was going to be soon after that. By the matter of--I was told, you know, within the week to two, three weeks.
Q. What's the 737 class you're talking

about?

A. I was obtaining a type rating to add to my pilot's license to fly the 737.

Q. Is that something Polar Air flies?

A. No.

Q. And when somebody in your industry, based on your experience, is offered a training program, isn't that pretty much an indication that you've tentatively been offered a job?

A. Tentatively, yes.

Q. And it is subject to you satisfactorily performing your training. Isn't that right?

A. Probably a multiple of things. I know it's also--

Q. But that's one of the contingencies.

A. --pending, you know, the background check as well.

Q. But that's one of the contingencies, correct?

A. That's correct.

Q. And then you do have some background and some medical tests and things like that that you also have to go through, right?

A. I--no, I don't believe you have to go through medical tests. You already have a medical

certificate.

Q. So as long as your medical certificate is in good standing, that fulfills that requirement.

A. I--I'm sure it does, yeah.

Q. And so you were scheduled by Polar Air to actually go through training because they intended to--

A. No, I was not scheduled.

Q. --offer you a job. You were not scheduled.

A. I was not scheduled. Who said I was scheduled?

Q. Well, the voice mail that I listened to suggested that there was training that had been scheduled for you.

A. The voice mail says, We'd like to invite you to a--whatever the date was--class.

Q. Okay. So why didn't you go?

A. I just told you why I didn't go. I was undergoing training for another program at the time. And they were going to put me in the next class. It happens all the time.

Q. Okay. So let's say that you had canceled your 737.

A. I couldn't cancel. I was already in it.

Q. Well, let's say you just didn't show.

A. I was already in it.

Q. Can't you physically leave?

A. Why would I do that?

Q. So that you could secure a job with Polar Air by going through training?

A. I was going to do that at the next class.

Q. All right. But trust me on the hypothetical here. Let's say that you had left your training and gone to Polar Air. Would you have been able to go through training at the time they offered you?

A. What? That didn't make any sense.

Q. You said they were wanting to schedule you for training, correct?

A. They wanted to invite me to a class.

Q. All right. Did they tell you when the class was?

A. Yes. There was a date on the voice mail. I don't remember the exact date.

Q. Right. And let's say you had been free that time.

A. Yes.

Q. Do you have anything that would indicate to you that you couldn't have attended training at that time?

A. If I was free, I would have attended.

Q. But nothing other than this other class you were taking precluded you from going to training.

A. No.

Q. Okay. And instead, you called Polar Air and told them you were not going to attend class at that time because you were already in this other training.

A. I called--no.

MR. STRINDBERG: Objection. Misstates his testimony.

THE WITNESS: I didn't say that. I called them and asked them--I had some obligations and if I was able to attend the next future class. They said that would be no problem.

BY MR. PETERSEN:

Q. Who flies 737s?

A. Southwest. It's a requirement for their airline.

Q. Have you had an interview with

Southwest?

A. No, I haven't. You have to have the rating to be selected to interview.

Q. Have you had any interviews with anyone other than Polar Air--

A. No.

Q. --since your last deposition?

A. No.

Q. And then why were you not given a subsequent training time period for Polar Air?

A. I have absolutely no idea.

Q. So when you told them that you were not going to go for training, they did not offer you another training session.

A. Yes, they did offer me another training session. They didn't have a date scheduled yet for the other training session.

Q. All right.

A. That's why--

Q. Tell me when they offered it to you.

A. When I talked to them.

Q. The second--

A. Sorry.

Q. The second training session, they--you said they offered it to you.

A. Yes. They said, We'll put you in the next class that comes around.

Q. But they haven't done that.

A. No, they haven't. I don't know why.

Q. Couldn't it be because you refused to go to the first one?

A. No. It happens all the time that people, you know, with military commitments, what not, many different reasons. That's why they have, you know, several training classes. You act as if it's completely out of the ordinary. Had I been told--well, I'm not going to go there.

Q. Did you send any other requests to SkyWest, PRIA requests?

A. This was it.

Q. So twice. Is that your testimony?

A. I believe it was faxed twice, yes.

Q. And the letter--it's your testimony you also faxed that one.

A. That was part of the second request.

Q. With some list that you don't know where that's at.

A. Well, I'm sure it's somewhere. I mean, it's just--it's a list.

Q. Is there a reason why you haven't

produced it in the litigation?

A. I don't believe I have it. I think I faxed it and threw it out. There's nothing secret about it. It's the--it was--you know, the--a list of what documents are required to be furnished. That's all.

Q. Where did you--how did you come up with the list?

A. It's in the act, the PRIA act.

Q. So did you get that off the same web site that you got the PRIA form?

A. Yes. It's public information.

Q. And then, did you have anymore discussions with Tiffany after you faxed this follow up letter?

A. No. I believe Tiffany--I'm trying to think if Tiffany called me after this or not.

Q. Did you read Exhibit 48 to Tiffany before you sent it?

MR. STRINDBERG: Just a second. You have a question pending--

THE WITNESS: Right.

MR. STRINDBERG: --he's thinking about.

THE WITNESS: No. I believe that's the last I've spoke to Tiffany about this. This was

faxed in. And I don't know if Tiffany spoke to Marion afterwards or not.

BY MR. PETERSEN:

Q. All right. So sometime in July or shortly after--sometime--I guess prior to July 21, 2004, was the last time you and Tiffany spoke about the PRIA request until recently.

A. She called me, I believe, in the end of October, maybe early November, to say that she had finally received the records from Salt--from, you know, St. George on her fax machine.

Q. Do you know whether Tiffany indicated to SkyWest that she was a representative of Polar Air?

A. She wouldn't have done that. But I don't know what she said to them.

Q. Isn't that who you intended that she represent when she sent the PRIA request?

A. Where does it say that?

Q. I'm asking you a question.

A. No. Like I said before, you're tending to represent. She's representing herself trying to get my background records.

Q. On an Air Carrier and Other Records Request form?

A. Well, that's what it says there.
Q. So is it your testimony that any person off the street can fill one of these out and send it in and the airline has a duty to respond to it?
A. I'm sure anybody can do whatever they want.
Q. So answer the question.
MR. STRINDBERG: Objections. Calls for a legal conclusion.
THE WITNESS: I have no idea. You know, maybe this isn't the correct form. I don't know.
BY MR. PETERSEN:
Q. Is it your understanding that it is not dishonest to have somebody who's not from an airline fill this out and send it in to an airline requesting information?
A. You can call it whatever you want.
Q. I'm asking you. Is that dishonest to you?
A. Under the circumstances, I don't believe it is.
Q. You don't believe that was dishonest in this case.

A. No.

Q. Would it generally be dishonest to do something like this?

MR. STRINDBERG: Objection. You're asking him to speculate.

BY MR. PETERSEN:

Q. Go ahead.

A. No.

Q. It would not be?

A. No.

Q. So anybody on the street that fills one of these out and sends it in and obtains information on a particular pilot, that would not be a dishonest act, in your understanding.

A. You know, I don't know if it happens. I don't know if people do that. I doubt they do. You know--but when someone, you know, has to deal with what's being sent out and what's correct and what's not correctly being sent out, then I think this was justified, yes.

Q. Okay. So will you answer my question?

MR. PETERSEN: Will you read the question back, please?

(The requested question was read.)

MR. STRINDBERG: Objection. It's