RECEIVED CLERK
FILED
2005 JUL -5 P 6: 17
U.S. DISTRICT COURT
DISTRICT OF UTAH

Todd C. Emerson, A8175
SkyWest Airlines, Inc.
444 S. River Road
St. George, UT 84790
Telephone: (435) 634-3530

Scott M. Petersen, A7599
David N. Kelley, A9137
FABIAN & CLENDENIN,
A Professional Corporation
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah 84151
Telephone: (801) 531-8900

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ANDREW DAVID CALLAWAY<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST AIRLINES INC., a Utah Corporation,<br><br>Defendant. | **REPLY SUPPORTING OBJECTIONS TO MAGISTRATE ORDER**<br><br>Civil No. 2:04CV00179<br><br>Judge Ted Stewart<br><br>Magistrate Samuel Alba |

Defendant SkyWest Airlines, Inc. ("SkyWest") submits the following Reply Supporting its Objections to Magistrate Alba's May 25, 2005 Order.

**ARGUMENT**

Callaway wants a trier of fact to award him over $6,400 per month in lost past and future wages and benefits that he claims he is entitled to as a result of his termination from SkyWest.

(Pl.'s Answer to Def.'s First Set of Discovery Requests, Answer to Interr. No. 3, attached as Exhibit "A"). Yet it is settled law that Callaway has a duty to mitigate his alleged damages, including past and future wages and benefits, by making reasonable efforts to seek other employment. *E.E.O.C. v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980); *see also Dilley v. Supervalu, Inc.*, 296 F.3d 958, 966 (10th Cir. 2002). The United States Supreme Court has made it clear that a plaintiff fails to mitigate his damages if "he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982).

If Callaway were to prevail on liability and back pay or front pay is awarded, SkyWest "has the burden of showing that the discriminatee did not exercise reasonable diligence in mitigating damages caused by the employer's illegal action." *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980). This "failure to mitigate" defense requires SkyWest to demonstrate "(1) that the damage suffered by plaintiff could have been avoided, i.e., that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such position.'" *Id.* (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978)). The Polar Air discovery SkyWest seeks goes to the second prong of its "failure to mitigate" defense.

## I. THE PARTIES' CONFLICTING POSITIONS REQUIRE MORE DISCOVERY THAN THE MAGISTRATE ALLOWED.

The parties' positions differ greatly on what took place relative to Callaway's application for employment with Polar Air. SkyWest is at a clear disadvantage in trying to uncover the truth, however, because it was not privy to any of the events that took place between Callaway and Polar Air, and the Magistrate has, to date, not allowed SkyWest the opportunity to effectively

communicate with Polar Air, or to obtain any Polar Air documents relative to Callaway. To understand why SkyWest needs more information than the Magistrate has allowed, SkyWest outlines the competing positions of the parties below.

**A. What Callaway has Claimed.**

Callaway testified that he applied and was interviewed for a pilot position with Polar Air Cargo. (Callaway Dep. at 329, attached as Exhibit "B"). During the interview process, Callaway claims he personally provided a Polar Air employee with the appropriate SkyWest facsimile number and thereafter observed the employee send, via facsimile, a Pilot Records Improvement Act ("PRIA") request to SkyWest. (Callaway Dep. at 329-34). SkyWest never responded to the PRIA request.

Callaway testified that he was later offered pilot training for Polar Air and that pilot training is akin to a job offer. (Callaway Dep. at 458). Callaway turned down the training because he was busy in training to fly 737 airlines, planes that Polar Air does not use. (Callaway Dep. at 475-76). Callaway claims Polar Air told him he could secure a later date for pilot training, but he was never given another date and he never pursued another date with Polar Air. (Callaway Dep. at 462). In fact, Callaway conceded that he believed Polar Air was giving him "the runaround." (Callaway Dep. at 478-79). Callaway has no idea why he was not offered subsequent training or actually employed by Polar Air. (Callaway Dep. at 462).

Nevertheless, Callaway blames SkyWest for his failure to obtain employment with Polar Air. (Callaway Dep. at 478-79, 482). He claims SkyWest's failure to respond to the PRIA request caused Polar Air not to hire him. (Callaway Dep. at 478-79; Letter from Eric Strindberg to Scott Petersen dated October 8, 2004, attached hereto as Exhibit "C").

**B. SkyWest's Position.**

SkyWest, in contrast, has been unable to verify that Callaway even applied for a position with Polar Air, let alone the nature and factual circumstances surrounding Callaway's alleged interview. Callaway has not provided a copy of his job application and admitted that he has not asked Polar Air for a copy. (Callaway Dep. at 456). SkyWest has been precluded by the Magistrate from subpoenaing any documents from Polar Air.

SkyWest has never received a PRIA request from Polar Air relating to Mr. Callaway. (Affidavit of Jacque Nielsen, ¶ 4, attached as Exhibit "D", hereafter "Nielsen Aff."). Rather, SkyWest received a bogus PRIA request with a false "air carrier" name and "certificate number" (*see* Exhibit "E") that was designed to make SkyWest believe it was from Polar Air. (Nielsen Aff., ¶¶ 5, 8-12). Specifically, Callaway instructed a friend of his who lived in Boston and did not work for any airline, to fill out the false PRIA request and fax it to SkyWest. (Callaway Dep. at 293-95).

