FILED IN UNITED STATES DISTRICT COURT
FEB 06 2006 3:47 pm
MARKUS B. ZIMMER, CLERK
BY ________ DEPUTY CLERK

Erik Strindberg (Bar No. 4154)
Ralph E. Chamness (Bar No. 6511)
**STRINDBERG SCHOLNICK & CHAMNESS, LLC**
426 North 300 West
Salt Lake City, UT 84103
Telephone: (801) 359-4169
Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **DAVID ANDREW CALLAWAY**<br>Plaintiff,<br>vs.<br>**SKYWEST AIRLINES, INC.,**<br>Defendant. | **MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br>Case No. 2:04CV00179<br>Judge Ted Stewart<br>Magistrate Judge Alba |

Plaintiff David Andrew Callaway ("Callaway"), by and through his undersigned counsel, hereby submits the following Memorandum in Opposition to the Motion for Summary Judgment filed by Defendant SkyWest Airlines, Inc. ("SkyWest"). As outlined below, there are disputed issues of material fact which preclude the Court from entering judgment as a matter of law. Accordingly, the Court should deny SkyWest's motion and allow Callaway to present his claims to a jury

## INTRODUCTION

Callaway is a pilot who began working for SkyWest in 1999. He was initially employed as a First Officer on the Ebraer Brasila aircraft. At the time of his termination in October 2003, Callaway was serving as a Captain flying the Canadair Regional Jet. During Callaway's employment with SkyWest, SkyWest never had a problem with Callaway's performance as a pilot.

Unfortunately, after Callaway and other pilots contacted the Air Line Pilots Association ("ALPA") about the possibility of organizing a union for the pilots at Skywest, SkyWest began manufacturing incidents in an effort to create a reason to terminate Callaway's employment, without it appearing retaliatory. Callaway was one of the Skywest pilots who actively supported the ALPA (and other)organizing committee's efforts. As part of his union organizing activities, Callaway frequently posted information on a pilots' website. SkyWest management chastised Callaway for his activities and began to gather information which they believed they could use to discharge Callaway. This lawsuit seeks damages and other relief based upon SkyWest's firing Callaway for engaging in Union organizing activities. Callaway has brought claims for SkyWest's: (1) violation of the Railway Labor Act, 45 U.S.C. § 151, *et seq,* ("RLA") and

(2) violation of the Wire And Electronic Communication Interception and Interception of Oral Communications Act[1].

## SUMMARY JUDGMENT STANDARD

The Tenth Circuit has held that "[s]ummary judgment should not be granted where different inferences can be drawn from conflicting affidavits and depositions . . . .This is particularly so where an issue turns on credibility." *Romero v. Union Pacific Railroad*, 615 F.2d 1303, 1309 (10th Cir. 1980). Additionally, the Tenth Circuit has repeatedly emphasized that the Court must draw all inferences in favor of the party opposing summary judgment. *O'Shea v. Yellow Technology*, 185 F.3d 1093 (10th Cir. 1999) (citations omitted). This is why the burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

In assessing the record to determine whether there is a genuine issue as to any material fact, the Court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Additionally, "the court may not make credibility determinations or weigh the evidence. 'Credibility determinations,

[1]The parties have previously stipulated to the dismissal of the remaining claims in Callaway's Amended Complaint.

the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (*quoting Anderson*, 477 U.S. at 255). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Ortiz v. Norton*, 254 F.3d 889, 893 (10th Cir. 2001). The Tenth Circuit also noted in *Ortiz* that:

> A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." In this review, we have oft reminded that all inferences arising from the record before us must be drawn and indulged in favor of the party opposing summary judgment. "In this respect, we must view the evidence in context, not simply in its segmented parts.

*Id. (quoting Anderson, see also United States v. Diebold Inc.*, 369 U.S. 654, 655 (1962)) (*per curiam*). If "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2nd Cir. 1995) (*citation omitted*). It is well settled that, on a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. *See Anderson*, 477 U.S. at 255.

## STATEMENT OF MATERIAL FACTS[2]

1. Callaway applied for a job as an airline pilot with SkyWest in 1996.

*The date Callaway applied for a position with SkyWest is undisputed.*

2. SkyWest interviewed Callaway for the position in January of 1998.

*It is undisputed that SkyWest interviewed Callaway in January of 1998.*

3. As part of the hiring process, Callaway was scheduled for pilot training in February 1998, but failed to attend.

*While this fact is undisputed, it is irrelevant to any of the issues presented in the pending Motion. Callaway missed this initial training date because his father was seriously ill.* Deposition of David Andrew Callaway dated December 8, 2004, Volume I, ("Callaway Dep."), at 31-33) (Copies of the cited pages are attached as Exhibit "1"). *Callaway informed SkyWest that he was going to miss the initial training because he needed to attend to his father. Id.*

4. Five months later, in July of 1998, Callaway sent a letter to SkyWest requesting that he be allowed another opportunity to attend training.

*Callaway requested that he be allowed to reschedule his training when he made his call to SkyWest informing it of his father's illness and that he would not be able to*

[2]For the Court's convenience, Callaway will outline the disputed facts in italics beneath each the numbered facts listed in SkyWest's Revised Memorandum Supporting Motion for Summary Judgment.

*attend his scheduled training. When Callaway made this request, SkyWest informed him that he could not reschedule the training and accordingly did not hire him.* Callaway Dep. at 35. *Callaway eventually was allowed to resubmit an application after Jim Breeze, SkyWest's Chief Pilot, advised him to submit a second application.* Callaway Dep. at 35-36.

5. Those who received his request were of the opinion not to hire Callaway; however, Jim Breeze, SkyWest's Systems Chief Pilot, made the decision to give Callaway another chance.

*While this fact is undisputed, it is irrelevant to any of the issues presented in this Motion.*

6. Accordingly, after receiving a response letter from SkyWest, Callaway submitted a new application for employment, was scheduled for and attended training, and began working for SkyWest as a pilot on January 13, 1999.

*It is undisputed that Callaway began working as a pilot on January 13, 1999. It is also undisputed that SkyWest never had any problem with Callaway's skills or performance as a pilot.*

7. Callaway was hired by SkyWest as an "at-will" employee, meaning that he could be fired with or without cause and with or without notice. SkyWest's Employee Handbook states, "Employment with SkyWest is voluntarily entered into and the

employee is free to resign at-will at any time, with or without cause or notice. Similarly, the employer may terminate the employment relationship at will at any time, with or without cause or notice."

*Callaway does not dispute that he was an "at-will" employee. However, Callaway's status as an "at-will" employee does not effect SkyWest's legal obligation to not retaliate against him based upon his union activities. Given the parties' stipulation to dismiss Callaway's Third and Fourth Causes of Action, the fact that Callaway was an "at-will" employee is irrelevant to any of the issues remaining in this litigation.*

8. SkyWest's Company Policy Manual, Standard Practice 56 states, "SkyWest Airlines promotes a productive work environment and does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment." The Policy Manual further states, "Employees are expected to maintain a productive work environment <u>free of harassment</u>."

*Callaway does not dispute that SkyWest's Company Policy Manual states what is outlined in Paragraph 8. However, that portion of SkyWest's Policy Manual is referring to the anti-discrimination laws which are not at issue here. Further, Kelvin Hyatt, SkyWest's Chief Pilot in Salt Lake City, testified that he was aware of at least two SkyWest pilots who actually engaged in sexually harassing behavior, thereby violating*

*the policy, but were not fired.* Deposition of Kelvin Hyatt dated November 5, 2004 ("Hyatt Dep.") at 189 (copies of the relevant pages are attached as Exhibit "2"). *One received a "counseling statement and time off" and the other was "suspended."* Hyatt Dep. at 189-90.

9. SkyWest's Policy Manual, Standard Practice 306(30)states, "Crew members may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and/or within any other work-related circumstances."

*Callaway does not dispute that SkyWest's Company Policy Manual states what is outlined in Paragraph 9.*

10. On or about December 7, 2000, Kelvin Hyatt, a Chief Pilot at SkyWest, and Mr. Callaway's immediate supervisor, was informed by Anita Spencer, the Director of Crew Scheduling, that Callaway had mistreated certain SkyWest crew schedulers under her supervision.

*Callaway objects to the statements in paragraph 10 because they contain inadmissible hearsay. Further, Callaway disputes the allegation that he ever "mistreated certain SkyWest crew schedulers." In fact, SkyWest appears to have fabricated the alleged incident after the fact in order to cover up its real reason for disciplining Callaway: his union activities. The Scheduler alleged that Callaway complained although they had accommodated his "commutable" line bid (i.e.- where the pilot would*

*have to fly to the City where the trip originated). Callaway never bid a commutable line as his trips always started in Salt Lake, where he lived.* Hyatt Dep. at 200. *Finally, Callaway disputes that he ever said, or did, anything to the scheduler which could be considered mistreatment.* Callaway Dep. at 61-64. *At a minimum, SkyWest's recording of the alleged incidents was sloppy. In Callaway's termination letter, SkyWest claimed that this incident occurred in June, 2000.* Callaway Dep. at 42. *Further, the scheduler who was allegedly "mistreated," listed December 14 as the date of the alleged incident when she signed the document December 7.*

11. Ms. Spencer informed Mr. Hyatt that Callaway was verbally harassing her crew schedulers over an "open time" issue. According to Ms. Spencer, Callaway wanted a particular flight that he was not entitled to according to company policy. "There had been several complaints from the crew schedulers on calls. The whole gamut from whining, complaining, disagreeing. And it was just unacceptable, and he was told so."

