# EXHIBIT "1"

# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY (VOL. I)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT: The Law Offices of
Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, Utah

DATE: Wednesday, December 8, 2004

TIME: 9:16 a.m.

REPORTED BY: Scott M. Knight, RPR

[redacted]

Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City | Washington, DC | New York | Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180 | Toll Free: 877-441-2180 | Fax: 801-983-2181

www.thackerco.com

A. Yes. Yes, it was--
Q. Tell me what that's all about.
A. Invited me to a class in early 1998. January, I believe--January or February of 1998.
Q. All right. And did you attend?
A. I did not attend.
Q. Why not?
A. I was informed that my father had cancer. And I was unable to attend.
Q. How were you informed that your father had cancer?
A. My father called me.
Q. What did he say?
A. He was going in the hospital for cancer--for surgery.
Q. Was this after or before you were selected for employment?
A. This was after selected for employment.
Q. And what did you do at that point?
A. I made the decision to take care of my family obligations, notified SkyWest I was unable to attend the training.
Q. What kind of cancer did your father have?
A. Thyroid cancer.

Q. Where was he at at the time?
A. He was in surgery in New York.
Q. Do you recall the hospital?
A. I don't.
Q. And you attended to family matters meaning you went to be by his side.
A. Yes.
Q. Is that in a nutshell? Were your parents divorced at the time?
A. Yes.
Q. Did your brother go as well?
A. At the time, my brother was not living out here.
Q. Where was he at?
A. He was back East. Or no. Excuse me. Where was he? I believe he was in Tennessee at the time.
Q. And nonetheless, you made the decision that you would go be with your father.
A. That's correct.
Q. What kind of treatment was your father to receive? Do you recall?
A. He underwent surgery to remove the cancer and then followed by radiation surgery.
Q. And did the surgery take place before

your scheduled training?
A. I don't recall.
Q. You--
A. I don't know.
Q. You don't remember?
A. I don't remember the date of the surgery, no.
Q. You don't recall whether it was prior to or after the date of your--that you were scheduled to go do training.
A. I believe it was right after training, right after the start of training.
Q. Did you call SkyWest at the time and tell them that your father had thyroid cancer and you wouldn't be able to make it?
A. Yes, I did.
Q. Who did you talk to?
A. I don't recall. I believe it might have been Kim Ence.
Q. Do you recall the substance of the conversation?
A. I just said that I was unable to attend the class that was to begin in a few days because of a family emergency.
Q. And what were you told in response?

call with--you said it was Mr. Ence.

A. I believe Kim Ence.

Q. Kim Ence. Okay. With Ms. Ence. After your phone call with Ms. Ence, you--your father went through surgery, or was it--the surgery prior to the phone call?

A. He was in the hospital when I made the phone call. And the surgery happened afterwards.

Q. Did you request that they let you continue it to another time, your training?

A. I asked about that. It was told that, no, it cannot be rescheduled.

Q. So was it your understanding at that point, then, that you were no longer going to be employed by SkyWest?

A. That was my understanding.

Q. You sent letters thereafter requesting that SkyWest consider you again for employment.

A. Yes.

Q. Several letters, right?

A. Yes.

Q. And eventually, you were allowed to submit a second application.

A. Yes. I believe I was advised to submit an--a second application.

Q. Who advised you to do that?
A. Jim Breeze.
Q. How did you get a hold of Jim Breeze?
A. I called him on his phone.
Q. Directly?
A. Yes.
Q. Had you interviewed with Mr. Breeze in your first interview?
A. I had not. I had met with Jim Breeze before my interview, though.
Q. And why is it that you met with Mr. Breeze?
A. Mr. Breeze was acquaintances with a gentleman I was flying with corporate at Jet Sales and Services.
Q. Who was that?
A. Mike Jones.
Q. So Jim knew Mike.
A. Yes.
Q. Did Mike talk to Jim for you?
A. Yes.
Q. And said you're what, you're a great guy, hire him? Is that what you understand the conversation--
A. It's what I understand it to be, yes.

Q. All right. So those two bullet points are accurate, correct?
A. Yes.
Q. All right. The third one says, "In June 2000 Andy was summoned to headquarters to meet with Brad Holt and Jim Breeze because of comments made on the company Web site." Were you summoned in June 2000 to headquarters to meet with Brad Holt and Jim Breeze?
A. No.
Q. Where are headquarters?
A. St George, Utah.
Q. Do you recall ever being summoned to headquarters?
A. Yes.
Q. And you're saying it didn't happen in June of 2000.
A. That's correct.
Q. All right. Tell me when the first time you were summoned to headquarters?
A. I believe it was December of 2000.
Q. All right. And you were asked to meet with Brad Holt and Jim Breeze.
A. That's correct.
Q. And were you asked to meet with them

because of some comments that were made on a company Web site?

A. At the time, I was not told why I was meeting with them. It was--

Q. When you were summoned, you were not told why.

A. Right.

Q. All right. When you got there were you told that you had made comments on a company Web site that were inappropriate?

A. That's correct.

Q. And that was with Brad Holt and Jim Breeze.

A. Yes. And Chris Abell.

Q. Now, when you were working at SkyWest--who was your immediate supervisor in December of 2000?

A. That would have been Kelvin.

Q. Kelvin Hyatt?

A. Hyatt.

Q. Sorry. I pronounced that wrong.

And so when you went--who was it that asked you to go in in December of 2000?

A. Brad Holt phoned me at home and said he wanted to see me in St. George.

Q. --and said, I have a meeting with Kelvin--or with Brad Holt on Monday. Will you be there?

A. To the best of my recollection, yes.

Q. And did Mr. Abell tell you, Why are you being summoned?

A. He did not know either.

Q. So you said, I don't know why I'm being summoned, to Mr. Abell.

A. That's what I said, yes.

Q. You guys didn't talk about what you thought it might be about.

A. Well, that was mentioned, but he didn't understand it either.

Q. All right. So when you show up--whose office are you in?

A. Brad Holt's office.

Q. Tell me what happens in that meeting.

A. The meeting started off with--I was presented a calculator, asked to add up some numbers and read those numbers back out. Those numbers then--he referred to those numbers as, This is how many time you pilots call down to crew scheduling and we have a complaint from a crew scheduler.

Q. What was the complaint?
A. I was not given any documentation about the complaint.
Q. You weren't told, though, what the complaint was in crew schedule.
A. There was a complaint, I believe, that the--they said that I--that's when I was told that I had made a comment about Mr. Holt's house.
Q. Did you--did they tell you who at crew scheduling said you made the comment?
A. No, they did not.
Q. Was there a reference to comments made on a company Web site?
A. Yes, there was.
Q. Tell me what that was about.
A. I was asked why I was making posts on the Web site, which was the SAPA Web site, which was not a company Web site.
Q. All right. Tell me about the SAPA Web site.
A. The SAPA Web site was a message forum, message board that the pilots could use to communicate and discuss issues.
Q. You said it's not a company Web site.
A. That's correct.

