# EXHIBIT "2"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

COPY

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, | CIVIL NO. 2:04CV00179 |
| vs. | DEPOSITION OF: KELVIN HYATT |
| SKYWEST AIRLINES, INC., Defendant. | Held November 5, 2004 |
| | REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of KELVIN HYATT, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 9:35 a.m. on November 5, 2004, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

Depomax REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

A Ence, E-N-C-E.
Q Okay. Did you ever fly with Andy when he was still at SkyWest?
A I don't believe so, no.
Q So you didn't do any probationary pilot report on him?
A Not that I recall.
Q You mentioned a SAD earlier. What is a SAD?
A We call it a scheduled assignment deviation. It covers several different things. It basically is used to describe when a pilot no shows, when a pilot is not available when he should be available, when a pilot shows up late and causes a delay. It's part of the crew member policy manual and there's a number of different scenarios that would be called a SAD.
Q I saw in some of the records that SADs were not disciplinary in nature.
A No, it's not -- it's simply stating an event took place.
Q But I gather they're kept somewhere. Records of SADs are kept?
A SADs are assigned for the particular schedule that they happened on as part of the

A It was brought up during chief pilot conference calls.

Q Did you have telephone conversations during that month with Jim Breeze about Andy Callaway outside of these conference calls?

A There may have been some. I was given direction to put together a summary, file summary, which I did do, and E-mailed to the vice-president. The E-mail would certainly include Jim Breeze as well.

Q The vice-president is Brad Holt?

A Brad Holt, yes.

Q And was the summary something different than Exhibit 2, or is that --

A Yes, it was different than that. In many ways it contained the same information, but it was a different document.

Q What did it look like, because I don't --

A It was an E-mail document that basically summarized his file.

Q Did you save a copy of that somewhere?

A Not specifically, no. I believe that Jacque did have a copy of that E-mail, but I don't know for certain. Typically E-mail was purged automatically. I did not keep all of the E-mail. My

computer system also was updated, upgraded earlier this year when I took a new position, and any E-mail that I had in my computer was then destroyed.

Q Do you recall how that E-mail differed from Exhibit 2?

A It was not as involved. It did not set itself up as a story board. It was more this state, this -- this issue or this item is in the file.

Q And you recall sending it to Brad Holt, Jim Breeze and to Jacque?

A I did send it to Jim Breeze; I did send it to Jacque. I believe I copied it to Brad Holt, or I would be certain that -- well, I know for a fact probably Brad Holt did get a copy, if not from me, probably Jim Breeze.

Q Why do you know for a fact that Brad Holt got a copy?

A I think any E-mail of this nature, certainly Brad would have a copy of it. I believe that there were -- this is kind of where Brad makes his ultimate decision as to whether or not he's going to support a termination or not of the employee, is based upon that summary. He did decide that we should terminate, and that was the steps we took.

Q Did you talk with Brad Holt at any point

during this month between August 29th and September 29th?

A No.

Q Did you have any E-mail correspondence with him?

A No.

Q Did you make a recommendation as to what should happen to Andy?

A My recommendation, actually, on the E-mail was that I wasn't certain that termination was the proper course of action.

Q And this is the E-mail that contained the summary?

A Yes.

Q So you thought that other lesser discipline might be --

A Yes.

Q -- appropriate?

A Yes.

Q And why did you feel that?

A I did not feel that this was, on its own, a strong enough situation that warranted termination.

Q Any other reason?

A No.

Q So you made your recommendation in a letter

A No.
Q Why not?
A That's not how the process works. I put together what I needed to put together. I presented that to my boss. The chief pilots in total decided the best course of action for the company was to terminate this employee. During the E-mail I did voice concern I didn't feel that was necessarily the best course of action. I was overruled, and the company decided that the best course of action for the company was to terminate.
Q Did all of the other chief pilots think that termination was appropriate?
A Yes.
Q But I gather what the chief pilots decide is simply a -- I don't mean "simply" in a derogatory sense, but it's a recommendation, correct?
A Yes. Many times we have been overruled. Many times a different course of action does take place after the fact. My opinion was changed by conferences, conversations with other chief pilots to where then I did support the termination.
Q Are you talking about this -- Mr. Callaway's situation?
A Yes.

and/or Anita Spencer, their immediate supervisor.
Q But you don't have any documentation of them?
A No.
Q In Exhibit 7, the third paragraph, there's a reference to "posts you authored on the web boards."
A Uh-huh.
Q Do you know what that's referring to? Well, let me ask a background question before -- did you draft this document, this counseling statement?
A Parts of it. Other parts of it were drafted by probably Jon Tenpas, who did most of our drafting of these documents at that time.
Q And who is Jon Tenpas?
A Chief pilot, Los Angeles.
Q Okay. What parts of this counseling statement did you author?
A I would say bits and pieces of all parts. It was probably put together and reviewed by Jon. It would certainly be reviewed by Jim Breeze as well.
Q In the third paragraph it talks about "posts you authored on the web boards."
A Uh-huh.
Q What is that referring to?

A I would assume that would be posts that Andy posted on the SkyWest forum boards.
Q Do you know what it's referring to as opposed to -- you're making assumption, which may or may not be correct. Do you know what it's referring to?
A No, I do not.
Q Who put that in?
A It may have been put in by myself from references in his file. It may have been put in by Jim Breeze. I don't recall. I was not part of that process. He was summoned to St. George. The only part that I had in that is I was told to contact Andy and tell him that he was going to St. George.
MR. STRINDBERG: Counsel, have we been provided Andy's complete file? Do you know? I mean, this testimony raises lots of issues of what the file is, but -- and the reason I'm asking -- I'm not trying to trick anyone. I just -- I've not seen -- well, let me just leave it at that. Do you know if we have been?
MR. EMERSON: Yes, you have.
Q (BY MR. STRINDBERG) These calls from crew support that you say you received, were they between November 30th, '01 and August 29th, '03?

talk with Jim Breeze about the June meeting in St. George?

A I don't recall.

Q Go on to the second page of Exhibit 2. That first entry is October 1st, '01, and then it has a "10-03-01 Woody." Does that mean it was an entrance made into the electronic database by Woody?

A Yes.

Q And then it says "10-12-01, Customer Service Relations received a phone call from Claude Brandt in regards to a pilot for SkyWest." Where did that information come from?

A This would have been in his file. It was forwarded to me on or about or around the time that it took place. I did mention it to Andy, on or around the time it took place, that we had been contacted. That was the extent of that conversation.

Q And these next entries from 10-15-01 through 11-09-01 refer to, I guess, supposed -- or complaints by neighbors of wild parties and drug use; is that correct?

A That is what they said.

Q Did you ever -- you said you mentioned to Andy that you had heard from Jacque Nielsen that she had been contacted by this neighbor around that time?

A I mentioned to Andy that we, as a company, had been contacted about this. At the time, he indicated to me that that shouldn't have happened, that there was a lawsuit between himself and his neighbor.

Q Did you look into, at any time, any of these incidents, letters, allegations involving Mr. Brandt and what was going on with the Salt Lake City Police Department and Andy?

A No. No, I did not.

Q Do you know if anyone at SkyWest did?

A I don't know to what extent. Jacque, I believe, was the one that handling the situation. Certainly, as an airline, you're very sensitive to complaints dealing with crew members or your reputation. If you have issues with crew members and drug use, that's even a further concern, but we, as a company, as far as I am aware, did not get involved with the situation.

Q Why was this information put into your summary?

A It existed in his file and it also existed in the file that I gave -- or the company gave to Andy prior to his review board.

Q Well, why was it presented to the review

A I assume that he requested this write-up from his ground instructor.
Q That's --
A In fact, it states here that Bill did request Kelly to write up his contact with Andy.
Q Okay. But on the top of this third page it says, "I received a report from Kelly Dixon."
A Yes.
Q Who is the "I" who is referred to there, you or Bill Boice?
A That would have been me. This report was forwarded to me.
Q The Kelly Dixon report?
A Yes.
Q Okay. And that's what's under tab 6 in Exhibit --
A Yes.
Q This letter from Kelly Dixon starts out saying, "I am writing this letter in response to a request received from St. George management on November 13th." Do you know who in St. George management requested that report from Kelly?
A I would assume that it would be Bill Boice.
Q But you're not sure?
A I'm not certain, no.

