# EXHIBIT "8"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

ORIGINAL

| | |
|---|---|
| DAVID ANDREW CALLAWAY, | CIVIL NO. 2:04CV00179 |
| Plaintiff, | DEPOSITION OF: KELLY DIXON |
| vs. | Held February 11, 2005 |
| SKYWEST AIRLINES, INC., | REPORTED BY: |
| Defendant. | RENEE L. STACY, CSR, RPR |

Deposition of KELLY DIXON, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 1:00 p.m. on February 11, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

Depomax℠ REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

Q When did you write this?
MR. EMERSON: Take a moment to review it. Go ahead and read it all.
THE WITNESS: Can I just read it here?
Q (BY MR. STRINDBERG) Absolutely.
A Okay. Can you just restate the question, please?
Q Did you write this?
A Yes.
Q When did you write it?
A Oh, I'm not exactly sure if it was November 13th, 2001 or if that's when I received the request from Kelvin Hyatt to do it, but it was right in that neighborhood.
Q So somewhere around --
A November 13th.
Q -- mid November?
A Yeah.
Q And it was Kelvin Hyatt who requested it?
A Kelvin Hyatt, yes. He was the chief pilot for the Salt Lake City domicile at the time.
Q Okay. Your first sentence, though, says you received a request from St. George management.
A Probably that just means that Kelvin is in management at SkyWest Airlines and he, in concert

with somebody else at the people department -- you see, it was someone else at the people department that called up and asked Ben to give an opinion of an Andy Callaway when I had him in class, and so probably that's my thinking relating to when I wrote this relating to a request that was probably a joint request from Kelvin and her.

Q Did you talk with Kelvin directly?

A Yes. He talked to me on the phone. And he's the -- that's why I put his name down there, because he's the one -- no. Wait a minute. Kelvin is the one that specifically, on the phone, asked me to write it, if I remember correctly.

Q Okay. What did he ask you?

A He just wanted to get the same story that St. George had got from me, which was, you know, my experience with Andy, and then said something to the effect of, "Would you be willing to, you know, put that on paper?" And I said, "Yes."

Q So you had already talked with someone from St. George?

A Yes.

Q Who was that?

A I can't remember. Someone from the people department.

at their reaction, and had much experience dealing with people that were upgrading and had already been exposed to the majority of that information before, and always analyzed, you know, people in the class. It was my job to make sure that they were understanding and learning all of the information that we could possibly put out.

During the course of that week, I noticed a poor display of attitude from Andy Callaway.

Q What do you mean by that?

A What I mean by that is I would look back at him and he would have his arms folded and kind of be staring off to the wall on one side of the classroom.

Q Did you say anything to him?

A I didn't say anything to him.

Q Was he disruptive?

A He was not disruptive in the sense that he would interrupt, nor would he -- nor was he boisterous in any way.

Q So he just sat there?

A Nor would he talk with his classmates.

Q So he didn't interrupt the class to talk with his classmates, is what you're saying?

A No. He used -- all I'm saying is that he specifically used body language, in my estimation, on

purpose to show disapproval for what was happening there, for the fact that he had to be there.

Q And this body language was he sat there with his arms folded?

A His arms folded with what appeared to me to be kind of a scowl on his face. Certainly different from behavior that I had seen from him in the hall or down on the hangar floor.

Q But you never talked with him and asked him if there was a problem?

A No.

Q Did you ask the other instructors who were teaching at the time if they'd had any problems?

A I don't recall having done that.

Q Okay.

A The worst part of it, of course -- I mean, had that just been it, I would have left it alone. Had he just sat there and, in my mind, displayed poor attitude, in that he didn't participate in the class like we encourage the students to do and so on and so forth, had that been it, I wouldn't have thought much about it.

Q Okay. But this episode, as you describe it, he supposedly threw a test down on the podium; is that correct?

A Yes.
Q Did you say anything to him at that time?
A No.
Q Why not?
A I guess I probably didn't want to confront him in front of the class.
Q Did you ask him after the class?
A I probably wanted to gather my thoughts and think about what would be an appropriate course of action, given what I had seen.
Q Once you collected your thoughts, did you talk with Andy?
A No.
Q Why was he up at the podium?
A After administering any test -- and we always administered at least a midterm test and/or a final test during this three-week class, and the test that we administered at the end of that week was customary and the same test that I had administered throughout the whole time in the RJ classroom, and always -- partly because the FAA requires it and partly because it's just good educational practice. At the conclusion of a test after everyone has completed the test, I would always take the test -- both the test and the answer sheet, pass it back out

to all of the students so that we could make sure that they understood all of the different things that we went over.

Here again, the FAA requires that we pass tests with 80 percent corrected to a hundred percent, which means that I wouldn't be doing what I should be doing if we just kind of let them --

Q Okay. Let me interrupt you, Kelly.

A Yeah. Go ahead.

Q Why was he at the podium?

A Okay. So after the test was over and I had passed out the answer sheet and the exam, stood up there, said, "We're going to go over the test," unlike I'd ever seen before, and different from any other student in any other class I'd ever had, Andy decides to stand up, walk over to the wall, walk up the side of the classroom, walk across the front of the classroom in front of all my students, takes the test, throws it down on the podium and says, "I don't need to go over my test."

At that point, I thought to myself, "Who does this guy think he is?"

Q But you didn't say anything to him?

A No.

Q And then he went and sat down in his seat?

guys." Like I say, I generally try and win them over. It's usually successful with superior intelligence in teaching.

Q Other people who have done disrespectful things, you've said to them, "Hey, come on, guys"?

A Yeah, generally. It usually works.

Q But you didn't attempt that here, did you?

A I don't think "Hey, come on, guys" would be appropriate from one individual doing something so out of the ordinary.

Q But you didn't say, "Hey, guy, give me a break," or anything like that, did you?

A No, because that would be singling him out, and I generally didn't single people out.

Q And you didn't talk with him after class?

A No.

Q And you didn't write anything up on it until you were asked to do so; is that correct?

A That's correct.

Q Do you make more money as an RJ pilot than you do as a ground instructor?

A You have to be just a little bit more specific. As an RJ first officer, I made exactly what I made as a ground instructor. As an RJ captain, I do make more than I did as a ground

# EXHIBIT "9"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

ORIGINAL

| | |
|---|---|
| DAVID ANDREW CALLAWAY, | ) CIVIL NO. 2:04CV00179 |
| Plaintiff, | ) DEPOSITION OF: DANIEL R. BLACK |
| vs. | ) |
| SKYWEST AIRLINES, INC., | ) Held February 11, 2005 |
| Defendant. | ) REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of DANIEL R. BLACK, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 2:30 p.m. on February 11, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

Depomax REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

getting to the plane?

A Not that I'm aware of.

Q Okay. You said in your statement that you didn't notice anything unusual when Andy was at the security screening. Is that accurate?

A Yeah. At the time that I was there with him.

Q Did anyone -- after you wrote this letter, did anyone from -- I'll use the term generally -- did anyone from management ever call you --

A No.

Q -- to ask you anything?

A No.

Q How about in the period between November 13th and when you wrote this letter? Did anyone -- you know, the chief pilot or Jim Breeze or anyone -- did they call -- did anyone call you and say, "Were you in Butte? What happened?"

A I -- you know, I'm not real clear, but I think that Jim Breeze may have called me to ask me if I had seen anything.

Q And what did you tell him?

A Same thing I told Andy. Same thing that's in the statement. "Not while I was in his presence."

Q And you were in his presence at the ticket

counter and then --

A At the time that he got to the end of the line of screening and I proceeded to the front of the line.

Q And what is the Butte airport like? Is it fairly big? I mean --

A It's small.

Q What's the distance from the security check-in to where your plane was that day?

A A hundred feet. I don't know. It's not a long distance.

Q As you were walking towards your airplane when you went through security, did you hear any ruckus or anything back at security? Did you hear any yelling, screaming?

A No, but I would assume by the time -- if there was anything, being a small airport, I was probably already in the Jetway by the time that number of people had gone through, so from the time that I left Andy at screening, I can't attest to anything.

Q But you didn't hear anything, walking towards your airplane?

A No.

Q Did they check your bag at that time? Do

bit of the situation, asked if I saw anything, and I told him what is in the exhibit there.

Q What did he tell you the situation was?

A Just that there was -- there may have been a conflict and wanted to know if I saw anything, heard anything.

Q And you told him no, I assume.

A I told him I didn't.

Q Did you hear Andy being disrespectful at all?

A No.

Q Did you hear Andy being abusive?

A No.

Q Or acting in an abusive manner?

A No.

Q Did Jim ask you that specifically?

A I don't recall if he was that specific.

Q Did he -- did Jim ask you to prepare a written statement for him?

A "Him" being?

Q For --

A For Jim Breeze?

Q Yeah.

A No.

Q Or for anyone in the company.

Q Is that because you've had very limited contact with Mr. Callaway?

A I don't know if that's because I've had limited contact, but I have had limited contact. I don't know if that's the reason why.

MR. EMERSON: That's all I have.

FURTHER EXAMINATION

BY MR. STRINDBERG:

Q Just a few more questions. So, as I understand your testimony, you were at this ticket counter and Andy was next to you?

A Uh-huh.

Q Is that correct?

A Correct.

Q And your statement is that you guys were standing there for five to ten minutes at the counter?

A Possibly.

Q And during that time you did not hear anything that you consider to be or constitute inappropriate behavior on the part of Mr. Callaway?

A Not at that time.

Q Did you, at any time when you were in the airport with Andy, hear or see him engage in any inappropriate behavior?

A Not at any time that I was in his presence, no.

Q And you told Jim Breeze that?

A Yes, I did.

Q How often around this time were you flying in and out of Butte?

A I can't tell you. We bid lines. Our schedules are almost random, and you bid from one week to the other and -- plus being an instructor, my schedule changed quite often. I can't tell you how often I'd fly in and out of Butte, without looking at records.

Q Okay. So it's not like you guys are in and out every day the same airports?

A No.

Q Did anyone in Butte, any SkyWest employees or anyone up there, ever say anything to you about this alleged incident in November of '01?

A No. I don't spend any time talking to the employees at Butte that much, besides the casual passing. No.

Q Have you ever -- I assume you've probably gone through security more times than you want to remember. Would that be an accurate statement?

A Correct.

# EXHIBIT "12"

19

**Kelvin Hyatt**

**From:** AC [dacallaway@comcast.net]
**Sent:** Friday, August 29, 2003 5:01 PM
**To:** Kelvin Hyatt
**Subject:** explanation
**Importance:** High

August 29, 2003

Kelvin:

Without knowing the exact accusations you refer to in your email dated August 22, I will be unable to answer your request in an accurate manner. However, I will assume you are referring to a personal and private matter with Kristen Wiley and therefore submit the following explanation.

This is a personal matter that does not involve SkyWest in any form whatsoever. Kristen Wiley has a financial obligation to repay a debt from a vacation she attended in 2002. She has defaulted on this agreement and as a result, a Small Claims Affidavit & Order was filed in the Third District Court on August 22, under case number 038905345. Before this suit was filed, I made a final attempt to collect the debt by emailing her the procedures that would take place if this debt were not satisfied on a personal level. This email contained the legal rights I have, as a citizen, to recover the unpaid debt, and the actions the court would take to enforce the judgment. Kristen has had almost one year to repay this financial obligation. I sent the email through SkyWest Online after she disconnected her personal email and her mailing address is unknown. This email did not contain any offensive language or create an intimidating or hostile work environment, or include any references to violence. Further, there is absolutely nothing in my email that could be construed as sexual harassment.

These actions do not violate SP56 because they do not contain any illegal language that constitutes harassment. There was no systematic or continued action taken by myself, other than a final email indicating her options to repay a debt. There was no threatening message that contained any language designed to extort money or obtain property through threatening letters. In addition, my notice followed all federal regulations under the Fair Debt Collection Practices Act, Title VIII, Section 805 and 806 with regards to Harassment and Communication, as well as Utah Code 76-5-106 and 20A-3-502.

This email also does not violate my Counseling Statement of 2001 because it contained no abusive language or abusive treatment of a fellow employee. Kristen Wiley is a friend of mine, who I have never worked with, who took advantage of my financial position and refused to fulfill her legal obligation to repay a debt. In addition, SkyWest was never asked to mediate this matter, nor was SkyWest asked to intervene on my behalf.

I have provided the email thread from SkyWest Online for your reference. If you have any questions, please contact me at 699-0849 or through this email address. Thank you for your understanding.

Sincerely,

Andrew Callaway

DEPOSITION EXHIBIT 3 Hyatt
PENGAD 800-631-6989

**Date:**Jul 03 2003 8:09 PM
**From:**Andrew Callaway - 010957
**Subject:**????
**To:** Kristen Wiley - 014321

---

Hola,

20

| | |
|---|---|
| *Sender ID* | *10957* |
| Full Name | Andrew Callaway |
| Recipiant ID | 14321 |
| Subject | RE: ??? |
| Date Sent | 2003-08-12 08:23:00.0 |
| Read Notify Date | 2003-08-12 08:28:00.0 |
| Body | actually kristen, i have an email from you that says you WILL pay and you also told me you would sign over your bonus check! I never said you did not have to pay for the villa/car. I dont mean to be mean about this, but I am not a bank. Your first check |

| | |
|---|---|
| *Sender ID* | *10957* |
| Full Name | Andrew Callaway |
| Recipiant ID | 14321 |
| Subject | RE: ??? |
| Date Sent | 2003-08-12 08:55:00.0 |
| Read Notify Date | 2003-08-12 08:56:00.0 |
| Body | you have already acknowledged the debt, so why do you not sign over the bonus check like you promised and get it over with. or, you can have a garnishment put on your paycheck for 3 times what you owe me and be forced to pay and have a collection placed on your credit report for 10 years. Is this worth $270 to you, or would you rather pay $810 plus court costs? The choice is yours! Friends don't screw each other like this kristen! |

| | |
|---|---|
| *Sender ID* | *14321* |
| Full Name | Kristen Wiley |
| Recipiant ID | 10957 |
| Subject | RE: ??? |
| Date Sent | 2003-08-11 09:10:00.0 |
| Read Notify Date | 2003-08-12 08:19:00.0 |
| Body | you know, money is so tight right now and looking back you told me that I wouldn't need to pay. the only thing I needed to pay was for food and other things. sorry andy<br>----- Original Message ----- From: Andrew Callaway Sent: 2003-08-11 06:28:49 To: |

| | |
|---|---|
| *Sender ID* | *14321* |
| Full Name | Kristen Wiley |
| Recipiant ID | 10957 |
| Subject | RE: ??? |
| Date Sent | 2003-08-12 08:29:00.0 |
| Read Notify Date | 2003-08-12 08:51:00.0 |
| Body | if you feel that is necessary. ----- Original Message ----- From: Andrew Callaway Sent: 2003-08-12 08:23:10 To: Kristen Wiley Subject: RE: ???<br>> actually kristen, i have an email from you that says you WILL pay and you also told me you would sign over |

