# EXHIBIT "A"

Erik Strindberg (Bar No. 4154)
Ralph E. Chamness (Bar No. 6511)
**STRINDBERG SCHOLNICK & CHAMNESS, LLC**
426 North 300 West
Salt Lake City, UT 84103
Telephone: (801) 359-4169
Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **DAVID ANDREW CALLAWAY**<br><br>Plaintiff,<br><br>vs.<br><br>**SKYWEST AIRLINES, INC.,**<br><br>Defendant. | **AFFIDAVIT OF DAVID ANDREW CALLAWAY**<br><br>Case No. 2:04CV00179<br><br>Judge Ted Stewart<br>Magistrate Judge Alba |

STATE OF UTAH

CITY OF SALT LAKE CITY )

COUNTY OF SALT LAKE )

Affiant, being duly sworn, hereby states as follows:

1. I am the plaintiff in this action, over 18 years of age, and give this testimony based on my own personal knowledge.

2. At the time of my discharge from SkyWest, I held the rank of Captain and flew the Canadair Regional Jet. I was employed by SkyWest from 1999 through 2003.

3. During the time that I was at SkyWest I was very active in the various union organizing campaigns that were conducted, including sitting on at least two organizing committees. I also regularly made posts on the SAPA website in support of union representation.

4. Most, if not all of the posts I made on the SAPA website were union related. For example, I posted a chart showing the disparity between the SkyWest's top three management salaries for Jerry Atkin, Ron Reber, Brad Rich and those of SkyWest's Captains and First Officers. That chart showed that the top three managers' salaries had increased by 133% during the same period that Captains' salaries had only increased 23%, and First Officers' salaries had only increased 18%. I provided these figures to support our position that SkyWest's pilots would be better served by a union. Additionally, I posted a cartoon showing a small blimp representing "Pilot Pay Proposal" bumping under a much larger blimp representing "Management Pay & Bonuses." I also posted a drawing entitled "Comair +1." This referred to Comair's industry leading contract and a proposal that, after organizing a union, SkyWest's pilots should seek the same contract deal as Comair, plus 1%. I had this drawing made into stickers which we put on our flight bags.

5. Through my involvement in the organizing campaigns I knew what other pilots were active in the campaigns and I also could observe the postings made on the SAPA website by others. I also learned which of those pilots were having problems as a result of their involvement in the organizing campaigns.

6. One of those pilots was Steve Kanuch. He also was very involved in the organizing campaigns and would regularly make posts on the SAPA website that I read. Like my posts, Kanuch's comments were also very pro-union.

7. Sometime after I was called to St. George in late 2000, where I was threatened by Brad Holt and Jim Breeze for my postings, Steve Kanuch called me and told me that he too had been told to report to St. George to meet with Jim Breeze. It had been made clear to him that he would be questioned about his pro-union postings and therefore he and I discussed what had happened at my "meeting" and how he could best handle his meeting.

8. After he returned from St. George, I spoke again with Steve and we discussed what he had gone through. It was apparent that he had gone through much the same haranguing and threats that I had experienced. Shortly thereafter, Steve lost his check airman status, which earned him about $15.00 per hour in additional wages.

9. I also know about some of the problems that Ben Palmer, another SkyWest pilot, went through. Ben was also very involved in union organizing. In approximately 2003 he was accused of by Jim Breeze of demanding that pilots who were going to ride in the cockpit jump-seat had to first sign union cards. Although Ben told Breeze that this was untrue (and although SkyWest had no proof that it occurred) he was initially fired by the company and then rehired after he filed an appeal to get his job back.

10. Another pilot, John Manardi, got into trouble for refusing to fly a Comair plane into a Comair station, Des Moines, Iowa. The Comair pilots were on strike and for some reason SkyWest ended up with some of their planes and began to fly into Des Moines from Salt Lake

City. A number of us were concerned about making such flights unless the ALPA union representing the Comair pilots said it was okay. Brad Holt told the pilots that if they did not want to fly into a Comair station they could simply put their name on a list and they would not be required to make the flight.

11. When the flight came up John asked that he not be required to take the flight. SkyWest refused to make a change in the schedule and John was fired. His job was not reinstated until it went up to one of the top managers, Ron Reber, at SkyWest.

