Todd C. Emerson, A8175
SkyWest Airlines, Inc.
444 S. River Road
St. George, UT 84790
Telephone: (435) 634-3530

Scott M. Petersen, A7599
David N. Kelley, A9137
FABIAN & CLENDENIN,
A Professional Corporation
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah 84151
Telephone: (801) 531-8900

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| ANDREW DAVID CALLAWAY<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST AIRLINES INC., a Utah Corporation,<br><br>Defendant. | ) | **REPLY MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 2:04CV00179<br><br>Judge Ted Stewart |

Defendant SkyWest Airlines, Inc. ("SkyWest") hereby submits its Reply Memorandum Supporting its Motion for Summary Judgment.

## INTRODUCTION

While starting with four causes of action, only one remains at issue in this case[1]:

[1] By prior stipulation, Mr. Callaway dismissed with prejudice his claims for breach of contract and termination in violation of public policy. Plaintiff now concedes further that summary judgment in favor of SkyWest on his claim for violation of federal wiretapping laws is appropriate. (Pl.'s Opp. Mem. at xiv footnote 3).

Plaintiff's claim for wrongful termination in violation of the Railway Labor Act ("RLA"). Basically, Mr. Callaway claims that he was progressively disciplined and, in October 2003, terminated from employment as a pilot at SkyWest for alleged pro-union internet postings he allegedly made sometime prior to December 2000. Callaway claims that SkyWest management, specifically Jim Breeze, learned of his pro-union postings in December 2000 and thereafter targeted Mr. Callaway for a series of fabricated incidents for which Mr. Callaway was repeated disciplined and eventually terminated.

Mr. Callaway's conspiracy theory that Jim Breeze spent three years trying to find a reason to fire him, an at-will employee, which conspiracy allegedly involved SkyWest management, crew schedulers, pilot trainers, Mr. Callaway's neighbors, the Salt Lake City police department, non-SkyWest security personnel from Butte Montana, and a flight attendant, is simply unsupported by any evidence.

Mr. Callaway has conducted extensive discovery in an effort to support his claim. He has deposed thirteen SkyWest employees and management, including his former supervisor and Chief Pilot Kelvin Hyatt, Mr. Hyatt's direct report Jim Breeze, and the person in authority over all of SkyWest's 2,000 plus pilots, Brad Holt. Mr. Callaway has deposed the four people who served on a board that reviewed his termination, and certain other employees of SkyWest's human resources department. He has even deposed co-workers, including other pilots, who worked with him or were otherwise involved with the circumstances surrounding his various disciplinary actions and eventual termination.

In addition to depositions, Mr. Callaway has served on SkyWest two sets of interrogatories and requests for production of documents resulting in the production of or access

to thousands of pages of documents including Callaway's own employee file and the employee files of literally thousands of other SkyWest pilots, both current and past employees. Mr. Callaway, through counsel, was provided access to the employee file of every SkyWest pilot since 1999, literally tens of thousands of documents.

Notwithstanding the extensive discovery conducted by Mr. Callaway, he has failed to establish a prima facie case of discrimination in violation of the RLA. Therefore, his remaining claim fails and the Court should grant SkyWest's motion for summary judgment in its entirety, dismissing Mr. Callaway's complaint with prejudice.

## REPLY TO SKYWEST'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Mr. Callaway did not set forth a concise statement of material facts to which he contends a genuine issue exists, as required by DUCivR 56-1(c). Instead, he copied SkyWest's fact statement and, for the most part, argued about the weight of SkyWest's evidence. At times Callaway sets forth additional facts in the midst of his arguments—but at no time does he offer any admissible evidence that supports his claim that SkyWest violated the RLA. As such, every material fact set forth by SkyWest is "deemed admitted for the purpose of summary judgment, unless specifically controverted by the statement of the opposing party identifying material facts of record meeting the requirements." *Id.*

In an effort to comply with the rules, SkyWest sets forth two tables. Table 1 is copy of the Statement of Undisputed Facts from SkyWest's previous memorandum with a column that notes whether Mr. Callaway objects or offers opposing facts that demonstrate an actual dispute.

Table 2 contains the additional asserted facts we have identified in Callaway's opposition memorandum, with a corresponding reply from SkyWest to the additional asserted facts.

## TABLE 1

| STATEMENT OF UNDISPUTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 1. Mr. Callaway applied for a job as an airline pilot with SkyWest in 1996. (Callaway Dep. at 27). | Undisputed. |
| 2. SkyWest interviewed Mr. Callaway for the position in January of 1998. (Callaway Dep. at 28). | Undisputed |
| 3. As part of the hiring process, Mr. Callaway was scheduled for pilot training in February 1998, but failed to attend. (Callaway Dep. at 31 & 41). | Undisputed. |
| 4. Five months later, in July of 1998, Mr. Callaway sent a letter to SkyWest requesting that he be allowed another opportunity to attend training. *Id.* at 37. | Undisputed. |
| 5. Those who received his request were of the opinion not to hire Callaway; however, Jim Breeze, SkyWest's Systems Chief Pilot, made the decision to give Callaway another chance. (Breeze Dep. at 23). | Undisputed. |
| 6. Accordingly, after receiving a response letter from SkyWest, Mr. Callaway submitted a new application for employment, was scheduled for and attended training, and began working for SkyWest as a pilot on January 13, 1999. (See Complaint at ¶ 6; *see also* Callaway Dep. at 41). | Undisputed. |
| 7. Mr. Callaway was hired by SkyWest as an "at-will" employee, meaning that he could be fired with or without cause and with or without notice. (Callaway Dep. at 286-87 & 336). SkyWest's Employee Handbook states, "Employment with SkyWest is voluntarily entered into and the employee is free to resign at-will at any time, with or without cause or notice. Similarly, the employer may terminate the employment relationship at will at any time, with or without cause or notice." (Employee Handbook at 9). | Undisputed. |
| 8. SkyWest's Company Policy Manual, Standard Practice 56 states, "SkyWest Airlines promotes a productive work environment and | Undisputed. |

| | |
|---|---|
| does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment." (Policy Manual, Standard Practice 56). The Policy Manual further states, "Employees are expected to maintain a productive work environment free of harassment." (Policy Manual Standard Practice 56) (emphasis added). | |
| 9. SkyWest's Policy Manual, Standard Practice 306(30) states, "Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and/or within any other work related circumstances." | Undisputed. |
| 10. On or about December 7, 2000, Kelvin Hyatt, a Chief Pilot at SkyWest and Mr. Callaway's immediate supervisor, was informed by Anita Spencer, the Director of Crew Scheduling, that Mr. Callaway had mistreated certain SkyWest crew schedulers under her supervision. (Hyatt Dep. at 132-133). | Undisputed. Callaway objects to the statements in paragraph 10 claiming that they contain inadmissible hearsay. SkyWest does not offer the report to prove the truth of the matter asserted. Rather, SkyWest offers the report as evidence that SkyWest had notice of alleged mistreatment of another employee by Callaway and had cause to investigate and administer discipline. Although he disputes the veracity of the complaint, Callaway does admit that a crew scheduler complained of mistreatment (Callaway Dep. at 58-59, 64, attached as **Exhibit "A"**). This report is proper evidence of what Mr. Hyatt was told and believed had taken place when he and others at SkyWest made the decision to terminate Mr. Callaway.[2] |

[2] It is settled law in the Tenth Circuit and elsewhere that out-of-court statements or documents offered to establish the employer's state of mind when making an employment decision are not hearsay. *Faulkner v. Super Value Stores, Inc.*, 3 F.3d 1419, 1434-35 (10th Cir. 1993) ("Although this testimony incorporates out-of-court statements, it was expressly presented to demonstrate [defendant's] state of mind in not hiring [plaintiffs], and was not offered to prove the truth of the matter overheard."); *see also Hardie v. Cotter and Co.*, 849 F.2d 1097, 1101 (8th Cir. 1988) ("The documents to which [plaintiff] objects were not offered to prove the truth of the material contained within them, but to demonstrate the state of mind of [defendant] personnel who made the decision to discharge [plaintiff], a factor of crucial importance in wrongful discharge cases.").

| | |
|---|---|
| 11. Ms. Spencer informed Mr. Hyatt that Mr. Callaway was verbally harassing her crew schedulers over an "open time" issue. According to Ms. Spencer, Mr. Callaway wanted a particular flight that he was not entitled to according to company policy. (Hyatt Dep. at 132-133; *see also* Handwritten note from Nicki McDonald). "There had been several complaints from the crew schedulers on calls. The whole gamut from whining, complaining, disagreeing. And it was just unacceptable, and he was told so." (Breeze Dep. at 23). | Undisputed. Callaway objects to the statements in paragraph 11 claiming they contain inadmissible hearsay. However, as set forth in the response to paragraph 10, this does not constitute hearsay. Further, the report from Nicki McDonald is a memorandum created in the regular course of business under Rule 803(6) hearsay exception. |
| 12. Given the complaints, Mr. Hyatt arranged for a meeting with Mr. Callaway. The meeting also included Mr. Hyatt's superior, Jim Breeze (System Chief Pilot), and Mr. Breeze's superior, Brad Holt (Vice President of Flight Operations). The meeting was set for December 11, 2000. (Callaway Dep. at 50-51; Breeze Dep. at 23). | Undisputed. |
| 13. During the meeting, Mr. Callaway was confronted with the complaints about his behavior toward the crew schedulers. (Callaway Dep. at 49-50 and 72). | Undisputed. |
| 14. Also, during the December 2000 meeting, SkyWest questioned Mr. Callaway about comments he made on the SkyWest Airline Pilots Association ("SAPA") website regarding SkyWest and SkyWest management. (*See* Callaway Dep. at 50-51). | Undisputed. |
| 15. The SAPA website is an independent website that is not sponsored by SkyWest, but which is maintained and used by SkyWest pilots to discuss work and work-related issues. (Callaway Dep. at 50-51). | Undisputed. |
| 16. Regarding the statements that are posted on this site, Mr. Callaway testified, "You know, anybody can, you know, print this stuff out, send it down to St. George. They could gain access to the message boards if they had a, you know, friend that was, let's say, anti-union, decided to give their password to management." (Callaway Dep. at 349-50). | Undisputed. |

