FILED CLERK

2006 MAR -2 A 1:40

U.S. DISTRICT COURT DISTRICT OF UTAH

Todd C. Emerson, A8175
SkyWest Airlines, Inc.
444 S. River Road
St. George, UT 84790
Telephone: (435) 634-3530

Scott M. Petersen, A7599
David N. Kelley, A9137
FABIAN & CLENDENIN,
*A Professional Corporation*
215 South State Street, 12th Floor
P.O. Box 510210
Salt Lake City, Utah 84151
Telephone: (801) 531-8900

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ANDREW DAVID CALLAWAY<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST AIRLINES INC., a Utah Corporation,<br><br>Defendant. | **EXHIBITS TO REPLY MEMORANDUM SUPPORTING MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 2:04CV00179<br><br>Judge Ted Stewart |

Attached are SkyWest's Exhibits to its Reply Memorandum Supporting Motion for Summary Judgment.

DATED this 2nd day of March, 2006.

[signature]
Scott M. Petersen
David N. Kelley
FABIAN & CLENDENIN,
Attorneys for Defendant SkyWest Airline

365615_1.DOC

# EXHIBIT "A"

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY,

Plaintiff,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

Case No. 2:04CV00179

Judge Ted Stewart

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPE DEPOSITION OF DAVID ANDREW CALLAWAY (VOL. I)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT: The Law Offices of
Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, Utah

DATE: Wednesday, December 8, 2004

TIME: 9:16 a.m.

REPORTED BY: Scott M. Knight, RPR



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*

Salt Lake City | Washington, DC | New York | Los Angeles

Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101

801-983-2180 | Toll Free: 877-441-2180 | Fax: 801-983-2181

www.thackerco.com

A. Yes.
Q. --and said, I have a meeting with Kelvin--or with Brad Holt on Monday. Will you be there?
A. To the best of my recollection, yes.
Q. And did Mr. Abell tell you, Why are you being summoned?
A. He did not know either.
Q. So you said, I don't know why I'm being summoned, to Mr. Abell.
A. That's what I said, yes.
Q. You guys didn't talk about what you thought it might be about.
A. Well, that was mentioned, but he didn't understand it either.
Q. All right. So when you show up--whose office are you in?
A. Brad Holt's office.
Q. Tell me what happens in that meeting.
A. The meeting started off with--I was presented a calculator, asked to add up some numbers and read those numbers back out. Those numbers then--he referred to those numbers as, This is how many time you pilots call down to crew scheduling and we have a complaint from a



crew scheduler.
Q. What was the complaint?
A. I was not given any documentation about the complaint.
Q. You weren't told, though, what the complaint was in crew schedule.
A. There was a complaint, I believe, that the--they said that I--that's when I was told that I had made a comment about Mr. Holt's house.
Q. Did you--did they tell you who at crew scheduling said you made the comment?
A. No, they did not.
Q. Was there a reference to comments made on a company Web site?
A. Yes, there was.
Q. Tell me what that was about.
A. I was asked why I was making posts on the Web site, which was the SAPA Web site, which was not a company Web site.
Q. All right. Tell me about the SAPA Web site.
A. The SAPA Web site was a message forum, message board that the pilots could use to communicate and discuss issues.
Q. You said it's not a company Web site.



A. That's correct.
Q. How do you know that?
A. The SAPA site is owned by Bob Novak. It is not part of SkyWest.
Q. Who pays for the hardware? Do you know?
A. Bob Novak does, to my--best of my knowledge. There's also a disclaimer page on there that says it has no affiliation with SkyWest or is not property of SkyWest.
Q. Do you have to--can anybody access this Web site?
A. Only SAPA members. And they are given a pass word by Bob Novak.
Q. Were you given--you had a password in December of 2000.
A. Yes.
Q. And were you regularly posting messages on the message board?
A. Yes, I was.
Q. What kinds of messages were you posting?
A. We were posting messages regarding the ALPA, Airline Pilots Association, union organizing efforts.



Q. So you were talking about union organizing in 2000.
A. That's correct.
Q. December of 2000.
A. That's correct.
Q. What kind of things were you saying?
A. I would provide, you know, opinions, research, statistics regarding our contract or lack thereof compared to other airlines and issues that affected the pilots and arguments as to why we should unionize.
Q. Is that Web site in 2000--is that basically solely a place for posting messages about union activity or union organizing?
A. It could be for anything.
Q. But your--did you have other types of messages that you posted other than union-related activity messages?
A. To the best of my knowledge, most of my posts, if not all, were regarding the union organizing.
Q. Were you part of the union drive at all?
A. Yes, I was.
Q. Were you on an organizing committee?



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 53

A. Yes.
Q. Now, help me understand a little bit. In your understanding, when there was a union drive in 2000--this isn't just you're just kind of hanging around saying, It would be nice to be a union. There's actually an organized effort to try to create a union at SkyWest among the pilots.
A. That's correct.
Q. Is that--that's right. And that happens periodically. It happened periodically while you were employed at SkyWest.
A. I--during my time, I believe there was three or four union drives.
Q. Okay. And in the meeting with Mr. Holt and Mr. Breeze and Chris Abell--is it "AB-ell" or "a-BELL"?
A. I think it's "a-BELL."
Q. Okay. "a-BELL." All right. Did they discuss messages that you had posted on this SAPA Web site?
A. They discussed in general terms the messages.
Q. All right. Tell me how it is they discussed in general terms. What do you mean by

Page 54

that?
A. They asked why I was, you know, posting critical comments or what--perhaps maybe derogatory about the company. I don't know if those words were used though.
Q. Did you say, What comments?
A. I did.
Q. And what did they say?
A. To the best of my knowledge, the issue was never discussed any further.
Q. Well, if I ask you--I'll ask you, what comments do you think they were talking about?
A. The only comments I made on there were my union organizing comments.
Q. So was it your understanding in this meeting that they were criticizing you because you were making union comments on the SAPA Web site?
A. Yes.
Q. But it's not your testimony--you couldn't tell me specifically whether either of these three people identified the union postings specifically during this meeting.
A. I don't remember.
Q. So it's possible they could have mentioned it and you just can't recall, or they

Page 55

didn't mention it?
A. It's possible they did mention it.
Q. All right. Did they tell you that you had made comments about Brad Holt's home?
A. Yes.
Q. Did you tell them, No, I didn't make any comments?
A. Yes, I did.
Q. Who was it that said to you, You've made comments about me? Who specifically of these three?
A. Brad Holt asked.
Q. And what did he say?
A. He said, I heard--I believe he said, I heard you're making comments about my house, and what business is it of yours?
Q. And what did you respond?
A. I said, I did not make any comments. I don't know about your house. You know, I just had purchased my own home. I don't have any concern for anyone else's, you know, personal business.
Q. Did Jim Breeze make any comments at the time?
A. No.

Page 56

Q. How about Mr. Abell?
A. Oh, he made comments during the meeting, but not at that particular time.
Q. All right. What comments did Mr. Breeze make at the meeting?
A. Jim asked me if I was happy at SkyWest. And then he also asked if--how Mike Jones was doing.
Q. Did you have any understanding as to why Mr. Breeze was asking you if you were happy at SkyWest?
A. I can--no. I can perhaps maybe imagine that he did not think I was happy because of my posts.
Q. Were--your posts were critical of the company.
A. They were posts, you know, suggesting why we should be unionized.
Q. Did Mr. Abell make any comments?
A. He was not allowed to. He was not allowed to comment, according to him.
Q. So he said at the meeting words to the effect of, I'm just here, I'm not allowed to comment.
A. That's correct. He told me this before



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

we went into the meeting.
Q. All right. How long did the meeting last?
A. I believe it lasted 45 minutes.
Q. Were there any--any resolutions made, any decisions made at the end of the meeting?
A. Mr. Holt said that there was--or at the end of the meeting he handed me my employee file. He said, We're not putting anything in your file. We're not giving you any disciplinary action. We're going to put you back on the trip that I'd been taken off of. And I was sent home.
Q. Are you familiar with I-Share?
A. Yes, I am.
Q. Tell me what that is.
A. I-Share is a message board on the SkyWest online Web site.
Q. Is that specific to pilots or any SkyWest employee?
A. Any employee can post on there.
Q. But that's a place where you can post whatever messages you might have in relation to SkyWest or employment.
A. Yes. Yes, anything.
Q. Did you ever post anything on I-Share?



A. I might have.
Q. In December of 2000?
A. Skywestonline.com did not exist in December of 2000.
Q. So I-Share didn't exist then.
A. That's correct.
Q. Did the company have any sort of Web site at all at the time that you recall?
A. There was skywest.com, which was basically a company information Web site that--
Q. Couldn't post messages on.
A. No, no, no, no. It was just a--you know, a Web site that, you know, showed what SkyWest is, information only, who they are, what they do, who the employees are. There was no messages. It was for the general public.
Q. All right. Looking back at Exhibit 35, this second sentence of the third bullet point, it says, "And because of behavior towards crew schedulers such as berating the schedulers over scheduling or pay issues."
A. Uh-huh (affirmative.)
Q. That's a yes? Did you see that?
A. Yes, I see that.
Q. All right. And you were told by Mr.



Holt that somebody in scheduling had complained about some scheduling issues.
A. Yes.
Q. Tell me about that. What were you told was the complaint?
A. I was not--like I said before, I was not read the actual complaint, so I don't--did not know the specifics at the time. Earlier the previous week I'd attempted to pick up a trip in open time that was assigned to me as--which ended up being a captain's trip. It was assigned to me and then was taken off my schedule.
Q. Tell me about open time. What does that mean?
A. I believe open time is all the trips that are not assigned to the pilots that are--for scheduling reasons, you know--if a pilot takes vacation or sick time, that trip goes into open time and was available to be assigned to a reserve pilot or to a line pilot with a, you know, regular schedule that would like to pick up some extra flying.
Q. Are there criteria--is it done on seniority as to whether or not you can pick up an online flight?



A. If the trip is an open time--
Q. Open flight. Sorry.
A. --yeah--if the trip is an open time, my understanding was, a pilot, if they saw it in open time, was able to pick that up on their day off or for extra flying.
At the same time, there was--it could also be assigned to a reserve crew member.
Q. And you were on reserve at the time.
A. No, I was not.
Q. All right. Tell me how it is that you attempted to pick up that open flight.
A. I saw a trip in the open time on the SBS computer, which we had at the time, and called scheduling to pick that trip up. It was assigned to me, but then was noted that it was for a captain. I was a first officer. So I was taken off the schedule. I then called scheduling back to discuss why it was taken off. And it was not known at that time that it was for a captain.
Q. The person that you talked to, was that Nicki McDonald, the scheduler?
A. At the time, I don't recall. But I do now from the--the name does sound familiar.
Q. This is Exhibit 22. So I'm not going



Thacker + Co LLC
Court Reporters
*Utah's Leader in Litigation Support*
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

to mark it, but I want to show you a copy of it.
MR. PETERSEN: It's SW0--or 301 and 302 for you, Erik.
BY MR. PETERSEN:
Q. Have you ever seen this document, Exhibit 22--
A. Yes.
Q. --Mr. Callaway? What do you understand that it is?
A. This appears to be a complaint written by Nicki McDonald regarding some scheduling issues.
Q. And have you had a chance to read it?
A. I have.
Q. I don't want to trick you, but I don't want to waste a lot of time either. Do you agree generally with what is said in it?
A. No, I don't.
Q. All right. So let's go ahead and read it. And you tell me what you don't agree with. If you want, I will read it.
A. Okay.
Q. It says, "Andy Callaway called and wanted to pick up a trip in open time on the 14th." Assuming that's the 14th of December.



A. Well, that couldn't have been if she signed it December 7.
Q. All right. Fourteenth of November.
A. Yeah.
Q. Does that seem right so far?
A. Yes.
Q. "We had about 14 or 15 reserves, so I told him I couldn't give it to him because I had a lot of reserves." Did she tell you that?
A. No. I was assigned a trip.
Q. Okay. She says, "He went off on me about how he wanted the trip, he was going to get it if he had to talk to the top guy of the company because it was no fair that they can't get overtime/junior man pay when they decide they want it." Did you say anything similar to that to her?
A. No, I did not.
Q. "He said he just sat when he was a reserve and it won't hurt them to just sit now." Did you say that?
A. No. To the best of my knowledge, I was a line holder. I was flying a schedule. I was not on reserve.
Q. Is it your testimony she's making this



up?
MR. STRINDBERG: I need to object to this line of questioning. It's not--there's been no foundation laid as to what this complaint is or if it was the complaint that was referenced in the--at the time that Andy went down there. As I recall from the depositions I've taken, no one could identify what it was, when it came about. Are you representing, Counsel, that this was the complaint that was discussed at this meeting in St. George?
MR. PETERSEN: That was a very long speaking objection. But I will say that Mr. Callaway just testified that this was the complaint that Nicki submitted.
MR. STRINDBERG: No, he didn't. You asked him--
BY MR. PETERSEN:
Q. Then let me ask the question. Mr. Callaway, I asked you before if you recognized this document. You said you did. When I asked you what you understood it to be, didn't you just tell me that you understood it to be Nicki McDonald's complaint?
A. That's what it appears to be. She



wrote this, and she's complaining in here. But that's not--that's what she claims.
Q. You also testified, I believe, that you've read this before and that you disagreed with its contents, correct?
A. Yes, I do.
Q. Is this what you were told in substance by Brad Holt and Jim Breeze at your meeting in December of 2000 was the complaint from scheduling?
A. From scheduling. But there was no reference as to who it was from or to the details of what it was about.
Q. All right. At anytime thereafter were you told that the person complaining was Nicki McDonald?
A. Never.
Q. Were you ever made aware that Nicki McDonald was a person you spoke to in scheduling when you were seeking to get this open time flight?
A. It's possible I spoke to Nicki about this, but every time you call scheduling you--you know, I don't know how many schedulers there are--you speak to whoever answers the phone.

Page 93

Q. It's your testimony you only met with Brad and Jim once to talk about crew schedulers by--prior to October of 2001.
A. That's correct. There was only one meeting.
Q. Then going to No. 6 it says, "In approximately October 2001, human resources received phone calls from neighbors of Andy's in Salt Lake City complaining about Andy's party house. The neighbors knew Andy was a pilot for SkyWest. The police department was called to Andy's house numerous times for loud party and disturbance." Where were you living in October of 2001?
A. October 30--October 2000. October 31, 2001, I purchased my home at 581 West Capitol Street and moved into that home.
Q. Were you living in that home prior to that time?
A. Absolutely not.
Q. All right. Was there a time in which your attention was drawn by your superiors at SkyWest in relation to allegations--
A. Actually--
Q. --by your neighbors?

Page 94

A. (To Mr. Strindberg) Can I correct something?
MR. STRINDBERG: Yes, absolutely.
THE WITNESS: It was October 31, 2000, that I purchased my home--
BY MR. PETERSEN:
Q. All right.
A. --in 581, so . . .
Q. So in October of 2001 you were there
A. That's correct, yes.
Q. Okay. Were there--had you ever had some complaints made to the City, Salt Lake City about events that took place at your house?
A. There was a neighbor who made numerous complaints.
Q. All right. What was the person's name?
A. Heidi--I don't remember her last name. Heidi--oh, Heidi Borgensen, I believe, Borgesen.
Q. What were the nature of the complaints? Do you know?
A. She had numerous complaints. Very outrageous complaints.
Q. Okay. Tell me the substance of the complaints.
A. Drug dealing, because black people were

Page 95

in my house, was the main complaint. Loud noise, loud parties.
Q. Did you have parties at your house during October 2001?
A. No, I did not.
Q. Prior to that time?
A. You know, I've had people at my house. I have a pilot that stays at my house. Every complaint that was filed, when the police would come to my house, would result in no further investigation because there was no party going on.
Q. Did--while you were at your house, are you aware as to whether illegal drugs were ever either bought, sold, or consumed--
A. Never.
Q. --in your house?
A. Never. Was I aware? Never.
Q. Yes.
Did you ever turn your music up really loud?
A. No. I mean, my music is--you know, you can turn it up. But if you go outside, you cannot hear it.
Q. So it's your belief, if I understand this, that neighbors complained because you had an

Page 96

African American that visited your house at times.
A. Heidi did complain to the police department that there was--behavior of black people coming and going to my house was indicative of drug use and dealing.
Q. Okay. I'm going to show you--this is 9 through 14.
MR. PETERSEN: I don't think it's in our exhibit list, is it?
MR. EMERSON: I don't see it.
Exhibit-37 marked
BY MR. PETERSEN:
Q. Mr. Callaway, I'm showing you what's been marked as Exhibit 37. It's SW9 through SW014, 14.
A. Uh-huh (affirmative.)
Q. Have you ever seen those documents before?
A. Yes. The first time I saw these was after I was terminated.
Q. Look at the first page, No. 9. It--you know, I know you--these were not prepared by you. If I represent to you that these were documents received by the Salt Lake City Police Department--what I want to look at is--



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 113

because of Andy's behavior in upgrade training and at the Butte station. Captain Hyatt read Tony Thompson's write up from the meeting." Do you recall meeting with Brad Holt, Bill Boice, and Tony Thompson on November 13, 2001?
A. Yes, I do. Among other people, yes.
Q. Tell me how you came about to meet with them.
A. On November 13, in the morning, I was up in Butte, Montana conducting flight training. I was returning to Salt Lake City to conduct my type ride later that evening, on the 13th. When I arrived back to Salt Lake City, I was advised that there had been a reported incident in Butte, Montana. And I was, I believe, placed on administrative leave at that time until further notice.
A meeting was then arranged that afternoon in Salt Lake City, I believe, only because everyone in management happened to be in Salt Lake City at that time for a ceremony, if I remember correctly, of some sort. And that's when that meeting took place.
Q. Did it surprise you that you had been asked to meet with them?

Page 114

A. Absolute--well, it surprised me--the whole thing surprised me, yes.
Q. The whole thing, meaning the incident in Butte.
A. That's correct.
Q. Tell me what happened in Butte.
A. It was reported that I had been--you know, created a problem with the security personnel in Butte.
Q. Actually, to make it easier on you, let me mark another exhibit. And I'll go over that with you.
MR. STRINDBERG: What number is that, Counsel?
MR. PETERSEN: It's 19.
THE REPORTER: Thirty-nine.
MR. PETERSEN: It's Exhibit 7.
BY MR. PETERSEN:
Q. All right. I'm going to show you what has been previously marked as Exhibit 7. Do you recognize that document?
A. Yes, I do.
Q. Tell me what it is?
A. It's a counseling statement.
Q. Is this what you received on or around

Page 115

November 30 of 2001?
A. Yes.
Q. At the time you received it, were you asked to read it?
A. Yes.
Q. And review it?
A. Yes.
Q. Were you asked if you had any questions about it?
A. Yes.
Q. And you--is that your signature down--
A. That's correct.
Q. --at the bottom? And then there are some words underneath your signature.
A. Yes.
Q. What do those words say?
A. "Under protest. Please see attachment."
Q. Okay. Let's go over this. Is this what you were given at the time you met in Salt Lake City with Brad, Bill, and Tony?
MR. STRINDBERG: Objection. Assumes facts not in evidence.
BY MR. PETERSEN:
Q. Go ahead.