When SkyWest received the false PRIA request, at that time it believed it was from Polar Air and faxed its reply to the number provided on the form. (Nielsen Aff., ¶¶ 8-9). SkyWest thereafter contacted Polar Air by telephone to confirm receipt of the information. Polar Air responded that they had not sent the PRIA request and that the information provided in the request was not theirs. (Nielsen Aff., ¶¶ 10-12). SkyWest did not communicate further with Polar Air at that time because it did not have knowledge that Callaway had actually caused the falsified PRIA request to be prepared and sent to SkyWest. Thus, the only contact SkyWest has had with Polar Air is the brief telephone conversation seeking to confirm Polar Air's receipt of the completed PRIA request.

SkyWest has been unable to verify whether Polar Air actually offered Callaway pilot training. Callaway produced to SkyWest what appear to be voicemail messages allegedly from Polar Air offering Callaway pilot training. However, SkyWest cannot verify these voicemails, including who left them, when they were left, or any surrounding circumstances. The Magistrate has not allowed SkyWest to contact Polar Air. A transcribed copy of the voicemails is attached as Exhibit "F").

Moreover, the Magistrate has not allowed SkyWest to contact Polar Air to verify that Callaway turned down the training because he was busy in 737 training. It is SkyWest's belief that Callaway wanted to take a vacation to Spain during the offered training date and that is why Callaway turned down the offer. Also, SkyWest has been unable to determine why Polar Air failed to give Callaway later training, even assuming that they provided Callaway the subsequent training option. SkyWest contends that nothing it did or failed to do hindered Callaway from obtaining employment from Polar Air. However, SkyWest has been unable to verify this fact.

The competing issues are obvious. Callaway claims he is trying to find a job but has been unsuccessful, and SkyWest claims Callaway had the equivalent of a job offer from Polar Air, but ruined his chances for obtaining it by refusing to go to training when Polar Air offered it to him. The Magistrate has unreasonably limited SkyWest's ability to confirm whose version of the facts is true.

## II. ALLOWING SKYWEST TO SERVE A SEVERELY LIMITED DEPOSITION ON WRITTEN QUESTIONS IS TOO RESTRICTIVE.

### A. Limiting SkyWest's Discovery to Deposition on Written Questions is Unworkable.

SkyWest concedes that after three hearings and multiple filed memoranda, the Magistrate

has now allowed it to serve a deposition on written questions pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, but the Magistrate's order is problematic and unworkable for a number of reasons.

First, it allows SkyWest to seek answers to only two questions leaving several relevant issues incapable of verification. The Magistrate's order reads as follows:

> SkyWest may serve on Polar Air, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, a subpoena for deposition upon written questions to obtain valid responses to (a) why Polar Air has not provided Mr. Callaway any subsequent pilot training, and (b) why Polar Air has not hired Mr. Callaway for the position of pilot for which he applied at Polar Air.

(Order Regarding Defendant's Motion to Vacate Protective Order at 2). These questions are clearly valid questions, and they form part of what SkyWest seeks to verify from Polar Air, but they are not enough.

For example, as explained in detail above, Callaway claims Polar Air sent SkyWest a PRIA request to which SkyWest failed to respond. SkyWest never received any PRIA request, and testimony from Polar Air confirming whether they actually sent one, to whom, and if there exists a copy, would answer this question; either validating Callaway's claim, or impeaching his testimony. Either way, the information is necessary for SkyWest's "failure to mitigate defense" because Callaway will presumably assert to the trier of fact that SkyWest is to blame for his failure to obtain employment at Polar Air.

As another example, asking the above questions does not allow SkyWest to verify the alleged voicemails that Callaway has produced. SkyWest needs to talk to the person who allegedly send them to determine whether, in fact, they were sent, and then, perhaps, why no subsequent training was offered. Part of this line of questioning would be what Polar Air recalls

was Callaway's excuse for not accepting the pilot training when offered.

Second, requiring that SkyWest conduct the deposition on written questions is unacceptable. If Polar Air is suspicious of the purpose for the deposition questions (and they will certainly contemplate the risk of a wrongful failure to hire claim), they will answer the questions very narrowly. There will follow the cumbersome, time-consuming task of cross questions and redirect questions pursuant to Rule 31(a)(4) in an effort to obtain clarification or more complete responses.

As one court effectively explained: "Depositions upon written questions are one of the least effective means of challenging a declarant's credibility. The predictable and cumbersome nature of interrogatories makes it difficult for one to conduct searching examination of a hostile or reluctant witness." *U.S. v. Burbank*, 1990 WL 86147 at **4 (4th Cir. 1990) (A copy of the *Burbank* decision is attached as Exhibit "G"); *see American Cas. Co. of Reading, P.A. v. Krieger*, 160 F.R.D. 582, 590 (S. D. Cal. 1995) ("Written questions are not a satisfactory substitute for depositions upon oral examination in these circumstances.").