*Callaway objects to the statements in paragraph 11 because they contain inadmissible hearsay. SkyWest never gave Callaway any documentation about the alleged complaint and never told him who made the alleged complaint at the time it disciplined him.* Callaway Dep. at 50. *As outlined in response to Paragraph 10, Callaway disputes the allegation that he ever verbally harassed a crew scheduler over "an 'open time' issue."* Callaway Dep. at 78-86.

12. Given the complaints, Mr. Hyatt arranged for a meeting with Callaway. The meeting included Mr. Hyatt's superior, Jim Breeze (System Chief Pilot), and Mr. Breeze's superior, Brad Holt (Vice President of Flight Operations). The meeting was set for December 11, 2000.

*Callaway does not dispute that such a meeting was arranged for December 11, 2000. However, the real purpose of the meeting was to chastise Callaway for his posting pro-union comments on the SAPA website (which was owned by private individual) and for his union organizing activities.* Deposition of Bradford R. Holt dated February 10, 2005 ("Holt Dep.") at 95 (copies of the relevant pages are attached as Exhibit "3"). *It is undisputed that Callaway's posts on the website were related to his efforts to organize the pilots for the Airline Pilots Association ("ALPA") and that Callaway was on the ALPA organizing committee.* Callaway Dep. at 51; 52; 55-56; 146. *Callaway's posts provided, "opinions, research, statistics regarding our contract or lack thereof compared to other airlines and issues that affected the pilots and arguments as to why we should unionize." Id. Callaway testified that "most of my post, if not all, were regarding the union organizing." Id.* and Callaway Dep. at 54; 146. *Jon Tenpas, who was the Chief Pilot in Los Angeles, remembered reviewing Callaway's posts on the website and agreed they related to Callaway's union activities.* Deposition of Jon Tenpas dated June 13, 2005 ("Tenpas Dep.") at 36-37 (copies of the relevant pages are attached as Exhibit "4").

*Bradford R. Holt, SkyWest's Vice-President of Flight Operations, who was present at the meeting, could not recall that* ***anything*** *other than Callaway's pro-union posts were discussed at the meeting. He testified that SkyWest had "issues with Andy's attitudes, his posts." Holt clarified that he was referring to "[h]is posts on certain forums, his comments about management. In general, just issues with the company."* Holt Dep. at 85. *When asked if he remembered "anything else . . . about the talk down in St. George?" Holt responded, "No."* Holt Dep. at 86. *Callaway testified that when he first got to the meeting, Holt and Breeze told him that he had made "inappropriate" comments on SkyWest's website and asked Callaway why he was making posts on the website.* Callaway Dep. at 43; 50; 55.

*Further, the first item on the "verbal warning" given to Callaway claimed that he was required "to come to St. George" because he "had repeatedly made inflammatory and unfair statements on the company website about the company and its policy."* Hyatt Dep., Exhibit "14" (a copy is attached as Exhibit "5"). *Breeze and Holt "warned" Callaway "that this behavior would not be tolerated." Id.*

*Because Callaway had never "abused" "harassed" or otherwise engaged in any inappropriate behavior towards the crew schedulers, SkyWest's alleged reason for the meeting is an after the fact rationalization for its attempt to chill Callaway's unionizing activities.*

13. During the meeting, Mr. Callahan was confronted with the complaints about his behavior toward the crew schedulers.

*Callaway does not dispute that he was asked about his behavior toward crew schedulers.* Callaway Dep. at 49-50. *However, as outlined above, Callaway never engaged in any inappropriate behavior toward the crew schedulers. Moreover, it quickly became apparent that the real purpose of the meeting was to chastise him for his union activities. As outlined above in response to paragraph 12, the real purpose of the meeting was to question Callaway about posts that the made on the SAPA website supporting ALPA's unionizing effort.*

14. Also, during the December 2000 meeting, SkyWest questioned Mr. Callaway about comments he made on the SkyWest Airline Pilots Association ("SAPA") website regarding SkyWest and SkyWest management.

*Callaway agrees that he was warned by SkyWest management that the comments he made on the SAPA website would "not be tolerated."* Exhibit "5." *It is clear that management was discussing certain pro-Union comments he made on the website. As outlined above, "most, if not all" of the posts made by Callaway were union related. Specifically, Callaway posted a chart showing the disparity between the SkyWest's top three management salaries for Jerry Atkin, Ron Reber, Brad Rich and those of SkyWest's Captains and First Officers. That chart showed that the top three managers' salaries had*

*increased by 133% during the same period that Captains' salaries had only increased 23% and First Officers' salaries had only increased 18%. Callaway provided these figures to support his position that SkyWest's pilots would be better served by a union. Additionally, Callaway posted a cartoon showing a small blimp representing "Pilot Pay Proposal" bumping under a much larger blimp representing "Management Pay & Bonuses." Callaway also posted a drawing entitled "Comair +1." This referred to Comair's industry leading contract and the proposal that, after organizing a union, SkyWest's pilots should seek the same deal as Comair plus 1%. Callaway had this drawing made into stickers which he put on his flight bag. See* Affidavit of David Andrew Callaway attached as Exhibit "6."

15. The SAPA website is an independent website that is not sponsored by SkyWest, but which is maintained and used by SkyWest pilots to discuss work and work-related issues.

*Callaway agrees with the characterization of the SAPA website contained in paragraph 15. However, it is also important to note that the SAPA website was the main forum for SkyWest's pilots to discuss unionizing activities and the benefits/drawbacks of a union at SkyWest.* Callaway Dep. at 50-52. *Callaway was surprised that SkyWest's management knew about his posts on the website because, as outlined below in response*

*to Paragraph 16, access was limited to non-management employees who agreed not to disclose postings.* Callaway Dep. at 87; Holt Dep. at 95.

16. Regarding the statements that are posted on this site, Callaway testified, "You know, anybody can, you know, print this stuff out, send it down to St. George. They could gain access to the message boards if they had a, you know, friend that was, let's say, anti-union, decided to give their password to management."

*Callaway does not dispute that he made this statement. Callaway was merely recognizing that SkyWest management could put its anti-Union animus in action by having an anti-Union pilot provide it with copies of posts on the website.*

17. When asked whether Callaway knew if somebody printed out the website postings and gave them to somebody in SkyWest management he testified, "I have no idea."

*While Callaway did not know how SkyWest management obtained the information related to his posts on the website, it is undisputed that SkyWest management did obtain that information and questioned Callaway on his posts. See* Response to paragraphs 12-16 above.[3] *Both Holt and Breeze testified that they had reviewed some of Callaway's*

---

[3]Callaway has determined that he will not contest SkyWest's Motion for Summary Judgment on his Second Cause of Action alleging a violation of the Wire And Electronic Communication Interception and Interception of Oral Communications Act. Accordingly, he will not address the facts related to that claim or the underlying law supporting his claim.

*posts. Holt testified that he received them by way of SkyWest's interoffice mail.* Holt Dep. at 85-86; 94-95. *Breeze testified that "they were either shown to me or I saw them electronically."* Deposition of Jim Breeze dated November 29, 2004 ("Breeze Dep.") at 40-41 (copies of the relevant pages are attached as Exhibit "7." *Breeze further testified that he knew that Holt "has access to them also."* Breeze Dep. at 41. *The fact that Callaway does not know how SkyWest management obtained the posts is irrelevant when it is undisputed that SkyWest management had copies of his posts and disciplined Callaway for making those posts.*

18. Callaway testified that he suspected that pilots print postings from the website, fax them in to SkyWest management, and post hardcopies of them on bulletin boards. Callaway believes it is primarily an anti-union pilots that do this.

*Given the agreement by users to NOT copy posts in a public place, it is difficult to imagine that a pro-Union employee would provide SkyWest's anti-Union management with copies of the posts. Again, this issue is only relevant to show that SkyWest management knew of Callaway's union organizing activities and disciplined him for making the posts, both of which are undisputed. As outlined in Footnote 3, Callaway does not contest that his Second Cause of Action, regarding wiretapping, should be dismissed.*

19. In October 2001, Customer Service Relations received a phone call from a Mr. Brandt, who indicated he was the owner and landlord of property neighboring Callaway's residence in Salt Lake City. Mr. Brandt indicated that his tenants had complained to him about loud parties, unbearable noise, and property damage from Callaway. SkyWest was also informed that neighbors stated they had seen drugs being used at Callaway's house. The neighbors knew Callaway was a SkyWest pilot and Mr. Brandt wanted SkyWest to do something about the problem.