Q. How do you know that?
A. The SAPA site is owned by Bob Novak. It is not part of SkyWest.
Q. Who pays for the hardware? Do you know?
A. Bob Novak does, to my--best of my knowledge. There's also a disclaimer page on there that says it has no affiliation with SkyWest or is not property of SkyWest.
Q. Do you have to--can anybody access this Web site?
A. Only SAPA members. And they are given a pass word by Bob Novak.
Q. Were you given--you had a password in December of 2000.
A. Yes.
Q. And were you regularly posting messages on the message board?
A. Yes, I was.
Q. What kinds of messages were you posting?
A. We were posting messages regarding the ALPA, Airline Pilots Association, union organizing efforts.
Q. So you were talking about union

organizing in 2000.

A. That's correct.

Q. December of 2000.

A. That's correct.

Q. What kind of things were you saying?

A. I would provide, you know, opinions, research, statistics regarding our contract or lack thereof compared to other airlines and issues that affected the pilots and arguments as to why we should unionize.

Q. Is that Web site in 2000--is that basically solely a place for posting messages about union activity or union organizing?

A. It could be for anything.

Q. But your--did you have other types of messages that you posted other than union-related activity messages?

A. To the best of my knowledge, most of my posts, if not all, were regarding the union organizing.

Q. Were you part of the union drive at all?

A. Yes, I was.

Q. Were you on an organizing committee?

A. Yes.

A. They asked why I was, you know, posting critical comments or what--perhaps maybe derogatory about the company. I don't know if those words were used though.

Q. Did you say, What comments?

A. I did.

Q. And what did they say?

A. To the best of my knowledge, the issue was never discussed any further.

Q. Well, if I ask you--I'll ask you, what comments do you think they were talking about?

A. The only comments I made on there were my union organizing comments.

Q. So was it your understanding in this meeting that they were criticizing you because you were making union comments on the SAPA Web site?

A. Yes.

Q. But it's not your testimony--you couldn't tell me specifically whether either of these three people identified the union postings specifically during this meeting.

A. I don't remember.

Q. So it's possible they could have mentioned it and you just can't recall, or they didn't mention it?

A. It's possible they did mention it.
Q. All right. Did they tell you that you had made comments about Brad Holt's home?
A. Yes.
Q. Did you tell them, No, I didn't make any comments?
A. Yes, I did.
Q. Who was it that said to you, You've made comments about me? Who specifically of these three?
A. Brad Holt asked.
Q. And what did he say?
A. He said, I heard--I believe he said, I *heard you're making comments about my house, and* what business is it of yours?
Q. And what did you respond?
A. I said, I did not make any comments. I don't know about your house. You know, I just had purchased my own home. I don't have any concern for anyone else's, you know, personal business.
Q. Did Jim Breeze make any comments at the time?
A. No.
Q. How about Mr. Abell?

A. Oh, he made comments during the meeting, but not at that particular time.

Q. All right. What comments did Mr. Breeze make at the meeting?

A. Jim asked me if I was happy at SkyWest. And then he also asked if--how Mike Jones was doing.

Q. Did you have any understanding as to why Mr. Breeze was asking you if you were happy at SkyWest?

A. I can--no. I can perhaps maybe imagine that he did not think I was happy because of my posts.

Q. Were--your posts were critical of the company.

A. They were posts, you know, suggesting why we should be unionized.

Q. Did Mr. Abell make any comments?

A. He was not allowed to. He was not allowed to comment, according to him.

Q. So he said at the meeting words to the effect of, I'm just here, I'm not allowed to comment.

A. That's correct. He told me this before we went into the meeting.

Q. All right. How long did the meeting last?
A. I believe it lasted 45 minutes.
Q. Were there any--any resolutions made, any decisions made at the end of the meeting?
A. Mr. Holt said that there was--or at the end of the meeting he handed me my employee file. He said, We're not putting anything in your file. We're not giving you any disciplinary action. We're going to put you back on the trip that I'd been taken off of. And I was sent home.
Q. Are you familiar with I-Share?
A. Yes, I am.
Q. Tell me what that is.
A. I-Share is a message board on the SkyWest online Web site.
Q. Is that specific to pilots or any SkyWest employee?
A. Any employee can post on there.
Q. But that's a place where you can post whatever messages you might have in relation to SkyWest or employment.
A. Yes. Yes, anything.
Q. Did you ever post anything on I-Share?
A. I might have.

MR. PETERSEN: It's SWO--or 301 and 302 for you, Erik.

BY MR. PETERSEN:

Q. Have you ever seen this document, Exhibit 22--

A. Yes.

Q. --Mr. Callaway? What do you understand that it is?

A. This appears to be a complaint written by Nicki McDonald regarding some scheduling issues.

Q. And have you had a chance to read it?

A. I have.

Q. I don't want to trick you, but I don't want to waste a lot of time either. Do you agree generally with what is said in it?

A. No, I don't.

Q. All right. So let's go ahead and read it. And you tell me what you don't agree with. If you want, I will read it.

A. Okay.

Q. It says, "Andy Callaway called and wanted to pick up a trip in open time on the 14th." Assuming that's the 14th of December.

A. Well, that couldn't have been if she

signed it December 7.

Q. All right. Fourteenth of November.

A. Yeah.

Q. Does that seem right so far?

A. Yes.

Q. "We had about 14 or 15 reserves, so I told him I couldn't give it to him because I had a lot of reserves." Did she tell you that?

A. No. I was assigned a trip.

Q. Okay. She says, "He went off on me about how he wanted the trip, he was going to get it if he had to talk to the top guy of the company because it was no fair that they can't get overtime/junior man pay when they decide they want it." Did you say anything similar to that to her?

A. No, I did not.

Q. "He said he just sat when he was a reserve and it won't hurt them to just sit now." Did you say that?

A. No. To the best of my knowledge, I was a line holder. I was flying a schedule. I was not on reserve.

Q. Is it your testimony she's making this up?

MR. STRINDBERG: I need to object to this line of questioning. It's not--there's been no foundation laid as to what this complaint is or if it was the complaint that was referenced in the--at the time that Andy went down there. As I recall from the depositions I've taken, no one could identify what it was, when it came about. Are you representing, Counsel, that this was the complaint that was discussed at this meeting in St. George?

MR. PETERSEN: That was a very long speaking objection. But I will say that Mr. Callaway just testified that this was the complaint that Nicki submitted.

MR. STRINDBERG: No, he didn't. You asked him--

BY MR. PETERSEN:

Q. Then let me ask the question. Mr. Callaway, I asked you before if you recognized this document. You said you did. When I asked you what you understood it to be, didn't you just tell me that you understood it to be Nicki McDonald's complaint?