A I would assume that I did, yes.
Q The fourth paragraph -- excuse me -- yeah, the fourth paragraph -- I was right -- talks about a Captain Black witnessed all the interactions with a ticket agent and whatnot. Did you ever contact Captain Black --
A I did not talk to him.
Q -- to ask him what he knew?
A I did not talk to Captain Black, however, he did -- I believe he talked with Tony, but I don't know for certain.
Q With Tony --
A Thompson.
Q And do you know what he said to Tony Thompson?
A I don't know for certain, no.
Q Have you ever seen a statement from Captain Black?
A There was a statement that was presented to the review board by Andy, and that was the first time I had seen that statement.
Q The review board in '01?
A The review board for the Butte incident, yes.
Q Okay. And do you recall what Captain Black

Butte incident or event and deals with the same type of behavior from Andrew. The instructor noticed Andy's -- Andrew's attitude and the way he treated other SkyWest personnel. The instructor stated, "His name stuck out in my mind as a student who displayed very poor attitude."

Q Okay. Did you give Andy a copy of this, I guess, Kelly Dixon statement prior to the review board?

A No.

Q Had you ever talked with Andy about what Kelly Dixon had said about him prior to the review board?

A No. During that time frame, again let me state that Andy was under Bill Boice.

Q Do you know if Bill Boice ever told him what Kelly Dixon had said?

A I was not informed that he did.

Q What does Bill Boice do now?

A He's retired.

Q Do you know where he lives?

A San Diego. I assume San Diego.

Q Let's go back for a moment to the second page of Exhibit 2. It's referenced at tabs 3 and 4 in Exhibit 15. Tab 3 starts out with some kind of --

it looks like a city ordinance or something about public nuisance, then some definition from the Utah Code, and a letter from Heidi Chester to Dear Bob, and a letter then from Bob to the police department, and then it looks like a printout of a complaint search. Where did you get all that information?

A This information was provided to me by the people department.

Q And when did they provide it to you?

A I assume it was around October the 3rd, 2001.

Q And did you -- other than talk with Andy that one time, did you have any other conversations with Andy about this alleged neighborhood issue?

A No.

Q Look at tab 12. Tell me what tab 12 and, I guess, the answer on March 26th, '02 is about.

A It looks to me like this is a write-up from crew support. This copy that is here is the electronic copy out of the scheduling computer system. It looks like Andy was the most junior on multiple days on reserve. He was called to tell him that he was on ready reserve from 10:30 to five o'clock.

Q Okay. Let me interrupt you. Do you

Q The comments that are there.
A No.
Q In other words, you never called him up or E-mailed him and said, "I'm taken aback by your response. It's nonresponsive," or whatever?
A No, I did not.
Q Whose phrase is this, "SkyWest property was being used to hunt and harass a fellow employee"?
A That is mine.
Q And why did you use "hunt and harass," other than the good alliteration?
A She felt that she was being harassed. Andy's statement in return to me was that he had no other way of contacting her, so I assumed that he was using company property to hunt her.
Q On the next to last page of Exhibit 2, it says "summary" and then it says, "First year of employ he is summoned to SGU because of abusive writings on the web site." Again, this was information you received from, you think, Jim Breeze or Brad Holt that there were abusive writings on the web site?
A Yes.
Q You never personally told them -- or saw them?

Q Are you aware of any rules or policies regarding what can or cannot be sent to someone's in-house E-mail message box?
A I don't know that we actually have specifically written down what may be in messages to crew members from in-house. I do know that we do have policy about what you may not harass crew members with, and that's spelled out in SP 56.
Q Okay. But you're not aware of a policy that deals specifically with the intranet and what may or may not be sent over that?
A No.
Q Are you aware of anyone else besides Andy -- any pilot besides Andy who has ever been fired for alleged misuse of the company intranet?
A Andy wasn't terminated for misuse of the intranet. He was terminated for continuing harassing behavior and abusive behavior of fellow crew members and fellow employees.
Q Okay. Have you -- are you aware of any employee whose termination was based, in part or in whole, on misuse of the company intranet?
A I believe we have terminated somebody for misusing our computer equipment. I do not know all employees that may have been terminated --

A The pilot's name was Gary Green.

Q And what did Gary supposedly do or say?

A He made a comment to a ramp worker who brought paperwork on the aircraft. At the time, after 9-11, there was a requirement for the ramp personnel to ascertain the employee IDs of the crew members and check it against documentation. Gary made a comment to the employee that, "I'll show you mine if you show me yours." There was some other comments -- without my file in front of me -- that he was indicating sexual nature along that line.

Q Okay. So that's harassment of a sexual nature?

A Yes.

Q And what discipline did that person receive?

A He received a counseling statement and time off, as far as I can recall.

Q Do you know who Phil Alford is?

A Yes.

Q Who is he?

A Phil Alford is a CRJ captain in Salt Lake.

Q During the period of time that you were the chief pilot, did Mr. Alford ever receive any suspension or termination?

A He was not terminated. I believe that there was suspension made by St. George to him over comments that he made to a flight attendant.

Q And what comments did he supposedly make?

A I don't have that.

Q Were you not involved in his suspension?

A Some information came through me, but I was not involved in it.

Q Wasn't it discussed at the chief pilots' conference?

A It was discussed, but I don't recall exactly what it was that he said. There was a complaint -- two complaints, the same complaint rewritten by the flight attendant, but St. George elected that they wanted to take care of it, and they took care of it.

Q Why did St. George get involved in that and not you?

A St. George wanted to get involved in it.

Q Do you know why?

A I have no reason. Nothing was given to me as to why they wanted to be dealing with that.

Q Who in St. George got involved in it?

A It would be Brad Holt, Jim Breeze, Sonya Wolford, I believe.

A No.

Q Just one thing I want to clear up. Look at Exhibit 15, tab 2. There's a reference to "commutable."

A Uh-huh.

Q His bid was not very commutable, in the third paragraph, and it's circled. What is a commutable line?

A Commutable would be for an individual that traveled to the domicile to work.

Q So, in other words, they lived in one city and had to fly out of another?

A Yes.

Q Do you know if Andy ever bid a commutable line?

A I don't know the various lines that Andy bid.

Q Did you receive this letter sometime in December of '01 when it was apparently faxed?

A I would assume that's when I received this letter.

Q Did you ever try to check out some of the information contained in this letter?

A No.

Q Did you ask anyone to check it out?

# EXHIBIT "3"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

ORIGINAL

| | |
|---|---|
| DAVID ANDREW CALLAWAY, | CIVIL NO. 2:04CV00179 |
| Plaintiff, | DEPOSITION OF: BRADFORD R. HOLT |
| vs. | Held February 10, 2005 |
| SKYWEST AIRLINES, INC., | REPORTED BY: |
| Defendant. | RENEE L. STACY, CSR, RPR |

Deposition of BRADFORD R. HOLT, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 1:56 p.m. on February 10, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

Depomax REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F, SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

# C O R R E C T I O N S

Deposition of: BRADFORD R. HOLT
Taken: February 10, 2005
Case Name: Callaway vs. SkyWest Airlines
Case No: 2:04CV00179

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 84 | 25 | FLIGHT STANDARDS | Wrong word |
| 32 | 8 | NECIA CLARK-MANTLE | wrong spelling |
| 32 | 9 | NECIA | " |
| 23 | 12 | JEPP | SPELLING |

SIGNATURE [signature] DATE 2/24/05

normally deal with the day-to-day discipline issues. I review time off, terminations.

Q And what do you review them for?

A Just to ensure that, from my perspective, we're being fair and that we're applying the right discipline.

Q Do you have some guidelines that you work from in regards to discipline?

A Experience.

Q Is there any kind of written guidelines?

MR. PETERSEN: Hold on. Let me just ask a clarifier. Are you talking about "you," meaning him, or "you," meaning SkyWest?

MR. STRINDBERG: Either.

THE WITNESS: Yeah, we have discipline guidelines in our policy manual.

Q (BY MR. STRINDBERG) Other than what's in the policy manual, are there any written guidelines regarding discipline?

A No, not that I know of.

Q What is your role when a pilot asks for a review board hearing or meeting?

A My role is, I approve it or disapprove it.

Q Approve having the meeting or -- is that what you mean?

on the basis that it calls for a legal conclusion.

Q (BY MR. STRINDBERG) You can give me your opinion.

A My opinion is no.

Q Has SAPA ever attempted to negotiate with the company over such things as wages and terms and conditions of the pilots -- terms and conditions of the employment of the pilots?

A I believe SAPA represents the pilot group in those discussions, yes.