20a

*yMessages SENT*

| | |
|---|---|
| *Sender ID* | *10957* |
| Full Name | Andrew Callaway |
| Recipiant ID | 14321 |
| Subject | RE: ??? |
| Date Sent | 2003-08-12 08:23:00.0 |
| Read Notify Date | 2003-08-12 08:28:00.0 |
| Body | actually kristen, i have an email from you that says you WILL pay and you also told me you would sign over your bonus check! I never said you did not have to pay for the villa/car. I dont mean to be mean about this, but I am not a bank. Your first check is considered partial payment of a debt that you agreed to repay. Now, you can continue ignoring this, or I will sue you and have garnish your paycheck! Your choice. |

| | |
|---|---|
| *Sender ID* | *10957* |
| Full Name | Andrew Callaway |
| Recipiant ID | 14321 |
| Subject | ??? |
| Date Sent | 2003-08-11 06:28:00.0 |
| Read Notify Date | 2003-08-11 09:09:00.0 |
| Body | BONUS CHECK?<br><br>Come on Kristen, Im tired of this!<br><br>i need my money now or i'll get it the hard way!<br><br>thanks, andy |

| | |
|---|---|
| *Sender ID* | *10957* |
| Full Name | Andrew Callaway |
| Recipiant ID | 14321 |
| Subject | hola |
| Date Sent | 2003-08-04 21:12:00.0 |
| Read Notify Date | 2003-08-05 13:21:00.0 |
| Body | Bonus checks are here! How about signing it over to me? Call me when you are around so we can catch up and do a lunch or something.<br><br>thanks!! |

| | |
|---|---|
| *Sender ID* | *10957* |
| Full Name | Andrew Callaway |
| Recipiant ID | 14321 |
| Subject | RE: ??? |
| Date Sent | 2003-08-12 08:55:00.0 |
| Read Notify Date | 2003-08-12 08:56:00.0 |
| Body | you have already acknowledged the debt, so why do you not sign over the bonus check like you promised and get it over with. or, you can have a garnishment put on your paycheck for 3 times what you owe me and be forced to pay and have a collection placed on your credit report for 10 years. Is this worth $270 to you, or would you rather pay $810 plus court costs? The choice is yours! friends don't screw each other like this kristen! |

| | |
|---|---|
| *Sender ID* | *10957* |
| Full Name | Andrew Callaway |
| Recipiant ID | 14321 |
| Subject | ???? |
| Date Sent | 2003-07-03 20:09:00.0 |
| Read Notify Date | 2003-07-09 14:34:00.0 |
| Body | Hola,<br><br>I need to get the full amount asap!!! I still never hear from you! I have been around, so you can |

20b

| | |
|---|---|
| | drop it in my door mailbox at home, mail it to me at 581 W. Capitol 84103, or call me.<br><br>hope to see you at W on july 12 and 19 for more ibiza madness<br><br>thanks, ac |

| | |
|---|---|
| *Sender ID* | *14321* |
| Full Name | Kristen Wiley |
| Recipient ID | 10957 |
| Subject | RE: Bonus Check! |
| Date Sent | 2003-05-04 10:14:00.0 |
| Read Notify Date | 2003-05-04 11:10:00.0 |
| Body | *Yo...I did not reciece this quarter bonus check and I am going to give you 65 dollars for the* next 4 weeks so we will be even. If you ever return my phone calls, maybe we can get together. ----- Original Message ----- From: Andrew Callaway Sent: 2003-05-0 |

| | |
|---|---|
| *Sender ID* | *14321* |
| Full Name | Kristen Wiley |
| Recipient ID | 10957 |
| Subject | RE: ??? |
| Date Sent | 2003-08-12 08:29:00.0 |
| Read Notify Date | 2003-08-12 08:51:00.0 |
| Body | if you feel that is necessary. ----- Original Message ----- From: Andrew Callaway Sent: 2003-08-12 08:23:10 To: Kristen Wiley Subject: RE: ???<br><br>> actually kristen, i have an email from you that says you WILL pay and you also told me you *would sign over your bonus check! I never said you did not have to pay for the villa/car.* I don't mean to be mean about this, but I am not a bank. Your first check is considered partial payment of a debt that you agreed to repay. Now, you can continue ignoring this, or I will sue you and have garnish your paycheck! Your choice. |

| | |
|---|---|
| *Sender ID* | *14321* |
| Full Name | Kristen Wiley |
| Recipient ID | 10957 |
| *Subject* | RE: ??? |
| Date Sent | 2003-08-11 09:10:00.0 |
| Read Notify Date | 2003-08-12 08:19:00.0 |
| Body | you know, money is so tight right now and looking back you told me that I wouldn't need to pay. the only thing I needed to pay was for food and other things. sorry andy<br><br>----- Original Message ----- From: Andrew Callaway Sent: 2003-08-11 06:28:49 To: |

# EXHIBIT "13"

DEPOSITION EXHIBIT 2 Hyatt

PENGAD 800-631-6989

David Andrew Callaway – Review Board

Kelvin Hyatt – Chief Pilot

Opening:

Thanks for the opportunity to explain the Company's perspective on the termination of Andy Callaway.
The company will present a complete work history on Capt. Callaway, the bases for our determination that he does not meet the profile we wish to retain.

File History:

2/2/98 - No Showed for Pilot Training.

7/13/98 - Andrew sent Jim Breeze a letter requesting to be allowed to come to training.

7/20/98 - Message written by Karalee Smith: Jim Breeze will call and tell Andrew no. He no showed on Feb 2, 1998 for class.

7/30/98 - Letter from Andrew to Larraine Caldwell with a new application.

8/24/98 - Letter from Andrew to Gary Overbaugh requesting to be considered for a pilot position. Andrew stated his father had thyroid cancer, and that is why he no showed to class. SkyWest never asked for the documentation. There is no correspondence from this time until he started training.

**It is curious to note, there are such things as telephones. We have had new hires call and postpone class dates due to personal or family emergencies.**

1/13/99 - Started training for SkyWest.

**Andy was given a second chance at SkyWest.**

06/2000- Meeting in SGU with Jim Breeze and Brad Holt over inflammatory and unfair statements on the company website and comments and language used with crew schedulers.

**Andy was called to meet with Jim Breeze and Brad Holt in SGU concerning messages he left of the website and reports of abusive treatment of crew schedulers.**

12/7/00 - Received a call from Anita Spencer concerning Andy. She indicated that he was verbally harassing one of her schedulers over an open time issue. I talked with Andy, educating him on the fact that open time as depicted in SBS, is not always open time. Also to the fact that if the reserve compliment is above the minimum, a reserve must be assigned to the open time as per the policy manual. I felt that this was the end of the issue and the end of the conversation. According to Anita, Andy then called back and again demanded the open time, made derogatory comments about the company and company officials. This information then was forwarded to Brad Holt, as some of the alleged comments were about him. Brad felt that he wanted to have a discussion with Andy and a meeting was set for 12-11-00 in SGU. (12-13-00 Hyatt)

2

12/11/00 - Talked with Jim Breeze about Andy and his ~~meeting with~~ Jim and Brad in SGU. Jim indicated that the meeting went well, Andy was cordial and seemed to understand the concerns that Brad had with his attitude. (12-13-00 Hyatt)

10/01/01 - Began Upgrade training in the CRJ this date. (10/03/01 Woody)

10/12/01 - Customer Service Relations received a phone call from Claude Brandt in regards to a pilot for SkyWest - Andrew Callaway.

10/15/01 - Jacque Nielsen called Mr. Brandt. Mr. Brandt told Jacque he owned an apartment house neighboring Andy Callaway. The renters are asking for help in getting Andy to be more considerate of the neighborhood. Andy throws wild parties and the noise is unbearable. Mr. Brandt stated his renters have seen drugs being used (snorting cocaine around the kitchen table), and Andy disregards the noise ordinance. Andy disregards everyone. The renters have had property damage, and blame Andy. Mr. Brandt gave Jacque a name (Kim Guess) at the SLC Police Department and her phone number. Ms. Guess would be able to tell Jacque what a nuisance Andrew Callaway has been.

10/16/01 - Jacque called and talked with Kim Guess at the SLC Police Department. Kim is not a police officer. Kim works for the police department as a go between with the citizens of the community and the police. Kim stated Andrew has been uncooperative and obstinate towards his neighbors and the police department. Andrew owns his house and therefore can do whatever he wants to do. The neighborhood has made complaints, and Kim has tried to talk with Andrew, but Andrew disregards anything said to him. Kim said she would try to send Jacque whatever she could on Andrew. Kim stated the neighbors have stopped complaining because nothing has happened, other than retaliation towards property. Cars have been keyed, tires slashed, Christmas ornaments destroyed.

10/30/01 - Received a fax from Kim Guess regarding Andrew. There was two letters from the tenants of Mr. Brandt. The tenants gave the police department permission to send SkyWest a copy. 3

11/1/01 - Contacted Kim Guess and asked her to contact the writers of the letters regarding Andrew. Karalee wanted to be contacted if Andrew had another party.

11/09/01 - Karalee contacted Mr. Brandt, and told him SkyWest was certainly concerned about the unprofessional portrayal of a SkyWest Pilot. Karalee assured Mr. Brandt SkyWest does not tolerate drug use, and we have one of the safest records in the industry. It was upsetting to learn from him about all the problems Andrew has created in his neighborhood. We have letters from the neighbors to substantiate these undesirable activities. Karalee asked Mr. Brandt to let her know if he had any other problems arise. 4

**Crewmember policy manual SP 307 2. (A) You will appear well groomed and business-like while in uniform. Your personal conduct and appearance, both on and off duty, shall be such to maintain or improve the image of the Company.**

**Certainly owning/condoning what the police call a "party house" does not follow the above policy. I talked to Andy about this, his answer was that he was suing his neighbor and his neighbor should not have called SkyWest.**

11/12/01 - Mr. Brandt called and informed Karalee that Andrew had a party on Saturday November 10th that started at 4 p.m. and lasted until 4 a.m. The police were called again.

11/13/01 - Received a report from Michelle Lott SkyWest BTM Operations. 5

During the investigation into this incident, I received a report from Kelly Dixon, CRJ Ground Instructor. He had mentioned to Ben Crawford and Verdean Heiner that he had a difficult time with Andy when he was a student in his class. They in turn mentioned it to Bill Boice. Bill requested Kelly to write up his experience with Andy during his ground school and forward it to Andy's Chief. 6

Brad Holt was informed of these issues, remembering that he and Jim Breeze had counceled Andy in SGU the prior summer, Brad decided he wanted to talk to Andy again. Meeting was conducted at the SLC Training facility on 11-13-01. Here are the notes taken by Tony Thompson, SLC Asst. CP and Bill Boice Dir. of Flight Standards. 7 8

11/30/01 - Andrew received a counseling statement and three weeks admin without pay 9

Andrew provided a written statement, which was attached to the Counseling Statement. 10

**It should be noted that in Andy's statement he does not acknowledge any responsibility for his actions, in fact goes on to say nothing happened.**

12/17/01 – Review board held for the counseling statement received for the BTM situation. Review board upheld the counseling statement with one change to the counseling statement. The word "extremely" was removed. 11

03/26/02 - Comments from CrewTrac regarding Cp Callaway's SAD:

MOST JUNIOR ON FOR MULTIPLE DAYS.
15488 03/26/02 08:45
called to tell him he was on rdy 10:30-0500,he said he could fly but didn't want to fly multiple
days he was getting over cold and wanted to stay in SLC so he could get over his sickness closer to
home. He asked if he was most jr. and I told him he was most jr for multiple trip. He was willing to fly and sit rdy but didn't want to be called for multiple day trip. I asked him if he wanted to
be taken off sick. He said yes.5-5 rsv Jill
15050 03/26/02 09:10 12

op's should be a SAD not sick. Jill
15050 03/26/02 09:14

**Sick call was changed to a SAD as per policy. Crewmember reported sick when called while on reserve.** 13

05/07/02 - Neglected to sign and/or include employee ID with signature on A/C Log. (5-24-2002 EY for KH).

07/16/02 - Received paperwork from US Investigations office notifying us of driving convictions on his record. Andy had been arrested in Dec 1998 for DUI & Open container. Charges had been reduced to Misdemeanor reckless driving. Talked to Andy informing him that we had this on file and that it did not affect his security clearance. 14

07/17/03 - SAD on file, following message sent to Andy:

**Andy received a SAD on his schedule on Jun 30, 2003. While on reserve, contact was attempted no response. Crewtrac comments entered were:**

lm to nt of trip on the first...1st attempt 0939
trev
16206 06/30/03 09:41

lm's again on 801-699-0849 and 866-532-6550 at
0959 it has been 20 minutes......trev
16206 06/30/03 09:59

assigned sad didn't call us back. This was a duty
day no vac nor onp was assigned.....Trev
16206 06/30/03 10:07
CALLED BACK ONCE HE GOT MSGS TTO TREV, INDICATED
NO SIGNAL ON PHONE, HE WAS IN COURT, SINCE THEN
HAS CALLED BACK EVERY HOUR TO CHECK ON SCHEDULE.
15858 06/30/03 16:37

**I was notified of this by crew support. It was noted to me that he had put in a request for ONP or USR if ONP was not available. That request had been sent on Jun 28. Crew support did not get to the request until Jul 1 at which time is was denied. After having been notified of the SAD, Andy logged on and cancelled the time off request for Jun 30. He then entered a request for Jul 1 USR or VAC, for "have a court deposition". This was denied due to lack of coverage.** 15

**After reviewing this documentation I sent the following message to Andy:**

Capt. Callaway,

I've researched your SAD and find that it appears to have been issued according to policy. Skywestonline records show that on June 28, you applied for June 30 off, however it was not processed until July 1 and was denied. The records also so that you cancelled this request on June 30. With the information that I have currently, I cannot excuse this SAD. If you have further information, please provide and I will consider it.

Kelvin 16

**Response:**

Kelvin,
I submitted a second request for the next day off as well that included the 30th, rather than having several requests in at the same time. Everytime I logged onto online, I experienced several problems after attempting to submit requests. I even emailed you the errors I recieved from online. It should not take so long to process, and Crew Support acknowledged in a company wide email that they were continuing to experience problems processing time off requests. Further, I complied with EVERY instruction from Donna regarding this issue and was not even informed a SAD was issued until after 4:30pm, after I had contacted Crew Support every hour, all day!! Why does everything have to be so hostile these days?