12. I also know that Phil Alford, another RJ Canadair Captain, lost his check airman status because he stood up for John Manardi by writing to Kelvin Hyatt, asking that the company not fire John. Phil was also very involved in the numerous organizing campaigns that have taken place.

13. I know of other pilots who have been involved in campaigns that have also been harassed and threatened by SkyWest. A typical pattern is that SkyWest will wait until the pro-union pilot has been involved in a relatively minor incident and then blow it out of proportion and threaten the pilot with suspension or termination. Those who have been involved in organizing are also often labeled as having a bad attitude, or trying to tear down the company, or attacking management. In fact, in most instances those pilots are simply expressing their opinions as to why a union would be beneficial.

DATED this 3 day of February, 2006.

[signature]
Andy Callaway

The foregoing instrument was acknowledged and executed before me on

February 3, 2006, by Andy Callaway.

NOTARY PUBLIC
GERALDINE L. RICE
44 Exchange Place 2nd FL
Salt Lake City, UT 84111
COMMISSION EXPIRES
December 2, 2006
STATE OF UTAH

Geraldine L. Rice

NOTARY PUBLIC

U:\Current Client\Callaway_DA\Pleadings Federal\affidavit_andy2.wpd

# EXHIBIT "B"

A. Yes.
Q. --and said, I have a meeting with Kelvin--or with Brad Holt on Monday. Will you be there?
A. To the best of my recollection, yes.
Q. And did Mr. Abell tell you, Why are you being summoned?
A. He did not know either.
Q. So you said, I don't know why I'm being summoned, to Mr. Abell.
A. That's what I said, yes.
Q. You guys didn't talk about what you thought it might be about.
A. Well, that was mentioned, but he didn't understand it either.
Q. All right. So when you show up--whose office are you in?
A. Brad Holt's office.
Q. Tell me what happens in that meeting.
A. The meeting started off with--I was presented a calculator, asked to add up some numbers and read those numbers back out. Those numbers then--he referred to those numbers as, This is how many time you pilots call down to crew scheduling and we have a complaint from a



crew scheduler.
Q. What was the complaint?
A. I was not given any documentation about the complaint.
Q. You weren't told, though, what the complaint was in crew schedule.
A. There was a complaint, I believe, that the--they said that I--that's when I was told that I had made a comment about Mr. Holt's house.
Q. Did you--did they tell you who at crew scheduling said you made the comment?
A. No, they did not.
Q. Was there a reference to comments made on a company Web site?
A. Yes, there was.
Q. Tell me what that was about.
A. I was asked why I was making posts on the Web site, which was the SAPA Web site, which was not a company Web site.
Q. All right. Tell me about the SAPA Web site.
A. The SAPA Web site was a message forum, message board that the pilots could use to communicate and discuss issues.
Q. You said it's not a company Web site.



A. That's correct.
Q. How do you know that?
A. The SAPA site is owned by Bob Novak. It is not part of SkyWest.
Q. Who pays for the hardware? Do you know?
A. Bob Novak does, to my--best of my knowledge. There's also a disclaimer page on there that says it has no affiliation with SkyWest or is not property of SkyWest.
Q. Do you have to--can anybody access this Web site?
A. Only SAPA members. And they are given a pass word by Bob Novak.
Q. Were you given--you had a password in December of 2000.
A. Yes.
Q. And were you regularly posting messages on the message board?
A. Yes, I was.
Q. What kinds of messages were you posting?
A. We were posting messages regarding the ALPA, Airline Pilots Association, union organizing efforts.



Q. So you were talking about union organizing in 2000.
A. That's correct.
Q. December of 2000.
A. That's correct.
Q. What kind of things were you saying?
A. I would provide, you know, opinions, research, statistics regarding our contract or lack thereof compared to other airlines and issues that affected the pilots and arguments as to why we should unionize.
Q. Is that Web site in 2000--is that basically solely a place for posting messages about union activity or union organizing?
A. It could be for anything.
Q. But your--did you have other types of messages that you posted other than union-related activity messages?
A. To the best of my knowledge, most of my posts, if not all, were regarding the union organizing.
Q. Were you part of the union drive at all?
A. Yes, I was.
Q. Were you on an organizing committee?