| | |
|---|---|
| 17. When asked whether Mr. Callaway knew if somebody printed out the website postings and gave them to somebody in SkyWest management he testified, "I have no idea." (Callaway Dep. at 350). | Undisputed. |
| 18. Mr. Callaway testified that he suspected that pilots print postings from the website, fax them in to SkyWest management, and post hardcopies of them on bulletin boards. Mr. Callaway believes it is primarily the anti-union pilots that do this. (Callaway Dep. at 87-88). | Undisputed |
| 19. In October 2001, Customer Service Relations received a phone call from a Mr. Brandt, who indicated he was the owner and landlord of property neighboring Mr. Callaway's residence in Salt Lake City. Mr. Brandt indicated that his tenants had complained to him about loud parties, unbearable noise, and property damage from Mr. Callaway. SkyWest was also informed that neighbors stated they had seen drugs being used at Mr. Callaway's house. The neighbors knew Mr. Callaway was a SkyWest pilot and Mr. Brandt wanted SkyWest to do something about the problem. (Callaway Dep. at 93-94, 98; Nielsen Dep. at 111-112). | Undisputed. Callaway objects to this statement claiming it is inadmissible double hearsay. However, Callaway has admitted that his neighbors complained to SkyWest and the Salt Lake City police about "drug dealing," and "loud noise, loud parties" (Callaway Dep. at 94-95). These are non-hearsay admissions under Rule of Evidence 801(d)(2). The fact that Customer Service Relations received a telephone call from one of Callaway's neighbors is not hearsay because the fact and contents of the call, along with the follow-up calls from Ms Nielsen to a woman named Kim Guess, was testified to by the SkyWest employee who was involved in the calls, Jacque Nielsen. (Nielsen Dep. at 111-12, attached as **Exhibit "B"**). |
| 20. Jacque Nielsen, from SkyWest Human Resources, called Mr. Brandt who indicated that he wanted SkyWest to stop the parties and drug use. Mr. Brandt also suggested that Ms. Nielsen call Kim Guess, an employee of the Salt Lake City Police Department. (Nielsen Dep. at 111-112). | Undisputed. While Callaway claims this is inadmissible hearsay, he also admits that SkyWest received a call. Furthermore, as set forth in the response to paragraph 10 above, this statement does not constitute hearsay. |
| 21. Ms. Nielsen called Ms. Guess, who told Ms. Nielsen about the repeated complaints from Mr. Callaway's neighbors. (Nielsen Dep. at 111-113). | Undisputed. Despite Mr. Callaway's objection, as set forth in the response to paragraph 19 above, this statement does not constitute hearsay. |
| 22. Mr. Hyatt contacted Mr. Callaway about the complaints. Mr. Callaway told Mr. Hyatt that he had sued both the neighbor and city for harassment and defamation of character. (Callaway Dep. at 100; Nielsen Dep. at 115- | Undisputed. |

| | |
|---|---|
| 116). | |
| 23. Mr. Brandt again called SkyWest and informed it that Mr. Callaway had another party on Saturday, November 10 from 4:00 p.m. until 4:00 a.m. SkyWest was also informed that the police had been called to Mr. Callaway's house again. (David Andrew Callaway – Review Board document). | Undisputed. Despite Mr. Callaway's objection, the fact that SkyWest received another call from Mr. Brandt is not hearsay. See response to statement number 19 above. |
| 24. Sometime prior to November 2001, Mr. Callaway was required to attend classroom instruction and testing related to SkyWest's regional jets. (Dixon Dep. at 13-16, and 22-25). | Undisputed. |
| 25. During the course of his classroom instruction, Mr. Callaway exhibited a "poor display of attitude" toward the instructor, Kelly Dixon. (Dixon Dep. at 22-23). | While Mr. Callaway disputes that he ever exhibited a "poor attitude" toward Kelly Dixon, he does not dispute that Dixon reported to SkyWest management that Mr. Callaway had exhibited a poor attitude. |
| 26. Specifically, after having taken a required test, when Mr. Dixon was reviewing the test, Mr. Callaway;<br>Unlike I'd ever seen before, and different from any other student in any other class I'd ever had, Andy decides to stand up, walk over to the wall, walk up the side of the classroom, walk across the front of the classroom in front of all my students, takes the test, throws it down on the podium and says, 'I don't need to go over my test.' At that point, I thought to myself, 'Who does this guy think he is?'<br><br>(Dixon Dep. at 25). | While the underlying facts as they are reported by Dixon are disputed, it is undisputed that Dixon reported his perception of Mr. Callaway's behavior to SkyWest management. |
| 27. Mr. Dixon prepared a written summary of the occurrence and submitted to SkyWest. (Dixon Dep. at 16-17; Copy of the written summary). | Undisputed. |
| 28. On or about November 13, 2001, SkyWest received complaints from the airport in Butte, Montana stating that Mr. Callaway had exhibited inappropriate behavior toward | Undisputed. Although he disputes that he exhibited inappropriate behavior while in the Butte airport, Callaway does not dispute that SkyWest received complaints about his |

| | |
|---|---|
| agents, and security personnel. (Callaway Dep. at 113-114). | behavior. |
| 29. Mr. Hyatt also received word that three SkyWest agents witnessed Mr. Callaway's behavior. (Customer Service Irregularity Form"; Hyatt Dep. at 152-153). | Callaway disputes that three witnesses were SkyWest ramp employees. He testified that there was one "ticket agent," a SkyWest employee "conducting the security screening" and an employee from another company. Callaway Dep. at 123. However, this does create a genuine issue of material fact. |
| 30. Shortly thereafter, Mr. Callaway met with Brad Holt, Bill Boice, Tony Thompson, Kelvin Hyatt, Dave Faddis, and Mike Eisenstat because of Mr. Callaway's behavior at the Butte station. (Callaway Dep. at 112-113, 117). | Undisputed. |
| 31. Mr. Callaway reportedly argued with security agents at the Butte airport. (Callaway Dep. At 113-114; Customer Service Irregularity Form). | It is undisputed that agents at the Butte airport reported to SkyWest that Callaway had argued with them. Callaway only denies that he argued with security agents at the Butte airport. |
| 32. Mr. Callaway was given a counseling statement citing his "extremely inappropriate behavior" and was placed on administrative leave for three weeks without pay. (Callaway Dep. at 114-116. November 30, 2001 Counseling Statement ). | Callaway does not dispute that he was placed on administrative leave for three weeks, however, he asserts that the leave was paid. Callaway Dep. at 119. This does not create an issue of material fact. |
| 33. Mr. Callaway requested and was provided a review board regarding the counseling statement. The review board upheld the counseling statement but removed the word "extremely" from the statement regarding Mr. Callaway's inappropriate behavior. (Callaway Dep. at 122-123). | Undisputed. |
| 34. On March 26, 2002, Mr. Callaway was given a Scheduled Assignment Deviation ("SAD") for telling crew scheduling that he did not want to be placed on a multiple day trip because he was recovering from a cold. (Callaway Dep. at 186-187). | Undisputed. |
| 35. On or about June 30, 2003, Mr. Callaway received another SAD for his failure to respond to calls from crew scheduling while he was on reserve. (Hyatt Dep. at 100; Callaway Dep. at 189-190). Mr. Callaway failed to return calls to crew support who attempted to give him an | Undisputed. |

| | |
|---|---|
| assignment. Mr. Callaway should have let SkyWest know that he was not available because he is paid by SkyWest while on reserve. (Hyatt Dep. at 101). Mr. Callaway accepted responsibility for the SAD. (Callaway Dep. at 189-190; Callaway's Statement Regarding SAD June 2003 ). | |
| 36. On August 12, 2003, Mr. Hyatt was approached by Kristen Wiley, a flight attendant working at SkyWest, who broke down crying while speaking to Mr. Hyatt. Ms. Wiley said she had received threatening emails from Mr. Callaway through her SkyWest email account concerning money Mr. Callaway claimed she owed him. (Hyatt Dep. at 80-81; and see Deposition of Kristin Wiley at 61, 65, 92, & 96-97 ). | Undisputed. |
| 37. Apparently, Mr. Callaway had invited Ms. Wiley to go to Spain with Mr. Callaway and some friends in September 2002. (Wiley Dep. at 38). | Undisputed. |
| 38. Ms. Wiley believed that because she was to take the place of another girl whom Mr. Callaway had already paid for, she would not have to pay for the trip. (Wiley Dep. at 28). | Undisputed. |
| 39. In approximately November 2002, Mr. Callaway began to ask Ms. Wiley to reimburse him for her costs of the trip. (Wiley Dep. at 35). | Callaway asserts that he began asking for the money as early as September 2002, but the start date is not a material fact. |
| 40. By the summer of 2003, Mr. Callaway began sending Ms. Wiley emails, through the SkyWest network, demanding that she pay him the money. (Wiley Dep. at 39-40). | Undisputed. |
| 41. One of the emails sent by Mr. Callaway stated, "Come on, Kristen. I'm tired of this. I need my money now or I'll get it the hard way. Thanks. Andy." (Wiley Dep. at 90). | Undisputed. |
| 42. Ms. Wiley thought Mr. Callaway meant he would do something physically to her to recover the money. (Wiley Dep. at 90). | Undisputed. |
| 43. Ms. Wiley did not feel safe about going to work. She felt she had to avoid Mr. Callaway. Ms. Wiley was also afraid to read her email | Undisputed. |

| | |
|---|---|
| messages. (Hyatt Dep. at 81-82; Wiley Dep. at 61). | |
| 44. Ms. Wiley went into Mr. Hyatt's office, crying, told Mr. Hyatt about Mr. Callaway's threats, and asked him, "can you help me take care of it, get it to stop?" (Wiley Dep. at 62). | Undisputed. |
| 45. The stress and anxiety of her dealings with Mr. Callaway caused Ms. Wiley to seek medical treatment. She began taking Xanax as a result of the stress from Mr. Callaway's behavior. (Wiley Dep. at 23). | Disputed. See Exhibit "10" of Callaway's Opp. Mem. Whether Callaway, or some other factor, was the true cause of Ms. Willey's stress is immaterial. It is undisputed that Wiley reported to SkyWest that Callaway was the source of her anxiety and she required time off as a result. |
| 46. In fact, Ms. Wiley eventually stopped working for approximately two months due to her stress. (Hyatt Dep. at 96, Nielsen Dep. at 45-46; Wiley Dep. at 71-72). | Undisputed. |
| 47. As part of his investigation into Ms. Wiley's claims, Mr. Hyatt sent an email to Mr. Callaway asking him to address his treatment of Ms. Wiley. Mr. Callaway responded that it was none of SkyWest's business. (Callaway Dep. at 214-25; Nielsen Dep. at 47-48; Mr. Callaway's response email ). | Undisputed. |
| 48. Mr. Callaway testified that he believes he was terminated because of the response email he wrote to Mr. Hyatt. (Callaway Dep. at 223). | Undisputed. Callaway further asserts that he testified about other factors that contributed to his termination but this does not preclude summary judgment. |
| 49. Also during September 2003, Mr. Hyatt received a call from Denver Asst. Chief Pilot Don Watkins. Mr. Watkins informed Mr. Hyatt that he overheard Mr. Callaway say many negative things about SkyWest and its management. (Hyatt Dep. at 179-180). | That Mr. Watkins called Mr. Hyatt is undisputed. Callaway objects to this statement claiming it is inadmissible double hearsay. SkyWest does not offer the report to prove the truth of the matter asserted. Rather, SkyWest offers the report as evidence that SkyWest had notice of unprofessional behavior in violation of Mr. Callaway's prior counseling statement and had cause to investigate. |
| 50. Mr. Hyatt asked Mr. Watkins for a write-up of what he heard. (Hyatt Dep. at 180). Mr. Watkins complied. See Write-up. | Mr. Callaway does not dispute that Hyatt asked Watkins for a write-up or that Mr. Watkins provided the write-up. Rather, he contests the underlying facts of the write-up. This does not create a dispute of material fact. |