Page 116

A. No.
Q. All right. Then let's--were you ever provided a counseling--you said you signed the counseling statement. So you were given it at some point, right?
A. Yes, yes.
Q. But you met with Brad, Bill, and Tony on the 13th of November.
MR. STRINDBERG: Objection. Misstates his testimony.
BY MR. PETERSEN:
Q. Is that right?
A. To the best of my knowledge, there was a meeting in the afternoon. I don't know if it was the 13th, but I think it was.
Q. All right. On or about two weeks prior--
A. That seems--
Q. --to the time you received the counseling statement. I'm not trying to trick you. I'm just trying to get a chronology here.
A. I'm sorry.
Q. So about two weeks, maybe a little more than two weeks prior to you receiving the counseling statement you met with these gentlemen.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 117

A. Yes.
Q. Okay. And at the meeting, then, you show up and you don't have--you know you're there because of alleged complaints regarding Butte, Montana, right?
A. Yes.
Q. Okay. Tell me what happens. You walk in the office, and what happens next?
A. I walked into a conference room at the Salt Lake SkyWest hangar. At the meeting was Brad Holt, Bill Boice, Tony Thompson, Kelvin Hyatt, Dave Faddis, Mike Eisenstat--
Q. Why was Mike there?
A. --and Tony--and maybe Tony Fizer.
I'm sorry. Why was who there?
Q. Why was Mike there?
A. I had requested Mike, who was with SAPA, to be there on my behalf.
Q. Why didn't you request Chris Abell?
A. I spoke to Chris. Chris assigned this responsibility to Mike, who was, I believe, vice president of SAPA.
Q. Why did you feel you needed SAPA representation?
A. Because I felt intimidated. And I

Page 118

wanted someone there to witness what was to take place.
Q. Did you know you were going to be in trouble?
A. I honestly did not know what this--was stemmed from, other than what I was told earlier that day that there had been an incident with security personnel in Butte.
Q. Well, you knew it couldn't have been a good thing that you were meeting with them, right?
MR. STRINDBERG: Objection. Argumentative.
BY MR. PETERSEN:
Q. Go ahead.
A. I don't know.
Q. Well, you asked for a SAPA representative.
A. Yes.
Q. And you wouldn't ask for a SAPA representative if you were about to be promoted, would you?
A. Probably not.
Q. Generally would ask for a SAPA representative when you had an idea that it would be potentially adverse to your employment.

Page 119

A. Yes. Well, I assumed that only because I was taking--I was placed on administrative leave--
Q. Okay.
A. --with pay.
Q. And so you then met with this group of people. Tell me who led the meeting.
A. I believe the meeting was led mostly by Brad Holt.
Q. What did Mr. Holt say?
A. He wanted to talk about what happened in Butte. And he asked if--you know, what happened.
Q. What did you say?
A. I told him that nothing had happened.
Q. So you don't recall anything unusual about your time in Butte on November 12, 2001, or thereabout.
A. That was nothing that happened in Butte. I asked the security screener why empty bags had been--were being emptied--or excuse me--not emptied, being X-rayed. They were emptying the contents of the bag, X-raying the bag separately from the contents. I simply asked a security screener why that was being done, because

Page 120

I had never seen that process done before.
Q. And did the screener respond?
A. I believe she did. And I don't remember the answer.
Q. Was it in any form that caused you to think she was concerned--
A. Absolutely not.
Q. --or upset?
A. Absolutely not.
Q. You didn't get upset at the screeners.
A. Absolutely not.
Q. The screeners--tell me--in Butte, Montana during this time period--so I'm talking November 12, 2001--who employed them? Do you know?
A. At the time--to my knowledge, it was all SkyWest personnel, but . . .
Q. So you thought that the people who were checking your bags in Butte were also SkyWest employees.
A. That's correct.
Q. Are you aware as to whether there are other companies who employ those who do security at the airport?
A. I did not know if that was the case at



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 121

SkyWest--or excuse me--at Butte.
Q. Did they have SkyWest uniforms on, that you're aware of?
A. I believe so. And they had SkyWest ID badges.
Q. You ever heard of Horizon?
A. Yes.
Q. What do you understand that company to be?
A. That's another regional airline.
Q. Do you know whether any of the Horizon employees were conducting screening at the Butte place on this November 12 date?
A. I did not notice.
Q. Did you ever find out later on whether that was the case?
A. Yes.
Q. And what did you understand the result to be? That there were some Horizon people?
A. Yes, there were some Horizon employees there. They're the other airline that serves Butte.
Q. Horizon's not SkyWest, right?
A. No.
Q. All right. Let's look at this

Page 122

Exhibit--what is it--7. I want to go over each sentence and ask you if you agree or disagree. Okay?
A. Okay.
Q. First sentence says, "On November 12, 2001, while returning from BTM"--I'm assuming that's Butte, Montana--
A. Yes.
Q. --"you had conducted flight training, you were reported as exhibiting inappropriate behavior." Now, what I want to ask is, November 12, 2001, is when you were returning from the Butte, Montana--
A. That's correct.
Q. --place. You were doing flight training there, correct?
A. That's correct. That previous evening, yes.
Q. All right. Do you agree with the statement, "You were reported as exhibiting inappropriate behavior"?
A. No, I do not.
Q. There's something that's been blacked out. Do you see that?
A. Yes, I do.

Page 123

Q. Do you know what was under that?
A. Yes, I do.
Q. What did it say?
A. "Extremely."
Q. Do you know why it was blacked out?
A. The review board that I requested requested that that word be removed.
Q. Was that at your request?
A. No. That was their request.
Q. They were just floating you a bone on that one.
MR. STRINDBERG: Objection.
BY MR. PETERSEN:
Q. Were they just doing that gratuitously?
A. That was the decision of the review board.
Q. Okay. Then it says, "Three SkyWest Airlines ramp agents witnessed this behavior." Do you know who the ramp agents that would be referring to?
A. Well, there weren't three SkyWest ramp agents. There was a SkyWest ticket agent, a SkyWest--the employee--the SkyWest employee that was conducting the security screening and then the Horizon employee conducting the security

Page 124

screening.
Q. Okay.
A. So I don't know who the three SkyWest airline agents are.
Q. At the time, though, I think you said you believed that all involved were SkyWest employees.
A. At the time I did, yes.
Q. All right. And so it says then, "It is reported to have begun at the ticket counter when 'must ride' authorization was not present for your travel." What is must ride authorization?
A. Must ride is a method to, I guess, ensure that the employee is--gets a seat on the aircraft, a confirmed seat. There's usually authorization that's given to people that the pilots or employees that are in training events or on company business.
Q. When you were there on November 12 was it your belief that you were to have a must ride for that--for your travel from Butte to Salt Lake or--
A. Yes.
Q. --wherever it was you were headed?
A. Yes, it was.



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 189

point, "Andy received another SAD on June 30, 2003." Do you recall that?
A. Yes, I do.
Q. Tell me what that was about.
A. June 30. Okay. That was--I submitted request for a day off to attend to some court matters regarding the--my litigation with the City. The date was wrong. I submitted a request, canceled it, and submitted a request for another day. And it was never processed. And I was contacted by scheduling, not for an assignment, but they said, Please call us every 30 minutes to see if there's any scheduling changes. I complied with their request. I was still issued the SAD.
Q. So would it be your testimony that you should not have received a SAD on June 30?
A. I understand why the SAD was issued and agreed to why it was issued, but I also followed their instructions as well.
Q. All right. Why do you say, you understand why it was issued? Why do you understand it was issued?
A. Well, the definition of a SAD is when a crew member is not--cannot be contacted within ten

Page 190

minutes of leaving a message. A message was left. And I did not return the phone call until, I believe, 30 minutes later. And that's when I was instructed to keep calling back every half hour.
Q. So that justified the SAD, whether--
A. Sure.
Q. --you want to give weight to how good or bad?
A. Sure. I have no issue with that.
Q. Okay. How about the March 26, 2002, SAD? Do you have any issue with the appropriateness of issuing that one?
A. I did, I believe, at the time, only because the scheduler told me that I would be taking off--she would put me down as sick. In fact, the documentation--she offered to do that in the documentation.
Q. So--but--so is it your opinion that a SAD should not have been issued on March 26?
A. That's correct.
Q. Because if you had called in sick, then even though you miss a particular flight, there's not a SAD that's--
A. If I had called in sick, it would not

Page 191

have been a SAD.
Q. Okay.
A. What happened there is I went to bed early the night before because I was sick, and either lack of my own, you know, setting the alarm and all that, I just--didn't hear the phone ring in the morning. And that's when scheduling advised me of this.
Q. On--going to the fifth bullet point down, it says, "On August 12, 2003, Flight Attendant Kristen Wiley told Captain Hyatt she had concerns she was receiving threatening e-mails from Andy regarding money he said she owed him. Andy had invited Kristen to go with him and a group of people to Spain. According to Kristen, Andy told her she only needed to worry about her plane ticket and food, and everything else would be paid for. Now almost a year later, Andy was using skywestonline.com to send messages demanding payment of the shared expenses from the trip. Kristen felt threatened to even check her messages and asked Captain Hyatt if there was anything he could do to stop these messages. Captain Hyatt said he would look into this matter."
Did you and Kristen Wiley go to Spain?

Page 192

A. She attended a group trip to Spain in September of 2002.
Q. Okay. And who else was on the trip other than you and Kristen?
A. There was--I believe ten of us. None from--she was the only other coworker, colleague--friend of mine.
Q. The others--who were they?
A. Friends of mine outside work.
Q. What are their names?
A. I would have to sit here and think about it, because a lot don't live here.
Q. All right. Can you think of any of them?
A. Let's see. Jed Arveseth.
Q. Where does he live?
A. Salt Lake City.
Q. Do you have a phone number for him?
A. I don't--you know, it's in my cell phone. I don't--you know, I don't know--I don't have these memorized.
Christina Hill. Christina Cruz.
Q. Also both living in Salt Lake?
A. Christina Hill, yes. Christina Cruz, no. And I don't know where she lives now. I



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 201

Q. Okay. Do you see that one?
A. Yes.
Q. And what does it say?
A. It says, "You know, money is so tight right now. And looking back, you told me I wouldn't need to pay, the only thing I needed to pay was for food and other things. Sorry, Andy."
Q. So she told you at least--what's the date on--this one that was sent?
A. August 11--yes, August 11. I read it August 12, it looks like.
Q. August 12 of 2003.
A. Correct.
Q. And you guys went on--it was in 2002, September of 2002, right?
A. Correct.
Q. So this is almost a year later.
A. Yes, it is.
Q. She says--at this point, she's told you she thought she didn't have to pay, right?
A. That's what that e-mail says.
Q. Right.
A. It's not what the other e-mail says.
Q. You disagree with that. And you say--if you look at the first one--"Actually, Kristen,

Page 202

I have an e-mail from you that says you will pay."
A. Yeah.
Q. "You also told me [that] you would sign over your bonus check," right?
A. Yes.
Q. All right. So she disputed whether she owed you the money at least at some point in here.
A. Uh-huh (affirmative.) Yes.
Q. And look at the next page, SW193.
A. Uh-huh (affirmative.)
Q. The second one down. What does that one say?
A. "Come on, Kristen. I'm tired of this. I need my money now, or I'll get it the hard way. Thanks, Andy."
Q. You sent that one on skywestonline.com, right?
A. Yes, I did.
Q. What did you mean "I'll get it the hard way"?
A. Small claims court.
Q. It doesn't say that, though, does it?
A. No. But small claims court is a pain

Page 203

in my butt to do. And that's what it meant.
Q. So it was the hard way for you or the hard way for Kristen?
A. The hard way for me.
Q. That's not usually how we use that phrase, is it?
A. Between a friend, that's how I talk. That's how our communication was. She admits on the next page to owing me the money.
Q. All right. Going back to the prior exhibit, which is, I believe, Exhibit 41--
A. Yes.
Q. --before it says--about six lines down, "I had the feeling he was trying to start a relationship with me, and I was also told that he was interested." Are you aware as to whether some other person told Ms. Wiley that you were interested in some sort of relationship with her?
A. No, I'm not.
Q. She says, "After we got back we started hanging out more often." I'm assuming that's after you got back from your trip. Is that a fair statement?
A. That is completely false.

Page 204

Q. You didn't hang out more often.
A. No, I did not. She actually started dating a friend of mine.
Q. She says, After November start, I lost interest. And that is when he started mentioning about how much the trip cost him.
When was the first time you told her to pay you back?
A. After we returned. I don't know exactly the time frame that elapsed, but it was--
Q. Would it have been November?
A. September--yeah, it could have been November. I'd received a payment from her.
Q. She gave you 50 bucks.
A. Uh-huh (affirmative.) And then it stopped. The payments stopped.
Q. How big is Ms. Wiley? Do you know how tall she is, or is she small?
A. Oh, maybe five-seven, maybe.
Q. Was there a particular bar that you--that she would go to with you in which she had a boyfriend that worked?
A. Not that I know of.
Q. You don't ever recall going to a bar and having her know one of the people that worked



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 205

there, a man?
A. No, I don't. This letter is the first I've seen of that.
Q. Did you talk to her beyond e-mails about getting paid?
A. Never.
Q. You never spoke to her in person?
A. I never saw her.
Q. Did you call her on the phone?
A. Voice mail.
Q. You would leave her voice mails.
A. I would leave her voice mails to call me back.
Q. Did you leave voice mails saying, Pay me the money?
A. I could have, yes.
Q. Okay. Tell me how many of those you did.
A. I have no idea.
Q. Do you know when?
A. I don't.
Q. Was it more than one?
A. It could have been more than one. Certainly not more than three or four over a year. After--you know, the phone--after I would

Page 206

never get a phone call back, I just gave up on that avenue of collection.
Q. Did it seem inappropriate to you to use skywestonline.com to send her an e-mail wherein you say, I'll get it the hard way?
A. At the time I wrote that e-mail, I did not see that to be much of an issue from e-mail to a friend--who I thought was a friend at the time.
Q. Looking back at it now, do you think that was a poor use of judgment?
MR. STRINDBERG: Well, obviously, because he got fired, you know.
BY MR. PETERSEN:
Q. So is that yes, your Counsel testified?
A. I can understand where that could be construed, yes.
Q. Okay.
A. At the time, though, I never knew of any issue there.
Q. Are you aware as to whether company policy prohibits the use of company e-mail for purposes of collecting a debt?
A. I'm not aware of any policy on that.
Q. Are you aware as to whether company

Page 207

policy precludes somebody from intimidating another employee?
A. I'm sure there is a policy on that. I now have read a policy on that.
Q. Let's look at that policy. Find the dumb thing.
MR. EMERSON: It's also in Exhibit 15.
BY MR. PETERSEN:
Q. All right. I'm showing you what was--
MR. PETERSEN: They're both pages on there or not?
MR. EMERSON: I don't think so. It's earlier. It's in the book. It's in this book.
BY MR. PETERSEN:
Q. I'm showing you what's been previously marked as Exhibit 15, sub 17-B. Do you recognize that document?
A. Yes, I do.
Q. Tell me what it is.
A. I'm sorry. Which one are you making me look at?
Q. The document, the whole page.
A. This is regarding reserve.
MR. EMERSON: Must be 306.
MR. STRINDBERG: Yeah. I think it's

Page 208

the wrong one.
MR. EMERSON: Must be 306.
MR. PETERSEN: Well, you're right there.
BY MR. PETERSEN:
Q. All right. We've got the right one now. All right. Do you recognize that document?
A. Yes, I do.
Q. Okay. Tell me what that is.
A. It appears to be the policy manual--crew member policy manual.
Q. Do you see No. 29 on the right side?
A. Yes, I do.
Q. What does it say? Or--well, you don't have to read it. Tell me what you understand it to mean.
A. It talks about the destruction of information and misusing computer terminals, printers, related equipment. Mentions nothing in there on e-mail.
Q. So you don't understand--if you sent an e-mail on a company computer, you wouldn't understand that to fall under No. 29.
A. Absolutely not.
Q. Why is that?



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 213

financial affairs?
A. I don't know what you're getting at here. Company stamp? Company--
Q. Answer the question if you--if you can answer the question.
A. Repeat it then.
Q. All right. If you sat down in a company office and you turned on the company computer, you typed up a demand letter demanding payment for something, a debt owed to you about by another employee--
A. Uh-huh (affirmative.)
Q. --and you printed it on the printer down the hall, on a white piece of paper, you took it and you put it in a blank envelope that was purchased by SkyWest and put a stamp on it that you got out of the SkyWest office and sent it to this crew member, would that violate 34?
A. I don't believe it would.
Q. Because you're not actually involving a representative of the company?
A. I'm not involving the company. I'm not representing the company. There's no SkyWest letterhead or graphic or anything of the such that

Page 214

is being represented.
Q. But you used company property in that scenario.
A. A computer is an inanimate object. It cannot be used.
Q. Use my scenario, please. My scenario with the paper and the stamp and the letter and the computer and the printer, that in your opinion does not involve the company.
MR. STRINDBERG: Counsel, it's asked and answered. He already--
THE WITNESS: No.
MR. STRINDBERG: --gave you an opinion. He answered the question.
MR. PETERSEN: He just did.
MR. STRINDBERG: Well, he did before, too.
BY MR. PETERSEN:
Q. All right. Getting back to Exhibit 35, six bullet points down, it says, "Captain Hyatt sent a message to Andy asking for explanation." Do you recall receiving a message from Captain Hyatt asking you to explain what happened in regards to Kristen Wiley?
A. Yes, I do.

Page 215

Q. Was that an e-mail you received?
A. Yes, it was.
Q. Tell me what it said in essence.
A. I don't recall exactly without looking at it, which I'm sure you're about to produce.
Q. I've got it. I was just hoping you could tell me.
A. It said that I had been--well, I'll just wait, because I don't recall the wording.
Q. Okay.
Exhibit-42 marked
MR. PETERSEN: I don't think this is in your exhibit, is it?
MR. EMERSON: I think it is.
MR. PETERSEN: Do you?
MR. EMERSON: Uh-huh (affirmative.)
BY MR. PETERSEN:
Q. I'm showing you what has been marked Exhibit 42. Do you see that?
A. Yes.
Q. Is that the message you received from Mr. Hyatt?
A. Yes, it is.
Q. Were you shocked when you got this?
A. Yes, I was.

Page 216

Q. Why?
A. For one, it didn't mention who it was. And I had absolutely no idea what this complaint was regarding.
Q. Did you call Mr. Hyatt?
A. No, I did not.
Q. Well, if you were requested to respond, would it be important to clarify to know what he was talking about?
A. Perhaps.
Q. But you didn't--you chose not to call him.
A. No. I--after reading these policies that were in here, I assumed it regarded Kristen.
Q. So you figured it out.
A. Yes, figured it out and then answered the--these allegations in a letter back to Kelvin.
Q. I'm showing you what has been marked as Exhibit 3, I believe. Do you see this? Is this the response you prepared for Mr. Hyatt?
A. Yes, it is.
Q. I have read through this. And I don't note any apology anywhere in here. Was it your position when you wrote this to Mr. Hyatt that you in no way believed you had sent anything



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 221

Q. When was that?
A. That was 2000--well, when was that? 2001.
Q. It was after he left your house.
A. Yes. Yes. That's why he left. He was asked to leave the house because he did not pay his rent.
Q. Have you ever been sued?
A. No, I have not.
Q. Have you ever been charged with a crime other than the reckless driving?
A. No, I have not.
Q. Were you charged with anything when you were arrested in relation to your neighbor and the loud party allegations?
A. I believe they tried to use disturbing the peace. Or maybe it was interfering with an officer, I believe, for not opening the door. Both were dismissed.
Q. Those are the only times you've been charged with a crime.
A. Yes.
Q. Looking at this exhibit, this SW191, your response, there's little tiny different print in that.

Page 222

A. Yes.
Q. Do you know why that is?
A. I believe that's the formatting that the e-mail Microsoft Outlook did, because this was typed--I typed the document in Microsoft Word and then did cut and paste and pasted into an Outlook e-mail. And I--from my end, it didn't look like this. But when this was presented to me from Mr. Hyatt, that's--there was that one paragraph in a different font. It's the only my--only explanation I have for that.
Q. Okay. And then you say, "I have provided the e-mail thread from skywestonline for your reference." That's in the last paragraph on this page.
A. Yes.
Q. Is that the summary of e-mails that we've already gone over?
A. Yes.
Q. You didn't reference other e-mails to Ms. Wiley that you sent not on skywestonline.com.
A. I don't believe so.
Q. Why not?
A. They were irrelevant. They were repeated in the skywestonline e-mail.