Third, given that Polar Air is not a Utah company, providing Polar Air's responses to the trier of fact will be more difficult and cumbersome if SkyWest is required to present three sets of carefully crafted questions with their surely expected carefully crafted answers. As the *Burbank* court explained: "Likewise, this method is ineffective for the party attempting to put credibility in issue because the jury is unable to observe the declarant's demeanor." *Burbank*, 1990 WL 86147 at **4. The purpose of discovery is to find truth and then present it in an understandable form to the trier of fact. A live deposition with live cross examination and redirect will accomplish this with less expense and burden on Polar Air and without any greater hindrance to

Callaway's job prospects.

### B. Callaway's Concerns about Hindering Employment Opportunities are not Resolved by the Magistrate's Order.

Callaway has maintained all along that discovery of Polar Air information will hinder his ability to obtain employment with Polar Air. Yet, Callaway has already claimed that SkyWest has hindered his ability to obtain employment with Polar Air, and blames SkyWest for his failure to obtain employment with Polar Air. (Callaway Dep. at 478-79, 482). Thus, there should be no additional harm in allowing SkyWest to depose a Polar Air representative. Also, there is a greater likelihood that the deposition on written questions will be more time consuming and cumbersome, and more likely to hinder Callaway's job opportunities with Polar Air than will a simple live deposition to talk about what took place with respect to Callaway's job application, and any accompanying supporting documents Polar Air might have. Thus, both parties are better served by allowing SkyWest to depose the proper Polar Air representative rather than requiring written deposition questions.

## CONCLUSION

For the foregoing reasons, the Court should sustain SkyWest's objections to the Magistrate's May 26, 2005 Order, allow SkyWest to subpoena records from Polar Air, and thereafter, if necessary, allow SkyWest to depose the proper representative of Polar Air regarding those documents and the decisions Polar Air made regarding Callaway.

DATED this 5th day of July, 2005.

Scott M. Petersen
David N. Kelley
FABIAN & CLENDENIN,
A Professional Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of July, 2005, I caused to be mailed, by first-class mail, postage prepaid, a true and correct copy of the **REPLY SUPPORTING OBJECTIONS TO MAGISTRATE ORDER** to:

Erik Strindberg
Ralph Chamness
STRINDBERG SCHOLNICK & CHAMNESS, LLC
44 Exchange Place
Salt Lake City, UT 84111

# Exhibit “A”

Erik Strindberg (Bar No. 4154)
**STRINDBERG & SCHOLNICK, LLC**
44 Exchange Place, 2nd Floor
Salt Lake City, UT 84111
Telephone: (801) 359-4169
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DAVID ANDREW CALLAWAY**<br>Plaintiff,<br>vs.<br>**SKYWEST AIRLINES, INC.,**<br>Defendant. | **PLAINTIFF'S ANSWER TO DEFENDANT'S FIRST SET OF WRITTEN DISCOVERY REQUESTS**<br>Case No. 2:04CV00179<br>Judge Ted Stewart |

INTERROGATORY NO. 1

Identify all individuals, other than counsel, assisting in answering these interrogatories.

**Answer:** David Andrew Callaway.

INTERROGATORY NO. 2

Identify each person you expect to call as a factual witness at trial or other proceeding in this matter. With respect to each person, set forth a narrative of what you expect each witness to testify concerning and any documentary evidence you expect to introduce through each witness,

**Answer:** Plaintiff has not made a decision as to what witnesses he will call at trial.

## INTERROGATORY NO. 3

Set forth in detail the amount you claim to have been damaged by SkyWest's actions, including:

a. back wages and benefits

b. future lost wages and benefits

c. compensatory damages

**Answer:** a. and b. - October through December of 2003 losses (not including benefits) total $18,718.87. This breaks down as follows: Flight pay - $16, 138.95 ($63.29/hour x avg. 85 hours per month); User time - $410.12 (avg 80 hours per month x .027 accrual rate); Vacation time - $584.80 (avg. 80 hours per month x .0385 accrual rate); Holiday pay - $145.00; per diem (avg. 300 hours per month at $1.60 per hour away from base).

From January 1, 2004, through the present (and continuing into the future) losses average $6468.65 per month. This breaks down as follows: Flight pay at $65.25 per hours x 85 hours per month; User time - average 80 hours per month x .0386 accrual rate; Vacation Time - average 80 hours per month x .0462 accrual rate; Per diem at 300 hours per month x $1.60 per hour. In addition, there will be losses for holiday pay. Future losses will need to be increased to account for shifts in the general pay scale for SkyWest pilots and for increased earnings I would have made as my seniority increased.

In addition to these losses, there is the value of the lost benefits, contributions to 401k plan and lost stock options.

c. It is not possible to give an absolute dollar figure for compensatory damages.

INTERROGATORY NO. 4

Describe, in detail, all attempts you have made to obtain employment since being terminated by SkyWest.

**Answer:** On an everyday basis I check the internet to determine if there are any new openings for pilots. In particular I check the web site "climbto350.com."

I also am continually updating my resume and sending it to all airlines and other companies that are, or may be hiring. I have sent resumes to the following: Southwest, America West, Cathay Pacific, AirTran, Jet Blue, Fed Ex, UPS, Alaska, ASA, ComAir, Frontier, Atlas Air, Polar Air, ATA, Net Jets, Numerous Crew Leasing Companies, Emirate Air Lines.

I have had interviews at Polar Air and Atlas Air.