*Callaway objects to the inadmissible double hearsay statements contained in paragraph 19. Further, the underlying facts related to this complaint are clearly disputed. Callaway did not have "loud parties," create "unbearable noise," cause "property damage," or allows drugs to be "used" at his house.* Callaway Dep. at 95. *Callaway eventually sued the tenant of Mr. Brandt's, who had made the complaints, for harassment and defamation.* Callaway Dep. at 101; 105-07. *After meeting with Mr. Brandt, showing Mr. Brandt around his home and explaining what had happened, Mr. Brandt agreed that the allegations did not appear to be well founded. Mr. Brandt then evicted his tenant. Given the tenant's eviction, Callaway dismissed his lawsuit against the tenant.* Callaway Dep. at 106-07.

20. Jacque Nielsen, from SkyWest Human Resources, called Mr. Brandt who

indicated that he wanted SkyWest to stop the parties and drug use. Mr. Brandt also suggested that Ms. Nielsen call Kim Guess, an employee of the Salt Lake City Police Department.

*Callaway objects to the use of inadmissible hearsay in paragraph 20. As outlined above in response to Paragraph 19, Callaway sued Mr. Brandt's tenant for making unfounded allegations and the tenant was eventually evicted. Further, when the Salt Lake City Police Department acted upon the tenant's false information, Callaway sued the City and eventually obtained a settlement of $87,000.00.* Callaway Dep. at 102-04.

21. Ms. Nielsen called Ms. Guess, who told Ms. Nielsen about the repeated complaints from Callaway's neighbors.

*Callaway objects to the use of inadmissible hearsay in paragraph 21. As outlined above, the alleged events did not occur and the false accusations resulted in Callaway's reaching a settlement with the City and the eviction of the person making the false complaints.*

22. Mr. Hyatt contacted Callaway about the complaints. Callaway told Mr. Hyatt that he had sued both the neighbor and city for harassment and defamation of character.

*Callaway does not dispute that he was asked about the complaint and that he informed Mr. Hyatt that the claims were baseless and he was taking legal action to*

*protect his rights.* Callaway Dep. at 100. *SkyWest took no disciplinary action against Callaway because of these complaints, it was only raised at his termination.* Hyatt Dep. at 162.

23. Mr. Brandt again called SkyWest and informed it that Mr. Callaway had another party on Saturday, November 10 from 4:00 p.m. until 4:00 a.m. SkyWest was also informed that the police had been called to Callaway's house again.

*Callaway objects to the use of inadmissible hearsay contained in paragraph 23. Further, as outlined above in paragraphs 19-22, the underlying claim was untrue and Callaway eventually obtained a settlement and the eviction of the complaining tenant after filing litigation based upon the false allegations about occurrences at his home. Furthermore, Callaway's supervisor, Hyatt, testified that he only "mentioned" it to Callaway, that he did not investigate the allegations and SkyWest, "as far as I am aware, did not get involved with the situation."* Hyatt Dep. at 144-45. *The one time Hyatt "mentioned" receiving the complaint to Callaway was the only time he discussed the issue with him.* Hyatt Dep. at 162.

24. Sometime prior to November 2001, Callaway was requested to attend classroom instruction and testing related to SkyWest's regional jets.

*Callaway does not dispute that he attended the classroom instruction and testing related to SkyWest's regional jets. It is undisputed that he passed the testing and was qualified to fly regional jets.*

25. During the course of his classroom instruction, Callaway exhibited a "poor display of attitude" toward the instructor, Kelly Dixon.

*Callaway disputes that he ever exhibited a "poor attitude" toward Kelly Dixon.* Callaway Dep. at 257. *It is interesting that Mr. Dixon never reprimanded Callaway, never mentioned to Callaway that his behavior was inappropriate or ever had any interaction with Callaway indicating that Callaway had done anything but behave in a professional manner until AFTER he was requested to make a report by SkyWest's management in St. George.* Deposition of Kelly Dixon dated February 11, 2005 ("Dixon Dep.") at 22-25, 53 (copies of the relevant pages are attached as Exhibit "8); Hyatt Dep. at 155; Callaway Dep. at 256. *The request to Dixon came from St. George and was made after SkyWest's management was aware of Callaway's union support and his alleged criticism of SkyWest's management on the SAPA website.* Dixon Dep. at 16-17. *Importantly, SkyWest never even told Callaway about Dixon's problem with him until* ***after*** *he was terminated.* Callaway Dep. at 256-57; Hyatt Dep. at 161. *Further, Callaway disputes that he engaged in any such behavior and testified that the two other instructors "did not have any issue with [him]." Id.*

26. Specifically, after having taken a required test, when Mr. Dixon was reviewing the test, Callaway;

> Unlike I'd ever seen before, and different from any other student in any other class I'd ever had, Andy decides to stand up, walk over to the wall, walk up the side of the classroom, walk across the front of the classroom in front of ally my student, takes the test, throws it down on the podium and says, 'I don't need to go over my test.' At that point, I though to myself, 'Who does this guy think he is?'

*Again, Callaway denies taking the actions alleged in this paragraph or making the alleged statement. As outlined above, it is undisputed that neither Dixon, nor SkyWest ever reprimanded Callaway or discussed with Callaway any allegedly inappropriate behavior. It is also undisputed that Callaway did not know that Dixon had written a statement until his final Review Board. Callaway testified that the other two ground instructors did not have any problems with him and he "was very surprised to read — to hear that letter." When it was read at the Review Board, he "had no defense for it, because I didn't know where it came from or when it came from or who it was written by."* Callaway Dep. at 257-58.

27. In November, Mr. Dixon prepared a written summary of the occurrence and submitted to SkyWest.

*As outlined above in response to Paragraph 25, Dixon only prepared the written summary after receiving a call from SkyWest's corporate headquarters. Callaway never*

*saw the letter or heard that Mr. Dixon had an issue with his behavior, prior to his termination.* Callaway Dep. at 256-57; Hyatt Dep. at 161.

28. On or about November 13, 2001, SkyWest received complaints from the airport in Butte, Montana stating that Callaway had exhibited inappropriate behavior toward agents, and security personnel.

*Callaway disputes that he ever exhibited inappropriate behavior while in the Butte airport. When first asked about what happened, Callaway told Mr. Holt "that nothing had happened."* Callaway Dep. at 119. *Callaway had simply asked a screener why his empty bags were being X-rayed. Id. Neither the screener, nor Callaway got upset and the screener did nothing to let Callaway think she was concerned. Id.* at 120; 126. *Callaway did not exhibit "inappropriate behavior" in Butte. Id.* at 122; 133; 135. *Callaway did not act in an "arrogant" or "disrespectful" or "abusive" manner.* Callaway Dep. at 126; 146. *Callaway was never "stopped or questioned" about his bags.* Callaway Dep. at 128. *SkyWest either did not investigate by speaking with the other pilots present when this alleged incident happened or ignored what they said.* Hyatt Dep. at 159. *Daniel Black, a SkyWest pilot present at the time, testified that he told Breeze that he did not see anything unusual when Callaway was at the security screening.* Deposition of Daniel R. Black dated February 11, 2005 ("Black Dep.") at 10-11, 18, 30-31 (copies of the relevant pages are attached as Exhibit "9".)

29. Mr. Hyatt also received word that three SkyWest agents witnessed Mr. Callaway's behavior.

*Callaway disputes that three SkyWest ramp agents were present. He testified that there was one "ticket agent," a SkyWest employee "conducting the security screening" and an employee from another company.* Callaway Dep. at 123.

30. Shortly thereafter, Callaway met with Brad Hold, Bill Boice, Tony Thompson, Kelvin Hyatt, Dave Faddis, and Mike Eisenstat because of Callaway's behavior at the Butte station.

*Callaway does not dispute that he had a meeting. However, as outlined above in response to paragraph 28, there was no factual basis to support any claim that his "behavior" in Butte was inappropriate.*

31. Callaway reportedly argued with security agents at the Butte airport.

*As outlined above in response to Paragraph 29, Callaway denies that he ever argued with security agents at the Butte airport.*

32. Callaway was given a counseling statement citing his "extremely inappropriate behavior" and was placed on administrative leave for three weeks without pay.

*Callaway does not dispute that he was placed on administrative leave for three weeks, however, the leave was paid.* Callaway Dep. at 119. *However, it is clear that*

*SkyWest's discipline was based, in part, on Callaway's unionizing activities. The "Counseling Statement" provided to Callaway specifically referred to the "posts you authored on the Web Boards."* Exhibit 5. *Hyatt assumed "that would be posts that Andy posted on the SkyWest forum boards."* Hyatt Dep. at 114.

33. Callaway requested and was provided a review board regarding the counseling statement. The review board upheld the counseling statement but removed the word "extremely" from the statement regarding Callaway's inappropriate behavior.

*Callaway does not dispute that the review board changed the counseling statement by deleting one word.*

34. On March 26, 2002, Callaway was given a Scheduled Assignment Deviation ("SAD") for telling crew scheduling that he did not want to be placed on a multiple- day trip because he was recovering from a cold.

*Callaway does not dispute that he received a SAD. However, he was initially told that he would be taken off the list because he was sick. Despite being told that he was off the schedule, a supervisor gave Callaway a SAD.* Callaway Dep. at 187; 190-91. *While SkyWest attempts to make much of the fact that it issued Callaway two SADs, it neglects to point out that the "company average for pilots, is I think, 5.8 per year."* Callaway Dep. at 261. *Finally, Hyatt testified that SADs are not disciplinary in nature, but are "simply stating an event took place."* Hyatt Dep. at 49.