A. That's what it appears to be. She wrote this, and she's complaining in here. But

that's not--that's what she claims.

Q. You also testified, I believe, that you've read this before and that you disagreed with its contents, correct?

A. Yes, I do.

Q. Is this what you were told in substance by Brad Holt and Jim Breeze at your meeting in December of 2000 was the complaint from scheduling?

A. From scheduling. But there was no reference as to who it was from or to the details of what it was about.

Q. All right. At anytime thereafter were you told that the person complaining was Nicki McDonald?

A. Never.

Q. Were you ever made aware that Nicki McDonald was a person you spoke to in scheduling when you were seeking to get this open time flight?

A. It's possible I spoke to Nicki about this, but every time you call scheduling you--you know, I don't know how many schedulers there are--you speak to whoever answers the phone.

Q. Do you have any basis to suggest that

A. That's correct. I was given my employee file right after the meeting. And this was not in there. This was also written three weeks after the alleged complaint.

Q. So what you're saying is that December 7 is three weeks after the 14th--

A. That's correct.

Q. --of November or whatever the math is. Okay. So without getting into the details of whether or not this is the magic complaint, what I want to know is, on the detail of what is alleged to have been said between you and scheduling. And I want to use this as a basis. Do you understand what I'm saying?

A. Uh-huh (affirmative.)

Q. Yes?

A. Yes.

Q. All right. Were you told by someone at scheduling that you couldn't have the open flight that you had requested, the open--I know I keep saying it wrong--

A. Open time.

Q. --the open time flight?

A. The first time I contacted crew scheduling was from Idaho Falls. I saw the trip

on the SBS computer from Idaho Falls, called scheduling, spoke to a scheduler, requested to pick up the trip. I was advised that, I believe, if I remember correctly, there was enough reserve coverage at the time and it could not be assigned. Per the policy, it says that the schedule--or the trip has to be assigned immediately to a reserve if it is not assigned to the person calling to pick it up.

I returned to Salt Lake City an hour or two later, checked the computer for additional open time, noticed that this trip was still in open time, and called scheduling. And at that point it was assigned to me.

Q. Was it a female you spoke to at scheduling?

A. I don't remember.

Q. You had the one conversation, I think, you said, where, in Idaho?

A. Idaho Falls, yes.

Q. And then, did you have a second telephone call with scheduling--

A. Yes.

Q. --in Salt Lake City?

A. That's correct.

Q. And you don't recall whether either time it was with a female or a male?
A. I don't recall.
Q. You don't recall at all who it was.
A. No.
Q. When--in your normal course of calling scheduling, would they say their name when they normally pick up the phone?
A. I'm not sure. I don't know if they say crew scheduling. I don't remember.
Q. Okay.
A. I--you know, I was sitting at a table. I had two pilots sitting with me during the whole conversation.
Q. Look at about a third--two-thirds of the way down in the middle. It says, "I told him that I couldn't do that. I had just gotten a passdown from Kay the night before that states per Anita that we must explain why, who, and who caused the junior man. She needs this info for Brad." That doesn't even ring a bell to you at all?
A. No, it does not.
Q. It then says, "I did not state Brad wrote a memo to us. He still went on about how

it is bull that we have to do all that and that he couldn't pick up whatever he wanted and the only reason we couldn't give out any junior man anymore is so Brad could build his big ole house and he doesn't give a crap about us and the ways that we may"--

MR. EMERSON: "Wages."

BY MR. PETERSEN:

Q. --"wages that we make as long as he gets everything he wants, and it is no fair." None of that took place, that you remember.

A. Absolutely not.

Q. So you initially--all right. So then forgetting this for now, just based on your testimony, you call down from Idaho Falls and you request it and you're told no initially, right?

A. Initially, yes. And I was told that it might be in there--if it's in there later, if it's not assigned or something like that, then I might be able to get it. But at that time they said to check back later.

Q. All right. And why--and you said there was a policy.

A. The policy manual stated vaguely that it was to be assigned to the person picking up

the trip--requesting it, or assigned to a reserve.

Q. So it was your feeling at the time when you called from Idaho Falls that that--what they were telling you was incorrect.

A. *I don't know what they were telling me* from Idaho Falls. They just said to check back later, which I did.

Q. But they weren't going to give you the flight at the time.

A. At Idaho Falls they did not give me the flight.

Q. And did you think that was wrong?

A. I didn't look into it. I--you know, I was flying back to Salt Lake.

Q. Did that bother you that they wouldn't give you the flight?

A. Initially, yes.

Q. Did you tell them?

A. No. I said, I will call back later.

Q. All right. And how long after that when you made the second call?

A. Maybe three hours, three or four hours. It was--I had a long break in Salt Lake, I remember. And I called during that break.

Q. And when you made the phone call in

Salt Lake, what happened then?

A. It was assigned to me.

Q. And did you actually pick up that flight, then--

A. No.

Q. --and fly it?

A. No.

Q. Why not?

A. Shortly after that, I checked my schedule. It was not on my schedule. So I contacted scheduling again, asked what happened to the trip. And we discovered that it was a captain's trip that was assigned to me in error. I was a first officer.

Q. All right. Were you upset at that time?

A. After we found out it was for a captain, there's nothing, you know, I could do about it. So it didn't make any difference to me at that point.

Q. So you were not upset.

A. No. Nothing I could do about it.

Q. Did you raise your voice to anybody at scheduling?

A. Absolutely not. As I said before, I

had two pilots sitting right with me during the entire conversation.

Q. Who were they?

A. Lee Vance and Gary Green.

Q. And they were during which conversation?

A. During both calls to scheduling in Salt Lake--when I was in Salt Lake City on my break.

Q. But not in the Idaho Falls call.

A. No. The pilot I was flying with was with me in Idaho Falls.

Q. Are those two gentlemen still--they're SkyWest employees.

A. To the best of my knowledge they are.

Q. And they sat there listening to you on the phone. Was it a pay phone or a cell phone? How were you doing the calls?

A. I believe it was my cell phone.

Q. And when you say they were right there, tell me--

A. They were sitting one to the left, one to the right.

Q. So they would hear your conversations, most likely.

A. Absolutely, yeah.

Q. Probably not hear what's being said on the other side.

A. I don't know if they could or not. Probably not.

Q. Did you have--

A. It depends on how loud the phone was.

Q. Did you have discussions with them, either one of them, after your conversations with scheduling?

A. The pilot I was flying with, I was talking to him about what happened. It was a non-issue.

Q. Who was that?

A. It was either Lee Vance or Lynn Redd.

Q. You're not sure.

A. I don't remember exactly who I was flying with at that day.

Q. What did you tell--

A. It was one of those two.

Q. One of those two. What did you tell them?

A. I just told them that I was assigned a captain's trip, it was taken off my schedule--or what I thought was for a first officer. I told him that I did--

was able to pick up the open time. It wasn't on my schedule anymore. And it turned out to be a captain's trip, which was why it was taken off my schedule. Makes perfect sense.