Q Do you meet with SAPA?

A Yes.

Q How often?

A It depends on what's going on. Sometimes --

MR. PETERSEN: I was just going to say, when you say "you," you're talking about Brad personally?

MR. STRINDBERG: Yes.

THE WITNESS: When we're talking about revising work rules and pay and stuff like that, it can be as much as a couple times a month, or it can be every two or three months, depending on what's happening.

Q (BY MR. STRINDBERG) What's the purpose for

Q Were you involved in forming it?
A Yes. Well, I was in management at the time.
Q What was your involvement with it?
A I don't remember specifically what my involvement was. I know we -- that -- I think we had SAPA around when I first came into the position that I'm in now, or shortly thereafter. But that was 14 years ago, so I don't remember the specifics of how the whole thing worked.
Q Did someone in management organize SAPA?
A Yeah. I would say yes.
Q Who?
A I don't know.
Q What was the purpose behind organizing SAPA?
A So that the employees would have a voice and be able to voice their concerns to management and have some policies and procedures that weren't in place in the company policy manual that were more specific to pilots and crew members.
Q Does SAPA have the authority to negotiate a collective bargaining agreement with the company?
A No.
MR. PETERSEN: Hold on. I want to object

you meeting with SAPA?
A To discuss policy and procedure and pay and work rules.
Okay. Now I'm going to have to take a break.
(Discussion off the record.)
(Recess.)
(Whereupon Deposition Exhibit No. 60 was marked for identification.)
Q I think you've been given Exhibit 60.
A Uh-huh.
Q Is that your signature on the bottom right hand?
A Yes.
Q Did you author this?
A I took part in authoring it, yes.
Q What part did you take in authoring it?
A I don't know specifically. There's three signatures on the bottom of it and we all participated in it.
Q Did you do a draft of it?
A Yes, I probably did.
Q Did you do the first draft of it?
A I don't recall whether I did the first draft or not.

Q So you believe you took part in drafting it, but you don't recall what part that was?
A No, I don't. This was six years ago. I don't recall what part.
Q In the third paragraph, the last sentence of the third paragraph, it says, "In the next few weeks we will do our best to forward any and all information we have on these issues." What is that referring to?
A It's referring to these six issues below that paragraph.
Q Had you and Ron Reber and Jerry Atkin come up with some sort of a plan or campaign -- mailing campaign where you were going to send out a number of letters to pilots?
A Yes.
Q Who came up with that idea?
A I don't recall who came up with it.
(Whereupon Deposition Exhibit No. 61 was marked for identification.)
Q Is this one of the memos or letters that was sent out?
A Yes.
Q Who authored this?
A I believe I did.

Q Where did you get the information about Delta's agreement that's referred to in the second paragraph?

A I don't recall where I got the information.

Q How about the information about United's collective bargaining agreement? Where did you get that information?

A I don't recall.

Q In the third paragraph it talks about a suit that ALPA pilots -- that Delta filed, I guess, against ALPA pilots at Comair. Where did you learn about that?

A I don't recall. I can't tell you specifically where I came up with the information.

Q Where, generally, did you get it?

A Oh, there's industry newsletters. There's all kinds of information sent out in the industry magazines and --

Q What industry magazines do you regularly read?

A Well, at the time I don't know what I was reading.

Q What do you read now?

A I read all the aviation business magazines and Newsweek and all those types of magazines.

(Whereupon Deposition Exhibit No. 62 was marked for identification.)

Q Can you tell me what Exhibit 62 is?

A This looks like a memo to Mike Lowry adding pilots to the eligibility list for a vote in '99.

Q Who is Mike Lowry?

A Mike Lowry is with Ford & Harrison.

Q And why were you sending him a list of people to add to the pilot list?

A Because the initial list didn't have these pilots' names on it, and so he was updating the NMB with these names.

Q Did he ask for this information?

A I don't know.

Q What does NMB stand for?

A National Mediation Board.

Q Had he sent you a memo saying, "I need an updated list"?

MR. PETERSEN: Hold on. Michael Lowry is an attorney, right?

MR. STRINDBERG: You've waived the privilege, guys.

MR. PETERSEN: No, we haven't.

MR. EMERSON: On this document.

MR. STRINDBERG: Well, you can't say, "We

waive it just for this document." If you give me a document which is from Brad Holt to his attorneys, I can ask what prompted that and if Mr. Lowry sent him something. You've waived it. I'm sorry. You don't -- you can't just waive it --

MR. PETERSEN: Hold on. Don't answer the question on the basis of attorney-client privilege. If this was produced, it was done inadvertently, if Mr. Lowry is an attorney at the company. That might have been my mistake. I didn't -- was not aware that Mr. Lowry was an attorney. It doesn't reference him as an esquire.

(Whereupon Deposition Exhibit No. 63 was marked for identification.)

Q Do you recall receiving this letter, which is Exhibit 63, from Mr. Lowry's legal assistant?

A Yes.

Q I gather --

MR. PETERSEN: Hold on. Let us take a break for a second.

MR. EMERSON: You know, to save time, do you have any others like these we can review on this break?

MR. PETERSEN: I'm not going to let him answer questions on this. I've got to talk to Todd.

We're going to have a problem.

MR. STRINDBERG: There's a whole bunch of these, actually. I didn't -- I don't think I've even copied all of them. I've copied some of them.

MR. PETERSEN: Is there a place we can talk in private?

(Discussion off the record.)

(Recess.)

MR. PETERSEN: As to Exhibit 62, we're not asserting that it's an attorney-client privilege, because it's a public document. The information contained is passed on to the National Mediation Board, so you can ask him questions about that, but I -- we're not suggesting that we've waived any privilege at all. It certainly hasn't been our intent. And none of the documents shown so far, including Exhibit 63, deals with anything that would be attorney-client privilege, so we -- ask your questions, I guess, of these documents and we'll just deal with it as we go along. I don't think there was a pending question. Was there a pending question that I told him not to answer?

MR. STRINDBERG: I asked him -- yeah, I think there was.

MR. PETERSEN: Why don't you read the

question back, please.

THE REPORTER: He answered it.

(Record read back as follows: "Question: Do you recall receiving this letter, which is Exhibit 63, from Mr. Lowry's legal assistant? Answer: Yes.")

Q (BY MR. STRINDBERG) Okay. Go back to Exhibit 62. What I had asked -- and I think you refused to let him answer -- was: How was it you came to send this to Mr. Lowry? Did he send you an E-mail or did he call you or something and ask you for an update?

A No.

Q How did you know you were supposed to update the pilot list?

A We send the initial list when it's requested, and then the list is reviewed to make sure that it's correct, and in that review we found that these names were missing.

Q Who reviewed it?

A I don't recall.

Q Someone at SkyWest?

A Yes.

Q Do you recall getting Exhibit 63?

A I know I received this. I don't recall

when or under what circumstances, but yes, I remember this letter.

Q Did it have enclosed with it the notice of election and a cover letter from the NMB?

A Yes.

Q What did you do with this letter when you got it?

A I don't know what I did with it.

(Whereupon Deposition Exhibit No. 64 was marked for identification.)

Q Can you tell me what Exhibit 64 is?

A That's just a letter to the pilot group regarding the costs of hiring ALPA.

Q Did you write it?

A Yes, I believe I did.

Q Did anyone help you?

A Yes, I'm sure I had help.

Q Who helped you?

A I don't know specifically.

Q Who do you think helped you?

A I don't have any idea who would have helped me with it.

Q Did you have SkyWest's attorney review this before it was sent out?

A I don't know whether they reviewed it or

not.

(Whereupon Deposition Exhibit No. 65 was marked for identification.)

Q Is that your signature?

A Yes.

Q This contains a pretty sophisticated description of how the voting process occurred -- takes place. Where did you get that information?

A I don't recall where I got the information.

Q Do you have a book you reviewed?

A I've been dealing with these issues for the last 12 or 14 years. I'm pretty familiar with the process, so I don't know where the information came from.

(Whereupon Deposition Exhibit No. 66 was marked for identification.)

Q What's Exhibit 66?

A Looks like it's my declaration.

Q Who prepared that declaration?

A I don't know for sure who prepared it.

Q Did your attorney -- or SkyWest's attorneys prepare it?

A It would be my guess that that's who would have prepared it.

Q What was the purpose for this declaration?