Respectfully, Andy ---- Original Message ----- From: Kelvin Hyatt Sent: 2003-07-17 16:31:35 To: Andrew Callaway Subject: SAD

08/12/03 - On August 12, 2003, FA Kristen Wiley approached me, she had with concerns that she was receiving threatening emails from Andy Callaway concerning money Andy said she owed him.

Kristen told a tale of how Andy had invited her to accompany him to Spain for a vacation with several other and other couples. This had happened just after Andy had broken off with his girlfriend whom he had intended to accompany him on this trip. According to Kristen, he indicated that she would only need to pay for food and show up as everything else was already paid for. She purchased tickets through the travel center and two days later was in Spain. Now almost a year after the trip, Andy has been sending e-messages to Kristen via SkyWestOnline demanding payment for a share of the villa expenses. Kristen expressed to me that she felt threatened to even check her email and was there anything I could do to stop these messages. I informed her that I would look into the matter.

**After hearing this story, I felt that it indicated behavior that went against the Counseling Statement that was issued on November 30, 2001. I referred to the document and noted the following wording:**

*"In fact this is the third time your behavior has been called into question. Any further behavior problems such as:*

- *Arrogant and abusive treatment of fellow employees.*
- *Disregard or refusal to comply with company policies and direction.* 9
- *Any conduct that would constitute an embarrassment to SkyWest Airlines or its employees."*

**I also noted that the Crewmember Policy manual has the following direction to crewmembers, Personnel files, rules of conduct and crewmember reliability, SP 306**
**(30) Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and /or within any other work related circumstances.**

**(34) Crewmembers shall not involve the Company in the crewmember's personal financial affairs.**

**Also I noted the Company Policy Manual SP 56: 1. Purpose A. SkyWest Airlines promotes a productive work environment and does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment....**

**It appeared to me that Andy's conduct violated each of these documents in some form or another, I sent the following message to Andy requesting a written response:**

Andy,
I have received a complaint from a fellow employee that you are sending harassing and threatening emails using the company email system. 17

Please refer to the Company Policy Manual SP 56, Crew Member Policy Manual SP 306, 30 and 34 as well as the counseling statement you received on November 30, 2001. I am requiring you to respond in writing within 7 days of receipt of this notice, explanations as to why we should not find you in violation of SP56 and your counseling statement dated November 30, 2001. 18
Kelvin Hyatt Chief Pilot

**Andy's response to the above message is as follows:**

August 29, 2003

Kelvin:
Without knowing the exact accusations you refer to in your email dated August 22, I will be unable to answer your request in an accurate manner. However, I will assume you are referring to a personal and private matter with Kristen Wiley and therefore submit the following explanation. 19

This is a personal matter that does not involve SkyWest in any form whatsoever. Kristen Wiley has a financial obligation to repay a debt from a vacation she attended in 2002. She has defaulted on this agreement and as a result, a Small Claims Affidavit & Order was filed in the Third District Court on August 22, under case number 038905345. Before this suit was filed, I made a final attempt to collect the debt by emailing her the procedures that would take place if this debt were not satisfied on a personal level. This email contained the legal rights I have, as a citizen, to recover the unpaid debt, and the actions the court would take to enforce the judgment. Kristen has had almost one year to repay this financial obligation. I sent the email through SkyWest Online after she disconnected her personal email and her mailing address is unknown. This email did not contain any offensive language or create an intimidating or hostile work environment, or include any references to violence. Further, there is absolutely nothing in my email that could be construed as sexual harassment.

These actions do not violate SP56 because they do not contain any illegal language that constitutes harassment. There was no systematic or continued action taken by myself, other than a final email indicating her options to repay a debt. There was no threatening message that contained any language designed to extort money or obtain property through threatening letters. In addition, my notice followed all federal regulations under the Fair Debt Collection Practices Act, Title VIII, Section 805 and 806 with regards to Harassment and Communication, as well as Utah Code 76-5-106 and 20A-3-502.

This email also does not violate my Counseling Statement of 2001 because it contained no abusive language or abusive treatment of a fellow employee. Kristen Wiley is a friend of mine, who I have never worked with, who took advantage of my financial position and refused to fulfill her legal obligation to repay a debt. In addition, SkyWest was never asked to mediate this matter, nor was SkyWest asked to intervene on my behalf.

I have provided the email thread from SkyWest Online for your reference. If you have any questions, please contact me at 699-0849 or through this email address. Thank you for your understanding.

Sincerely,
Andrew Callaway

**I was taken aback by Andy's response, it was apparent he had not even looked at the manuals that I had referred to in my message. His assertion that this is a "personal matter that does not involve SkyWest in any form whatsoever" was not correct. SkyWest property was being used to hunt and harass a fellow employee for payment of a private debt. Andy's response not only completely ignores this fact it goes on to paint the picture that somehow SkyWest is interfering with his rights as a citizen.**

Date:Jul 03 2003 8:09 PM
From:Andrew Callaway - 010957
Subject:????
To: Kristen Wiley - 014321

Hola,
I need to get the full amount asap!!! I still never hear from you! I have been around, so you can drop it in my door mailbox at home, mail it to me at 581 W. Capitol 84103, or call me.

hope to see you at W on july 12 and 19 for more ibiza madness.
thanks, ac

**Date:**Aug 04 2003 9:12 PM
**From:**Andrew Callaway - 010957
**Subject:**hola
**To:** Kristen Wiley - 014321

---

Bonus checks are here! How about signing it over to me? Call me when you are around so we can catch up and do a lunch or something.
thanks!!
**Date:**Aug 11 2003 6:28 AM
**From:**Andrew Callaway - 010957
**Subject:**???
**To:** Kristen Wiley - 014321

---

BONUS CHECK?
Come on Kristen, Im tired of this!
i need my money now or i'll get it the hard way!
thanks, andy
**Date:**Aug 11 2003 9:10 AM
**From:**Kristen Wiley - 014321
**Subject:**RE: ???
**To:** Andrew Callaway - 010957

---

you know, money is so tight right now and looking back you told me that I wouldn't need to pay. the only thing I needed to pay was for food and other things. sorry andy
**Date:**Aug 12 2003 8:23 AM
**From:**Andrew Callaway - 010957
**Subject:**RE: ???
**To:** Kristen Wiley - 014321

---

actually kristen, i have an email from you that says you WILL pay and you also told me you would sign over your bonus check! I never said you did not have to pay for the villa/car. I dont mean to be mean about this, but I am not a bank. Your first check is considered partial payment of a debt that you agreed to repay. Now, you can continue ignoring this, or I will sue you and have garnish your paycheck! Your choice.
**Date:**Aug 12 2003 8:29 AM
**From:**Kristen Wiley - 014321
**Subject:**RE: ???
**To:** Andrew Callaway - 010957

---

if you feel that is necessary. ----- Original Message ----- From: Andrew Callaway Sent: 2003-08-12 08:23:10 To: Kristen Wiley Subject: RE: ???
**Date:**Aug 12 2003 8:55 AM
**From:**Andrew Callaway - 010957
**Subject:**RE: ???
**To:** Kristen Wiley - 014321

---

you have already acknowledged the debt, so why do you not sign over the bonus check like you promised and get it over with. or, you can have a garnishment put on your paycheck for 3 times what you owe me and be forced to pay and have a collection placed on your credit report for 10 years. is this worth $270 to you, or would you rather pay $810 plus court costs? the choice is yours! friends dont screw each other like this kristen!

During the first part of September 2003, I received a call from DEN Asst. Chief Pilot Don Watkins. He informed me about a conversation that he was forced to listen to on his overnight in El Paso on August 27th. He said the conversation was so loud, anybody in adjoining rooms could have followed the conversation as he did. I asked him to write it down for me. Here is his write-up.

On the night of August 27th in the Marriot hotel in El Paso, while I was in room 238, at about 22:50 local time, I was just about to fall asleep when the person in the room next to me (240) made a phone call. He was very loud and from the inflection of his voice, very angry. I remember thinking how very rude to call someone at almost 11:00 and be loud and generally obnoxious in a hotel room. I was about to put in earplugs and turn up the air conditioner to drown out his voice, when my attention was grabbed by this statement, "IF THEY DO THAT I'LL SUE THE SHIT OUT OF SKYWEST." He went on to say, "I'LL SUE BRAD, JIM AND KELVIN." Not knowing that there was another crew for SkyWest in the hotel, I thought this was a disgruntled passenger or customer, and I was curious to hear more. He then went on to say that his basis of his lawsuit would be similar to that of the pilots at Cathay Pacific. This lawsuit was by the non oriental pilots suing in the workplace. He stated that were about 30 or 40 non-oriental pilots out of about 2000 or so, and that they stood a good chance of winning their lawsuit. He also stated that he would settle for 10 thousand dollars if he does sue. He went on to say that he would contact a lawyer named Ed Collins in SLC tomorrow (Thursday 28th), because his "report" was due on Jim Breeze's desk on Friday at 3 o'clock. The person on the other line must have asked him what was the company going after him for because his next remark was "THEIR TRYING TO GET ME ON A PERSONAL VIOLATION OF THE COMPANY POLICY ON THE COMPANY E-MAIL." He went on to say that the only thing the company had on him was a "counseling statement about an incident in Butte." He then also stated that he was looking for a new job, and has an interview with Jet Blue Airlines on Oct 14th. At this point the person on the other line must have asked him what SAPA was doing for him, because his next statement was this "CHRIS ABELL SAID TO ME "YOU KNOW MORE THAN YOU'RE SAYING." The person in the room then said "SAPA WON'T DO ANYTHING FOR ME UNTIL THE COMPANY [SkyWest] TAKES DISCIPLINARY ACTION." He said this with disgust in his tone and something about them (SAPA) not being very effective. He then said some other things that sounded like complaints and the conversation ended at about 11:20. He said to the person on the other line "THANKS DAN" and hung up. I then called down to the front desk and explained that I was the Assistant Chief Pilot at SkyWest and I thought I might know the person in the next room and asked Eddie who was in the room next to mine. Eddie said that it was indeed a SkyWest pilot and his name was Andy Calloway. I then called Crew Scheduling and asked if a pilot named Andy Calloway was working and if he was indeed on an overnight here in El Paso. Crew Sked confirmed that Andy Calloway was in ELP and he had flown in from DFW.

In closing, let me say that I have heard employees talk about their company, or their boss in a negative tone. This doesn't usually bother me, I think we all blow off steam from time to time, especially when we think we are in the confines or privacy of our hotel room or house. However, this Andy Calloway was whining and complaining, and sneering about subjects and people that he was just plain WRONG about. He was saying how he had set up 2 interviews with some small company and was PROUD that he had not showed up for either one of them and he had the audacity to say he might set up a 3rd interview just to see if "THEY HAD LEARNED THEIR LESSON". Although I have never met this Andy Calloway, he reminds me of a spoiled rotten kid and just thinks everybody else is wrong and he is right. If he does have another interview, I say good riddance and good luck. By the way I was wondering if this is what he says about SkyWest and it's employees and it's managers in a hotel room loud enough for me to hear, I wonder how many other people or PASSENGERS hear him or if the other room overheard him talking bad about SkyWest. Very unprofessional.

21

Sincerely,

Donley E. Watkins III
Assistant Chief Pilot
Denver

After looking over Donley's write-up, I felt as did others, that this action on the part of Andy had violated SP 306 2. (21) Crewmembers may not make or publish false, vicious or malicious statements concerning any employee, management representative of the Company, or which has the potential to adversely affect the Company's relationship with customers, suppliers, employees, or the public.

Summary:

No showed for his initial class.

First year of employ he is summoned to SGU because of abusive writings on the website and comments to crew support. He is warned his behavior will not be tolerated.

A call to SkyWest from his neighbors concerning loud and noisy parties, Andy is verbally notified that this needs to stop.

Abusive treatment to fellow SkyWest and Horizon employee's in BTM, disregard to a bulletin issued by Brad Holt concerning compliance with screener directions.

Write-up from Ground Instructor concerning his arrogant attitude.

Another meeting with Brad Holt, the third in his three year employment, concerning his attitude and abusive treatment of fellow employees

Counseling statement issued for abusive treatment of fellow employees and screening agents including three weeks unpaid leave.

Counseling and time off was upheld by review board.

SAD for sick after call from reserve

SAD for not returning call while on reserve, did not accept responsibility. Non compliance for return of written verbal warning.

Harassment of fellow employee using SkyWest property in violation of company policy manual and crewmember policy.

Violation of crewmember policy in making vicious or malicious statements concerning any employee, management representative of the company.

SkyWest Airlines reserves the right to employ those individuals that it feels meets the personnel profile maintained for specific positions. Once the employment selection has been made, SkyWest strives to maintain a productive interaction with its employees. SkyWest maintains various employee work group representatives. Working with these work group representatives, SkyWest jointly crafts work rules and policies specific to each work group. SkyWest also maintains an overall corporate employee policy manual.

Each employee is subject to the rules of conduct outlined in these manuals. We feel Andrew Callaway has violated and shown disregard for these rules a number of times through out his

employment. The Company has taken a number of actions as stipulated by policy to effect corrections to his behavior. We did not see the required behavioral correction, in fact we see a continued thread of behavior that has been addressed before. The company feels that we have followed policy to the limit, verbal warnings, personal meetings with department VP and counseling statement with associated time off have did not have a corrective effect. Therefore the only solution we had left was termination.

# EXHIBIT "14"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

ORIGINAL

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, | CIVIL NO. 2:04CV00179 |
| vs. | VIDEOCONFERENCE DEPO OF: JOHN WANGENSTEEN |
| SKYWEST AIRLINES, INC., Defendant. | Held February 14, 2005 |
| | REPORTED BY: RENEE L. STACY, CSR, RPR |

Videoconference deposition of JOHN WANGENSTEEN, taken on behalf of the Plaintiff, at 299 South Main Street, 18th Floor, Salt Lake City, Utah, commencing at 9:23 a.m. on February 14, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

Depomax
REPORTING SERVICES, INC.

333 SOUTH RIO GRANDE, SUITE F,
SALT LAKE CITY, UTAH 84101
(801) 328-1188 / 1-800-DEPOMAX
FAX 328-1189

was in existence at the time, like ALPA that's already a union and they've been receiving dues for a long time and probably a fairly well-organized organization. It would have been a so-called in-house union probably that was taking place.

Q On these last two drives, the 2000 and 2004, what position has SAPA taken regarding those drives?

A Well, certainly in the most recent one, which I was a part of SAPA -- well, let's see. The one in 2000, I would have been part of SAPA at that one, too, but I'm just -- I'm much more aware of the most recent one, of which I would have to say that -- you know, I can't say that all 19 SAPA members were against it. If I were to make a guess, I would probably say that they were. It's -- but if someone told me that -- or somehow if I found out that one or two members voted in favor of the most recent union drive, I wouldn't be shocked, so --

But to answer your -- I think, to answer your question, the most recent drive, I would say that certainly, as a collective body, that we would have been basically against that union drive, and --

Q Did SAPA -- in this latest drive, did SAPA issue some kind of a position statement or did it

send out any information to pilots?