Page 53

A. Yes.
Q. Now, help me understand a little bit. In your understanding, when there was a union drive in 2000--this isn't just you're just kind of hanging around saying, It would be nice to be a union. There's actually an organized effort to try to create a union at SkyWest among the pilots.
A. That's correct.
Q. Is that--that's right. And that happens periodically. It happened periodically while you were employed at SkyWest.
A. I--during my time, I believe there was three or four union drives.
Q. Okay. And in the meeting with Mr. Holt and Mr. Breeze and Chris Abell--is it "AB-ell" or "a-BELL"?
A. I think it's "a-BELL."
Q. Okay. "a-BELL." All right. Did they discuss messages that you had posted on this SAPA Web site?
A. They discussed in general terms the messages.
Q. All right. Tell me how it is they discussed in general terms. What do you mean by

Page 54

that?
A. They asked why I was, you know, posting critical comments or what--perhaps maybe derogatory about the company. I don't know if those words were used though.
Q. Did you say, What comments?
A. I did.
Q. And what did they say?
A. To the best of my knowledge, the issue was never discussed any further.
Q. Well, if I ask you--I'll ask you, what comments do you think they were talking about?
A. The only comments I made on there were my union organizing comments.
Q. So was it your understanding in this meeting that they were criticizing you because you were making union comments on the SAPA Web site?
A. Yes.
Q. But it's not your testimony--you couldn't tell me specifically whether either of these three people identified the union postings specifically during this meeting.
A. I don't remember.
Q. So it's possible they could have mentioned it and you just can't recall, or they

Page 55

didn't mention it?
A. It's possible they did mention it.
Q. All right. Did they tell you that you had made comments about Brad Holt's home?
A. Yes.
Q. Did you tell them, No, I didn't make any comments?
A. Yes, I did.
Q. Who was it that said to you, You've made comments about me? Who specifically of these three?
A. Brad Holt asked.
Q. And what did he say?
A. He said, I heard--I believe he said, I heard you're making comments about my house, and what business is it of yours?
Q. And what did you respond?
A. I said, I did not make any comments. I don't know about your house. You know, I just had purchased my own home. I don't have any concern for anyone else's, you know, personal business.
Q. Did Jim Breeze make any comments at the time?
A. No.

Page 56

Q. How about Mr. Abell?
A. Oh, he made comments during the meeting, but not at that particular time.
Q. All right. What comments did Mr. Breeze make at the meeting?
A. Jim asked me if I was happy at SkyWest. And then he also asked if--how Mike Jones was doing.
Q. Did you have any understanding as to why Mr. Breeze was asking you if you were happy at SkyWest?
A. I can--no. I can perhaps maybe imagine that he did not think I was happy because of my posts.
Q. Were--your posts were critical of the company.
A. They were posts, you know, suggesting why we should be unionized.
Q. Did Mr. Abell make any comments?
A. He was not allowed to. He was not allowed to comment, according to him.
Q. So he said at the meeting words to the effect of, I'm just here, I'm not allowed to comment.
A. That's correct. He told me this before

Page 145

you what's been marked as Exhibit 39. Is that the--your response statement to the counseling statement?
A. Yes, it is.
Q. It's your signature down at the bottom.
A. Yes, it is.
Q. Why did you write this?
A. Because this was my defense to the allegations that were outlined in the counseling statement that I felt were incorrect and felt that weren't--statements from witnesses were not investigated or reviewed. So I wrote this rebuttal.
Q. So is it accurate to say that you don't think you ever made any--that you did not make any comment about Mr. Holt regarding his house?
A. I did not make that comment, yes.
Q. You did not post anything other than your union activity critical of the company on any Web site.
MR. STRINDBERG: Objection. That misstates--
MR. PETERSEN: I'm asking--
MR. STRINDBERG: --his testimony--
MR. PETERSEN: All right.

Page 146

MR. STRINDBERG: --about the postings.
BY MR. PETERSEN:
Q. Is it your testimony that you did not post anything critical other than union-related statements about the company on any Web site?
A. My posts were about the union organizing efforts.
Q. So the answer is, no, you didn't post anything other than union-related statements--
A. Yes.
Q. --about the company. And you did not have a conversation that was inappropriate, in your characterization, regarding open time flights with scheduling in 2000--2000, December, November 2000, right?
A. Yes.
Q. And it's also your testimony that you did not, in fact, have any inappropriate behavior in Montana with the security personnel or the ticket counter people.
A. That is correct.
Q. At the time that you wrote this, in November, 2001, did you believe that--I mean, did it dawn on you that all of these things that had been alleged against you, you didn't think any of