| | |
|---|---|
| 51. After all of these reported instances, Mr. Callaway was terminated on October 1, 2003, "due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees." (Callaway Dep. at 234). Termination Notice. | Undisputed as to the date and stated reason for termination. Obviously, Callaway claims the stated cause of termination is pretextual but supplies no evidence is support of his claims that would create a dispute of material fact. |
| 52. Mr. Callaway requested a Review Board Hearing on or about October 3, 2003, claiming that he believed his termination was unfair. (Callaway Dep. at 274). | Undisputed. |
| 53. Mr. Callaway's review board request was approved and he was provided with a hearing on October 24, 2003. During the hearing, Mr. Callaway addressed allegations, facts, and evidence, and was provided the opportunity to introduce his own evidence. Review Board Summation. At no time during his hearing did Mr. Callaway complain that he had been disciplined for any union activity. | Callaway does not dispute that a review board was held on October 24, 2003, and that during the hearing he had the opportunity to introduce his own evidence. Callaway does dispute that he did not complain of being disciplined for any union activity to the Review Board. |
| 54. The Review Board upheld Mr. Callaway's termination but decided to give Mr. Callaway the option of resigning and being made eligible for rehire. Mr. Callaway refused this offer, opting instead for termination. (Callaway Dep. at 268-269). | Undisputed. |
| 55. While Mr. Callaway claims that he has some evidence that Jim Breeze wanted him fired, he cannot identify what that evidence is. Moreover, he has no evidence to suggest that Breeze's alleged desire to terminate Mr. Callaway had anything to do with Mr. Callaway's union activity. (Callaway Dep. at 240-245). Mr. Callaway testified as follows:<br>Q. So help me understand your theory as to why they fired you.<br>A. I'm not quite sure. Again, I think a lot can attribute it back to Jim Breeze.<br>…<br>Q. So you believe that the review board and those involved – by that, I mean Mr. Hyatt and Mr. Holt ultimately as the VP – that they were being coerced in – or that they were being influenced into doing something that had an ulterior motive by Jim Breeze. | Undisputed. Callaway attempts to dispute this fact by repeating the same unsubstantiated theories that appear in his Complaint. He offers no evidence, other than his personal opinion, that Jim Breeze targeted him for termination. This does not create a genuine issue of material fact. |

| | |
|---|---|
| A. Yes, It's possible, yes.<br>Q. And the factual basis for that belief is what? Is it just a belief theory you have, or do you have evidence?<br>A. Well, Mr. Hyatt testified that he – Jim Breeze ever regretted hiring me. And he also testified that he did not recommend my termination.<br>…<br>Q. But the theory you've proposed is that it's Jim Breeze who is the one who set you up for termination.<br>A. Yes.<br>Q. And the factual basis for that is Mr. Hyatt suggesting that he initially did not want you terminated.<br>A. Mr. Hyatt did not –<br>Q. Right.<br>A. --testified that he did not recommend termination.<br>Q. And that's one of the factual bases for you believing that it was Jim Breeze that was trying to get you fired.<br>A. It certainly points that direction.<br>Q. So is the answer yes?<br>A. Yes.<br>Q. And what else? What other facts?<br>A. Well, the facts that's several correspondence in here from Jim Breeze, e-mails requesting and soliciting documents against me that have been backdated by one to two years.<br><br>(Callaway Dep. at 240-245). | |
| 56. Mr. Callaway testified that he was fired because of the response email he wrote to Mr. Hyatt regarding his treatment of Ms. Wiley. (Callaway Dep. at 223). Mr. Callaway stated the following:<br>Q. Why do you think you were terminated?<br>A. Well, I believe I was terminated because of this e-mail. | Undisputed that Callaway so testified. Again, Callaway points to other testimony where he offers his personal theories, but this does not constitute admissible evidence. |

| | |
|---|---|
| (Callaway Dep. at 223). | |
| 57. John Wangensteen, a pilot for SkyWest who has worked for SkyWest for approximately fourteen years was asked to be a member of Mr. Callaway's final review board. (Deposition of John Wangensteen at 30). | Undisputed. |
| 58. Mr. Wangensteen was a member of the SkyWest Airline Pilots Association ("SAPA"). (Wangensteen Dep. at 12). | Undisputed. |
| 59. Robert Donahoe is also a member of SAPA and was asked to participate in the review board. (Deposition of Robert Donahoe at 28-29). | Undisputed. |
| 60. During Mr. Callaway's presentation to the review board, he never told the board that he thought he had been terminated because he was a union organizer. (Wangensteen Dep. at 85; Donahoe Dep. at 65-67). | Undisputed. |
| 61. In fact, Mr. Callaway's direct supervisor, Kelvin Hyatt, did not even know that Mr. Callaway was involved in any union organizing. (Hyatt Dep. at 175). | Undisputed. |

**TABLE 2**

| CALLAWAY'S ADDITIONAL FACTS | SKYWEST'S RESPONSE |
|---|---|
| 3(a) Callaway informed SkyWest that he was going to miss initial training. | Disputed but immaterial. Two HR managers, Karalee Smith and Jacque Nielsen, testified that Callaway gave no advance notice he would miss training and "no-showed" for training. (Nielsen Dep. at 101-102; Smith Dep. at 13-15, attached as **Exhibit "C"**). |
| 4(a) Callaway made a call to SkyWest to notify he would not attend initial training. | Disputed but immaterial. See response to #3, above. |
| 6(a) It is undisputed that SkyWest never had any problem with Callaway's performance as a pilot. | Disputed but immaterial. Adequate pilot performance requires adherence to all company policy. SkyWest has set forth at length the policies that Callaway violated. |
| 8(a) That portion of SkyWest's Policy Manual is referring to the anti-discrimination laws which are not at issue here. | Disputed but immaterial. The relevant portion of the employee handbook, marked as SW1052, sets forth **both** a no-violence/ harassment **and** a sexual harassment policy on the same page. Even a cursory reading of the policy language reveals that it is applicable to Mr. Callaway's behavior toward crew schedulers, security personnel, ramp agents and Ms. Wiley. (Relevant portions of the Policy Manual are attached as **Exhibit "D"**). |
| 8(b) Kelvin Hyatt, SkyWest's Chief Pilot in Salt Lake City, testified that he was aware of at least two SkyWest pilots who actually engaged in sexually harassing behavior, thereby violating the policy, but were not fired. Deposition of Kelvin Hyatt dated November 5, 2004 ("Hyatt Dep.") at 189. One received a "counseling statement and time off" and the other was "suspended." Hyatt Dep. at 189-90. | Irrelevant. Mr. Callaway was never accused or disciplined for sexual harassment. This additional statement does not create a genuine issue of material fact. |
| 10.Callaway disputes that he ever said, or did, anything to the scheduler which could be considered mistreatment. | Irrelevant. For the purposes of this motion it does not matter whether he actually mistreated SkyWest crew schedulers. What matters is that those who made the decision to terminate Mr. Callaway (Kelvin Hyatt, Jim Breeze, Brad Holt, and others) were told that crew scheduling had complained about Mr. Callaway's mistreatment of crew schedulers. Importantly, Mr. Callaway admits he was confronted by SkyWest (Jim Breeze and Brad |

| | |
|---|---|
| | Holt) in December 2000 about that complaint. (Callaway Dep. at 58-59, 64). |
| 10(b) In Callaway's termination letter SkyWest claimed that this incident occurred in June | Disputed. This statement does not appear in Callaway's termination letter. |
| 10(c) SkyWest appears to have fabricated the alleged incident after the fact in order to cover up its real reason for disciplining Callaway: his union activities. | Argumentative. Plaintiff provides no evidentiary support for this statement. Additionally, Mr. Callaway has no evidence that SkyWest fabricated the complaint from crew scheduling. To the contrary, in his December 17, 2001 review board Mr. Callaway acknowledged that he had a discussion with "Nicki" in crew scheduling that resulted in the complaint being made. (Tr. of December 17, 2001 Review Board at 21, attached as **Exhibit "E"**). All the write-up indicates is what Nicki McDonald claims took place, and her write up is authenticated with the proper foundation laid by Ms. McDonald's accompanying affidavit. |
| | |
| 10(d) Callaway disputes that he ever said, or did, anything to the scheduler which could be considered mistreatment. Callaway Dep. at 61-4. | Immaterial. Mr. Callaway's disputes over the Crew Scheduler's complaints are irrelevant for the purposed of this motion. It is undisputed that Nicki McDonald did complain and the complaint was not "manufactured" as argued by Callaway. |
| | |
| 10(f) Further, the scheduler who was allegedly "mistreated," listed December 14 as the date of the alleged incident when she signed the document December 7. | Argumentative. Callaway is arguing the weight of the evidence and offers no fact to dispute that SkyWest investigated a complaint about his behavior. |
| 11(a) SkyWest never gave Callaway any documentation about the alleged complaint and never told him who made the alleged complaint at the time it disciplined him. Callaway Dep. at 50. | Irrelevant. Callaway has repeatedly admitted that the complaint in fact occurred. |
| 11(b) As outlined in response to Paragraph 10, Callaway disputes the allegation that he ever verbally harassed a crew scheduler over "an 'open time' issue." Callaway Dep. at 78-86. | Mr. Callaway's disputes over the substance of the Crew Scheduler's complaints are irrelevant. He does not dispute that Crew Scheduling made the complaint. |
| 12(a) The real purpose of the meeting was to chastise Callaway for his posting pro-union | This statement lacks factual support. Callaway testified that he could not remember whether |