Page 223

Q. So if you had threatened her but not on a SkyWest e-mail, you didn't think that had anything to do with why you were being asked to respond.
A. No.
Q. All right. Tell me what happened. You sent this to Kelvin. Then what?
A. I sent this to Kelvin. Left on vacation, and came back, and was on administrative leave, and then terminated.
Q. Why do you think you were terminated?
A. Well, I believe I was terminated because of this e-mail.
Q. It's not your testimony, is it, that Jim Breeze had a call with Kelvin Hyatt that he should talk to Kristen Wiley about saying something bad about you?
A. I'm sorry. What was that?
Q. Do you think that Jim Breeze contacted Kristen Wiley to get her to say that you were threatening her?
A. I don't know where you get that.
Q. It's just a question. Yes or no, do you believe that or not?
A. I have no idea.

Page 224

Q. You have nothing that would suggest that he did, do you?
A. I have nothing to suggest that he did. And I also have nothing to suggest that this was investigated.
Q. You don't have anything to suggest that Jim Breeze contacted Captain Hyatt to terminate you as a result of this Kristen Wiley incident.
A. It's possible.
Q. Why do you say it's possible?
A. Because anything's possible.
Q. Right. So other than pigs flying, is there any other basis that you would have for that?
A. No. And the reference here to the counseling statement that mentions arrogant or abusive treatment of fellow employees, I could see how Kristen could have manipulated the situation to make it seem that I was threatening her. So that is why--
Q. Do you think Kristen knew that you had a counseling statement talking about threatening and abusive and whatever you just described?
A. Yes.
Q. How do you know she knew that?



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 265

A. The posts on the Web site.
Q. Okay. Tell me where it mentions union activity.
A. Well, that's what I was discussing when I was talking about the visit to St. George. And I did mention in the review board my union organizing involvement.
Q. Did you mention--
A. Why--
Q. Go ahead.
A. Why it's not in here, I don't know.
Q. Did you mention to the review board that you thought any of the disciplinary actions that you received were related to your union postings?
A. I did mention the union post--
Q. Okay. But that wasn't my question.
A. --as the reason for me receiving the first counseling statement.
Q. So my question is, did you tell the panel that you--your first counseling statement was because you posted union?
A. That was my belief.
Q. Right. But what did you tell the panel during the review board?

Page 266

A. I don't remember the exact words.
Q. Is it possible that you did not mention anything about you being counseled because of union postings?
A. The recollection--my--best of my recollection is I did mention the posts regarding the union activities and the counseling statement.
Q. If we go to the tapes and transcribe them, that would answer that, wouldn't it?
A. Of course it would answer them.
Q. What you told them.
A. It would refresh all of our memories, I'm sure.
Q. Looking at--under where it says "Rebuttal" on SW004--do you see that?--
A. Yes.
Q. --it says, "Andy was terminated because of continual behavior that was not acceptable, not because of one incident." Why did--do you know why Kelvin responded like that?
A. I don't.
Q. Did you tell the panel that you believed you were being terminated because of the Kristen Wiley incident?
A. I believe that was the catalyst that

Page 267

caused the termination. It was like the last straw that they were going to deal with. I believe that all these incidents passed that were made to believe--to, you know, show a pattern were based on fabrication and documents that were false, with false allegations.
Q. And your belief that these are false and fabricated is just your theory.
MR. STRINDBERG: Objection. It misstates his testimony.
BY MR. PETERSEN:
Q. Go ahead.
MR. STRINDBERG: It's argumentative.
THE WITNESS: It's my belief, yes. There are documents in there that don't even resemble me, that talk about someone else.
BY MR. PETERSEN:
Q. And you believe they were fabricated or created to terminate you because what?
A. They would show a pattern relating to my organizing posts, you know, my showing that I am, you know, vocal regarding the union. It pissed people off. And they're going to build whatever they can to show a pattern of this type of behavior.

Page 268

Q. "They" being Jim Breeze.
A. Yes.
Q. It says--
A. When you have every document that says "Per Jim Breeze's request," I have no other reason to believe it was Jim Breeze.
Q. It says, "Andy did not accept responsibility for any of his behavior." Is that inaccurate?
A. Well, that would be inaccurate, because I did accept the two SADs that were given.
Q. Outside of that, you didn't accept responsibility for anything else. Is that fair?
A. That is fair. I didn't accept responsibility because also my evidence was never investigated.
Q. All right. Look at the next page where it says the "Decision." It's SW005. Do you see that?
A. Yes.
Q. It says, "After careful consideration, the panel members upheld the termination, but Andy was given the option to resign and be made eligible for rehire." Were you offered an opportunity to resign?



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

Page 285

references was accusing me of being arrogant and a liar.
Q. So when it says, ". . . and feel that there are areas that I would like to become more sensitive in and understanding towards," is that something you meant to say or was that something you simply said because you wanted to save your job?
A. No, that's something that--if someone keeps--you know, accusing me of being arrogant, you know, I'm going to do something to maybe change that perception. But that perception is an individual opinion.
Q. So is the answer that, yes, you did feel that there were areas that I would like to become more sensitive in and understanding towards, or is your answer that, no, you did not feel that?
MR. STRINDBERG: Objection. Asked and answered.
BY MR. PETERSEN:
Q. Go ahead.
A. I've answered it.
Q. Answer it again, please.
A. What was the question?

Page 286

Q. All right. It's a simple question, Mr. Callaway. And you've not answered it. I said to you, when you wrote the sentence, "I have thought about everything that was said to me when we met and feel that there are areas that I would like to become more sensitive in and understanding towards," my question is, did you mean what you say there?
A. Yes.
Q. Okay. Did you get an employee handbook when you were first hired on at SkyWest, Mr. Callaway?
A. Yes, I did.
Q. Do you recall whether that handbook had anything referencing something that is referred to as at-will language?
A. Yes.
Q. What do you recall that that language indicated to you?
A. I don't recall. I don't have a copy in front of me, and I don't know what it says.
Q. Do you have an understanding as to whether--at the time you were hired you could quit at any time?
A. Yes.

Page 287

Q. You could, right?
A. You could quit, yes.
Q. And you didn't have to give notice to the company, you just quit.
A. I believe two weeks' notice was requested.
Q. Do you know whether it was required?
A. I don't recall.
Q. Do you have an understanding as to whether the company could terminate you at any time?
A. Yes.
Q. And that understanding is that they could?
A. Yes.
Q. With or without notice?
A. Yes.
Q. And with or without cause?
A. Yes.
MR. PETERSEN: I'm about done with my questions. So let's take a two or three minute break. And I'll get to the end here.
THE VIDEOGRAPHER: We're going off the record. Time is 4:51 p.m.
(Recess taken, 4:51-4:58 p.m.)

Page 288

THE VIDEOGRAPHER: We're back on the record. Time is 4:58 p.m.
BY MR. PETERSEN:
Q. All right. Mr. Callaway, I'm going to show you what's been marked as Exhibit 45.
Exhibit-45 marked
BY MR. PETERSEN:
Q. Do you recognize that document?
A. Yes.
Q. Tell me what it is.
A. It's a letter from Robert Odor, who was approached by Mr. Breeze to conduct an illegal background check on me.
Q. Why do you say "illegal background check"?
A. It mentions it right there that--"Highly unusual considering it would be illegal and outside the scope of my duties." Also, background check is--cannot be conducted without the employee's consent.
Q. And the basis for your belief of that.
A. I've researched the Utah Code regarding that.
Q. Okay. So you're making a determination--so you think the legal effect is of



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

employee handbook sets forth certain terms and conditions of employment which may constitute an implied in fact contract as well as the practices of the airline. These practices include not terminating pilots except for cause and giving them the opportunity to appear before a review board."

Now, yesterday you testified that you were aware that the handbook has language saying that your employment with SkyWest is at-will, correct?

A. Yes.
Q. And that you could quit at any time with any--for any reason, right?
A. Yes.
Q. And that, in fact, it explains that you can be fired at any time and for any reason, right?
A. Yes.
Q. You also testified yesterday that, for example, if a pilot tests positive for alcohol or drug use, that they are terminated automatically without any procedures. Is that right?
A. I would assume so, yes.
Q. Are there--is there anything outside of



what you've testified to that you would add to your answer to Interrogatory No. 5?
MR. STRINDBERG: Objection. It calls for a legal conclusion.
THE WITNESS: I have no idea.
BY MR. PETERSEN:
Q. So there's nothing additional, factual--
A. There might be.
MR. STRINDBERG: Objection. It calls for a legal conclusion.
BY MR. PETERSEN:
Q. All right. So I--what I would like to know is, as you sit here today, is there any facts other than what you've already testified to that you would like to add to this particular answer?
A. There might be. There might not be. I don't know.
Q. Well, if you have an idea as you sit here today, I am entitled to know it. And if you don't, then you can say, I don't have any more.
A. Well, I don't have any more today.
Q. Okay. Mr. Callaway, if you look at Request No. 3, which is on page .4, it says,



"Please"--what it's requesting is all documents you will or may seek to introduce as exhibits at any trial or hearing in this action. And the answer says, "Plaintiff has not decided what documents he will offer as exhibits at trial." Is that still your position today?
A. Yes, it is.
Q. Have you produced to us, other than the names of the people that you were in touch with at Polar Air--have you produced with us--to us today all documents that you believe are relevant to the claims you have against SkyWest?
A. As--
MR. STRINDBERG: Objection. It misstates his prior testimony.
BY MR. PETERSEN:
Q. Go ahead.
A. As of today, it seems to be that way.
Q. All right. Do you anticipate that you--this isn't a trick question--do you have any idea as you sit here today that you anticipate having additional documents that you intend to submit as evidence in this case?
A. Yes.
Q. All right. What documents do you



anticipate you'll be submitting in addition to what you've already produced?
A. I don't know right now. I don't have those documents in front of me. I don't have an answer to that question.
MR. EMERSON: Mr. Strindberg, I think we need to have a quick discussion. Discovery deadline here is in six days. If we're unable to identify the witnesses that'll be called at trial or identify any of the exhibits that are going to be used at trial, I think we have a right to know what those are by the end of discovery. So we either need to extend discovery so you have time to figure that out or get these questions answered today.
MR. STRINDBERG: Well, I--Scott and I have already some time ago talked--had had a discussion about extending discovery.
MR. PETERSEN: We need to--
MR. STRINDBERG: And I think we need to follow up on that. I don't disagree with you. They are--you know, we have produced, you know, witnesses and documents, you know, already. I mean, the witnesses are listed in our initial disclosures, as I recall. I don't know if it's

Page 348

interpret the docs for me. Tell me what it is.
A. I--well--start on page .1 and go to 181.
Q. If that's what you need to do. I don't need a page by page. What I want to know is, what do you believe the significance is in relation to your claims against SkyWest?
A. A lot of these--
MR. STRINDBERG: Counsel--just a second. Counsel, you asked for these documents. We provided them. You asked for all submissions to the SAPA Web site. We--they were printed out. They were in a string of e-mails. Okay? Some of them are from people other than Mr. Callaway. We included those because that's how they--one, how they printed out and you could gather--you know, the threads of conversations about them. So I . . .
BY MR. PETERSEN:
Q. All right. Do you understand my question?
MR. STRINDBERG: Well, I'm going to object to the question. It's unclear and ambiguous. What do you mean?
BY MR. PETERSEN:
Q. Do these 181 or so pages--are they

Page 349

probative of anything--of any of your claims against SkyWest?
MR. STRINDBERG: Objection. Calls for a legal conclusion.
THE WITNESS: These posts are--regard a lot of union organizing activities. Our arguments as to why we should be unionized. There's discussion between other pilots on here.
BY MR. PETERSEN:
Q. Right.
A. That's it.
Q. Okay. Are you saying that SkyWest had copies of this?
A. I'm sure SkyWest has read these, yes.
Q. How do you know that?
A. It's no known secret that management has access to the SAPA boards.
Q. How do they have access to the SAPA boards?
A. You asked that question yesterday. And I answered it.
Q. All right. Refresh my recollection. What was your answer?
A. You know, anybody can, you know, print this stuff out, send it down to St. George. They

Page 350

could gain access to the message boards if they had a, you know, friend that was, let's say, anti-union, decided to give their password to management.
Q. Do you know whether somebody specifically printed out these documents and gave them to somebody at management at SkyWest?
A. I have no idea.
Q. All right. Did you print these off of your home computer?
A. Yes, I did.
Q. And you said that you think that Mr. Novak purged the postings prior to this date or thereabouts.
A. Yes. There's nothing on the current message board that goes prior to these dates.
Q. And do you know why Mr. Novak purged those?
A. I believe it has--is more of an issue of storage capacity.
Q. Okay. So it's just at some point he starts--the memory builds up, or whatever, the storage, and he wants to get rid of them because they're old.
A. That would be my guess. You'd have to

Page 351

ask him.
Q. Do you know whether or not there's a policy that he has about, you know, after X years, I'm purging it?
A. I don't know if he has a policy on that.
Q. Okay.
A. I don't know if he makes a backup or not.
Q. So when you say you print this off, this isn't on your hard drive at home. This is on the SAPA server.
A. This is from the SAPA--skywestpilot.com SAPA, you know, Web page.
Q. You access that SAPA site, and then you download to your home printer, I guess, this stuff. Is that how it works?
A. That's correct.
Q. Okay.
MR. STRINDBERG: One second.
(Attorney-witness discussion held off the record.)
BY MR. PETERSEN:
Q. Other than what you've printed here, do you have downloaded on your home computer any prior e-mails or postings?



Thacker + Co LLC
Court Reporters
Utah's Leader in Litigation Support
Corporate Offices: 50 West Broadway, Suite 900, Salt Lake City, Utah 84101
801-983-2180 Toll Free: 877-441-2180 Fax: 801-983-2181

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| DAVID ANDREW CALLAWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:04CV00179 |
| vs. | ) | |
| | ) | Judge Ted Stewart |
| SKYWEST AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

DEPOSITION OF JACQUE NIELSEN

Taken at the Holiday Inn Conference Room
850 South Bluff
St. George, Utah

On Monday, November 29, 2004
at 10:50 a.m.

REPORTED BY: JENNIFER SULLIVAN, RPR



APPEARANCES:

For the Plaintiff: ERIK STRINDBERG, ESQ.
Strindberg & Scholnick, LLC
44 Exchange Place
Second Floor
Salt Lake City, Utah 84111
(801) 359-4169

For the Defendant: SCOTT PETERSEN, ESQ.
Fabian & Clendenin
215 South State Street
Twelfth Floor
Salt Lake City, Utah 84111
(801) 531-8900

AND

TODD EMERSON, ESQ.
SkyWest Airlines
Director - Government
and Legal Affairs
444 South River Road
St. George, Utah 84790
(435) 634-3530

* * * * *



INDEX


| WITNESS | | PAGE |
|---|---|---|
| JACQUE NIELSEN | | |
| Examination by Mr. Strindberg | | 4 |
| Examination by Mr. Petersen | | 150 |
| Examination by Mr. Strindberg | | 163 |
| Examination by Mr. Petersen | | 170 |
| EXHIBITS | | |
| 25 | E-mail from Andrew Callaway to Jacque Nielsen | 86 |
| 26 | Letter from Jacque Nielsen to Andrew Callaway | 88 |
| 27 | Request for Review Board Hearing | 89 |
| 28 | E-mail from Jim Breeze to Jacque Nielsen | 91 |
| 29 | E-mail from Jim Breeze to Jacque Nielsen | 92 |
| 30 | Letter written by Donley E. Watkins, III | 95 |
| 31 | E-mail from Anita Spencer to Jacque Nielsen and Jim Breeze | 130 |
| 32 | E-mail from Anita Spencer to Jacque Nielsen and Jim Breeze | 131 |




JACQUE NIELSEN,
having been first duly sworn to testify to the truth, the whole truth, and nothing but the truth was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:

Q. Please state your full name and current address.

A. Jacqueline Renee Cur -- I mean Nielsen. Sorry. I was giving you my maiden name. I have a P.O. Box and -- do you want both of them?

Q. Street address.

A. 422 South 375 West, Leeds, Utah 84746.

Q. Ms. Nielsen, have you ever had your deposition taken before?

A. I have not.

Q. Let me go over a few ground rules. First of all, you're under oath, so you need to answer truthfully.

Is there anything that would prevent you from answering truthfully?

A. No.

Q. Second, you need to answer audibly and verbally as you just did. Shaking your head or going "uh-huh" doesn't work very well.

Page 101

Q. You do?
A. Yes.
Q. Okay. What do you know about it?
A. Andy was interviewed. He was given a class date, and he no-showed for the class date. And then he contacted -- I think it was Larraine or contacted SkyWest wanting to come to work for us. And we said no.
I mean, that's what a lot of these letters going back and forth, Andy sending letters saying, Please reconsider. My father had thyroid cancer, or something to that effect, and we had said no, or at least Karalee had said no, because that's how we were doing it. When people no-showed or failed to come to training, we wouldn't give them a second chance, most of the time.
So Andy contacted, and Jim told him to reapply, and I think about a year later, he went into training. So they gave him another chance.
Q. When did you learn about the situation involving his no-show?
A. About the time that he no-showed.
Q. How did you know about it?
A. I was in the HR department and we -- I was involved in -- because of the push to hire a lot of

Page 102

pilots, I helped Larraine in doing background checks. And it was a small group, so we would know if someone failed to show up. If they failed to show up, they were on the "no" list. Flight Operations would let us know if someone failed to show. We'd put it on their application or something like that that they no-showed. It would take a while before we'd even give them another chance, if at all.
Q. Did you have any conversations with Jim Breeze or Gary Overbaugh about giving Andy a second chance?
A. I did not.
Q. Look at Exhibit 23, specifically page got marked -- one, two, three -- the fourth page, which is part of Andy's rebuttal. Actually, it starts on the bottom of the third page. Andy explained his no-show to class. And the last sentence, Apparently there was a miscommunication. The first part says, Larraine Caldwell, who doesn't work at SkyWest anymore, did tell Andy that there was a miscommunication between the hangar and St. George.
Do you know anything about that miscommunication?
MR. PETERSEN: Before you answer, let's

Page 103

just clarify that's in the presentation section. You referenced rebuttal, which is right below that.
MR. STRINDBERG: Apologize.
THE WITNESS: Do I know anything? There was no communication with Larraine Caldwell. Larraine Caldwell had no communication with Andy. She does still work at SkyWest. She had put -- there was -- he was a no-show. That's his claim in the review board, that he talked with her, and she claimed she had never spoke with him.
BY MR. STRINDBERG:
Q. Go back to Exhibit 2. There's an entry for 6/2000 meeting at SGU -- which I suppose is St. George, Utah?
A. That's correct.
Q. -- with Jim Breeze and Brad Holt over inflammatory and unfair statements on the company Web site.
What do you know about that?
A. I never saw anything. All I remember is that there was comments made about Brad building a big house, things like that, and that's all I know. I did not see anything. I was told later.
Q. Told later by whom?
A. I can't remember. I mean, this happened

Page 104

four years ago, and I just remember there were some statements made about Brad building a big house in St. George.
Q. Who told you --
A. I said --
Q. -- that?
A. -- I don't recall who told me.
Q. Does Brad have a big house in St. George?
MR. PETERSEN: I'm going to object. Calls for -- vague.
THE WITNESS: I don't know.
MR. PETERSEN: What do you mean by "big house"? Your house is probably big.
BY MR. STRINDBERG:
Q. Does he have a house that's bigger than 4,000 square feet?
A. I've never seen it. He was building a house at the time, but a lot of our VP's were.
Q. Look at Exhibit 15, the item under No. 1.
A. Fifteen?
Q. Yeah.
Had you seen this at all prior to the review board hearing in October of '03?
A. Not that I recall, no.
Q. Do you know why it was written up

Page 109

Over the course of several months, at the end of last year and beginning of this year, Andy Callaway's phone calls were repeatedly and progressively more rude.