I have attempted to contact by phone, email and regular mail, friends and others who I know who are involved in the industry.

In any effort to improve my qualifications I completed, in July of 2004, a 737 Type Rating Course.

INTERROGATORY NO. 5

Set forth all the facts that support your claim that you employment relationship with SkyWest was an implied in fact contract, including the terms of such implied in fact contract.

**Answer:** We object to this interrogatory as it calls for a legal conclusion. Without waiving this objection, Plaintiff responds that the employee handbook sets forth certain terms and conditions of employment which may constitute an implied in fact contract as well as the

practices of the airline. These practices include not terminating pilots except for cause and giving them the opportunity to appear before a Review Board.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST NO. 1

All documents identified, referred to, or utilized in preparing your answers in the foregoing interrogatories.

**Answer:** All documents responsive to these requests have been included and are labeled CAL 0111 through CAL 0450.

### REQUEST NO. 2

All documents upon which you relied or referred to in your Complaint.

**Answer:** See the response to Request No. 1.

### REQUEST NO. 3

All documents you will or may seek to introduce as exhibits at any trial or hearing in this action.

**Answer:** Plaintiff has not decided what documents he will offer as exhibits at trial.

### REQUEST NO. 4

All correspondence or other documents related to communications between you and SkyWest.

**Answer:** See the response to Request No. 1.

### REQUEST NO. 5

All documents upon which you intend to rely to establish proof of claims and/or damages.

**Answer:** See the response to Request No. 1.

REQUEST NO. 6

All expert reports or other documents relating to your proposed expert witnesses, if any, including Curriculum Vitae.

**Answer:** See the response to Request No. 1.

REQUEST NO. 7

Copies of any and all submissions you made to the SAPA website as set forth in Paragraph 19 of the Complaint.

**Answer:** See the response to Request No. 1.

REQUEST NO. 8

All other documents not previously requested relating to the pending action between the parties.

Answer: Plaintiff objects to this request as being over-broad, burdensome and calling for a legal conclusion. Without waiving that objection see the response to Request No. 1.

David Callaway appeared this date 22 of October, 2004

STATE OF UTAH )
: ss.
County of Salt Lake)

On the 22 day of October, 2004 personally appeared before me ____________ who being first duly sworn upon his/her oath or affirmation signed the foregoing declaring its contents to be true and correct to the best of his/her knowledge.

NOTARY PUBLIC
GERALDINE L. RICE
44 Exchange Place 2nd FL
Salt Lake City, UT 84111
COMMISSION EXPIRES
December 2, 2006
STATE OF UTAH

NOTARY PUBLIC

DATED this 25 day of October, 2004.

STRINDBERG SCHOLNICK & CHAMNESS, LLC

Erik Strindberg
Attorneys for Plaintiff

U:\current clients\Callaway_DA\FirstDiscovtoDef.wpd

# Exhibit “B”

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY (VOL. I)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT: The Law Offices of
Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, Utah

DATE: Wednesday, December 8, 2004

TIME: 9:16 a.m.

REPORTED BY: Scott M. Knight, RPR



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City | Washington, DC | New York | Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180 | Toll Free: 877-441-2180 | Fax: 801-983-2181

www.thackerco.com

Page 293

saying is, if there's a better document than this, where is it? I don't--you didn't produce it to us.
A. Okay. Well, hold on. Now that I read this more, I believe this was my closing statement to the review board that I read--
Q. Okay.
A. --at the end of the review board.
Q. Look at the third--
A. So this was not a letter that was written. This was simply for my reference in the review board.
Q. So this is just--did you submit this to the review board, or is this just something you used to read from during your closing argument?
A. I used it to read from during my closing arguments.
Q. Okay.
Exhibit-47 marked
BY MR. PETERSEN:
Q. All right. I'm showing you now what's been marked as Exhibit 47. It's CAL0133. Do you recognize that document?
A. It appears to be a prior request page or document.

Page 294

Q. Okay. There's a Part I and a Part II in there. Do you see that? First box says, "Part I: Air Carrier and Other Records Request (PRIA); Part II: Airman Consent to Release of Records." Is that your signature in Part II?
A. Yes, it is.
Q. Dated 6/12/2004, correct?
A. That's correct.
Q. And did you prepare Part II?
A. Yes, I did.
Q. The Part I, do you know who prepared that?
A. Yes, I do.
Q. Who is it?
A. Tiffany Cotter.
Q. Who is Tiffany Cotter?
A. Tiffany Cotter is a friend of mine.
Q. All right. And who does she work for?
A. She works for a company in Boston.
Q. What's the company called?
A. I don't know.
Q. Does she work for Polar Air?
A. No.
Q. Do you see where it says "AAWH" under--over the "Air Carrier Name"?

Page 295

A. Yes, I do.
Q. What is that in reference to? Do you know?
A. I don't know. I did not fill out Part I.
Q. Does Tiffany Cotter work for an airline at all?
A. No, she does not.
Q. Okay. That's the 64 dollar question, then, why would you have your friend Tiffany Cotter fill out an air carrier request?
A. Because I had not received my PRIA records from Polar Air. They had not received PRIA records that were requested during an interview I had. And I wanted to see why and if I would be able to obtain my own records, which I am allowed to do.
Q. So you had her falsify a PRIA request.
MR. STRINDBERG: Objection. It's argumentative.
MR. PETERSEN: Okay. Go ahead. Answer.
MR. STRINDBERG: Just a second. Give me a moment.
THE VIDEOGRAPHER: We're going off the record. Time is 5:08 p.m.