35. On or about June 30, 2003, Callaway received another SAD for his failure to respond to calls from crew scheduling while he was on reserve. Callaway failed to return calls to crew support who attempted to give him an assignment. Callaway should have let SkyWest know that he was not available because he is paid by SkyWest while on reserve. Callaway accepted responsibility for the SAD.

*Callaway accepted responsibility for the SAD because he submitted an incorrect date on a request for time off. The litigation described above in paragraphs 19-23 required his attendance and he "submitted a request, canceled it, and submitted a request for another day." Unfortunately, "it was never processed."* Callaway Dep. at 189. *Callaway was told that he needed to contact scheduling every thirty minutes and complied. Nevertheless, he received a SAD. Id.*

36. On August 12, 2003, Mr. Hyatt was approached by Kristen Wiley, a flight attendant working at SkyWest, who broke down crying while speaking with Mr. Hyatt. Ms. Wiley said she had received threatening emails from Callaway through her SkyWest email account concerning money Callaway claimed she owed him.

*Callaway does not dispute that Ms. Wiley approached Mr. Hyatt. However, he disputes the claim that he ever sent Ms. Wiley "threatening emails."* Callaway Dep. at 216-17. *The email correspondence between Callaway and Ms. Wiley demonstrates that Callaway was merely attempting to collect money which Ms. Wiley owed.* Callaway Dep.

at 200-03. *Indeed, it appears that Ms. Wiley complained to SkyWest in order to avoid paying Callaway the money she owed him.* Callaway Dep. at 225. *Eventually, Callaway obtained a judgment against Ms. Wiley in small claims court. Id.*

37. Apparently, Callaway had invited Ms. Wiley to go to Spain with Mr. Callaway and some friends in September 2002.

*Callaway invited Ms. Wiley to go to Spain when another person cancelled at the "last minute."* Callaway Dep. at 194.

38. Ms. Wiley believed that because she was to take the place of another girl whom Callaway had already paid for, she would not have to pay for the trip.

*It is not clear what Ms. Wiley thought. Prior to the trip, Ms. Wiley agreed to pay Callaway, "for her portion of a villa rental . . ., along with a rental cal and her incidentals and expenses over there."* Callaway Dep. at 193; 198.[4] *See* Exhibit "10."

39. In approximately November 2002, Callaway began to ask Ms. Wiley to reimburse him for her costs of the trip.

*See* Exhibit "10."

40. By the summer of 2003, Callaway began sending Ms. Wiley emails, through

[4]Pursuant to the Court's Order dated August 5, 2005, Docket #69, Ms. Wiley's deposition and attached exhibits were classified "Confidential." Accordingly, any response to SkyWest's facts containing such information have been placed in a sealed envelope, marked "SUBJECT TO COURT PROTECTIVE ORDER" and marked as Exhibits 10 and 11.

the SkyWest network, demanding that she pay him the money.

*Both Callaway and Ms. Wiley corresponded by email to discuss the payment due to Callaway, both on the SkyWest network and on Ms. Wiley's "hotmail" account.* Callaway Dep. at 199-203. *While SkyWest attempts to make much of the fact that Callaway sent Wiley emails, it neglects to mention that it did not have a policy prohibiting employees from this type of communication. Breeze testified that he was "not familiar" with any SkyWest "rule or policy" which "talks about what can or cannot be posted on the message system."* Breeze Dep. at 35. *When Holt was questioned if he was "aware of any rule which says that employees cannot personal E-mails over the company intranet," he responded, "No."* Holt Dep. at 107. *Similarly, when Hyatt denied knowledge of any policy "that deals specifically with the intranet and what may or may not be sent . . . ."* Hyatt Dep. at 187.

41. One of the emails sent by Callaway stated, "Come on, Kristen. I'm tired of this. I need my money now or I'll get it the hard way. Thanks. Andy."

*Callaway does not dispute that he sent Ms. Wiley such an email. As he explained in his deposition, the "hard way" referenced in the email referred to "small claims court."* Callaway Dep. at 202.

42. Ms. Wiley thought Callaway meant he would do something physically to her to recover the money.

*Given the lengthy history of Callaway's attempts to collect the amount due and his use of small claims court to collect that amount, it is incredible that Ms. Wiley had any reasonable fear that Callaway would ever "do something physically to her."*

43. Ms. Wiley did not feel safe about going to work. She felt she had to avoid Mr. Callaway. Ms. Wiley was also afraid to read her email messages.

*See* Exhibit "10."

44. Ms. Wiley went into Mr. Hyatt's office, crying, told Mr. Hyatt about Callaway's threats, and asked him, "can you help me take care of it, get it to stop?"

*As outlined above, Callaway did not make any "threats" to Ms. Wiley beyond his efforts to obtain the money Ms. Wiley had already promised to pay him.*

45. The stress and anxiety of her dealings with Callaway caused Ms. Wiley to seek medical treatment. She began taking Xanax as a result of the stress from Callaway's behavior.

*See* Exhibit "10."

46. In fact, Ms. Wiley eventually stopped working for approximately two months due to her stress.

*Callaway does not dispute that Wiley took time off. However, as outlined above in response to paragraph 45, it is not clear the real reason why Wiley took time off from work.*

47. As part of his investigation into Ms. Wiley's claims, Mr. Hyatt sent an email to Callaway asking him to address his treatment of Ms. Wiley. Callaway responded that it was not of SkyWest's business.

*Callaway responded to Hyatt's email with a detailed explanation of what occurred and why he did not believe he violated SkyWest's policy in attempting to collect the money due him. Callaway provided Mr. Hyatt with the emails he and Ms. Wiley had sent each other concerning the amount due him. See* Hyatt Deposition Exhibit "3" (a copy is attached as Exhibit "12.") *Hyatt never told Callaway that he was dissatisfied with Callaway's response.* Hyatt Dep. at 169.

48. Callaway testified that he believes he was terminated because of the response email he wrote to Mr. Hyatt.

*Callaway testified that he believes he was terminated in part for that email, but that the email was part of a continued effort to terminate him for his union organizing activities. He testified that he believed that Jim Breeze wanted to terminate him based upon the "December 2000 meeting and the counseling statement, you know, mentioned by posts on —that I had authored on the Web site for union organizing."* Callaway Dep. at 246. *He further testified:*

> *A: I believe that was the catalyst that caused the termination. It was like the last straw that they were going to deal with. I believe that all these incidents passed that were made to believe—to, you know, show a pattern*

*were based on fabrication and documents that were false, with false allegations.*

. . .

*A: They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And they're going to build whatever they can to show a pattern of this type of behavior.*

Callaway Dep. at 267.

49. Also during September 2003, Mr. Hyatt received a call from Denver Asst. Chief Pilot Don Watkins. Mr. Watkins informed Mr. Hyatt that he overheard Callaway say many negative things about SkyWest and its management.

*Callaway objects to the inadmissible hearsay contained in paragraph 49. Furthermore, it is irrelevant. Mr. Watkins' letter was not written until three weeks after Callaway was terminated.* Callaway Dep. at 230. *It could not have been considered by SkyWest in making its decision to terminate Callaway. Callaway also denies ever making any such comments.* Callaway Dep. at 227.

50. Mr. Hyatt asked Mr. Watkins for a write-up of what he heard. Mr. Watkins complied.

*Watkins' write-up did not accurately reflect reality. Callaway testified that it was impossible for him to have made negative comments because he "was not in the hotel" at the time Mr. Watkins allegedly heard Callaway making the comments.* Callaway Dep. at 227. *In fact, Callaway has a restaurant receipt showing that he could not have been in*

*the room at the time Mr. Watkins claims to have heard him making negative comments about Skywest.* Callaway Dep. at 228-229.

51. After all of these reported instances, Callaway was terminated on October 1, 2003, "due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees."

*Callaway does not dispute that SkyWest terminated him on October 1, 2003. However, as outlined above, he did not have "attitudinal" or "interpersonal" conflicts. Further, Hyatt did not believe that Callaway's actions warranted termination.* Hyatt Dep. at 106. *Despite this Hyatt was required to prepare a memo outlining SkyWest's case.* Hyatt Dep. at 104. *Included in that summary of "reasons" why Callaway should be terminated was SkyWest's warning to Callaway about his "inflammatory and unfair statements on the company website . . . ."* Hyatt Dep., Exhibit "2" (a copy is attached as Exhibit "13.") *Hyatt gave the summary to Breeze and Holt and they decided to terminate Callaway.* Hyatt Dep. at 104; Breeze Dep. at 44.

52. Callaway requested a Review Board Hearing on or about October 3, 2003, claiming that he believed his termination was unfair.

*Callaway does not dispute that he requested a Review Board Hearing in an attempt to save his job.*

53. Callaway's review board request was approved, and he was provided with a

hearing on October 24, 2003. During the hearing, Callaway addressed allegations, facts, and evidence, and was provided the opportunity to introduce his own evidence. At no time during his hearing did Callaway complain that he had been disciplined for any union activity.