Q. Were you upset when you talked to this captain?

A. No.

Q. All right. So at the end of the meeting you were told--I believe you said that nothing was going to be placed in your file, right?

A. Yes.

Q. So in your understanding, was--were you disciplined at all for this incident?

A. No.

Q. Did you have any understanding as to--I think you said that somebody hinted or suggested that you were posting things on the SAPA site. Did you ask them how it is they knew you were posting things on the SAPA site?

A. Yes, I did.

Q. And what were--which one did you ask, or did you ask it to all three?

A. I asked it to the room. But I think my questioning was--you know, targeted to Mr. Holt

since he was conducting the meeting.

Q. Tell me what you asked. What did you say?

A. To the best of my knowledge, I mentioned that the SAPA board was--message board was for SAPA members only and that it was not to be viewed by management. And that was the end of the discussion.

Q. So were you upset when you said that to Mr. Holt?

A. I was surprised. I was--I wouldn't say I was upset, but I was pretty surprised that that had been--my messages were viewed by management when the message board clearly states that it's not for management's viewing.

Q. And did they respond as to how they found out?

A. No, they did not.

Q. Do you know how it is they did?

A. I have no idea how they found out, but I have my suspicions.

Q. All right. What are your suspicions?

A. Plenty of pilots who print things out and fax them in and post them up on bulletin boards. It's--you know, it's not unknown now to

loud parties.

Q. Did you have parties at your house during October 2001?

A. No, I did not.

Q. Prior to that time?

A. You know, I've had people at my house. I have a pilot that stays at my house. Every complaint that was filed, when the police would come to my house, would result in no further investigation because there was no party going on.

Q. Did--while you were at your house, are you aware as to whether illegal drugs were ever either bought, sold, or consumed--

A. Never.

Q. --in your house?

A. Never. Was I aware? Never.

Q. Yes.

Did you ever turn your music up really loud?

A. No. I mean, my music is--you know, you can turn it up. But if you go outside, you cannot hear it.

Q. So it's your belief, if I understand this, that neighbors complained because you had an African American that visited your house at times.

it was she thinks is going on at your house, and thereafter, you sue her for--you said harassment and--

A. Defamation of character.

Q. --defamation of character. What is the defamation that you claim she--

A. She distributed letters to all my other neighbors on the street, among other things.

Q. And what did those letters say, as you recall?

A. They also alleged drug activity, loud parties. I think they even went as far to say I didn't shovel the driveway. Just--

Q. Did you shovel your driveway?

A. It's on a hill. If I didn't shovel the driveway, I wouldn't be able to leave my house.

Q. Okay. And did that one settle?

A. That one I dismissed. I dropped that case because the--she was a tenant who was evicted because of these problems by the landlord who owned the house.

Q. Who was your attorney in the suit against the neighbor?

A. Brian Bernard. I was not looking for any kind of damages or monetary gain from that.

It was simply to cease her activities.
Q. So you sued her to make her stop.
A. That's right.
Q. Was part of the reason you sued her that she complained to SkyWest?
A. Yes, it was.
Q. Tell me what you understand resulted from her complaints to SkyWest.
A. I'm not sure I follow your question. Could you rephrase that, please?
Q. Sure. Well, she complained to SkyWest, apparently, at least on one occasion that you're aware of, right?
A. Uh-huh (affirmative.)
Q. What happened? What did--did SkyWest do anything about it?
A. Well, Mr. Hyatt mentioned it to me.
Q. Okay. What did he say to you?
A. He said that--just as I said before, that he'd received complaints or human resources had received complaints and to make sure it doesn't continue. And that was it, to the best of my knowledge.
Q. Look at Exhibit 35, the seventh bullet point.

I was taking--I was placed on administrative leave--

Q. Okay.

A. --with pay.

Q. And so you then met with this group of people. Tell me who led the meeting.

A. I believe the meeting was led mostly by Brad Holt.

Q. What did Mr. Holt say?

A. He wanted to talk about what happened in Butte. And he asked if--you know, what happened.

Q. What did you say?

A. I told him that nothing had happened.

Q. So you don't recall anything unusual about your time in Butte on November 12, 2001, or thereabout.

A. That was nothing that happened in Butte. I asked the security screener why empty bags had been--were being emptied--or excuse me--not emptied, being X-rayed. They were emptying the contents of the bag, X-raying the bag separately from the contents. I simply asked a security screener why that was being done, because I had never seen that process done before.

Q. And did the screener respond?
A. I believe she did. And I don't remember the answer.
Q. Was it in any form that caused you to think she was concerned--
A. Absolutely not.
Q. --or upset?
A. Absolutely not.
Q. You didn't get upset at the screeners.
A. Absolutely not.
Q. The screeners--tell me--in Butte, Montana during this time period--so I'm talking November 12, 2001--who employed them? Do you know?
A. At the time--to my knowledge, it was all SkyWest personnel, but . . .
Q. So you thought that the people who were checking your bags in Butte were also SkyWest employees.
A. That's correct.
Q. Are you aware as to whether there are other companies who employ those who do security at the airport?
A. I did not know if that was the case at SkyWest--or excuse me--at Butte.

A. Yes, I do.
Q. What did it say?
A. "Extremely."
Q. Do you know why it was blacked out?
A. The review board that I requested requested that that word be removed.
Q. Was that at your request?
A. No. That was their request.
Q. They were just floating you a bone on that one.
MR. STRINDBERG: Objection.
BY MR. PETERSEN:
Q. Were they just doing that gratuitously?
A. That was the decision of the review board.
Q. Okay. Then it says, "Three SkyWest Airlines ramp agents witnessed this behavior." Do you know who the ramp agents that would be referring to?
A. Well, there weren't three SkyWest ramp agents. There was a SkyWest ticket agent, a SkyWest--the employee--the SkyWest employee that was conducting the security screening and then the Horizon employee conducting the security screening.

Lake City. I filled the form out, handed it back, and was issued a card, a boarding card.

Q. Did you act in an arrogant fashion with the ticket counter person?

A. Absolutely not.

Q. Did you act in a disrespectful fashion?

A. Absolutely not.

Q. Would you characterize your behavior as abusive?

A. No.

Q. The conversation you had with the ticket counter, was that in front of other passengers?

A. No. The person--there was one person standing next to me, and that was the captain who was flying that aircraft down to Salt Lake.

Q. What's his name?

A. Dan Black.

Q. Is he still employed, do you know?

A. To the best of my knowledge, he is.

Q. Tell me, then, how it involves the baggage people. Was that--I'm assuming that was prior to you approaching the counter.