A To verify how the people -- the pilots on the eligibility list qualify to be on the eligibility list. So it's an explanation of the specific positions and why they would be eligible to vote.
Q So was there an issue raised whether assistant chief pilots and ground instructors were part of the bargaining unit?
A Yes.
Q And you and SkyWest were attempting to get assistant chief pilots included in that bargaining unit?
A Yes. We did get them included.
Q And why did you want them included?
A Because they have a right to vote. They're pilots.
Q Isn't it that you wanted them included because you thought they would vote against the union?
A We include them because they have a right to vote. They are part of the bargaining unit.
Q So it was just simply altruistic that you wanted them part of the bargaining unit?
MR. PETERSEN: Hold on. I'm going to object. You're just harassing him with that.
MR. STRINDBERG: I'm not harassing him.

MR. PETERSEN: Is there a question, then?
MR. STRINDBERG: Yeah.
Q So it was simple altruism, why you wanted them included in the bargaining unit?
A These pilots have a right to vote, just like every other line pilot out there. They are part of the bargaining unit and they have a right to vote, just like every other line pilot does. It's their future, just like everybody else's.
Q So it had nothing to do with the fact that SkyWest wanted them included because they thought they would vote in a manner that was favorable to SkyWest?
A I don't know whether these guys would vote one way or the other.
(Whereupon Deposition Exhibit No. 67 was marked for identification.)
Q Who is Bill Hiers? That's H-I-E-R-S.
A I don't have any idea who Bill Hiers is.
Q He's an attorney at Ford & Harrison, isn't he?
A I don't know.
Q Why were you sending these two documents to Bill Hiers if you didn't know who he was?
MR. PETERSEN: Hold on. Is it --

MR. EMERSON: Facts not in evidence.

MR. PETERSEN: It doesn't matter. What I'm trying to get at is, when you ask that question, you don't place a time on it. He says he doesn't know who Bill Hiers is. It doesn't mean he didn't at the time this was prepared.

Q (BY MR. STRINDBERG) Do you know why you were sending these two memos which are included with this fax cover page to Bill Hiers on or about July 22nd, 1999?

MR. PETERSEN: Don't testify as to anything that may have been told to you by the attorneys at Ford & Harrison.

THE WITNESS: Well, first, I don't remember Bill Hiers' name, to start with. Second, if I sent these to Ford & Harrison, it would be for review prior to sending them out.

(Whereupon Deposition Exhibit No. 68 was marked for identification.)

Q (BY MR. STRINDBERG) Does 68 refresh your recollection as to who Bill Hiers is?

A No, it doesn't.

Q Did you have a secretary by the name of Tammie back in 1999?

A No.

Q Do you know who Tammie is?
A I don't.
Q Is that your signature on the third page of Exhibit 68?
A Yes.
Q Who told you there was an issue as to whether or not the assistant chief pilot should be included in the putative bargaining unit?
A That information comes from the NMB.
Q Did someone from the NMB tell you that there was an issue?
A I don't recall how I found out or who I found out from. Normal process would be the NMB would communicate with our law firm and our law firm would inform us, so I would assume that that's the way it worked, but I don't recall exactly.
Q Did you ask Tony Thompson to give the declaration which is the second page of this exhibit?
A I don't know if I specifically asked him or not.
Q Did you ask someone to ask him?
A I don't recall whether this came through me or some other avenue.
(Whereupon Deposition Exhibit No. 69 was marked for identification.)

Q Do you recall receiving the letter which is Exhibit 69?

A Yes. I recall this letter.

Q Do you recall what you received with it?

A No, I don't.

Q Did you have any discussions with Mr. Atkin at or about this time regarding the ALPA election?

MR. PETERSEN: Sorry. Would you repeat the question, please.

(Question read back as follows: "Did you have any discussions with Mr. Atkin at or about this time regarding the ALPA election?")

THE WITNESS: I don't know whether I did or not.

Q (BY MR. SILVESTRININ) Do you have any recollection of ever talking with Jerry Atkin at any time about the 1999 ALPA election?

A Not specifically.

Q Have you ever had any conversations with Ron Reber about the '99 ALPA election?

A I'm sure that I have, yes.

Q What had you and he discussed?

A I don't recall what we discussed.

Q Did you guys do anything to celebrate the fact that you -- that that ALPA election had gone in

favorable manner for SkyWest?

A No, not that I recall.

Q Didn't go out to dinner? Didn't have a party or anything?

A No.

(Whereupon Deposition Exhibit No. 70 was marked for identification.)

Q Can you tell us what Exhibit 70 is?

A This is just a letter to the pilots informing them that there was a union drive.

Q This is similar to Exhibit 60, I gather.

A Yes.

Q It's sort of an initial letter that SkyWest sends out to its pilots when there's a union drive going out; is that accurate?

A Yes.

Q And then it's followed by a series of other letters or memos that are sent out dealing with various topics; is that correct?

A Yes.

Q Did you sign this document?

A I don't recall whether I signed it or not. I don't see my signature on here.

Q Was this sent out to the pilots?

A I believe it was.

Q Was this also reviewed by the attorneys at Ford & Harrison before it was sent out?
A I don't know.
(Whereupon Deposition Exhibit No. 71 was marked for identification.)
Q What is Exhibit 71?
A It looks like some correspondence that went out to the pilots.
Q Did you send it out?
A I don't recall whether I did or not.
Q What's a CFR? It's in the footnote.
A CFR are the regulations -- the code of regulations for --
Q Whose code of regulations?
A The government's code of regulations in the transportation system.
Q Are you familiar with those?
A Yes.
Q How did you become familiar with those?
A The CFRs?
Q Yes, the CFRs.
A The CFRs are the overall holding place for all the federal regulations that the air transportation system works under.
Q You don't recall whether you wrote this

document or not?

A No. I believe I did, but I don't recall specifically writing it. It looks like something I would have written.

(Whereupon Deposition Exhibit No. 72 was marked for identification.)

Q Is that your signature on the last page of this?

A Yes.

Q Who drafted this?

A It looks like something that would be a combined effort between me and our attorneys.

Q Do individual pilots who become ground instructors, do they get paid extra being ground instructors? Let me put it this way: Do they get paid more than a typical line pilot?

A No.

Q How are they compensated?

A They're compensated based on their experience and whether or not they're actual rated pilots in a specific airplane, what position they hold, what airplane they teach in.

Q Right. But my understanding is there's a fairly complicated formula, I gather, for how line pilots are paid based on -- there's seniority type of

airplane, but it's also -- they're paid a certain number of hours per flight, and then there's other pay they get, correct? Other per diems and other things?

A Yes.

Q When someone is working as a flight instructor, how is their pay calculated?

A Are you talking flight instructors or ground instructors?

Q Ground instructors. I apologize.

A Ground instructors are on salary, based on their experience and their value in the department.

Q Well, I've seen -- some of the documents say an RJ pilot is making 60 bucks an hour. If that person became a ground instructor, are they -- what would they get? What would their pay be?

A We wouldn't hire that person as a ground instructor.

Q Why?

A Because that's not the type of people we have teaching ground school.

Q Who do you have teaching ground school?

A We don't have RJ captains teaching ground school.

Q Why?

A Because they're too expensive, to start with.

Q Who do you hire and how do you calculate their pay?

A We normally hire ground instructors off the street and we calculate their pay based on their experience, and if they join us on the line, they go through the interview process and are hired as a pilot while they're a ground instructor. Then their pay becomes based on what they can hold on the line.

Q Okay. So what exactly does that mean? In other words, it says here Daniel DeKock flew 33.41 hours. Say Daniel DeKock was being paid $25 an hour for flight time. How does that translate into what he would receive as a ground instructor?

A If he was a full-time ground instructor, then he would have been on salary and the 33 hours wouldn't have -- he wouldn't have been paid specifically those 33 hours. He would have been paid a number of hours --

Q I understand. But what do you do? Do you take the $25 an hour he would have received as a pilot and multiply that by 40 hours to come up with his salary as a flight instructor?

A As a ground instructor?

Q Ground instructor.
A Yes.
Q So that's what you do? You take the flight time --
A If he's a pilot and he's qualified on the line, yes. We have pilots that are qualified to fly the line that are ground instructors. We have ground instructors that are not pilots that are just ground instructors. There's two different things.
Q The ones who are qualified to fly the line, am I correct in saying that you take their then current hourly rate and multiply that by 40 to get their salary?
A Yeah. Forty would not be the number, probably, but that's the method.
Q What would the number be?
A It would depend on the person. It would depend on who it was. Everybody -- it's not a standard pay for ground instruction. There are specific ways we pay pilots that fly the line and then come into the ground school versus people we hire off the street that are not pilots.
Q Okay. We're just talking about the line pilots that would become ground instructors.
A Okay.