A Many members would -- members of SAPA would answer pilots' questions, general pilots' questions concerning unions, and there would be probably little specific questions here and there, and I think that some SAPA members would answer those questions the best that they could.

Our official position on any union drive is that we don't have a position, that if the pilots want to vote in a union, that that's -- which would replace us -- that's up to them. If they want to vote in a union, that's perfectly fine, and if they don't, that's perfectly fine, too, and -- but we always did have a stated position that we would not endorse or reject the union. I mean, we wouldn't take an official stand. Our official stand is that we didn't have one.

Q Okay. Why, in light of that, do you think, then, most of the 19 SAPA people were against the union?

A I believe that the 19 members believe that the system -- if that's a good word -- the system that we have in place today would -- better represented the pilots. It would be better for the pilots to keep that system in place, rather than go

# EXHIBIT "15"

Service: **Get by LEXSEE®**
Citation: **90 fed. appx. 276**

*90 Fed. Appx. 276, *; 2003 U.S. App. LEXIS 25372, **;*
*173 L.R.R.M. 3056; 149 Lab. Cas. (CCH) P10,292*

WEBCO INDUSTRIES, INC., Petitioner and Cross-Respondent, v. NATIONAL LABOR RELATIONS BOARD, Respondent and Cross-Petitioner. UNITED STEELWORKERS OF AMERICA, Intervenor.

Nos. 01-9532 & 01-9533

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

90 Fed. Appx. 276; 2003 U.S. App. LEXIS 25372; 173 L.R.R.M. 3056; 149 Lab. Cas. (CCH) P10,292

December 16, 2003, Filed

**NOTICE: [**1]** RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** NLRB. (No. 17-CA-19898).

**DISPOSITION:** Enforcement of the order granted; Petitioner's petition for review denied.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Alleging retaliatory discharges, intervenor union filed an unfair labor practices charge, and respondent, the National Labor Relations Board, found violations of the National Labor Relations Act, 29 U.S.C.S. §§ 151-169, specifically § 8(a)(1), (3) of the act, 29 U.S.C.S. § 158(a)(1), (3). Petitioner employer appealed that finding, the Board cross-appealed for enforcement, and the union supported the Board.

**OVERVIEW:** Following a market decline, the employer laid off 53 of its 273 employees, including the 10 alleged discriminatees. The court enforced the Board's decision, finding that: (1) a trainer who signed reprimand slips when so instructed was not a supervisor; (2) the Board properly refused to give effect to a private settlement agreement partly because of the employer's history of prior violation; (3) the finding of coercive interrogation was supported by the facts that one employee was called at home, he felt a need to falsely deny his union involvement and was informed that management was going to "keep an eye" on him; also, the questioning of another employee was prefaced by his supervisor locking the door; and (4) the employer violated § 8(a)(1) by using a legitimate economic layoff to rid itself of union activists by blending them in with the discharge of other employees and by retaining employees with quiescent union leanings. The record was replete with evidence of the employer's anti-union animus in two prior organizing campaigns, and at the final meetings to firm up the layoff list, all of the alleged discriminatees were mentioned as pro-union and in need of discharge.

**OUTCOME:** The court granted the Board's cross-application for enforcement.

**CORE TERMS:** supervisor, discriminatee, general counsel, settlement, administrative law, discharged, campaign, unfair labor practice, unfair, supervisory, trainer, severance, organizer, personnel, training, manager, quotations, organizing, tensile, layoff, plant, independent judgment, regional director, timely filed, interrogation, questioning, discipline, coercive, suspend, hire

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices

*HN1* See 29 U.S.C.S. § 158(a)(1).

Labor & Employment Law > Collective Bargaining & Labor Relations > Right to Organize

*HN2* See 29 U.S.C.S. § 157.

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices

*HN3* See 29 U.S.C.S. § 158(a)(3).

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices

*HN4* See 29 U.S.C.S. § 160(b).

Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review

*HN5* The findings of the National Labor Relations Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. 29 U.S.C.S. § 160(e); 29 U.S.C.S. § 160(f). In measuring substantiality, the court weighs the whole record, including evidence leading to inferences contrary to Board findings. However, the court will not negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor will the court displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. Substantial evidence denotes not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree which could satisfy a reasonable factfinder. Credibility and weight determinations belong to the Board, and the court will not set them aside absent extraordinary circumstances. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review

*HN6* As to the National Labor Relations Board's (NLRB's) legal conclusions, in reviewing the NLRB's interpretation of the National Labor Relations Act, the court recognizes that Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language. While the court accords great deference to legal rulings of the NLRB, the court must reject administrative constructions which are contrary to clear congressional intent. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Protected Activity

*HN7* The National Labor Relations Act, 29 U.S.C.S. §§ 151-169, excludes supervisors from its protection. More Like This Headnote

Labor & Employment Law > Employment Relationships > Employees

Labor & Employment Law > Collective Bargaining & Labor Relations > Protected Activity

*HN8* The employer carries the burden of proving an individual is a supervisor under the

National Labor Relations Act, 29 U.S.C.S. §§ 151-169. More Like This Headnote

Labor & Employment Law > Employment Relationships > Employees

Labor & Employment Law > Collective Bargaining & Labor Relations > Protected Activity

**HN9** Employees are statutory supervisors under the National Labor Relations Act, 29 U.S.C.S. §§ 151-169 if: (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions; (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment; and (3) their authority is held in the interest of the employer. One nominally a supervisor may not enjoy his exempt status under the act because the degree of independent judgment exercised is measurably circumscribed by the employer. It falls clearly within the National Labor Relations Board's discretion to determine, within reason, what scope of discretion qualifies to separate an employee from a supervisor. It was the United States Senate's prevailing view during enactment of 29 U.S.C.S. § 152(11) that employees such as "straw bosses," who have only minor supervisory duties, should be included within the act's protections. More Like This Heac

Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review

Labor & Employment Law > Employment Relationships > Employees

Labor & Employment Law > Collective Bargaining & Labor Relations > Protected Activity

**HN10** A court accords great weight to a National Labor Relations Board determination of supervisory status since the gradations of authority responsibly to direct the work of others are so infinite and subtle. More Like This Headnote

Labor & Employment Law > Employment Relationships > Employees

Labor & Employment Law > Collective Bargaining & Labor Relations > Protected Activity

**HN11** See 29 U.S.C.S. § 152(11).

Labor & Employment Law > Employment Relationships > Employees

Labor & Employment Law > Collective Bargaining & Labor Relations > Protected Activity

**HN12** See 29 U.S.C.S. § 152(3).

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement

**HN13** A private settlement agreement should be rejected if it does not mirror the complete remedy which the alleged discriminatees might achieve on all charges in a concluded unfair labor practice proceeding. The power of the National Labor Relations Board to prevent unfair labor practices is exclusive, and its function is to be performed in the public interest and not in vindication of private rights and the Board alone is vested with lawful discretion to determine whether a proceeding, when once instituted, may be abandoned. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement

**HN14** In order to assess whether the purposes and policies underlying the National Labor Relations Act, 29 U.S.C.S. §§ 151-169, would be effectuated by the National Labor Relations Board approving a private settlement agreement, the Board will examine all

the surrounding circumstances including, but not limited to: (1) whether the charging party(ies), the respondent(s), and any of the individual discriminatee(s) have agreed to be bound, and the position taken by the General Counsel regarding the settlement; (2) whether the settlement is reasonable in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of the litigation; (3) whether there has been any fraud, coercion, or duress by any of the parties in reaching the settlement; and (4) whether the respondent has engaged in a history of violations of the Act or has breached previous settlement agreements resolving unfair labor practice disputes. More Like Th

Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review

***HN15*** The responsibility of the National Labor Relations Board to effectuate the purposes of the National Labor Relations Act, 29 U.S.C.S. § 151-169, is an exercise to which the court accords great deference. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices

***HN16*** To determine whether questioning violates the National Labor Relations Act, 29 U.S.C.S. §§ 151-169, specifically Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C.S. § 158(a)(1), a court considers whether under all of the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the act. Either the words themselves or the context in which they are used must suggest an element of coercion or interference. A violation is established if the questions asked, when viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review

***HN17*** A reviewing court must recognize the competence of the National Labor Relations Board in the first instance to judge the impact of utterances made in the context of the employer-employee relationship. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices

***HN18*** Although § 8(a)(1) and (a)(3) of the National Labor Relations Act, 29 U.S.C.S. § 158(a)(1), (3), are not coterminous, a violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1). More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices

***HN19*** In an unfair termination action under the National Labor Relations Act (NLRA), 29 U.S.C.S. §§ 151-169, the General Counsel need show by a preponderance of the evidence only that a discharge is in any way motivated by a desire to frustrate union activity. However, proof that the discharge would have occurred in any event and for valid reasons amounts to an affirmative defense on which the employer carries the burden of proof by a preponderance of the evidence. The employer does not violate the NLRA if any anti-union animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement

***HN20*** To determine whether an amended charge is "closely related" to a timely filed charge, the National Labor Relations Board examines: (1) whether the untimely charges concern the same legal theory as the timely charge; (2) whether they arise from the same factual situation or sequence of events; and (3) whether the respondent would raise the

same or similar defenses. More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review

HN21 A court defers to the authority of the National Labor Relations Board to construe provisions of the National Labor Relations Act, 29 U.S.C.S. §§ 151-169. More Like This Headnote

**COUNSEL:** For Webco Industries, Inc., Petitioner (01-9532): David E. Strecker, Strecker & Associates, Tulsa, OK. James E. Erwin, Thompson, Coburn, St. Louis, MO.

For National Labor Relations Board, Respondent (01-9532): Aileen A. Armstrong, Dpty Assoc. Gen. Cns, National Labor Relations Board, Washington, DC. Sharon Block, National Labor Relations Board, Washington, DC. Kathleen Lyon, National Labor Relations Board, Washington, DC. Francis Arnold Molenda, National Labor Relations Board, Tulsa, OK. Bridget O'Connor, NLRB, Washington, DC.

For United Steelworkers of America, Intervenor (01-9532): Robert D. Clark, United Steelworkers of America, Pittsburgh, PA. Arlus J. Stephens, Washington, DC.

For National Labor Relations Board, Petitioner (01-9533): General Counsel, National Labor Relations Board, Washington, DC. Charles Donnelly, National Labor Relations Board, Washington, DC. Aileen A. Armstrong, Dpty Assoc. Gen. Cns, National Labor Relations Board, Washington, DC. F. Rozier Sharp, **[**2]** NLRB, Region 17, Overland Park, KS.

For Public Service Company of Oklahoma, Respondent (01-9533): Lynn Paul Mattson, Doerner, Saunders, Daniel & Anderson, Tulsa, OK. Jon E. Brightmire, Doerner, Saunders, Daniel & Anderson, Tulsa, OK. Michael C. Redman, Doerner, Saunders, Daniel & Anderson, Tulsa, OK.

**JUDGES:** Before O'BRIEN, Circuit Judge, McWILLIAMS, and BRORBY, Senior Circuit Judges.

**OPINIONBY:** TERRENCE L. O'BRIEN

**OPINION: [*277] ORDER AND JUDGMENT ***

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

* This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Webco Industries, Inc. appeals a decision of the National Labor Relations **[*278]** Board (Board) finding it violated § 8(a)(1) n1 and (a)(3) n2 of the National Labor Relations Act (Act) n3; the Board cross-appeals for enforcement, and the United Steel Workers of America (Union) **[**3]** intervenes in support of the Board. Exercising jurisdiction under 29 U.S.C. § 160(e) and (f) (2002), we grant the Board's cross-application for enforcement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Section 8(a)(1) of the National Labor Relations Act corresponds to 29 U.S.C. § 158(a)(1) (2002), which provides: HN1 "It shall be an unfair labor practice for an employer . . . to

interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the Act] . . . ." 29 U.S.C. § 157 provides: HN2 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

n2 Section 8(a)(3) of the National Labor Relations Act corresponds to 29 U.S.C. § 158(a)(3), which provides: HN3 "It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." **[**4]**

n3 29 U.S.C. §§ 151-169.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The issues presented are: (1) whether substantial evidence supports the findings of the alleged violations; (2) whether Bryan O'Connell was a supervisor and therefore barred from relief under the Act; (3) whether Eric Martin is barred from relief because he signed a severance agreement releasing Webco from claims under the Act; and (4) whether relief for Bryan O'Connell and Charlie Williams is time barred under § 10(b) n4 of the Act.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Section 10(b) of the National Labor Relations Act corresponds to 29 U.S.C. § 160(b). It provides: HN4 "No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . . Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[**5]**

***Nature of the Case***

On October 8, 1998, the Union filed an unfair labor practices charge with the Board's regional director against Webco alleging, *inter alia*, violation of § 8(a)(1) and (a)(3) of the Act, stemming from the discharge n5 of a number of employees in alleged retaliation for Union activity. Based on these charges, later amended, the Board's general counsel, by the acting regional director, filed a complaint, later amended, against Webco.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 While one of the employees (Robert Leasman) was discharged during his probationary term, Webco characterizes the other employees as having been "laid off." However, in light of Webco's own policy that laid-off employees could never again apply for employment with the company, the event is properly described as a discharge. For purposes of this proceeding, the two terms are interchangeable.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

After conducting a hearing on the amended complaint, an administrative law judge issued a decision on September 17, 1999, sustaining certain charges, dismissing **[**6]** others and recommending remedial relief. By Decision and Order dated July 19, 2001, the Board found Webco violated § 8(a)(1) n6 and (a)(3) n7 of the Act and issued an order of relief.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Webco interfered with the § 7 [29 U.S.C. § 157] rights of Messrs. Schooley, O'Connell, Rogers, and Morris through coercive interrogation about Union activities, implied threat of reprisal for exercise of rights to organize and interference with rights to solicit Union support.

n7 Webco discharged Messrs. Schooley, O'Connell, Rogers, Morris, Wilson, Teague, Leasman, Martin, Ruckman, and Williams in retaliation for Union support.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

### [*279] *Standard of Review*

*HN5*"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e); *see* 29 U.S.C. § 160(f). In measuring substantiality, we weigh the whole record, including evidence leading to inferences **[**7]** contrary to Board findings. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 95 L. Ed. 456, 71 S. Ct. 456 (1951). However, we will not "negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." *Id.* Nor will we "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* Substantial evidence denotes "not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 377, 139 L. Ed. 2d 797, 118 S. Ct. 818 (1998) (emphasis in the original); *see N.L.R.B. v. Wilhow Corp.*, 666 F.2d 1294, 1299 (10th Cir. 1981). Credibility and weight determinations belong to the Board, *Wilhow Corp.* at 1299-1300, and we will not set them aside "absent extraordinary circumstances. **[**8]** " *Medite of New Mexico, Inc. v. N.L.R.B.*, 72 F.3d 780, 792 (10th Cir. 1995). *HN6*As to the Board's legal conclusions, "in reviewing the NLRB's interpretation of the NLRA, we recognize that Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language . . . ." *Colorado-Ute Elec. Ass'n, Inc. v. N.L.R.B.*, 939 F.2d 1392, 1400 (10th Cir. 1991) (quotations and citations omitted), *cert. denied sub nom.*, 504 U.S. 955 (1992). While we accord great deference to legal rulings of the Board, we "must reject administrative constructions which are contrary to clear congressional intent." *N.L.R.B. v. Oklahoma Fixture Co.*, 295 F.3d 1143, 1145 (10th Cir. 2002), *enf. granted*, 332 F.3d 1284(2003) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 n.9, 81 L. Ed. 2d 694 (1984), *reh'g denied*, 468 U.S. 1227, 82 L. Ed. 2d 921(1984)).