Page 147

them were true--did you think somebody was out to get you?
A. It crossed my mind, yes.
Q. Who did you think was out to get you?
A. Jim Breeze.
Q. Isn't he the guy who said to hire you, though?
A. Uh-huh (affirmative.)
Q. Yes?
A. Well, I don't know if he was thè one who said to hire me. I was hired. I don't know if he had that ultimate decision or not.
MR. PETERSEN: This is in there. Where is this one?
BY MR. PETERSEN:
Q. All right. I'm going to show you what's been marked as Exhibit 11 previously. Have you ever seen that document?
A. I've seen this document here after--you know, recently, yes. I wrote the document. But I have not seen the handwriting that is on here until recently.
Q. Okay. This is a letter you wrote to Jim Breeze back in '98 in an effort to get him to help you have another shot at being employed by

Page 148

SkyWest.
A. That's correct.
Q. Look at the writing in the top right.
A. Uh-huh (affirmative.) Yes.
Q. Do you--can you see what it says?
A. Yes.
Q. What does it say?
A. It says, "Jim Breeze will call and tell him no."
Q. Okay. Keep going.
A. "He no-showed on February 2, 1998, for class."
Q. And do you see who looks like signed it?
A. Karalee.
Q. Do you know who that would be?
A. No.
Q. Look down at the bottom and see if there's some writing there. Do you see that? It's handwriting.
A. "Let me know if I can bring this guy in or not."
Q. All right. And then under that--
A. File in--I don't know what that says.
Q. "File in his file in the noes."



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

# EXHIBIT "C"

Todd C. Emerson, A8175
SkyWest Airlines, Inc.
444 S. River Road
St. George, UT 84790
Telephone: (435) 634-3530

Scott M. Petersen, A7599
David N. Kelley, A9137
FABIAN & CLENDENIN,
A Professional Corporation
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah 84151
Telephone: (801) 531-8900

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| ANDREW DAVID CALLAWAY<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST AIRLINES INC., a Utah Corporation,<br><br>Defendant. | ) | **DEFENDANT'S FIRST SET OF WRITTEN DISCOVERY REQUESTS**<br><br>Civil No. 2:04CV00179<br><br>Judge Ted Stewart |

Pursuant to Rules 33 and 34 of the Utah Rules of Civil Procedure, Defendant SkyWest Airlines, Inc. ("SkyWest"), through counsel, hereby requests that Plaintiff answer under oath each of the interrogatories hereinafter set forth and serve a sworn copy of such answers upon the undersigned counsel within thirty (30) days after service hereof; and produce and permit

SkyWest to inspect and copy all of the originals and copies of the documents herein requested within thirty (30) days after service hereof. Pursuant to Rule 26(e) of the Utah Rules of Civil Procedure, Plaintiff is requested to supplement his answers to each of the interrogatories and requests for production of documents hereinafter set forth.

**DEFINITIONS AND INSTRUCTIONS**

1. "Plaintiff," "you," or "your" refers to David Andrew Callaway, and any of his agents or representatives or anyone else acting on his behalf.

2. "SkyWest" refers to Defendant SkyWest Airlines, Inc. and any of its agents or representatives, or anyone else acting on its behalf.

3. Where an interrogatory calls for an answer which involves more than one part, each part of the answer should be clearly set out so that it is understandable.

4. Whenever in these interrogatories there is a request to specify, identify or name an individual, you shall provide that individual's:

(a) full name;

(b) present resident address (indicating street name and number, city or town and state) and telephone number. If their present resident address or telephone number is unknown, so state and set forth the corresponding last known information; and

(c) last known employment and business affiliation.

5. When an interrogatory requests you to identify, to state the identity of, or to describe a document, you shall provide:

(a) the date the document was prepared;

(b) the date the document bears;

(c) the identity of the author of the document;

(d) a description of the document in sufficient detail to enable it to be specifically identified in a request for production of documents or a subpoena; and

(e) the identity of the person or persons now having custody of the document.

6. When an interrogatory requests you to identify a meeting or conference, you shall provide:

(a) the date of the meeting or conference; and

(b) the full name and present last known position, business affiliation and residential address of each person attending the meeting or conference.