| | |
|---|---|
| comments on the SAPA website (which was owned by private individual) and for his union organizing activities. Deposition of Bradford R. Hold dated February 10, 2005 ("Holt Dep.") at 95). | those who met with him in December 2000 mentioned anything about his alleged union postings. (Callaway Dep. at 54-55). Callaway's citation to Brad Holt's deposition as support for this claim is also incorrect, as is his claim that Mr. Holt discussed Mr. Callaway's "pro-union posts" at the December 2000 meeting. Callaway's citations certainly do not support his claimed facts. Mr. Holt never testified that the purpose of the December 2000 meeting was to chastise Callaway for pro-union comments. (Holt Dep. at 120-21, attached as **Exhibit "F"**). To the contrary, Mr. Holt testified that he did not even know Callaway was allegedly involved in union activity until this lawsuit was filed. (Holt Dep. at 118-19). |
| 12(b) It is undisputed that Callaway's posts on the website were related to his efforts to organize the pilots for the Airline Pilots Association ("ALPA") and that Callaway was on the ALPA organizing committee. Callaway Dep. at 51; 52; 55-56; 146. | Inadmissible under Federal Rule of Evidence 1002. See Motion to Strike filed herewith. |
| 12(c) Callaway's posts provided, "opinions, research, statistics regarding our contract or lack thereof compared to other airlines and issues that affected the pilots and arguments as to why we should unionize." Id. Callaway testified that "most of my post, if not all, were regarding the union organizing." Id. and Callaway Dep. at 54; 146. | Inadmissible under Federal Rule of Evidence 1002. See Motion to Strike filed herewith. |
| 12(d) Jon Tenpas, who was the Chief Pilot in Los Angeles, remembered reviewing Callaway's posts on the website and agreed they related to Callaway's union activities. Deposition of Jon Tenpas dated June 13, 2005 ("Tenpas Dep.") at 36-37. | Mr. Callaway's assertion is simply wrong. First, Mr. Tenpas was not present during the December 2000 meeting and stated that he never spoke with SkyWest management about Callaway's postings. (Tenpas Dep. at 37, attached as **Exhibit "G"**). Second, any Callaway postings that he did see Mr. Tenpas testified "were in regard to other people's comments about pay, pay negotiations and working conditions. I'm not aware that any of them were specifically related to ALPA." (Tenpas Dep. at 36). Callaway is confusing alleged statements about working conditions |

| | |
|---|---|
| | with statements regarding establishing or undermining a union. The latter constitute protected activity under the RLA, the former do not. *See Rachford v. Evergreen Int'l Airlines, Inc.*, 596 F. Supp. 384, 386 (N. D. Ill. 1984); *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1023 (9th Cir. 1990). |
| 12(e) Bradford R. Holt, SkyWest's Vice-President of Flight Operations, who was present at the meeting, could not recall that anything other than Callaway's pro-union posts were discussed at the meeting. He testified that SkyWest had "issues with Andy's attitudes, his posts." Holt clarified that he was referring to "[h]is posts on certain forums, his comments about management. In general, just issues with the company." Holt Dep. at 85. When asked if he remembered "anything else . . . about the talk down in St. George?" Holt responses, "No." Holt Dep. at 86. | This does not create a disputed issue of fact. However, Holt never said the posts were pro-union posts. Rather, according to Federal Rule of Evidence 1002, the contents of the posts must be established by the posts themselves. Callaway's unsupported assertion that the posts were pro-union is inadmissible. |
| 12(f) Callaway testified that when he first got to the meeting, Holt and Breeze told him that he had made "inappropriate" comments on SkyWest's website and asked Callaway why he was making posts on the website. Callaway Dep. at 43; 50; 55. | This additional "fact" is not supported by any admissible evidence. Neither Mr. Holt nor Mr. Breeze discussed any alleged pro-union postings. (Holt Dep. at 118-19, 121; Breeze Dep. at 23-24, attached as **Exhibit "H"**). It does not create an issue of material fact. |
| 12(g) Further, the first item on the "verbal warning" given to Callaway claimed that he was required "to come to St. George" because he "had repeatedly made inflammatory and unfair statements on the company website about the company and its policy." Hyatt Dep., Exhibit "14". Breeze and Holt "warned" Callaway "that this behavior would not be tolerated." Id. | Undisputed but Irrelevant. Mr. Hyatt did not understand the posts to involve union organizing statements as he testified that he never saw or discussed any website posting from Callaway involving union organizing, nor was he even aware that Mr. Callaway had any involvement in union organizing. (Hyatt Dep. at 175-76, attached as **Exhibit "I"**). Mr. Breeze, the author of the summary, could not recall the specifics behind seeing the postings or what the postings contained. (Breeze Dep. at 40-41). |
| 12(h) Because Callaway had never "abused" "harassed" or otherwise engaged in any inappropriate behavior towards the crew schedulers, SkyWest's alleged reason for the meeting is an after the fact rationalization for | This is pure conjecture. Callaway provides no evidentiary support for this claim. To the contrary, as noted above, Mr. Callaway admitted that at the December 2000 meeting, Mr. Holt and Jim Breeze discussed a complaint |

| | |
|---|---|
| its attempt to chill Callaway's unionizing activities. | about Mr. Callaway from crew scheduling and alleged statements Mr. Callaway made about Brad Holt building a new house. (Callaway Dep. at 55, 58-59). |
| 14(a) It is clear that management was discussing certain pro-Union comments he made on the website. As outlined above, "most, if not all" of the posts made by Callaway were union related. | Callaway provides no evidentiary support for this statement. Callaway has provided no admissible evidentiary support for the contention that his postings were pro-union. |
| 14(b) Specifically, Callaway posted a chart showing the disparity between the SkyWest's top three management salaries for Jerry Atkin, Ron Reber, Brad Rich and those of SkyWest's Captains and First Officers. That chart showed that the top three managers' salaries had increased by 133% during the same period that Captains' salaries had only increased 23% and First Officers' salaries had only increased 18%. Callaway provided these figures to support his position that SkyWest's pilots would be better served by a union. Additionally, Callaway posted a cartoon showing a small blimp representing "Pilot Pay Proposal" bumping under a much larger blimp representing "Management Pay & Bonuses." Callaway also posted a drawing entitled "Comair plus 1%. Callaway had this drawing made into stickers which he put on his flight bag. See Affidavit of David Andrew Callaway. | Inadmissible under Federal Rule of Evidence 1002. See Motion to Strike filed herewith. |
| 17(a) Both Holt and Breeze testified that they had reviewed some of Callaway's posts. Holt testified that he received them by way of SkyWest's interoffice mail. Holt Dep. at 85-86; 94-95. Breeze testified that "they were either shown to me or I saw them electronically." Deposition of Jim Breeze dated November 29, 2004 ("Breeze Dep.") at 40-41. Breeze further testified that he knew that Holt "has access to them also." Breeze Dep. at 41. The fact that Callaway does not know how SkyWest management obtained the posts is irrelevant when it is undisputed that SkyWest management had copies of his posts and disciplined Callaway for making those | Undisputed and Irrelevant. Mr. Callaway has dropped his Wire and Electronic Communication Interception and Interception of Oral Communications Act claim. |

| | |
|---|---|
| posts. | |
| 19(a) Further, the underlying facts related to this complaint are clearly disputed. Callaway did not have "loud parties," create "unbearable noise," cause "property damage," or allows drugs to be "used" at his house. Callaway Dep. at 95. Callaway eventually sued the tenant of Mr. Brandt's, who had made the complaints, for harassment and defamation. Callaway Dep. at 101; 105-07. After meeting with Mr. Brandt, showing Mr. Brandt around his home and explaining what had happened, Mr. Brandt agreed that the allegations did not appear to be well founded. Mr. Brandt then evicted his tenant. Given the tenant's eviction, Callaway dismissed his lawsuit against the tenant. Callaway Dep. at 106-07. | That Mr. Callaway disputes whether he actually had loud parties or drugs at his house is irrelevant. It is undisputed that complaints were made to SkyWest alleging that such things were taking place and it was one of the bases upon which SkyWest made its decision to terminate Mr. Callaway. Significantly, Mr. Callaway sued Salt Lake City based on the very complaint allegations he is now claiming are hearsay and therefore inadmissible. (*See* Third District Court Complaint, *Callaway v. Kim Guess and Salt Lake City Corp.*, Civ. No. 050901173, filed January 20, 2005, hereafter "Callaway's Salt Lake City Lawsuit," a copy of which is attached as **Exhibit "J"**). In Callaway's Salt Lake City Lawsuit, he asserts that his "neighbor contacted SkyWest airlines and complained" about Callaway, that SkyWest contacted Ms. Guess and obtained more information about the complaint, and more importantly, that SkyWest then used both the complaint and the additional information from Salt Lake City "to substantiate, in part, a Counseling Statement that Callaway received from SkyWest in November of 2001." (Callaway's Salt Lake City Lawsuit, ¶¶ 17-24). Equally significant, Callaway then alleges: "Although the materials and information received from Salt Lake City were not the sole basis for his termination, SkyWest used that information to justify and support the termination." (Callaway's Salt Lake City Lawsuit, ¶ 27). |
| 20(a) Callaway sued Mr. Brandt's tenant for making unfounded allegations and the tenant was eventually evicted. | Callaway's lawsuit against his neighbor is irrelevant. |
| 20(b) Further, when the Salt Lake City Police Department acted upon the tenant's false information, Callaway sued the City and eventually obtained a settlement of $87,000.00. Callaway Dep. at 102-04. | Callaway's lawsuit and settlement against Salt Lake City is irrelevant. |
| 21(a) As outlined above, the alleged events did not occur and the false accusations resulted | Complaints were made to SkyWest about alleged activity at Mr. Callaway's house. True |