Do you have any idea why Ashley's statement was written apparently many months after the phone calls?

A. I don't know when this was written.

Q. Did you ever talk with Ashley about the situation?

A. No.

Q. Did you ever talk with Anita Spencer?

A. No.

Q. I gather Ashley reports to Anita; is that correct?

A. She does.

Q. Going back to Exhibit 2, there's an entry for 12/11/00, Talked with Jim Breeze in his meeting with Jim and Brad in St. George.

Do you know, is that referring to a separate meeting than the one referenced on 6/2000, or is it the same meeting?

MR. PETERSEN: If you know.

THE WITNESS: I think it's referencing the meeting on 12/11 of 2000 in St. George.

Page 110

BY MR. STRINDBERG:

Q. Have you ever asked Jim if he met with Andy more than once in St. George?

A. Have I asked him? Jim says he's met with him twice.

Q. When did you get that information?

A. At the time that we were having the review board or setting up for the review board is what I remember.

Q. What else did Jim tell you?

A. I don't recall what else he told me. I mean, I didn't talk with Jim.

Q. You just said Jim told you, and now you're saying you didn't talk with Jim?

A. I didn't have any more conversations. If I had a conversation, it could have been with the -- when we had the conference call. I mean, I didn't specifically go and track down Jim and say, Hey, let's talk about Andy. It was probably in the course of with the conference call with the pilots.

Q. Okay. But you didn't -- you weren't involved in -- whether there was one or two meetings in St. George, you weren't involved in either of them?

A. No, I was not.

Page 111

Q. On to the next page, there is a series of entries regarding phone calls from a neighbor and whatnot.

I gather you were involved in these to some extent?

A. That's correct.

Q. How did you get involved in this issue of these complaints by Mr. Brandt?

A. Mr. Brandt called SkyWest and told -- he left a message saying that he had some complaints in regards to a pilot, and so I called him back and --

Q. Who directed you to call him back?

A. Who directed me? If someone calls and has complaints, serious allegations regarding an employee, it's my job to call them back.

So I called him back, and he proceeded to tell me that we have a pilot, Andy Callaway, who lives next to a house that he owns, but he has renters. And he says they have a lot of parties, there's been drug use observed by his renters, and they wanted us to stop it. They wanted SkyWest to put an end. He says, I know he's a pilot. I don't think you want a pilot who is not supposed to be using drugs using drugs.

And he gave me a number to call. He says,

Page 112

Call Kim Guess at the Salt Lake Police Department, and she'll tell you everything, or whatever. So I mean, following -- I needed to follow it. There were serious allegations of drug use.

Q. This information that's -- you just told me about this telephone conference that's referenced under 10/15/01.

Did you make notes of that or something? I mean, how did Kelvin get ahold of this information?

A. I told him about it and there was --

Q. When did you tell him about it?

A. At the time that he was going to get -- when we were putting everything together -- when he was putting everything together of Andy's history of SkyWest, this was part of what was in his file, and it was -- I mean, I told him about it.

Q. Okay. This -- did you make notes of this phone call with Mr. Brandt?

A. I did make notes, and I think I found them the other day, actually, and there was -- just pretty much that's what was in the notes was what was on 10/15.

Q. Okay. That's what I'm asking.

A. That's all that I had. I had a

EXHIBIT "C"

19

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| DAVID ANDREW CALLAWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:04CV00179 |
| vs. | ) | |
| | ) | Judge Ted Stewart |
| SKYWEST AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________ | ) | |

DEPOSITION OF KARALEE SMITH

Taken at the Holiday Inn Conference Room
850 South Bluff
St. George, Utah

On Monday, November 29, 2004
at 9:45 a.m.

REPORTED BY: JENNIFER SULLIVAN, RPR



APPEARANCES:

For the Plaintiff: ERIK STRINDBERG, ESQ.
Strindberg & Scholnick, LLC
44 Exchange Place
Second Floor
Salt Lake City, Utah 84111
(801) 359-4169

For the Defendant: SCOTT PETERSEN, ESQ.
Fabian & Clendenin
215 South State Street
Twelfth Floor
Salt Lake City, Utah 84111
(801) 531-8900

AND

TODD EMERSON, ESQ.
SkyWest Airlines
Director - Government
and Legal Affairs
444 South River Road
St. George, Utah 84790
(435) 634-3530

* * * * *

INDEX


| WITNESS | PAGE |
|---|---|
| KARALEE SMITH | |
| Examination by Mr. Strindberg | 3 |
| Examination by Mr. Petersen | 33 |

EXHIBITS

(None)




KARALEE SMITH,

having been first duly sworn to testify to the truth, the whole truth, and nothing but the truth was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:

Q. Please state your full name and current address.

A. Karalee H. Smith. 1134 East 900 South, Townhouse 49, and that's in St. George, 84790.

Q. Ms. Smith, have you ever had your deposition taken before?

A. I have.

Q. On how many occasions?

A. Probably two.

Q. And what type of matters were they in conjunction with?

A. Just employment lawsuits with my employer -- employers.

Q. Who were you working for when the first deposition was taken?

A. Safeway.

Q. And what type of lawsuit was it?

A. Gosh, it's been a long time. It's probably almost been 20 years, so it was some sort



of an employment lawsuit. To be quite honest with you, I can't remember what it was.

Q. Were you working for Safeway in Salt Lake?

A. I was.

MR. STRINDBERG: Can we go off the record for a second.

(Discussion off the record.)

BY MR. STRINDBERG:

Q. So that was, you say, about 20 years ago?

A. Maybe about 15, 20 years ago.

Q. And when was the next time you were deposed?

A. I think I had a deposition soon after I started work at SkyWest.

Q. What type of matter was it?

A. It was an employment discrimination lawsuit.

Q. I gather from these two, you're probably generally familiar with depositions. Let me just go over the ground rules. First of all, you're under oath, so you need to answer truthfully.

Is there anything that would prevent you from doing so today, you know, under any kind of medication, undue stress, or anything like that?

A. No.

Page 13

MR. STRINDBERG: -- numbers.
MR. PETERSEN: Uh-huh.
MR. STRINDBERG: But yes, you're right. This has been previously marked.
BY MR. STRINDBERG:
Q. Is that your note up there?
A. Yes, it is. That's my writing. That's my note.
Q. What do you recall -- recall about this matter, this no-show for class?
A. As I recall, he no-showed for his scheduled training, and then he called and wanted to be reconsidered again for the training to be -- get back into the pool, as they call it, to come back to class.
We had previously -- it was, I guess -- from here, I can see that it was in 1998 that he no-showed for class, and I remember at one point he did call the then existing chief pilot, who at that time was Gary Overbaugh. And Gary and I discussed his no-show and decided he shouldn't be considered again for employment.
Q. When you said he called in, did he talk with you when he called in?
A. No. I think he spoke with Larraine Caldwell.

Page 14

Q. Who was Larraine Caldwell?
A. Larraine was the person in charge of pilot hiring and recruitment at the time. And actually, this is her writing I see down here, file in his file in the nos, no-showed for class. And I think he spoke with -- and you know, I shouldn't say that with certainty because I'm not sure. But he either spoke with Gary Overbaugh or Larraine. And we talked about whether to allow him back in the class, and at that time we said no.
Q. Do you know how that -- well, let me ask a foundational question.
How did Jim Breeze become involved in it?
A. I don't know how he became involved in it, but he obviously took over. At some time he took over within that few months period, I think, because he and Overbaugh switched positions. I couldn't tell you the date, but Overbaugh went back to flying the line. Jim Breeze was in Salt Lake and came down and took over the chief pilot, or maybe he was still chief pilot at the time. I don't know how he became involved. You'd have to ask him. I don't know. All I know is that we did have a discussion with him as well.

Page 15

Q. With Jim?
A. With Jim. And originally the discussion was no, not to allow Andy to come to class and be in the pool because he had no-showed for class.
Q. Who ultimately decided to allow him to return?
A. I believe that was Jim Breeze.
Q. Did he consult with you before he made that decision?
A. Yeah, he did, as I recall. I think he left me a message. He either told me or he told Larraine, and I don't know, but -- I don't remember.
Q. Look at Exhibit 12, if you would, the next one.
A. That's the next one.
Q. Do you recall seeing this letter around July 30th, 1998?
A. I can't honestly tell you that I recall seeing it.
Q. How about Exhibit 13?
A. I don't think I've seen this one either.
Q. So you believe Jim Breeze made the decision to allow Mr. Callaway to reapply?
A. I believe he did. He probably convinced Gary, if Gary was still the chief of Flight Operations. I don't know -- director of Flight Operations. I don't know. But I'm assuming he did because he's the one that was going to call Andy Callaway and tell him no, that we weren't going to allow him back in the pool and back in class.

Page 16

And then the only other next thing that I remember is that Larraine Caldwell came to me and said that Andy was going to be in class and had reapplied, and they had allowed him to be back in the pool. And I believe that was -- I believe it was Jim Breeze's decision. He had convinced Gary Overbaugh, if Gary was still in the position. And I don't know.
Q. Does the HR department keep files on each of the pilots?
A. At that time we did because the recruitment of pilots was under our umbrella. We did keep files.
Q. The way you've indicated that, it sounds like you no -- HR no longer keeps files?
A. We don't do the individual -- we got so big that Flight Ops does their own recruiting now. InFlight does their own recruiting and keeps their files. Customer Service does their own recruiting and keeps their files.

# EXHIBIT "D"

Paragraph | Page

1. Purpose ....1
2. Harassment ....1
3. Sexual Harassment ....1
4. Reporting Harassment ....2
5. Disciplinary Consequences ....2

## 1. Purpose

A. SkyWest Airlines promotes a productive work environment and does not tolerate verbal or physical conduct by any employee that harasses, disrupts or interferes with another's work performance or that creates an intimidating, offensive or hostile environment. This policy establishes guidelines for ensuring a productive work environment, and provides procedures to follow if an employee has been the victim of harassment.

## 2. Harassment

A. Employees are expected to maintain a productive work environment free of harassment. This includes not only sexual harassment but also harassment based on race, gender, sexual orientation, national origin, religion, disability, pregnancy, age or military status.

B. Each manager and supervisor has a responsibility to maintain a workplace free of harassment and, in particular, sexual harassment.

## 3. Sexual Harassment

A. Sexual harassment includes, but is not limited to, the following conduct by any employee, manager, supervisor or non-employee:

1) Threats or insinuations, either explicitly or implicitly, that an employee's refusal to submit to sexual advances will adversely affect the employee's employment evaluation, wages, advancement, assigned duties, shifts, or any other condition of employment or career development.

2) Physical harassment including offensive touching, grabbing, and/or suggestive gestures.

3) Verbal harassment such as lewd comments, sexual flirtations, offensive or inappropriate personal questions, or degrading words.

4) Visual harassment including the display in the workplace of sexually suggestive objects or pictures, including nude photographs.

5) Offensive written materials including letters, email messages or graffiti.

**4. Reporting Harassment**

A. Any employee who believes/perceives that he/she has been the subject of harassment, sexual or other, has a responsibility to report or complain, as soon as possible, to their immediate supervisor or to the Manager of Employee Relations.

B. All complaints of harassment will be investigated promptly and in an impartial and confidential manner. Employees are required to cooperate with any investigation. A timely resolution of each complaint will be reached and communicated to all parties involved.

C. If an employee is not satisfied with the handling of a complaint or the action taken by the Manager of Employee Relations, the employee should bring the complaint to the attention of the Vice President of People. In all cases, the employee and Vice President of People are to be advised of the findings and conclusion in writing.

**5. Disciplinary Consequences**

A. Any employee, supervisor, or manager who is found, after appropriate investigation, to have violated the harassment policy will be subject to appropriate disciplinary action, depending on the circumstances, up to and including termination. SkyWest prohibits retaliation against employees for bringing bona fide complaints or providing information about harassment.

14)All Crewmembers will report fit for duty. In order to ensure that each crewmember is fit for duty, the following must be adhered to:

a) As a general policy, Crewmembers should avoid drugs when flying. Pilots will clear all use of medication with his/her Chief Pilot or an aviation medical examiner. Flight Attendants should ask their physician if the medication prescribed would affect their ability to perform as a Flight Attendant. If in the opinion of the physician the prescription would affect their ability to fly they must notify their Chief Flight Attendant/Assistant Chief Flight Attendant. The use of any non-prescribed drugs including all medications prohibited by FAA for use while flying or the use of any unlawful agent or drug is considered cause for immediate dismissal.

b) It is recommended that crewmembers not give blood unless it is absolutely necessary. A crewmember may return to work seventy-two (72) hours after giving blood provided that after donation a physician must perform a hematocrit test to determine that the crewmember's blood is no less than three percent (3%) lower than his/her hematocrit prior to donation. This test *need not be accomplished if fourteen (14) days has elapsed since donation.*

c) To avoid decompression sickness, crewmembers will not begin a flight within twenty-four (24) hours of the end of SCUBA diving.

15)If a crewmember becomes ill and is unable to perform his/her normal duties, crew support or flight control shall be notified as soon as possible by that crewmember. This notification shall include the nature of the illness and the length of time expected to be off duty. If, for any reason, the length of time must be exceeded, the Company shall be notified immediately.

16)Flight Attendants shall insure the safety, order and cleanliness within the cabin.

17)Crewmembers will not release any information, regardless of intent, to the press or news media. All requests for information will be directed to the Vice President of Flight Operations or other authorized personnel.

18)Crewmembers shall not discriminate because of age, gender, race, color or creed to fellow employees or passengers.

19)Crewmembers are expected to follow direct (legal) orders given by a member of management or other person in authority. Full cooperation is necessary, when asked, to provide information to the Company in an investigation.

20)Crewmembers may not restrict work output or encourage others to do so.

21)Crewmembers may not make or publish false, vicious or malicious statements concerning any employee, management representative of the Company, or which has the potential to adversely affect the Company's relationship with customers, suppliers, employees, or the public.



22)Crewmembers may not possess, use, sell, or distribute any medically unauthorized or illegal drugs while employed with the Company or on Company property.

23)Unauthorized, attempted possession, or removal of any Company property including records, private information, property of employees, property of customers or others with whom the Company does business will not be tolerated.

24)Crewmembers may not abuse or misuse any travel benefits (free, reduced rate or while on Company business) and/or obtain or conspire to obtain travel benefits for which you are not entitled or for individuals who are not entitled.

25)Crewmembers will be held responsible for any misconduct of employees/relatives and or persons traveling on a buddy pass while traveling or attempting to travel on a pass or reduced fare ticket on Company flights or any other carrier.

26)Crewmembers will submit only true and accurate information on all Company records and reports.

27)Crewmembers may not transport, attempt to transport, or allow to be transported, unauthorized individuals, or prohibited or illegal articles on which appropriate charges, taxes or duty have not been paid.

28)Crewmembers may not deliberately destroy, deface, misplace or damage any Company property, the property of others, or property for which the Company bears responsibility.

29)Crewmembers may not misuse or permit others to misuse Company computer equipment, including computer terminals, printers and related support equipment, whether the Company's property or other property for which the Company bears responsibility. The misuse, destruction, distortion of information, data of or instruction codes will not be tolerated.

30)Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate, or assault others while on Company property, and/or within any other work related circumstances.

31)Crewmembers may not gamble on Company property.

32)Improper or negligent behavior while on Company property and/or in other work related circumstances will not be allowed.

33)Unauthorized absence from work and/or repeated failure to properly notify the Company of any absence will not be tolerated.

34)Crewmembers shall not involve the Company in the crewmember's personal financial affairs.

35)Crewmembers shall not chew gum while in uniform in view of passengers or the public.

17b

B. Computer software may only be installed or upgraded on SkyWest computer systems by or under the specific direction of SkyWest IT personnel. This allows us to license software properly, maintain system integrity and limit the introduction of computer viruses. Under no circumstances should anyone load personal software (any software not purchased/licensed by SkyWest) on SkyWest computer systems.

**5. Data Protection**

A. Backup copies of your data should be maintained in case of system hardware failure or data corruption. Personal computer users should ensure that any critical company data is stored on network servers where the SkyWest IT Department will periodically backup the information to magnetic tape. If storage on a network server is not feasible then computer users are responsible for performing their own regular data backups. The IT Department should be contacted if assistance in developing a data backup plan is required.

**6. Hardware Protection**

A. Automation equipment provided by SkyWest Airlines and our code-share partners is very costly. Care should be taken to prevent theft or damage when transporting or using it. Particular care must be used with portable computers and video projection equipment. If at all possible, computer equipment should not be checked as luggage or placed in luggage compartments.

**7. Internet and Electronic Mail Policy** – For your reference. I am not being charged with violating this policy

A. Electronic Mail (e-mail) and Internet/Intranet Access is provided according to management approval. These tools can enhance our ability to gather information and communicate with employees, customers and trading partners. The following policies have been established regarding their use:

1) Internet and Intranet access is provided for SkyWest business purposes and we reserve the right to restrict access accordingly.

2) Our systems can monitor each web-site that has been visited, each electronic mail message that has been sent or received, and each file transfer into or out of our internal networks, and we reserve the right to do so at any time.

3) Use of the Internet to access online radio stations and online video materials without a valid business purpose is forbidden.

4) Internet based electronic mail (Hotmail, Yahoo, AOL, etc.) may not be accessed from company owned equipment.

5) Files attached to e-mail messages should not be opened unless the receiver is expecting them. Executable (.exe) or visual basic (.vbs) files that have been received via e-mail should never be opened.

6) E-mail messages from unknown senders should not be opened and should be deleted from your system.

7) E-mail jokes, chain letters or attachments that have no business purpose should not be sent or forwarded.

8) The display of any sexually explicit image or document on any company system is a violation of our company policy on sexual harassment.

9) SkyWest Internet facilities and computing resources must not be used to violate the laws or regulations of any city, state, or nation. This includes adherence to all intellectual property, obscenity, security and privacy laws.

10) SkyWest reserve the right to inspect all electronic files stored on SkyWest network servers, personal computers and magnetic storage media.

11) Any files downloaded via the Internet into the SkyWest network and all e-mail messages created, sent, or received become the property of the SkyWest.

12) Files or programs may not be downloaded from the Internet unless specifically authorized by IT personnel.