Page 296

(Recess taken 5:08-5:11 p.m.)
THE VIDEOGRAPHER: We're back on the record. Time is 5:11 p.m.
MR. PETERSEN: Could I get you to read back the question?
(The last question was read.)
MR. STRINDBERG: And I'm going to--before he answers, I have advised him that he has a constitutional right not to answer that question. The reason I've advised him is because Mr. Emerson in prior conversations has gone on and on about submitting some kind of a PRIA application if your not a member of an airline as a criminal offense.
So, I don't know whether it is or not, but I think under those circumstances it's apparent to me that SkyWest wants to make some issue out of it. So I've told Mr. Callaway he doesn't have to answer if he doesn't want to based on his Fifth Amendment right.
BY MR. PETERSEN:
Q. Do you want me to ask the question again?
MR. STRINDBERG: It's up to you.
THE WITNESS: I'm going to abide by



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*
**Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101**
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY (VOL. II)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT: The Law Offices of
Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, Utah

DATE: Thursday, December 9, 2004

TIME: 9:42 a.m.

REPORTED BY: Scott M. Knight, RPR



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City | Washington, DC | New York | Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180 | Toll Free: 877-441-2180 | Fax: 801-983-2181

www.thackerco.com

there when he's 80 years old, I don't see an issue with that.
Q. If in lieu of the money you've talked about, would you prefer to be reinstated? Did that make sense? Did you understand that question?
A. Yes.
Q. So what's the answer?
A. I'd have to think about it. It would depend.
Q. All right. Look at page .3 of your interrogatory answers. It's Interrogatory No. 4. It says, "Describe in detail all attempts you have made to obtain employment since being terminated at [sic] SkyWest." Your answer is, "On an everyday basis I check the Internet to determine if there are any new openings for pilots. In particular, I check the Web site climbto350.com." Do you mean that, that every single day you check that, or is that sort of a little fluff that--
A. Every single day I check that. I checked it this morning while I was eating breakfast.
Q. And what is climbto350.com?
A. The Web site that posts job openings.



Q. For pilots?
A. For pilots as well as other aviation areas, mainly pilots.
Q. Okay. You have a list of airlines that you have sent resumes to. Have you since sent resumes to additional airlines other than those you have listed?
A. No. I believe those are about all the airlines that are hiring right now.
Q. And have you interviewed additional airlines other than Polar Air and Atlas Air?
A. I have never interviewed at Atlas Air.
Q. Okay. Your answer says, "I have had interviews at Polar Air and Atlas Air." Do you see that?
A. Atlas Air owns Polar Air. Maybe that was the confusion there.
Q. So you've really had one interview.
A. One interview.
Q. And that was with Polar Air.
A. Polar Air. And then in October of last year I interviewed with Jet Blue.
Q. Okay. Is there a trend, a type of airline that you're looking to be hired with? Do you understand that? It's not a trick question.



I may be phrasing it poorly. I'm--I guess what I'm asking is, are you looking to be hired with a cargo company, with a passenger company? Is there a type of airline that you want?
A. There's no preference. I want to be working for a good company who provides a good quality of life and is stable.
Q. All right. The next one says, "I have attempted to contact by phone, e-mail, and regular mail, friends and others who I know who are involved in the industry." Who specifically have you contacted in the industry that you know?
A. I don't have their names and phone numbers and all that right now. I have friends that are all around the world right now that work for various airlines.
Q. When you interviewed with Polar Air, when did you interview with them?
A. July of--or excuse me. June of 2004, I believe.
Q. And who was it that you interviewed with?
A. I don't recall their names right now.
Q. Was it one person or more than one person?



A. It was two individuals.
Q. Male or female?
A. Both.
Q. So one man, one woman.
A. Yes.
Q. Do you recall what their titles were?
A. I do not. I have all that information written down at home.
Q. Do you have any problem producing to us copies of the information you received from Polar Air?
A. No.
MR. PETERSEN: All right. We'd request, then, Mr. Strindberg--
MR. STRINDBERG: Request what?
MR. PETERSEN: --that we get the information--he says he has written documents from his interviews with Polar Air.
THE WITNESS: No. I didn't say I had written documents.
BY MR. PETERSEN:
Q. Well, you've got something written, right?
A. I have the names of the people I interviewed with written down.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Q. Okay.
A. I don't have written documents from them.
Q. All right. You didn't receive any letters or anything regarding your interview.
A. No. I have voice mails that are still saved on my phone.
Q. What is your current status--
A. I can play those for you right now if you would like.
Q. What is your current status at Polar Air?
A. There is no status.
Q. Were you turned down for the job?
A. I--best of my knowledge, yes.
Q. You didn't, though, receive a formal letter telling you thanks for playing.
A. No, I did not.
Q. Are you aware as to whether Polar Air sent a PRIA request to SkyWest?
A. Best of my knowledge, they did.
Q. Who was it at Polar Air that informed you that they sent a PRIA request?
A. It was an admin woman that was in the interview that took our forms and went to the fax



machine and faxed them.
Q. The same woman that you interviewed with?
A. She was--no, not the same woman that I interviewed with.
Q. Do you know the name of this person who made the request?
A. No, I don't.
Q. Do you know what department she worked in?
A. No, I don't. I would assume she works in the human resource department.
Q. Could you describe her to us, as best you can?
A. No, I cannot.
Q. Where did you interview at Polar Air?
A. Miami, Florida.
Q. And is that where the woman was who faxed the--
A. Yes.
Q. --PRIA request?
A. Yes.
Q. Have you been contacted by anyone at Polar Air in relation to the PRIA requests that they made?