*Callaway did discuss his union activity at the Review Board and the Board's summary reflects SkyWest's reference to Callaway's admission that "his comments could have been misconstrued and may have been a little abrasive." Callaway made clear that he was referring to the fact that the "posts on the message boards regarding union organizing could have been construed that way. But that is the intent of that."* Callaway Dep. at 253-54. *Indeed, SkyWest's counsel attempted to get Callaway to admit that he did not raise his union activities during the Review Board:*

> *Q: Did you–we basically read your entire–a summary of your entire response. Your didn't mention anything about the fact that you had been engaged in any union activity, right?*
> *A: The posts on the Web site.*
> *Q: Okay. Tell me where it mentions union activity.*
> *A: Well, that's what I was discussing when I was talking about the visit to St. George. And I did mention in the review board my union organizing involvement*
> . . .
> *A: Why it's not in here, I don't know.*
> *Q: Did you mention to the review board that you thought any of the disciplinary actions that you received were related to your union postings?*
> *A: I did mention the union post - --*
> *Q: Okay. But that's wasn't my question.*
> *A: —as the reason from my receiving the first counseling statement.*

Callaway Dep. at 265-66.

*During the Review Board, the members considered the fact that SkyWest had held the December 2000 meeting with Callaway where he was chastised for his pro-union posts. Hyatt represented SkyWest and presented the fact that Callaway had been warned about his website postings.* Exhibit 13. *The Review Board also received Breeze's written memo concerning the "verbal" warning given to Callaway which warned him to stop making posts.* Exhibit "5." *Interestingly, SkyWest had originally told Callaway that SkyWest was "not putting anything in [his] file. We're not giving you any disciplinary action."* Callaway Dep. at 57.

54. The Review Board upheld Callaway's termination but decided to give Mr. Callaway the option of resigning and being made eligible for rehire. Callaway refused this offer, opting instead for termination.

*Callaway viewed the Review Board's offer as illusory. He stated, "I would never be eligible for rehire because I don't think Jim Breeze would ever allow that to happen again after, you know, my postings pissed him off."* Callaway Dep. at 270.

55. While Callaway claims that he has some evidence that Jim Breeze wanted him fired, he cannot identify what that evidence is. Moreover, he had no evidence to suggest that Breeze's alleged desire to terminate Callaway had anything to do with Callaway's union activity. Callaway testified as follows:

Q. So help me understand your theory as to why they fired you.
A. I'm not quite sure. Again, I think a lot can attribute it back to Jim Breeze...
Q. So you believe that the review board and those involved–by that, I mean Mr. Hyatt and Mr. Holt ultimately as the VP–that they were being coerced in–or that they were being influenced into doing something that had an ulterior motive by Jim Breeze.
A. Yes, it's possible, yes.
Q. And the factual basis for that belief is what? Is it just a belief theory you have, or do you have evidence?
A. Well, Mr. Hyatt testified that he–Jim Breeze ever regretted hiring me. And he also testified that he did not recommend my termination...
Q. But the theory you've proposed is that it's Jim Breeze who is the one who set you up for termination.
A. Yes.
Q. And the factual basis for that is Mr. Hyatt suggesting that he initially did not want you terminated.
A. Mr. Hyatt did not–
Q. Right.
A. –testified that he did not recommend termination.
Q. And that's one of the factual bases for you believing that it was Jim Breeze that was trying to get you fired.
A. It certainly points that direction.
Q. So is the answer yes?
A. Yes.
Q. And what else? What other facts?
A. Well, the facts that several correspondence in here from Jim Breeze, emails requesting and soliciting documents against me that have been backdated by one to two years.

*SkyWest has selected certain portions of Callaway's deposition and cited them out of context to distort what he said. On page 237 Callaway was asked why he was terminated and another pilot, Palmer, was terminated, but then reinstated:*

*Q. Why do you think, then that you were terminated and he was not?*

*A. I think it's - - it goes back to Mr. Breeze and the theory that was presented to me from SAPA that initially I was - - embarrassed him by posting union organizing subject matter on the Internet. It stemmed from that.*

*Callaway reiterates that his union activities were key to the termination a few pages later, at page 246 (a portion conveniently left out by SkyWest):*

*Q. Why is it that you think he wanted to have you fired? Is it because of the December 2000 meeting?*

*A. The December 2000 meeting and the counseling statement, you know, mentioned my posts on - - that I authored on the Web site for union organizing.*

*Q. The ones that you were counseled about in December of 2000?*

*A. That's correct. I believe that those activities pissed them off.*

*Callaway also testified that he believed that complaint by Kristen Wiley was pretextual and not the real reason for his discharge (Callaway Deposition at 266-7):*

*Q. Did you tell the panel that you believed you were being terminated because of the Kristen Wiley incident?*

*A. I believe that was the catalyst that caused the termination. It was like the last straw that they were going to deal with. I believe that all these incidents passed that were made to believe - - to, you know, show a pattern based on fabrication and documents that were false, with false allegations.*

...

*Q. And you believe they were fabricated or created to terminate you because of what?*

*A. They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And, they're going to build whatever they can to show a pattern of this type of behavior.*

56. Callaway testified that he was fired because of the response email he wrote to Mr. Hyatt regarding his treatment of Ms. Wiley. Callaway stated the following:

Q. Why do you think you were terminated?
A. Well, I believe I was terminated because of this email.

*See the response to previous paragraph. Also, as outlined above in response to paragraph 48, Callaway believed that the email was the "catalyst" for his termination and that the real reason was his pro-union postings.*

57. John Wangensteen, a pilot for SkyWest who has worked for SkyWest for approximately fourteen years was asked to be a member of Callaway's final review board.

*Callaway does not dispute that Mr. Wangensteen was on the Review Board.*

58. Mr. Wangensteen was a member of the SkyWest Airline Pilots Association ("SAPA").

*SAPA is a SkyWest pilot's organization organized by SkyWest's management which has vehemently opposed a pilots' union.* Holt Dep. at 57. *Mr. Wangensteen testified that "as a collective body, that we would have been basically against the union drive."* Deposition of John Wangensteen dated February 14, 2005 ("Wangensteen Dep") at 26 (copies of the relevant pages are attached as Exhibit "14.") *Mr. Wangensteen noted that while SAPA would not take "an official stand" that SAPA's "19 members believe that the system . . . we have in place today . . . better represented the pilots."*

Wangensteen Dep. at 27. *SAPA clearly has no ability to collectively bargain with SkyWest.* Holt Dep. at 57. *By placing SAPA members on the Review Board as "peer members" SkyWest ensured that there were no pro-union members.*

59. Robert Donahue is also a member of SAPA and was asked to participate in the review board.

*Callaway does not dispute that Mr. Donahue is a SAPA member who participated on the Review Board.*

60. During Callaway's presentation to the review board, he never told the board that he thought he had been terminated because he was a union organizer.

*While Callaway did not make an explicit statement, as outlined above in response to paragraph 53, Callaway made clear that he thought the termination process was started as a result of his union postings.*

61. In fact, Callaway's direct supervisor, Kelvin Hyatt, did not even know that Callaway was involved in any union organizing.

*It is irrelevant whether Hyatt knew of Callaway's organizing activities as he did not make the decision to terminate Callaway. It is undisputed that Breeze and Holt both knew of Callaway's activities* ***and*** *made the decision to terminate him.*

## ARGUMENT

### I. THERE IS A GENUINE FACTUAL DISPUTE AS TO WHETHER CALLAWAY'S UNION ACTIVITIES WERE A MOTIVATING FACTOR IN HIS TERMINATION

SkyWest argues that Callaway's RLA claim should be dismissed, claiming that SkyWest did not even know that Callaway was a union organizer. SkyWest Revised Memo ("SkyWest Memo") at 6. Such an argument exemplifies the approach that SkyWest has taken in the pending Motion. Apparently, SkyWest believes that it can ignore the testimony and evidence demonstrating that there are disputed material facts related to almost every issue in this case. As outlined above, there are numerous disputed facts which a jury must determine. At a minimum, those disputed facts preclude summary judgment.

The decision to terminate Callaway was made by SkyWest's Chief Pilot, Breeze, and Vice President of Operations, Holt. Breeze Dep. at 33, 35-6; Holt Dep. at 87-91; Hyatt Dep. at 105. Holt and Breeze summoned Callaway to St. George at the end of 2000 to "question" him about pro-union postings that he had made on an independent website. Breeze Dep. at 23-4, 39-41; Holt Dep. at 85-6, 92-4. SkyWest subsequently and repeatedly referred to Callaway's pro-union postings when it disciplined him. SkyWest then used the postings as a reason for suspending Callaway, and then in 2003, as a reason for terminating him. Indeed, even SkyWest's Memo cites to those pro-union exhortations

as a basis for firing Callaway. *SkyWest Memo* at v, 11. Of course, SkyWest attempts to disguise those statements, but this disguise is at best superficial. Nonetheless, it is clear that, at a minimum, there is a disputed fact as to SkyWest's claim that it was ignorant of Callaway's organizing activities and the role those activities played in SkyWest's decision to terminate Callaway.