A. After.

Q. After. So you went to the counter, you

Q. You were not stopped or questioned about your bags in any point there?
A. No. No. All I had was my flight bag.
Q. You didn't have any more discussions back and forth with any of the security personnel?
A. No.
Q. All right. Looking back at Exhibit 7, the second paragraph, it says, "On September 27, 2001, VP"--is that vice president?--
A. Yes. Yes.
Q. --"of flight operations, Brad Holt, issued an ITL Bulletin 01-36." What's an ITL Bulletin 0-1--
A. I don't know what ITL means.
Q. All right. What do you understand generally to be the purpose of a bulletin of this type?
A. A bulletin--well, a bulletin is issued to employees regarding information that's--you know, needs to be removed.
Q. Sort of a directive by the company of some sort.
A. Could be. I know there were several different types of bulletins. Like I said, I don't know what ITL means.

refuse to comply with requests from airport security personnel.

A. No, that would not be appropriate.

Q. So whether or not you got this bulletin or not, you knew at the time that you needed to comply with requests from airport security personnel.

A. Yes.

Q. Okay. The counseling statement says thereafter, "Your reported conduct does not comply with this direction."

A. Uh-huh (affirmative.)

Q. You disagree with that.

A. Yes.

Q. Look at the next paragraph. It says, "This is not the first time you have been counseled on your behavior. During the summer of 2000, you were summoned to corporate headquarters for verbal consultation in reference to abusive treatment of crew support personnel and posts you authored on the Web boards." At the time that you received this counseling statement, what did you understand that statement to be referring to?

A. At the time, that statement referred to my visit to St. George in December of 2000. Yet,

would constitute an embarrassment to SkyWest Airlines or its employees could result in further disciplinary action up to and including termination." Do you see that?

A. Uh-huh (affirmative.) Yes.

Q. That--you read this in--at the time you received this counseling statement, correct?

A. Yes.

Q. So you knew--I understand that you're saying, Look--No. 1, you didn't post any bad things about the company other than the union discussions you talked about in December of 2000 or there--prior, right?

A. Yes.

Q. And you're saying that you didn't say anything bad about Mr. Holt's house, right?

A. Yes.

Q. And you're saying that you didn't have any problems with the Butte people. You're not sure why that's happening.

A. Yes.

Q. Right? But nonetheless, you're told that going forward from November 30 of '01, that any problems such as the three bullet points could result in discipline up to your termination,

BY MR. PETERSEN:

Q. Is it your testimony that you did not post anything critical other than union-related statements about the company on any Web site?

A. My posts were about the union organizing efforts.

Q. So the answer is, no, you didn't post anything other than union-related statements--

A. Yes.

Q. --about the company. And you did not have a conversation that was inappropriate, in your characterization, regarding open time flights with scheduling in 2000--2000, December, November 2000, right?

A. Yes.

Q. And it's also your testimony that you did not, in fact, have any inappropriate behavior in Montana with the security personnel or the ticket counter people.

A. That is correct.

Q. At the time that you wrote this, in November, 2001, did you believe that--I mean, did it dawn on you that all of these things that had been alleged against you, you didn't think any of them were true--did you think somebody was out to

notation, which was later changed to a SAD.

Q. All right. Why do you say it was a sick notation changed to a SAD?

A. Crew scheduling had contacted me for a ready reserve assignment to sit at the airport on the morning of the 26th. I had been very sick. And the scheduler offered to take me off sick. And then I believe, if I remember reading the notes correctly, that it was--a supervisor changed it to a SAD.

Q. Okay.

MR. STRINDBERG: When--Counsel, when it's appropriate, let's take a break.

MR. PETERSEN: All right. We can take a break now if you like. Let's go ahead and go off.

MR. STRINDBERG: And convenient.

MR. PETERSEN: Yeah.

THE VIDEOGRAPHER: We're going off the record. Time is 2:48 p.m.

(Recess taken 2:48-2:54 p.m.)

THE VIDEOGRAPHER: We're back on the record. Time is 2:54 p.m.

BY MR. PETERSEN:

Q. All right. Mr. Callaway, we're still

2003." Do you recall that?

A. Yes, I do.

Q. Tell me what that was about.

A. June 30. Okay. That was--I submitted request for a day off to attend to some court matters regarding the--my litigation with the City. The date was wrong. I submitted a request, canceled it, and submitted a request for another day. And it was never processed. And I was contacted by scheduling, not for an assignment, but they said, Please call us every 30 minutes to see if there's any scheduling changes. I complied with their request. I was still issued the SAD.

Q. So would it be your testimony that you should not have received a SAD on June 30?

A. I understand why the SAD was issued and agreed to why it was issued, but I also followed their instructions as well.

Q. All right. Why do you say, you understand why it was issued? Why do you understand it was issued?

A. Well, the definition of a SAD is when a crew member is not--cannot be contacted within ten minutes of leaving a message. A message was

left. And I did not return the phone call until, I believe, 30 minutes later. And that's when I was instructed to keep calling back every half hour.

Q. So that justified the SAD, whether--

A. Sure.

Q. --you want to give weight to how good or bad?

A. Sure. I have no issue with that.

Q. Okay. How about the March 26, 2002, SAD? Do you have any issue with the appropriateness of issuing that one?

A. I did, I believe, at the time, only because the scheduler told me that I would be taking off--she would put me down as sick. In fact, the documentation--she offered to do that in the documentation.

Q. So--but--so is it your opinion that a SAD should not have been issued on March 26?

A. That's correct.

Q. Because if you had called in sick, then even though you miss a particular flight, there's not a SAD that's--

A. If I had called in sick, it would not have been a SAD.

Q. Okay.

A. What happened there is I went to bed early the night before because I was sick, and either lack of my own, you know, setting the alarm and all that, I just--didn't hear the phone ring in the morning. And that's when scheduling advised me of this.

Q. On--going to the fifth bullet point down, it says, "On August 12, 2003, Flight Attendant Kristen Wiley told Captain Hyatt she had concerns she was receiving threatening e-mails from Andy regarding money he said she owed him. Andy had invited Kristen to go with him and a group of people to Spain. According to Kristen, Andy told her she only needed to worry about her plane ticket and food, and everything else would be paid for. Now almost a year later, Andy was using skywestonline.com to send messages demanding payment of the shared expenses from the trip. Kristen felt threatened to even check her messages and asked Captain Hyatt if there was anything he could do to stop these messages. Captain Hyatt said he would look into this matter."

Did you and Kristen Wiley go to Spain?

A. She attended a group trip to Spain in

September of 2002.
Q. Okay. And who else was on the trip other than you and Kristen?
A. There was--I believe ten of us. None from--she was the only other coworker, colleague--friend of mine.
Q. The others--who were they?
A. Friends of mine outside work.
Q. What are their names?
A. I would have to sit here and think about it, because a lot don't live here.
Q. All right. Can you think of any of them?
A. Let's see. Jed Arveseth.
Q. Where does he live?
A. Salt Lake City.
Q. Do you have a phone number for him?
A. I don't--you know, it's in my cell phone. I don't--you know, I don't know--I don't have these memorized.
Christina Hill. Christina Cruz.
Q. Also both living in Salt Lake?
A. Christina Hill, yes. Christina Cruz, no. And I don't know where she lives now. I believe in California. Gosh, who else was there?