Q How do you calculate their pay? How many hours a week do you pay them for being ground instructors?
A It's not based on a week. It's based on a month. And they would normally get about a hundred hours a month at a specific pay rate. It may or may not be their pay rate.
Q What pay rate would it be at?
A It would be based on the equipment that they're teaching in. They may not be able to hold seniority in the equipment they're teaching in.
Q Ground instructors don't fly, though, do they?
A Yes.
Q Okay. So it's basically, though -- if they're flying -- say they're instructing on one of your RJ jets. Do they get that hourly rate for, what, a first officer times a hundred hours?
A Yes.
Q Is that how it's figured?
A Yes.
Q Okay. What if they work more than a hundred hours in a month as a ground instructor? Do they get paid extra?
A No.

(Whereupon Deposition Exhibit No. 73 was marked for identification.)

Q Okay. Exhibit 73, the first page is a fax cover page. The next several pages are a letter, which appears to be authored by an attorney at Ford & Harrison, but the fax page seems to be from you to Ellen Ham. First of all, do you know who Ellen Ham is?

A No, I'm not sure who Ellen Ham is.

Q Do you know why you were faxing a letter from your attorney to somebody by the name of Ellen Ham?

MR. PETERSEN: Hold on. I'm going to object on the basis that it assumes facts not in evidence. You haven't established that that fax cover sheet corresponds to what follows. It says "four," and you've got many more than four that follow.

MR. STRINDBERG: We have five, but that's how --

MR. PETERSEN: Then you count the cover sheet.

MR. STRINDBERG: That's how it was produced to us. That's all I can tell you.

MR. PETERSEN: Was it stapled?

MR. STRINDBERG: I don't remember, counsel.
Q Do you know who Ellen Ham is?
A No.
Q Does the fax cover sheet correspond to the letter underneath it?
A I can't tell because it doesn't reference anything that's underneath it. There's no reference to anything.
Q How many times have you met Andy Callaway, including today?
A I don't know for sure, but quite a few times.
Q What's "quite a few"?
A I'd say more than five.
Q When was the first time you recall meeting him?
A I think the first time was at a meeting at the hangar here in Salt Lake City.
Q What year?
A I don't recall. It would have had to have been three or four years ago, though.
Q Who was present?
A I don't even remember that.
Q What was the purpose of the meeting?
A All I remember is vaguely that there was

some attitude issues, and I don't know if it was ground school or what it was, and so I think all we discussed was Andy's attitude.

Q How is it you came to be in Salt Lake?

A I don't recall specifically. I'm in Salt Lake all the time. I spent a lot of time here.

Q Do you recall what you said at this meeting in the hangar?

A Like I say, I remember the meeting vaguely, because I have about 3,000 employees and I meet with a lot of them, so this doesn't stand out as a bright light in my history, but I vaguely remember talking to Andy about his attitude and basically asking him to try and be a little better employee. And I do remember at the time that he was very willing to do that.

Q Do you -- well, did you, three or four years ago, keep some kind of a calendar of your appointments?

A No.

Q Do you have a secretary?

A Yes.

Q Did you at the time?

A Yes.

Q Did she keep your calendar?

A No. She didn't have any specific calendar. I mean, I have a planner that I write stuff down in if I have specific appointments with -- I don't keep a calendar.

Q That's what I meant by a calendar. I assume this planner has days in it.

A Yes.

Q It has weeks and months in it?

A (Witness nods.)

Q Is that correct?

A Yes.

Q And do you make notations there of meetings in Salt Lake, things like that?

A Yes. If it's something that I -- if it's not just an on-the-spot meeting, it's something that I've planned and I'm going to attend, yeah, I'll normally write it down.

Q Do you have a regular time you go to the various domiciles?

A No.

Q How do you decide you're going to go out to visit some domicile?

A It depends on a lot of things. What the current issues are, whether or not we're having schedule problems in a specific domicile, whether

Q How was it that Andy came to be in St. George for a meeting with you guys?

A More attitude problems and issues just kept popping up with Andy and so we felt like we ought to talk to him.

Q What issues?

A I don't remember the specific issues. Like I say, these meetings -- I have 3,000 employees, and so if I -- I don't recall exactly what went on in the meeting. I do know there's issues with Andy's attitudes, with his posts.

Q Posts?

A His posts on certain forums, his comments about management. In general, just issues with the company.

Q What about these -- where were these posts, I should say?

A I'm not sure whether the posts were. All I know is the one circumstance we were talking about was someone comatted me something that Andy had posted and --

Q You used the word "comatted," which I don't think I know.

It's company material. Somebody just grabs an envelope somewhere, sticks something in it, writes

my name on it, sends it down on the airline. That's comat. It's company material.

Q What was it that was sent? A copy of something from the intranet or something in a chat room?

A I don't remember exactly what it was. I can't be specific about it, other than to say that it was a post from Andy that basically said he didn't like the company and didn't like management and -- you know, just those types of attitudes.

Q Okay. Anything else you recall about the talk down in St. George?

A No.

Q What other times do you recall meeting with or meeting Andy?

A I don't really recall any other specific time.

Q How did you -- well, did you, at some point, learn that the company had issued a termination notice to Mr. Callaway?

A Are you asking did I know that we were going to terminate Mr. Callaway?

Q Well, I didn't ask it that way, but let me ask it that way. Did you know that the company intended on terminating Mr. Callaway before the

notice of termination was issued to him?

A I'm pretty sure that I would know before that, yes.

Q Well, do you recall?

A No.

Q Do you recall who told you?

A No.

Q What do you recall being told about why the company was going to issue a notice of termination?

A Well, I don't remember anybody specifically telling me what the issue was. When we are going to terminate somebody, I get the file and I review it, so that's how I would be aware of what's going on with any crew member.

Q And where did you get the file from that you reviewed?

A I don't know, this specific file, but I can tell you what the normal process would be.

Q Okay. Tell me what the normal process is.

A The normal process would be, after all the information is gathered from the chiefs and GM, they put that all together and they give me a summary that says, "This is this guy's background, this is what's in his file," and give me a good idea of what it is they're dealing with.

Q Do you recall reviewing such a summary in Mr. Callaway's situation?
A I don't remember the specific summary.
Q I didn't ask that. I asked if you remembered reviewing the summary.
A I don't remember reviewing a specific summary. I would assume that I did, though.
Q Do you recall what reason was being given for why Jim Breeze or the chief pilot wanted to fire Andy?
A I think the final straw that broke the camel's back was that Andy was using company material to harass a company employee and he refused to stop doing that, and that was right in line with Andy's behavior for the previous four years, so...
Q What company property was he using?
A Computers.
Q Do you know --
A He was using our intranet.
Q Do you know who he was supposedly harassing?
A I know it was a flight attendant. I don't recall her name.
Q Did you ever talk with that flight attendant?

A No.
Q Have you ever talked with her?
A I don't believe so.
Q Do you know if she's still employed?
A I don't.
Q Did you ever see any of the E-mails that went back and forth between this flight attendant and Mr. Callaway?
A I think I did see them. I can't tell you what they said, but it seems like I did see some things in the file.
Q Who showed them to you?
A I don't recall. I don't think I need anybody to show me them. I look in the file and there they are. I mean, when I review a file, I look at the information. So I don't need anybody to show me the stuff.
Q What did this file look like?
A Just like an employee file that all other 8,000 employees have. It's a tan-looking file, just like you would have in your file drawer in your office.
Q Was there a summary stuck on top of it?
A I don't recall.
Q Who told you that Andy had refused to stop

harassing the person?

A I don't know specifically who told me. I had discussions with Jim; I had discussions with Kelvin. I don't recall who said what or what the timing was on it or anything else. I don't get involved in the initial investigation.

I'll say, again, I have 3,000 employees that work for me and I don't get involved in every single specific issue until it gets down to the end before I review it.

Q Okay. Did you talk with anyone about the situation, other than Kelvin or Jim?

A Not that I know of.

Q So either Kelvin or Jim told you that Andy had refused to stop harassing this person?

A I don't -- that's not what I said. What I said was I talked to Kelvin and Jim, both, on this case. I don't recall what they told me. I said I talked to both of them. That's all I said.