### *Background*

Webco Industries, Inc. is a manufacturer and distributor of specialty steel tubing. Its largest facility, Southwest Tube, **[**9]** is located in Sand Springs, Oklahoma. On October 7, 1998, due to a precipitous market decline, conceded by the Board's general counsel and the Union,

Webco laid off fifty-three of its 273 employees at the Southwest Tube facility. The Union contended the ten alleged discriminatees were selected for discharge because of their Union sympathies and activities. Webco denied the allegation and showed that employees without Union sympathies, including supervisory personnel, were also laid off, and employees with Union sympathies were retained. But history informs the debate.

The Union tried to organize the Southwest Tube facility beginning in early 1997. In connection with that campaign, Webco was charged with unfair labor practices. n8 **[*280]** The campaign was suspended in April of 1997, but resumed on August 19, 1998, n9 with handbilling n10 just outside the Southwest Tube facility by Union organizer Jim Teague. Supervisor Ted Dye, who observed the handbilling, testified his presence was intended to ward off any anti-Union misbehavior. Of the ten alleged discriminatees, eight of them (Messrs. Morris, Rogers, Schooley, Wilson, Martin, Ruckman, O'Connell and Williams) were active in both the 1997 **[**10]** and 1998 Union organizing efforts, and six served on an in-house organizing committee (Messrs. Morris, Rogers, Schooley, Wilson, Ruckman and O'Connell). Richard Teague was not employed by Webco at the time of the 1997 effort, but took a handbill from Jim Teague and attended the Union meeting on August 19, 1998. Robert Leasman was a probationary employee with Webco who began employment in the latter part of July 1998. He also took a flyer from Jim Teague on August 19 and attended the Union meeting that evening. Unlike the others, all of whom were laid off on October 7, he was discharged without explanation on August 24. Richard Teague was a brother of Union organizer Jim Teague, and Gary Schooley and Robert Leasman were related to Jim Teague by marriage.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 *See* Webco Indus., Inc. v. N.L.R.B., 217 F.3d 1306 (10th Cir. 2000) (upholding NLRB decision finding Webco violated § 8(a)(1) and (a)(3) of the Act).

n9 Unless otherwise indicated, all date references are to 1998.

n10 The handbill announced a Union organizing meeting that evening.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**11]**

Webco management testified as to the process for selecting the fifty three employees laid off on October 7. In late September, founder and chief executive officer Bill Weber and his daughter, chief operating officer Dana Weber, informed Ms. Robin Robinette, human resources director, that facility reorganization and layoffs were necessary to meet a declining market. Ms. Robinette took charge of the effort to thin the labor force, assisted by Messrs. Tom Lewis, Don Holder, and Doug Jackson of senior management. The Webers offered broad guidance to this group, declaring attitude to be the number one factor in determining which employees would be kept and which let go. Attitude was described as a willingness to be flexible in job assignments, do whatever needed to be done, and be a team player. Senior management reviewed personnel files, discussed the matter, and prepared the initial list of employees to be released. In the days leading up to the first lay-offs on October 7, middle managers were invited into the process and given an opportunity to remove names from the release list.

Five former members of Webco middle management testified at the hearing (Messrs. Whittenburg, O'Brien, **[**12]** Cash, Nance, and Krevett). Each of them claimed senior Webco management exhibited anti-union animus. n11 All except Mr. Whittenburg (who left Webco in 1996) testified that active Union activity was a reason for placing an employee on the October 7 discharge list. According to the collective testimony of these managers, at the final meetings to firm up the layoff list, all ten of the alleged discriminatees were variously mentioned as pro-Union and in need of discharge (Mr. Leasman had already been discharged on August 24).

At these meetings, Ms. Robinette wondered aloud how Richard Teague and Robert Leasman were ever hired, since they were both related to Union organizer Jim Teague. **[*281]** Members of senior management described Richard Teague and Robert Leasman as "union plants." At a meeting on October 7, some managers defended employees who had been placed on the layoff list. Chief executive officer Mr. Bill Weber told the assembled group their jobs were on the line for any name they removed from the list.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 As the administrative law judge put it, "The witnesses are generally independent and mutually corroborating and despite certain unlikely aspects . . . I believe their testimony. In so finding, I have considered that each could have a motive to fabricate. But when taken together there is just too much evidence to disbelieve." (R. Vol. IV, Decision of Administrative Law Judge, at 20.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[**13]**

***Was O'Connell a Supervisor or an Employee?***

Webco argues it did not violate § 8(a)(1) and (a)(3) of the Act with respect to Bryan O'Connell because he was a supervisor and not an employee. ***HN7*** The Act excludes supervisors n12 from its protection. ***HN8*** The employer carries the burden of proving an individual is a supervisor. *N.L.R.B. v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 712, 149 L. Ed. 2d 939, 121 S. Ct. 1861 (2001). ***HN9*** "Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions [*see* n.12], (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer." *Id.* at 713 (quotations and citations omitted). One nominally a supervisor may not enjoy his exempt status under the Act because the degree of independent judgment exercised is measurably circumscribed by the employer. "It falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies" to separate an employee from a supervisor. *Id.* "It was the Senate's **[**14]** [prevailing] view [during enactment of 29 U.S.C. § 152(11)] that employees such as 'straw bosses,' who had only minor supervisory duties, should be included within the Act's protections." *N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 281, 40 L. Ed. 2d 134, 94 S. Ct. 1757 (1974). ***HN10*** We accord great weight to a Board determination of supervisory status "since the gradations of authority responsibly to direct the work of others . . . are so infinite and subtle . . . ." *N.L.R.B. v. Dixon Indus., Inc.*, 700 F.2d 595, 598 (10th Cir. 1983) (quotations and citations omitted).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n12 ***HN11*** "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

***HN12*** "The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . ." 29 U.S.C. § 152(3).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**15]**

Mr. O'Connell, one of twelve trainers at the plant, was responsible for training in the cold draw department. His immediate supervisor was shift business manager Mark McIllwain. Mr. O'Connell spent about half his time training new employees on equipment, and the other half of his time he operated a machine on the shop floor or ran errands for his supervisor. He also trained veteran employees shifting from one piece of equipment to another. He exercised judgment in how to train an employee. He initialed time cards. He had the authority to send an employee home sick if Mr. McIllwain was absent. He critiqued employees on how well they were doing their jobs and offered input on whether an employee would advance from one pay level to another. He could offer a recommendation on whether to keep a probationary employee, but he could not make the decision. He assisted in the employee evaluation process, although all employees participated in a team evaluation effort. On occasion, he signed employee evaluations. He signed reprimands **[*282]** of other employees about three times at the instruction of his supervisor, and after his supervisor had asked him to investigate the situation. He attended management **[**16]** meetings representing his department on perhaps three occasions in place of his supervisor. These meetings concerned safety and production. When his supervisor was absent, which occurred about four times, he was in charge of the department. He was paid an hourly wage that exceeded the highest wage in the department by about twenty-five cents per hour.

Mr. Nance, general business manager of the cold draw department and McIllwain's superior, testified it was rare for a trainer to fill in for his immediate supervisor because company policy directed a shift business manager be on duty at all times. According to Mr. Nance, when a trainer was not training he was usually operating a machine on the shop floor. He considered a trainer a lead person with no authority to hire or issue disciplinary action, although he might sign a disciplinary form along with his shift business manager and the general business manager. Actual discipline was approved by management only. According to his testimony, the purpose of a trainer "was pretty strictly to keep the work and production flowing and teach people how to run machines and that sort of thing." (R. Vol. I at 289).

Notwithstanding the testimony **[**17]** from Mr. O'Connell and Mr. Nance, Ms. Robinette testified trainer responsibilities were in writing, and Mr. O'Connell spent all of his time training, which included training on company policies and procedures. Mr. O'Connell denied having been shown the written responsibilities of trainers, and he denied training on company policies and procedures. Ms. Robinette claimed Mr. O'Connell had the authority to initiate disciplinary action and to suspend other employees. She added he wore a supervisor's uniform and parked in a management parking lot for which he needed a special pass.

From this litany of job descriptors, Webco argues Mr. O'Connell had the responsibility to direct, evaluate, discipline and suspend other employees, and in so doing he exercised independent judgment. The Board concluded Webco failed to prove supervisory status for Mr. O'Connell, and the record supports its decision. Missing in Webco's case is a direct link between Mr. O'Connell's exercise of his job responsibilities and company decisions "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees." 29 U.S.C. § 152(11). The Board concluded **[**18]** Mr. O'Connell was an insignificant player in company decisions affecting other employees. His participation was at most ministerial and attenuated, as in signing reprimand slips at the instruction of his supervisor. Adopting the reasoning of the Board, we agree Mr. O'Connell performed only the kinds of "minor supervisory duties" envisaged by legislative history as insufficient to establish supervisory status. *Bell Aerospace,* 416 U.S. at 281.

***Martin Severance Agreement***

Webco next contends it did not violate § 8(a)(1) and (a)(3) of the Act with respect to Eric Martin because he signed a severance agreement providing for the payment to him of $ 569.40 (less usual withholdings) in exchange, *inter alia*, for his promise not to file a complaint with the Board

concerning his discharge and his release of Webco from all employment-related claims. Mr. Martin signed the agreement when he was discharged on October 7, without taking the opportunity Webco gave him to discuss it with an attorney or Union officials. On **[*283]** October 8, the Union filed its first charge against Webco, not naming Mr. Martin as an alleged discriminatee. He was so named in the first amended **[**19]** charge filed by the Union on December 29. The Board's acting regional director issued a complaint on March 8, 1999. Neither the Board's general counsel nor the Union had notice of the agreement when it was signed, and both objected to giving it effect. The Board, in a divided opinion, upheld the administrative law judge's decision finding the severance agreement did not bar relief for Mr. Martin under the Act.

In *Independent Stave Co, Inc.*, employees on whose behalf unfair labor practices were filed reached private, non-Board settlement agreements with the employer, approved by their union, and requested withdrawal of charges. Independent Stave Co, Inc., 287 N.L.R.B. 740 (1987). The Board's general counsel objected, relying on Board precedent which suggested ***HN13*** a private settlement agreement should be rejected if it does not mirror the complete remedy which the alleged discriminatees might achieve on all charges in a concluded unfair labor practice proceeding. The Board noted its "power to prevent unfair labor practices is exclusive, and that its function is to be performed in the public interest and not in vindication of private rights and the Board alone is vested **[**20]** with lawful discretion to determine whether a proceeding, when once instituted, may be abandoned." *Id.* at 741 (quotations and citations omitted). The Board then revised its test for evaluating whether to give effect to private, non-Board settlement agreements:

> ***HN14*** In order to assess whether the purposes and policies underlying the Act would be effectuated by our approving the agreement, the Board will examine all the surrounding circumstances including, but not limited to, (1) whether the charging party(ies), the respondent(s), and any of the individual discriminatee(s) have agreed to be bound, and the position taken by the General Counsel regarding the settlement; (2) whether the settlement is reasonable in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of the litigation; (3) whether there has been any fraud, coercion, or duress by any of the parties in reaching the settlement; and (4) whether the respondent has engaged in a history of violations of the Act or has breached previous settlement agreements resolving unfair labor practice disputes.

*Id.* at 743. In giving effect to the agreements, **[**21]** the Board noted the settlement terms were reasonable and respondent had no history of violating the Act. *Id.*

Again, in *Hughes Christensen,* the validity of private settlement agreements was before the Board. In September and October 1992, the union filed charges based on the non-selection of certain employees for transfer to a new company facility. *Hughes Christensen Co.,* 317 N.L.R.B. 633, 634 (1995), *enf. denied on other grounds*, 101 F.3d 28 (5th Cir. 1996). In November, the Board's regional director dismissed the charges, and the union appealed. *Id.* While appeal of the dismissal was pending, three employees signed private settlement agreements. *Id.* In April 1993, the appeal was sustained and the charges reinstated. Both the union and the general counsel opposed giving effect to the severance agreements, although there was no contention they were fraudulent. *Id.* Nevertheless, applying the *Independent Stave* test, the Board enforced the agreements. The Board specifically stated the agreements were "a reasonable adjustment in light of the potential costs and risks inherent in any litigation." *Id.* Further, the Board emphasized **[**22]** the company "does not have a history of violating the Act . . . ." *Id.*

**[*284]** Here, the administrative law judge examined all of the surrounding circumstances,

applied the *Independent Stave* test and declined to give effect to Mr. Martin's private settlement agreement. As in *Hughes Christensen*, the Union and general counsel opposed the settlement agreement and there was no contention it was fraudulent. The administrative law judge, however, distinguished *Hughes Christensen*, particularly noting the respondent's history of prior violation of the Act. As to the agreement's reasonableness, he further distinguished *Hughes Christensen* on the grounds the Martin severance agreement was executed before charges were filed, suggesting it was thus impossible for the judge to evaluate its reasonableness "in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of litigation." *Independent Stave Co, Inc.*, 287 N.L.R.B. at 743. A majority of the Board adopted the administrative law judge's reasoning, and so do we. We are particularly compelled to this conclusion by consideration of HN15 the responsibility of the Board to effectuate the [**23] purposes of the Act, an exercise to which we accord great deference. *Oklahoma Fixture*, 295 F.3d at 1145. While we concur in the principle of just settlement of claims, in this instance the Board's refusal to give effect to the Martin severance agreement came after an examination of the totality of the circumstances and a reasoned application of the *Independent Stave* test; it is thus a lawful exercise of Board discretion with which we will not interfere.