7. When an interrogatory requests you to identify a communication, you shall provide:

(a) the date of the communication;

(b) where the communication took place;

(c) the full name, business affiliation, and business address at the time, present or last known position and business affiliation and residential address of each party to the communication; and

(d) who initiated the communication.

8. If any document for which identification has been sought has been lost or destroyed, state in addition to the information required pursuant to the identification of that document whether such document was lost or destroyed and, if lost, state the circumstance under which such document was lost, and, if destroyed, state the circumstances under which such

document was destroyed and identify each person responsible for or participating in such document's destruction.

9. When an interrogatory requests you to describe something or to state the factual basis of a claim or assertion, you shall provide a reasonably detailed narrative statement setting forth the facts, information and matters presently available to you on the matter in question, including, when applicable, the relevant dates, times and places, the identity of the person or persons who participated or were involved therein, the substances thereof, and the principals for whom such person or persons purported to act. When reference is made to a date, time, figure, amount or geographic area, the answer when necessary, may reflect that it contains a reasonable approximation.

10. "Communication(s)" includes, without limitation, any oral communication, whether transmitted in meetings, by telephone, telegraph, telex, cable, tape recording, or otherwise, and all written communications, including electronic mail.

11. "Document" means any writing or record of any type or description whatsoever -- including, but not limited to, "writings," "recordings" and "photographs" as these terms are defined in Rule 1001 of the Federal Rules of Evidence.

12. "Relates to," when used in connection with any request for a document or category of documents, means recording, summarizing, digesting, referring to, commenting upon, describing, reporting, listing, analyzing, studying or otherwise discussing in any way the subject matter identified in the request.

13. In answering these interrogatories and requests for production of documents, if you claim that any of the requested information or documents are privileged, please state the privilege claimed and the facts upon which that claim is based for each claim of privilege.

**INTERROGATORIES**

INTERROGATORY NO. 1: Identify all individuals, other than counsel, assisting in answering these interrogatories.

INTERROGATORY NO. 2: Identify each person you expect to call as a factual witness at trial or other proceeding in this matter. With respect to each person, set forth a narrative of what you expect each witness to testify concerning and any documentary evidence you expect to introduce through each witness.

INTERROGATORY NO. 3: Set forth in detail the amount you claim to have been damaged by SkyWest's actions, including:

a. back wages and benefits

b. future lost wages and benefits

c. compensatory damages

INTERROGATORY NO. 4: Describe in detail all attempts you have made to obtain employment since being terminated by SkyWest.

INTERROGATORY NO. 5: Set forth all the facts that support your claim that your employment relationship with SkyWest was an implied in fact contract, including the terms of such implied in fact contract.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

REQUEST NO. 1: All documents identified, referred to, or utilized in preparing your

answers to the foregoing interrogatories.

REQUEST NO. 2: All documents upon which you relied or referred to in your Complaint.

REQUEST NO. 3: All documents you will or may seek to introduce as exhibits at any trial or hearing in this action.

REQUEST NO. 4: All correspondence or other documents related to communications between you and SkyWest.

REQUEST NO. 5: All documents upon which you intend to rely to establish proof of claims and/or damages.

REQUEST NO. 6: All expert reports or other documents relating to your proposed expert witnesses, if any, including Curriculum Vitae.

REQUEST NO. 7: Copies of any and all submissions you made to the SAPA website as set forth in Paragraph 19 of the Complaint.

REQUEST NO. 8: All other documents not previously requested relating to the pending action between the parties.

DATED this 16th day of September 2004.

Scott M. Petersen
David N. Kelley
FABIAN & CLENDENIN,
a Professional Corporation
Attorneys for Defendant

# EXHIBIT "D"

Westlaw.



**H**

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Tenth Circuit.
Dennis Lee CORTESE; Debbie Duz Donuts, trade name for 3-D Donuts, Corp., Plaintiffs-Appellants,
v.
James L. BLACK, Ex-Sheriff of Larimer County, Colorado; Ronald Petitt; Andrew Josey; Charles Nichols, Deputy Sheriff of Larimer County, Colorado; Larimer County Sheriff's Department; Larimer County Board Of County Commissioners, Defendants-Appellees.
**No. 95-1429.**

June 25, 1996.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before PORFILIO, JONES, [FN**] and TACHA, Circuit Judges.

FN** Honorable Nathaniel R. Jones, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

TACHA, District Judge.