| | |
|---|---|
| in Callaway's reaching a settlement with the City and the eviction of the person making the false complaints. | or not, SkyWest had these complaints from both Callaway's neighbor and the Salt Lake City police department, and SkyWest relied on the complaints and information obtained as a basis for disciplining Callaway. |
| 23(a) Further, as outlined above in paragraphs 19-22, the underlying claim was untrue and Callaway eventually obtained a settlement and the eviction of the complaining tenant after filing litigation based upon the false allegations about occurrences at his home. | Paragraphs 19-22 speak for themselves. Mr. Callaway's various lawsuits and their outcomes is irrelevant to this case. |
| 23(b) Furthermore, Callaway's supervisor, Hyatt, testified that he only "mentioned" it to Callaway, that he did not investigate the allegations and SkyWest, "as far as I am aware, did not get involved with the situation." Hyatt Dep. at 144-45. The one time Hyatt "mentioned" receiving the complaint to Callaway was the only time he discussed the issue with him. Hyatt Dep. at 162. | The extent of Hyatt's investigation or conversations about the issue with Callaway are irrelevant. |
| 25(a) Callaway disputes that he ever exhibited a "poor attitude" toward Kelly Dixon. Callaway Dep. at 257. | The fact that Callaway disagrees with his instructor's characterization of what took place is irrelevant. Mr. Dixon told SkyWest of his experience and it was Mr. Dixon's characterization of the event that formed a basis for SkyWest's termination decision. Accordingly, while Mr. Callaway disagrees with Mr. Dixon, he cannot dispute what it was Mr. Dixon told SkyWest. |
| 25(b) It is interesting that Mr. Dixon never reprimanded Callaway, never mentioned to Callaway that his behavior was inappropriate or ever had any interaction with Callaway indicating that Callaway had done anything but behave in a professional manner until AFTER he was requested to make a report by SkyWest's management in St. George. Deposition of Kelly Dixon dated February 11, 2005 ("Dixon Dep.") at 22-25, 53; Hyatt Dep. at 155; Callaway Dep. at 256. | The fact that Mr. Dixon did not reprimand Mr. Callaway is also irrelevant. Nothing in the law requires an employer to discipline an employee before it can legitimately rely on unacceptable behavior as a basis for an employment decision. Callaway was admittedly an at-will employee. (Callaway Dep. at 286-87, 336). SkyWest did not need a reason to terminate him and SkyWest was furthermore not bound by any particular progressive disciplinary procedure. Moreover, Mr. Dixon testified that he had no company obligation to issue a written discipline to a student that he believed was acting in a disrespectful manner. (Dixon |

| | |
|---|---|
| | Dep. at 46, attached as **Exhibit "K"**). Notwithstanding, after the incident with Mr. Callaway occurred, Mr. Dixon did complain to his supervisor, Ben Crawford, SkyWest's Chief Ground Instructor. (Dixon Dep. at 18). |
| 25(c) The request to Dixon came from St. George and was made after SkyWest's management was aware of Callaway's union support and his alleged criticism of SkyWest's management on the SAPA website. Dixon Dep. at 16-17. | This statement is misleading. Ben Palmer, SkyWest's Chief Ground Instructor, asked Mr. Dixon for his opinion of Mr. Callaway. (Dixon Dep. at 18). The classroom incident in which Mr. Dixon believed Callaway showed poor attitude and insubordination had already occurred, but Mr. Dixon was not sure it was the same person. (Dixon Dep. at 18-19). Mr. Dixon and Mr. Palmer looked up Mr. Callaway's picture on the SkyWest's computer system and "sure enough, it was Andy Callaway. I said: 'You need to tell St. George and the people department that he's not going to be in class. He's already been in class. I'm not sure exactly where he is in the process, but this is what happened,' and so I related to them what had happened."(Dixon Dep. at 19).<br>Mr. Dixon testified that about a day or so later, he was contacted by Kelvin Hyatt and asked to explain again his experience with Mr. Callaway. He did so and was asked if he "was willing to write it down. I said, 'Yes.'" (Dixon Dep. at 19). The written summary of what took place is attached as Exhibit "?". There is nothing sinister about these undisputed facts. They do not demonstrate any conspiracy or systematic plan to terminate Callaway. They are the natural events in a procedure for investigating problems Mr. Callaway caused. |
| 25(e) Importantly, SkyWest never even told Callaway about Dixon's problem with him until after he was terminated. Callaway Dep. at 256-57; Hyatt Dep. at 161. | The fact that Callaway did not receive a copy of Mr. Dixon's summary until his termination review board is not indicative of anything. As an at-will employee, Mr. Callaway had no rights to review any documentation prior to being terminated. SkyWest did not need a reason to terminate him. Rather, SkyWest went to all the trouble to investigate and |

| | |
|---|---|
| | deliberate over Mr. Callaway's termination because SkyWest invests significant funds in training its pilots. (Breeze Dep. at 89-90). SkyWest is trying to protect its investment. |
| 25(f) Further, Callaway disputes that he engaged in any such behavior and testified that the two other instructors "did not have any issue with [him]." Id. | While it is disputed whether Mr. Callaway engaged in any such behavior, it is irrelevant to the ultimate issue. Mr. Dixon told SkyWest management that Mr. Callaway had exhibited a poor attitude during class. (Dixon Dep. at 22-23). |
| 26(a) Callaway testified that the other two ground instructors did not have any problems with him and he "was very surprised to read—to hear that letter." When it was read at the Review Board, he "had no defense for it, because I didn't know where it came from or when it came from or who it was written by." Callaway Dep. at 257-58. | It is irrelevant that two ground instructors did not have any problems with Mr. Callaway, or that Mr. Callaway was surprised to hear about Mr. Dixon's problems with him when Dixon's statement was read at the Review Board. |
| 28(a) When first asked about what happened, Callaway told Mr. Holt "that nothing had happened." Callaway Dep. at 119. | Undisputed but irrelevant. |
| 28(b) Callaway had simply asked a screener why his empty bags were being X-rayed. Id. Neither the screener nor Callaway got upset and the screener did nothing to let Callaway think she was concerned. Id. at 120; 126. Callaway did not exhibit "inappropriate behavior" in Butte. Id. at 122; 133; 135. Callaway did not act in an "arrogant" or "disrespectful" or "abusive" manner. Callaway Dep. at 126; 146. Callaway was never "stopped or questioned" about his bags. Callaway Dep. at 128. | Even though Mr. Callaway disputes that he argued with anyone in the Butte, Montana airport, it is not what Callaway claims took place that is relevant but rather what SkyWest was told took place. There is no dispute that the Customer Service Irregularity Form was submitted to SkyWest after the incident. Thus, SkyWest's state of mind was that the incident occurred as reported. |
| 28(c) SkyWest either did not investigate by speaking with the other pilots present when this alleged incident happened or ignored what they said. Hyatt Dep. at 159. | This statement mischaracterizes Mr. Hyatt's testimony. Mr. Hyatt never indicated that he ignored what other pilots said about the incident. |
| 28(d) Daniel Black, a SkyWest pilot present at the time, testified that he told Breeze that he did not see anything unusual when Callaway was at the security screening. Deposition of Daniel R. Black dated February 11, 2005 ("Black Dep.") at 10-11, 18, 30-31. | Dan Black testified that he was not present when Mr. Callaway was at the security screening. Accordingly, Mr. Black did not see anything unusual. (Black Dep. at 25-26, attached as **Exhibit "L"**). |
| 32(a) However, it is clear that SkyWest's | This statement misstates the facts and has no |

| | |
|---|---|
| discipline was based, in part, on Callaway's unionizing activities. | evidentiary citations or support. SkyWest was not aware of Mr. Callaway's alleged unionizing activities as explained in detail in this memorandum. |
| 32(b) The "Counseling Statement" provided to Callaway specifically referred to the "posts you authored on the Web Boards." Exhibit 5. Hyatt assumed "that would be posts that Andy posted on the SkyWest forum boards." Hyatt Dep. at 114. | Undisputed. However, the Counseling statement simply related a prior instance where Mr. Callaway had been counseled for his attitude and behavior. |
| 36(a) However, he disputes the claim that he ever sent Ms. Wiley "threatening emails." Callaway Dep. at 216-17. The email correspondence between Callaway and Ms. Wiley demonstrates that Callaway was merely attempting to collect money which Ms. Wiley owed. Callaway Dep. at 200-03. Indeed, it appears that Ms. Wiley complained to SkyWest in order to avoid paying Callaway the money she owed him. Callaway Dep. at 225. Eventually, Callaway obtained a judgment against Ms. Wiley in small claims court. Id. | Mr. Callaway disputes Ms. Wiley's claim that the emails were threatening, suggests that anything he wrote in his email to Ms. Wiley was appropriate because Ms. Wiley owed him money, and Mr. Callaway ultimately obtained a judgment against Ms. Wiley. These additional facts, however, do not change the issue, which is that SkyWest received a report that Mr. Callaway was using its email system to harass and intimidate a fellow employee. Nor do they change Mr. Wiley's testimony. In her deposition, Ms. Wiley testified as follows:<br>Q. What does that E-mail say?<br>A. "Come on, Kristen. I'm tired of this. I need my money now or I'll get it the hard way. Thanks. Andy."<br>Q. And do you recall receiving that E-mail?<br>A. Yeah.<br>Q. Do you recall what you understood him to mean by what he says in that E-mail?<br>A. Yeah.<br>Q. What did you – what did you think he meant?<br>A. Physically.<br>Q. That he would hurt you?<br>A. Or something to that extent.<br>Q. Were you afraid when you received that E-mail?<br>A. Uh-huh.<br>Q. Is that "yes"?<br>A. Yes. |

| | |
|---|---|
| | Q. That wasn't the first E-mail you had received at the time asking for the money; is that right?<br>A. I don't think it was. It wasn't the first, no.<br>Q. Did you feel intimidated by Mr. Callaway?<br>A. Yes.<br>Q. Why?<br>A. Because of his actions, his words, what he can do.<br>Q. Had you observed him get upset with other people?<br>A. Oh, yeah.<br>Q. And what is your – how would you describe him when he gets upset?<br>A. Very confrontational.<br>Q. Have you ever seen him get violent with somebody?<br>A. No.<br>Q. At the time that you received that particular E-mail, you were afraid that he might be violent with you?<br>A. Violent or confrontational. I knew I just was scared and I needed to stay away from him.<br><br>(Wiley Dep. at 90-92, attached as **Exhibit "M"**). Clearly she felt intimidated by Mr. Callaway because of her prior observations of Mr. Callaway's very confrontational nature. This testimony is corroborated by Kelvin Hyatt's testimony wherein he stated:<br>A. I agreed to talk with [Kristen] about the situation. And she explained to me what was troubling her and she broke down and started crying and –<br>…<br><br>A. Kristen indicated to me that she was receiving harassing E-messages via SkyWest's messaging from Andy Callaway over some money that he felt she owed him; however, she felt that she did not owe this to |