# EXHIBIT "E"

# Andrew Callaway Review Board 12/24/2003

| | |
|---|---|
| JACQUE NIELSEN: | We are here at the review board hearing for Andy Callaway. The date is October 24, 2003. The time is 10:00 a.m. and the location is Salt Lake City, Utah. Andy's date of hire was January 13th, 1999. The date terminated was October 1st, is that correct?, 2003. And the reason for termination, I'm just going to read a small part of his termination letter: "Do to pattern attitudinal and interpersonal conflicts with supervisors and other SkyWest employees." The employee is requesting reinstatement and back pay. *Representatives for the company are* Kelvin Hyatt, Salt Lake City Chief Pilot, and the employee is Andrew Callaway, Salt Lake City RJ Captain. Panel members are management, Jon Tenpas, LAX Chief Pilot, Bill Dykes, Salt Lake City Maintenance Manager. Peers are Robert Donahoe, Sacramento RJ Captain, is that correct? |
| R. DONOHOE (01:01): | Yep. |
| JACQUE (01:02): | And John Wagensteen, Portland, you're an EMB Captain? OK. And moderator is Jackie Nielsen, Employee Relations Manager. Are there any objections to the panel members? Objections? Do you have any? OK. And does everyone agree to abide by the decision of the committee? |
| (01:19): | Yes. |
| Jacque (01:21): | OK. I'll explain my job as a moderator. I'm here to make sure that this runs smoothly and that, and to answer any questions. I'm not here to sway the panel members to think one way or the other. My job is just here to make sure everything runs as smoothly as possible. There's a couple of things about a review board. First of all, they're not precedent setting. It's what happens in this review board is unique and we don't go back to previous review boards saying 'Well, so and so. This is how that happened in their review board.' Every review board is different. And, also what is said here stays in this group. So, we don't go out and talk about what was said or what was done in the review board to other managers unless, I mean to other people unless it's part of the need-to-know circle, and this is pretty much here and upper management. Everybody has a piece of, I mean, has paper, pens, does anybody need a |

pen? Got them, OK. Please take notes. We want to make sure that if you have any questions, please write them down so that no one's interrupted so they'd lose their train of thought. So, you can have, there's three decisions, or three ways of outcome. You can uphold the termination, that's, and then you can override the termination, or overturn it, or a modified solution, and the modified solution is something that, that the panel members come up with, but it also has to be within policy, we can't make up a position for somebody, something like that, that cannot be done. Each presentation has forty-, they have forty-five minutes to present their, to do their presentation and then they have a fifteen minute rebuttal period. Then after that they will leave and you, the panel members, will decide what we will do. And, it has to be a unanimous decision, it can't be, you know, fifty-fifty or, you know, three against one kind of thing, it has to be a unanimous decision. So, just so that you guys know that.

(03:21): Now, what happens if we do get to a three to one, or something like that?

Jacque (03:24): We will deliberate until we come to a decision. It has to be unanimous. OK. Um... are there any questions before we get started? Other than that, other than it being unanimous? No other one? OK, well, the company will present first and then Andy will present, so Kelvin.

KELVIN HYATT (03:49): OK, I appreciate the opportunity to present our side to the board here, why we feel that our decision to terminate Andy was just and appropriate. I'm going to kind of go through his entire file history. I've made a copy for everybody of the documents in his history. I'll go ahead and pass these around.

Jackie(04:10): You can write on these, but I will take them back after.

Kelvin (04:15): I think Andy has everything already.

ANDY CALLAWAY: Let me see.

Kelvin (04:18): You did get the fax?

Andy (04:19): Yes.

Jackie: That's it ....

Kelvin (04:21): OK, Andy initially was interviewed the first part of 1998. He was offered the class state federated second 1998, which he no-showed for. I guess, several months later, it looks like in July of '98, Andy sent a letter to Jim Breeze requesting, to be allowed to come to training. Initially, the company's position was no. He no-showed for a training class, we did not feel that he should be allowed to show up again. Andy made some additional letters, new interview, or new application to Larraine Caldwell and, evidently, was allowed to come into training, started training in January of 1999. There was no phone calls, no information passed on to SkyWest as to why he no-showed for his initial training class in 1998, February of '98. Uh... so, in other words, the company gave Andy a second chance to work for SkyWest after no-showing for a class. Not a real good foot to get off on. In December, or rather, the next item that I have in the file, which is kind of comments to Exhibit 1, if you will in the handout I gave you, is comments from Jim Breeze concerning a summary of a verbal warning given to Andy in St. George around June of 2000. The reason that Andy was summoned to St. George to meet with Jim Breeze and Brad Holt was over statements that were entered on the company website about company policy. Also, crew support, crew schedulers had complained to Jim and to Brad, to Anita about inflammatory language that was being used on crew schedulers, crew support, and personnel.

VOICE (06:18): Question, company website, that would be?

Kelvin (06:21): SkyWest Online or the pilot boards.

VOICE (06:25): The SkyWest forums?

Kelvin (06:26): Yes.

VOICE (06:27): That's considered a company website?

Kelvin (06:29): Uh, it is managed by company personnel or moderated by company personnel.

VOICE (06:34): OK.

Jacque (06:35): If we can hold all questions.

VOICE (06:36): Alright.

Jacque (06:37): Just write them down, any of the questions that you have so that we can get through the presentation first. OK?

Kelvin (06:45): At any rate, Andy was warned by both Brad and Jim that his behavior would not be tolerated. There's a proper was to handle problems and issues by not, but not by being abusive in times of discontent with fellow employees. Andy agreed that maybe his behavior was too aggressive and now he was working to not repeat this type of behavior in the future. This was a verbal warning, as we don't have a signed document of that. Towards the end of 2000, received, I received a call from Anita Spencer concerning Andy. She indicated that he was verbally harassing one of her schedulers over an open time issue. I talked with Andy, educated him on the fact that open time is picked with SBS. The time is not always open time. Sometimes all his time that shows up in open time is being worked on. It is live data so, therefore, you don't know that it's being worked on. It is a contention amongst a lot of crewmembers; however, we cannot have our crewmembers take this out on schedulers. Andy, I think, disagreed with that, per policy and if time is available, should be available, it's a heated discussion. And, again, Anita felt that there were derogatory comments aimed at her schedulers from Andy about company officials, company policy. Brad Holt, again, decided to talk with Andy over this confrontation with schedulers that was reported by Anita. I talked with Jim Breeze about that meeting. Jim felt the meeting was good, Andy was cordial, seemed to understand the concerns that Brad had with his attitude.

(08:33) On into 2001, Andy began the upgrade training for the CRJ in October of 2001. Shortly thereafter, the people department, or H.R., received some calls from a tenant or a property owner close to Andy's house here in Salt Lake City, and they were upset, or his tenants in his apartment complex were upset, with the party house, that they felt that Andy owned a party house and there were a lot of parties. They had seen drug use there by being a SkyWest employee, and certainly was evident to these tenants of this individual that Andy was a SkyWest employee, they did not feel it was appropriate to have a party house. They did not feel it was appropriate that drugs were being used. We don't feel that it's appropriate that you have a party house, particularly if people know that you work for SkyWest. It goes against policy where you're kind of an ambassador to SkyWest, even when you're not on duty, and it is outlined

in policy as well. The next couple of pages that you have, I think it's a, mines not labeled, I think they were number three, are a copy that were sent to SkyWest and sent to the tenant by the Salt Lake City Police Department, and the final page of those documents there are some letters. I'm not going to go through the letters, you can through that on your deliberation. But, the final page is a, of those, is a listing, it looks like it's right here.

(10:23) This is a copy from the Salt Lake City Police that they pulled up and you'll note there there's some handwriting and those are different calls on different days that were made to the Salt Lake City Police Department for disturbances, for noise, for parties at this residence, which is Andy's residence in Salt Lake City. Your next page four is a copy of the crewmember policy manual at SkyWest. Standard practice 307, and you'll notice there that the company look, which is the bottom of the first page and continuing to the second page, the final sentence in that paragraph says, "Your personal conduct and appearance both on and off duty shall be such as to maintain or improve the image of the company." We don't feel that having loud and noisy parties that will lead to the police being called and certainly the neighbors understanding that this is owned by a SkyWest pilot really meets this policy at all. On to number five, you see this report in November of 2001 and this is a customer service irregularity report, or report form. It covers an episode or a situation that occurred in the, on the morning of November the 13th, 2001. Andy had been doing some flight training in Butte, Montana, in the early morning hours, as typical with our flight training when we can find an airplane out in the system. He was traveling back to Salt Lake City, felt that he should have been listed as must ride, evidently that had not been completed, but he got upset at the counter, raised a stink. All three employees wrote letters on him at that point. I don't have a copy of the letters, including a Horizon employee. This is the first time and also the last time that we've ever had a report on a pilot out of Butte, Montana for inappropriate behavior. It also involved the screening process up there. Now, granted, this was shortly after 9/11 and screening had changed, but Brad Holt had issued a bulletin to crewmembers to comply, don't question, just comply with the screeners. This did not happen. We did issue a counseling statement on this event. The next couple of pages are some write-ups, and I'll get back to them in a little bit here. We did issue a counseling

statement on this, which I will go over a little bit and it had been reviewed as well, and we'll talk about that.

(13:29) The next page is a statement that happened to arrive in my hands about the same time. It's written by a ground school instructor here in Salt Lake, Kelly Dixon. He had complained to his bosses, Verdeen and Ben Crawford, about a student that he had in the CRJ class and that student happened to be Andy Callaway. It goes on to say here that "his name stuck out in my mind as a student displaying a very poor attitude. I've taught professional pilots in a classroom setting for five years and I've never seen anybody act quite like he did. I guess that's why I remember him." It goes on to say "He didn't participate very much at all. He sat in the back of the room, because that's where he was assigned, folded his arms with a defying scowl on his face. He stared somewhere else as if to purposefully show me he wasn't listening. It wasn't that he was daydreaming. He seemed to display an attitude that suggested to me that he didn't think he needed to be there or we were wasting his time." We don't get these kind of letters very often, and again, this is background for what we feel is a, an attitudinal problem and a deliberate disregard for working with the company, being cordial to your fellow employees. It gave additional background to the situation that we had occur in Butte. I'll let you read that as you will.

(14:59) We had a meeting with Andy Callaway, again, this was Brad Holt, in Salt Lake on the afternoon of November 13th. The next page, page seven, are the notes from Tony Thompson concerning this meeting. Tony Thompson, at the time, was the assistant chief pilot to Salt Lake City. His general impression was Mr. Callaway's demeanor was generally one of arrogance and disrespect during this meeting. Let's see... Bill Boice was involved and did a lot of the talking in the meeting. He emphasized about the complaints from Butte. Being that Bill was director of flight standards at the time the training took place under him and the people reported to Bill. They described, three different employees observed that Mr. Callaway as being, their words, "arrogant and disrespectful." The final sentence on this observation, Brad drew a conclusion asking how long Mr. Callaway had been employed by SkyWest. He answered "Three years." Brad asked "How many times have we had to talk to you, including this time?" He answered "Three times." We don't have very

many employees that talk to Brad or someone to talk to Brad at all, let alone three times in three years. We certainly see a trend here of very poor attitude, attitudinal problems, disrespect to fellow employees to the point that they're complaining about him all the time.

(16:30) The next page, eight, is Bill Boice and his observation over the event. Get to page nine and that is a copy of the original counseling statement that was issued to Andy for the event at Butte and other behavior issues that came to light. Along with this counseling statement, Andy was given three weeks off without pay. Note here that the final paragraph, it goes on to say that "... this is not the first time that you've been counseled on your behavior. During the summer of 2000, you were summoned to corporate headquarters for a verbal consultation in reference to abusive treatment of crew support, personnel and posts you authored on the web board. In fact, this is the third time your behavior has been called into question. Any further behavior problems, such as arrogant and abusive treatment of fellow employees, disregard or refusal to comply with company policies and direction, or any conduct that would constitute an embarrassment to SkyWest Airline or its employees could result in further disciplinary action up to and including termination." Now, as I said earlier, this counseling statement was reviewed, and the review board held, upheld the counseling statement and the time off with the exception of the second line, the word "extremely" was deleted. The next page, page ten, is Andy's rebuttal to the counseling statement. It's interesting to note that it basically paints Andy as almost milk toast in his approach to the people at Butte, sharply in contrast with three different reports from individuals in Butte, and, again, the only such report that we've ever received about a crewmember from the station in Butte. The first sentence of his statement says "alleged incident". Well, I don't think that we would agree that it's an alleged incident. It took place, and I won't go through that any further. You're welcome to look at that. Again, this, that particular counseling statement had been reviewed and it's not subject to this review board, but we feel that it paints a history of where we're going and why our decision was made.

(18:54) Page eleven, the next three pages are a copy of the review summary of that review board and you can certainly go through that at your leisure. Page twelve, or number twelve there, this is crew support's write-up on a SAD, and those

of you that are not pilots who don't understand what SADs are, a SAD is considered a schedule assignment, or is a scheduled assignment deviation. That means that you, as a crewmember, didn't show up for your shift or you called in too late. There are a number of things, a whole list of them, of which I printed out some of them in the following pages. This was issued on March the 26th, 2002. When we called Andrew to show up for or to schedule him for ready reserve in Salt Lake he said he couldn't do it, didn't want to do it, he was sick, and, therefore, we pulled him off sick. The policy manual, which is printed as item thirteen, schedule assignment deviation, which is paragraph five, item 'F'. "A reserve crewmember declares himself sick when contacted by crew support for a flight assignment. Reserve crewmembers are paid three hours and forty-five minutes per day to sit reserve." We've had problems and the reason this policy was written is crewmembers would sit hoping they not get called because they are sick. If you have a sick call then that comes out of your user time. We kind of look at this as a little bit of fraudulent activity. You're asking the company to pay you while you're sick, when you should have called in sick to begin with. So, if crew support calls you and you state that you are sick and unable to work while you're on reserve, it's a SAD, assignment deviation, and one, which we typically, do not excuse.

(21:21) Item fourteen is just paperwork that came on file during the background check. I had to talk to Andy to let him know that we did have this on file. Everybody, all the crewmembers, had to have a background check. This is simply that Andy had been arrested for a DUI, open container. Through court proceedings that had been reduced to a misdemeanor, reckless driving, and this happened 1998, December 20th. And I simply needed to talk with Andy and to let him know that we did have that on file that it was not disqualifying during his background check. Next area, area fifteen, it's a copy of some SkyWest Online reports. It's another SAD. This particular SAD had to do with unable to contact. Crew support attempted to contact Andy on the morning of December the, or June the 30th, 2003. And the comments under crew tracks report is they "left a message to notify of a trip on the 1st." First attempt happened at 9:39 in the morning and it was issued by Trevor Hunter, crew support. He tried to call him again on both numbers listed at 9:59. It had been twenty minutes and according to policy, which there is a copy of the policy manual in there as well, crewmembers have ten minutes to

return these calls. If they receive a call or page while they are on reserve, they have ten minutes in which to return that. It had been twenty minutes. He called again, assigned a SAD, "Didn't call us back." Looks like later on, about 10:07, Andy called back, indicated that he was in court and no signal on the phone. Most court proceedings don't allow you to have your cell phone on. In doing a little research in this as we typically do and certainly in Andy's favor, looking to make sure that everything had been properly, it was brought to my attention that Andy had filled out, online, a request for time off. Page fifteen 'A', the second page there, the date is June the 28th, Andy filled out a request for *OFNO* pay for Monday. If you look down at the bottom it's circled. "Usuary of *OFNO* pay is not available. Thanks." You'll note down below that that on July the 1st, 2003, it was denied. Now, granted that was after the time requested off. Crew support typically receives about 500 of these after the 24th, when the bids are finally finalized. They get to them as a first case, or first come first served basis and they did not get to this until July the 1st. It certainly never, the reserve date block never came off of his schedule and had he looked at SkyWest Online, it should have still been on his schedule. He had indicated to me that we, he has having problems getting on SkyWest Online, which does happen at times, but certainly a phone call to crew support would have been able to inform him that he was still on reserve and that his request for time off was not granted. After he was notified of the SAD, it looks like the next page, fifteen "B", at 6/30, it looks, on 6/30, Andy then cancelled the request for time off. That was denied on 7/3. And the next page, also on 6/30, Andy requested time off for 7/1, the next day. It was denied. We did not have coverage. Typically, during this time frame, the last three days of the month or the first three days of the month, we're very tight on crewmembers, it's a transition, very hard to schedule time off. Andy then did request time off and was granted personal time off on November, or January the 1st, by Bill Boice, who was the MOD, and this was for a court deposition.

(25:46) Crewmembers have the responsibility to make sure that they are where we can get a hold of them. They have to make sure that they are able to complete assignment as we assign that within a reserved block. I sent a message to Andy over this, that I had researched, and this is page sixteen, I had researched his SAD and I find it appears to have been issued according to policy. SkyWest records

show that on June 28th you applied for June the 30th off, however, it was not processed until July 1 and was denied. The records also show that you cancelled this request on June 30th. "With the information that I have currently I cannot excuse this SAD. If you have further information, please provide and I will consider it." His response was kind of troubling. "I submitted a second request for the next day off as well as that included on the 30th rather than having several requests at the same time. Every time I logged in to Online I experienced several problems after attempting to submit requests. I even e-mailed you the errors I received from Online. It should not take so long to process and crew support acknowledged in a company-wide e-mail that they were continuing to experience problems processing time-off requests. Further, I have complied with every instruction that Donna, from Donna regarding this issue and was not even informed a SAD was issued until after 4:30." Now, we've published the crewmember manual for a number of years and it does show or tell how a SAD will be issued. I don't see anything in this statement from Andy where he accepted any responsibility as a crewmember for his role in assuring that he was complying with policy, that he had the day off, that he attempted to call crew support to ascertain if he had the day off as requested, even to check to see if his request had been processed. Even a call to the MOD, 'I'm going to be in depositions. I'll be out of contact.' We allow crewmembers to call crew support and state 'Can I be off my cell phone for an hour.' Depending on the workload, crew support many times will grant that. If it's the only reserve we have on schedule they may not grant that. But, the call is made. I know when I was on reserve, which, granted, was long ago, I did that a number of times where I would be outside of range and I think that perhaps some of you, when you've been on reserve, have done the same thing. But, it didn't happen. The responsibility did not happen in this event.

(28:34) Up to seventeen, seventeen is a copy of a record that we're using as chief pilots to record a verbal warning. This SAD evented, or was a verbal warning. It occurred three days after a year from the previous SAD, which would have been a letter of instruction. At any rate, this was done on August the 15th and even as of this day, this was never complied with. If you notice the first record "If you'd agree with" or the first paragraph, it says, "If you disagree with this statement below, contact me. Otherwise, please

print a copy of this e-mail, sign it, and return it to Lou Godfrey, Lou Bodkins, or myself. Lou is the assistant chief pilot in Salt Lake. Lou had been changing e-mails back and forth with Andy and we still have not seen him comply with this request. The next area, or the next page you have is seventeen. This is a copy of the company policy manual, a productive work environment. And it states, "The purpose there (a) SkyWest Airline promotes a productive work environment, does not tolerate verbal or physical contact, or conduct, by any employee that harasses, disrupts or interferes with another work- another's-," some days I can talk, this isn't one of them. "...With another's work performance or that creates an intimidating, offensive or hostile environment." This is the general umbrella policy manual that covers all employees. It is a separate manual from these, the SkyWest crewmember policy, but, nonetheless, still has the same coverage on all employees, and including crewmembers. Look at the next page, seventeen 'A', you'll notice, "(b) All complaints of harassment will be investigated promptly and in an impartial and confident manner. Employees are required to cooperate with any investigation. A timely resolution of each complaint will be reached and communicated to all parties involved." So, certainly, we, as managers, are required when we have a harassment complaint from any employee to research that employee or research that complaint. It doesn't matter what we feel of it at the time. We've got to investigate. That is the requirement of our policy and it's also the requirement of law. Seventeen 'B' is a copy of the crewmember policy manual. If you look at the right side of it, item thirty, it states that standard practice 306-30, "Crewmembers may not fight, provoke a fight, threaten, coerce, intimidate or assault others while on SkyWest, on company property and/or within any other work related circumstance." 34, "Crewmembers shall not involve the company in the crewmember's personal financial affairs."

(31:35) On or about the middle of August, I believe, August 12th, I had a flight attendant of the name of Kristen Wiley approach me. She had concerns that she was receiving threatening e-mails from Andy Callaway concerning money Andy said she owed him. Kristen told a tale of how Andy had invited her to accompany him to Spain for a vacation with several others and other couples. This had happened just after Andy had broken off with his girlfriend, whom he had intended to accompany him on this trip.

According to Kristen, he indicated that she would only need to pay for the food, show up, and everything else would, was already paid for. She purchased tickets through the travel center two days later, and uh, two days later was in Spain. Now, almost a year after the trip, Andy had been sending e-messages to Kristen via SkyWest Online demanding payment for her share of the living expenses. Kristen expressed to me that she felt threatened to even check her e-mail and was there anything I could do to stop these messages. I informed her that we'd look into the matter. Kristen has taken time off. She's contacted EAP and is on time off now for stress that she felt that culminated because of this harassment.