A. I have not.
Q. Did you actually see a document that showed that the PRIA request was, in fact, sent?
A. Did I see a document showing it was sent?
Q. Yes.
A. What would that be?
Q. Like a fax confirmation sheet.
A. No, I did not.
Q. So the basis for you saying that they in fact sent a PRIA request to SkyWest is that you spoke with a woman who in front of you actually put it on the fax machine and sent it off.
A. That's correct.
Q. What fax number did they send it to? Do you know?
A. I don't recall.
Q. Did you provide them with the fax number?
A. No, I did not.
Q. All right. What is a 737 type rating course?
A. That's training for the Boeing 737 aircraft.



Q. You completed that course in July of 2004.
A. That's correct.
Q. And the purpose of that was what?
A. To further my qualifications. Also to further my qualifications specifically for Southwest Airlines who require the type rating.
Q. So that makes you more marketable to some of the airlines.
A. In particular, Southwest Airlines.
Q. Are those the planes they fly?
A. Yes.
Q. Okay. Those aren't the planes that SkyWest flies.
A. No.
Q. Do you have an understanding as to whether that kind of a course would make you more valuable to SkyWest?
A. I have no idea if it would make me more valuable to SkyWest. It wouldn't hurt.
Q. All right. Look at the answer to Interrogatory 5, which is on 3--page .3 to 4. That's--asks for your factual basis for the claim that you think you had implied in fact contract with SkyWest. Your answer indicates, "The



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY
(VOLUME III)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | |
|---|---|
| TAKEN AT: | Fabian & Clendenin<br>215 South State Street, Suite 1200<br>Salt Lake City, Utah |
| DATE: | February 14, 2005 |
| TIME: | 2:06 p.m. |
| REPORTED BY: | Scott M. Knight, RPR |

Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City    Washington, DC    New York    Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180    Toll Free: 877-441-2180    Fax: 801-983-2181

www.thackerco.com

Page 455

Q. Go ahead. Answer the question, please.
MR. STRINDBERG: You don't have to answer.
MR. PETERSEN: He dang well--yes, he does have to answer the question.
THE WITNESS: I don't know why Tiffany would, you know--just so Tiffany knew what was being sent to them.
BY MR. PETERSEN:
Q. So she would know how to respond when an airline contacted her?
A. I don't know how she would respond. She's a smart girl. She's smarter than all of us.
Q. Does she know how to--does she know what's in the regulations governing PRIA request?
A. I believe she does.
Q. Where would she learn that information?
A. From the list that was page .2.
Q. That you gave her.
A. Yeah.
Q. For the purpose of . . .
A. I have no idea. I don't--actually, I don't know if she has it. I don't know if I faxed it to her.

Page 456

Q. All right. What's the current status of your employment with Polar Air?
A. I'm not employed by Polar Air.
Q. Do you have a copy of your application?
A. I do not have a copy of my application.
Q. Have you asked for one?
A. No.
Q. Did you obtain a copy of it?
A. I just answered that. I said I don't have a copy of my application.
Q. Do you have any information from Polar Air other than two voice mails?
A. I have some e-mails.
Q. From them?
A. Yes.
Q. Have they been produced?
A. Have they? I believe one was produced.
Q. Are there others?
A. There was a recent e-mail. I don't know if that was produced.
MR. STRINDBERG: I don't know. We'll certainly produce it if it's--
THE WITNESS: You have the first one, because in the first deposition he--you showed it.
MR. STRINDBERG: Right.

Page 457

BY MR. PETERSEN:
Q. Are there any e-mails or correspondence from Polar Air since your last deposition?
A. Yes. There's one e-mail.
Q. And what does say?
A. It says, "We will contact you when we have something available for you."
Q. There was a reference in a voice mail that your attorneys produced that purports to be from Polar Air indicating something about training.
A. Uh-huh (affirmative.)
Q. Were you scheduled to be--to go through training at Polar Air at some point?
A. I was offered a class, which I was unable to attend. They said they would put me in the next class.
Q. Why were you unable to attend?
A. I was currently undergoing a 737 type rating class. And the next training--the training date that Polar offered was right in the middle of that. And the second class was going to be soon after that. By the matter of--I was told, you know, within the week to two, three weeks.
Q. What's the 737 class you're talking