At pages 6-7 of its memo, SkyWest sets forth a four-part test, taken from *Lebow v. Am. Trans Air*, 86 F.3d 661, 666 (7th Cir. 1996), that can be used for determining if Callaway has made out a *prima facie* case of wrongful discharge in violation of the RLA.[5] Callaway does not dispute the elements of the *Lebow* "test" set forth in SkyWest's Memorandum, or even that it may be helpful in this case.[6] A few points are in order, however. First, since this matter is before the Court on summary judgment, the issue is not whether Callaway will ultimately prevail, but simply whether there is a question of

[5] The elements set forth in *Lebow* are that: 1) he engaged in union . . . activities; 2) the employer knew of the employee's involvement in protected activities; 3) the employer harbored animus towards those activities; and 4) there was a causal connection between the employer's animus and its discharge decision. *Lebow* 86 F.3d at 666.

[6] The test set forth in *Lebow* is taken from cases arising under the National Labor Relations Act ("NLRA"). The Tenth Circuit has not yet addressed whether it would adopt the same test, although its reliance on NLRB case law in other cases involving the RLA indicates that it might adopt the test, if given the chance. *See Davies v. American Airlines, Inc.*, 971 F.2d 463 (10th Cir. 1992)(utilizing a test taken from a case under the NLRA in a RLA case to determine if the dispute involved interpretation of the collective bargaining agreement).

material fact as to each of the elements of the claim. *See Brown v. Parker-Hannifin Corporation*, 746 F.2d 1407, 1411(10th Cir.1984)("Where different ultimate inferences may be drawn form the evidence, . . . the case is not one for summary judgment). Second, the Tenth Circuit has cautioned against requiring a plaintiff to use a "rote formula" to make about a *prima facie* case. *Ready Mix Concrete Company v. National Labor Relations Board*, 81 F.3d 1546, 1551(10th Cir. 1996)(commenting on the use of the same test in the context of the NLRA). Rather, once the evidence either directly or circumstantially establishes that the employer knew of the employee's union activities, many different factors can be used to make out the prima facie case: comments by a supervisor, evidence that the reasons given for the discharge seem pretextual, or if the employer's explanations seem unreasonable. *Id.*

Finally, although the use of the term *prima facie* is reminiscent of Title VII claims, the burden of proof is different. Unlike Title VII cases where the employer simply has to articulate a non-discriminatory reasons for the discharge, under the RLA, once the employee has made out a *prima facie* case, the "burden shifts to the employer to *prove by a preponderance of the evidence* that the employee would have been fired anyway for a valid reason." *Lebow* at 86 F.3d at 666 (emphasis added).

The disputed facts related to SkyWest's alleged non-discriminatory reasons for Callaway's discharge present a conflict which only the finder of fact can resolve.

### A. There is Substantial Evidence that SkyWest Knew About Callaway's Protected Activities.

SkyWest admits that Callaway engaged in union organizing activities. Callaway sat on organizing committees, handed out union cards, and regularly posted pro-union statements and comments on the pilots' forum on the SAPA run (and independently owned) website in an effort to promote support for the union. However, despite its repeated use of Callaway's website postings as a basis for discipline, SkyWest now argues that it did not know about these activities. But by disciplining Callaway for those activities, SkyWest cannot deny that it knew about them. Breeze, the company's chief pilot, admits that he saw the postings that Callaway had made on the website, and that he knew that his boss, Holt, also had access to those postings. Breeze Dep. at 40-1. Holt similarly acknowledges seeing those posts, and testified that they were sent to him through the company's intra-mail. Holt Dep. at 85-6, 94. Further, both Holt and Breeze acknowledge that these postings caused them to call Callaway to St. George in December of 2000, to warn him that this conduct was unacceptable. Breeze Dep. at 23, 39, 54; Holt Dep. at 85-6, 93.

While SkyWest tries to contend that Callaway's postings had nothing to do with union organizing, the evidence is otherwise. Callaway testified that most, if not all, of his posts involved union organizing and included opinions, research and statistics regarding benefit packages and comparisons with other airlines. Callaway Dep. at 51. While

Breeze and Holt now claim that they no longer specifically remember that Callaway's posts were pro-union and in favor of the organizing efforts, their testimony belies this assertion. The memo that Breeze prepared about the December meeting where Callaway's postings were discussed, states that "Andy had repeatedly made inflammatory and unfair statements on the company web site [*sic*] about the company and its policy." *See* Exhibit "5." Holt testified that the posts reflected poorly on "Andy's attitude," that he had made comments about management and issues with the company, and that in the posts Callaway had said he did not like the company and did not like management. Holt Dep. at 85-6. Breeze's and Holt's testimony about Callaway's posts is consistent with the type of posts that would be made during a union organizing campaign. Indeed, the Tenth Circuit has acknowledged that saying that an employee has a "bad attitude" is often a way of labeling a union sympathizer. *Webco Industries, Inc. National Labor Relations Board*, 90 Fed. Appx. 276, 287 (10th Cir. 2003) (Attached as Exhibit "15"). Finally, the posts that Callaway made are irrefutably supportive of a union. *See* Statement of Fact 14. Further, Callaway's posts from the following year, all involve union organizing and are the same type as he posted the previous year. Deposition Exhibit 56, (a copy is attached as Exhibit "16").

These facts are irrefutably sufficient to at least create a question of fact as to whether SkyWest knew of Callaway's protected activities, and therefore, satisfy the

second part of the *Lebow* test. SkyWest cannot circumvent this by claiming that Kelvin Hyatt, Callaway's immediate supervisor, did not know that the posts involved the organizing campaign. Hyatt was not the person who made the decision to terminate Callaway. Hyatt Dep. at 105-6. Rather, the termination decision was made by Breeze (after consulting with his subordinate chief pilots) and Holt. Breeze Dep. at 90; Holt Dep. at 88-90. And, for the purposes of summary judgment, their knowledge of Callaway's protected activities must be taken as true.

**B. SkyWest's Animosity Towards Callaway's Union Activities is Another Disputed Material Fact**

SkyWest next argues that there is no evidence that it harbored any animosity towards Callaway's union activities. *SkyWest Memo* at 7-8. The evidence for this, SkyWest claims, is that its union free statement on its website is not coercive or unlawful. Further, SkyWest argues that even if its actions in 2000 in calling Callaway to St. George to warn him about his activities reflects animus, its overtly anti-union discipline is too remote in time from when it fired Callaway.[7] In regards to the first argument, SkyWest has again carefully ignored most of the relevant facts demonstrating its anti-union animus. Similarly, in regards to the second argument, SkyWest also ignores facts showing that

---

[7]SkyWest apparently makes these arguments to show that Callaway has not created an issue of material fact in regards to the third element (animus towards union activities) of the *Lebow* test. However, they would also seem to go to the fourth element (connection between this animus and the termination) of that same test.

Callaway's union organizing was a recurrent and ongoing concern of SkyWest and the repeated basis for disciplining him.

Callaway concedes that solely looking at the carefully word crafted language of SkyWest's union free statement on its website is insufficient to show anything more than SkyWest's intense dislike of unions. One would expect no less from a company whose responses to union organizing campaigns are carefully monitored and crafted by the law firm of Ford & Harrison, which specializes in the area. Holt Dep. at 58-81. However, anti-union animus can be shown in many different ways:

> An employer's anti-union motivation may be proven by circumstantial evidence. *Intermountain Rural Elec. Ass'n v. NLRB*, 732 F.2d 754, 759 (10th Cir. 1984). Thus, proof of an employer's specific intent to discriminate is unnecessary, and the evidence may provide a presumption of intent. *Presbyterian/St. Luke's Med. Ctr. v. NLRB*, 723 F.2d 1468, 1476 (10th Cir. 1983). The NLRB may consider factors such as the employer's knowledge of the employee's union activities, the employer's commission of other unfair labor practices, the timing of the employer's action, and the credibility of its explanation of the reasons for the discharge. See *Ready Mixed Concrete Co.*, 81 F.3d at 1550-51.

*MJ Metal Products, Inc., v. National Labor Relations Board*, 267 F.3d 1059, 1065 (10th Cir. 2001).

Here there is substantial evidence creating a question of fact as to whether SkyWest harbored an anti-union animus. First, SkyWest's conduct towards Callaway in 2000 by itself is evidence of such. Callaway was directed to go to corporate headquarters where he was forced to meet with the vice-president and chief pilot who castigated him

about his union posts, repeatedly told that he had a bad attitude towards the company and, in the words of Jim Breeze, "warned by both Brad and myself that this behavior would not be tolerated." Exhibit 5. This episode constitutes an unfair labor practice because the questioning was coercive and directly threatened Callaway if his union activities did not cease. *Monfort v. National Labor Relations Board*, 145 L.R.R.M. 2923, ¶¶ 33-4 (10th Cir. 1994).[8]

Further, this episode with Callaway was not an isolated one. Another union organizer, Steve Kanuch, was also called to St. George to discuss his pro-union posts. *Callaway Affidavit* at 6-8. Kanuch was told that the posts were unacceptable and embarrassing. *Id.* As a result of these posts, SkyWest took away Kanuch's check airman status, which had been earning him $15 per hour in additional wages. *Id.* Similarly, SkyWest's treatment of Phil Alford, another pro-union organizer, also shows the anti-union animus of SkyWest. Alford lost his check airman status when he asked SkyWest to reconsider the termination of another pilot who refused to fly a Comair jet into a Comair station during a strike of Comair pilots. All of these incidents could easily have been

---

[8]Importantly, as discussed in the last argument, SkyWest admits that these anti-union postings were one of the reasons it fired him in 2003. This is a violation of the RLA.

found to constitute unfair labor practices which violate the RLA and show a pattern of anti-union animus on the part of SkyWest.