Tara Key.
Q. How do you spell the last name?
A. K-E-Y. She works for SkyWest now as a flight attendant.
Q. Did you pair up in couples?
A. No.
Q. Were you dating Kristen Wiley at the time?
A. Absolutely not.
Q. Did you have any romantic relationship with Ms. Wiley?
A. Absolutely not.
Q. This says, "According to Kristen, Andy told her she only needed to worry about her plane ticket and food, and everything else would be paid for." Do you agree with that?
A. No, I don't.
Q. Tell me what you understand the arrangement to be.
A. The arrangement was for her--she had to pay for her portion of a villa rental that we rented, along with a rental car and her incidentals and expenses over there.
Q. And her plane ticket?
A. Yes. Yes. All of her costs.

Q. Did the others pay their share?
A. Yes.
Q. How did you decide where you were going to be staying and what kind of car you were going to rent?
A. I had been going--doing this trip for a few years. And it's just the same process every year.
Q. How long were you gone?
A. I--maybe two weeks, I think. I'm not sure.
Q. Do you know how old Kristen Wiley was at the time?
A. I believe 21, maybe 22.
Q. How old were you at the time?
A. Let's see. When was this? 2002? So 29 or 30.
Q. Were you hoping to be able to date Ms. Wiley?
A. Absolutely not.
Q. Why did you invite her?
A. There was a spot that had gone a last minute cancellation she filled in, another friend of ours, mutual friend, a girl that I had been dating. And she canceled last minute and the

trip, but she would have the money after the trip by way of her bonus checks.

Q. So it's your testimony that at the time you intend that you were to go you weren't going to make her pay before she left because she was going to pay you with bonus checks when she got back.

A. I'm sorry. One more time.

Q. All right. Obviously, you didn't make her pay before you guys left.

A. Right.

Q. Why not?

A. It was just--I think there was only a few days before when she decided to come.

Q. Did you tell her at the time that you were going to take her how much her portion would be?

A. Yes, I did.

Q. What did you tell her that portion would be?

A. I don't recall the exact amount. It's all on a spreadsheet at home. But it was given to her. It was a couple hundred dollars.

Q. And she agreed to pay it.

A. Absolutely, in writing.

Q. All right. I'm showing you what's been marked--somebody stole my paper clips. I'm showing what's been marked Exhibit 15. Do you see that?

A. Yes.

Q. It's sub 20 of Exhibit 15, actually.

Is this a summary--I mean, do you recognize those pages? It's SW192 to SW194.

A. I recognize them.

Q. Are they a summary of the e-mails that were sent back and forth on skywestonline.com?

A. They are part--in part. Some of those e-mails are not the full set of e-mails.

Q. So there were additional e-mails in addition to these.

MR. STRINDBERG: Objection. That's not what he stated.

BY MR. PETERSEN:

Q. That's why I'm asking the question, Mr. Callaway.

A. Well, as soon as I can look back, I'll answer.

They're the same.

Q. Are there more e-mails, is the question, than what you see listed?

A. There were some e-mails--oh, yes, these are the e-mails from skywestonline, yes.
Q. Okay. There were other e-mails sent through another Internet medium.
A. There were e-mails, yes.
Q. All right. What e-mails would those be? Have you produced copies of those?
A. Yes, they were produced, but not on skywestonline, but from Kristen Wiley's Hotmail account here.
Q. My question is, have you produced them in this litigation?
A. Yes, I have.
Q. Now, have you--you've read the substance of these e-mails that are this Exhibit 20--or 15, sub 20.
A. Yes.
Q. And in them wouldn't you acknowledge that there are some from Kristen saying, You told me I didn't have to pay? Specifically look at SW192, the third one down.
A. Third one down.
Q. That one's from Kristen to you.
A. 8/11.
Q. Okay. Do you see that one?

A. Yes.
Q. And what does it say?
A. It says, "You know, money is so tight right now. And looking back, you told me I wouldn't need to pay, the only thing I needed to pay was for food and other things. Sorry, Andy."
Q. So she told you at least--what's the date on--this one that was sent?
A. August 11--yes, August 11. I read it August 12, it looks like.
Q. August 12 of 2003.
A. Correct.
Q. And you guys went on--it was in 2002, September of 2002, right?
A. Correct.
Q. So this is almost a year later.
A. Yes, it is.
Q. She says--at this point, she's told you she thought she didn't have to pay, right?
A. That's what that e-mail says.
Q. Right.
A. It's not what the other e-mail says.
Q. You disagree with that. And you say--if you look at the first one--"Actually, Kristen, I have an e-mail from you that says you will

pay."

A. Yeah.

Q. "You also told me [that] you would sign over your bonus check," right?

A. Yes.

Q. All right. So she disputed whether she owed you the money at least at some point in here.

A. Uh-huh (affirmative.) Yes.

Q. And look at the next page, SW193.

A. Uh-huh (affirmative.)

Q. The second one down. What does that one say?

A. "Come on, Kristen. I'm tired of this. I need my money now, or I'll get it the hard way. Thanks, Andy."

Q. You sent that one on skywestonline.com, right?

A. Yes, I did.

Q. What did you mean "I'll get it the hard way"?

A. Small claims court.

Q. It doesn't say that, though, does it?

A. No. But small claims court is a pain in my butt to do. And that's what it meant.

Q. So it was the hard way for you or the hard way for Kristen?
A. The hard way for me.
Q. That's not usually how we use that phrase, is it?
A. Between a friend, that's how I talk. That's how our communication was. She admits on the next page to owing me the money.
Q. All right. Going back to the prior exhibit, which is, I believe, Exhibit 41--
A. Yes.
Q. --before it says--about six lines down, "I had the feeling he was trying to start a relationship with me, and I was also told that he was interested." Are you aware as to whether some other person told Ms. Wiley that you were interested in some sort of relationship with her?
A. No, I'm not.
Q. She says, "After we got back we started hanging out more often." I'm assuming that's after you got back from your trip. Is that a fair statement?
A. That is completely false.
Q. You didn't hang out more often.

A. For one, it didn't mention who it was. And I had absolutely no idea what this complaint was regarding.

Q. Did you call Mr. Hyatt?

A. No, I did not.

Q. Well, if you were requested to respond, would it be important to clarify to know what he was talking about?

A. Perhaps.

Q. But you didn't--you chose not to call him.

A. No. I--after reading these policies that were in here, I assumed it regarded Kristen.

Q. So you figured it out.

A. Yes, figured it out and then answered the--these allegations in a letter back to Kelvin.

Q. I'm showing you what has been marked as Exhibit 3, I believe. Do you see this? Is this the response you prepared for Mr. Hyatt?