Q Well, earlier you said that it was your understanding that Andy had refused to stop harassing this flight attendant.

A That's my understanding.

Q Where did you get that understanding from?

A I don't know.

Q This is Exhibit 2. Have you ever seen this document before?

A Yes, I have.

Q When did you first see this?

A I don't recall. I assume that it was when I was reviewing Andy's case.

Q Before the notice of termination was sent out?

A That's what I would think.

Q Okay. And did you -- and I think Todd has it there. Did you get this document which is Exhibit 2 with that set of attachments?

A I don't know whether I did or not.

Q It's been identified, that which was previously marked as Exhibit 15, as a series of exhibits that correspond with the numbers in the boxes on the right-hand side of Exhibit 2.

A Okay.

Q And I think these originally were blue. The separation sheets were a light blue. Does that refresh your recollection?

A No. I don't -- I don't know. I don't know when I seen this or where I seen it. I recognize the information on this sheet.

Q Did you talk with either Kelvin or Jim

about the information that's contained on Exhibit 2?
A I'm sure I did discuss some of this. I can't say that I discussed this whole document or all the information on it, but I'm sure I discussed some of this with him.
Q Do you recall what parts you discussed with him?
A No.
Q Did you have any questions about it?
A Did I have any questions about this document?
Q Yes.
A I don't recall. It would be normal that I would have some questions, yes.
Q You don't remember, though?
A But I don't remember specifically, no.
Q On the first page there's a reference to a meeting. It's under the heading "Andy was given a second chance at SkyWest," 06-2000 meeting with Jim Breeze and Brad Holt, and then the last entry, 12-11-00, seems to reference another meeting. How many meetings did you have with Andy down in St. George?
A Well, I thought there was only one, but --
Q That's -- well, that's your recollection?

A That's my recollection, but, like I say, I have a lot of meetings, so...

Q Do you recall what time of year it was?

A I don't.

Q Is this the meeting you were referring to when you were telling me about the posts on the web site, comments about management?

MR. PETERSEN: Which meeting, the 6-2000 or the 12-11 reference?

MR. STRINDBERG: I believe Andy's testimony is that there was only one meeting, and I think Jim Breeze's testimony was there was only one meeting. It was Kelvin who prepared this document, as I recall, so Mr. Hyatt might have made a mistake.

MR. PETERSEN: Is there a question there, because --

Q (BY MR. STRINDBERG) You recall one meeting --

A Yeah.

Q -- in St. George?

A That's what I recall.

Q And that one meeting is when you discussed these posts on the web site and these comments about management; is that correct?

A Yeah, I think so.

Q This entry under 6-2000 refers to statements on the company web site. Do you have any recollection as to where this post or posts that you saw came from? Do you need to take a call?

MR. PETERSEN: Sorry. Before you answer, would you repeat the question? I got thrown off with this phone.

(Question read back as follows: "This entry under 6-2000 refers to statements on the company web site. Do you have any recollection as to where this post or posts that you saw came from?")

MR. PETERSEN: I'm going to object. It's been asked and answered. Go ahead.

THE WITNESS: I don't know what web site -- the thing I do remember is that I got a comat envelope with Andy's statements in it. That's what I remember.

Q (BY MR. STRINDBERG) What did you do with that envelope?

A With the envelope?

Q I mean -- well --

A It just stays in the system.

Q How about the information in the envelope?

A I'm sure I just discarded it.

Q Do you recall who sent you this comat?

A No. No, I don't think it was from any -- I don't think anybody put a return on there. I get comat envelopes all the time with stuff in them like this. It seems like, for some reason, people don't want to put their name on it. They just pull it off the board because it's posted and send it to St. George.

Q Do you know what -- what board are you referring to?

A They pull it off from the board in the pilot lounge where somebody has just stuck a note up there, or they print something off the computer and stick it on the pilot board for everybody to read, and somebody will walk by and not like it and pull it off and comat it to St. George.

Q Does SAPA have a web site or a chat room?

A Yes.

Q Who owns that chat room or web site?

A Well, I think Bob Novak owns the system.

Q Do you have access to that web site?

A No.

Q Why not?

A Because it's a SAPA web site and so I don't have a password to it. I'm not part of SAPA.

Q Are managers not supposed to have access to

conducted?

A Not that I recall.

(Whereupon Deposition Exhibit No. 77 was marked for identification.)

Q I'll tell you that Exhibit 77 is the statement that Andy wrote and, I believe, gave to Mr. Hyatt about the incident. Have you ever seen that before?

A I don't remember seeing it.

Q Okay. And you don't have any knowledge about whether the surveillance camera for the screening area up in Butte was ever looked at, or the tape that would come from that screening camera?

A No, I don't know that.

Q Okay. Just so I'm clear, there's nothing else you know about Butte, Montana? I mean in regards to this incident. You may know a lot about Butte, but I'm talking about this incident.

A No.

Q This meeting you had in St. George with Andy, how long did it last?

A I don't recall how long it was. I would say less than an hour.

Q Do you know if anything was put in Andy's file at the time regarding that meeting?

Q Did you ask Kelly Dixon for her -- is it a her or a him?

A It's a him.

Q Did you ever ask Kelly Dixon for his comments on having Andy in class?

A No.

Q Did you know that Kelly was being asked for such a letter?

A No.

Q Do you know why Kelly was asked for such a letter?

A No.

Q Have you ever seen Exhibit 4 before?

A Yeah. I don't know if I've seen this specifically. I've seen this wording, I've seen this information, but I don't know where I actually looked at it.

Q Can you tell from the heading on Exhibit 4 if Kristen sent this E-mail to Mr. Callaway over the company intranet?

A No. I don't know.

Q Are you aware of any rule which says that employees cannot send personal E-mails over the company intranet?

A No.

Q Have you ever used the company intranet for personal use?
MR. PETERSEN: You mean to send a personal E-mail?
MR. STRINDBERG: Yeah, a personal E-mail.
THE WITNESS: No.
Q (BY MR. STRINDBERG) You've never sent an E-mail to someone asking them to go to lunch or anything like that?
A No. No reason for me to use the company E-mail. I use my other E-mail, so --
Q What other E-mail is that?
A I don't communicate on this, on the company intranet.
Q Why not?
A For personal business, I just don't do it. I have a personal E-mail address, and if I want to communicate with somebody, I use that.
Q Well, say it's someone at work and you want to see if they want to go to lunch.
A That wouldn't be the way to communicate it.
Q How would the way be?
A Regular E-mail or telephone or --
Q But you're not aware of any rules which would prohibit sending an E-mail of a personal nature

# EXHIBIT "4"

but I'm asking again. Do you recall any of the subjects of any of the other postings that Andy made on this web site?

MR. PETERSEN: Same objection.

THE WITNESS: I'm sorry. Did you object?

MR. PETERSEN: Yeah. I said, "Same objection." Go ahead. You can answer it, if you haven't already.

THE WITNESS: Okay. I have not answered it already. As far as I know, most of his comments were in regard to other people's comments about pay, pay negotiations and working conditions. I'm not aware that any of them were specifically related to ALPA.

Q (BY MR. CHAMNESS) Do you recall if they were related to any unionizing activities?

A Say that one again. I'm sorry.

Q Sure. I'm just trying to make sure that -- I'm clarifying your answer. You said you don't recall that any of them related to ALPA, and my question is: Do you think they were related to any unionizing activities?

MR. PETERSEN: Hold on. I want to object. I think that's vague as to what "union activities" means. Go ahead, if you can answer, Jon.

THE WITNESS: I suppose, because they

related to pay and work conditions, that you could conclude that those were in that category.

Q (BY MR. CHAMNESS) Do you recall discussing any of Andy's posting with any members of management at SkyWest?

A No, sir, I don't.

Q Do you recall anyone ever mentioning Andy's postings on that web site to you?

A No, sir, honestly, I don't. That was a long time ago.

Q Now, you said that you were on Andy's first review board; is that correct?

A Well, I don't know -- again, maybe "first" wasn't the correct descriptive word. I believe I was on a review board. And, honestly, I don't recall what it was about.

Q That was going to be my next question, is what you recall about that review board.

A I don't recall -- I'm trying to rack my brain here, but I do not recall what it was in regards to.

Q And how did you get selected for that review board?

A I believe I was notified by the people department that I had been chosen to sit on the

# EXHIBIT "5"

This will serve as a summary of a verbal warning given to Andy Callaway.