### *Sec. 8(a)(1) Violations*

#### *Gary Schooley*

Mr. Schooley was a draw bench operator before being discharged on October 7. He was active in both the 1997 and 1998 Union campaigns. Jim Teague, the Union organizer, was his brother-in-law. On September 7, a few weeks after the Union renewed its campaign to organize Webco, supervisor Jene Harmon called Mr. Schooley at home and asked him how Union activities were going. Mr. Schooley claimed not to know, stating he was trying to stay out of it and "lay low." (R. Vol. I at 361). This was false, by Mr. Schooley's own testimony, since he was at the very time trying to convince other employees to sign Union cards and attend meetings.

#### *Bryan O'Connell* [**24]

Mr. O'Connell was also active in both the 1997 and 1998 Union organizing campaigns. He offered unrefuted testimony that on September 7 his supervisor, Mr. McIllwain, called him at home, and informed him his own superior, Mr. Nance, had called to say Mr. O'Connell had been discussing the Union with other employees. Mr. O'Connell denied this to Mr. McIllwain. Later that week, Mr. McIllwain approached Mr. O'Connell on the shop floor, and asked him if he was talking Union again. He told Mr. O'Connell that Larry O'Brien, quality assurance manager, had informed him Mr. O'Connell had been discussing the Union with Jerry Rogers at break time. Mr. O'Connell denied this, although he had discussed Union issues with Mr. Rogers on previous occasions. Mr. McIllwain then told Mr. O'Connell that Mr. O'Brien had told him to "keep an eye on" him.

#### *Jerry Rogers and Roy Morris*

Messrs. Rogers and Morris, both Union activists in the 1997 and 1998 campaigns, were employed as quality assurance auditors under the direct supervision of Charlie Conn. Both were laid off on October 7, while the third quality assurance auditor was retained in a restructured position. Messrs. Rogers and Morris worked [**25] in an area of the plant described as the tensile room, which also doubled as an informal [*285] break room. An official break room was across the hall. According to each of them, on September 18, Mr. Conn came into the tensile room and locked the door behind him. He informed them that while it was acceptable to take their breaks in the tensile room, Union talk was only appropriate on break time and in the official break room across the hall. Mr. Conn himself took occasional lunch breaks with Messrs. Rogers and Morris in the tensile room, where they discussed family and recreational matters. He asked Mr. Rogers if he was still serious about getting the Union into the plant. They discussed Union activities and then other subjects. n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n13 Webco suggests Mr. Rogers initiated the conversation, and argues the Act is not violated when an employee who is an avowed union supporter initiates discussion of the union with the employer. However, the record indicates Mr. Conn led Mr. Rogers into the Union discussion, and thus supports the administrative law judge's finding of coercive interrogation.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**26]**

***Analysis***

The Board found the interrogation of Mr. Schooley and Mr. Rogers to be coercive, that of Mr. O'Connell to constitute an intent by management to surveil in order to discourage Union activities, and that of Messrs. Rogers and Morris to be an attempt to restrain Union discussion on break time in a de facto break room, while permitting discussion of other subjects in the same room, all in violation of § 8(a)(1) of the Act. We agree.

Webco cites to *Rossmore House,* 269 N.L.R.B. 1176 (1984),*Rossmore House,* 269 N.L.R.B. 1176 (1984), *aff'd sub nom. Hotel Employees & Restaurant Employees Union, Local 11 v. N.L.R.B.,* 760 F.2d 1006 (9th Cir. 1985), for the proposition that employer-initiated questioning of an avowed union supporter concerning union activities does not violate § 8(a)(1) of the Act. However, the holding was fact specific. ***HN16***To determine whether questioning violates the Act, we consider "whether under all of the circumstances the interrogation reasonably tends to *restrain, coerce, or interfere with rights guaranteed by the Act . . . . Either the words themselves* or the context in which they are used must suggest an element of coercion or interference." *Rossmore House,* 269 N.L.R.B. at 1177 **[**27]** (citation and footnote omitted); *accord, Presbyterian/St. Luke's Med. Ctr. v. N.L.R.B.,* 723 F.2d 1468, 1475 (10th Cir. 1983). "A violation is established if the questions asked, when viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities." *Presbyterian/St. Luke's,* 273 F.2d at 1475 (quotations and citation omitted).

It is uncontested Messrs. Schooley, O'Connell and Rogers were avowed Union supporters. The fact that Mr. Harmon called Mr. Schooley at his home and inquired about Union activities, and the fact that Mr. Schooley felt a need to falsely deny his Union involvement evidences a context suggesting coercion. The same is true of the questioning of Mr. Rogers, prefaced by his supervisor locking the door of the tensile room. The merits of the alleged violation concerning Mr. O'Connell are perhaps the most convincing. He was questioned about his Union activities during a telephone call to his home and once on the job site, and he was informed management was going to "keep an eye" on him. Webco's recent history of unfair labor **[**28]** practices provides additional coercive context to each of these conversations. With good reason, Webco offers no defense in its brief to the allegation of attempting to ban Union discussion from a de facto break room during break time. Bearing in mind ***HN17***"a reviewing court must **[*286]** recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship," *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 620, 23 L. Ed. 2d 547, 89 S. Ct. 1918 (1969), we uphold the Board's findings of the listed § 8(a)(1) violations.

***Sec. 8(a)(3) Violations***

The Board upheld the administrative law judge's findings that in discharging Mr. Leasman and in laying off Messrs. Morris, Rogers, Schooley, Wilson, Teague, Martin, Ruckman, O'Connell, and Williams, Webco violated § 8(a)(1) and (a)(3) of the Act. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n14 *HN18*"Although § 8(a)(1) and (a)(3) are not coterminous, a violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1)." *Metropolitan Edison Co. v. N.L.R.B.*, 460 U.S. 693, 698 n.4, 75 L. Ed. 2d 387, 103 S. Ct. 1467 (1983).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**29]**

**Analysis**

*HN19*In an unfair termination action under the Act, "the General Counsel need show by a preponderance of the evidence only that a discharge is in any way motivated by a desire to frustrate union activity . . . ." *N.L.R.B. v. Transportation Mgmt. Corp.*, 462 U.S. 393, 399, 76 L. Ed. 2d 667, 103 S. Ct. 2469 (1983). However, "proof that the discharge would have occurred in any event and for valid reasons amounts to an affirmative defense on which the employer carries the burden of proof by a preponderance of the evidence." *Id.* at 400. The employer "does not violate the NLRA . . . if any anti-union animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause." *Id.* at 398. The Board concluded the general counsel had established its case, and Webco had failed to establish its affirmative defense. We agree.

The record is replete with evidence of Webco's anti-union animus in the face of two successive Union organizing campaigns in 1997 and 1998, evidenced in particular by the damning testimony of its former executives, the prior unfair labor practice charges relative to the 1997 campaign, and the **[**30]** course of conduct leading to the § 8(a)(1) violations discussed above. All of the persons discharged were known Union activists, except Messrs. Leasman and Richard Teague, who were known relatives of Union organizer Jim Teague. Webco personnel monitored Union handbilling on August 19, 1998, the kick-off to the new organizing campaign. At this time, Messrs. Leasman and Richard Teague took handbills from Union organizer Jim Teague.

While Webco offered no explanation for the discharge of probationary employee Robert Leasman, it explained the discharge of the remaining nine alleged discriminatees was due to plant restructuring, a review of their personnel files and an evaluation of their attitude. The administrative law judge offered this concerning the personnel records upon which Webco relied:

> The fact is for even the worst alleged discriminatee, certain sections support General Counsel's theory; for even the best alleged discriminatee, certain sections support Respondent's theory. Those employees among the 53 laid off, who are not claimed to be alleged discriminatees also had records which could be argued from either side. For good measure, my attention is also called to **[**31]** those employees not laid off who in some cases had equally inconsistent records. The result of this tidal wave of reports, evaluations, reviews, and the disciplinary write-ups is in my opinion, inconclusive.

*Webco Indus.*, 334 N.L.R.B. 77 at 30, 2001 WL 831622 (2001) (quoting *Webco Indus.*, **[*287]** 1999 WL 33454714 (Sept. 17, 1999) (citation omitted)).

As well, each of the nine employees discharged in at least partial reliance upon alleged poor personnel records testified no explanation was given for their discharge other than poor market conditions requiring downsizing. This was the company response even when two employees specifically asked if their discharge was due to anything in their work record. When Mr. O'Connell challenged supervisor Mr. Nance about the reason for his layoff, Mr. Nance offered the stock economic justification and added, "sometimes when people hear things, they hold a

grudge." (R. Vol. I at 579). When Mr. Wilson asked why he was being discharged, a company supervisor told him it was due to economic conditions and his name was "pulled . . . out of a hat." (R. Vol. I at 603). As to "bad attitude," the Board relied on its own precedent **[**32]** and characterized this terminology as a codeword for union sympathizer. *See* Highland Yarn Mills, Inc., 313 N.L.R.B. 193, 211 (1993).

On the sum of the evidence, and after an exhaustive review of the record, we believe the Board had a substantial basis for finding Webco employed the opportunity provided by a legitimate economic layoff to rid itself of persons it regarded as actual or potential troublesome Union activists, by blending them in with the discharge of other employees who had no demonstrated Union sympathies, and, in fact, by retaining some employees who may have had quiescent Union leanings. Despite Webco's efforts to camouflage its intent, the Board correctly found the general counsel met its burden of establishing unlawful termination of the ten alleged discriminatees, and Webco failed to establish its affirmative defense of legitimate discharge.

### *§ 10(b) of the Act*

Webco contends § 10(b) of the Act bars relief for Messrs. O'Connell and Williams because their names were added to the action by way of an amended charge, dated April 30, 1999, which was filed more than six months after the alleged unfair labor practices at issue. However, **[**33]** the same practices that gave rise to the timely filed charges gave rise to the amended charges.

The Board allowed the amendment by relying on its enunciated procedure in *Redd-I, Inc.*: "We would not find the amendment barred under Section 10(b) . . . because the discharge occurred within 6 months of a timely filed charge and the alleged violation appears to be closely related to the allegations of that charge." 290 N.L.R.B. 1115 (1988). *HN20*To determine whether a charge is "closely related" to a timely filed charge, the Board examines (1) whether the untimely charges concern the same legal theory as the timely charge, (2) whether they arise from the "same factual situation or sequence of events," and (3) whether the respondent would raise the "same or similar defenses." *Id.* at 1118; *see also,* Facet Enters. v. NLRB, 907 F.2d 963, 979 (10th Cir. 1990) (allowing amendment alleging an unfair labor practice closely related to a timely filed charge).

*HN21*We defer to the Board's authority to construe provisions of the Act, *Oklahoma Fixture,* 295 F.3d at 1145, agree with the Board's application of its test to the facts **[**34]** of this case, and conclude § 10(b) of the Act does not bar relief for Messrs. O'Connell and Williams.

### *Conclusion*

We conclude the Board at all times acted within its authority, and substantial evidence supports its findings. Therefore, we **[*288]** **GRANT** enforcement of the Board's order and **DENY** Webco's petition for review.

**Entered by the Court:**

**TERRENCE L. O'BRIEN**

United States Circuit Judge

Service: **Get by LEXSEE®**
Citation: **90 fed. appx. 276**
View: Full
Date/Time: Monday, February 6, 2006 - 12:25 PM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs

# EXHIBIT "16"

That's a good one!!! Little do they know how long we have been trying to get an accurate address list!

Has it been 2 or 3 years now?

IP: Logged |

[redacted]
Member
[redacted]

posted 05-31-2002 13:00

[redacted]
Perhaps you could explain to those of us who are not as knowledgeable in this union stuff as you are exactly what are the "problems" that Alpa is causing for our fellow regional Airline pilots.
Thanks
green
Just looking to be enlightened

Posts: 22 | From: **santa clara, utah usa** | Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 05-31-2002 15:53

[redacted]
You might want to speak personally with some of our former WestAir or TSA pilots to hear about their firsthand experiences with ALPA.
Then to get up to date on recent issues I'd suggest taking a look at the RJ Defense website.
Do you know anyone at Piedmont, PSA, or Allegheny? If not, try stopping by a Wal-Mart near their domiciles. You'll probably find some of those furloughed to make room for mainline pilots working there.
I know you might want to blame it all on the MEC's but I don't hear anyone from ALPA national voicing disappointment over how regional pilots are being furloughed so their mainline counterparts can stay employed.
One of the primary reasons for a union is to protect jobs. ALPA has chosen only to protect mainline jobs. It's quite understandable since they derive the bulk of their income from mainline pilots.

Posts: [redacted] From [redacted] | Registered: **Aug 2000** | IP: Logged |

Andy Callaway
Unregistered User

posted 05-31-2002 16:57

[redacted]

I can't wait to hear this one again.

Honestly though, what did ALPA do to Westair pilots?

IP: Logged |

[redacted]
Member
[redacted]

posted 06-01-2002 06:33

[redacted]
I also would like to know exactly what happened at westair, but the problem is, other than [redacted] (who is a fine man by the way)(and a man with whom I have discussed this for several hours)
you can't find any Westair guys that were actually involved in Westair Alpa.
What you find are guys who are in a spittle emitting rage over how bad they

CAL 0177

got screwed but they either weren't there when it happened or they were not involved in Alpa so they are not quite sure what happened.

So why don't YOU tell us what happened at Westair. Tell us why Alpa didn't save Westair from [redacted] any more than it saved Eastern from [redacted].
Thanks green
P.S. As I reread this post it sounds to me sort of like I am trying to pick a fight. That is not the case. I have to go work so I don't have time to rewrite it.
fly brothers forever

Posts: [redacted] | From: [redacted] | Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 06-01-2002 09:50

[redacted]
We have many pilots that have flown for other regionals that were represented by ALPA. Do you find it odd that none of them are clamoring for ALPA on the property at SkyWest? How come we never see a post stating something on the order of "we had ALPA at XYZ airlines and they improved.....yada yada yada."
There must be a reason that few or none who worked for an ALPA regional want ALPA here at SkyWest.

There are also broader implications to consider. If we do go ALPA how will our growth and expansion plans be effected? DAL and UAL seem to like the fact that we're not union. The more flying SkyWest gets assigned the quicker we move up the seniority list, upgrade, perhaps even find ourselves in 70 seaters, etc.
Do you really think that ALPA will improve our relationship with mgmt? Will ALPA really give us that much more bargaining power? Right now many of us are complaining about unannounced policy changes and reserve manning issues. Do you think none of that occurs at an ALPA carrier?

Posts: [redacted] | From: [redacted] | Registered: **Aug 2000** | IP: Logged ||

[redacted]
Member
[redacted]

posted 06-01-2002 10:46

Dear Andy (Callaway) [redacted]

I think that you both are fine aviators with valuable experience in the subject. However - your method for drumming support for ALPA is not the best. In fact, you might be driving the support away. Try a more positive approach instead. A good salesman will always give you all the positive aspects of their product intead of trying to point out the negative aspects of the competition.