***1** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Plaintiffs-appellants appeal from the district court's entry of summary judgment in favor of defendants on their claims that their constitutional rights were violated when defendants attempted to prevent them from opening their business, and once opened, closed the business pursuant to a state nuisance statute. Plaintiffs' complaint is based on 28 U.S.C. § 1983. Our jurisdiction arises from 28 U.S.C. § 1291 and we affirm.

Plaintiffs owned and operated a topless doughnut shop that also sold sexually oriented books and videotapes. After plaintiff Cortese sold illegal drugs to an undercover police officer, the defendant police officers obtained arrest warrants for Cortese and Gary Petty, an employee of the business. Also based on the illegal drug sales and pursuant to a state nuisance statute, defendants sought and obtained a temporary restraining order from a state court against conducting further business at the doughnut shop. Plaintiffs ultimately abandoned their claims in the state court nuisance action.

Cortese entered an *Alford* plea to the criminal drug charges brought against him, thus permitting him to maintain his claim that the drugs were planted by defendants as an excuse to close the business. It was after he entered a plea to the criminal charges that he admitted that he had provided the drugs. Plaintiffs allege that defendants engaged in a course of action to close plaintiffs' business, thus violating various constitutional rights. For a complete recitation of the facts, *see Cortese v. Black,* 838 F.Supp. 485 (D.Colo.1993).

On appeal, plaintiffs claim (1) the police investigation of plaintiffs' business was motivated to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

close the business, not for a legitimate purpose; (2) the business was subjected to an unconstitutional search and seizure during the execution of the arrest warrant on Gary Petty; (3) the state nuisance statute under which the temporary restraining order was issued resulted in the unconstitutional restraint of freedom of expression because defendants seized constitutionally protected materials; (4) enforcement of the nuisance statute at plaintiffs' business violated equal protection because the statute was not employed to close other businesses; (5) seizure of the business was effected without affording plaintiffs constitutionally required pre-seizure notice and an opportunity to be heard; (6) plaintiffs' § 1983 claims are not barred by either the doctrine of res judicata or the entry of an *Alford* plea to the drug charges; and (7) summary judgment was inappropriate because there exist disputed material facts.

We review the grant of summary judgment de novo, applying the same standard as the district court. *Applied Genetics Int'l, Inc., v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). " Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991). We view the record in the light most favorable to the nonmoving party. *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991).

***2** We first address plaintiffs' argument that the police took action to close their business in violation of their constitutional rights. They contend that the drugs Cortese was accused of providing to an undercover police officer were planted by the police to provide an excuse to arrest Cortese and close the business. During his deposition, however, Cortese admitted that it was he who had provided the drugs to the undercover officer. Therefore, plaintiffs' claim that the police investigation was unlawfully motivated must fail.

As a corollary to their argument that the police acted improperly, plaintiffs argue that Cortese's initial statement to the district court denying that he had provided the drugs was not a "material lie." *See* appellants' brief at 16-21. The district court did not, however, sanction plaintiffs because Cortese had lied about having provided the illegal drugs. Instead, the court resolved the legal issues based on Cortese's admission. Accordingly, we do not address whether Cortese's lie to the court was " material."

We turn to plaintiffs' claim that the business was subjected to an unlawful search and seizure. They allege that defendants unlawfully seized a constitutionally protected videotape during the arrest of Petty. It is undisputed that the police officers, believing the videotape was a bootleg tape, removed it from plaintiffs' business on April 4, 1990, and returned it on April 13, 1990. It is also undisputed that the police served the temporary restraining order on the evening of April 4, 1990, at which time they had the legal right to enter the business and inventory its contents, thus permitting them to have possession of the videotape. Viewing the record in the light most favorable to the nonmoving party, as the district court did, we assume that the videotape was seized without a search warrant or an arrest warrant. Even so, we conclude that any Fourth Amendment violation was de minimis in view of the facts that defendants seized only one item, and had possession of it illegally for only a few hours. *See Artes-Roy v. City of Aspen,* 31 F.3d 958, 962-63 (10th Cir.1994) (officer's warrantless entry into plaintiff's foyer, even if Fourth Amendment violation, was de minimis); *see also Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992)(in prison context, de minimis uses of physical force are excluded from constitutional recognition); *Artes-Roy,* 31 F.3d at 962-63 (collecting cases). Accordingly, there was "no actionable constitutional wrong." *Artes-Roy,* 31 F.3d at 963 (quotation omitted).