| | |
|---|---|
| | him. She was feeling to the point that she was not wanting to even read her messages, which we do required crew members to read messages via the messaging on SkyWestOnLine. She was upset to the point that she said she was fearful of him coming to work, due to harassment from Mr. Callaway over the monies that he alleged she owed him. (Hyatt Dep. at 80-82). |
| 38(a) It is not clear what Ms. Wiley thought. Prior to the trip, Ms. Wiley agreed to pay Callaway, "for her portion of a villa rental . . ., along with a rental cal and her incidentals and expenses over there." Callaway Dep. at 193; 198. | Ms. Wiley's testimony expresses what she thought. "He – I felt – I thought that when he invited me to go to Spain in place of the girl that he had already paid for, meaning that he had paid for her place and I was to take her place, so I wouldn't have to pay, and there was no previous agreement for me to pay before the trip, so that's where the misunderstanding came in." (Wiley Dep. at 37-38). |
| 40(a) Both Callaway and Ms. Wiley corresponded by email to discuss the payment due to Callaway, both on the SkyWest network and on Ms. Wiley's "hotmail" account. Callaway Dep. at 199-203. | Undisputed. |
| 40(b) While SkyWest attempts to make much of the fact that Callaway sent Wiley emails, it neglects to mention that it did not have a policy prohibiting employees from this type of communication. Breeze testified that he was "not familiar" with any SkyWest "rule or policy" which "talks about what can or cannot be posted on the message system." Breeze Dep. at 35. When Holt was questioned if he was "aware of any rule which says that employees cannot personal E-mails over the company intranet," he responses, "No." Holt Dep. at 107. Similarly, when Hyatt denied knowledge of any policy "that deals specifically with the intranet and what may or may not be sent . . . ." Hyatt Dep. at 187. | SkyWest was not concerned about the personal emails until they resulted in Ms. Wiley feeling intimidated by Mr. Callaway and approaching management crying and asking management to take care of this situation. By using SkyWest's email system to contact a co-employee, Mr. Callaway involved SkyWest in his debt collection. Mr. Hyatt testified as follows:<br>Q. Is there – were there some guidelines anywhere about what could be sent over the – what kind of messages could be left?<br>A. As far as messages specifically, no, not that I'm aware of. However, harassment – certainly if somebody is harassing somebody, whether or not it is sexual, you still can be harassed, and if you feel that harassing issue is contrary to a good work environment, yes, the airline has to deal with that.<br>Q. Even though it involved a private matter, private dispute? |

| | |
|---|---|
| | A. A private dispute on company property is still a company problem.<br>Q. What company property was being used?<br>A. The SkyWestOnLine messaging. That is a total intranet function.<br>(Hyatt Dep. at 83). Furthermore, Mr. Callaway's collection efforts became SkyWest's problem when Ms. Wiley approached management and broke down crying because she was afraid to check her messages though it was a requirement of her job. (Hyatt Dep. at 82). |
| 43(a) Callaway cites Exhibit 10. | The fact that Ms. Wiley approached Mr. Hyatt, crying, told Mr. Hyatt that she was fearful of coming to work because of Mr. Callaway's emails is not disputed. (Wiley Dep. at 62, 92; Hyatt Dep. at 80-82). |
| 45(a) Mr. Callaway does not offer evidence to dispute that Wiley began taking Xanax as a result of the stress from Mr. Callaway's behavior. Rather, he indicates his efforts to collect the money he claimed he was owed was only one of many factors. Ms. Wiley's testimony is as follows:<br>Q. And what happened in July and August that caused you to start having anxiety attacks?<br>A. Just stress. Stress from work, stress from personal life. And they got worse during – when I was at work, so – they were only – my anxiety attacks were only affecting me while I was at work, and it prevented me from flying because I had to take the Xanax, so – and you cannot fly on Xanax.<br>Q. Okay. And what at work was causing you the stress?<br>A. Basically the harassment from Andy. When I would get E-mails it threw me into a worse anxiety attack and I'd have a really hard time flying my flights.<br>Q. Anything else at work that caused you stress?<br>A. No. | |

| | |
|---|---|
| (Wiley Dep. at 23-24). Furthermore, Ms. Wiley testified as follows:<br>Q. Did the panic attacks increase, in your understanding, based on the feelings of intimidation you had from Mr. Callaway?<br>…<br>A. I know that this one started when – that's when I was with my pilot, and I was really crying and I was having a hard time doing my flight.<br>Q. When you say "this one," you're talking about the E-mail that sys, "I need my money now or I'll get it the hard way"?<br>A. Yes, sir.<br>(Wiley Dep. at 105). Mr. Callaway does not dispute that Wiley's stress was, in part, due to his harassment. | |
| 48(a) Callaway testified that he believes he was terminated in part for that email, but that the email was part of a continued effort to terminate him for his union organizing activities. He testified that he believed that Jim Breeze wanted to terminate him based upon the "December 2000 meeting and the counseling statement, you know, mentioned by posts on—that I had authored on the Web site for union organizing." Callaway Dep. at 246. He further testified:<br>A. I believe that was the catalyst that caused the termination. It was like the last straw that they were going to deal with. I believe that all these incidents passed that were made to believe—to, you know, show a pattern were based on fabrication and documents that were false, with false allegations.<br>. . .<br>A. They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And they're going to build whatever they can to show a pattern of this type of behavior. Callaway Dep. at 267. | Argumentative and Irrelevant. Mr. Callaway initially testified that he believes he was terminated because of the email.<br>Q. All right. Tell me what happened. You sent this to Kelvin. Then what?<br>A. I sent this to Kelvin. Left on vacation, and came back, and was on administrative leave, and then terminated.<br>Q. Why do you think you were terminated?<br>A. Well, I believe I was terminated because of this e-mail.<br>(Callaway Dep. at 223). Mr. Callaway later testified that he believed that the Kristen Wiley incident was the catalyst that caused the termination. "It was like the last straw that they were going to deal with. I believe that all these incidents passed that were made to believe – to, you know, show a pattern were based on fabrication and documents that were false, with false allegations." (Callaway Dep. at 266-67). However, Mr. Callaway's belief as to why he was terminated is not competent evidence that would preclude summary judgment. What is abundantly clear from Mr. |

| | |
|---|---|
| | Callaway's Opposition to SkyWest's Motion for Summary Judgment is that there are no facts to support his belief that he was fired for union organizing activity. Mr. Callaway's conspiracy theory that Jim Breeze spent three years trying to find a reason to fire him, which conspiracy allegedly involved SkyWest management, crew schedulers, pilot trainers, Mr. Callaway's neighbors, the Salt Lake City police department, non-SkyWest security personnel from Butte Montana, and a flight attendant, is simply unsupported by the evidence. |
| 49(a) Furthermore, it is irrelevant. Mr. Watkins' letter was not written until three weeks after Callaway was terminated. Callaway Dep. at 230. It could not have been considered by SkyWest in making its decision to terminate Callaway. Callaway also denies ever making any such comments. Callaway Dep. at 227. | Whether Mr. Callaway actually made negative comments about SkyWest is not relevant. What is relevant is that it is undisputed that Mr. Watkins told Kelvin Hyatt Mr. Callaway made such comments. The call from Watkins undisputedly came in September 2003, prior to Mr. Callaway's October 1, 2003 termination. The call from Assistant Chief Pilot Don Watkins came at a time when Mr. Callaway's behavior was being reviewed with respect to his threats to Ms. Wiley. The call from Watkins regarding what he overheard was simply one more event in a string of events where individuals were informing SkyWest management that Mr. Callaway had displayed inappropriate behavior. |
| 50(a) Watkins' write-up did not accurately reflect reality. Callaway testified that it was impossible for him to have made negative comments because he "was not in the hotel" at the time Mr. Watkins allegedly heard Callaway making the comments. Callaway Dep. at 227. | Nevertheless, whether Mr. Callaway did or did not make the comments reported in Watkins' write-up does not create an issue of fact as to what SkyWest thought at the time it conducted Callaway's termination review board. The write-up was simply one more event in a long line of events where Mr. Callaway had been reported to management as displaying inappropriate behavior. |
| 50(b) In fact, Callaway has a restaurant receipt showing that he could not have been in the room at the time Mr. Watkins claims to have heard him making negative comments about SkyWest. Callaway Dep. at 228-229. | Undisputed. Irrelevant. |
| 51(a) Further, Hyatt did not believe that | Undisputed. Irrelevant. |

| | |
|---|---|
| Callaway's actions warranted termination. Hyatt Dep. at 106. Despite this Hyatt was required to prepare a memo outlining SkyWest's case. Hyatt Dep. at 104. | |
| 51(b) Included in that summary of "reasons" why Callaway should be terminated was SkyWest's warning to Callaway about his "inflammatory and unfair statements on the company website . . . ." Hyatt Dep., Exhibit "2" Hyatt gave the summary to Breeze and Holt and they decided to terminate Callaway. Hyatt Dep. at 104; Breeze Dep. at 44. | Exhibit "2" of Hyatt's deposition is the Review Board Summary. After being terminated, Callaway asked for a Review Board in an attempt to get his job back. The Review Board summarized his disciplinary career and was not intended as a justification for Callaway's termination. |
| 53 (a) Callaway did discuss his union activity at the Review Board and the Board's summary reflects SkyWest's reference to Callaway's admission that "his comments could have been misconstrued and may have been a little abrasive." Callaway made clear that he was referring to the fact that the "posts on the message boards regarding union organizing could have been construed that way. But that is the intent of that." Callaway Dep. at 253-54. | While Mr. Callaway's deposition testimony cited in response to fact paragraph 53 suggests that there may be a dispute as to whether Mr. Callaway mentioned his union activity, such a dispute, however, is not material and cannot preclude summary judgment because it is undisputed that Mr. Callaway never suggested to the Review Board that he believed he had been terminated because of union activity. (*See* Tr. October 24, 2003 Review Board, **Exhibit "E"**). |
| 53(b) Indeed, SkyWest's counsel attempted to get Callaway to admit that he did not raise his union activities during the Review Board:<br>Q: Did you—we basically read your entire—a summary of your entire response. You didn't mention anything about the fact that you had been engaged in any union activity, right?<br>A: The posts on the Web site.<br>Q: Okay. Tell me where it mentions union activity.<br>A: Well, that's what I was discussing when I was talking about the visit to St. George. And I did mention in the review board my union organizing involvement.<br>. . .<br>A: Why it's not in here, I don't know.<br>Q: Did you mention to the review board that you thought any of the disciplinary actions that you received were related to your | Additionally, Mr. Callaway presented letters from other pilots, currently employed by SkyWest, in support of his reinstatement as a pilot. These letters are attached as **Exhibit "N"**. However, despite the fact that some of these pilots were union organizing pilots from prior union drives, not one of them mentioned that Mr. Callaway was a union organizer, or that he had been terminated because of union organizing activities. |