VOICE (32:51): What's DAP?

Kelvin (32:52): Employee Assistance Program.

VOICE (32:53): Oh, EAP.

Kelvin (32:54): Yeah, EAP. And I don't know her status as far as returning to work at SkyWest at this point. Anyway, after hearing that story I was required to do an investigation and I looked in Andy's file and I passed on this information as well to In-Flight. I noticed that the counseling statement. If you want to refer back to the counseling statement you certainly may, but the final paragraph, it talks about, in fact, "this is the third time your behavior has been called into question. Any further behavior problems, such as arrogant and abusive treatment of fellow employees, disregard or refusal to comply with company policies and direction or any conduct that would constitute an embarrassment to SkyWest Airlines or its employees." I felt that looking at the harassment that Kristen felt that she was subject to in e-mail messages from Andy certainly was a violation of this counseling statement, as did other senior management people in flight operations. I noticed, or also noted the crewmember policy manual, those areas that we just talked about, gives direction to crewmembers that you may not use SkyWest property to intimidate or coerce others. You also may not involve SkyWest in your personal financial affairs. We don't need to be involved in crewmembers financial affairs even to the point of using our property to collect those debts. SkyWest Online is wholly owned by SkyWest Airlines, it is not an Internet site. In the sense of the e-messages, it's not an Internet address. It is a company owned site, therefore, these e-messages were

SkyWest property and using SkyWest property to transmit and receive these messages. So, we had a lot of issues with this type of harassment because it is extremely libelous for us, as a company, to have this type of harassment in-house.

(35:02) I sent a message to Andy. I'd received in the messages I, and it's page seventeen or eighteen, "I received a complaint from a fellow employee that you're sending harassing or threatening e-mails using the company e-mail system. Please refer to company policy manual SP 56, crewmember policy manual SP 306-30 and 34 as well as the counseling statement you received on November the 30th, 2001. I'm requiring you respond in writing in seven days of the receipt this notice an explanation as to why we should not find you in violation of SP 56 and your counseling statement dated November the 30th. Andy's response is nineteen, and it goes on to say, without knowing the exact accusations, however, he figured pretty quickly what crewmember had made these complaints, he assumes that we are referring to a personal and private matter with Kristen Wiley and, therefore, submitted the following explanation: "This is a personal matter and does not involve SkyWest in any form whatsoever." Well, if it's using SkyWest property it certainly does involve SkyWest. "Kristen Wiley has a financial obligation to repay a debt from a vacation she attended from 2002. She has defaulted on this agreement and as a result a small claims affidavit and order was filed in Third District Court on August the 22nd under case number so on, so forth. Before the suit was filed I made a final attempt to collect this debt by e-mailing her the procedures that would take place if this debt were not satisfied on a personal level. This e-mail contained the legal rights I have as a citizen to cover the unpaid debt and the actions the court would take to enforce the judgment. Kristen has almost had one year to repay this financial obligation. I sent the e-mail through SkyWest Online after she disconnected her personal e-mail and her mailing address is unknown. This mail did not contain any offensive language or create an intimidating or hostile work environment or include any references to violence. Further, there is absolutely nothing in my e-mail that can be construed as sexual harassment." And we agree, there is no sexual harassment in the e-mail, however, it is still been done on SkyWest Online. It does not matter if Kristen disconnected her personal e-mail or her mailing address is unknown, you still may not use that as an excuse to use company property to pursue another employee. He goes on

to say, "These actions do not violate SP 56 because they do not contain any illegal language that constitutes harassment. There's no systematic or continued action taken by myself other than a final e-mail indicating her options to repay a debt. There was no threatening message that contained any language designed to extort money or obtain property through threatening letters. In addition, my notice followed all federal regulations of the fair debt collection practices act." So on and so forth. "This e-mail does not violate my counseling statement of 2001 because it contains no abusive language or abusive treatment of a fellow employee. Kristen Wiley is a friend of mine, whom I've never worked with, but took advantage of my financial position and refused to fulfill her legal obligation to repay a debt. In addition, SkyWest was never asked to mediate this matter nor was SkyWest asked to intervene on my behalf." We were not asked to intervene on Andy's behalf, but we were asked to intervene on Kristen Wiley's behalf. She felt that this was threatening her and looking at the e-mails I would say it was threatening. She felt that this was harassment. I would agree. It happened over a period of months. It certainly was harassing her on company property against our policy. I see no indication in this letter that there's any apology or any understanding, even, of SkyWest policies. It's almost as if, if somehow SkyWest is guilty of standing in the way of his civil rights as a citizen. However, this is private property. This is a company system. We can dictate how our employees are going to use our private property and that's why we find this to be in violation of the policies and the practices that have been written.

(39:22) Item thirty are a copy of these e-mails back and forth, but I won't go through them. And it is a dump, they are not necessarily in any particular order. I.T. dumped all the messages for us. On to page twenty-one. Before I go over twenty-one, I'm just going to talk about standard practices 306, item twenty-one. Again this is the personal rules of conduct for the crewmembers. Item twenty-one says "Crewmembers may not make or publish false, vicious or malicious statements concerning any employee, management representative or management representative of the company, or which has the potential to adversely affect the company's relationship with the customers, suppliers, employees or the public. Item number twenty-one is a letter that is written by the assistant chief pilot in Denver of a situation that he was a party to while at a hotel

in El Paso. I'll read the whole thing and, hopefully, I can stumble through it without losing anybody. "On the night of August the 27th in the Marriott hotel in El Paso while I was in room 238 at about 22:50, local time, I was just about to fall asleep and the person in the room next to me, 240, made a phone call. He was very loud and from the inflection of his voice, very angry. I remember thinking 'How rude to call somebody at 11 o'clock and to be loud and generally obnoxious in a hotel room.' I was about to put the earplugs in and turn up the air conditioner to drown out his voice when my attention was grabbed by this statement, 'If they do that I'll sue the shit out of SkyWest.' He went on to say 'I'll sue Brad, Jim and Kelvin.' Not knowing that there was another crew for SkyWest in the hotel, I though this was a disgruntled passenger or customer, and I was curious to hear more. He went on to say that his basis for his lawsuit would be similar to the pilots of Cathay Pacific. This lawsuit was by a non-Oriental pilot suing Cathay Pacific for what was known as a hostile work environment and general harassment in the workplace. He stated there were about thirty or forty non-Oriental pilots out of about 2,000 or so and that they stood a good chance of winning their lawsuit. He also stated that he would settle for $10,000 if he does sue. He went on the say that he would contact a lawyer named Ed Collins in Salt Lake tomorrow, Thursday the 28th, because his report was due on Jim Breeze's desk on Friday at three o'clock. The person on the other line must have asked him 'What was the company going after him for?' because of his next, because his next remark was 'They're trying to get me on a personal violation of the company policy on the company e-mail.' He went on the say that the only thing the company had on his was a counseling statement about an incident in Butte. He then also stated that he was looking for a new job and has an interview with JetBlue on October the 14th. At this point the person on the other line must have asked him what SAPA was doing for him, because his next statement was 'Chris Bell said to me you know more than you're saying.' The person in the room then said 'SAPA won't do anything for me until the company takes disciplinary action.' He said this with disgust in his tone and something about them, SAPA, not being very effective. He then said some other things that sounded like complaints and the conversation ended about 11:20. He said to the person on the other line 'Thanks, Dan' and hung up. I then called to the front desk and claimed that I was an

assistant chief pilot for SkyWest and I thought I might know the person in the next room and asked Eddie who was in the room next to mine. Eddie said it was indeed a SkyWest pilot; his name was Andy Callaway. I then called crew scheduling and asked if a pilot named Andy Callaway was working and if he was indeed on an overnight in El Paso. Crew support confirmed that Andy Callaway was in El Paso and he'd just flown in from Dallas Fort Worth. In closing, let me say that I've heard employees talk about their company or their boss in a negative tone. This usually does not bother me. I think we all blow off steam from time to time, especially when we think we are in the confines of privacy of our hotel room or house. However, this Andy Callaway was whining and complaining and sneering about subjects and people that he was just plain wrong about. He was saying how he'd been set-up, how he'd set-up two interviews with some small company and was proud that he did not show up for either one of them and had the audacity to say that he might not show up for a third interview, just to see if they'd learned their lesson. Although I've never met this Andy Callaway, he reminds me of a spoiled, rotten kid who thinks everybody else is wrong and he is right. If he does have another interview, I say good riddance and good luck. By the way, I was all, I was also wondering if this is what he has to say about SkyWest and it's employees and it's managers." Let's see, "I was also wondering if this is what he says about SkyWest and it's employees and managers in a hotel room loud enough for me to hear. I wonder how many other people or passengers hear him or if the other room overheard him talking bad about SkyWest. Very unprofessional."

(44:20) Well, we feel that that pretty much violates directly the policy of "Crewmembers may not make published, false, malicious, or vicious statements concerning any employee, management, representative of the company or which has a potential to adversely affect the company's relationship with customers, suppliers employees or the public." As employees for SkyWest, we are always on display for SkyWest and certainly this doesn't sound very good coming from an employee that could have been overheard by any passengers. A request for a review board hearing, Andy made the request "I'm unaware of any pattern as set forth in the attached notice. The only incident in my file that I'm aware of is the November 30th, 2001 counseling statement. I've been accused of no such conduct since

then. According to her admission in court, the recent complaint from Kristen Wiley was made in retaliation for a small claims lawsuit that I filed against her collect a debt. I believe my termination for collecting a debt I was owed is unfair because it does not reflect poorly on SkyWest." We did not terminate Andy on trying to attempt to collect a debt. We terminated Andy on attitudinal problems. We terminated Andy because he refuses to fail, or refuses to follow company policy manual and or to crewmember policy manual. A kind of summary of his history here. Summary: He no-showed for his initial class, first year employment he was summoned to St. George to talk about abusive writings, to about abusive writings on the website and comments to crew support, he was warned by Brad Holt and Jim Breeze that his behavior will not be tolerated. We received a call from his neighbors concerning loud and noisy parties, a party house. Certainly his neighbors are aware that he's a SkyWest party, a SkyWest pilot. This again is a violation of our policy manual and certainly we do not need this kind of exposure from our own employees to the public. The abusive treatment of a fellow SkyWest and Horizon employees in Butte, Montana, disregarded a bulletin issued by Brad Holt concerning compliance with screener directions, we issued a counseling statement, three weeks off. Write-up from ground instructor concerning his arrogant attitude.

Kelvin (46:41): Another meeting with Brad Holt, the third in his three-year employment concerning his attitude, abusive treatment of fellow employees, again, a very common thread. Counseling statement was issued for that and, again, three weeks of unpaid leave and that was upheld by a review board, similar to this. A SAD for calling in sick, or calling sick when you were called on reserve. The company kind of looks at that as fraudulent, trying to defraud the company and to be paid for something that you should not be paid for. Another SAD for not returning call while on reserve, did not accept responsibility, non-complies for a return of the written verbal warning on that, again, will not follow policy. Harassment of the fellow employees using SkyWest property, in violation of the company policy manual and crewmember policy manual as well as violating the counseling statement. Violation of crewmember policy manual making vicious or malicious statements regarding or concerning any employee, management, representative of the company. Again, if this was loud enough that it could be heard by a pilot at SkyWest, it certainly could

have been heard by passengers of SkyWest as well. We can't tolerate that. SkyWest airlines reserves the right to employ those individuals that it feels meets the personal profile maintained for specific positions. Once the employment selection has been made, SkyWest tries to maintain a productive interaction with its employees. SkyWest maintains various employee and work group representatives. Working with these work groups representatives, SkyWest jointly crafts work rules and policies specific to each work group. SkyWest also maintains an overall corporate employee policy manual. Each employee is subject to the rules of conduct as outlined in these manuals. We feel that Andy has violated and shown disregard for these rules a number of times throughout his employment. The company has taken a number of actions as stipulated by policy to effect corrections in his behavior. We do not see changes in those behaviors. In fact, we've seen those behaviors continue down the path of disregard. We don't feel that we have any other steps that we can hope to have any change in behavior to take against Andy. We were left with one choice only, and that was termination. We have to think of all of the employees here. We have to think of all of our policies in place and the only thing that we felt left with, left was termination. Any questions?

VOICE (49:19) Do we have a copy of the final termination letter?

Kelvin (49:26): I do, in fact it's around

Jackie (49:28): And I have the original, too.

VOICE (50:22): When it says here "He has repeatedly declared his dissatisfaction with SkyWest and his desire to work elsewhere" what were the specific incidents?

Kelvin (50:35): That was part of

VOICE (50:36): What was the basis for that statement "He has repeatedly declared his dissatisfaction with SkyWest"?

Kelvin (50:40): I think that came from the letter that Donley Watkins wrote and the comments in there and other comments that are kind of common knowledge.

VOICE (50:53) OK, so it's that single incident that you talked about. It says repeatedly?

Kelvin (50:50): Common knowledge.

VOICE (51:01): Common knowledge?

Kelvin (51:01): Other employees have indicated this to management. We don't write down every one of our conversations that we have with employees.

VOICE (51:08): OK, but this written down and it says repeatedly.

Kelvin (51:10) Yes, yes.

VOICE (51:11): So, that's why I ask.

Kelvin (51:12): We as management can use other things that we may not have writing on to base our decisions.

VOICE (51:19): K, so there's nothing specific to back that up….

Kelvin (51:23): I don't have, in writing, anything specific outside of that.

VOICE (51:26) How about his desire to work elsewhere, it's again; it's that Don Lee Watkins overhearing through the wall in the hotel?

Kelvin (51:30): Yes, yes.

(Inaudible)

Jacque (52:48): Are there any questions for Kelvin? Maybe you'll have more questions if we let Andy present? Is that?

VOICE (52:53): Yeah.

Jacque (52:56) … OK, Andy you can … OK.

A. CALLAWAY (52:58): Thank you everyone for (inaudible) my appeal. I have made copies of what I'm going to give you, but I'm sorry, Kelvin, I only have four.

Kelvin (53:07): OK

Andy ( But I can probably…

Kelvin (53:07): I'll share with you.

Andy (53:14): I'd like to start by going back and reviewing the, uh, from my, uh, this package was arranged, and this is from the counseling statement. I guess, to start off, though, it's a

little out of order. Follow along with, if we could go from this, make sure we're on the, on the same page. The, this verbal warning that was issued from Mr. Breeze is in the, uh, your package there. I'm not sure which page now. If you'll fast forward a little bit, oh, there, .... I'm sorry...

VOICE (54:13): No problem.

Andy (54:20): ... right here. This is the verbal warning. It's page, it's after the, yes, it's on that page. It was submitted by Jim Breeze to Kelvin Hiatt December 14th, 2001, referencing a verbal warning. I was not aware of that verbal warning prior to that date, and it's missing from this package right here. I did go to St. George. I did accept the, that my comments could be construed as abrasive or direct. They were issued on the SAPA site, remember you asking about the, which website they're on.

VOICE (54:58): Right.

Andy (54:59): They were on the SAPA website, which, to my knowledge, was for SAPA members only. And, that is what this is in regards to. I'll just, I'll read now what it is. In reviewing, in November of 2001, I did receive the counseling statement after a station's gate agent in Butte filed a complaint. I accepted full responsibility for my actions and assured everyone that they would not be repeated in the future. However, in reviewing the actual irregularity form that I received when I requested a copy of my employee file, which was sent to me the other day. I became quite confused after I read through all of the statements. I was not allowed to view these statements when I was, had the review board back in 2001. While my counseling statement said my conduct was arrogant, rude and abusive, I was unable to find this statement in the irregularity report. Again, I did take responsibility. I did ask some, probably, appropriate, inappropriate question to the security screener and I did accept that, but I still don't know where it was described as arrogant, rude and abusive. While going over the documents in my employee file I noticed several other statements that came from there. One statement was the e-mail from Mr. Breeze to Mr. Hyatt requesting Anita write-up her department's experience with me. A statement then followed that said I was rude and abusive to crew schedulers beginning in late 2000 to 2001. In this statement the person who writes it say, and I do not know who wrote it, states I was very angry that my line was not

very commutable. When I read this I thought for sure they must have me confused with someone else because I've never commuted during my employment at SkyWest. I don't remember having any conversation that was described in this statement. If I was rude to the scheduler, I wish I were notified of my behavior when it occurred so I could have corrected it almost a year later. And I do agree that we should not be calling crew scheduling and voicing our discontent with them and I have taken up issues with SAPA instead, if I had a conf-, you know, a disagreement with them.

(57:13) The other part of the e-mail that confused me was the verbal warning that was about a situation one and a half years prior. This verbal warning said I was summoned to St. George in June, 2000, for making inflammatory comments on the company website and causing problems with crew scheduling. The reason this confuses me is I did not go to St. George to meet with Mr. Holt and Mr. Breeze, excuse me, I did, but it was not until December 11th of 2000. No mention of website posts were discussed and there was no company website until SkyWest Online was implemented in 2001. Again, it was the SAPA site that there were some posts on there. The final document that was read from the file was written by ground instructor Kelly Dixon, commenting on my experience with me during upgrade training. This letter was read to me by Mr. Hyatt during the review board in 2001, but many parts were left out. While the letter described Mr. Dixon's experience with me in class, he also noted that Verdeen did not have any problems with me in class. If my experience or lack or participation during this last class was perceived as offensive I do apologize, uh, to Kelly. I certainly did not think that my posture would come across this way or that my actions offended anyone. I would never want someone to think this of me and he also went on to mention that I was a nice guy. In closing on the rev-, the statement on the counseling statement, I wish I was allowed to review the documents I have now, because I would have been able to see or understand more exactly what I was doing. I also feel that I had myself and the review board been allowed to view these statements we could have been able to change the way I was perceived by my peers. So, going from, back to Kelvin's copies here, I believe that covers page one, two, one, two, on to page three, it references some comments on a neighbor. This was a big issue, a big I ... well, if you go to page three 'C' it is, it looks like a list of complaint calls.

My home was purchased in November, or October 31st of 2000. There's a lot of things on here that go from other dates on there. However, this was an ongoing litigation with the City of Salt Lake regarding our neighbor and it was a lawsuit that was, uh, brought, this woman was, uh, had some issues with some of the other people in my house. She made complaints that, uh, there was drug use because of black people in the home. And the lawsuit was brought against the city and her and she was evicted from her home and the lawsuit was won. Again, it's a personal matter, it had nothing to do with SkyWest, but I do understand where Kelvin's situation is coming from. After this lawsuit was, if you would like to pass it around you can, after this lawsuit was settled with the city, or filed and she was evicted there've been no other complaints whatsoever. It was a very difficult time, for me as well, as well as the other residents of the home.

(01:01:09) On page seven, ... , or section seven, page seven ... , the letter from Tony Thompson is cut off at the bottom. This meeting did happen. I met with everyone. We did discuss this, the problem in Butte. However, I'm a little confused why the letter was cut off. The letter continues to discuss about our discussion with Brad Holt and I don't know whether that's what it says because it's not here. Also, in your, the file that I handed out, there's a letter from Dan Black that was not included in the, uh, review board from 2001. He was a witness with me the entire time I was in Butte, but, again, I did take responsibility because I did ask some questions to the security screeners as to why they were emptying bags out and x-raying those bags. The SAD on page twelve, I do accept this. Kelvin did mention, however, when he was reading this that I did not want to do the trip. That is not what the statement says here. It says, he said, "He would do the trip." Or, "would do the assignment." The scheduler did notice that I sounded sick and offered to take me off sick. I did not know this would happen, but, in retrospect, I should have called in the night before. I went to sleep early and was not awakened until I was called by scheduling, trying to get over that, uh, cold.