Page 458

about?
A. I was obtaining a type rating to add to my pilot's license to fly the 737.
Q. Is that something Polar Air flies?
A. No.
Q. And when somebody in your industry, based on your experience, is offered a training program, isn't that pretty much an indication that you've tentatively been offered a job?
A. Tentatively, yes.
Q. And it is subject to you satisfactorily performing your training. Isn't that right?
A. Probably a multiple of things. I know it's also--
Q. But that's one of the contingencies.
A. --pending, you know, the background check as well.
Q. But that's one of the contingencies, correct?
A. That's correct.
Q. And then you do have some background and some medical tests and things like that that you also have to go through, right?
A. I--no, I don't believe you have to go through medical tests. You already have a medical



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

**Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101**
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

certificate.
Q. So as long as your medical certificate is in good standing, that fulfills that requirement.
A. I--I'm sure it does, yeah.
Q. And so you were scheduled by Polar Air to actually go through training because they intended to--
A. No, I was not scheduled.
Q. --offer you a job. You were not scheduled.
A. I was not scheduled. Who said I was scheduled?
Q. Well, the voice mail that I listened to suggested that there was training that had been scheduled for you.
A. The voice mail says, We'd like to invite you to a--whatever the date was--class.
Q. Okay. So why didn't you go?
A. I just told you why I didn't go. I was undergoing training for another program at the time. And they were going to put me in the next class. It happens all the time.
Q. Okay. So let's say that you had canceled your 737.



A. I couldn't cancel. I was already in it.
Q. Well, let's say you just didn't show.
A. I was already in it.
Q. Can't you physically leave?
A. Why would I do that?
Q. So that you could secure a job with Polar Air by going through training?
A. I was going to do that at the next class.
Q. All right. But trust me on the hypothetical here. Let's say that you had left your training and gone to Polar Air. Would you have been able to go through training at the time they offered you?
A. What? That didn't make any sense.
Q. You said they were wanting to schedule you for training, correct?
A. They wanted to invite me to a class.
Q. All right. Did they tell you when the class was?
A. Yes. There was a date on the voice mail. I don't remember the exact date.
Q. Right. And let's say you had been free that time.



A. Yes.
Q. Do you have anything that would indicate to you that you couldn't have attended training at that time?
A. If I was free, I would have attended.
Q. But nothing other than this other class you were taking precluded you from going to training.
A. No.
Q. Okay. And instead, you called Polar Air and told them you were not going to attend class at that time because you were already in this other training.
A. I called--no.
MR. STRINDBERG: Objection. Misstates his testimony.
THE WITNESS: I didn't say that. I called them and asked them--I had some obligations and if I was able to attend the next future class. They said that would be no problem.
BY MR. PETERSEN:
Q. Who flies 737s?
A. Southwest. It's a requirement for their airline.
Q. Have you had an interview with



Southwest?
A. No, I haven't. You have to have the rating to be selected to interview.
Q. Have you had any interviews with anyone other than Polar Air--
A. No.
Q. --since your last deposition?
A. No.
Q. And then why were you not given a subsequent training time period for Polar Air?
A. I have absolutely no idea.
Q. So when you told them that you were not going to go for training, they did not offer you another training session.
A. Yes, they did offer me another training session. They didn't have a date scheduled yet for the other training session.
Q. All right.
A. That's why--
Q. Tell me when they offered it to you.
A. When I talked to them.
Q. The second--
A. Sorry.
Q. The second training session, they--you said they offered it to you.

Page 475

been marked as Exhibit 49. Have you ever seen that document?
A. Yes, I've seen this document.
Q. It's a letter that was sent by your attorney to me sometime in October.
A. Uh-huh (affirmative.)
Q. Yes?
A. Yes.
Q. And the last sentence of the letter, do you see that?
A. Yes.
Q. It says, "For your information, Mr. Callaway did not go for 'training' because SkyWest never responded to the PRIA request."
A. Yeah.
Q. Is that true?
A. Seems likely. I don't know if that's the exact--you know, if that's the reason or not.
Q. It's not what you said earlier today, though, is it?
A. What did I say earlier today?
Q. I think we just covered that. You indicated that you didn't go for training because you were at 737 training, or 737 class, right?
A. Yes. And I was to be offered the next

Page 476

training date.
Q. But the training that you did not attend had nothing to do with a PRIA request, in your understanding, correct?
MR. PETERSEN: Don't nod your head, please.
MR. STRINDBERG: He's not looking at me, Counsel.
MR. PETERSEN: Okay. Well, then I'd still appreciate it, then, if you didn't do that.
THE WITNESS: Say it again.
MR. PETERSEN: What was the question?
MR. STRINDBERG: And, Counsel, you're asking him about a letter that he didn't author. So you need to establish some background really if you're going to question him about it, such as, you know, did he review it before it went out, things like that. There's a lack of foundation.
MR. PETERSEN: I can ask those questions or I can do it in the order that I prefer. And what I'm asking is--well, I can't remember my question
(The following was read:
"Q But the training that you did not attend had nothing to do with a PRIA request, in

Page 477

your understanding, correct?")
THE WITNESS: The training that I did not attend did not have anything to do with the PRIA request.
BY MR. PETERSEN:
Q. All right. I'll rephrase it.
A. Please.
Q. It's simple. You testified earlier that you did not go to training the first time it was offered to you because you were currently in a class to be certified for 737--
A. Yes.
Q. --flying.
A. Yes.
Q. That has nothing to do with a PRIA request, correct?
A. No.
Q. And so when you were going the second time for training, you indicated you had no idea why you had not been given a second training date. Isn't that what you said earlier today?
A. I have my suspicions, yes. But I don't--I've not been told specifically why I've not been, you know, selected. Like I said, I received e-mails saying--you know, giving me the