Even if this testimony were not enough to create a question of fact as to SkyWest's antipathy towards unions (and it is) it should be pointed out that not all of its anti-union literature is as benign as its web page. For example, in July of 1999, Holt sent out a letter to all pilots which stated that they would have to pay dues and that there were "no exceptions." Holt Dep. Exhibit 64, a copy is attached as Exhibit "17." Such a statement violates Utah's Right to Work law, Utah Code Ann. § 34-34-1 *et. seq.*, which provides that no employee can be forced to join a union, even if it becomes the recognized bargaining agent for the unit. Accordingly, Holt's statements were not only false, but were designed to threaten and intimidate pilots who might be thinking about voting for the union. A second letter to pilots, dated July 20, 1999, is similarly improper and also probably an unfair labor practice. Holt Dep. Exhibit 67, a copy is attached as Exhibit "18." In that letter SkyWest states that if a union is voted in it will have no incentive to pay well, provide good benefits, or have beneficial work rules, implying that such things will be withdrawn. Sending out a letter containing statements which threaten employees with retaliation for supporting a union constitute an unfair labor practice and is further proof of SkyWest's position towards unions.

In summary, there is substantial evidence from which a jury could decide that Callaway's termination was motivated by SkyWest's anti-union animus. Such a conclusion is further strengthened by SkyWest's repeated reliance on Callaway's union activities when disciplining him and by the lack of credibile reasons for his discharge. Suffice it to say, that there is a factual dispute as to the third element in the *Lebow* test.

SkyWest also argues that even if the episode at the end of 2000 shows anti-union animus it is too remote in time to the termination in 2003 (which really goes to the fourth element in the *Lebow* test). *SkyWest Memo* at 8-9. SkyWest cites to two cases, *General Electric Co. v. NLRB* (D.C. Cir. 1997) and *Goldtex Inc. v. NLRB*, 14 F.3d 1008 (4th Cir. 1994), in support of its argument. However, *General Electric* is factually distinguishable and *Goldtex* does not stand for the proposition cited by SkyWest.

In *General Electric*, the length of time between the election and the firing was only mentioned in passing. Rather, the court focused on the fact that there was substantial evidence showing that the employee had actually violated a work rule which supported termination. Further, there was no evidence that the employer was actually considering the employee's union activities when it terminated him.

This is diametrically opposite of what occurred here. SkyWest called Callaway to St. George in December of 2000, which was about 2 ½ years before his termination, and castigated about his union activities. However, during the 2 ½ years after that meeting,

SkyWest repeatedly referenced, and relied upon Callaway's pro-union activities in disciplining him. First, SkyWest memorialized Callaway's pro-union activities in a memo written by Breeze and placed in Callaway's personnel file. Exhibit 5; Breeze Dep. at 39. A year later, Callaway's pro-union organizing was again cited in support of a suspension that SkyWest imposed on Callaway. In November of 2001, an airport employee in Butte Montana complained that Callaway had acted improperly going through security check (he apparently asked them why they had to have all the bags emptied). SkyWest served Callaway with a Counseling statement (and three week suspension) citing the protected activities as further justification for the suspension:

> This is not the first time you have counseled on your behavior. During the summer *[sic]* of 2000, you were summoned to Corporate Headquarters for verbal consultation in reference to abusive treatment of crew support personnel and posts you authored on the Web Boards.

Hyatt Dep. Exhibit 7, a copy is attached as Exhibit "19." The postings on the web site by Callaway were again raised, this time to the review board which was reviewing the suspension, by Salt Lake Chief Pilot Hyatt, as support for the suspension. Exhibit 5. While neither the counseling statement or Hyatt's comments specifically refer to union organizing, the repeated reference to "web postings" and being called to St. George is but a coded reference to those activities.

But most crucially, there is also evidence that Callaway's pro-union activities, referred to by SkyWest as "web posts," motivated the termination decision as well. The

ostensible reason given for Callaway's termination by SkyWest was the complaint by Kristen Wiley. Callaway's supervisor, who apparently did not know about the content of those web posts, did not feel that her complaint warranted termination. Hyatt Dep. at 113-4, 106, 110. Hyatt however, prepared a summary of Callaway's file which was similar to Exhibit 13. That summary noted that Callaway had been called to St. George because of "inflammatory and unfair statements on the company website . . . " *Id.*[9] This summary was sent to Breeze and Holt, the two individuals who, unlike Hyatt, were fully aware that web posts involved pro-union exhortations. Breeze Dep. at 34, Holt Dep. at 91. After reviewing this summary, Breeze and Holt, unlike Hyatt, decided that Callaway should be terminated. Breeze Dep. at 90, Holt Dep. at 19, 90.

When Callaway appealed his termination to the review board, Hyatt represented SkyWest. Hyatt took his summary and used it as a basis for his presentation to the Board. Exhibit 13. One of the items presented to the Board, as justification for Callaway's termination, was "inflammatory and unfair statements on the company website." *Id.*, page SW 297. In his closing summary, Hyatt again referred to the "abusive writings on the website" and stated that Callaway had been warned that his behavior would not be

---

[9] Hyatt's summary set the meeting in June instead of the correct date of December. He also mistakenly stated that the posts were on the company website, instead of on the privately run and owned SAPA site.

tolerated. *Id.*, page SW 205. As Hyatt said to the Board, these postings were part of what he called a disregard for rules of conduct drawn up by the company. *Id.*

So, unlike *General Electric*, at least as far as SkyWest was concerned Callaway's organizing efforts were not remote in time. Rather, they were something that the company repeatedly referred to and specifically used as at least part of the reason for his termination. Even if there were other, legitimate reasons for the termination, a jury could conclude that Callaway's union activities were at least part of the reason for the termination. If this is found to be the case, SkyWest's termination of Callaway violated the RLA. *N.L.R.B. v. Transportation Mgmt. Corp.*, 462 U.S. 393, 399 (1983).

Contrary to SkyWest's contention, *Goldtex* actually supports Callaway's position. In *Goldtex*, one of the terminated employees had, like Callaway, been vocal in his support for the organizing activities. The *Goldtex* court found that his discharge was motivated by his union involvement, even though 2 years had elapsed without significant organizing activities, or references to that organizing by the company. It was only in regards to the employees whose positions regarding the union was either unknown, or at most weakly expressed some two years earlier, that the court conclude that they were not terminated for supporting the union. In short, the court concluded that even when the employer does not keep bringing up the union activities, as did SkyWest, a passage of 2 years does not protect the company.

A jury could conclude that because of SkyWest's repeated references to the pro-union web postings, including the reference in the summary prepared by Hyatt, and presented to the review board, that SkyWest did terminate Callaway, at least in part because of Callaway's union activities. Of course, SkyWest contends that there is no linkage. However, looking at all the facts, and not just the few picked out by SkyWest, a dispute as to a material fact exists which precludes summary judgement.

**C. SkyWest Has Distorted Callaway's Testimony About his Termination.**

SkyWest also argues that Callaway's own testimony undercuts his claim that he was fired because of union activities. *SkyWest Memo.* at 9-10. SkyWest then quotes from very selective portions of Callaway's deposition, cutting out and ignoring those portions which are unhelpful, and splicing together the edited portions so as to distort Callaway's actual testimony. A more objective review of his deposition shows that his testimony is consistent with the legal arguments made in this memo. While Callaway did state that he thought Breeze was behind his termination (which Breeze himself admits) Callaway repeatedly asserts that his union postings were at the root of the termination.

Callaway was asked why he was terminated and another pilot, Palmer, was terminated, but then reinstated:

Q. Why do you think, then that you were terminated and he was not?

A. I think it's - - it goes back to Mr. Breeze and the theory that was presented to me from SAPA that initially I was - - embarrassed him by posting union organizing subject matter on the Internet. It stemmed from that.

Callaway Dep. at 237.

Callaway reiterated that his union activities were key to the termination (a portion conveniently left out by SkyWest):

Q. Why is it that you think he wanted to have you fired? Is it because of the December 2000 meeting?

A. The December 2000 meeting and the counseling statement, you know, mentioned my posts on - - that I authored on the Web site for union organizing.

Q. The ones that you were counseled about in December of 2000?

A. That's correct. I believe that those activities pissed them off.

Callaway Dep. at 246.

Callaway also testified that he believed that complaint by Kristen Wiley was pretextual and being used as a convenient excuse to mask the real reason for his termination. While Callaway does not use this exact wording, he should not be expected to use legal terminology. In any event, the meaning he conveys is clear that he did not believe the Wiley complaint was the real reason for his discharge:

Q. Did you tell the panel that you believed you were being terminated because of the Kristen Wiley incident?

A. I believe that was the catalyst that caused the termination. It was like the last straw that they were going to deal with. I believe that all these

incidents passed that were made to believe - - to, you know, show a pattern based on fabrication and documents that were false, with false allegations.