A. Yes, it is.

Q. I have read through this. And I don't note any apology anywhere in here. Was it your position when you wrote this to Mr. Hyatt that you in no way believed you had sent anything inappropriate to Ms. Wiley?

A. That's correct. I don't also recall being asked to apologize, because at the time I did not know what the allegations were specifically. I simply responded on why I felt that I did not violate the three questions that Mr. Hyatt asks in his e-mail.

Q. Did you talk to Andy Bharath about this?

A. I don't recall.

Q. How about Fred Alford?

A. No.

MR. EMERSON: Phil.

BY MR. PETERSEN:

Q. Phil.

A. No.

Q. Did you talk to anyone else about this before you responded to Mr. Hyatt?

A. No.

Q. What did you think was going to happen when you sent this letter?

A. I thought that this would clear everything up. This would explain my point and why I did not--why I felt I did not violate the policies stated, and that would be the end of it. Also, it would explain that Kristen had owed me

through that whole ordeal.

Q. So do you think that she wanted to get back at you because you were asking her for money?

A. I would not put it past her.

Q. Do you believe that's what she was doing, making more of an issue of this than existed because she didn't--she was wanting to get back at you?

A. Yes, I do. I believe that she was trying to get out of a debt, paying a debt.

Q. And so she used SkyWest and inflated her feelings about this whole deal in order to get out of paying you the 200 and change that you said she owed you.

A. Yes.

Q. Apparently it worked. Did she ever pay you?

A. Her paycheck was garnished.

Q. That was after the small claims judgment.

A. Yes.

Q. All right.

A. Not only that, she admitted in small claims court that she had me fired.

A. I saw the copy of the letter after I was terminated.

Q. You didn't see it during the process of your termination.

A. No, I did not. I saw it right before the review board.

Q. Do you disagree with what it said?

A. I disagree 100 percent with what it says. I was not in the hotel.

Q. All right. I'm showing you what has been previously marked as Exhibit 30. Do you see that document?

A. Yes, I do.

Q. Is that the copy of the statement by Mr. Watkins?

A. Yes, it is.

Q. That's the one you saw prior to your review board.

A. Yes, it is.

(To Mr. Strindberg) Do you have the original?

Q. Is your testimony that in fact you had no conversation at all in your hotel room in reference to SkyWest with somebody on the phone?

A. Yes.

Q. Your testimony is that you were at an Applebees.
A. That's correct.
Q. So your statement is you don't have any idea what--who this is referring to.
A. That's correct. I have a receipt from Applebees.
Q. Does your receipt have a time on it?
A. Yes, it does.
Q. What was the time on the receipt?
A. I don't have it in front of me. But I believe it was 11:06 or 11:10. I'm not exactly sure on the time.
Q. That would be the time you paid.
A. That I paid.
Q. Were you in El Paso on the night of August 27?
A. I believe I was, yes.
Q. And did you stay at the Marriott hotel that night?
A. Yes, I did.
Q. Do you recall whether or not--have you ever met Mr. Watkins?
A. No, I have not.
Q. You're not suggesting, are you, that

you were not in the room next to him that night. It's your testimony that you simply weren't home at that time. Is that right?

A. I'm not sure what room he was in, if it was next to me or not. But I was not in the room during the entire time in question. I was having dinner.

Q. So at 10:50--do you know what room you were in?

A. I don't recall.

Q. Do you know whether it was room 240?

A. I have no idea. I stay in a lot of hotels.

Q. Do you stay in a hotel room by yourself?

A. Yes.

Q. Did you, in fact, on this night stay in one by yourself?

A. Yes.

Q. But you're saying at 10:50 local time you were not there.

A. That's correct.

Q. You were at the Applebees.

A. Yes.

Q. Were you with someone at the Applebees?

A. No, I was not.

Q. So that's not true too, the whole statement

BY Mr. Watkins doesn't refer to you, in your--

A. This is not me.

Q. --testimony.

Is it your belief that Jim Breeze talked to Don Watkins and had him create this letter?

A. It's possible.

Q. All right.

A. This letter was--

Q. Other than the pigs thing again, tell me why--

A. --this letter was faxed to SkyWest three weeks after it was written--or excuse me--it was written three weeks after August 27, after I was terminated.

Q. Why is it that you think Mr. Watkins would write such a letter if he doesn't know you?

A. Because I believe Jim Breeze was soliciting information from other employees. This was written after I was terminated. And it's very possible. And I've seen other letters that

Q. So coercing employees to sign union cards you believe is worse than--is more just reason for termination than what you've read as to the reasons given for your termination.

A. Like I said, I don't know who weighs in what level of discipline to administer.

Q. Right. But my question to you was, did this justify it? And you indicated there were worse things that others had done and were not terminated. And I asked you what was worse. So I'm assuming, then, you indicated Mr. Palmer did certain things. Do you consider his behavior to be worse than what yours was?

A. I consider that the things that he did are very similar to what was alleged that I had done.

Q. Why do you think, then, that you were terminated and he was not?

A. I think it's--it goes back to Mr. Breeze and the theory that was presented to me from SAPA that initially I was--embarrassed him by posting union organizing subject matter on the Internet. And it stemmed from there.

Q. You identified Mr. Palmer as one of the union targets.

his prior testimony.

BY MR. PETERSEN:

Q. Is it?

A. This is part of the reason why I believe Jim Breeze might have it out for me, if you--for lack of a better term.

Q. And why is it that you think he wanted to have you fired? Is it because of the December 2000 meeting?

A. The December 2000 meeting and the counseling statement, you know, mentioned my posts on--that I authored on the Web site for union organizing.

Q. The ones that you were counseled about in December of 2000.

A. That's correct. I believe that those activities pissed them off.

Q. And that's what--that supports, in your mind, the theory that Chris Abell voiced to you about--

A. That's part of it. Another part of it is Mr. Breeze approached a employee in the security department who is also a sheriff to have him conduct an illegal background check on me.

Q. How do you know that?

them, I didn't know I had received a verbal warning from Jim Breeze?

A. That is correct. The meeting in St. George, Mr. Holt specifically told me that this is non-disciplinary and that nothing is being placed in your file.

Q. And then it says, "Andy did go to St. George and did admit his comments could have been misconstrued and may have been a little abrasive." Did you admit your comments could have been misconstrued?

A. My posts on the message boards regarding union organizing could have been construed that way. But that is the intent for that.

Q. Construed in what way?

A. As--well, get you the exact word.

Abusive treatment of crew personnel and posts who author on the Web board.

Q. So when it says, "Andy did admit his comments could have been misconstrued," you're not saying that you admitted your comments to schedulers were--could have been misconstrued. You're saying that's in reference to the postings on the Web.