Around June of 2000, Andy Callaway was told to visit with Brad Holt and myself in the St. George Corporate offices. Andy requested Chris Abbel, SAPA President to be in attendance.

The reason for the measure of requiring Andy to come to St. George was the following:
1. Andy had repeatedly made inflammatory and unfair statements on the company web site about the company and its policy.
2. On several occasions, Andy had called Crew Schedulers and berated them over scheduling or pay issues. He used inflammatory language causing serious problems in the Scheduling Department.

Andy was warned by both Brad and myself that this behavior would not be tolerated. There is a proper way to handle problems and issues but not by being abusive and causing discontent with fellow employees.

Andy agreed that maybe his behavior was too aggressive and that now he was warned, he would not repeat this type of behavior in the future.

Because this was a verbal warning, there was nothing signed.

Jim Breeze

PENGAD 800-631-6989 DEPOSITION EXHIBIT 14 Hyatt

# EXHIBIT "6"

Erik Strindberg (Bar No. 4154)
Ralph E. Chamness (Bar No. 6511)
**STRINDBERG SCHOLNICK & CHAMNESS, LLC**
426 North 300 West
Salt Lake City, UT 84103
Telephone: (801) 359-4169
Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **DAVID ANDREW CALLAWAY**<br><br>Plaintiff,<br><br>vs.<br><br>**SKYWEST AIRLINES, INC.,**<br><br>Defendant. | **AFFIDAVIT OF DAVID ANDREW CALLAWAY**<br><br>Case No. 2:04CV00179<br><br>Judge Ted Stewart<br>Magistrate Judge Alba |

STATE OF UTAH

CITY OF SALT LAKE CITY )

COUNTY OF SALT LAKE )

Affiant, being duly sworn, hereby states as follows:

1. I am the plaintiff in this action, over 18 years of age, and give this testimony based on my own personal knowledge.

2. At the time of my discharge from SkyWest, I held the rank of Captain and flew the Canadair Regional Jet. I was employed by SkyWest from 1999 through 2003.

3. During the time that I was at SkyWest I was very active in the various union organizing campaigns that were conducted, including sitting on at least two organizing committees. I also regularly made posts on the SAPA website in support of union representation.

4. Most, if not all of the posts I made on the SAPA website were union related. For example, I posted a chart showing the disparity between the SkyWest's top three management salaries for Jerry Atkin, Ron Reber, Brad Rich and those of SkyWest's Captains and First Officers. That chart showed that the top three managers' salaries had increased by 133% during the same period that Captains' salaries had only increased 23%, and First Officers' salaries had only increased 18%. I provided these figures to support our position that SkyWest's pilots would be better served by a union. Additionally, I posted a cartoon showing a small blimp representing "Pilot Pay Proposal" bumping under a much larger blimp representing "Management Pay & Bonuses." I also posted a drawing entitled "Comair +1." This referred to Comair's industry leading contract and a proposal that, after organizing a union, SkyWest's pilots should seek the same contract deal as Comair, plus 1%. I had this drawing made into stickers which we put on our flight bags.

5. Through my involvement in the organizing campaigns I knew what other pilots were active in the campaigns and I also could observe the postings made on the SAPA website by others. I also learned which of those pilots were having problems as a result of their involvement in the organizing campaigns.

6. One of those pilots was Steve Kanuch. He also was very involved in the organizing campaigns and would regularly make posts on the SAPA website that I read. Like my posts, Kanuch's comments were also very pro-union.

7. Sometime after I was called to St. George in late 2000, where I was threatened by Brad Holt and Jim Breeze for my postings, Steve Kanuch called me and told me that he too had been told to report to St. George to meet with Jim Breeze. It had been made clear to him that he would be questioned about his pro-union postings and therefore he and I discussed what had happened at my "meeting" and how he could best handle his meeting.

8. After he returned from St. George, I spoke again with Steve and we discussed what he had gone through. It was apparent that he had gone through much the same haranguing and threats that I had experienced. Shortly thereafter, Steve lost his check airman status, which earned him about $15.00 per hour in additional wages.

9. I also know about some of the problems that Ben Palmer, another SkyWest pilot, went through. Ben was also very involved in union organizing. In approximately 2003 he was accused of by Jim Breeze of demanding that pilots who were going to ride in the cockpit jump-seat had to first sign union cards. Although Ben told Breeze that this was untrue (and although SkyWest had no proof that it occurred) he was initially fired by the company and then rehired after he filed an appeal to get his job back.

10. Another pilot, John Manardi, got into trouble for refusing to fly a Comair plane into a Comair station, Des Moines, Iowa. The Comair pilots were on strike and for some reason SkyWest ended up with some of their planes and began to fly into Des Moines from Salt Lake

City. A number of us were concerned about making such flights unless the ALPA union representing the Comair pilots said it was okay. Brad Holt told the pilots that if they did not want to fly into a Comair station they could simply put their name on a list and they would not be required to make the flight.

11. When the flight came up John asked that he not be required to take the flight. SkyWest refused to make a change in the schedule and John was fired. His job was not reinstated until it went up to one of the top managers, Ron Reber, at SkyWest.

12. I also know that Phil Alford, another RJ Canadair Captain, lost his check airman status because he stood up for John Manardi by writing to Kelvin Hyatt, asking that the company not fire John. Phil was also very involved in the numerous organizing campaigns that have taken place.

13. I know of other pilots who have been involved in campaigns that have also been harassed and threatened by SkyWest. A typical pattern is that SkyWest will wait until the pro-union pilot has been involved in a relatively minor incident and then blow it out of proportion and threaten the pilot with suspension or termination. Those who have been involved in organizing are also often labeled as having a bad attitude, or trying to tear down the company, or attacking management. In fact, in most instances those pilots are simply expressing their opinions as to why a union would be beneficial.

DATED this 3 day of February, 2006.

Andy Callaway

The foregoing instrument was acknowledged and executed before me on

February 3, 2006, by Andy Callaway.

NOTARY PUBLIC
GERALDINE L. RICE
44 Exchange Place 2nd Fl.
Salt Lake City, UT 84111
COMMISSION EXPIRES
December 2, 2006
STATE OF UTAH

Geraldine L. Rice

NOTARY PUBLIC

U:\Current Client\Callaway_DA\Pleadings Federal\affidavit_andy2.wpd

# EXHIBIT "7"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

COPY

| | |
|---|---|
| DAVID ANDREW CALLAWAY,<br>Plaintiff,<br>vs.<br>SKYWEST AIRLINES, INC.,<br>Defendant. | Case No. 2:04CV00179<br>Judge Ted Stewart |

DEPOSITION OF JAMES BREEZE

Taken at the Holiday Inn Conference Room
850 South Bluff
St. George, Utah

On Monday, November 29, 2004
at 4:50 p.m.
AND RESUMING ON
Tuesday, November 30, 2004
at 9:05 a.m.

REPORTED BY: JENNIFER SULLIVAN, RPR

Depomax REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

A. On two occasions.

Q. Where was the first meeting?

A. In St. George, corporate offices.

Q. Who was involved in the meeting?

A. Brad Holt and myself and Andy.

Q. Had you asked Andy to come down to St. George?

A. I don't think I asked him directly. I think I asked Kelvin to have him come down.

Q. Why did you ask Kelvin to have Andy come down to St. George?

A. There had been complaints about Andy's abrasiveness with crew scheduling. We wanted to have him come down and have a visit with him. This isn't how we treat each other in this company.

Q. What time of year was that meeting?

A. I don't recall.

Q. What was discussed at that meeting?

A. Just his -- his contact with crew scheduling, and there had been several complaints from the crew schedulers on calls. The whole gamut from whining, complaining, disagreeing. And it was just unacceptable, and he was told so.

Q. Pardon?

A. And he was told that, to not do it again.

He was put on notice.

Q. What did Andy say in that meeting?

A. He just nodded, and as I recall, you know, said, Okay. I didn't think I came across like that. And just I don't recall that conversation. It wasn't recorded.

Q. Did you take notes?

A. No.

Q. Did Brad take notes?

A. I don't know. You'd have to ask him.

Q. Was he in the room with you?

A. Yes.

Q. Did you see him taking notes?

A. I don't recall.

Q. Was it in Brad's office?

A. Yes.

Q. Who -- from whom had you received the complaints?

A. From Anita Spencer.

Q. What position does Anita Spencer --

A. She's director of crew scheduling. There might have been casual conversation with some of the individual schedulers. It was -- it was an important event that were transpiring.