Just some helpful ideas.

Posts: 954 | From: **Picturesque Gig Harbor, WA** | Registered: **Jun 2000** | IP: Logged |

[redacted]
Avatar Image
[redacted]

posted 06-01-2002 14:35

ALPA or no ALPA. I can give you an example of how ALPA helped us at WestAir. WestAir pilots were making considerably more money flying airplanes than Mesa(non-union) pilots were. The exact difference escapes me

**CAL 0178**

Shitaquas of the industry?
Check their Morale.

Regards,
[redacted]

PS.... No Bull = No Bashing

( I really dont bash very often, my blood presure just rose to an extreme level hearing so much misinformation spreading around crew lounges, that led to some pretty intense posts to bring forth the "Facts". Sorry if I offended anyone, it wasnt my intent.)

---

Post[redacted] Registered: **Feb 2001** | IP: Logged |

[redacted]
Member
Membe[redacted]

posted 06-09-2003 10:30

---

quote:

---

Originally posted by Andy Callaway:
**Well said! However, we have too many 1000 hour wonders here that have NO CLUE about the histroy of our industry and cannot wait to fly "heavy iron" and thus will do whatever it takes to get there, at the expense of our profession!**

**Sadly, I feel that his piece of shite TA will pass when some of our FO's vote 'yes' so they can fly larger jets!**

---

Hey Knuckle-head, I'm an FO who voted NO (hey that rymes) and 80% of the **CAPTAINS** (junior CA's anyway) I have talked to are voting YES. What now, BOY......

-Equal Opportunity Offender

---

Posts[redacted]Registered: **Jun 2001** | IP: Logged |

[redacted]
Member
Membe[redacted]

posted 06-09-2003 12:24

---

quote:

---

, I'm an FO who voted NO (hey that rymes) and 80% of the CAPTAINS (junior CA's anyway) I have talked to are voting YES. What now, BOY......

---

This is not a Captain / FO thing.

It is the difference between those who take pride in the value of their services, and the prices we paid to provide them, and those who will sell themselves out for the so
called "opportunity" to fly bigger jets.

We are not in the "Time Building" buisness anymore. We are in a profession providing our services to an employer.

CAL 0313

I have been an advocate for you. You may not know or believe this. But one thing that I have never done -- and will never do -- is share your name or specifics of your issues with *anyone* not absolutely vested or otherwise included in the outcome. I certainly wouldn't use prejudicial bits of your issues to further my own.

Now, I think that you do not have all the facts, and are sharing inappropriate bits of information. Or you do have all the facts, and are sharing prejudicial bits of what you know. Either way, I think you're out of line.

Every pilot who sits in the enviable position of service as a SAPA Rep. has a vested interest in the fair treatment of pilots. We will make the best case for any pilot who needs our assistance. It is in our best interest as individuals, as Reps., and as SkyWest pilots.

I'll go back and correct every unintentional misspelling of your name. I apologize for that.

[redacted]

Posts: [redacted] | Registered: **Jun 2000** | IP: Logged |

Andy Callaway
*Unregistered User*

posted 06-02-2003 19:17

Dave,

I simply responded to the first post [redacted] posted the details. Why are you slamming me when he posted the specifics?

IP: Logged |

[redacted]

posted 06-02-2003 19:31

[redacted]

I may have missed a turn in this thread, but I thought that you and I were saying 'he said/she said' in this thread [redacted] kinda jumped into the middle of us, and I bit you.

*I do apologize for the edge in my tone: I think that some rumors need to be* stomped out feverishly, or supported carefully and openly by only the principals in the issue.

[redacted]

Posts: **1695** | From: **san diego** | Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 06-20-2003 16:39

I am pleased to inform all concerned that [redacted] was reinstated to his position as [redacted] On behalf of the Unified Pilots Assc, I would like to thank all the pilots who wrote letters on [redacted] behalf.

Peace
[redacted]

[redacted] | Registered: **Jun 2000** | IP: Logged |

CAL 0299

IP: Logged |

[redacted]
Member
[redacted]

posted 06-02-2003 11:08

Andy:
As far as I know [redacted] was fired.

Please mail me some more cards.

Posts: [redacted] | Registered: Mar 2001 | IP: Logged |

Andy Callaway
Unregistered User

posted 06-02-2003 11:34

Jesse, I know [redacted] was fired! This is what I confirmed in my post above. Who's next?

IP: Logged |

[redacted]

posted 06-02-2003 14:10

CPT Callaway-

I submit that you are not aware of, or are not sharing all or indicative details of this issue.

I submit that what you are championing right now is not the rights of an individual wrongly accused, but your own agenda.

*If you don't have all the facts, then your are out of line, in my opinion. If you do* have all the facts, and are not presenting them here -- for whatever reason -- then you are out of line, in my opinion.

Sir.

[redacted]

Posts: [redacted] Registered: Jun 2000 | IP: Logged |

Andy Callaway
Unregistered User

posted 06-02-2003 15:17

What are you [redacted], the new Information Minister? My view is the exact same as the one [redacted] posted above.

There is no agenda here and I am extremely offended by your comment!

When are you going to spell my name correctly?

Sir.

IP: Logged |

[redacted]
Moderator
[redacted]

posted 06-02-2003 15:59

CPT Callaway:

I don't buy it: you don't strike me as someone who would be offended by my comments.

CAL 0298

Someone wrote a letter that said, "We are frustrated with the line values," and got fired?

I don't believe that. Is there more to the story that you are willing to share?

[redacted]

Posts: [redacted] | Registered: **Jun 2000** | IP: Logged |

[redacted]



Member [redacted]

Icon 31 posted 06-01-2003 15:58

> quote:
>
> Originally posted by Andy Callaway:
> **It's true! [redacted] and about 50 others apparently signed a letter expressing their frustration with the lines. [redacted] took the fall for it!**
>
> ***So if you have an opinion, you better keep your mouth shut or face the Gestapo!***
>
> **Nice open door policy!**

The **specific** reason?.............yeah right.

[redacted]

Posts: [redacted]
Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 06-01-2003 19:15

Once you are on "the list" it's just a matter of time and you will feel the wrath of the red rat. Some of the senior guys refer to this as the target. Stay low and keep moving.

Posts: [redacted] Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

Icon 26 posted 06-01-2003 23:41

[redacted]

You guys crack me up...stop listening to Art Bell!
I'm drunk [Frown] [Embarrassed] [Razz] [Mad]

Posts: **129** | From: **slc** | Registered: **Apr 2001** | IP: Logged |

[redacted]
Member
[redacted]

posted 06-02-2003 00:32

[redacted]

Callllllll meeeeeee! [redacted]

Posts: [redacted] Registered: **Jun 2000** | IP: Logged |

[redacted]
Member

posted 06-02-2003 08:03

CAL 0296

[redacted]
Member
[redacted]

posted 01-24-2003 20:31

> quote:
>
> Originally posted by [redacted]
> **Anyone considering the quality of pilots that will apply here now?? It will be very low time rich parents pilots in my book, goodbye freight dogs and hard working well experienced pilots. We will get what we pay for.**

There are a lot of excellent captains at this airline that hired on when there was no pay during training. Some of them spent 3 years as a reserve Metro FO making next to nothing. Let's try not to insult them. When they hired on many already had 3,000 or more hours of quality experience.

Posts: [redacted] | Registered: **Aug 2000** | IP: Logged |

Andy Callaway
Unregistered User

posted 01-24-2003 20:36

> quote:
>
> Originally posted by [redacted]
> **Contrary to popular belief, we would NOT lock in our current policy manual by unionizing; we would start negotiating FROM SCRATCH.**

The day the majority vote in a union is the day the company can no longer change anything unless the employees agree. After the Union is certified by the NMB, the company is prohibited from modifying any conditions of employment except through joint negotiations. (RLA, Section 152(Seventh).

IP: Logged |

[redacted]
Member
[redacted]

Icon 18 posted 01-25-2003 10:44

They are simply taking advantage of the fact that not many other carriers are hiring right now. People would rather suffer a little and have a job then now job at all. I agree though the newhires should be paid during training. They will lose quality pilots due to no pay during training, they did in the past. I know a few friends who did not come here when they weren't being paid

Posts: [redacted] | Registered: **May 2001** | IP: Logged |

[redacted]
Member
[redacted]

posted 01-25-2003 16:56

So why is it so negative for SkyWest to cut this pay during training when Southwest requires a $7,500+ type rating to get a job there?

Posts: [redacted] | Registered: **Jun 2000** | IP: Logged |

[redacted]

posted 01-25-2003 19:19

> quote:
>
> Originally posted by [redacted]

CAL 0284

[redacted]
Moderator
Member [redacted]

posted 10-31-2002 20:31

I understand. Thanks for being willing to discuss your issues post facto.

[redacted]

Posts: **1695** | From: **san diego** | Registered: **Jun 2000** | IP: Logged |

Andy Callaway
Unregistered User

posted 11-01-2002 03:00

[redacted], and [redacted], and everyone else that believes this crap does not happen,

I beg to differ! If you believe that we are immune to management mistreatment, then please explain why my counseling statement contains the following:

"This is not the first time you have been counseled on your behavior. During the **summer of 2000**, you were summoned to Corporate Headquarters for verbal consultations in reference to **posts you authored on the Web Boards.** Any further behavior problems such as:

Arrogant and abusive treatment of fellow employees
Disregard or refusal to comply with company policies and direction
Any conduct that would constitute an embarrassment to SkyWest Airlines or it's employees.

could result in further disciplinary action up to and including termination."

**Since my posts were on the SAPA site ONLY, management's admission to gaining access to these posts clearly violate not only my 1st Amendment rights, but also my rights clearly outlined in Fedral Law U.S.C. SS 2510-2520 and U.S.C. SS 2701-2710.**

Does anyone care to dispute this or provide any explanation?

Does anyone know what was going on during the summer of 2000?

IP: Logged |

[redacted]
Moderator
Member [redacted]

posted 11-01-2002 09:19

[redacted]:

I'm glad to see that you are willing to discuss your issues; I think that this will shed a little light.

What are the details of the entire counseling statement? The "posts you authored on the Web Boards"? Did Management present printed data? Did you appeal the outcome? Did you have a SAPA Representative with you? As many details as you can share would help.

I am not suggesting that a pilot get on this or any site and say something stupid. What I am suggesting is that anyone who feels that they have been inappropriately disciplined, and have followed our established appeal process, could help their fellow pilots a great deal by recounting those details here. It would be difficult for someone who shows a history of poor judgment to discuss the details of their issues here. But if a pilot has been inappropriately

Andy Callaway
Unregistered User

posted 10-24-2002 21:39

Personally I dont see the relevance here, but I'll venture to guess that [redacted] might have been on a trip when the application was sent in and therefore was not immediately informed. But does it really matte[redacted]

Also, by continuing to collect cards, the organizing committee can recieve correct addresses to compile a mailing list since the company has been very reluctant to release this information.

IP: Logged |

[redacted]
Member
[redacted]

posted 10-24-2002 22:39

> quote:
>
> Originally posted by Andy Callaway:
> **Personally I dont see the relevance here, but I'll take a guess and venture that Andy might have been on a trip when the application was sent in and therefore was not immediately informed. But does it really matter, Dave? but Also, by continuing to collect cards, the organizing committee can recieve correct addresses to compile a mailing list since the company has been very reluctant to release this information.**

I gue[redacted]may have had no idea that 35% was the magic number when he made the post indicating 500+ cards were received.
Seems like if all you want is addresses that it would be easier to communicate via email and phone than post cards. I'm also surprised that there was no announcement about the successful signature gathering campaign.
I'm a bit confused about why you folks think the company owes anyone a mailing list. If I wanted to invite you on a fishing trip the company will not even tell me your phone number due to confidentiality policies.

Posts: [redacted] | Registered: **Aug 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 10-25-2002 01:19

[redacted] does the company owe Zuric Insurance company a mailing list? I've received junk mail from said insurance company soliciting my business. I am also aware that only 35% of signatures are required to petition the NMB. There are a number of pilots who requested cards but were unable to procure them due to unforseen circumstances. The purpose for soliciting additional cards was so that every pilot could have an opportunity to express his or her intrest in pettitioning the NMB and to compile an address list. You say phone calls or e-mails would be easier. Perhaps you would like to volunteer to send e-mails and make phone calls. Petition cards are the route we chose and we stand by that. Appreciate your input.

[redacted] if SAPA is not on a gag order regarding self certification as you claimed, why don't you elaborate on your assertion that my reasoning on SAPA's silence is false. Can you honestly infer that your ability to represent this group will not enhance through government certification and self funding. How about expressing your opinions on this forum. What's keeping your guys from speaking out. If you are against certification, then come out and say so.

CAL 0219

Peace

[redacted]

Posts: [redacted] Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 10-22-2002 07:34

That was not my intent. Perhaps those involved could step forward and tell us what REALLY happened. Would you agree that, IF it is as I had described, that it would be a breach of professional practice?

Posts: [redacted] | Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 10-22-2002 09:42

[redacted] I know who you are and I believe you know who I am. I also believe that you already know my answer to your question. I will refrain from stating the obvious.

Peace

[redacted]

Posts: 532 | From: **Newport Beach CA 92663** | Registered: **Jun 2000** | IP: Logged |

Andy Callaway
Unregistered User

posted 10-25-2002 16:15

[redacted]

Have you ever considered that perhaps this "accuser", who I heard is a new hire, misinterpreted what this captain was saying, or implying?

I do not know anyone on the organizing committee that would resort to such tactics.

I am tired of hearing about fellow crewmembers being accused of alleged wrongdoings,incidents that never happened, or events that were grossly exaggerated and immediately being treated as though they are "guilty until proven innocent." (kd)

If this jumpseater had a dispute with a captain, then he should have discussed it right then and there to clear up any misunderstanding, rather than report back to management behind someone's back and jeopardize one's career.

IP: Logged |

[redacted]
Member
[redacted]

posted 10-25-2002 17:04

Hey!!! Let's just call this th[redacted]!!

Posts: **74** | From: **Draper, Utah** | Registered: **Jun 2000** | IP: Logged |

[redacted]
Member
[redacted]

posted 10-28-2002 06:40

[redacted]

CAL 0200

dues money to fund the plan.

Which method would you prefer?
I'm getting tired of guys using paranoia as a means of advancing the ALPA campaign. If we want a legal plan let's get a legal plan.
One other thought. Keep a NASA form handy. The FAA has the power to amend, suspend, modify, or revoke your pilot certificate if and only if the violation was deliberate and you forgot to file a NASA form. You will still have the finding within your record though.