Plaintiffs also maintain that the restraining order issued under the state nuisance statute, Colo.Rev.Stat. § 16-13-303, deprived them of their First Amendment rights to freedom of expression. They assert that the order to close the business deprived them of the right to sell constitutionally protected books and videotapes. The business, however, was closed because the owner/manager provided illegal drugs to an undercover policeman,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not because the business was sexually oriented. The drug activity "carried on in this case manifests absolutely no element of protected expression." *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 705 (1986). Consequently, the First Amendment is not implicated by the enforcement of the Colorado nuisance statute intended to prevent any building from being used for the unlawful sale, distribution or storage of illegal drugs. Colo.Rev.Stat. § 16-13-303; *Arcara,* 478 U.S. at 707; *accord O'Connor v. City & County of Denver,* 894 F.2d 1210, 1217 (10th Cir.1990)(First Amendment not implicated by enforcement of criminal code prohibiting public sex acts even though result was to close theater).

*3 Plaintiffs also assert that they were selected for prosecution because of the nature of their business. To maintain a claim of selective prosecution, plaintiffs must show that they have been singled out for prosecution while others similarly situated generally have not been prosecuted for similar conduct, and that the government selected them to prevent them from exercising their constitutional rights or for other impermissible reasons. *United States v. Furman,* 31 F.3d 1034, 1037 (10th Cir.), *cert. denied,* 115 S.Ct. 651 (1994). To support their claim of selective prosecution, plaintiffs cite Cortese's testimony that he knew of other establishments that were not treated as harshly as plaintiffs' in allegedly similar situations. Inadmissible hearsay, however, cannot defeat summary judgment "because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill. Furthermore, generalized, unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment." *Thomas v. International Business Mach.,* 48 F.3d 478, 485 (10th Cir.1995)(quotations omitted). Cortese's generalized references to what happened to other establishments is inadmissible hearsay, insufficient to defeat summary judgment. *See Swoboda v. Dubach,* 992 F.2d 286, 291 (10th Cir.1993) (appellate court may affirm district court's judgment for reasons other than those relied on by the district court).

Plaintiffs next allege that their constitutional rights to procedural due process were violated when the police officers served the temporary restraining order without first providing plaintiffs with notice and an opportunity for a hearing. The temporary restraining order was based on Cortese's illegal drug activity. Its purpose was not to forfeit the business, even though defendants later requested a forfeiture to which plaintiffs did not object. The temporary restraining order was authorized by state statute, and issued by a state district court; it was not initiated by self-interested private parties. Furthermore, the temporary restraining order provided plaintiffs an opportunity for an immediate hearing. Consequently, we conclude that this case " presents an 'extraordinary' situation in which postponement of notice and hearing until after seizure did not deny due process." *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 679-80 (1974); *see Swoboda,* 992 F.2d at 291 (appellate court may affirm district court's judgment for reasons other than those relied on by the district court).

We dispose of plaintiffs' argument that their § 1983 claims are not barred by the doctrine of res judicata or by Cortese's guilty plea by noting that the district court found that the claims were not barred for either of those reasons. The district court addressed the merits of plaintiffs' § 1983 claims, concluding that defendants were entitled to summary judgment.

*4 Finally, plaintiffs assert that summary judgment was inappropriate because there exist genuine issues of material fact. *See* Fed.R.Civ.P. 56(c). Plaintiffs object to the district court's reliance on defendants' affidavits because they refute plaintiffs' allegations. Rule 56(c) provides that affidavits may support a summary judgment motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)(it is from Rule 56(c)'s list of materials "that one would normally expect the nonmoving party to make the [required] showing"). Plaintiffs also point to various discrepancies in the parties' statements. *E.g.,* appellants' brief at 19-21. We determine that the disputed matters are not material to the legal issues presented, and do not preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)(existence of *some*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disputed facts will not defeat summary judgment; there must exist *genuine* issue of *material* fact).

The judgment of the United States District Court for the District of Colorado is AFFIRMED. The mandate shall issue forthwith.

C.A.10 (Colo.),1996.
Cortese v. Black
87 F.3d 1327, 1996 WL 346618 (C.A.10 (Colo.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.