| | |
|---|---|
| union postings?<br>A: I did mention the union post—<br>Q: Okay. But that's wasn't my question.<br>A: —as the reason from my receiving the first counseling statement.<br>(Callaway Dep. at 265-66). | |
| 53(c) During the Review Board, the members considered the fact that SkyWest had held the December 2000 meeting with Callaway where he was chastised for his pro-union posts. Hyatt represented SkyWest and presented the fact that Callaway had been warned about his website postings. Exhibit 13. The Review Board also received Breeze's written memo concerning the "verbal" warning given to Callaway which warned him to stop making posts. Interestingly, SkyWest had originally told Callaway that SkyWest was "not putting anything in [his] file. We're not giving you any disciplinary action." Callaway Dep. at 57. | There is no admissible evidence to suggest that Callaway's posts were pro-union. Callaway has not introduced the posts, nor has he attempted to obtain the posts. Accordingly, this testimony is precluded by Federal Rule of Evidence 1002. |
| 55(a) SkyWest has selected certain portions of Callaway's deposition and cited them out of context to distort what he said. On page 237 Callaway was asked why he was terminated and another pilot, Palmer, was terminated, but then reinstated:<br>Q: Why do you think, then that you were terminated and he was not?<br>A: I think it's—it goes back to Mr. Breeze and the theory that was presented to me from SAPA that initially I was—embarrassed him by posting union organizing subject matter on the Internet. It stemmed from that.<br><br>Callaway reiterates that his union activities were key to the termination a few pages later, at page 246 (a portion conveniently left out by SkyWest):<br>Q: Why is it that you think he wanted to have you fired? Is it because of the December 2000 meeting?<br>A: The December 2000 meeting and the counseling statement, you know, | Mr. Callaway's response to SkyWest's factual paragraph 55 is not a genuine dispute. In fact, Mr. Callaway's additional testimony provided in his response to paragraph 55 fails to provide any evidence that Jim Breeze wanted him fired. Rather, the additional testimony quoted simply states that Mr. Callaway believed that Mr. Breeze wanted him fired and that Mr. Breeze created false documents containing false allegations. |

| | |
|---|---|
| mentioned my posts on—that I authored on the Web site for union organizing.<br>Q: The ones that you were counseled about in December of 2000?<br>A: That's correct. I believe that those activities pissed them off.<br><br>Callaway also testified that he believed that complaint by Kristen Wiley was pretextual and not the real reason for his discharge (Callaway Deposition at 266-7):<br>Q: Did you tell the panel that you believed you were being terminated because of the Kristen Wiley incident?<br>A: I believe that was the catalyst that caused the termination. It was like the last straw that they were going to deal with. I believe that all these incidents passed that were made to believe—to, you know, show a pattern based on fabrication and documents that were false, with false allegation.<br>. . .<br>Q: And you believe they were fabricated or created to terminate you because of what?<br>A: They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And, they're going to build whatever they can to show a pattern of this type of behavior. | |

# ARGUMENT

## I. MR. CALLAWAY CANNOT ESTABLISH A PRIMA FACIE CASE.

To overcome summary judgment, Mr. Callaway must present admissible evidence to establish four elements of a prima facie case under the Railway Labor Act ("RLA"). In its initial brief, SkyWest demonstrated that evidence to establish three of the four elements was lacking. Instead of responding with disputed facts, Mr. Callaway's opposition memorandum rolls out a fog of argument and asserted facts that, when closely analyzed, does not substantively dispute a single fact asserted by SkyWest. Neither does he offer an additional disputed material fact that would require a trial to resolve. His memorandum does not follow the rules set forth in DUCivR 56-1 and is designed to confuse the Court or otherwise shift the Court's focus from the actual admissible evidence. Mr. Callaway constantly assumes certain facts to be what they are not, and he cites to deposition or document references that simply do not stand for the propositions cited.

Notwithstanding, summary judgment in SkyWest's favor is mandated because after a careful, deliberate analysis of the admissible evidence Mr. Callaway fails to establish (1) that his SAPA postings in 2000 constituted protected activity of which SkyWest was aware, (2) that SkyWest made anti-union statements with any "seed of a threat" of discipline, and (3) that SkyWest terminated Mr. Callaway because of any alleged pro-union activity.

In addition, the undisputed facts are that SkyWest received multiple complaints from varying sources both in and outside of SkyWest regarding Mr. Callaway's abusive, rude behavior toward other people. Thus, even if Mr. Callaway could establish a prima facie case, SkyWest had cause to terminate him and therefore summary judgment is appropriate.

**A. Mr. Callaway Offers no Evidence to Support his Claim that he was Disciplined in December 2000 for SAPA Postings about Union Organizing.**

On nearly every page of his twenty-two pages of argument, Mr. Callaway claims that SkyWest knew his SAPA postings in 2000 regarded union organizing activity. Mr. Callaway relies solely on these alleged "pro-union" web postings to show that SkyWest was aware of his RLA-protected activity and used dozens of people in several states, including employees of other airlines, in a conspiracy that lasted three years to eventually terminate him. This assumption is absurd and not supported by admissible evidence.[3]

First, Mr. Callaway has not produced any of his alleged 2000 postings on a private website. Therefore, we do not know what, if anything, he posted or the contents of those postings. Mr. Callaway conveniently attempts to describe the contents of his postings through his own deposition and affidavit testimony. However, having made no effort whatsoever to obtain these alleged "pro-union" SAPA postings, Callaway's testimony is inadmissible, as demonstrated by SkyWest's concurrently filed Motion to Strike.

Second, even if we did know the substance of the postings, and they were as Mr. Callaway alleges, Mr. Callaway could not establish that they were presented to SkyWest. Rather, Mr. Callaway testified that he did not know whether someone else printed off his postings and sent them to SkyWest. (Callaway Dep. at 350). Mr. Holt denied that he saw any pro-union postings from Mr. Callaway (Holt Dep. at 121) and testified that he was unaware Mr. Callaway claimed to be "union organizer" until Callaway filed this lawsuit. (Holt Dep. at 118-

---

[3] It is important to note that "protected activity" under the RLA does not cover mere complaints about conditions at work. Rather, it relates to "establishing a union" or "undermining a union." *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1023 (9th Cir. 1990); *Rachford v. Evergreen Intern. Airlines, Inc.*, 596 F. Supp. 384, 386 (N. D. Ill. 1984); *see* 45 U.S.C. § 152 (Fourth).

19). Mr. Breeze could not recall the specifics of any alleged postings. (Breeze Dep. at 40-41).

Third, Mr. Callaway cannot show that these "pro-union postings" were the subject of the December 2000 meeting he had with Brad Hold and Jim Breeze. Mr. Callaway argues that Brad Holt and Jim Breeze "summoned Callaway to St. George at the end of 2000 to 'question' him about pro-union postings that he had made on an independent website." (Opp. Mem. at 1). This wildly inaccurate characterization of the testimony (which is reiterated in one form or another throughout his opposition memorandum), however, is entirely unsupported by his citations or any other admissible evidence.

Mr. Callaway stated in his deposition that he could not remember whether those who met with him in St. George mentioned anything about his alleged union postings. (Callaway Dep. at 54-55). To the contrary, what he could remember was that Mr. Holt and Mr. Breeze discussed (1) a complaint about Mr. Callaway from crew scheduling and (2) alleged statements Mr. Callaway made regarding Mr. Holt building a new house. (Callaway Dep. at 55, 58-59). The testimony of both Mr. Holt and Mr. Breeze is consistent. Mr. Holt testified that they discussed Mr. Callaway's "attitude problems" and statements that he "didn't like the company and didn't like management." (Holt Dep. at 85-86). Mr. Holt could not have been referring to any "pro-union" statements because he was unaware Mr. Callaway claimed to be "union organizer" until Callaway filed this lawsuit. (Holt Dep. at 118-19). Similarly, Mr. Breeze testified that the crew scheduling complaint is what was discussed during the meeting. (Breeze Dep. at 23-24).

In summary, Mr. Callaway cannot show that he made any "pro-union" postings on the SAPA website. He cannot show that SkyWest had any notice of his "pro-union" statements, if such existed. Without this evidence, his entire claim fails as it hinges on the alleged December

2000 postings. Without this central and critical piece of evidence, Callaway does not even reach the remaining elements of his claim. Therefore, summary judgment is warranted.

**B. Mr. Callaway Fails to Provide Evidence of Anti-Union Animus.**

While Mr. Callaway has characterized SkyWest's "union free statement" as "carefully word crafted" (sic), he agrees that it does not amount to harboring animus toward Mr. Callaway's alleged protected activity.[4] Seeking, therefore, to meet his burden regarding this essential element of his claim, Mr. Callaway now points to several other pieces of alleged "evidence" to claim animus. Mr. Callaway asserts animus is demonstrated by (1) SkyWest's conduct toward him during the December 2000 meeting, (2) SkyWest's alleged treatment of Steve Kanuch and Phil Alford, both current SkyWest pilots, and (3) two 1999 letters issued to all SkyWest pilots by Mr. Holt.

First, as explained above, there is no evidence that SkyWest's December 2000 meeting with Mr. Callaway had anything to do with union organizing. All admissible evidence is to the contrary. Thus, this assertion does not establish animus.

Second, Mr. Callaway's testimony regarding Steve Kanuch and Phil Alford is inadmissible as it lacks personal knowledge and foundation. Mr. Callaway is not competent to testify that SkyWest disciplined other pilots for their alleged union activity. He simply does not know this. Self-serving, conclusory allegations about SkyWest's alleged treatment of Mr. Kanuch and Mr. Alford cannot establish animus as it is inadmissible. Rather than reiterate its arguments here, SkyWest refers the Court to its Motion to Strike filed concurrently with this reply memorandum.

---

[4] Mr. Callaway implies that, by hiring a law firm to advise it during "union organizing campaigns," SkyWest is somehow demonstrating anti-union animus.

Third, Mr. Callaway claims that Mr. Holt wrote illegal letters designed to "threaten and intimidate pilots." (Opp. Mem. at 9). The first letter, dated July 7, 1999, which he attaches as his Exhibit 17, is supposed to contain a statement about all pilots being forced to pay union dues with "no exceptions" if a union is voted in. This statement does not exist in Mr. Callaway's Exhibit 17. Neither does it exist in the other letter by Mr. Holt, attached as Mr. Callaway's Exhibit 18. Even if it did, Mr. Callaway gets the law wrong when he claims it would violate the Utah Right to Work Statute, which "provides that no employee can be forced to join a union." (Opp. Mem. at 9). Whether an employee is forced to join a union or forced to pay dues are two different questions, but in any event, the RLA is the applicable law and it preempts state right-to-work statutes. 45 U.S.C.A. § 142 *et seq*; *See Railway Employees Dept. v. Hanson*, 351 U.S. 225, 231-34 (1956).