(01:03:31) Also, this was the time when they were using the reserve, the, uh, bucket system. I was not, it lead to a lot of, the bucket system for reserves, were they assigned different seniority to reserves and it was not, it lead to a lot of confusion with SAPA, at the time. But, I am at fault for that SAD. Page fourteen is a background check that Kelvin

discussed with me saying I was arrested for a DUI or charged with reckless driving. That was dismissed. I don't know why it wasn't; I believe I did talk to you about that, Kelvin. There's the uh, dismissal on that, but it, uh, was, uh, in 1998, before I was employed with SkyWest.

(01:05:38) And I do apologize, again, for going out of order. I had thought it would be in a different order, but it didn't. This was the original employee file that was sent to me by, I believe, I believe you sent it, yeah, and in it, it has the actual letters that I wrote to the company explaining my no-show in 1998. My father had thyroid cancer and I did not find out about this until he was in the hospital, when class started, and here are the letters regarding that. Apparently, there was a miscommunication, as it was told to me. Larraine Caldwell, I believe, who doesn't work here anymore, did tell me there was a miscommunication between St. George and the hangar, as far as my no-show, due to this unfortunate circumstances. My father is recovered now, but, uh, uh.... As soon as that was clarified, a class date was assigned.

(01:07:08) And then, as..., moving to the section fifteen, I believe it is, yeah, section fifteen, which was a SAD received in June of 2003, their statements on that. Can you pass that? Here. And I have one more. Uh...,yes, it's 2003. I do accept this SAD. I did try to make some arrangements to get a day covered for a court deposition. It was not a actual court hearing for my cell phone was not allowed. I was in an office building in a courtroom; excuse me an office in the courthouse. When I received a message from scheduling I immediately called them and spoke to Donna and explained to her the situation that the phone wasn't working at the time. She instructed me to call every half hour to hour to keep checking in to see if there was any assignments. There were some other reserves on, but not for a certain amount of days, due to this bucket system. I did that and then at 4:30 I noticed the SAD. Again, I, after looking back at it, it's it's, uh, I acknowledge that I should have had maybe made arrangements, called into crew scheduling to see if I could get off, uh, not be with my phone for an hour. I wasn't, I didn't know that was available to me, but sounds much better then calling in thirty to sixty minutes. Anyway, Kelvin did e-mail me the IOR. I signed it. I was in discussions with Lou about that, coming in to talk about it and to give him the actual paper. My show times during when this was going on were before the office is open, and

one time I said I would bring it in on a Wednesday and I was unable to because I departed out of the other terminal, terminal one. I, therefore, faxed the copy of this to him and he did not receive it. On August 29th, Lou, yes, excuse me, on September 9th he says, "I did not receive the signed copy of the verbal warning. You were going to bring it by Wednesday. Please meet with Kelvin and myself October 3rd to sign the verbal warning. If it is not possible to meet with us let me know." And, I responded with his voice-mail. Now, that was not read until September, that was September 9th, but I did tell Lou that I would bring that by and faxed that to him. So, that is my responsibility. Uh, I am guilty of that SAD. Here's a fax, or a log from my fax machine. This is when I faxed it to him. 4/2/06. I do have it right here, actually, signed, you can see.... And that's, this is what I faxed. Uh, due to that then, I've been very careful with my phone, make sure it's always around. Um, I now have three different phone numbers. So wherever I go I'm, someone knows where I am or where to be reached. Fortunately, I've recently been able to hold a line, or was holding a line on that one. And then, moving forward to the Kristen, uh, Kristin Wiley piece

(01:12:19) Uh, could you pass those around? My, uh, situation with Kristen is absolutely unfortunate. Uh, it's something I did not, uh, intend for it to happen. I find myself out of a job now that, as uh, or because of this, is a catalyst for my behavior and fellow employees have accused me of behavior that is out of character. I was simply attempting to collect a personal debt. This was a personal matter, and, again, I did not think, at the time, it had anything to do with SkyWest. It is possible I had a lapse in judgment by using company resources, such as SkyWest Online, to contact her. It is regrettable that this e-mail exchange requesting that she contact me to discuss payment terms and explaining the possibility of a small claims suit was misinterpreted as an attempt on my part to create a hostile work environment. I assure that this was not my intention. Uh, if Kristen had informed me that felt harassed or intimidated, she is friend of mine, I've known her since she was employed here in 2000, I would have stopped. But, I want to, or you to understand that this was only done as a last resort in attempt to contact her. I was simply trying to, as a friend, give her one last chance to maintain her integrity, to make good on this debt. I'd tried, in vain, to preserve our friendship during my attempts to collect the money that she owed me. Taking Kristen to court was an

option that I reluctantly pursued. While I won the judgment, I sadly lost a friendship and my job in the process. On the policies that were quoted to me I do not, uh, I was using those as my basis for my response to Kelvin on August 28th and it stated why I was not in violation of SP 56-306, Section 30 and 34 and counseling statement. Nowhere did I become aware that there was an e-mail policy or that this, sending an e-mail through SkyWest Online, fell under a different policy and I don't know where that policy is. It was a personal matter. Yes, I know, I sent it on SkyWest Online, which now became, I guess, part of SkyWest, if you will. I don't, I didn't think of that when I was typing the e-mail. There was e-mail exchanges from Kristen to me and back and forth ever since SkyWest Online came on. You know, personal e-mails, back and forth. On May 4th she sent the e-mail saying that she was going to pay me "X" amount of money and, you know, to get a hold of her. And, that was May 4th. The next e-mail to her was July 3rd, a month later. Very friendly e-mail, it says, "Hope to see you soon" followed by one month later, another e-mail saying, "Bonus checks are here. How about signing it over to me." That's what she was promised. "Call me when you're around so we can catch up or do lunch or something." Another month passes, or excuse me, not another month, a few weeks pass and that's when I sent the final e-mail. So, it was only three different times that I sent an e-mail on SkyWest Online, uh, requesting this. She then responded that she did not owe me the money, which contradicted her e-mail from May 4th, and I explained to her how it would go, or what the options were. Um, I really did not want to do that, but, uh, I then felt like play-, in being a bank for quite some time now. She did lose the case. It was, the complaint was prompted from her being served at her other job, not at SkyWest, and that is on the back page of, uh, your uh, your package there. I wish this did not have to come this way because I did enjoy Kristen's friendship, but, knowing her as well as I did, I don't believe that she would have done this if we had contacted and pursued other, a course of action. And, that's all that I, it's, it disappoints me that it came to that. So, I don't know what else to say about Kristen. It's, uh, very unfortunate.

(01:17:40) Uh, moving to the Don Watkins' letter. I believe it's the final, the final, yes, the final comment in the file. And there this, will you pass around ... thank you. The letter from Don Watkins confused me considerably. I've never

met Don Watkins and he does not know me. The letter is hearsay regarding a phone conversation that I simply do not remember having. There are references to matters I have no knowledge of. It troubles me that the front desk would even release my name to another guest. When I read this letter I started to think about the date and what I was doing around this time. I then remembered that I was next door at Applebee's during this time, having a quick snack before bed. When I went back through my records I even found a receipt from my dinner and this is the receipt and it shows on there the time, I think it says 11…

VOICE (01:18:48): 11:24.

Andy (01:18:49): 11:24 and the letter from Don says I was on the phone from 11:00 to 11:20, I think.

VOICE (01:18;58): No, it says 10:50.

Andy (01:19:01): Right. So. Now it says, "I remember thinking how very rude to call someone at almost 11."

VOICE (01:19:07): Right.

Andy (01:19:08): And then it says, uh, down here, he said, "Something that sounded like complaints and the conversation ended at about 11:20." I, yeah, this is, I'm not sure how to respond to that. It's a letter that I, or I don't know how someone could understand how a phone call and what was on the other end of the phone and there's some things in here that don't make sense to me or are pretty incredible, actually. … those if I can find my file. I've been a dedicated SkyWest employee for almost five years. During this time, I've performed my duties as a first office rank captain flawlessly. My training records will show that I approach my duties as a pilot very seriously. As a result, I've never been involved with any safety related or FAR violation, nor have I caused unnecessary tension to bear on my crew or this company. During my employment at SkyWest I have made many friends. Some have taken the time to write letters on my behalf and for that I am grateful. Fortunately, there are a few individuals within SkyWest that I have either offended or my demeanor and personality was misinterpreted as being arrogant, intimidating, harassing or rude. These opinions were formed during brief contacts with these individuals, or as evident from the information in my file, were based on hearsay or assumption. I do love

my job here at SkyWest. I have always tried to make people feel welcome and comfortable when I meet them. I've never been intentionally rude or arrogant to anyone and hope that my conduct is not perceived this way. This is not how I want people to think of me because I'm not like this. While it is regrettable that some individuals have perceived me this way, there are many that do not. But, I'm willing to acknowledge that there may be an issue and I'm willing to address this forthright. In the future, I would hope that these individuals reserve judgment until getting to know me a little better. I have over twenty letters to attest to my character and, if we have time, I'd like to read just one or two.

(01:21:50) This letter is written by Carl Wager, a first officer, "Please accept this letter of reference regarding the character of Mr. Andy Callaway. I've known Mr. Callaway for approximately one year. During this time, I've had the opportunity to work closely with him as a flight crewmember and to interact with him socially on various occasions. In my experience, Andy has distinguished himself by his professional conduct and demeanor in the work environment. If during our many conversations he ever held a conflicting viewpoint, he either refrained from commenting or politely expressed his qualified disagreement. He has never used his professional standing as a pilot in command in attempt to coerce, manipulate, intimidate or otherwise cajole a desired behavior from a colleague or social acquaintance. What is more, knowing him as I do, I can not believe that he would do so." And I have these letters to pass to you. This is from Hayes Grace, "To Whom It May Concern, I'm writing you to provide support and character reference to Captain Andy Callaway. I've known Mr. Callaway for five years now and have become close friends during that time. Mr. Callaway is an excellent pilot and performs his job with utmost professionalism. I've also worked closely with him in training department and he has always gave his best when teaching. His knowledge of SkyWest procedures and aircraft systems is always stellar. The circumstances that befall the writing of this letter are unfortunate, but I feel it is important to rally support for Mr. Callaway in an attempt" excuse me, "in any way that we can as a pilot group. I will wish him well and hope to see him back here at SkyWest soon." And, this one's from Courtney Wheeling, "To Whom It May Concern, this letter is a character reference written on the behalf of Andy

Callaway. I have known Andy for approximately four years. Our first introduction was working together as crewmembers. Since our first meeting, I have had the opportunity to work with Andy on several different occasions. After these experiences, I was very much impressed by Andy's professionalism in a team approach, that he was taken with all crew interactions. I associate with Andy socially and over the last four years have taken numerous vacations with him. Some of these trips have also included other employees of SkyWest Airline. My experience of Andy's character, whether professionally or socially, has been one of generosity and loyalty. Andy is an invaluable asset to SkyWest. I respectfully request that this reference to Andy's personal integrity and dedication as a professional be taken into consideration when determining the disposition of Andy's termination." And I'll just read one more. "To the review board, I am writing this letter to convey my viewpoint with respect to Andy Callaway in the case involving his dismissal as a pilot from SkyWest. I'm both troubled and perplexed that assertiveness would be confused with hostile here at SkyWest. Consider that one of the qualities that SkyWest Airline seeks in prospective pilots is command presence, otherwise known as assertiveness, which is what is at question now. I feel that this matter could have been resolved with Captain Callaway in another way, one that would be more suited for the true nature of the matter. I have flown with Andy on several occasions since he was hired as first officer in January '99. I've found Andy to be skilled, personable, knowledgeable and professional both in and out of the cockpit. Andy functioned very well as a second in command and because of the quality of his character and his high degree of professionalism and skill his upgrade to captain was a smooth one. Since Andy's upgrade to captain, I have not heard any first officer complain about Andy as a pilot in command like I do about other pilots I have flown with that have developed captainitis, a tyrannical leadership style that does not belong in the cockpit. I've heard no reports or stories of Andy being hostile towards anyone. I would not hesitate to recommend Andy for reinstatement as a pilot in command for SkyWest, as I believe that Andy is the type of asset that SkyWest needs to retain, based on my association with him these last four years. Further, I would not hesitate to have him as a guest in my home." And that's Bill Alfred.

VOICE (01:25:38): Bill Alfred ...

Andy (01:25:58): And just to conclude one more time, I have been told, and I can understand where my assertiveness or, uh, I guess, direct personality can come across as being rude. Um… I feel that I am a nice guy and I do like to interact with people on a direct basis and that is my style. It's unfortunate, and I do regret and I wish I could change how people see this and if I had a suggestion on where to start I would be more than happy to address that. I would like to see if I can have my job back and continue my career at SkyWest. The one last thing I forgot to mention was in that letter, or the termination letter, about career, or wanting to work somewhere else, it mentioned in Don's letter an interview with JetBlue and that was October 14th. My interview was actually September 10th, right there. It was not rescheduled until October 14th, until September 11th where it says here, "Thank you for coming," October 14th. Also, Don's letter was written on September 12th, discussing August the 27th.

VOICE (01:27:35): Have you gotten the results of this interview, Andy?

Andy (01:27:39): It was unsuccessful.

VOICE (01:27:42): Hmmm.

Andy (01:27:42): They, um, the, because of this.

VOICE (01:27:46); Oh, really. This is something that came up?

Andy (01:27:47): Yes, this came up in the interview.

VOICE (01:27:50): You say you have not met, Watkins, is that right?

Andy (01:27:54): No, I have not met Don Watkins.

VOICE (01:27:55): You have not met him.

Andy (01:27:56): No.

VOICE (01:28:00): In your, I saw that you had your original application, could I look at that real quick?

Andy (01:28:04): Absolutely. There's two. I was asked to reapply, so. This is from '96 and '98.

VOICE (01:28:31): … '98 …

Andy (01:28:32): There was, yeah, '96 was my first application and then '98 was my, uh, I believe, uh, Larraine Caldwell, went down to, uh, airline pilot hiring seminar, just to meet with Lorraine Caldwell and she advised my to fill out, send in another application.

VOICE (01:29:31): Let's see, uh, the last e-mail regarding the Kristen Wiley events from August 12th.

Andy (01:29:43): That's correct.

VOICE (01:29:43): At what point were you informed that this was...

Andy (01:29:49): An issue?

VOICE (01:29:50): Yes.

Andy (01:29:51): Uh, when I received Kelvin's e-mail on

VOICE (01:29:56): The 29th?

Andy (01:29:57): On the 22nd.

VOICE (01:30:00): Oh, right here. OK, alright, so there was nothing between the 12th and the 22nd?

Andy (01:30:06): That's correct.

VOICE (01:30:07): And there's nothing after that?

Andy (01:30:09): That's correct.

VOICE (01:30:10): Alright.

Andy (01:30:10): Yeah, between the 12th and the 22nd on, I don't have the originals. It's hard to see the date. Which one am I looking at here? ...the 12th... I wish the date came out on this, but between the 12th and the 22nd this was served on.

VOICE (01:30:44): OK, the-, the-, mainly the issue is, as far as using the company system for...

Andy (01:30:48): Right.

VOICE (01:30:50): ... uh, there was nothing more after you were warned?

Andy (01:30:53): No.

VOICE (01:30:55): In fact, there wasn't ...

| | |
|---|---|
| Andy (01:30:56): | No, that was the, that was the last e-mail dated August 12th. |
| VOICE (01:31:00): | OK. |
| VOICE (01:31:21): | On your original application in '96, you marked "No" on the... |
| Andy (01:31:28): | Uh huh. |
| VOICE (01:31:28): | ... on this one, you didn't mark it and then you put "N/A". |
| Andy (01:31:32): | Right. |
| VOICE (01:31:32): | Is that because that was pending? I mean why didn't you declare the DUI on this application? |
| Andy (01:31:37): | That was '96. |
| VOICE (01:31:39): | This is '98 here. |
| Andy (01:31:41): | '98? |
| VOICE (01:31:41): | Yeah. |
| Andy (01:31:41) | This was... |
| VOICE (01:31:42): | The original one in '96 you marked "No". |
| Andy (01:31:44): | OK, this is, right, this is August 5th, '98. |
| VOICE (01:31:47): | Yeah. |
| Andy (01:31:48): | And the che-, the background check was December '98. So, it didn't happen until December of '98. |
| VOICE (01:31:58): | The DUI was in December. |
| Andy (01:32:00): | And ... didn't |
| VOICE (01:32:00): | I'm just wondering why you didn't fill that out the way you did this one, just. |
| Andy (01:32:05): | OK, I'm just confused. |
| VOICE (01:32:07): | I don't under-.... |
| Andy (01:32:09): | In August of '98 there was no |
| VOICE (01:32:12): | I see. |

Andy (01:32:23): There was no charge. It was not until December of '98 that the citation was issued, which was then dismissed.

VOICES (01:32:25): Mmmm- Uh, I'm finished.

Jacque (01:32:47): OK. Continue.

VOICE (01:32:49): Question as to the format of these, uh, I've never been on one these boards.

Jacque (01:32:53): Uh-huh.

Voice (01:32:54): Do we all stay together and talk? Is there a possibility of meeting privately with Mr. Callaway? Captain Callaway?

Jacque (01:33:03): No, we're, what will happen is once we've finished with both presentations and there's no more questions then Andy and Kelvin will leave and then you'll deliberate. We do not put it on tape or anything like that, the deliberation, but then that's what's going to take place. We don't, you know, OK, let someone speak, you know, separately with each of the individuals; it's whatever questions need to be asked they need to be asked during now.

VOICE (01:33:35): OK. Alright.

Jacque (01:33:46): Are there any questions.

VOICE (01:33:48): Yeah, I'm sure they're going to come out. I have some and

Jacque (01:33:51): Well, no, just, right now is the time to ask if you've got questions. Just jump in there.

VOICE (01:24:02): I'm a little unclear on open time. What is the...? You know, not being familiar with how all that works. How, what is the process of that?