Page 478

runaround, so . . .
Q. You received e-mails from Polar Air giving you the runaround.
A. I believe I'm getting the runaround, yes.
Q. All right. You testified earlier that you received one e-mail since--you've only received two e-mails from Polar Air entirely, correct?
A. That's right.
Q. One of which you've given us, and one that you have not.
A. Correct.
Q. All right. Are there any other communications that would lead you to conclude that there's a runaround, as you've said, going on?
A. No. That's it.
Q. So two e-mails.
A. Right.
Q. How about phone calls? You produced--your Counsel has produced two alleged voice mail messages from Polar Air.
A. Correct.
Q. Are there any other communications



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 479

other than those four?
A. No.
Q. And any phone calls or e-mails you have sent to them that you have not produced to us that you have copies of?
A. Well, I told you that last e-mail you don't have.
Q. That was from them to you, though, right?
A. Right.
Q. I'm talking about from you to them.
A. Well, it's--I sent them an e-mail asking when, you know, the next class is, what--you know, I forgot what exactly I asked. And they replied saying, We'll call you when we have something available for you.
Q. And it's your belief that they're giving you the runaround.
A. Yes. Because they're--from my knowledge, there have been classes and there are classes that have been, you know, conducted. And I have not been--you know, was not offered that class.
Q. What would your suspicions be, as you indicated?

Page 480

A. Well, the one--the PRIA request, if that--you know, if-- sent the background records back to them, they would have put me in service.
Q. Why do you have that understanding?
A. That's what I understand.
Q. Are you aware that a--an airline can put you in service pending the receipt of PRIA information?
A. Pending receipt? Yes. They can't put you in service until they have it.
Q. That's your--no. My question was, are you aware that an airline can put you into service pending receipt of PRIA information?
A. Well, that might be what the regulation says. But why would an airline spend tons of money training someone without completing a background check. And then if something were to come back in that background check that disqualified the individual, then they've wasted all that money. So I don't believe that. I don't know any company that does that.
Q. It's not your understanding that that happens on a regular basis.
A. I don't know what--you know, I don't believe it does, no.

Page 481

Q. Okay. Did you help Mr. Strindberg prepare this October 8 letter?
A. No.
Q. Do you have any idea why it says, "For your information, Mr. Callaway did not go for training"--quote/unquote--"because SkyWest never responded to the PRIA request"?
A. I have no idea. I didn't write that.
Q. Did you approve that?
A. I didn't see it.
Q. All right. Is that correct?
A. It's a belief. It's a possible belief.
Q. Whose belief?
A. Mine.
Q. And that belief has, as a factual basis, what?
A. It's what I believe.
Q. All right. I understand that. Tell me why you believe that. What facts do you have--
A. I just told you why I believe. An airline is not going to spend all the money training a pilot and then to be--you know, throw him out because the background check doesn't come back. That's why I believe that.
Q. You're assuming that if SkyWest didn't

Page 482

send a PRIA response to Polar Air, that's why you have been given the runaround by Polar Air.
A. I believe the runaround from Polar Air is because you guys called them.
Q. That's why you believe it is.
A. I'm sure--you know, I'm trying to lay very low with Polar Air. And when you guys called them up, start asking questions, you know, trying to subpoena them and all that other garbage you were trying to do, yes.
Q. Do you know why they were called?
A. No. I don't know why you guys do half the stuff you do.
Q. Just answer the questions.
A. I don't.
Q. All right. You don't have an understanding that it was because we had received the false PRIA request that we called Polar Air to confirm receipt of a PRIA response.
A. No. Because when this was faxed in June, or whenever it was faxed to you, you had no idea that I interviewed at Polar Air.
Q. Okay.
A. And this letter's dated October 8.
MR. PETERSEN: All right. Mr.



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*
**Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101**
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

# Exhibit "C"

STRINDBERG SCHOLNICK & CHAMNESS, LLC
*Attorneys at Law*

October 8, 2004

***Fax and U.S. Mail***

Scott Petersen
Fabian & Clendenin
215 S. State, 12th Floor
Salt Lake City, Utah 84111

Re: *Callaway v. SkyWest Airlines, Inc.*

Dear Scott:

I am in receipt of you letter of October 7, 2004. The week of October 25th is, as of this writing, going to be difficult. What is your schedule like in November? Additionally, I believe that I am entitled to depose those individuals I previously identified, Kristen Wiley, Jacque Nielsen and Karalee Smith, before you depose Mr. Callaway.

For your information Mr. Callaway did not go for "training" because SkyWest never responded to the PRIA request. Therefore, he was never extended a job offer.

Sincerely,

**STRINDBERG SCHOLNICK & CHAMNESS, LLC**

ERIK STRINDBERG

cc: Callaway

U:\current clients\Callaway_DA\Correspondence\petersen_depo.wpd

44 EXCHANGE PLACE · SALT LAKE CITY, UT 84111 · PHONE: (801) 359-4169 · FAX: (801) 359-4313 · www.utahworklaw.com