...

Q. And you believe they were fabricated or created to terminate you because of what?

A. They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And, they're going to build whatever they can to show a pattern of this type of behavior.

Callaway Dep. at 266-67.

In summary, there is no merit to SkyWest's contention that Callaway's testimony does not support the claims made in this litigation.

SkyWest also argues that because Callaway did not argue to the review board that his termination was a result of his union organizing he is somehow estopped from making that claim. This too is without merit. While Callaway did not refer to union organizing directly, he repeatedly referenced his pro-union postings on the website. *See Statement of Facts* 53, 55, 56, 60. Further, there is no requirement that the claim brought in this litigation (under the RLA) had to be raised first in some other forum. This is not a Title VII discrimination suit which requires that a charge first be filed with an administrative agency. There is no such requirement under the RLA. Callaway was free to argue to the board whatever he thought would be most helpful. He knew that one of the persons on that board was a manager. The other two were SAPA members. SAPA was the in-house organization created by SkyWest management (presumably so that the pilots would feel

no need for a union). Because of their backgrounds, Callaway was fearful that the individuals on the board would be hostile and opposed to a real union. Accordingly, he felt he had a better chance at reinstatement if he did not directly raise the union issue at that hearing. Choosing not to do so for strategic reasons does not adversely affect his claims in this litigation as there has been no "intentional relinquishment of a known right." *K+T, Inc., v. Taylor*, 888 P.2d 623, 628 (Utah 1994).

### D. SkyWest Admits that Callaway's Protected Activities Were Part of the Reason it Fired Him.

Even if a jury were to find that Callaway has failed to make out a *prima facie* case (or at least shown that there are materially disputed facts), SkyWest claims that it has proven that it would have fired Callaway anyway. This is, SkyWest contends, because Callaway exhibited a pattern of disruptive conduct. However, SkyWest has distorted what occurred and, even more importantly, actually admits that it considered Callaway's protected activities in deciding to terminate his employment. SkyWest has therefore admitted that it violated the RLA.[10]

As discussed above at page 3, once a plaintiff has made out a *prima facie* case, the burden of proof shifts to the employer to prove that it has not violated the RLA. This is not, however, an insubstantial burden. The employer cannot simply prove that the

[10] Because of this admission, the Court should consider granting partial summary judgment, on this issue of liability, to Callaway.

employee's protected activities was but one of the reasons for the termination. It is not even sufficient for the employer to prove that its anti-union animus was not the primary reason for the termination. Rather, the employer must show that the protected activities of the employee played absolutely no role in the termination:

> In an unfair termination action under the Act, "the General Counsel need show by a preponderance of the evidence only that a discharge is in any way motivated by a desire to frustrate union activity . . . ." *N.L.R.B. v. Transportation Mgmt. Corp.*, 462 U.S. 393, 399, 76 L. Ed. 667, 103 S. Ct. 2469 (1983). However, "proof that the discharge would have occurred in any event and for valid reasons amounts to an affirmative defense on which the employer carries the burden of proof by a preponderance of the evidence." *Id.* at 400. The employer "does not violate the NLRA . . . if any anti-union animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause." *Id.* at 398. (emphasis added)

*Webco*, 90 Fed. Appx. at 286; *See also National Labor Relations Board v. Interstate Builders, Inc.*, 351 F.3d 1020 ((10th Cir. 2003)(if the anti-union animus actually contributed there is a violation of the act).

SkyWest cannot show that the undisputed facts prove its anti-union animus did not contribute at all to Callaway's discharge. It is undisputed that SkyWest called Callaway to St. George in December of 2000 and threatened that he could lose his job over his pro-union posts. Callaway's pro-union activities were again mentioned in the Counseling statement Callaway received a year later and used in support of his suspension. Those union organizing activities were included in the summary prepared by Hyatt in 2003 and

considered by Breeze and Holt in deciding to terminate Callaway. Hyatt also used Callaway's pro-union postings as a reason why the review board should uphold the termination decision, Such evidence, by itself, creates a question of fact as to whether SkyWest's antipathy towards Callaway's organizing activities played a part in its termination decision, thereby precluding summary judgment.

If this were not enough, however, SkyWest's Memorandum in support of its summary judgment motion leaves no doubt that Callaway's activities were considered by SkyWest in deciding to terminate him. In its statement of facts, page v, SkyWest admits that during the December 2000 meeting it discussed the pro-union posts with Callaway. In fact, SkyWest characterizes these posts as "Derogatory Remarks about SkyWest." *SkyWest Memo* at v. These posts, and the ensuing meeting in St. George, are then specifically referenced at pages 11-12 of its memo and given as part of a pattern of "unprofessional and abusive behavior" which led to his termination. SkyWest Memo. at 11-12. By including the Callaway's pro-union posts on the website, an activity clearly protected by the RLA, as part of a pattern of behavior which justified termination, SkyWest is doing nothing less than admitting that protected activity played a part in its decision to terminate Callaway. Even though there might have been non-protected reasons for the discharge as well, because the protected activity played a role in its

termination decision, SkyWest has violated the RLA.[11] *Lebow* at 667. In the least, there is a factual dispute as to whether SkyWest can show that its anti-union animus towards Callaway played no role its termination decision.

Further, there is a question of fact as to whether the other incidents of "unprofessional conduct" cited by SkyWest are to be believed. SkyWest refers to Callaway being counseled for his abusive treatment of schedulers. *SkyWest Memo* at 11. However, neither Holt nor Hyatt, his immediate supervisor, have any recollection that Callaway's supposed mistreatment of schedulers was raised with him at the St. George trip. Holt Dep. at 86; Exhibit 5. Holt, who called the St. George meeting, does not recall that the issue of schedulers was even discussed at that meeting. All he recalls is discussing the web postings. Holt Dep. at 85-6. Further, the alleged complaint seems to refer to someone other than Callaway, as it refers to someone who had bid a commutable line, something Callaway had never done. A jury could easily conclude that the issue of the schedulers was either fabricated or at worst, a minor one, and that it was raised only to try to disguise that Callaway was being called to St. George for his union activities.

---

[11] Even if the Court concludes that SkyWest's burden of proof is only to show that it would have made the same decision in the absence of the protected activity, summary judgment is still inappropriate. Because SkyWest has included the protected activity in its argument justifying termination, it has basically waived any argument that it would have made the same decision even in the absence of the protected activities.

Similarly, SkyWest's conclusion that Callaway did something wrong in Butte is subject to dispute. SkyWest ignored that another pilot who was at the airport with Callaway, had told them that he did not observe Callaway doing anything inappropriate. Black Dep. at 18. Neither did it look at the security camera tapes which would have shown what, if anything, happened. Holt Dep. at 105. This lack of investigation, and SkyWest's quickness in concluding that Callaway did something wrong, could be interpreted as SkyWest looking for some basis to get rid of Callaway, a union organizer. Particularly when the pro-union posts were included in the counseling statement he received for the alleged incident.

SkyWest's reliance on the allegations about the party house are also suspect. It never looked into the incident, and in fact at the time did nothing but call Callaway in and tell him to be more circumspect. Hyatt Dep. at 145, 162. The allegations about Callaway's conduct at the training class are also transparent, as Callaway never even knew there was an alleged problem until after he was fired. *Statement of Facts 25-27.* Finally, the allegations regarding the emails to Kristen Wiley are also suspect. Callaway was supposedly terminated for misuse of the company's intra-net. Yet, Holt, Breeze and Hyatt all admit that the SkyWest had no policy governing what could, or could not be

posted on the intranet. Breeze Dep. at 38; Holt Dep. at 107-8; Hyatt Dep. at 187.[12] Wiley also seems to have "enhanced" the alleged effect the emails had on her. Further, even if the Wiley emails precipitated the termination, a jury could still find that SkyWest had mixed motives in firing Callaway, and would not have done so absent the protected conduct.

In summary, a jury could conclude that these supposedly legitimate reasons for Callaway's termination were but a pretext. The questionable credibility of the reasons given by SkyWest is further evidence that SkyWest was motivated by anti-union animus. *National Labor Relations v. Interstate* at 1027.

## CONCLUSION

For the reasons set forth above, there are factual disputes as to whether Callaway has made out a *prima facie* case for wrongful discharge under the RLA and whether SkyWest has met its burden of proof. SkyWest's summary judgment motion should therefore be denied.

---

[12] This is apparently why SkyWest claimed that Callaway had violated the policy on sexual harassment, although the communications clearly were not of sexual nature.

Dated this 6th day of February, 2006

**STRINDBERG SCHOLNICK & CHAMNESS, LLC**

ERIK STRINDBERG
RALPH E. CHAMNESS
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing **MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was hand delivered this 6th day of February, 2006 to:

Scott M. Petersen
David N. Kelley
FABIAN & CLENDENIN
215 South State Street, 12th Floor
Salt Lake City, Utah 84111
Facsimile: 596-2814

and mailed via first class mail, postage prepaid to:

Todd C. Emerson
SKYWEST AIRLINES,
444 South River Road
St. George, Utah 84790

U:\Current Client\Callaway_DA\Pleadings Federal\MSJ_draft.wpd