A. That's correct. That was my understanding of why I was in St. George.

Q. Are you familiar as to whether or not the proceedings that take place in this review board are tape recorded?

A. Yes, they are.

Q. And it's your testimony that when it says here that you admitted your comments could have been misconstrued, that that was a specific reference to the postings as opposed to your discussions with scheduling.

A. It could have been, yes.

Q. Well, what--I believe it was.

A. I don't have the tapes. I don't know what was exactly said. And this appears to be a summary of--you know, this could be taken out of context. I'm not exactly sure what that specifies.

Q. Right. Which is why I asked you whether or not it's true that you admit in your comments could have been misconstrued. And you said, Yes. And I said, What comments? And you limited it to the postings. Is that your testimony?

A. It's the only thing I can imagine.

that was said or not.

Q. All right. So then maybe I need to clarify my question. "He apologized if he was." Are you saying as you sit here today, do you know whether that's an accurate summary of what the tapes will show?

A. I don't know. I don't remember.

Q. It says, "But he was"--"he only asked security questions and never was rude to crew scheduling," right?

A. Yes.

Q. "Regarding the letter from Kelly Dixon . . . ." Tell me what that letter is.

A. That was a letter that was presented during my review board, the first review board, by Kelvin. I'd never had an opportunity to look at it until after I was terminated. And it was based on a solicitation from Jim Breeze asking him to document his experience with me during upgrade training. And it mentioned in there that the other two ground instructors had no issue with me. And I was very surprised to read--to hear that letter. Kelvin read it during the review board--as I had no defense for it, because I didn't know where it came from or when it came from or who it

was written by.

Q. And it says--okay. It says, "Andy apologized for appearing like he was not interested in the class." Did you apologize in the review board for appearing like you were not interested in the class?

A. I might have apologized for appearing that way. You know, one's stance in--sitting in a chair, you know, if that's--if you believe--you know, you think that the way I sit in a chair is rude, I'm sorry you feel that way. But it's not. I don't mean it to be rude. This is how I sit. I think it's a little silly.

Q. So substantively you disagree with the letter from Kelly Dixon.

A. Absolutely. In addition to that letter, it mentioned the other two ground instructors did not have any issue with me. It also went on to say that I seemed like a nice person.

Q. The next bullet point talks about the lawsuit against the neighbor and the City. The intent of that was to say you didn't do anything wrong. Is that fair?

A. I didn't do anything wrong. And I

presented all the evidence that vindicated me of all that allegation.

Q. The next bullet point says, "Andy felt like the letter from Tony Thompson was cut off." What does that mean?

A. There was a letter presented after termination from Tony Thompson that was notes from the meeting that we had on November 13, I believe, 2001. And the letter was cut off. There was--only the first page of that letter was presented. It was cut off mid sentence. And the second page was not presented. Tony Thompson questioned that and wondered why the second page was not included, because it went on to discuss the behavior from management towards me.

Q. Do you know why the second page is not presented?

A. I'm sure it wasn't presented. I can only assume it wasn't presented because it discussed how management behaved towards me.

Q. And why would you assume that that's why it wasn't presented to you?

A. Because I was--because it paints the management in an unfavorable position.

Q. But isn't that the purpose of the

"Andy accepted the SAD received in June 2003." What does that mean, "Andy accepted the SAD"?

A. I don't dispute the SAD. Now, there's--you know, the company average for pilots is, I think, 5.8 per year. And this was not an issue for me.

Q. All right. The next bullet point says, "Andy explained the situation regarding Kristen Wiley. Andy did not intend for this situation to happen. Andy was simply intending to collect a personal debt, and this had nothing to do with SkyWest." Is that what you told the panel?

A. Yes.

Q. "Andy felt he perhaps had a lapse in judgment by using company resources such as skywestonline.com to contact Kristen." Is that what you said?

A. Perhaps, yes.

Q. "Andy did not intend to create a hostile work environment. Kristen is a friend of Andy's, and did not tell him she was intimidated by the e-mails." Is that what you said?

A. That's what I said.

Q. It says, "Andy would have stopped. This was a last resort in trying to contact

Q. Okay. Tell me where it mentions union activity.
A. Well, that's what I was discussing when I was talking about the visit to St. George. And I did mention in the review board my union organizing involvement.
Q. Did you mention--
A. Why--
Q. Go ahead.
A. Why it's not in here, I don't know.
Q. Did you mention to the review board that you thought any of the disciplinary actions that you received were related to your union postings?
A. I did mention the union post--
Q. Okay. But that wasn't my question.
A. --as the reason for me receiving the first counseling statement.
Q. So my question is, did you tell the panel that you--your first counseling statement was because you posted union?
A. That was my belief.
Q. Right. But what did you tell the panel during the review board?
A. I don't remember the exact words.

Q. Is it possible that you did not mention anything about you being counseled because of union postings?

A. The recollection--my--best of my recollection is I did mention the posts regarding the union activities and the counseling statement.

Q. If we go to the tapes and transcribe them, that would answer that, wouldn't it?

A. Of course it would answer them.

Q. What you told them.

A. It would refresh all of our memories, I'm sure.

Q. Looking at--under where it says "Rebuttal" on SW004--do you see that?--

A. Yes.

Q. '--it says, "Andy was terminated because of continual behavior that was not acceptable, not because of one incident." Why did--do you know why Kelvin responded like that?

A. I don't.

Q. Did you tell the panel that you believed you were being terminated because of the Kristen Wiley incident?

A. I believe that was the catalyst that caused the termination. It was like the last

straw that they were going to deal with. I believe that all these incidents passed that were made to believe--to, you know, show a pattern were based on fabrication and documents that were false, with false allegations.

Q. And your belief that these are false and fabricated is just your theory.

MR. STRINDBERG: Objection. It misstates his testimony.

BY MR. PETERSEN:

Q. Go ahead.

MR. STRINDBERG: It's argumentative.

THE WITNESS: It's my belief, yes. There are documents in there that don't even resemble me, that talk about someone else.

BY MR. PETERSEN:

Q. And you believe they were fabricated or created to terminate you because what?

A. They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And they're going to build whatever they can to show a pattern of this type of behavior.

Q. "They" being Jim Breeze.

A. Uh-huh (affirmative.)
Q. You were told that, right?
A. Yes, I was.
Q. All right. And you're telling me now, as I understand it, that even though you were told you would be eligible for rehire you would never be rehired.
A. That's correct.
Q. And your factual basis for that is what? Do you have one?
A. I think it's been detailed in the thousands of pages we have here.
Q. Well, I would like some direction as to why it is you think that if you're told you would be eligible for rehire you, in fact, would never be rehired?
A. I would never be eligible for rehire because I don't think Jim Breeze would ever allow that to happen again after, you know, my postings pissed him off.
Q. And other than your belief, do you have anything else to support that?
A. Recently, I guess the--I understand that the--this was--this modified solution was the result of a split review board, where the pilots



WORD INDEX
CD-ROM