Q. What was important event?

conversation with the chief pilots. It eventually happened, so obviously we talked about firing Andy.

Q. Did you give any input into that firing?

A. I'm sure I did.

Q. What input did you give?

A. Well, I voted that he should be terminated.

Q. Why?

A. Because of everything we've discussed this morning, his inability to get along with people, and the final straw, harassing an employee on company property.

Q. What do you know of this alleged harassment?

A. Just that he did inappropriate communication with her and in a threatening manner using company property.

Q. What's an inappropriate communication?

A. Threats.

Q. Threats of what kind?

A. Pay me or what else. I don't remember the communication. I don't know. I didn't --

Q. Did you ever review the e-mails that were sent?

A. I believe I did. I don't recall what they

said, but I got the idea from there that it was inappropriate.

Q. Do you remember the e-mail in which Kristen said that she owed Andy the money?

MR. PETERSEN: I'm going to object. It's not what the e-mails say.

MR. STRINDBERG: It does, Counsel.

MR. PETERSEN: You can show them to him if you like.

BY MR. STRINDBERG:

Q. Do you remember such an --

A. No. No, I don't.

Q. Were you aware that she did owe him the money?

A. No.

Q. Do you remember getting an e-mail from Kelvin which summarized Andy's file?

A. I know it happened. I don't recall it.

Q. How do you know it happened?

A. Well, because that's -- I just know that that's the normal course of events is a summary of a person's employment here when it has gone this far.

Q. And that's prepared by the chief pilot from the domicile?

A. Correct.

Q. And that e-mail or that review goes to you and to Brad?

A. Yes.

Q. Did you and Brad discuss it?

A. Yes.

Q. On how many occasions?

A. I don't recall.

Q. What did you and Brad discuss in regards to the summary?

A. That he was an employee that should not continue employment.

Q. What else?

A. I don't recall.

Q. Do you keep a Daytimer or anything?

A. No.

Q. How do you help yourself remember things?

A. If it's that important, it's -- I don't have a --

Q. Do you have a secretary?

A. Yes.

Q. Does she keep a calendar for you?

A. No. I do have a Palm -- electronic Palm Pilot, so I put stuff in there, you know, 9 o'clock deposition. It reminds me last night to be here at 9 o'clock. Then it's erased.

Q. How many meetings or discussions did you and Brad have about Andy after getting this summary of Andy's file from Kelvin?

A. I don't recall.

Q. Did Brad indicate that he wanted Andy fired?

A. Yes.

Q. And was that your opinion as well?

A. Yes.

Q. Did you communicate that to Kelvin?

A. Yes.

Q. Did you communicate that in a chief pilots' conference call, or was it a private conversation with Kelvin?

A. I don't recall.

Q. Are there any e-mails between you and Kelvin other than this summary?

A. I don't recall.

Q. Are you telling me you don't recall things so that you don't have to answer here?

MR. EMERSON: Objection.

MR. PETERSEN: I'm going to object. Are you badgering him? He's been placed under oath. Why don't you ask him the questions, and he'll answer the questions.

about Andy?

A. No.

Q. Do you remember talking with Kelvin at all about Andy?

A. I'm sure it happened. I don't remember specifically.

Q. What do you remember generally?

A. Talking to Kelvin about Andy's problems with the company, his issues.

Q. And those issues are what?

A. His inability to get along with people, his abrasiveness, his arrogance, not wanting to play by the rules or policies.

Q. What rules or policies?

A. We have a policy manual.

Q. Is there any rule or policy that you're aware of that talks about what can or cannot be posted on the mymessage system?

A. I'm not familiar with that, no.

Q. Have you ever sent a personal message on the mymessage system?

A. You'd have to define "personal."

Q. Have you ever asked anyone to lunch?

A. I don't recall, no.

Q. So you don't think you've ever done that

using the message system?

A. I'm sure there has been a personal message. I don't recall asking anybody to lunch.

Q. Look at Exhibit 14.

A. Okay.

Q. Did you prepare this document which is Exhibit 14?

A. Yes.

Q. When did you prepare it?

A. I don't recall.

Q. Was it prepared around June of 2000, or was it prepared later?

A. There's no date on it. I don't recall.

Q. Why did you prepare it?

A. In the course of summarizing Andy's behavior.

Q. For his termination or at some other time?

A. No. This looks like it's about the same time as he came to St. George, would be my guess.

Q. Item No. 1 on this document is, Andy had repeatedly made inflammatory and unfair statements on the company Web site about the company and its policy.

What Web site are you referring to?

A. Probably IShare. It's called IShare.

Q. How does an employee or how did an employee in June of 2000 access IShare?

A. Well, this thing has a metamorphose, and I'm not sure if IShare was there or not. It's a Web site that any employee can get on and talk, right.

Q. Is it now called IShare?

A. Yes.

Q. How does --

A. There are several Web sites, IShare and -- there's several Web sites. What I was referring to there, I don't know.

Q. How --

A. There's -- go ahead. I'm sorry.

Q. No. Go ahead, you.

A. There's a Web site for scheduling. There's a -- so what he was on, I don't recall.

Q. Did you see any of these postings?

A. I don't recall that. I'm sure I did if I wrote this.

Q. What -- what were these postings that you claim were inflammatory and unfair?

A. I don't have them in front of me, so I don't know.

Q. Did you print them out somewhere?

A. Not to my recollection. They were either

shown to me or I saw them electronically.
Q. Shown to you by whom?
A. I don't recall.
Q. Did you tell Brad Holt about them?
A. I don't recall that. He has access to them also.
Q. Did you -- well, according to this paper, which is Exhibit 14, you discussed those unfair postings with Andy when he was in St. George, correct?
A. That's what it says, correct.
Q. Does that refresh your recollection?
A. What's your question, sir?
Q. Do you now recall that you did talk with him about that?
A. Yes. More about the crew schedulers than the posts.
Q. Did you show him any of the posts?
A. I don't recall that.
Q. Did you tell him he couldn't do any posting on the --
A. No.
Q. -- company Web site?
A. I'm sure we didn't.
Q. Why are you sure you didn't if you don't

A. No.

Q. Did you see the results of the review board?

A. No.

Q. Why don't you look at Exhibit 2.

MR. STRINDBERG: Did you put that back in there, Counsel?

MR. PETERSEN: Yes.

BY MR. STRINDBERG:

Q. You might want to take it out of the binder because we're going to be referring to it. There's a paper clip.

MR. PETERSEN: Are we going to go to 15 again?

MR. STRINDBERG: Probably.

BY MR. STRINDBERG:

Q. Have you ever seen this document before?

A. Yes.

Q. When did you first see it?

A. I don't recall.

Q. Was this basically what Kelvin had sent to you when he outlined Andy's file for you?

A. It would be my guess, yes.

Q. You didn't keep that outline?

A. I didn't destroy it. I don't know where

which is a note from Ashley -- I can't read her last name.

A. No, I don't recall seeing this.

Q. Did you at any time ask Anita to have her people write anything?

A. I don't recall.

Q. Look at Exhibit 22.

Have you ever seen that before?

A. No.

Q. Do you know who Nicki McDonald is?

A. Nope.

Q. Going back to Exhibit 2, the next entry is a 12/11/2000 and says, Talked with Jim Breeze about Andy and his meeting with Jim and Brad in St. George.

Do you recall talking with Kelvin in December of 2000 about your meeting?

A. No.

Q. So that we're clear, there was just one meeting that you had with Andy in St. George; is that correct?

A. That's correct.

Q. Turn onto page 2. There's a series of entries from 10/15/01 through 11/12/01 regarding a complaint about a neighbor or from a neighbor about

you say they're a significant investment?

A. We put an extreme amount of money into their training, not only ground school which isn't that much, but simulators run 4 to $600 an hour and training in the actual aircraft. So we have a significant investment.

Q. Do you have an understanding as to whether the company prefers not to or prefers to -- that's a stupid question. I won't even ask it.

Is that one of the reasons why procedures are followed when a pilot is terminated?

A. Yes.

MR. PETERSEN: That's all I have for now.

EXAMINATION

BY MR. STRINDBERG:

Q. Did you present this file summary to Brad Holt in the case of Andy Callaway?

A. I'm sure I did.

Q. And do you recall what you and Brad discussed?

A. No. We just probably reviewed the file, and Brad has the final say on whether he should be terminated or other course of action.

Q. But you don't recall what the two of you discussed?