Posts: [redacted] | From: [redacted] | Registered: **Aug 2000** | IP: Logged | |

[redacted]
Member
[redacted]

posted 05-29-2002 09:20

ALPA ain't the greatest thing on the planet. It may not be right for Skywest. You find it insulting to want to bring a union on the property given your idea that this is a "family owned" business. I find it insulting that pilots get reprimanded or fired without all the facts which forces the pilot to go to great expense and stress to get his or her job back.
We really do need something written that is legally binding and a large chunk of money to back that up.

Posts: [redacted] | From: [redacted] | Registered: **Jun 2000** | IP: Logged |

Andy Callaway
Unregistered User

posted 05-29-2002 11:07

[redacted]

I find it insulting that we have pilots here who have the "as long as it is not happening to me" attitude!

Good point though, but I doubt it will get across to anyone.

Cheers,

IP: Logged |

[redacted]
Member
[redacted]

posted 05-29-2002 13:20

You guys are a scream, trying to re-invent the wheel!

Lots of whinning, but no action! Paper Tigers / Paper SIMS are great for knowing switch postions, but real flying is altogether a different animal!

Fact is we stopped being a "family" run business long ago! Fact, "politiaclly correct" and other forces at work today have cheapened the profession, irrespective of SkyWest. Like losing your 4th Amendment privileges? Fact, SAPA is a paper Tiger, they will admit to this themselves, and I know of several pilot defenses that were done by pilots other than SAPA Reps. While SAPA was ...... ?

Action gentlemen will win the day, not talk. You want a new regional only union for legal representation, then get about the business of doing just that and call the NMB!

Hey, what the heck do you find reasuring about being a non-union family

CAL 0175

Avatar Image

Member

[redacted]

were in an ALPA drive again...Here is my position in this matter:
Three and a half years ago I drove 6 times from LAS to SGU to get an interview, it was in the middle of the summer with out A/C in my old car. Being from Europe where everything has a Union, I CHOSE Skywest because of the simple fact that there was no union. A family owned business that had a lot to offer. (Enzo Ferrari, Dr. Ferry Porsche had a similar dream 65 years ago...)but that's not the issue. The issue is this: NO MATTER HOW BIG SKYWEST WILL GET, IT WILL ALWAYS BE A SMALL COMPANY. A company being run by a family, a family business that is doing the best they can and in my opinion they have succeded. A Union in Europe is mandatory to protect you from Government owned airlines and their CEO's. When the government changes every four years, so do the CEO's.
To ask for a union here in an insalt to the face of this family. It's like telling them that they don't know how to run their business and we need help from the outside. ALPA is made for Delta and United, the majors, not the Regionals like us. We are doing REALLY good under the circumstances. We have been the first one's to try new things, new markets, and the response has been good so far. What I would like to see is this: Create a National Organization, the equivelant of ALPA for the Regionals only. Let's be the first ones to attempt the big step. I think we have the man power to investigate if something like this is even possible. I would also like to see a Legal Department, I went through our telephone book and found every department, but Legal. It would be nice knowing that if that time ever comes we are been taken care off by "company employees" and not someone from the outside.
If you have seen the worst, had to learn a completely new language, leave your family overseas and come to work for a place that reminds you of home, then you would understand how lucky you are, having a work enviroment like the one we have.
That's my humble opinion, and you all know what they say about opinions...My ALPA card is in the "file cabinet"

[redacted]

Posts: [redacted] | Registered: Nov 2000 | IP: Logged |

Andrew Callaway
Unregistered User

posted 05-27-2002 14:56

"To ask for a union here in an insalt to the face of this family. It's like telling them that they don't know how to run their business and we need help from the outside"

"What I would like to see is this: Create a National Organization, the equivelant of ALPA for the Regionals only"

Which is it?

IP: Logged |

[redacted]

Avatar Image

Member

[redacted]

posted 05-27-2002 21:02

SAPA does it good with both the company and the pilots. By saying a "National Organization the equivelant of ALPA" all I mean is to show the rest of the regionals out there that we realize there is a problem with ALPA and us, the regional carriers, and step forward and lead the way, like we always have. Skywest is leading the way to show the Nationals that we have our own "deal" going on and we don't need them. Things work fine for us the way they are now amd again this is my opinion and my opinion only.

CAL 0173

[redacted]
Member
[redacted]

posted 05-31-2002 10:54

I read the title.... Read the post..... Still trying to figure out how this is "helpful"

Posts: [redacted] | Registered: Jun 2000 | IP: Logged |

[redacted]
Member
[redacted]

posted 05-31-2002 16:01

> quote:
>
> Originally posted by tjreishus:
> **I read the title.... Read the post..... Still trying to figure out how this is "helpful"**

[redacted]

If you haven't noticed another union drive is upon us. The polling data indicates that ALPA is not acceptable to the majority of our pilots. So if the union proponents really want a union they should come up with one that most pilots could agree on.
In other threads [redacted] and [redacted] have suggested certifying SAPA as an official union. That may be the most viable option.

Posts: [redacted] From: [redacted]) | Registered: Aug 2000 | IP: Logged |

Andy Callaway
Unregistered User

posted 05-31-2002 16:54

> quote:
>
> **if the union proponents really want a union they should come up with one that most pilots could agree on.**

Here's an idea, why dont the anti-union, or anti-ALPA proponents come up with a "union" most pilots could agree on and start a drive!

Let's see how far that one goes!

IP: Logged |

[redacted]
Member
[redacted]

[redacted]

IM a non union guy, so it still is not helpful! And no, I really didn't notice much. Did you happen to see your number of posts vs. mine. Considering I've been here almost 3 years longer.... WOW! I guess I enjoy too many things outside of my work. Looking at your "stats", you ought to think about asking for your own forum though. Just a thought. The [redacted] forum!

Posts [redacted] From: [redacted] | Registered: Jun 2000 | IP: Logged |

[redacted]

posted 06-01-2002 10:01

quote:

CAL 0171

SkyWest Forums

my profile login | register | search | faq | forum home

Jump to new posts

» [redacted] log out ]

SkyWest Forums » Flight Ops » SAPA Forum » Contract suggestions for upcoming negotiations

**Author**

[redacted]

**Topic: Contract suggestions for upcoming negotiations**

posted 02-03-2001 17:51

To continue on the thread that [redacted] suggested below; union or no union, we have a contract to negotiate. With that in mind, the following are my suggestions for our new contract.

The idea of tying our pay to other airlines has definite advantages, but there are drawbacks as well. One drawback is that there are already airlines doing this. American Eagle, and Mesa already have programs tying them to other regionals pay, and there are likely to be others considering it. While tying in guarantees that we will be at the top of the industry, the more airlines that do it, the fewer pilot groups are setting industry leading contracts for us to piggy-back on. IE, eventually, the gains per annum will be minimal. In addition, other groups may have work rules or benifits that are superior to ours to compensate for a lower pay that we just matched. In order to overcome those difficulties, and to continue to maintain and better our standard of living, I suggest that we match the pay of the highest comparable regional pilot anually as suggested, with the following clause. Assume the date for comparison to be July 1st of each year. We would get the higher of the matched rate, or a 3% increase over the rate received on June 30th of the year in question. It is a known fact that inflation has increased at 3% since 1925, and this formula would ensure that in the absence of an industry leading contract to match, we at least **maintain** whatever pay rate have achieved. This would also keep other regionals honest in their contract negotiations, since one group always uses another to negotiate pay.

In our present situation, we would match ACA's soon to be accepted rates of 1st year RJ Capt pay of $59/18th year of $100. Giving a 16%-22% raise assuming that bonuses are not used to calculate parity. Then, in the unlikely event that no other airline exceeds that contract in the next three years, we would get a 3% cost of living increase each year. When ACA renegotiates in three years, they will try to beat our 9 1/2% increase over them, and will start the process all over.

The intent, of course is that we will both maintain a standard of living, and contribute to industry pay improvements that directly effect us. The company should have no objection, as our growth will easily match or exceed inflation if management continues to run the shop in a responsible manner, and they have assured us of industry leading (matching) pay.

Implicit to that suggestion is that bonusses are just that... bonus. Our pay

EXHIBIT 56

CAL 0137

# EXHIBIT "17"

TO: PILOT CREWMEMBERS
FROM: BRAD HOLT
DATE: JULY 7, 1999
RE: ALPA IS NOT NECESSARY IF SKYWEST ACQUIRES, OR IS ACQUIRED BY ANOTHER REGIONAL CARRIER

Some of our pilots have expressed concern that Skywest will acquire or be acquired by another regional carrier. If that were to occur, there is a concern that Skywest pilots would somehow be disadvantaged in any seniority integration proceeding if they are not represented by ALPA. There is no basis for such a concern.

In the first place, there are no current plans for Skywest either to acquire, or to be acquired by, another carrier. If such a transaction were to occur, however, there would be no advantage to being represented by ALPA. If, for example, a merger occurred with a larger regional carrier that had ALPA-represented pilots, those pilots would approach the merger, and the possible seniority integration, pursuant to ALPA's Merger Policy. Under that policy, there would be absolutely no difference in your treatment during seniority integration based on whether you were represented by ALPA before the merger. You would have the right to negotiate for seniority integration, and if you weren't satisfied with the results of that negotiation, you would have the right to have an independent arbitrator determine a fair and equitable method of integration. Moreover, if, after the merger, ALPA has the right to represent the entire merged pilot group, it would be required by law to treat you fairly and to represent you just as vigorously as it would the pilots it represented pre-merger. If ALPA states anything to the contrary, they would be saying that they would treat a non-ALPA member in a pre-purchase situation less favorably than a pilot who would become ALPA after their non-union company was purchased by an ALPA carrier. In short, there is no reason whatsoever to hire ALPA and agree to pay dues, initiation fees and assessments in order to ensure your fair treatment in a merger with another regional carrier.

No doubt, individuals who want you to vote for ALPA may make vague, generalized and sometimes ominous sounding rumblings about how you would somehow be better off in a merger situation if you vote in ALPA. Challenge these individuals to give you specifics about how you would fare better as a result of paying ALPA dues. If they are honest, they won't be to give you specific, real reasons. Most of their information is just hype and "arguments" designed to play on your perceived naivete and fear. Be smart. Is it really advisable to pay ALPA dues and give up control over your career for vague non-specific benefits?

Best Regards,

Brad Holt

# EXHIBIT "18"

To: SkyWest Airlines Pilot Crewmembers
From: Brad Holt
Date: July 20, 1999
Re: Voting for ALPA will not improve your relationship with SkyWest Airlines.

We have received numerous inquiries about whether SkyWest pilots' relationship with the Company would be affected should they vote to hire ALPA as their union. The short answer is: of course, it would be affected – probably not for the better.

Over the years, SkyWest pilots have had an excellent relationship with the Company. That relationship has not been confrontational. Problems are addressed from a "win-win" standpoint. Presently, every pilot is encouraged to deal directly with decision-makers and management concerning problems that directly affect them. Individual pilots are treated as people, not just faceless, nameless seniority numbers.

SkyWest Airlines has worked hard to treat its pilots well and to ensure that their compensation, benefits and work rules are among the best in the industry. Obviously, it is to the Company's advantage to develop appropriate rewards and incentives for its workforce; that promotes the "win-win" situation. More importantly, however, it is the "right thing to do". But, let's face it, a secondary motive is to avoid the pilots perceived need for a union.

The fact is, if the pilots decide to join a union, the Company's motive for developing good will and good relationships is diminished. No longer is there an incentive to pay well, provide good benefits and to have beneficial work rules. Once the union becomes involved, the Company will no longer have the same motivation to voluntarily try to make those things available. The relationship between the Company and the pilots will become, because of its very nature, confrontational instead of cooperative.

Though the Company would negotiate in good faith to reach collectively bargained rates of pay, rules and work conditions, would there be any motivation to do even one little bit more? In the two or more years that it normally takes to negotiate an initial collective bargaining agreement, the Company would have absolutely no incentive to provide any improvements or favorable changes in the pilots' compensation, rules and working conditions. It would be adverse to the Company's best interest to do so. Eventually, after an agreement is finally reached, it would, in fact, be illegal for the Company to make unilateral improvements to the contract.

The bottom line is this: SkyWest Airlines values its current relationship with its pilots. This relationship has been developed and maintained for twenty-five years. Together, we have made this airline into the finest and most successful regional carrier in the world. It has been accomplished through hard work, mutual respect and cooperation. We believe that bringing a labor union on the property will change that relationship. Inevitably, it will become confrontational. Regardless of what you have been told, a labor union actually reduces your direct input to the Company. After a union arrives you will deal with the Company through your union leader (MEC or LEC Chairman or his representative) or through your negotiating committee rather than speaking directly to a member of management.

SkyWest Airlines has always had an "open door" policy with its pilots. Don't slam that door by voting ALPA!

Best regards,

Brad Holt

# EXHIBIT "19"

**SkyWest Airlines, Inc. Crewmember Policy Manual**
**Appendix "E"**

# Counseling Statement

DEPOSITION EXHIBIT 7 Hyatt
PENGAD 800-631-6989

| | |
|---|---|
| Employee: | Andrew David Callaway |
| Job Title: | Flight Officer |
| Manager: | Bill Boice, Kelvin Hyatt |
| Date: | 11-30-01 |
| Subject: | Behavior |

On November 12, 2001 while returning from BTM where you had conducted flight training, you were reported as exhibiting [redacted] inappropriate behavior. Three SkyWest Airlines ramp agents witnessed this behavior. It is reported to have begun at the ticket counter when "mustride" authorization was not present for your travel. It continued and escalated during passenger screening. This behavior is reported as "arrogant, disrespectful and abusive" and was displayed in front of other passengers.

On September 27, 2001, VP of Flight Operations Brad Holt issued an ITL Bulletin 01-36 to all flight crewmembers. This bulletin contained specific direction as to the conduct of crewmembers passing through security checkpoints. *"At no time will a crewmember or non-revenue traveler question the decisions of, or refuse to comply with requests from airport security personnel."* Your reported conduct does not comply with this direction.

This is not the first time you have been counseled on your behavior. During the summer of 2000, you were summoned to Corporate Headquarters for verbal consultation in reference to abusive treatment of crew support personnel and posts you authored on the Web Boards. In fact this is the third time your behavior has been called into question. Any further behavior problems such as:

- Arrogant and abusive treatment of fellow employees.
- Disregard or refusal to comply with company policies and direction.
- Any conduct that would constitute an embarrassment to SkyWest Airlines or it's employees.

could result in further disciplinary action up to and including termination.

[signature]
Kelvin L. Hyatt, Chief Pilot – SLC

[signature] 11/30/01
Employee's Signature Date
under Protest pls. see attachmen

[signature]
Witnessed by:

This documentation is a Counseling Statement. The above-described problem should be corrected immediately. Failure to correct this problem will result in further disciplinary action up to and including termination of employment. Your Chief Pilot will be responsible to follow up with the above-mentioned crewmember. A copy of this letter will be placed in your permanent personnel file.