The letter from Mr. Holt dated July 20, 1999 speaks for itself. Even Callaway admits that he is "implying" threats as he reads it—not that there is anything improper on its face. This letter was sent out in the midst of an Air Line Pilots Association ("ALPA") organizing drive in 1999, without complaint from ALPA. If there had been anything threatening, intimidating or retaliatory in this letter, Mr. Callaway, who claims to have been on the ALPA organizing committee (Callaway Dep. at 52-53), could have sought sanctions from the National Mediation Board in 1999. He did not. Neither did ALPA, which is not known for being shy on these matters. Reading implications into an old, unchallenged, letter and submitting it as "proof" of animus for Mr. Callaway's termination in 2003 only demonstrates the absence of evidence.

Moreover, it is worth reminding that "'an employer may properly point out the hazards' of the collective bargaining process." *Webco Indus., Inc. v. N.L.R.B.*, 217 F.3d 1306, 1317 (10th

Cir. 2000).

> It is when the statement exceeds an expression of opinion as to the natural and normal hazards of collective bargaining and "carries with it the seed of a threat that the employer will become punitively intransigent in the event the union wins the election," that that the statement becomes coercive and unlawful."

*Id.* (internal citations omitted). The evidence presented by Mr. Callaway does not establish union animus by SkyWest. Thus, he fails to establish this essential element of a prima facie case under the RLA.

### C. Mr. Callaway Cannot Show a Nexus Between His Alleged Protected Activity and His Ultimate Termination.

The final element of Mr. Callaway's prima facie case requires him to show that SkyWest's alleged union animus is connected to his termination in 2003. As with the other elements of his prima facie case, Mr. Callaway relies on his alleged "pro-union" postings on the SAPA website in 2000 as evidence of nexus. (Opp. Mem. at 14). However, as noted above, there is no evidence that Mr. Callaway made any "pro-union" postings, that SkyWest ever saw them if he did, and ultimately, that they were the subject of his December 2000 meeting with SkyWest. Without this, Mr. Callaway's nexus argument fails.

Mr. Callaway claims that SkyWest left out certain portions of Mr. Callaway's deposition testimony regarding the cause for his termination in an effort to "distort Callaway's actual testimony." (Opp. Mem. at 14). While it is true that SkyWest did not cite Callaway's conspiracy theories in total, it was not in an effort to distort anything. Rather, Mr. Callaway's beliefs, unsupported by any factual basis, is meaningless to the resolution of this case. Mr. Callaway's testimony is nothing more than speculation about what he apparently believes is an elaborate three-year scheme masterminded by Jim Breeze and involving nearly 40 people

(employees, neighbors, security personnel in Montana,  and the Salt Lake City Police Department) to terminate his admitted at-will employment.

These statements of belief are pure conjecture without any factual support. Mr. Callaway's conspiracy theory must be based on admissible evidence in order to defeat summary judgment. Mr. Callaway has taken thirteen depositions, reviewed thousands of documents, and had access to every pilot's personnel file maintained by SkyWest since 2000—more than 2200 individual files with hundreds of thousands of pages . Despite this, his only evidence of a nexus between his alleged activity in the end of 2000, and his termination in October 2003 is his belief that Jim Breeze was "embarrassed" and "pissed off" by Mr. Callaway's web postings. Despite this extensive and unfettered discovery, he has failed to advance his case beyond the unsupported allegations in his Complaint. His statement of belief as to SkyWest's motives for terminating him is simply insufficient.

Mr. Callaway also runs into timing problems. In *Goldtex Inc. v. NLRB*, 14 F.3d 1008 (4th Cir. 1994), the court overruled the NLRB's finding that a company had discriminated against an individual where the only knowledge the company may have had of the employee's pro-union position was a comment made two years prior to his termination. Although he tries to beat this remoteness-in time-problem by claiming that SkyWest repeatedly noted his 2000 web posting in subsequent discipline, he fails to realize that SkyWest utilizes a system of <u>progressive discipline</u>, as noted in the Employee Handbook at pp 18-19. (SW1067, attached as **Exhibit "O"**). This system, commonly used by companies and the courts, considers all prior infractions when determining the proper level of discipline for a new violation of company policy or law. Callaway offers no evidence to show he was somehow "re-disciplined" for his 2000 postings, he

simply denies that he ever did anything wrong at any point and morphs the progressive discipline system to fit his theory of an ongoing, company-wide, vendetta.

Finally, the *Goldtex* court upheld the NLRB's finding of discrimination for pro-union activity only for an employee who "was a vocal union activist whose views were well-known both to the supervisors and to the managers." *Id.* at 1012. Here, there is no evidence that SkyWest management knew that Mr. Callaway had allegedly engaged in any union organizing activity. Accordingly, there is no evidence that SkyWest was considering Mr. Callaway's alleged union activities when it terminated him, and there is no nexus between the alleged activities and Mr. Callaway's termination.

## III. SKYWEST TERMINATED MR. CALLAWAY BECAUSE IT RECEIVED MULTIPLE COMPLAINTS ABOUT HIS ARROGANT, DISRESPECTFUL AND ABUSIVE ATTITUDE.

Although Mr. Callaway disputes the merits of every complaint that SkyWest ever received about him, it is undisputed that SkyWest had sufficient evidence to show proper cause to terminate Callaway. As such, even if he could establish a prima facie case, Mr. Callaway's RLA claim still fails. *See N.L.R.B. v. Interstate Builders, Inc.*, 351 F.3d 1020, 1027 (10th Cir. 2003) (applying test under NLRA); *Lebow v. Am. Trans Air*, 86 F.3d 661, 666 (7th Cir. 1996). There are more than five bases to support SkyWest's termination decision. These include the following:

1. Crew scheduling complained that Mr. Callaway was abusive to them. Callaway admits this was told to him in December 2000 and that he was confronted about it. (Callaway Dep. at 58-59, 64; Tr. of December 17, 2001 Review Board at 21, **Exhibit "E"**). It is irrelevant that Mr. Callaway disputes the merits of the complaint. It is undisputed that SkyWest was told

of the complaint. (*See* Handwritten Note from Nicki McDonald, attached to initial supporting memorandum).

2. Mr. Callaway's neighbors complained to SkyWest that Mr. Callaway's behavior was unacceptable for a SkyWest pilot. (Nielsen Dep. at 111-12). It is irrelevant that Callaway disputes the merits of his neighbors' complaints or the intervention of the Salt Lake City Police Department because he admits SkyWest was told of the complaints. In fact, he has sued Salt Lake City for contacting SkyWest with these complaints, claiming that these complaints <u>caused SkyWest to discipline and eventually terminate him</u>. (Callaway's Salt Lake City Lawsuit, ¶¶ 17-24, 27). Apparently Mr. Callaway's theory of why he was terminated depends on who he is suing.

3. Mr. Callaway's ground instructor, Kelly Dixon, complained to his supervisor and, eventually, to Kelvin Hyatt, about Mr. Callaway's behavior in class. (Dixon Dep. at 18-19). It is irrelevant that Mr. Callaway claims we was not disrespectful. He has no facts to rebut what it was Mr. Dixon explained to SkyWest or wrote as a summary of what occurred. (*See* Mr. Dixon's written summary attached to original supporting memorandum).

4. A SkyWest ticket agent, a SkyWest security agent, and the Horizon Air security agent who dealt with Mr. Callaway in Montana complained that Mr. Callaway acted inappropriately. They sent their complaint in written form. (*See* Customer Service Irregularity Form attached to original supporting memorandum). It is irrelevant that Mr. Callaway claims he acted appropriately. There is no dispute that the complaint was made and discussed with him. (Callaway Dep. at 113-14, 117-18). In fact, this complaint was the subject of a review board requested by Mr. Callaway. (Callaway Dep. at 123).

5. Ms. Wiley complained to SkyWest that Mr. Callaway was threatening her in the collection of a debt that Mr. Callaway claimed was owed to him. Like the others, Mr. Callaway disputes Ms. Wiley's characterization of what took place (Callaway Dep. at 191, 201-206), but he does not dispute that Ms. Wiley complained to SkyWest and asked SkyWest to intervene. (Callaway Dep. at 214-16).

These various complaints demonstrate what SkyWest was told about Mr. Callaway when it disciplined him and eventually terminated his employment. Mr. Callaway wants to engage in a dozen mini-trials to dispute the merits of each and every complaint. But whether the actual complaints are true or not, they provide SkyWest's state of mind and a good faith basis to discipline an unprofessional, disrespectful and abusive pilot. SkyWest demonstrated its state of mind during two separate review boards in which Kelvin Hyatt, on behalf of SkyWest, explained SkyWest's reasoning for its employment decisions. None of these review boards discussed union activity as a basis for any employment decision. Rather, Mr. Hyatt summed up SkyWest's state of mind at the time of Callaway's termination this way:

> Andy was terminated because of continual behavior that was not acceptable, not because of one incident. Andy did not accept responsibility for any of his behavior. The Company did not have any place to go but to terminate.

(October 24, 2003 Review Board Summary at 3, attached as **Exhibit "P"**).

Thus, even if Mr. Callaway could establish a prima facie case, it is undisputed that SkyWest had legitimate causes, unrelated to any alleged "pro-union" postings, to terminate him, and would have terminated him anyway.

## CONCLUSION

The Court should grant SkyWest's Motion for Summary Judgment and dismiss

Callaway's last remaining claim with prejudice and upon the merits.

DATED this _1__ day of March, 2006.

/s/ Scott M. Petersen
Scott M. Petersen
David N. Kelley
FABIAN & CLENDENIN,
a Professional Corporation
Attorneys for Defendant SkyWest Airlines

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing **REPLY MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT** to be mailed, postage prepaid, this __1___ day of March, 2006, to the following:

Erik Strindberg, Esq.
Lauren I. Scholnick, Esq.
Ralph Chamness, Esq.
STRINDBERG SCHOLNICK & CHAMNESS, LLC
426 North 300 West
Salt Lake City, UT 84103

/s/ Scott M. Petersen

Per the request of the Court, the Exhibits have been filed in hard copy.