Kelvin (01:34:13): Open time is scheduled by time that it is not assigned. So, as they put the flight schedules in the system the computers are ... computer system the shifts to be flown. If they are not assigned to a crewmember they exist in what is called open time. Now the company has policies about time that exists in open time and crewmembers can pick that up. Because any time that is not assigned is in open time it may be time that is being worked on, otherwise a crew scheduler is working on assigning that to a crewmember, but you'll still see it in open time. So, it may not be available. And I know that that creates a lot of issues with crewmembers

| | |
|---|---|
| | because they see this time out there, but they're told that they can't have it. |
| VOICE (01:35:02): | So, is it something that's typically once that's completed or there's still open time that's not assigned is that filled by tenure? |
| Kelvin (01:35:11): | First come first served. |
| VOICE (01:25:14): | Yeah ...right. It's kind of a, it's was a think, and I think it's probably happened in crew track, too. There is no place for, in that database, to put, if they're working on time that's not assigned, it's one or the other. There is no place for them to put that trip so that is doesn't appear to be open time other, they have no way of saying 'We're working on this trip; we just haven't assigned it yet' so it ends up being in open time and people look at it and they go 'Why can't I have it?' |
| VOICE (01:25:42): | I see. |
| VOICE: (01:35:46): | Just as a totally outside comment. I wonder, I always come up with... brainchild; I wonder if we could come up with some alias-pilot name to where, when they're working on it, where we could assign it. |
| VOICE (01:36:01): | Well, the problem is, is that there will be a, like. You can't do it be a legality issue... |
| VOICE (01:36:06): | Yeah. |
| VOICE (01:36:06) | The trip would overlap and it wouldn't allow them to assign it to that alias. ... So, you'd have to have |
| Kelvin(01:26:10): | Yeah, the computer does not allow them to schedule anything that is illegal. |
| VOICE (01:36:16): | Uh huh. |
| Kelvin (01:36:16): | And, so, if you had this alias crewmember... |
| VOICE (01:36:17): | Right. |
| Kelvin (01:36:17): | ... and you're trying to dump a lot of time on there that may be illegal per the FARs... |
| VOICE (01:36:22): | Uh-huh. |

| | |
|---|---|
| Kelvin (01:36:22): | … it won't accept it. |
| VOICE (01:36:23) | Oh, I got ya. |
| Kelvin (01:35:23): | So, that is the problem. That's been thought of. |
| VOICE (01:36:26): | Captain X, X1, X2? |
| Kelvin (01:36:28): | Well, then it becomes confusing 'cause then you have this time spread amongst all these aliases |
| VOICE (01:36:33): | Uh, huh, now… no… |
| Kelvin (01:36:35): | So things could fall through the cracks. |
| VOICE (01:36:35): | Yeah. |
| VOICE (01:36:36): | I need a restroom break. |
| Jacque (01:36:38): | OK, what I will do |
| VOICE (01:36:39): | I have another question, maybe that, I don't know |
| VOICE (01:36:41): | Oh, I can hear it… |
| VOICE (01:36:42): | … or not, but… |
| VOICE (01:36:42): | … not that question… |
| (laughter) | |
| VOICE (01:36:43): | What is the policy on SADs? Is there a "X" amount of SADs results in a letter of counseling or is there a chain of event that goes with SADs? |
| Kelvin(01:36:53): | If you have two SADs in a twenty-four month period it is a letter of instruction. |
| VOICE (01:36:57): | Letter of instruction. |
| Kelvin (01:36:58): | As we start to get down that road then it escalates, counseling statement to termination. |
| VOICE (01:37:04): | OK. |
| VOICE (01:37:05) | Its unexcused SADs. |
| VOICE (01:37:07): | And if someone doesn't… |

| | |
|---|---|
| VOICE (01:37:07): | I thought it was one year. |
| VOICE (01:37:08): | If someone doesn't respond to a SAD, does that result in a counseling statement? |
| Kelvin (01:37:14): | It, it can result, because that's a direct request from the supervisor and you cannot ignore direct ques-, requests from the supervisor. So, certainly that will lead to escalations. |
| Jacque (01:37:30): | Did that answer your question? |
| VOICE (01:37:31): | Uh huh. |
| Jacque (01:37:32): | OK, what we'll do is I'll stop the tape. |
| VOICE (01:37:37): | Oh, sorry. |
| Jacque (01:37:37): | I started, so go ahead. |
| VOICE (01:37:38): | … mine … |
| Andy (01:37:39): | There's an e-mail from Kelvin to me. It says, "Because this is your second SAD in twelve months a letter of instruction will be issued. So, I don't, is it twelve or twenty-four months? |
| Kelvin (01:37:49): | That was the SAD that was deleted. |
| Andy (01:37:54): | Right, but is the policy twelve months or twenty-four months? |
| Kelvin (01:37:57): | If you have two in twelve months it's a letter of instruction. |
| Andy (01:38:01): | And, what is two in twenty-four months? |
| Kelvin (01:38:04): | Verbals each, or, nonetheless they are still on your record as a SAD part of the reliability, but… |
| VOICE (01:38:16): | Andy, is it true that you're on the UPA organizing committee? |
| Andy (01:38:21): | Uh, I, I've done work on it, yes. |
| VOICE (01:38:22): | Yeah. Thought I'd heard your name come up in that context. |
| VOICE (01:38:32): | And, that is a…? |

| | |
|---|---|
| Andy (01:38:32): | That is a, a... |
| VOICE (01:38:33): | That's a union organizing effort for pilots. So, what you want to do, Andy, is to simply retain your job and to continue flying. |
| Andy (01:38:59): | Uh-huh. Very much so. |
| VOICE (01:39:01): | And back wages, right? |
| Andy (01:39:03): | Back wages. |
| VOICE (01:39:04): | Got it. |
| VOICE (01:39:05): | How long have you been on? |
| Andy (01:39:06): | Unless that precludes my not being asked back, but. |
| VOICE (01:39:12): | Sorry? |
| VOICE (01:39:12): | So, that would be acceptable to you, is to simply? |
| Andy (01:39:14): | I would prefer that it not, you know, I prefer that, obviously, I have back wages back. It's been three or four weeks now? |
| VOICE (01:39:23): | Three. |
| Jacque (01:39:24): | October 1st, it's |
| Andy (01:39:26): | OK, So, about three weeks then. |
| VOICE (01:39:27): | I don't want to speak for the company, but I think if you're reinstated that's an automatic issue, then ... I mean ... |
| Jacque (01:39:34): | Not necessarily |
| VOICE (01:39:35): | Not necessarily? |
| Jacque (01:39:36): | I mean... |
| VOICE (01:39:36): | OK |
| Jacque (01:39:36): | ... it can be a modified solution... |
| VOICE (01:39:37): | Oh, OK, that would be a modified solution, but if he would just, think if you just reinstated |
| Jacque (01:39:42): | ... it's not an automatic. |

VOICE (01:39:45): So, there could be reinstatement with time off with without pay in lieu of the termination. Is that, this is, so, in other words, time served?

Jacque (01:39:55): Well, what, what is going on right now is you guys are asking questions and that, that would be something that

VOICE (01:40:01): We could do when we, when we ...

Jacque (01:40:03): The deliberations as to how, there's various modified solutions as long as they aren't something that, like, like I said, re, you know coming up with another job for this person or something in that effect. They can be all kinds of things.

VOICE (01:40:21): OK.

Jacque (01:40:22): OK.

VOICE (01:40:23): I just had to ask, I, to...

Jacque (01:40:26): No, that's fine, no.

VOICE (01:40:26): ... see what the range of possibilities are.

Jacque (01:40:28): But, yeah, there's a big range as long as it doesn't go against policy, but there is no policy that, you know, if you're reinstated you automatically get your back pay.

VOICE (01:40:41): OK. Shows you how much I know.

Jacque (01:40:52): But, here's the time to ask the questions if you have anything regarding any of the stuff that's been presented to you, because once you go into deliberations you don't have that opportunity.

VOICE (01:41:07): Don't they get rebuttals?

Jacque (01:41:08): Yeah, they get rebuttals if there's, I mean, I don't know, if there's any questions or you need them to rebut what has been said. Do you?

Robert (01:41:18): What, again, please correct me, anybody, or enlighten me as to the format of this, but John and I are here as SAPA representatives and to an extent I believe we're here on your behalf, Andy. Now is that, is that?

Jacque (01:41:37): What your position here is actually peers, and...

Robert (01:41:40): OK.

Jacque (01:41:41): ...and the peers are here because you're both captains.

Robert (01:41:44): OK.

Jacque (01:41:45): Uh... and that's when I have maintenance be up to A&P mechanics. We have, it just happens that SAPA, who picks the peers, has chosen you two. So, you're to act as peers, you're to act as pilots.

Robert (01:42:03): Right.

Jacque (01:42:03): You know, questioning both sides to figure out if this was a fair termination.

Robert (01:42:09): Right.

Jacque (01:42:11): Um. Management is also acting as Kelvin's peer and that's in there to question whether or not SkyWest did a fair, treated Andy fairly or not.

Robert (01:42:26): Uh huh.

Jacque (01:42:26): So, that's what your roles are. You're not here as SAPA reps, you're here as peers.

Robert (01:42:33): Uh-huh... OK.

Jacque (01:42:33): One of your positions in SkyWest, sounds like, are SAPA reps.

Robert (01:42:37): Right.

Jacque (01:42:37): So, you're here as, to make sure that this termination was done fairly.

Robert (01:42:44): OK.

Jacque (01:42:45): OK. ... thinking ... .

(Inaudible)

Robert (01:42:53): Well, to recap, the terminating incident is the use of SkyWest Online. Correct?

Kelvin (01:43:03): No, the terminating was based upon a series of events of continual problems all through his employment – disregard

for policy. Do I rebut now or? I mean, this gets into my rebuttal.

Jacque (01:43:23): Just go and

(Inaudible / Laughter)

Jacque (01:43:27): 'Cause it may, you know, that's, if you need more time.

Kelvin (01:43:29): The reason that I presented the entire file is because this is a continual thread of the same topic. Disregard for company policy, disregard for company and fellow employees, disregard for crew scheduling, um, abusive language, abusive, arrogant, are some of the comments that are written, let alone some of the comments that management has heard as descriptives for Andy. There's not very many employees, I would imagine, that when it's found out that they were terminated called me personally and asked me when the party was going to be and, as for the call I received from crew support. Only have certain things in writing, again, I get a number of phone calls as I'm sure happens with any management position in any company. Not everything is put in writing. So, there's an ongoing thread with behavior that we, as the company, feel is contrary to what we want in an employee. It's contrary to what we want to put other employees through. We do not see through the steps we have taken with Andy any change in that behavior. We still have disregard for fellow employees, disregard for published company policies. Not accepting responsibility is, and in looking at his writings and excuses for why things happen it doesn't really come back to it what was his responsibility or his fault. It's something else, its SkyWest Online was broken, my phone didn't work, those type of things. So, we feel that the last straw was this event and we, the company, had nowhere else to go but to terminate him. Now, a couple of things that Andy talked about that I just wanted to address. As far as the date on the verbal warning, again, it's a verbal warning. This is a record of the director of operations and the system chief pilot, his comment, his verbal warning. I don't know the dates of that. I was not involved. But, that is his recollection as to when things took place. If that's entered in here, I don't have that information. Nonetheless, the meeting did take place between Andy, Jim Breeze, and Brad Holt concerning his writings, his attitude, again, that common thread that we have issues with. The letter from Tony Thompson, that is all of it. Those were notes that

Tony presented to me in the file. There is nothing more to that letter.

VOICE (01:46:18): Uh… I'm sorry, Which Tony Thompson letter? In your package?

Kelvin (01:46:22): The note, yes.

Andy *(01:46:23):* *It's also in my package.*

Kelvin (01:46:24): Andy had indicated that it was missing part of it and there is no other part of it. That was the 7th.

VOICE (01:46:30): 7th?

Andy (01:46:31): Tony says there's a second page to that.

Kelvin (01:46:33): If there is, I do not have it and I've never seen it…. Um, the SAD, Andy brought up the fact that he would do the trip. He did say that he would do the trip. However, he was putting conditions on what he would do, which, from the company's perspective, we don't allow you, as a crewmember, to tell us what you're going to do or put conditions on the work we assign to you. So, therefore, that's still is considered a refusal to do the work. OK, the dismissal, as far as the DUI, all I can say is if you have an expunged an order you need to look into that because that was a background check that took place in 2002.

Andy (01:47:26): Yeah, I know.

Kelvin (01:47:28): Larraine Caldwell does still work for the company. She is in the people department and we spoke yesterday, she and I. She does remember that there was no phone calls that anybody knew of in St. George indicating why Andy no-showed and that was not information provided to SkyWest until much later in letters, which Andy does have copies of. So, I don't know of any miscommunication. She indicated there was no miscommunication that she could recall or any notification from Andy as to why he would not be at his new-hire class in February, '98. The Donley Watkins' letter, that letter is one I have from Donley Watkins. As far as the time, I can't comment on that. Donley called Bob Venturella, his boss in Denver, and indicated that he'd overheard this conversation and then penned the letter and sent it in and that's why I obtained it. As far as timing on that, I can't explain that. I'm not going to try. I have no reason to disbelieve Donley Watkins. He was assistant

chief pilot, and as a manager for the company, an assistant chief pilot who can certainly call the front desk and get information on other SkyWest crewmembers that may be staying at that hotel. That is not unheard of. Character letters, Andy does have a good following of fellow employees in some cases. Other cases, there are employees that would just as soon see him thrown down a stair. We all have pros and cons in our history and we believe that Andy can be very charming. He can be very personable. He is articulate and can certainly do a good job, but there's also a side to Andy that we, management, have seen through other comments from other employees that contradicts that sharply. Again, we do not take this step lightly. We feel that we have an employee that we are not getting the corrections from that we need to see as a company. We need to see compliance with policies and procedures. We need to see acceptance of responsibility with those policies and procedures, which we are not seeing. And, therefore, even through policy, there's not many steps left to us, as management, after a counseling statement and time off. So, we felt we had no further step to take except termination. Again, a couple of high points here. Three meetings with Brad Holt as his request seems very excessive. Most pilots here never meet with Brad Holt to talk about their attitude. Certainly, I think that that should indicate that there, from management perspective, is a problem here with this pilot.

Jacque (01:50:32): Questions?

VOICE (01:50:36): Oh, Andy, do you have anything to say to address the?

Andy (01:50:38): Yeah.

Jacque (01:50:39): Well, he'll address if, I don't, do you have any questions for Kelvin?

Andy (01:50:42): No.

Jacque (01:50:42): No? If not, then Andy, it is your rebuttal period.

Andy (01:50:46): OK. Uh, just to, I'll go backwards then. I've had two meetings with Brad, one on December 11th and one on November, which is the one that the letter of Tony Thompson refers to. There was only two meetings. The first meeting was the one where the verbal warning was issued a year and a half later. There are character

references. I do have friends here. But, I should maybe point out that I have probably worked with over 200 people that have gotten to know me on one-, two-, three-, four-day trips and not had one complaint filed or any problem there such. Um, nothing has been documented. So, everything else would be hearsay. Someone throwing me down the stairs doesn't sound nice, but I certainly haven't had any run-ins with anyone. Uh, with Don, uh, Watkins, uh, I did contact the Marriott and they say they have a policy not to release anyone's guest, regardless of who it is calling. The no-show back in 1998, uh, was circumstances beyond my control. My family does come first and I did everything I could, at the time, to relay that to, uh, SkyWest and, uh, Jim Breeze actually was helpful as well as Gary Overbaugh in making sure that went through correctly and then I was offered a position, again, without re-interviewing. That was before my employment. The SAD, uh, as far as the con-, putting conditions on the scheduler for the trip, I just indicated my preference to stay home. I did not say it would be the condition. If you don't do this, if you don't assign me a local I'm not going to do it. I didn't say that. I said I'm sick. I would like to stay close if I'm going to be sitting ready reserve, even though there was junior pilots, too. The letter from the scheduler did indicate there was a junior pilot available. And then, back to the comments where people have said I'm abusive, or use abusive language, the crew scheduler, or abusive language to crew scheduling, the letter might have me confused with someone else. It mentions that I was complaining and very angry about commutable line when I don't even commute or never have. I've never raised my voice to a crew scheduler or anyone on the phone for that matter, and if it was, if it came across as me yelling by talking directly into the phone, then that is something that I might be guilty of. Uh, and no employee has written anything saying I have used abusive language to them that I've worked with. And, as far as flight crews and, you know, people interacting with, I did take full responsibility for the two SADs as well as asking the agent in Butte some inappropriate questions regarding security, which was fairly new to me and new to all of us at the time. And I did accept those, uh, respon-, uh, the outcome on that and that is all I have to say on that.

VOICE (01:54:30): You, you've taken responsibility for these two SADs and have taken responsibility for, you haven't denied?

Andy (01:54:40): I have not denied, no. There are excuses, I mean, if this is what happened. But, I accept that.

VOICE (01:54:48): Right.

Robert (01:54:49): Right, alright, and then, this latest incident with the SkyWest Online, the messages, but you've acknowledged that you are now aware that that's on a company owned system…

Andy (01:55:04): Right.

Robert (01:55:04) … should not be used for private purposes regardless of whether this was non-threatening or not. What do you, so there is somewhat of a pattern of company violation

Robert (01:55:13): So, so there is somewhat of pattern of company violations… that you admit. What do you think management should do to address this? If by asking for this review board, do you think that termination is not the correct action? What do you believe would be the correct action? And, then, what would follow after that? How do you see this, this scenario playing out? What are you asking for?

Andy (01:55:44): Well, the two SADs, I accepted the verbal warning for and that is the policy on that. The e-mail, again, I'm not aware of any policy that prohibits that or dictates the e-mail use and I've looked in the policy manual and I still can't find one. If there is a policy then I would think…

Robert (01:56:07): I think you even have it in your package, don't you?

Andy (01:56:10): Uh huh.

Robert (01:56:10): Seeing that, you even have a note that's written on it.

Andy (01:56:15): Oh, yes, the company e-mail policy.

Robert (01:56:17): Right.

Andy (01:56:18): Right. That is what I found. Um, however, that was not brought to my attention if you look at the original letter form Kelvin it says, it mentions SP 56, crewmember policy SP 306-30 and 34.

Robert (01:56:36): OK.

Andy (01:56:36): And I just, I did pull that out of the company policy manual. And it says, for your reference, I was not being charged with violating this policy and I did go through this policy.

Robert (01:56:45): OK, but if you read this policy you can see that asking to have this debt repaid is, in fact, a violation of SP 61. Is that right?

Andy (01:57:00): Um, I

Robert (01:57:01): Even though you're not specifically being charged with it.

Andy (01:57:03): No, I don't know where I fall into this. It says, "Intranet access is provided for business purposes and reserve the right to restrict access." So, yes, business purposes. However, we've all been told that when crew, that when SkyWest Online came out that this was a way to communicate with people. It was a big enhancement to the company, as far as using it, uh, the, my messages part. It, uh, goes through here and tells you what, and this is I think the, the e-mail, or the, it, the, I guess SkyWest Online would be considered intranet. It just says what should and should not be done on here and I, its not very clear. And, again, if I'm not reading this correctly then that is my mistake. It's not very clear on where it says you may not send an e-mail to a co-worker, you know, regarding a personal matter or something like that. It doesn't say that.

Robert (01:58:10): Alright, so number one, it says

Andy (01:58:12): It does say business purposes

Robert (01:58:13): Business, and we reserve the right to restrict access accordingly.

Andy (01:58:17): Uh huh.

Robert (01:58:17): Now, you were, you were informed that, by Kelvin, that this was not something that they wanted you to do and you just

Kelvin (01:58:30): If I can interrupt.

Andy (01:58:31): Uh huh.

Kelvin (01:58:32): The issue we have with him is not communication. The issue is harassment using our equipment. If you're

| | |
|---|---|
| | hounding somebody for whatever purpose and they feel it is harassment we, at SkyWest, we must investigate that and that's under SP 56 crewmember policy manual 30 and 34. |
| Robert (01:58:56): | OK. |
| Kelvin (01:58:56): | Those are the areas I have listed in my letter to Andy, not the fact that communication, we're not against communication. |
| Robert (01:59:04): | OK. |
| Kelvin (01:59:05): | But, we cannot allow that communication to then become harassing... |
| Robert (01:59:09): | Uh huh. |
| Kelvin (01:59:10): | ... intimidating, threatening in nature, as spelled out by SP 56. That is the issue at hand. The content of the e-messages, not the fact that there were e-messages. |
| Robert (01:59:34): | OK, so that's, harassment is something that disrupts or interferes with another's work performance. I'm trying to see if there's a violation here. |
| Kelvin (01:59:52): | If somebody comes to work and they feel that another employee's harassing them... |
| Robert (01:59:57): | Uh huh. |
| Kelvin (01:59:57): | ...then that is harassment. If they feel is severe enough that they take leave from the job through our employee assistance program then that is harassment. They feel they are being harassed. We cannot allow harassment in the workforce. |
| Andy (02:00:19): | Have I made? What happens if a employee has found that her, if her accusations are false? |
| Kelvin (02:00:29): | Um... the messages were sent. |
| Andy (02:00:31): | Well, I know they were sent. But I'm saying, let's say she did bring that harassment complaint out of retaliation for the, the uh, her losing the lawsuit, which is how it appears. But, I've known Kristen for two years. I don't think she took leave specifically for this reason. In fact, I know private issues that have nothing to do with this with her that have been ongoing. Um... |