| | |
|---|---|
| Kelvin (02:01:01): | I do not have the report from the psychologist on Kristen's leave of absence, but the reason that was given was due to stress for the harassing messages. |
| Andy (02:01:12): | Yeah, I. |
| Kelvin (02:01:15): | I, I can't, I can't answer your question. |
| Andy (02:01:17): | Right. I've, I've just, I've known Kristen for a while and I know that's not, uh, she's had, I'm not at liberty to discuss those here because they're her personal matters that, that have been ongoing for a while. |
| Kelvin (02:01:35): | Any other questions? |
| Andy (02:01:41): | I, I just don't think that my e-mail, I think my e-mail might have been strong or assertive and under the, uh, circumstances, you know, I mean, I was quite frustrated because this was ongoing for a year. I don't think they would have pushed her over the edge, so to speak. She just was, she admitted that she was trying to avoid paying. |
| VOICE (02:02:13): | Is it fair to ask how much you were asking for? |
| Andy (02:02:16): | Uh, it's actually in there. |
| VOICE (02:02:17): | It's in there, I think. |
| Andy (02:02:19): | It was four, just under $400.00. The original debt was almost a thousand. |
| VOICE (02:02:23): | OK. |
| Andy (02:02:26): | As a, I mean, I don't loan money out anymore because of this. It's, it's, I didn't loan money. She attended a vacation. Her portion was that. So, it's not like I gave her, here's a thousand dollars, you have to pay this back. That's not how it was. |
| VOICE (02:02:41): | You, basically, just trying to get the cost of the... |
| Andy (02:02:46): | Right. |
| VOICE (02:02:47): | OK. |
| Andy (02:02:48): | Everyone else that went on that vacation paid and she did make those arrangements with me, but did not do it, so. |

And that's a lot of money to me. I, I have to look out for my, my own, you know, well-being.

Jacque (02:03:10): Are there any more questions? Because if not, then what will happen is I'll stop the tape recorder and then they will leave and then the deliberations will start. So, are there any, for either side, any more questions?

Robert (02:03:26): Haven't heard anything out of you John.

John (02:03:27): No, I'm trying to come up with something. I'm not disputing that it's, you know, twenty-one. It should be a fifteen or something…

Robert (02:03:33): Right.

(Laughter)

John (02:03:38): [*inaudible*] … have the facts and she necessarily expressed an opinion. Obviously, it's not black and white, but…

Robert (02:03:46): OK.

Jacque (02:03:47): If there are no more questions then I will stop the tape recorder and then we will.

# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, vs. SKYWEST AIRLINES, INC., Defendant. | CIVIL NO. 2:04CV00179<br>DEPOSITION OF: BRADFORD R. HOLT<br>Held February 10, 2005<br>REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of BRADFORD R. HOLT, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 1:56 p.m. on February 10, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

1

APPEARANCES

FOR THE PLAINTIFF: ERIK STRINDBERG
Attorney at Law
STRINDBERG SCHOLNICK & CHAMNESS
44 Exchange Place
Second Floor
Salt Lake City, UT 84111

FOR THE DEFENDANT: TODD C. EMERSON
Attorney at Law
SKYWEST AIRLINES
444 South River Road
St. George, UT 84790

SCOTT PETERSEN
Attorney at Law
FABIAN & CLENDENIN
215 South State Street
12th Floor
Salt Lake City, UT 84111

ALSO PRESENT: DAVID ANDREW CALLAWAY

2

INDEX

EXAMINATION

BY MR. STRINDBERG . . . . . . . . . . 5
BY MR. PETERSEN . . . . . . . . . . 117
BY MR. STRINDBERG . . . . . . . . . . 119

EXHIBITS

| Exhibit No. | | Marked | Discussed |
|---|---|---|---|
| 56 | "Dear Pilots" document | 49 | 49 |
| 57 | "Dear Pilots" document | 50 | 50 |
| 58 | "As a result of discussions" document | 55 | 55 |
| 59 | 7-14-99 "Dear Fellow Pilot" document | 56 | 56 |
| 60 | 6-30-99 "Dear SkyWest Pilots" document | 59 | 59 |
| 61 | 7-2-99 memo to all SkyWest pilots | 60 | 60 |
| 62 | 7-16-99 memo to Michael Lowry | 62 | 62 |
| 63 | 7-26-99 letter to Brad Holt | 63 | 63 |
| 64 | 7-23-99 memo to pilot crewmembers | 66 | 66 |
| 65 | 7-26-99 memo to all SkyWest pilots | 67 | 67 |
| 66 | Declaration of Bradford R. Holt | 67 | 67 |
| 67 | 7-22-99 fax to Bill Hiers | 69 | 69 |
| 68 | 7-29-99 fax from Brad Holt | 70 | 70 |

3

| | | | |
|---|---|---|---|
| 69 | 10-25-99 letter to Brad Holt | 71 | 72 |
| 70 | 2-9-04 "Dear SkyWest Pilots" letter | 73 | 73 |
| 71 | "One of the issues" document | 74 | 74 |
| 72 | Declaration of Bradford R. Holt | 75 | 75 |
| 73 | 3-26-04 fax to Ellen Ham | 80 | 80 |
| 74 | 11-14-01 "Notes from meeting" document | 98 | 98 |
| 75 | 12-16-01 fax to Andy Callaway | 101 | 101 |
| 76 | Counseling statement | 102 | 102 |
| 77 | Statement of Alleged incident | 105 | 105 |
| 78 | "To Whom it May Concern" letter | 106 | 106 |

4

Q How was it that Andy came to be in St. George for a meeting with you guys?
A More attitude problems and issues just kept popping up with Andy and so we felt like we ought to talk to him.
Q What issues?
A I don't remember the specific issues. Like I say, these meetings -- I have 3,000 employees, and so if I -- I don't recall exactly what went on in the meeting. I do know there's issues with Andy's attitudes, with his posts.
Q Posts?
A His posts on certain forums, his comments about management. In general, just issues with the company.
Q What about these -- where were these posts, I should say?
A I'm not sure whether the posts were. All I know is the one circumstance we were talking about was someone comatted me something that Andy had posted and --
Q You used the word "comatted," which I don't think I know.
It's company material. Somebody just grabs an envelope somewhere, sticks something in it, writes



my name on it, sends it down on the airline. That's comat. It's company material.
Q What was it that was sent? A copy of something from the intranet or something in a chat room?
A I don't remember exactly what it was. I can't be specific about it, other than to say that it was a post from Andy that basically said he didn't like the company and didn't like management and -- you know, just those types of attitudes.
Q Okay. Anything else you recall about the talk down in St. George?
A No.
Q What other times do you recall meeting with or meeting Andy?
A I don't really recall any other specific time.
Q How did you -- well, did you, at some point, learn that the company had issued a termination notice to Mr. Callaway?
A Are you asking did I know that we were going to terminate Mr. Callaway?
Q Well, I didn't ask it that way, but let me ask it that way. Did you know that the company intended on terminating Mr. Callaway before the



notice of termination was issued to him?
A I'm pretty sure that I would know before that, yes.
Q Well, do you recall?
A No.
Q Do you recall who told you?
A No.
Q What do you recall being told about why the company was going to issue a notice of termination?
A Well, I don't remember anybody specifically telling me what the issue was. When we are going to terminate somebody, I get the file and I review it, so that's how I would be aware of what's going on with any crew member.
Q And where did you get the file from that you reviewed?
A I don't know, this specific file, but I can tell you what the normal process would be.
Q Okay. Tell me what the normal process is.
A The normal process would be, after all the information is gathered from the chiefs and GM, they put that all together and they give me a summary that says, "This is this guy's background, this is what's in his file," and give me a good idea of what it is they're dealing with.



Q Do you recall reviewing such a summary in Mr. Callaway's situation?
A I don't remember the specific summary.
Q I didn't ask that. I asked if you remembered reviewing the summary.
A I don't remember reviewing a specific summary. I would assume that I did, though.
Q Do you recall what reason was being given for why Jim Breeze or the chief pilot wanted to fire Andy?
A I think the final straw that broke the camel's back was that Andy was using company material to harass a company employee and he refused to stop doing that, and that was right in line with Andy's behavior for the previous four years, so...
Q What company property was he using?
A Computers.
Q Do you know --
A He was using our intranet.
Q Do you know who he was supposedly harassing?
A I know it was a flight attendant. I don't recall her name.
Q Did you ever talk with that flight attendant?

that.
MR. STRINDBERG: I have nothing further.
MR. PETERSEN: Give us just two minutes. We may not have any questions at all.
(Recess.)

EXAMINATION

BY MR. PETERSEN:
Q Mr. Holt, there have been some questions given to you about the time that you began building your new home, and I think your testimony was that it began -- construction began in February of 2001. Is that correct?
A Approximately.
Q Did you have -- were you in the planning stages of that house prior to February of 2001?
A Yes.
Q About when did you begin planning the construction of your home? Do you recall?
A It had to have been at least three or four months in advance.
Q And did you speak with any other employees at SkyWest about the fact that you were planning to build a new home?
A Sure. Yeah.
Q So would it surprise you to know that other



employees at SkyWest in the latter part of 2000 were aware that you were in the process of planning a new home?
A No, that wouldn't surprise me.
Q When you reviewed Mr. Callaway's file, I think you testified that you had at least one discussion with Mr. Breeze. Is that correct?
A Yes.
Q Did you mention anything about union activity in that discussion?
A No.
Q Did Mr. Breeze mention anything about union activity?
A No.
Q Was the decision -- did Mr. Breeze indicate to you that the decision to terminate Mr. Callaway was related to union activity at all?
A No.
Q Did you even know that Mr. Callaway was involved in union organizing --
A No.
Q -- at that time?
A No idea.
Q When did you first, if ever, become aware that Mr. Callaway was involved in union activity?



A When we were made aware of this lawsuit.
Q So when you reviewed the file and upheld the decision of the review board --
MR. STRINDBERG: Objection. Misstates his testimony already.
Q (BY MR. PETERSEN) Did union activity have anything to do with your decision?
A No.
Q Are you aware of anyone that was involved in the process that terminated Mr. Callaway -- are you aware as to whether anyone involved in that process was motivated by anything involving a union or union activity?
MR. STRINDBERG: Objection. The witness is not competent to testify to that.
THE WITNESS: No.
MR. PETERSEN: That's why I asked if he was aware.
Q So what's your answer?
A No.
MR. PETERSEN: All right. That's all I have.

FURTHER EXAMINATION

BY MR. STRINDBERG:
Q Who did you talk with at the company about



your plans for a new house?
A I don't know. I'm sure there was a lot of people.
Q You don't recall who?
A No.
Q Did you show anyone your plan?
A Yeah, I think I did. I don't know who, though.
Q Do you recall who?
A No.
Q Someone in management?
A I don't know.
Q Did you talk with anyone in scheduling about your plans to build a house?
A I wouldn't talk to somebody in scheduling about it, no.
Q Can you name any pilots who have been involved in union organizing activities?
A Yes.
Q Who?
A Phil Alford, Andy Berath, Steve Kanuck. Those are the ones that stand out in my mind, because they're the leaders of all of them.
Q When you were sent this anonymous intercompany envelope with information that Andy had

posted somewhere, your testimony is that it was critical about the company and about company management?

A Yes.

Q Is that correct?

A Yes.

Q And it's true, in fact, that those postings were part of a dialogue about whether the company needed to be unionized; isn't that true?

A No.

Q You don't recall that?

A No, I don't.

MR. STRINDBERG: Okay. Nothing further.

(Whereupon the taking of the deposition was concluded at 5:30 p.m.)

* * * *



STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

I, RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public for the State of Utah, certify:

That the foregoing deposition of BRADFORD R. HOLT was taken before me pursuant to Notice at the time and place therein set forth, at which the witness was put on oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing deposition is a true record of the testimony and of all changes made by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action nor in anywise interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name and affixed my seal this 16th day of February, 2005.

RENEE L. STACY, CSR, RPR
Notary Public in and for the
County of Salt Lake, State of Utah

My Commission Expires:
November 9, 2007



STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

BRADFORD R. HOLT deposes and says: that he is the witness referred to in the foregoing deposition, taken February 10, 2005; that he has read the same and knows the contents thereof; that the same are true of his own knowledge.

______________________
BRADFORD R. HOLT

SUBSCRIBED and SWORN to before me this _____ day of ____________________, 2004.

______________________
Notary Public
Residing at ______________
______________________

My commission expires:
______________________



C O R R E C T I O N S

Deposition of: BRADFORD R. HOLT
Taken: February 10, 2005
Case Name: Callaway vs. SkyWest Airlines
Case No: 2:04CV00179

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

SIGNATURE ____________________ DATE ____________

# EXHIBIT "G"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, vs. SKYWEST AIRLINES, INC., Defendant. | CIVIL NO. 2:04CV00179<br>TELEPHONIC DEPOSITION OF: JON TENPAS<br>Held June 13, 2005<br>REPORTED BY: RENEE L. STACY, CSR, RPR |

Telephonic deposition of JON TENPAS, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 1:05 p.m. on June 13, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

1

A P P E A R A N C E S

FOR THE PLAINTIFF: RALPH E. CHAMNESS
Attorney at Law
STRINDBERG SCHOLNICK & CHAMNESS
44 Exchange Place
Second Floor
Salt Lake City, UT 84111

FOR THE DEFENDANT: (by phone) TODD C. EMERSON
Attorney at Law
SKYWEST AIRLINES
444 South River Road
St. George, UT 84790

SCOTT M. PETERSEN
Attorney at Law
FABIAN & CLENDENIN
215 South State, #1200
Salt Lake City, UT 84111

ALSO PRESENT: DAVID ANDREW CALLAWAY

2

I N D E X

EXAMINATION


BY MR. CHAMNESS. . . . . . . . . . . . . . . . . . 4
BY MR. PETERSEN. . . . . . . . . . . . . . . . . . 83
BY MR. CHAMNESS. . . . . . . . . . . . . . . . . . 86
BY MR. PETERSEN. . . . . . . . . . . . . . . . . . 92


E X H I B I T S

(None)

3

June 13, 2005
1:05 p.m.

P R O C E E D I N G S

JON TENPAS

called as a witness at the instance and request of the Plaintiff, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. CHAMNESS:

Q Tell us your full name.
A Jon Tenpas.
Q I'll go over some ground rules, but I think on the phone -- what normally happens is an attorney can object to a question, and because of that, I may ask that you wait half a beat, after I ask a question, to answer, just so that Scott can object.
A Okay.
Q I'll do my best not to ask objectionable questions, but if I do, it will just make it easier for everybody if you'd kind of wait half a second. Is that okay?
A That's fine.
Q And, obviously, because this is on the phone, some of the things I say in preparation for a

4

very little contact with him, up until the point -- I believe I sat on a review board for him at some point prior to the review board in question, but I can't say that I had any considerable contact with him other than that.

Q So you never supervised Andy?

A I never -- as far as I can remember, I never was his direct report.

Q Do you know, did you ever fly with Andy?

A Not that I'm aware of.

Q Did you ever do any training with Andy?

A Not that I'm aware of.

Q Did Andy do any training for you?

A No.

MR. PETERSEN: Hold on. I'm going to object. I think that's an ambiguous question. Go ahead, Jon.

THE WITNESS: No.

Q (BY MR. CHAMNESS) Okay. So you said the first time you really remember him was on the first review board; is that correct?

A As far as personal contact, that is correct. I believe I did read several of his postings on the SkyWest pilot forum, run by Bob Novak, but had -- and had some thread dialogue with



him, but I don't believe it was anything other than just some general comments and education.

In fact, I believe he actually corrected me on several points, and I thanked him for that.

Q When did those threads on the SkyWest pilots' forum occur?

A It had to do with pilot pay, I believe, and there was some thread involving European pay and tax rates, and I made a comment regarding the fact that European tax rates tend to be a little higher and that may be why people in Europe were paid more for the same job, and I believe Andy corrected me, saying that he had lived there and that the tax rates weren't significantly different than they were in the United States, and I believe I thanked him for that input.

Q Do you recall any other conversations on the forum?

A No, sir, I really don't.

Q And do you recall what context this thread occurred?

A No.

Q Did it have anything to do with the union organizing activities of ALPA?

A Not that I'm aware of.



Q And this -- the airline -- I'm sorry -- the pilots' forum that you're referring to, you said that was maintained by Bob Novak?

A Correct.

Q And was that open to everyone?

A It was.

Q Open to everyone at SkyWest?

A It was open to pilots and management of SkyWest Airlines.

Q And was it open to the public or just to SkyWest management pilots?

A As far as I know, it was open to the pilots and management of SkyWest Airlines.

Q Okay. And I'm just asking, did you have to have a -- like a password to get into the web site or --

A That's correct.

Q Okay. And you said you remembered his name on some of the threads. Do you recall any of the other threads that Andy posted?

MR. PETERSEN: Hold on. Asked and answered.

THE WITNESS: I'm sorry?

Q (BY MR. CHAMNESS) Scott thinks I asked a question and got an answer, and I very well may have,



but I'm asking again. Do you recall any of the subjects of any of the other postings that Andy made on this web site?

MR. PETERSEN: Same objection.

THE WITNESS: I'm sorry. Did you object?

MR. PETERSEN: Yeah. I said, "Same objection." Go ahead. You can answer it, if you haven't already.

THE WITNESS: Okay. I have not answered it already. As far as I know, most of his comments were in regard to other people's comments about pay, pay negotiations and working conditions. I'm not aware that any of them were specifically related to ALPA.

Q (BY MR. CHAMNESS) Do you recall if they were related to any unionizing activities?

A Say that one again. I'm sorry.

Q Sure. I'm just trying to make sure that -- I'm clarifying your answer. You said you don't recall that any of them related to ALPA, and my question is: Do you think they were related to any unionizing activities?

MR. PETERSEN: Hold on. I want to object. I think that's vague as to what "union activities" means. Go ahead, if you can answer, Jon.

THE WITNESS: I suppose, because they

related to pay and work conditions, that you could conclude that those were in that category.
Q (BY MR. CHAMNESS) Do you recall discussing any of Andy's posting with any members of management at SkyWest?
A No, sir, I don't.
Q Do you recall anyone ever mentioning Andy's postings on that web site to you?
A No, sir, honestly, I don't. That was a long time ago.
Q Now, you said that you were on Andy's first review board; is that correct?
A Well, I don't know -- again, maybe "first" wasn't the correct descriptive word. I believe I was on a review board. And, honestly, I don't recall what it was about.
Q That was going to be my next question, is what you recall about that review board.
A I don't recall -- I'm trying to rack my brain here, but I do not recall what it was in regards to.
Q And how did you get selected for that review board?
A I believe I was notified by the people department that I had been chosen to sit on the

37

board.
Q And is that -- you said "chosen." Do you know what goes into that process of choosing?
A I do not, sir.
Q And, again, you said you don't recall anything about what was said at that first review board; is that correct?
A I don't know enough to speak intelligently about it. If there were documentation, it might help me, but I do not remember.
Q Right. And this is, again, one of the joys of doing this by phone, is I really couldn't get the documents to you in time for today's deposition, so I'm going to be asking you about some things that we may have documents on and, at the end, we may try to figure out a way of getting them to you, but for right now, just -- you don't recall anything about that review board except it involved Andy?
A Correct.
Q Do you recall who else was on that review board?
A No, sir.
Q And do you recall what the result of that review board was?
A No, sir.

38

Q After this review board, when was the next time that you recall Andy's name coming up?
A I believe that there may have been some discussion at some point regarding his use of the company intranet to communicate with an employee.
Q And how do you recall that coming up?
A As far as I know and the best of my recollection is it was brought up in a chief pilot conference that an employee had contacted their manager and said that they felt threatened and couldn't come to work and that we were, therefore, in the process of investigating exactly what had happened.
Q Now, you said this came up at a chief pilots' conference?
A Yes, sir.
Q Describe for me what happens at a chief pilot conference.
A Well, generally we have telephonic conferences once a week and we do a general account of what's been happening within our domicile and the personnel involved.
Q And who all is on this conference call?
A I would say, generally speaking, it's the chief pilots and Jim Breeze. From time to time, we

39

bring in other managers to speak specifically. For instance, Anita Spencer might be brought in if there was a crew scheduling issue, or Mike Mumford might be brought in if there was a dispatch issue, so typically it was the chief pilots and Jim Breeze.
Q And this incident you described about the E-mail, do you recall who brought that up?
A I believe it was brought up by Kelvin.
Q And, again, you're talking about Mr. Hyatt?
A Correct.
Q And would you describe kind of generally -- is that what Mr. Hyatt talked about, the E-mail, in the conference call?
A Again, it was a long time ago. My recollection is, is that he told the group that he had received a complaint and that he was moving forward with trying to investigate what was going on.
Q When someone -- well, when a chief pilot reported things like that and this wasn't your area, what would your normal role be?
A It's just simply an FYI, because we have, from time to time -- people move in and out of domiciles, so we generally keep each other abreast of ongoing issues that we may or may not be involved with sometimes.

40

# EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

DAVID ANDREW CALLAWAY, )
)
Plaintiff, )
) Case No. 2:04CV00179
vs. )
) Judge Ted Stewart
SKYWEST AIRLINES, INC., )
)
Defendant. )
____________________)

DEPOSITION OF JAMES BREEZE

Taken at the Holiday Inn Conference Room

850 South Bluff

St. George, Utah

On Monday, November 29, 2004

at 4:50 p.m.

AND RESUMING ON

Tuesday, November 30, 2004

at 9:05 a.m.

REPORTED BY: JENNIFER SULLIVAN, RPR



APPEARANCES:

For the Plaintiff: ERIK STRINDBERG, ESQ.
Strindberg & Scholnick, LLC
44 Exchange Place
Second Floor
Salt Lake City, Utah 84111
(801) 359-4169

For the Defendant: SCOTT PETERSEN, ESQ.
Fabian & Clendenin
215 South State Street
Twelfth Floor
Salt Lake City, Utah 84111
(801) 531-8900

AND

TODD EMERSON, ESQ.
SkyWest Airlines
Director - Government and Legal Affairs
444 South River Road
St. George, Utah 84790
(435) 634-3530

* * * * *

INDEX


| WITNESS | PAGE |
| --- | --- |
| JAMES BREEZE | |
| Examination by Mr. Strindberg | 3 |
| Examination by Mr. Petersen | 87 |
| Examination by Mr. Strindberg | 90 |

EXHIBITS

(None)




JAMES BREEZE,
having been first duly sworn to testify to the truth, the whole truth, and nothing but the truth was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:
Q. Please state your full name and your current address.
A. James Hiram Breeze. 267 Turnbury, Washington, Utah 84780.
Q. Mr. Breeze, have you ever had your -- have you ever had your deposition taken before?
A. Yes.
Q. How many occasions?
A. Twice.
Q. When was the first?
A. I don't recall.
Q. What was it involving?
A. It was repair craft sales transaction.
Q. Were you working at SkyWest at the time?
A. No.
Q. What was the dispute about?
A. It was just a title dispute.
Q. When was the second time you've been deposed?



A. Oh, probably two years ago.
Q. Were you working at SkyWest at the time?
A. Yes.
Q. What type of a matter was it?
A. It was a termination.
Q. Who had been terminated?
A. Pilot by the name of David Harris.
Q. Had you been involved in Mr. Harris's termination?
A. Yes.
Q. Why was Mr. Harris terminated?
A. He had a long history of policy violations. The last was a conflict with the air traffic control system.
Q. Let me -- I'm going to ask you a few more questions about that, but I can see this is going to go for a few minutes. Let me give you a few instructions.
Number one, you're under oath, so you need to answer truthfully.
A. I understand.
Q. Is there anything that would prevent you from doing so: Medication, stress, anything like that?
A. No.

A. Got my license in '65, so 30, 31 years.
Q. More than that. 39.
A. Yeah.
Q. How did you get your job -- your first job at SkyWest?
A. I knew -- the vice president of Operations used to work for me before SkyWest, and so he encouraged me to come to work here.
Q. That was Brad Holt?
A. No. Earl Snow.
Q. Does Brad Holt now have the position that Earl Snow held at the time?
A. Yes.
Q. When did Earl Snow leave or step down, whatever?
A. Say about 12 years ago.
Q. Has Brad Holt been the VP of Operations since then?
A. Yes.
Q. Have you ever met Andy Callaway?
A. Yes.
Q. When was the first time?
A. I don't recall.
MR. PETERSEN: Just housekeeping. How late do you plan on going? It's quarter after five.



MR. STRINDBERG: We can stop now.
(The deposition adjourned at 5:17 p.m.)
* * * * *
(Continuation of the deposition of James Breeze on Tuesday, November 30, 2004, at 9:05 a.m.)
BY MR. STRINDBERG:
Q. Mr. Breeze, you understand you're still under oath?
A. Yes.
Q. I'd asked you when you first met Andy Callaway.
A. I don't recall.
Q. What do you mean by that? You don't recall the date --
A. I don't recall the date.
Q. What do you recall about that first meeting?
A. I just don't -- the only thing that comes to mind is when I had meetings with he and Brad Holt. I don't -- I very well possibly met him casually in Salt Lake. I don't recall.
Q. So you remember a meeting with you and Brad Holt?



A. On two occasions.
Q. Where was the first meeting?
A. In St. George, corporate offices.
Q. Who was involved in the meeting?
A. Brad Holt and myself and Andy.
Q. Had you asked Andy to come down to St. George?
A. I don't think I asked him directly. I think I asked Kelvin to have him come down.
Q. Why did you ask Kelvin to have Andy come down to St. George?
A. There had been complaints about Andy's abrasiveness with crew scheduling. We wanted to have him come down and have a visit with him. This isn't how we treat each other in this company.
Q. What time of year was that meeting?
A. I don't recall.
Q. What was discussed at that meeting?
A. Just his -- his contact with crew scheduling, and there had been several complaints from the crew schedulers on calls. The whole gamut from whining, complaining, disagreeing. And it was just unacceptable, and he was told so.
Q. Pardon?
A. And he was told that, to not do it again.



He was put on notice.
Q. What did Andy say in that meeting?
A. He just nodded, and as I recall, you know, said, Okay. I didn't think I came across like that. And just I don't recall that conversation. It wasn't recorded.
Q. Did you take notes?
A. No.
Q. Did Brad take notes?
A. I don't know. You'd have to ask him.
Q. Was he in the room with you?
A. Yes.
Q. Did you see him taking notes?
A. I don't recall.
Q. Was it in Brad's office?
A. Yes.
Q. Who -- from whom had you received the complaints?
A. From Anita Spencer.
Q. What position does Anita Spencer --
A. She's director of crew scheduling. There might have been casual conversation with some of the individual schedulers. It was -- it was an important event that were transpiring.
Q. What was important event?

Page 37

Is there a question?
MR. STRINDBERG: Yeah.
BY MR. STRINDBERG:
Q. Are you answering -- are you saying you don't recall so you don't have to answer my questions?
A. That's not correct.
Q. When you say you don't recall, do you have any recollection?
A. I have a general recollection of the event. I don't have -- I don't have the date and the time and the specific conversations.
Q. It doesn't matter, though. If I ask you a question, if you have a general recollection, you have to answer.
MR. PETERSEN: Don't argue with him. You ask him questions, and I get to make the objections. So we'll end the deposition if you're going to argue with him.
BY MR. STRINDBERG:
Q. What do you remember about sending e-mails to Kelvin?
A. We have -- we send e-mails on a regular basis.
Q. Do you remember sending any to Kelvin

Page 38

about Andy?
A. No.
Q. Do you remember talking with Kelvin at all about Andy?
A. I'm sure it happened. I don't remember specifically.
Q. What do you remember generally?
A. Talking to Kelvin about Andy's problems with the company, his issues.
Q. And those issues are what?
A. His inability to get along with people, his abrasiveness, his arrogance, not wanting to play by the rules or policies.
Q. What rules or policies?
A. We have a policy manual.
Q. Is there any rule or policy that you're aware of that talks about what can or cannot be posted on the mymessage system?
A. I'm not familiar with that, no.
Q. Have you ever sent a personal message on the mymessage system?
A. You'd have to define "personal."
Q. Have you ever asked anyone to lunch?
A. I don't recall, no.
Q. So you don't think you've ever done that

Page 39

using the message system?
A. I'm sure there has been a personal message. I don't recall asking anybody to lunch.
Q. Look at Exhibit 14.
A. Okay.
Q. Did you prepare this document which is Exhibit 14?
A. Yes.
Q. When did you prepare it?
A. I don't recall.
Q. Was it prepared around June of 2000, or was it prepared later?
A. There's no date on it. I don't recall.
Q. Why did you prepare it?
A. In the course of summarizing Andy's behavior.
Q. For his termination or at some other time?
A. No. This looks like it's about the same time as he came to St. George, would be my guess.
Q. Item No. 1 on this document is, Andy had repeatedly made inflammatory and unfair statements on the company Web site about the company and its policy.
What Web site are you referring to?
A. Probably iShare. It's called iShare.

Page 40

Q. How does an employee or how did an employee in June of 2000 access iShare?
A. Well, this thing has a metamorphose, and I'm not sure if iShare was there or not. It's a Web site that any employee can get on and talk, right.
Q. Is it now called iShare?
A. Yes.
Q. How does --
A. There are several Web sites, iShare and -- there's several Web sites. What I was referring to there, I don't know.
Q. How --
A. There's -- go ahead. I'm sorry.
Q. No. Go ahead, you.
A. There's a Web site for scheduling. There's a -- so what he was on, I don't recall.
Q. Did you see any of these postings?
A. I don't recall that. I'm sure I did if I wrote this.
Q. What -- what were these postings that you claim were inflammatory and unfair?
A. I don't have them in front of me, so I don't know.
Q. Did you print them out somewhere?
A. Not to my recollection. They were either

Page 41

shown to me or I saw them electronically.
Q. Shown to you by whom?
A. I don't recall.
Q. Did you tell Brad Holt about them?
A. I don't recall that. He has access to them also.
Q. Did you -- well, according to this paper, which is Exhibit 14, you discussed those unfair postings with Andy when he was in St. George, correct?
A. That's what it says, correct.
Q. Does that refresh your recollection?
A. What's your question, sir?
Q. Do you now recall that you did talk with him about that?
A. Yes. More about the crew schedulers than the posts.
Q. Did you show him any of the posts?
A. I don't recall that.
Q. Did you tell him he couldn't do any posting on the --
A. No.
Q. -- company Web site?
A. I'm sure we didn't.
Q. Why are you sure you didn't if you don't

Page 42

remember?
A. Well, it wouldn't be my -- not to ban him from the Web site ever again. It's not the way we do business. We warned him and expected him to take that warning and do something about it.
Q. Was Chris Abbel at that meeting?
A. I didn't recall that, but I think he might have been.
Q. Is Chris still with the company?
A. Yes.
Q. What position does Chris have?
A. He's the captain on the Brasilia.
Q. What's his domicile?
A. Palm Springs.
Q. What inflammatory language had Andy supposedly used with crew scheduling?
A. Well, I wasn't there. They just said that he was being rude and argumentative. I wasn't privy to the conversation, but they were upset. That's all I recall.
Q. In 2000 how was crew scheduling handled? How were pilots assigned routes?
A. That hasn't changed.
Q. What is it? How is it handled?
A. There are bid packets put out to all of

Page 43

the pilots, and they determine where they want to fly, and that is awarded by seniority.
Q. And a bid packet is what? A certain number of flights per month or per week?
A. Per month, broken down weekly, daily.
Q. Turn to Exhibit 15, item under No. 1, which seems to be that same memo with a date on it handwritten on the top.
Does that refresh your recollection or help you recall when you prepared this memo?
A. No. It's not my writing.
Q. Were you aware that after Andy was terminated, there was a review board meeting?
A. Yes.
Q. Do you recall that after he was disciplined for the -- supposedly what happened in Montana that there was a review board?
A. Yes.
Q. How did you become aware of the first -- of the review board that occurred after the Montana incident?
A. From Kelvin.
Q. Did you help Kelvin prepare for that?
A. No.
Q. Did you attend it?

Page 44

A. No.
Q. Did you see the results of the review board?
A. No.
Q. Why don't you look at Exhibit 2.
MR. STRINDBERG: Did you put that back in there, Counsel?
MR. PETERSEN: Yes.
BY MR. STRINDBERG:
Q. You might want to take it out of the binder because we're going to be referring to it. There's a paper clip.
MR. PETERSEN: Are we going to go to 15 again?
MR. STRINDBERG: Probably.
BY MR. STRINDBERG:
Q. Have you ever seen this document before?
A. Yes.
Q. When did you first see it?
A. I don't recall.
Q. Was this basically what Kelvin had sent to you when he outlined Andy's file for you?
A. It would be my guess, yes.
Q. You didn't keep that outline?
A. I didn't destroy it. I don't know where

A. Correct.
Q. And then once Brad makes a decision as to -- is he required, in your understanding, to follow the recommendation that you present to him?
A. No.
Q. Are there times when he has deviated from what you've presented?
A. Correct.
Q. Then what happens from there?
A. On a termination?
Q. Well, yeah, with the decision that Brad makes, who then disseminates that decision down to the pilot?
A. Then I talk to the appropriate chief pilot who does the termination.
Q. And as it relates to Andy, do you recall whether this basic procedure was followed in Andy's case?
A. Yes.
Q. Are the pilots a significant investment to SkyWest?
A. Very much so.
Q. Financially?
A. Yes.
Q. Why is that? What does it -- why would



you say they're a significant investment?
A. We put an extreme amount of money into their training, not only ground school which isn't that much, but simulators run 4 to $600 an hour and training in the actual aircraft. So we have a significant investment.
Q. Do you have an understanding as to whether the company prefers not to or prefers to -- that's a stupid question. I won't even ask it.
Is that one of the reasons why procedures are followed when a pilot is terminated?
A. Yes.
MR. PETERSEN: That's all I have for now.
EXAMINATION
BY MR. STRINDBERG:
Q. Did you present this file summary to Brad Holt in the case of Andy Callaway?
A. I'm sure I did.
Q. And do you recall what you and Brad discussed?
A. No. We just probably reviewed the file, and Brad has the final say on whether he should be terminated or other course of action.
Q. But you don't recall what the two of you discussed?



A. No.
Q. Did you go through his history?
A. Yes.
MR. STRINDBERG: I have nothing further.
MR. PETERSEN: That's all.
(The deposition concluded at 11:10 a.m.)



CERTIFICATE OF DEPONENT

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |

I, JAMES BREEZE, deponent herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be my deposition in said action; that I have read, corrected, and do hereby affix my signature to said deposition.

____________________
JAMES BREEZE
Deponent

Subscribed and sworn to before me this ____ day of ________________, 2004.

____________________
NOTARY PUBLIC

# EXHIBIT "I"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, vs. SKYWEST AIRLINES, INC., Defendant. | CIVIL NO. 2:04CV00179 |
| | DEPOSITION OF: KELVIN HYATT |
| | Held November 5, 2004 |
| | REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of KELVIN HYATT, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 9:35 a.m. on November 5, 2004, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *



A P P E A R A N C E S

FOR THE PLAINTIFF: ERIK STRINDBERG
Attorney at Law
STRINDBERG SCHOLNICK & CHAMNESS
44 Exchange Place
Second Floor
Salt Lake City, UT 84111

FOR THE DEFENDANT: TODD EMERSON
Attorney at Law
SKYWEST AIRLINES
444 South River Road
St. George, UT 84790

ALSO PRESENT: DAVID ANDREW CALLAWAY



I N D E X


EXAMINATION

BY MR. STRINDBERG . . . . . . . . . . . . . . . . . 5

BY MR. EMERSON . . . . . . . . . . . . . . . . . .201


E X H I B I T S


| Exhibit No. | | Marked | Discussed |
|---|---|---|---|
| 1 | SkyWest handbook 2004 | 66 | 66 |
| 2 | "David Andrew Callaway - Review Board" document | 86 | 86 |
| 3 | 8-29-03 E-mail to Hyatt | 89 | 89 |
| 4 | 5-4-03 E-mail from Wiley | 91 | 91 |
| 5 | Company policy SP 56 | 101 | 101 |
| 6 | Company policy SP 306 | 101 | 101 |
| 7 | 11-30-01 counseling statement | 108 | 108 |
| 8 | 11-10-03 E-mail from Wiley | 115 | 115 |
| 9 | Termination document | 122 | 122 |
| 10 | Termination document | 122 | 122 |
| 11 | 7-13-98 letter from Callaway | 126 | 126 |
| 12 | 7-30-98 letter from Callaway | 127 | 127 |
| 13 | 8-24-98 letter from Callaway | 130 | 130 |
| 14 | "This will serve as a summary" document | 132 | 132 |
| 15 | Document with tabs 1 - 21, given to Callaway at '03 review board | 134 | 134 |





| | | | |
|---|---|---|---|
| 16 | "Over the course of several months" document | 136 | 136 |
| 17 | 12-04-01 E-mail from Breeze | 138 | 138 |
| 18 | Customer Service Irregularity Form | 152 | 152 |
| 19 | Statement regarding SAD June 2003 | 167 | 167 |
| 20 | 8-15-03 E-mail from Hyatt | 168 | 168 |
| 21 | 5-12-03 fax to Breeze | 178 | 178 |
| 22 | Handwritten note from Nicki McDonald, 12-7-00 | 183 | 183 |
| 23 | Review Board From, 10-24-03 | 195 | 195 |
| 24 | State vs. Callaway document | 198 | 198 |

things where pilots can print messages and stuff on there.
A They have some forums that I'm aware of.
Q But you don't know if the SAPA has its own web site?
A I don't know. I'm not allowed to participate, as management, in SAPA's web site.
Q Have you ever tried to?
A Not as management, no.
Q So you just referred to SAPA web site, so you're aware that there is a SAPA web site?
A They have a forum. That is all that I'm aware of.
Q What's, in your mind, different between a forum and a web site?
A Web site would be a formal log-in SAPA.com type of web site. As far as I know, they do not have such a thing. They do have some message boards under a web site known as SkyWestPilot.com, but that contains areas for management and pilots in general, as well as other employees, to participate in communications, back and forth open forum discussion.
Q And this -- what was the web site called?
A SkyWestPilot.com.
Q And who, do you know, owns that web site?



A I believe it's owned by a gentleman by the name of Bob Novak.
Q So it's not owned by SkyWest?
A No.
Q And there's different sections on this -- his web site -- which allows different access to different levels of people?
A Yes.
Q How many different forums are there on that?
A I believe there's at least four different group forums. And as far as how many specifically, I don't know. I don't spend much time on it.
Q And when did Bob Novak start these --
A It's been around -- probably prior to SkyWestOnLine implementation.
Q Does SkyWestOnLine have any of these same type of on-line forums?
A Yes.
Q And who has access to them?
A All employees.
Q Now, if I, as a consumer and not an employee of SkyWest, type in "SkyWest" in the computer, do I end up at SkyWestOnLine, or is there a public --



A There is a SkyWest.com, which is for public use.
Q Okay.
A SkyWestOnLine is not for public use. Unless you had a password and an employee number to access it, you would not have access to that site.
Q Who runs SkyWest -- www.SkyWestOnLine?
A SkyWest Airlines.
Q Who at SkyWest Airlines?
A Specifically, I don't know who. It's probably overseen by the internal IT department.
Q Who is the head of the IT department?
A Jim Jensen.
Q Does the IT department also manage and control the public web site?
A For SkyWest.com, I believe so.
Q When did you -- well, let me put it this way: How did you learn that Kristen Wiley had a complaint or a concern about Andy?
A I was approached by the in-flight administrative assistant indicating that a flight attendant had some issues that she wanted to discuss with me concerning an RJ captain.
Q And who was this person who -- this administrative assistant?



A Amy Smith.
Q And where does she work out of?
A Salt Lake International.
Q Does she report to you or --
A No. She reports to Harold Allen.
Q Who is Harold Allen?
A He's the chief flight attendant.
Q And did Amy approach you in person or --
A Yes.
Q What did she say to you?
A She said, "I have a flight attendant out here who wants to discuss an issue with you concerning one of your pilots."
Q And what did you -- when did this occur?
A I don't remember the specific date. It was in the morning.
Q Where did it occur?
A In my office in Salt Lake.
Q Was there anyone else present besides you and her?
A No.
Q What was the next thing that happened?
A I agreed to talk with her about the situation. And she explained to me what was troubling her and she broke down and started crying

and --
Q Did Kristen come in that day?
A Yeah. She was standing outside.
Q Oh, okay. Okay.
A She was in the office, yes.
Q Okay. So Kristen then came into your office?
A Yes.
Q Did Amy Smith stay in your office?
A No.
Q So it was just the two of you?
A Yes.
Q Did you take any notes or anything?
A No. A few notes about who it was she was talking about. I did ask her -- she was complaining that she felt she was being harassed on the company message system.
Q Okay. And I'm going to ask about what was said. I'm just asking if you took any notes, and your answer is you took a few?
A I took basically notes to the point of noting who it was, noting employee ID numbers, who she was, employee ID number, but as far as other notes, no.
Q What have you done with those notes?



A I have no idea. I have many, many notebooks around and probably they went away with a lot of other operational at-the-moment type notes.
Q What do you mean you have a lot of notebooks?
A Well, when I get phone calls or people come in, I'll write a note to myself, and then as things are dealt with, they go away. I chuck them.
Q Okay. Tell me what Kristen said to you and what you said to her.
A Kristen indicated to me that she was receiving harassing E-messages via SkyWest messaging from Andy Callaway over some money that he felt she owed him; however, she felt that she did not owe this to him. She was feeling to the point that she was not wanting to even read her messages, which we do require crew members to read messages via the messaging on SkyWestOnLine.
She was upset to the point that she said she was fearful of him coming to work, due to harassment from Mr. Callaway over the monies that he alleged she owed him.
Q What did you say?
A I said, "Well, I will see what I can do about stopping that, but we don't allow employees to



harass other employees."
Q Now, you didn't interpret the word "harassing" or "harassment" to mean sexual harassment, did you?
A No, I did not.
Q Is there -- were there some guidelines anywhere about what could be sent over the -- what kind of messages could be left?
A As far as messages specifically, no, not that I'm aware of. However, harassment -- certainly if somebody is harassing somebody, whether or not it is sexual, you still can be harassed, and if you feel that that harassing issue is contrary to a good work environment, yes, the airline has to deal with that.
Q Even though it involved a private matter, private dispute?
A A private dispute on company property is still a company problem.
Q What company property was being used?
A The SkyWestOnLine messaging. That is a total intranet function.
Q Intranet?
A Intranet.
Q Okay. So how long did this conversation with Kristen last?



A Five, maybe ten minutes. I did ask her to print off the messages and bring them in to me.
Q Okay. And did she do that?
A She did.
Q And when did she do that?
A Within minutes of me asking her to do so.
Q How did she do it so quickly?
A She was able to walk out into the crew area where the computers -- a number of computers exist -- and log in and print those messages on the printer.
Q Okay. And then what did she do?
A She brought them back to me.
Q What did you do?
A. I then sent a message to Andy asking -- well, I did open his file and noted that there was a counseling statement in there from the incident in Butte where he was abusing fellow employees and --
Q When you say you opened his file, what did you open?
A The paper file in Salt Lake.
Q Did you open the electronic file?
A Yes.
Q And what was in the electronic file?
A I don't remember specifically which file contained what.

even think of any specifics that I may have brought up, but the idea was, we would talk about what's going on in the various domiciles --
Q As far as union activities?
A -- during our calls. Certainly. In some cases there may be fliers that were found in a certain domicile. There may be registration cards that were found in this domicile. "Has this showed up in your domicile?" So on and so forth. But that was generally the extent of it, is just information back to St. George about what's going on in various domiciles.
Q Was there discussion about any of the pilots and their involvement in union organizing activities?
A Not in general. We knew generally who the pilots were at times.
Q And who do you believe those pilots were?
A If they signed their name to a document, we knew who they were.
Q Okay. So if they signed their name to an organizing card, you would know who they were?
A If that was distributed and it was something that made it across my desk, certainly I would know who that was.

173

Q And would you keep track of those names?
A No.
Q What would you do with those cards?
A Generally I would destroy cards.
Q Why?
A We weren't in the business of having union cards sitting around in the domiciles.
Q How about signed cards? Would you --
A I never saw any signed cards.
Q So when would you find documents that had people's names on them?
A The only time I would have seen the document would be if a union organizer or group had sent out E-mail messages to the employee group at large and included their name on them.
Q And would you receive those E-mails?
A Not generally directly, no, but I would have -- I would see them laying around, people would bring them in to the chief pilot, they would have questions about them, things of that nature, but as far as being distributed to me, no.
Q How many of these E-mails did you see in the four years you were chief pilot?
A Probably less than a handful.
Q What are the names of the pilots who

174

brought them to your attention?
A I don't recall that I even had somebody bring it in and say, "Look at this on the desk." Usually those type of things were pinned to the bulletin board. I did not have somebody bring it to me.
Q Okay. I guess I misunderstood your testimony.
A Other chief pilots did, but I did not.
Q Did you see Andy's name on any of those E-mails?
A No.
Q Were you aware that Andy was in support of the union organizing activities?
A I was not aware of that, no.
Q Did you ever ask him?
A No.
Q Did you ever talk about it with Jim Breeze?
A No.
Q So you don't know the extent of Jim Breeze's knowledge about Andy?
A I do not know what Jim -- I do not know Jim Breeze's background knowledge, no.
Q How about Brad Holt? Did you ever talk with Brad Holt about Andy's activities as far as

175

organizing?
A No.
Q Have you ever seen any E-mails sent around saying we have to be careful of person X, Y and Z because they're involved in organizing activities?
A No.
Q Would you get E-mails from corporate in St. George telling you how to combat organizing activities?
A We did receive our legal responsibilities as management during a union drive. We did receive direction from corporate in St. George that they would conduct most of the formal communication. We did receive training in two different instances of just exactly what we can and cannot do as managers during a union drive.
Q When was the first of that training?
A I don't recall a specific date. It was the previous drive. It was in -- conducted in Las Vegas.
Q The training was?
A Yeah. Ford & Harrison.
Q Ford & --
A Law group --
Q Ford & Harris?
A -- that the company had retained to advise

176

# EXHIBIT "J"

FILED DISTRICT COURT
Third Judicial District

JAN 2 0 2005

SALT LAKE COUNTY

By________________
Deputy Clerk

Erik Strindberg (Bar No. 4154)
Ralph Chamness (Bar No. 6511)
**STRINDBERG & SCHOLNICK, LLC**
44 Exchange Place, 2nd Floor
Salt Lake City, UT 84111
Telephone: (801) 359-4169
Attorneys for Plaintiff

**IN THE THIRD DISTRICT COURT OF SALT LAKE**
**STATE OF UTAH**

| | |
|---|---|
| **DAVID ANDREW CALLAWAY**<br><br>Plaintiff,<br><br>vs.<br><br>**KIM GUESS**, a Salt Lake City Employee, in her individual and official capacities; and **SALT LAKE CITY CORPORATION**,<br><br>Defendants. | **COMPLAINT**<br>**(Jury Demand)**<br><br>Case No. 050901173<br>Judge Joseph Fratto |

Plaintiff, David Andrew Callaway ("Callaway" or "Plaintiff"), by and through his undersigned counsel, hereby complains against Defendants Kim Guess ("Guess") and Salt Lake City Corporation ("Salt Lake City") as follows:

**NATURE OF CASE**

This is an action for against the Defendants for the release of confidential information about Plaintiff which was used by his employer to justify Plaintiff's termination. This release violated Plaintiff's constitutionally protected right to privacy and was done in retaliation for Plaintiff pursuing certain constitutional claims against Salt Lake City.

## PARTIES

1. Plaintiff Callaway is a resident of Salt Lake City in the State of Utah.

2. Defendant Guess is believed to be an employee in Salt Lake's Police Department.

3. Defendant Salt Lake City is a municipality in Utah organized pursuant to the Constitution of the State of Utah and Utah Code.

## JURISDICTION AND VENUE

4. Jurisdiction is proper pursuant to U.C.A. § 78-3-4.

5. Venue is proper in this court pursuant to U.C.A. § 78-13-7 because the Defendants are either located in or work in Salt Lake County and the complained of actions occurred in this Salt Lake County.

## GENERAL FACTUAL ALLEGATIONS

6. Plaintiff Callaway owns a home located at 581 N. Capitol Street, in Salt Lake City.

7. Starting on or about January 13th day of January, 1999, Callaway was hired as a pilot by SkyWest Airlines, Inc., which has its corporate Headquarters in St. George, Utah.

8. At all times relevant hereto, Callaway's home airport was in Salt Lake City and the flights that he flew usually originated or ended in Salt Lake City.

9. At all times Callaway performed his job in an admirable and successful manner. In 2001 he was promoted to the rank of Captain. Thereafter, Callaway duties included flying a Canadair Regional Jet throughout the United States and Canada.

10. At no time was Callaway ever told that by SkyWest, or anyone, that his piloting skills were substandard, or that he needed to improve his performance.

11. At no time while Callaway was flying for SkyWest did he ever receive any citations or reprimands for engaging in unsafe or improper flight practices.

12. Starting in early 2001, police officers employed by Salt Lake City begin to harass Callaway, and guests at his home.

13. This harassment included, but was not limited to, unlawful entries into Callaway's home and arresting him and transporting him to the Salt Lake County jail. All of the charges against Callaway were eventually dropped.

14. Because of the ongoing harassment, Callaway was forced to retain legal counsel to protect his rights. By letter dated July 11, 2001, Callaway's counsel served Salt Lake City with a Notice of Claim as required under the Utah Governmental Immunity Act. This letter put Salt Lake City on Notice that if Callaway's claims were not resolved a lawsuit would be filed against Salt Lake City and its employees.

15. After receiving said Notice, further correspondence and negotiations took place between Callaway and Salt Lake City, but no resolution was reached and Callaway subsequently had to file two lawsuits against Salt Lake City and/or its employees. The first lawsuit was filed in December of 2001. The second lawsuit was filed in June of 2003.

16. Both lawsuits were eventually settled by Salt Lake City. As part of both settlements Salt Lake City paid Callaway money to compensate him for the violation of his rights.

17. On information and belief, sometime in October of 2001, Callaway's neighbor contacted SkyWest airlines and complained that Callaway was engaging in illegal activities and creating a nuisance in the neighborhood.

18. SkyWest then contacted Defendant Guess at the Salt Lake City Police department to find out what, if anything, was going on. It is believed that Guess works for, or in, the Police Department as some sort of a community liaison.

19. Guess told SkyWest that Callaway had been 'uncooperative and obstinate towards his neighbors and the police department;" that Callaway was disregarding everything she said to him; and implied that Callaway had "keyed" cars in the neighborhood, slashed tires and destroyed ornaments.

20. Nothing Guess told SkyWest about Callaway was true.

21. Guess also volunteered to send information that the police department had about Callaway to SkyWest.

22. The information that Guess sent to SkyWest was confidential and personal and should not have been released. The information and materials painted Callaway in a negative and false light.

23. These statements by Guess and the sending out of information occurred at a time that Callaway was threatening to pursue legal action against Salt Lake City for violation of his constitutionally protected rights.

24. After receiving the information from Salt Lake City, Callaway was called in by his supervisor and warned that his conduct while at home was unacceptable and could lead to further disciplinary action. The information from Salt Lake City also was used to substantiate, in part, a Counseling Statement that Callaway received from SkyWest in November of 2001.

25. A Counseling Statement is the last form of discipline a SkyWest employee receives before he/she is terminated.

26. SkyWest thereafter maintained copies of all of the materials on Callaway that it had received from Salt Lake City.

27. In October of 2003 Callaway was terminated from his position at SkyWest. Although the materials and information received from Salt Lake City were not the sole basis for his termination, SkyWest used that information to justify and support the termination.

28. On or about December 17, 2003, Callaway complained to Salt Lake City Mayor Rocky Anderson about the release of confidential and false information by the Police Department.

29. Callaway's complaint was referred to the Police Department for investigation

30. On or about July 14, 2004, Callaway served a Notice of Claim on Salt Lake City.

31. On September 28, 2004, Callaway received a letter from Salt Lake City's Risk Manager stating that the city was looking into the claims made by Callaway.

32. On or about October 28, 2004, Callaway received a letter from the Internal Affair Unit at the Salt Lake City Police Department.

33. This letter indicated that Callaway's complaint had been investigated and reviewed by the officers' division commander, the bureau commander and the Chief of Police, and that the complaint had been found "sustained." A copy of that letter is attached hereto as Exhibit A.

34. The letter explained that a charge which is "sustained" meant that the employee's actions violated either department policy or procedures.

35. Notwithstanding the Notice of Claim and the investigation which sustained the complaint, Salt Lake City has not contacted Callaway nor made any apparent attempts to resolve the claim.

36. After losing his job at SkyWest, Callaway has attempted to find other employment, and has even received additional training to make himself more marketable. He has not been able to find other employment, however.

**FIRST CAUSE OF ACTION**
**(Violation of Federal Constitutional Right to Privacy - against Kim Guess and Defendant Salt Lake City)**

37. Plaintiff realleges and incorporates by reference paragraphs 1-36 as set forth above.

38. At all times relevant hereto, Defendants acted under color of state law when committing the acts complained of.

39. As a private citizen of the United States, Plaintiff has a right to privacy which is guaranteed under Amendment I of the United States Constitution. This Amendment applies to states, and the political subdivision thereof, by the 14th Amendment to the United States Constitution.

40. As set forth above, Defendants purposefully and intentionally violated Plaintiff's constitutionally protected rights by giving out false and personal information about Plaintiff to which he had a legitimate expectation of privacy.

41. That disclosure served no compelling state or city interest.

42. The distribution of this personal confidential information to a party that had no right to receive that information was done in a intrusive and unnecessary manner.

43. Defendants' conduct violated clearly established constitutional rights of which a reasonable person would have known and he brings this action pursuant to 42 U.S.C. §1983.

44. Defendants' conduct which caused the violation of Plaintiff's rights was undertaken pursuant to a custom or policy or the conduct of Defendants were made by an official(s) with final

policy making authority and/or by the City's ratification of the decisions or recommendations of such official(s).

45. As a result of the Defendants' actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic loss, including, but not limited to: loss of wages and benefits, future pecuniary losses, emotional distress, and other compensatory damages.

46. Any actions or omissions of Defendants set forth above were done maliciously and/or in reckless disregard of Plaintiff's federally protected rights and Plaintiff is therefore entitled to punitive damages.

47. Plaintiff is also entitled, under 42 U.S.C. § 1988, to recover attorney fees and costs incurred in pursuing her claims.

**SECOND CAUSE OF ACTION**
**(Violation of Utah Constitution - Against both Defendants)**

48. Plaintiff realleges and incorporates by reference paragraphs 1 through 47 as set forth above.

49. As a private citizen of the State of Utah, Plaintiff has a right to privacy which is guaranteed under Article I. Section 14 of the Constitution of Utah. This Section applies to political subdivisions of the State of Utah.

50. As set forth above, Defendants purposefully and intentionally violated Plaintiff's constitutionally protected rights by giving out false and personal information about Plaintiff to which he had a legitimate expectation of privacy.

51. That disclosure served no compelling state or city interest.

52. The distribution of this personal confidential information to a party that had no right to receive that information was done in an intrusive and unnecessary manner.

53. Defendants' conduct violated clearly established constitutional rights of which a reasonable person would have known.

54. Defendants' conduct which caused the violation of Plaintiff's rights was undertaken pursuant to a custom or policy or the conduct of Defendants were made by an official(s) with final policy making authority and/or by the City's ratification of the decisions or recommendations of such official(s).

55. As a result of the Defendants' actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic loss, including, but not limited to: loss of wages and benefits, future pecuniary losses, emotional distress, and other compensatory damages.

56. Any actions or omissions of Defendants set forth above were done maliciously and/or in reckless disregard of Plaintiff's federally protected rights and Plaintiff is therefore entitled to punitive damages.

**THIRD CAUSE OF ACTION**
**(Violation of GRAMA Against both Defendants)**

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 56 as set forth above.

58. The information that was disclosed by Defendants pertaining to Callaway was no longer public information, but was "Protected" information as defined under the Governmental Records Access And Management Act ("GRAMA") and under UCA§ 77-18-15(7). ?!

expunged records of arrests + convictions

59. Pursuant to GRAMA, a governmental entity and its employees are not allowed to disclose Protected information except under limited circumstances.

60. As set forth above, Defendants released to the SkyWest information which should not have been released, in violation of UCA§ 63-2-202.

61. Plaintiff has been damaged by the release of this Protected information and is entitled both to injunctive relief and also damages, under UCA§ 63-2-803, because the release of the records was either willful or grossly negligent

62. Plaintiff is also entitled to recover attorney fees and costs pursuant to UCA§ 63-2-802.

**FOURTH CAUSE OF ACTION**
**(Breach of Privacy - Disclosure of Private Information - Against both Defendants)**

63. Plaintiff realleges and incorporates by reference paragraphs 1 through 62 as set forth above.

64. As set forth above, the information and materials sent out by the Defendants contained private information about Callaway.

65. SkyWest had no right to see or receive this private information about Callaway.

66. The information that was disclosed was false and negative and a reasonable person of ordinary sensibilities would have found the information highly objectionable and offensive .

67. Callaway has been damaged by the disclosures and Callaway is entitled to both injunctive relief and damages.

68. Since Defendants acted intentionally and with the purpose of interfering with Callaway's activities, Callaway is also entitled to recover punitive damages.

**FIFTH CAUSE OF ACTION**
**(Privacy - False Light)**

69. Plaintiff realleges and incorporates by reference paragraphs 1 through 68 as set forth above.

70. The information distributed by the Defendants about Callaway placed him in a false and demeaning light.

71. Being placed or portrayed in such a way would be highly offensive to a reasonable person..

72. Defendants knew, or acted in reckless disregard, as to the falsity of the publicized matter and the false light it placed Callaway in.

73. Callaway has been damaged by the disclosure and is entitled to recover damages, including compensatory damages, as well as attorney fees and costs.

74. Further, because Defendants acted intentionally and wilfully, and Callaway is also entitled to recover punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation for Exercise of Constitutional Rights- Against Both Defendants)**

75. Plaintiff realleges and incorporates by reference paragraphs 1 through 74 as set forth above.

76. As set forth above, prior to the time that the unauthorized disclosure to SkyWest occurred, Plaintiff had been harassed by Salt Lake City and was in the process of bringing a claim against it for violating his constitutional rights.

77. The disclosure of the private and confidential information caused, or was meant to cause, Plaintiff to suffer an injury that would deter any reasonable person from pursuing their constitutional claims.

78. Defendants' disclosure was substantially motivated in response to Plaintiff's constitutionally protected conduct.

79. As a result of Defendants' conduct Plaintiff has been damaged and he is entitled to damages and other relief. Plaintiff is also entitled to recover his attorney fees and costs incurred in pursuing this action pursuant to 42 U.S.C. § 1988.

**JURY REQUEST**

Plaintiff hereby requests a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, Callaway prays for the following relief:

1. For damages in an amount to be determined at trial.

2. Compensatory damages.

3. Prejudgment interest on the damages above.

4. Punitive damages.

5. For costs incurred in bringing this litigation including, but not limited to, reasonable attorneys' fees and costs

6. For any and all other relief deemed just and equitable by the Court.

DATED this 20 day of January, 2005.

**STRINDBERG & SCHOLNICK, LLC**

Erik Strindberg
Attorneys for Plaintiff

PLAINTIFF'S ADDRESS:
*581 West Capitol Street*
Salt Lake City, Utah 84103

U:\current clients\Callaway_DA\complaint_slc.wpd

# EXHIBIT "K"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, vs. SKYWEST AIRLINES, INC., Defendant. | CIVIL NO. 2:04CV00179<br>DEPOSITION OF: KELLY DIXON<br>Held February 11, 2005<br>REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of KELLY DIXON, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 1:00 p.m. on February 11, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

1

APPEARANCES

FOR THE PLAINTIFF: ERIK STRINDBERG
Attorney at Law
STRINDBERG SCHOLNICK & CHAMNESS
44 Exchange Place
Second Floor
Salt Lake City, UT 84111

FOR THE DEFENDANT: TODD EMERSON
Attorney at Law
SKYWEST AIRLINES
444 South River Road
St. George, UT 84790

ALSO PRESENT: DAVID ANDREW CALLAWAY

2

INDEX

EXAMINATION
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . . 4
BY MR. EMERSON . . . . . . . . . . . . . . . . . . . 45
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . . 50

EXHIBITS


| Exhibit No. | | Marked | Discussed |
|---|---|---|---|
| 7 | 11-30-01 counseling statement | -- | 46 |
| 9 | Termination document | -- | 49 |
| 78 | "To Whom It May Concern" letter | -- | 15 |


3

February 11, 2005
1:00 p.m.

PROCEEDINGS

KELLY DIXON

called as a witness at the instance and request of the Plaintiff, having been first duly sworn, was examined and testified as follows:

BY MR. STRINDBERG:
Q Please state your full name.
A Kelly Terrence Dixon.
Q Mr. Dixon, have you ever had your deposition taken before?
A This is the first time.
Q It's a wonderful experience, I assure you. A couple of ground rules. First of all, you're under oath, so you need to tell the truth.
A Okay.
Q Is there anything that would prevent you from doing so? Medication, undue stress?
A No.
Q Okay.
MR. EMERSON: I mean, do you believe that your employment for the company prevents you from telling the truth?

4

with somebody else at the people department -- you see, it was someone else at the people department that called up and asked Ben to give an opinion of an Andy Callaway when I had him in class, and so probably that's my thinking relating to when I wrote this relating to a request that was probably a joint request from Kelvin and her.

Q Did you talk with Kelvin directly?

A Yes. He talked to me on the phone. And he's the -- that's why I put his name down there, because he's the one -- no. Wait a minute. Kelvin is the one that specifically, on the phone, asked me to write it, if I remember correctly.

Q Okay. What did he ask you?

A He just wanted to get the same story that St. George had got from me, which was, you know, my experience with Andy, and then said something to the effect of, "Would you be willing to, you know, put that on paper?" And I said, "Yes."

Q So you had already talked with someone from St. George?

A Yes.

Q Who was that?

A I can't remember. Someone from the people department.



Q And did they call you or --

A What happened is they called Ben Crawford, who was the chief ground instructor, who came in and got me out of class one day and had me come in, and said, "St. George is interested in your opinion of this particular individual, Andy Callaway, and he's going to be in class here in the next little while, and they're interested in your opinion as" -- "in general."

And I said, "Well, what's the deal?" And they said, "Well, we don't want to say because we don't want to bias you in any way. Just interested in your opinion." To which I said, "If it's the person that I think it is, you have your facts incorrect. He's not going to be in class in the next couple of classes. He's already been in class. And I can tell you what I think of him right now."

So I told Ben, and I reminded Ben that I had come in on the particular day of this test that we took and told -- and complained to Ben about this -- about Andy Callaway, his poor attitude and what I would consider to be insubordination, and reminded him that I had done so, and he said, "Oh. That was him." And I said, "I believe so, but let's make sure."



So we looked on SkyWest on line, and there's a way for us to pull up a picture of any given pilot. Pulled up a picture. Sure enough, it was Andy Callaway. I said, "You need to tell St. George and the people department that he's not going to be in class. He's already been in class. I'm not sure exactly where he is in the process, but this is what happened," and so I related to them what had happened.

And then shortly thereafter, maybe not even the same day, maybe the next day, Kelvin Hyatt called and wanted to hear the story again from me. Asked me if I was willing to write it down. I said, "Yes."

Q Okay. Did you talk with someone in the people department at St. George?

A Yes. On a conference call with Ben Crawford.

Q Okay.

A Speaker phone in Ben's office.

Q How did Ben ask you about it? Did he come to your office or did he call you?

A Which time? Just initially after he had received the phone call from St. George?

Q Yes.

A Yeah, he just -- if I remember correctly, I



was in teaching class, and he came in, as he often did, in the back of the classroom when he needed to talk to you and said, "Come see me on your next break," something like that. So I walked into his office on my next break.

Q Okay. You said that you had been in a class with Andy administering a test; is that correct?

A Yes.

Q So had you actually taught one of his classes or had you just administered the test?

A No. I taught a full week of class that Andy was in.

Q Are you sure of that?

A Yes.

Q And you administered a test then?

A At the end of that week, yes.

Q When had that class occurred in relationship to November 13th?

A Previous to November 13th. Here again, I could find out the dates for you, but I don't recall.

Q What, months earlier, weeks earlier?

A Probably not months, plural. Probably -- I can't imagine it being more than a few weeks or -- maybe -- I mean, the longest would be two months, I

think, but I'm not sure. I'd have to verify that. But it wasn't a long period of time, relatively speaking, I guess, depending on how you want to define that.
Q Let's go back to that class.
A Okay.
Q You said that you were concerned about Mr. Callaway's behavior --
A Yes.
Q -- at a testing session; is that correct? And you went and talked with Ben --
A Yes. What happened is I was to teach that particular week. I was assigned to teach that week, went into class, as I always would, for that particular week, and instructed for the -- I can't remember if I flew one day or not during that week, but probably not. I probably just taught the whole week. So during that week, as an instructor -- I think I mentioned there, and it was at the time, I had instructed in ground school settings. This would now be the third different company for about five years. Had taught many ground schools, had many students.
And, of course, as an instructor, I always gauge the classroom and look at the students and look



at their reaction, and had much experience dealing with people that were upgrading and had already been exposed to the majority of that information before, and always analyzed, you know, people in the class. It was my job to make sure that they were understanding and learning all of the information that we could possibly put out.
During the course of that week, I noticed a poor display of attitude from Andy Callaway.
Q What do you mean by that?
A What I mean by that is I would look back at him and he would have his arms folded and kind of be staring off to the wall on one side of the classroom.
Q Did you say anything to him?
A I didn't say anything to him.
Q Was he disruptive?
A He was not disruptive in the sense that he would interrupt, nor would he -- nor was he boisterous in any way.
Q So he just sat there?
A Nor would he talk with his classmates.
Q So he didn't interrupt the class to talk with his classmates, is what you're saying?
A No. He used -- all I'm saying is that he specifically used body language, in my estimation, on



purpose to show disapproval for what was happening there, for the fact that he had to be there.
Q And this body language was he sat there with his arms folded?
A His arms folded with what appeared to me to be kind of a scowl on his face. Certainly different from behavior that I had seen from him in the hall or down on the hangar floor.
Q But you never talked with him and asked him if there was a problem?
A No.
Q Did you ask the other instructors who were teaching at the time if they'd had any problems?
A I don't recall having done that.
Q Okay.
A The worst part of it, of course -- I mean, had that just been it, I would have left it alone. Had he just sat there and, in my mind, displayed poor attitude, in that he didn't participate in the class like we encourage the students to do and so on and so forth, had that been it, I wouldn't have thought much about it.
Q Okay. But this episode, as you describe it, he supposedly threw a test down on the podium; is that correct?



A Yes.
Q Did you say anything to him at that time?
A No.
Q Why not?
A I guess I probably didn't want to confront him in front of the class.
Q Did you ask him after the class?
A I probably wanted to gather my thoughts and think about what would be an appropriate course of action, given what I had seen.
Q Once you collected your thoughts, did you talk with Andy?
A No.
Q Why was he up at the podium?
A After administering any test -- and we always administered at least a midterm test and/or a final test during this three-week class, and the test that we administered at the end of that week was customary and the same test that I had administered throughout the whole time in the RJ classroom, and always -- partly because the FAA requires it and partly because it's just good educational practice. At the conclusion of a test after everyone has completed the test, I would always take the test -- both the test and the answer sheet, pass it back out

A Yes.
MR. STRINDBERG: I have nothing further.
EXAMINATION
BY MR. EMERSON:
Q Mr. Dixon, you're still employed by SkyWest Airlines?
A Yes.
Q Do you feel like all of your testimony so far has been truthful?
A Yes, absolutely.
Q Tell me if you know whether or not SkyWest Airlines can discipline you for your participation today in this deposition.
A I don't know for sure if they can do that. I would guess they can't.
Q You believe that they can't?
A I believe they can't discipline me for complying with the law, no.
Q Do you feel like your employment with the company has caused you to exaggerate your answers today?
A No.
Q Is it your typical mode of operation when you teach a class to confront a student you believe is being disrespectful?



A No.
Q Why not?
A I generally try to -- prefer to see if I can win them over by good instruction and helping them be successful, and usually it works.
Q Is it your job to issue written discipline to a student that you believe is being --
A No.
THE REPORTER: That you believe what?
Q (BY MR. EMERSON) Let me finish -- that is being disrespectful or rude?
A No.
Q Who does that, if you know?
A Ben Crawford, the chief ground instructor, I believe has the authority to do that, and certainly his superiors are the directors, but I certainly didn't.
Q Look at what's already been entered in this case as Deposition Exhibit 7. This is the counseling statement issued to the plaintiff by the company on November 30th of '01. Take a moment and read that, if you would, just to yourself.
A Okay.
Q Prior to reading this counseling statement, were you aware of the fact that Mr. Callaway had been



disciplined for rude, disrespectful and abusive behavior in the station in Butte, Montana?
A Only in that I had heard, post my involvement, that he had had other problems previous to with me.
Q You'll see that the first line of the first paragraph states that incident happened on November 12th, 2001. You testified that you were asked to give a statement on November 13th, 2001. Did you know at the time that it had anything to do possibly with this incident in Butte, Montana?
A I don't think so.
Q Were you informed?
A I may have been informed afterwards.
Q You were told to offer an opinion, but not why?
A They specifically -- and I tried to be fairly persuasive to find out what it was that I needed to watch for, and they were very adamant about not telling me -- I should say Ben was very adamant about not telling me any specifics, other than, "Just interested in your opinion. I don't want to bias you."
Q Did he tell you why he didn't want to give you any specifics?



A I don't think so.
Q Look at the bullet points on this counseling statement. The first one that Mr. Callaway was counseled for was arrogant and abusive treatment of fellow employees. At the time he was in your class, were you his fellow employee?
A Yes.
Q Did you feel his treatment to you was arrogant or abusive?
A Certainly --
MR. STRINDBERG: Objection. It's compound.
Q (BY MR. EMERSON) Go ahead and answer.
A Certainly arrogant, but not abusive toward me.
Q Look at the second bullet point. "Counseled for disregard or refusal to comply with company policies and direction." Do you feel that he failed to comply with your direction while he was in your class?
A Yes.
Q The third bullet point, "Counseled for any conduct that would constitute an embarrassment to SkyWest Airlines or its employees." Did you find any of Mr. Callaway's actions to be an embarrassment to SkyWest Airlines while he was in your class?

# EXHIBIT "L"

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, vs. SKYWEST AIRLINES, INC., Defendant. | CIVIL NO. 2:04CV00179<br>DEPOSITION OF: DANIEL R. BLACK<br>*Held February 11, 2005*<br>REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of DANIEL R. BLACK, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 2:30 p.m. on February 11, 2005, before RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *



APPEARANCES

FOR THE PLAINTIFF: ERIK STRINDBERG
Attorney at Law
STRINDBERG SCHOLNICK & CHAMNESS
44 Exchange Place
Second Floor
Salt Lake City, UT 84111

FOR THE DEFENDANT: TODD C. EMERSON
Attorney at Law
SKYWEST AIRLINES
*444 South River Road*
St. George, UT 84790

ALSO PRESENT: DAVID ANDREW CALLAWAY



I N D E X

EXAMINATION

BY MR. STRINDBERG. . . . . . . . . . . . . . . . . 4
BY MR. EMERSON . . . . . . . . . . . . . . . . . . 20
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . 30
BY MR. EMERSON . . . . . . . . . . . . . . . . . . 38
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . 40

E X H I B I T S

| Exhibit No. | | Marked | Discussed |
|---|---|---|---|
| 7 | 11-30-01 counseling statement | -- | 28 |
| 18 | *Customer Service Irregularity Form* | -- | 12 |
| 75 | 12-16-01 E-mail from Black | -- | 7 |



February 11, 2005
2:30 p.m.

P R O C E E D I N G S

DANIEL R. BLACK

called as a witness at the instance and request of the Plaintiff, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:

Q Please state your full name.
A Daniel Ross Black.
Q Do you go by Dan? Daniel?
A Dan, Danny.
Q Okay. Is it all right if I call you Dan?
A Yep.
Q Have you ever had your deposition taken?
A I have not.
Q A couple of rules. First of all, you need to tell the truth. You're under oath. It's no different than being in a courtroom. Is there anything that would prevent you from telling the truth today? Being sick, undue stress, anything like that?
A No.

together at the security check point and sometimes you weren't. You cleared -- did you clear security first?
A Yes.
Q And how far back was Mr. Callaway behind you?
A I remember a line, and I would guess a half a dozen to a dozen people. I just --
Q So at the time you went through the screening, Mr. Callaway wasn't there?
A He was not.
Q And you did not remain at the screening station to witness what may have happened between Mr. Callaway and the security personnel when he went through?
A As crew members, we go to the front. We go through and proceed to the aircraft.
Q So you actually didn't witness Mr. Callaway have an exchange with the security personnel at all?
A I did not.
Q So again I ask you, it's possible that he had --
MR. STRINDBERG: Objection. He's stated that he didn't hear it.
MR. EMERSON: Let me finish my question.



Then you can object.
MR. STRINDBERG: Well, no. You're asking --
MR. EMERSON: Mr. Strindberg, there's a process to a deposition, which you are well aware of. Let me get my question out. I'll give you a chance to object.
MR. STRINDBERG: Fine.
MR. EMERSON: Thank you.
Q Again, is it possible that Mr. Callaway had a rude, unprofessional or abusive discussion with security personnel that you did not witness?
MR. STRINDBERG: Objection. You're asking him to speculate. He's already testified he wasn't there the entire time.
Q (BY MR. EMERSON) Go ahead and answer.
A It's possible.
Q In fact, you have no idea what was said between Mr. Callaway and the people at security screening?
A I have no idea.
Q You said Mr. Callaway asked you to prepare this?
A Correct.
Q When did he ask you to prepare this



document?
A It was shortly before that date, December 15, 2001.
Q Why did you do this? Why did you prepare this document?
A Andy told me his situation, asked me if I saw anything, and I let Andy know that I didn't see anything while I was in his presence, and that's all I could write, and that's what that reflects.
Q Are you friends with Mr. Callaway?
A I know Andy, but we don't hang out.
Q Did you feel some obligation to prepare this for him as a friend or fellow pilot?
A No. I just -- I felt like I could say nothing happened while I was around, and that's --
Q Did you feel any pressure from Mr. Callaway to prepare this document?
A No. I was in Montreal at the time doing training, so I was kind of busy and it was a little difficult for me to get it to him, but other than that, no.
Q He just asked you once and you prepared it and sent it to him?
A I don't know if he asked me just once. He probably asked me once and then may have had to ask



again, but I don't remember. I just know it took me a while to get it done because of my situation, being out of the country and work.
Q On Exhibit 75, you apparently -- and correct me if I'm wrong -- e-mailed this to Mr. Callaway, if I'm reading this correctly, from you. Is that your -- was that your Compuserve account?
A That was my account number, my E-mail.
Q And that was sent to Mr. Callaway, but the note itself is "Attention Tony Fizer." When did you take that to Mr. Fizer's attention?
A I believe Tony was -- he may have been president of SAPA at the time. I'm not sure, but I think he had something to do with the review board at the time.
Q I'm showing you Deposition Exhibit No. 7. I'll represent to you this is a counseling statement that Mr. Callaway received in response to the incident in Butte, Montana. At the bottom of the first paragraph it says that his behavior is reported as "arrogant, disrespectful and abusive and was displayed in front of other passengers." If this, in fact, happened, would it be improper to display arrogant, disrespectful or abusive behavior in front

# EXHIBIT "M"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID ANDREW CALLAWAY, Plaintiff, | CIVIL NO. 2:04CV00179 |
| vs. | DEPOSITION OF: KRISTEN WILEY |
| SKYWEST AIRLINES, INC., | Held March 15, 2005 |
| Defendant. | REPORTED BY: RENEE L. STACY, CSR, RPR |

Deposition of KRISTEN WILEY, taken on behalf of the Plaintiff, at 44 Exchange Place, Second Floor, Salt Lake City, Utah, commencing at 9:31 a.m. on March 15, 2005, before RENEE L. STACY, Certified *Shorthand Reporter, Registered Professional Reporter* and Notary Public in and for the State of Utah, pursuant to Notice.

* * * *

1

A P P E A R A N C E S

FOR THE PLAINTIFF:
ERIK STRINDBERG
Attorney at Law
STRINDBERG SCHOLNICK & CHAMNESS
44 Exchange Place
*Second Floor*
Salt Lake City, UT 84111

FOR THE DEFENDANT: (not present)
*TODD C. EMERSON*
Attorney at Law
SKYWEST AIRLINES
444 South River Road
St. George, UT 84790

*SCOTT M. PETERSEN*
Attorney at Law
FABIAN & CLENDENIN
215 South State, #1200
Salt Lake City, UT 84111

ALSO PRESENT: DAVID ANDREW CALLAWAY

2

I N D E X

EXAMINATION

BY MR. STRINDBERG. . . . . . . . . . . . . . . . . . . 4
BY MR. PETERSEN. . . . . . . . . . . . . . . . . . . 89
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . . . 96
BY MR. PETERSEN. . . . . . . . . . . . . . . . . . . 103
BY MR. STRINDBERG. . . . . . . . . . . . . . . . . . . 106

E X H I B I T S

| Exhibit No. | | Marked | Discussed |
|---|---|---|---|
| 8 | 11-10-03 E-mail from Wiley | -- | 67 |
| 15 | Document with tabs 1 - 21, given to Callaway at '03 review board | -- | 42 |
| 79 | 5-4-01 statement of employee | 18 | 18 |
| 80 | 5-4-01 *agreement* | 19 | 19 |
| 81 | 5-4-03 E-mail from Wiley | 43 | 43 |
| 82 | IOR document | 75 | 75 |
| 83 | *IOR document* | 75 | 75 |
| 84 | IOR document | 81 | 81 |
| 85 | Termination document | 81 | 81 |

3

March 15, 2005
9:31 a.m.

P R O C E E D I N G S

KRISTEN WILEY

called as a witness at the instance and request of the Plaintiff, having been first duly sworn, was *examined and testified as follows:*

EXAMINATION

BY MR. STRINDBERG:

Q Could you please state your full name.
A Kristen Wiley.
Q Is it all right if I call you Kristen?
A Uh-huh.
Q That's "yes"?
A Yes. Sorry.
Q Kristen, have you ever had your deposition taken before?
A No.
Q Let me give you a couple of ground rules. First of all, you're not a party to this lawsuit. In other words, you're not being sued.
A Okay.
Q You're just a possible witness or a witness to some facts. Do you understand that?

4

Q Okay. What did Andy say to you in regards to the additional money?
A Well, there was obviously misinterpretation between the two of us that I felt that I didn't owe him money and he felt that I did.
Q Okay. I understand that. I'm just asking you what he said to you in November of 2002 about this money.
A I don't recall.
Q When you say you don't recall, do you mean you don't remember the exact words or you have no recollection whatsoever?
A No recollection. I've put everything behind me. I've forgotten everything.
Q How much money did Andy tell you he felt you owed?
A In the area of two or three hundred dollars. I'm not sure.
Q And what was this misunderstanding that you believe existed?
A Well, the reason --
MR. PETERSEN: Hold on. I'm going to object. It's asked and answered. Go ahead.
THE WITNESS: Can you --
Q (BY MR. STRINDBERG) Well, tell me the



basis of this misunderstanding. You said there was a misunderstanding between you and Andy.
A He -- I felt -- I thought that when he invited me to go to Spain in place of the girl that he had already paid for, meaning that he had paid for her place and I was to take her place, so I wouldn't have to pay, and there was no previous agreement for me to pay before the trip, so that's where the misunderstanding came in.
Q And this was what, payment for rental of the house you guys stayed in?
A Yes.
Q Did Andy Bharath go on that trip to Spain?
A No, he didn't.
Q Anyone else from SkyWest?
A No.
Q Do you know why Mr. Callaway asked you to go with this group to Spain?
A Probably because I was his friend and I could easily get the ticket right away. I'm not sure.
Q So sometime in November Andy raised this issue of paying a share of the rental cost of the house with you; is that correct?
A I don't recall.



Q Well, you said earlier that you thought it was in November when you stopped hanging out.
A Well, that's when I paid him the $50 for the food costs that I borrowed from him.
Q When did he raise the issue of you owing other monies?
A I don't recall.
Q Was it around the same time?
A I honestly don't recall.
Q Do you recall any conversations between when you returned from Spain and when you started getting E-mails from Andy about the money?
A No.
Q Did you see Andy at all during that period of time?
A Between what period of time?
Q Between when you returned from Spain and --
A Yes.
Q -- when he sent you an E-mail about the money.
A I'm pretty sure we saw each other, because we hung out during October and the beginning of November, so -- I know he didn't send an E-mail before that. And then the first E-mails I remember are just the ones that -- during like the summertime.



Those are the only ones that I recall.
Q The summer of '03?
A Yes, sir.
Q Do you recall any contacts with Andy between the time you stopped hanging out in November of 2002 and when you got an E-mail from him in the summer of 2003?
A Yeah. Always -- at W, he'd always make comments about it.
Q And what would he say?
A He'd say, "When are you going to pay me my money?" Stuff like that.
Q And what did you say?
A I'd just tell him, "I don't owe you." It was always just a big argument over it. And then after the harassment just kept getting worse and worse, and so finally I'm like, "Whatever. I'm done." So that's when I said, "Hey, I'll start paying you what I can."
Q When did you tell Andy that?
A I don't recall. Probably -- what do those E-mails say? Unless I could read them, I cannot tell you for sure.
Q When you say the harassment got worse, what do you mean?

Q Did you ever tell SkyWest that Lei Frase harassed you at the clubs?
A No, because that was outside of work. I don't think I would have said that. I might have said, "Yeah, she's" -- you know, that's not why I would take it to my supervisor, because that's outside of work, but -- I don't recall ever going straight -- "Hey, I have personal problems. Take care of it." Never anything like that. It was just when it came inside of work where I was trying to work. When it was interfering with my work, I would take it to a supervisor.
Q When you say "it came inside of work," you mean you received these E-mails?
A Yeah. When I didn't feel safe about going to work where I'd have to avoid him and her.
Q Did you ever tell anyone at SkyWest that you were afraid of Lei Frase?
A No, I don't think I would tell them I was afraid of her. I just didn't like confrontation.
Q Did you tell her that you -- did you ever tell SkyWest that you were having any problems with Lei Frase?
A I might have mentioned it, but I don't recall.

61

Q Do you recall mentioning it?
A No, I don't recall.
Q Kelvin recalls you coming to see him on August 12th. Does that sound right?
A Yes.
Q What did you say to Kelvin?
A I said, "Here's what's" -- probably, "Here's what's going on, and can you help me take care of it, get it to stop?"
Q Tell me what you recall saying to him.
A I don't recall, then.
Q Tell me to the best of your recollection.
A I really don't know.
Q You brought in the E-mails; you remember that?
A Yes.
Q You have no recollection of what you said to him?
A I don't remember any of this.
Q How long did the meeting with Kelvin last?
A I don't know.
Q Did you at any point tell Kelvin that Andy was harassing you because you wouldn't date him?
A I don't remember.
MR. STRINDBERG: Do you want to take a

62

break?
THE WITNESS: Yes.
(Recess.)
Q (BY MR. STRINDBERG) We were talking about your conversation with Kelvin. Kelvin made some notes and said that you told him that Andy had broken off with his girlfriend and that was the point he asked you to come with him to Spain. Does that refresh your recollection at all?
A Yes.
Q Did you tell Kelvin that?
A (Witness nods.)
Q What was Andy's girlfriend's --
A Jennifer Barret.
Q And how -- did you know Jennifer Barret?
A Yeah.
Q And how did you know Jennifer?
A She was a flight attendant. And I basically got them together. Like I was hanging out with Andy and I was also hanging out with Jennifer, and then they started hanging out together.
Q How long did Jennifer and Andy go out, if you know?
A I don't recall.
Q I mean, when you told this to Kelvin, were

63

you trying to imply that Andy asked you to go to Spain because he had romantic intentions toward you?
A I don't recall. I always heard that, you know, Andy had interest in me, but it never manifested itself, so I don't -- I don't recall if I had implied that or not at the time, because that might have been the way I felt then.
Q What do you --
A That I might have felt that Andy had been trying to start a romantic relationship, but I just -- I don't remember.
Q But when you were in Spain, did he do anything which would indicate that he was? Did he ever make a pass at you or anything like that?
A No.
Q After talking with Kelvin -- what do you recall Kelvin saying to you?
A I don't recall what the conversation was.
Q Did you talk with anyone else at SkyWest about these E-mails?
A Other than the pilots, no, I don't recall talking -- they might have made me talk to Harold, but I don't remember.
Q Do you recall at some point talking with Jacque Nielsen about it?

64

you had been trying to call him, so you must have known his phone number.

A I'm not sure. I don't remember. I really honestly don't remember any of it.

MR. STRINDBERG: I don't have anything further.

EXAMINATION

BY MR. PETERSEN:

Q All right. I just have a few questions. Ms. Wiley, you testified earlier, I believe, that you spent a fair amount of time meeting at Mr. Callaway's residence, and then from there you would go to bars with a group of people; is that right?

A During which time frame? During the --

Q During the September 2002 and the summer of 2002.

A Yes.

Q And when you were at Mr. Callaway's house, did you ever observe drug use taking place at his house?

MR. STRINDBERG: Objection. That's irrelevant.

Q (BY MR. PETERSEN) Go ahead.

A No, I didn't ever.

Q All right. Let's look at Exhibit 15, sub



20. These are the E-mails that have been produced between you and Mr. Callaway, right?

A Correct.

Q I'm looking at the second page, the second E-mail down. Do you see that? It's the one that's dated August 11th --

A Yes.

Q -- of 2003.

A Uh-huh.

Q What does that E-mail say?

A "Come on, Kristen. I'm tired of this. I need my money now or I'll get it the hard way. Thanks. Andy."

Q And do you recall receiving that E-mail?

A Yes.

Q Do you recall what you understood him to mean by what he says in that E-mail?

A Yeah.

Q What did you -- what did you think he meant?

A Physically.

Q That he would hurt you?

A Or something to that extent.

Q Were you afraid when you received that E-mail?



A Uh-huh.

Q Is that "yes"?

A Yes.

Q That wasn't the first E-mail you had received at the time asking for the money; is that right?

A I don't think it was. It wasn't the first, no.

Q Did you feel intimidated by Mr. Callaway?

A Yes.

Q Why?

A Because of his actions, his words, what he can do.

Q Had you observed him get upset with other people?

A Oh, yeah.

Q And what is your -- how would you describe him when he gets upset?

A Very confrontational.

Q Have you ever seen him get violent with somebody?

A No.

Q At the time that you received that particular E-mail, you were afraid that he might be violent with you?



A Violent or confrontational. I knew I just was scared and I needed to stay away from him.

Q Do you recall when, after that particular E-mail, you spoke to -- you tried to get ahold of Harold Allen?

A Of when exactly?

Q Was it shortly thereafter?

A Yeah.

Q It was like a few weeks?

A That was the breaking point.

Q And then you were unable to get ahold of Mr. Allen?

A Uh-huh.

Q Is that right?

A Yes.

Q So then you contacted Kelvin Hyatt?

A Yes.

Q And did you go to his office personally or --

A Yeah.

Q Were you upset at the time?

A Yeah.

Q Describe your demeanor when you went into Kelvin Hyatt's office, if you recall.

A I was crying.

# EXHIBIT "N"

October 21, 2003

Regarding: Review Board
Employee: Andrew Callaway

Review Board Member,

Please accept this letter of encouragement from a fellow employee concerned about the perceived treatment of another fellow employee. Not having all the facts in the case presented before you I shall reframe from expressing my personal opinion. Mind you that I do have more information than other employees because of my past positions in management, and it is my strong conviction/desire to see that every employee is treated fairly that I offer this letter.

Your decision here today has implications that affect the character of the company that we all are responsible for shaping. The quality of your decision and perseverance of your desire to uphold what you believe is right will set us apart. Any decision made should deal strictly with facts, not perceptions, speculation or assumptions. Having seen three past Union Organizing Committee members terminated and have their jobs reinstated by review boards has me very concerned. Although I personally do not feel threatened, others do. All SkyWest employees deserve to work in an unthreatening environment and it is up to all of us to make sure this happens. Please consider your decision carefully.

Regards,

Tony Thompson
CRJ Captain
Unified Pilots Association
Organizing Committee Co-Chairman

To Whom It May Concern:

I received a phone call from Amy Smith the InFlight administrative assistant on October 21, 2003. She asked me if Andy Callaway and Heather Hamilton have ever or were dating, I responded to her with a definite no. Amy then said she didn't know why they wanted this information and the conversation would stop there.

I just thought you should be made aware of this incident. I have also informed Heather Hamilton of the conversation that I had this morning, with Amy.

If you need anything else don't hesitate to ask

Jory Corsi
jcorsi@mindspring.com
801 243 2140

To whom it may concern.

I am writing this letter to express some personal thoughts with the hope that it could influence the decision to reinstate my position at Sky West airlines. I have been a dedicated Sky West employee for almost 5 years. During that time I have performed my duties as a first officer and captain flawlessly. My training records will show that I approach my duties as a pilot with skill and supreme judgment. As a result I have never been involved with any safety related or FAR anomaly nor have I caused unnecessary attention to bear on my crew or this company. I have a plethora of letters from crewmembers that I have worked with that attest to my character and skill as a first officer and captain.

During my tenure at Sky West, I have made many friends. Some have taken the time to write letters on my behalf. For that I am grateful. Unfortunately there are elements within Sky West that I have either offended or my demeanor and personality was misinterpreted as being arrogant, intimidating, harassing or rude. These opinions were formed during brief contacts with these individuals or as is evident from the information contained in my file, were based on hear say or formed after someone eavesdropped on an alleged phone conversation I was engaged in. The listener was allegedly in an adjoining room and could only hear one side of the conversation.

I love my job here at Sky West airlines. I must confess that there were times during my tenure here that I felt unfairly targeted and scrutinized because of my vocal opinions and involvement with union organizing activities. My desire to procure union representation for our pilots should not be interpreted as a desire to spawn a contentious relationship with my peers and upper management. It is now painfully obvious to me that my methods for communicating my support for a pilot union could use an overhaul.

There is not one pilot here that at one time or the other entertained the idea of moving on to a major carrier. Many pilots, myself included continue to update their resumes and applications at certain carriers. This ambition is not toxic to Sky West airlines. It is regrettable that my ambitions were misinterpreted as a lack of desire to continue my employment at Sky West. I assure that this is not the case.

In closing I would like to appeal to this board to extend some compassion and leniency. I know you have in your possession a long list of alleged events, issues and personal opinions and statements regarding my personality and demeanor. I could contest each accusation on a case-by-case basis but at this point I feel that this is counter productive and a waste of our time. I would like to discuss what steps I can take and wish to seek your advice as to how I can bring about a cessation to the negative impact I sometimes have on my co workers.

Wednesday, 15 October 2003

To Whom It May Concern:

Please accept this letter of reference regarding the character of Mr. Andy Callaway.

I have known Mr. Callaway for approximately one year. During this time I have had the opportunity to work closely with him as a flight crew member, and to interact with him socially on various occasions. In my experience, Andy has distinguished himself by his professional conduct and demeanor in the work environment. If during our many conversations he ever held a conflicting viewpoint, he either refrained from commenting or politely expressed his qualified disagreement. He has never used his professional standing as pilot-in-command in an attempt to coerce, manipulate, intimidate or otherwise cajole a desired behavior from any colleague or social acquaintance. What is more, knowing him as I do, I cannot believe that he would do so.

In work and informal settings, Andy has offered every social courtesy to me and to other flight crew members. Included among this group was Ms. Kristen Wiley. In January of this year I was part of a flight crew in which Andy and Kristen were the other members. During this time, his behavior, both on and off the job, was unimpeachable. Ms. Wiley's comportment, on the other hand, was less than exemplary on occasion. One instance that may bear relevance to the circumstances at hand involved her leaving a hotel restaurant without paying for her meal. When confronted the following week by the hotel staff member who had served her the meal, and therefore recognized her, she claimed that she had not eaten at the restaurant on the night in question, and refused payment. To my knowledge, the account was never settled.

I am willing to reaffirm the above statements in any milieu and under oath, if necessary. Please contact me if I may be of further assistance.

Regards,

Carl Wager, Pilot
SkyWest Airlines

**CAL 0115**

WAGER - 23 SOUTH 800 EAST, NO. 4 - SALT LAKE CITY UT 84102-1244 - (801) 359-1860 - cwager@comcast.net

October 21, 2003

To Whom It May Concern:

I am writing you to provide support and character reference to Captain Andy Callaway. I have known Mr. Callaway for 5 years now and we have become close friends during that time.

Mr. Callaway is an excellent pilot and performs his job with the utmost professionalism. I have also worked closely with him in the training department, and he always gave his best when teaching. His knowledge of Skywest procedures and aircraft systems was always stellar.

The circumstances that befall the writing of this letter are unfortunate, but I feel it is important to rally support for Mr. Callaway in any way that we can as a pilot group. I wish him well and hope to see him back here at Skywest soon.

Sincerely,

Phillip H Grace
Captain Regional Jet SLC
(801) 631-4176

Courtney Wielang
5575 Sandycrest Ter #4
Portland, Or 97213

October 22, 2003

Skywest Airlines
Salt Lake International Airport
AMF Box 22151
Salt Lake City, UT 84122

To Whom It May Concern:

This letter is a character reference written on the behalf of Andrew Callaway.

I have known Andy for approximately four years. Our first introduction was working together as crewmembers. Since our first meeting I have had the opportunity to work with Andy on several different occasions. After these experiences I was very much impressed by Andy's professionalism and the "team" approach that was taken with all crew interactions.

I associate with Andy socially and over the last four years have taken numerous vacations with him. Some of these trips have also included other employees of Skywest Airlines. My experience of Andy's character, whether professionally or socially has been one of generosity and loyalty.

Andy is an invaluable asset to Skywest Airlines. I respectfully request that this reference to Andy's personal integrity and dedication as a professional be taken into consideration when determining the disposition of Andy's termination.

Sincerely,

Courtney Wielang
Flight Attendant
PDX

Phil Alford, #019
SLC, CRJ Captain

To the Employee Review Board:

I am writing this letter to convey my viewpoint with respect to Andy Callaway and the case involving his dismissal as a pilot for SkyWest Airlines. I am both troubled and perplexed that assertiveness would be confused with "hostile" here at SkyWest. Consider that one of the qualities that SkyWest Airlines seeks in prospective pilots is "command presence" otherwise know as assertiveness, which is what is at question now. I feel that this matter could have been resolved with Captain Callaway in another way, one that would be more suited to the true nature of the matter.

I have flown with Andy on several occasions since he was hired as First Officer in January of 1999. I found Andy to be skilled, personable, knowledgeable, and professional both in and out of the cockpit. Andy functioned very well as second in command, and because of the quality of his character and his high degree of professionalism and skill his upgrade to Captain was a smooth one.

Since Andy's to Captain, I have not heard any First Officer complaining about Andy as a pilot in command like I do about other pilots I have flown with that developed "captainitis"(a tyrannical leadership style, that does not belong in the cockpit). I have heard no reports/stories of Andy being hostile toward anyone.

I would not hesitate to recommend Andy for re-instatement as a pilot in command for SkyWest Airlines as I believe that Andy is the type of asset that SkyWest needs to retain, based on my association with him these last four years. Further I would not hesitate to have him as guest in my home.

Sincerely,

Phil Alford

Phil Alford
Captain, SkyWest Airlines, SLC

200 Paris lane #204 Newport Beach CA 92663

# Andy T Bharath

October 15, 2003

To whom it may concern:

This letter is attesting to the character of Mr. Andy Callaway.

I have known Andy for approximately four years. Our first introduction was during initial RJ training back in January 2000. Shane Losee and Tony Fizer were our instructors at the time. Andy's demeanor during the ground portion of the training was always cordial and professional. He was attentive and displayed no visible signs of arrogance or abusive personality traits. I also had the opportunity to observe Andy's simulator sessions and was extremely impressed with his piloting abilities. Andy flew a flawless profile and maintained his composure during the myriad anomalies that were thrown at him during these sessions.

Andy and I are now both Captains at SkyWest. We've never flown together so I cannot attest to his interaction with his crew. I have flown with crewmembers that did fly with Andy and none have opined that his attitude as a Captain was abusive or arrogant. In fact, these individuals had nothing but high praises for Andy. They all seem to enjoy working with Andy.

I associate with Andy socially and have observed other SkyWest employees interact with him on this level. One of these employees was Ms. Kristen Wiley. Andy was always cordial with Ms. Wiley to the point where she felt comfortable going on a group vacation that he organized. Andy displayed tremendous generosity by advancing Ms. Wiley the portion of her expenses for the trip. Andy's attempts to recover funds from Ms. Wiley turned out to be an exercise in futility. I have personally witnessed some of these attempts and none were threatening or harassing in nature. In desperation, Andy sent Ms. Wiley an e-mail via SWOL urging payment. While this method may not be palatable to SkyWest, one cannot ignore the frustration levels endured by Andy during his failed collection attempts. I therefore respectfully request that the use of this incident as the catalyst for his termination is reconsidered. Andy is an excellent Captain who values his employment at SkyWest Airlines.

Sincerely,

Andy T Bharath
SLC CRJ Capt.

October 21, 2003

Jaime Ryan
512 North Columbus Street
Salt Lake City, UT 84103
(801) 333-8586

To Whom It May Concern:

I am writing this letter on behalf of Mr. Andy Callaway whom I have known for over two years both in a personal and professional relationship. I have found that throughout our friendship that Andy has carried himself in a professional manner in both instances. Andy consistently treats friends, co-workers, and new acquaintances with the utmost respect, being genuinely concerned about their thoughts and feelings. I have never heard Andy belittle coworkers or company representatives, and has often times gone to bat for both parties. I have witnessed Andy diffuse potentially hostile situations using a good natured sense of humor and a charming wit. Often times Andy has left these situations with all parties feeling better about the outcome.

During our friendship, the one fault that I have found with Andy is his generosity. Andy often times sacrifices personal time to help friends and co-workers. He has forgone personal days at home with family to work shifts that would otherwise result in SkyWest canceling flights. During his tenure as Static Instructor, Andy often times would spend extra time with students who were struggling to met the standards set forth by the training department. All of this resulting in less time with friends and family, while gaining nothing for his efforts.

One of the most admirable attributes of Mr. Callaway is his candor. When dealing with Andy, you always know where you stand. While some people mistake this bluntness for and air of brashness, Andy has never been disrespectful while voicing his opinions. His arguments are well thought out and presented, and I have never had, or witnessed, a one sided conversation. Andy is always willing to engage in open debate, and enters these conversations with an open mind.

I believe that losing Andy Callaway as an employee would be a true injustice. Andy has excellent flying skills, is a strong leader, and as excellent communicator of thoughts and ideas. He truly is an asset to SkyWest Airlines. Should you have any questions, please feel free to contact me at (801) 333-8586.

Sincerely,

Jaime R Ryan

Jaime Ryan
Flight Attendant
DEN - 12665

CAPTAIN HARLAN L. MUNGER
Skywest Airlines Inc.

10/21/03

Re: Captain Andrew Callaway, Skywest Airlines Inc.

To Whom It May Concern:

I have known Captain Callaway for several years. When we first became acquainted, he was a First Officer in the CL-65 for Skywest, and we flew numerous trips together.

Most of the trips we flew were to FAA Designated Special Airports, such as Butte, Montana. The schedules involved reduced rest, working on the back side of the clock. It was the kind of flying that tested all your skills as a pilot...Flying high performance jet equipment, late at night and very early in the morning, into airports surrounded by mountainous terrain and no Air Traffic Control. There was no margin for error.

For twenty-one years I have been a Captain at Skywest Airlines. Flown with hundreds of different First Officers. Some of them I would not remember or even recognize.

I remember Captain Andrew Callaway. There are certain First Officers that you wish didn't put the four stripes on their shoulders...Because you will dearly miss working with them!

Captain Callaway is an exceptional pilot. He is not only intelligent and logical, but also a natural at his profession. As a crewmember he is a pleasure to work with, and a true asset for Skywest Airlines as an employee.

Sincerely,

Captain Harlan L. Munger

October 21, 2003

To Whom It May Concern:

I am writing this letter on behalf of Andrew Callaway.

I have flown with Andy many times and have spent time with him on numerous RON's. Andy has always been very professional, easy to work with, and pleasant to be around. I consider Andy an excellent pilot and an exceptional person.

As a crew member, I can attest to Andy's honesty and integrity. I have never seen Andy act in a threatening or demeaning manner toward anyone, on or off duty, and have never heard anyone else say anything to the contrary.

Sincerely,

Lynn Redd
RJ Captain, SLC
(801) 756-0841

David Coven
2688 Fillmore St.
Salt Lake City, UT 84106

October 18, 2003

To Whom It May Concern,

This letter is to attest to the personal character of Andy Callaway, and my experiences with him, both in a professional and social setting.

I first met Andy in June of 2002 when I was assigned to fly my first trip off IOE. Andy's demeanor and professionalism set me at ease, considering this was my first flight after training. In fact, on my first leg as flying pilot from PHX to LAX, I became somewhat behind on the aircraft while flying the arrival procedure into LAX. However, Andy's calm attitude and patience gave me the confidence and motivation to catch up with airplane. During the beginning 2003, I noticed a trip on the swap board. When I noticed the Captain was Andy, I elected to pick up the trip because of my previous experience with him.

Due to my positive experiences I had with Andy while flying with him after IOE, I was happy to receive invitations to attend social functions with Andy and his friends. After a short time, I considered him a friend and continued to interact with him socially. During the many times I have spent with Andy, I was always impressed in the way he made people feel welcome. Andy took a genuine interest in everyone he came in contact with. I never witnessed any rude or intimidating behavior of any kind.

Based on these experiences, I believe Andy's professional and social conduct is a valuable asset to SkyWest Airlines. If you have any questions, please call me at 541-913-6858.

Sincerely,

David Coven
CRJ First Officer #14063

Hiram Magruder Drane, Jr.
c/o 4414 West Thayn Drive
West Valley City, Utah (84120)

To: Skywest Airlines
c/o Review Board
444 S. River Road
St. George, Utah

To whom it may concern:

This letter is being written to the review board in the matter of Andy Callaway vs. Skywest Airlines to attest to the character of Andy.

I have known Andy for several years and in all my dealings with Andy he has demonstrated honesty and integrity that is beyond reproach. He has, from my viewpoint, been enthusiastic about the company and the people he works with.

If I may be of further assistance, let me know by e-mail or phone.

Sincerely,
Hiram Magruder Drane, Jr.

Leilia L. Frase
55 S. 500 W., #733
Salt Lake City, UT 84101

October 17, 2003

To Whom It May Concern:

This letter is in reference to the recent termination of Andy Callaway. I have known Andy for four years and feel qualified to defend his personal integrity as a dedicated professional, and individual.

I have had the pleasure of working directly with Andy on several trips and have always been impressed with his conduct and professionalism. Andy has always taken extra steps to insure that passenger and crewmember needs are fulfilled. I have never heard him express any negative feelings for any aspect of his job, nor comment negatively toward any other crewmember or individual. Andy always maintains a positive attitude, and works well with his colleagues.

I urge you to review Andy's situation, since I believe he is an invaluable asset to SkyWest Airlines. If I can answer any questions regarding this matter, please feel free to call me at 801-347-4436.

Sincerely,

Leilia L. Frase
Flight Attendant
SkyWest Airlines

To whom it may concern,

This is in reference to Andrew Callaway -- SLC RJ Captain. I have flown with Andy when he was a First Officer and also as a Captain on the RJ. Andy is very professional in all aspects. There was never a time that I ever felt threatened by him.

He conducted himself as a professional and a gentleman while on the aircraft and off. He was always involving all crew members when it came to the overnights as far as going out to dinner, breakfast or lunch. There would never be a time that I would ever question his professionalism. In regards, if you feel you need further information, please feel free to contact me. Thank you for your time.

Sally Oja
Salt Lake City Flight Attendant
Phone: 307-262-7105 / 307-247-1549

10/19/03

To Whom It May Concern,

I have known Andy Callaway personally and professionally for at least 5 years. When I have worked with him in the past I found him to be completely professional. He has an excellent work ethic and takes his job seriously. In my dealings with Andy I have found him to be upfront, fair, and honest.

Sincerely,

Heather Hamilton

October 23, 2003

To Whom It May Concern:

I have been fortunate to know Andy Callaway for around 4 years. I first met Andy through mutual friends in Salt Lake City UT, and then later I had the opportunity to work with him both as a First Officer and then as a Captain for SkyWest Airlines.

Andy has always been a pleasure to be around both socially and professionally, he has a great attitude in anything that he does. I have always found him to be a person of strong moral convictions when it comes to his personal life. Professionally I always enjoyed the time spent with him on my crew he is a very dedicated safety oriented professional.

I have never heard a negative comment, or felt a negative attitude from Andy, he is always positive and up beat in everything he does.

In the years that I have known Andy I am glad that I can call him a friend.

Sincerely,

Jory Corsi
InFlight Instructor
SLC #9541

Thursday, October 23, 2003
RE: ANDREW CALLAWAY
RJ CAPTAIN

To Whom It May Concern:

I am writing this letter as a character reference concerning Andrew Callaway. I have had the extreme pleasure of flying with Mr. Callaway on several occasions. He has always behaved in a professional and diligent manner. I personally, and I believe many of my peers would agree, that Andy Callaway has the utmost positive demeanor, and posses an impeccable standard of integrity.

His passion for his job is evident in all the dedicated years he's been flying for our company.

Sincerely,

Christina Burnette-Sexton
ID # 8579
D.O.N. 02-03-98

**AC**

---

**From:** Lewis Bjork [bjorkathome@mstar2.net]

**Sent:** Monday, October 20, 2003 2:19 PM

**To:** AC

**Subject:** Re: your help is needed

To Whom It May Concern:

I have personally worked with Andy Callaway at Skywest Airlines. I have known him to demonstrate nothing but a thoroughly professional demeanor in his capacity as a pilot.

Lewis Bjork
#6250 Skywest Airlines.

19 OCT 2003

To whom it May Concern,

I have known Andy Callaway for several years and have flown with him when he was a First Officer in the R.J. He demonstrates good ability and judgement as a pilot. As a person I find him to be honest and trustworty.

Sincerly
Capt Dave Bandei
DEN.

October 23, 2003

To whom it may concern:

This letter is in regard to the aviation skills of Andrew Callaway, Captain of the Canadair Regional Jet for SkyWest Airlines.

On the morning of November 29th, 2002 I was on reserve and was called by Crew Scheduling to be the non-flying pilot in the Flight Safety Simulator in Salt Lake City, UT for Mr. Callaway's six-month check ride.

During that time, Mr. Callaway exhibited the flying abilities and commadability of the aircraft that are in accord with the industry's standards. In my estimation, he displayed exceptional understanding of emergency procedures and aircraft knowledge that is necessary to be a Captain.

Throughout his check ride, he instilled in me a sense of confidence to the point where I would feel more than comfortable with my family aboard an aircraft with Mr. Callaway in command.

Sincerely,

Robert C.D. Merritt
CRJ Captain- SLC
SkyWest Airlines

# EXHIBIT "O"

# employee relations

## DISCIPLINARY ACTION

SkyWest has established rules and policies for the conduct of business to ensure that we provide all of our stakeholders with excellent customer service. It is the supervisor's responsibility to provide appropriate feedback to each employee regarding his/her job performance. The objective of providing feedback is to correct undesirable behavior and improve performance.

### steps in disciplinary action

**ORAL WARNING** - If an employee is not meeting performance standards, the supervisor will discuss with the employee areas for improvement. This generally occurs during a counseling session where both parties will agree on a future course of action.
**WRITTEN WARNING** - If the behavior continues a written warning will be issued including a letter of instruction and a counseling statement.
**FINAL WARNING** - Following a counseling statement, a final warning may be issued which may include time-off or other disciplinary action up to and including termination.
**SUSPENSION** - This is reserved for situations when the employer believes that further investigation into a serious incident involving the employee is required before a final decision is made.
**DISCHARGE** - This may occur if the offense is of serious nature or when prior warnings have failed to correct a performance or behavioral problem.

Any of the above steps may or may not be used when dealing with disciplinary problems. Every case will be considered individually and reviewed based on employment history, attitude, and severity of incident.

**NOTE:** SkyWest reserves the right to bypass any step in this procedure and take disciplinary action up to and including termination upon any employee without prior warning or notice. The use of published disciplinary procedures does not change an employee's at-will status or in any way restrict the company's right to terminate such an employee.

## EMPLOYEE APPEALS PROCESS

Terminated employees will have the opportunity to have disciplinary actions resulting in termination reviewed. The terminated employee will be provided with an opportunity to present his/her issues and appeal the decision through a formal complaint and appeals process. All review processes will remain confidential. The appeals review committee will review all available facts surrounding the termination appeal and make a decision based on the information presented. For more detailed information refer to Standard Practice 78 in the Company Policy Manual.

## EMPLOYEE SEPARATION PROCEDURES

Voluntary Resignation- SkyWest recognizes that there will be instances when an employee may decide to resign voluntarily. To allow adequate time to transfer duties and responsibilities, please provide two-weeks notice and a letter of resignation.

Furlough- This is defined as the release of an employee or employees due to lack of work or business necessity and where the release is no fault of the employee. It includes such company actions as eliminating positions and closing stations. For further details refer to Standard Practice 71 in the Company Policy Manual.

### property clearance procedures

When an employee terminates employment with SkyWest, all company property must be returned to his/her supervisor or a People Department representative by the last day worked. The following items must be returned:

- I.D. Badge(Airport and Company)
- Parking Pass
- Uniform
- Keys
- Equipment (laptop computer, cell phone, pager, etc)
- Credit and Calling Card

An employee who fails to return SkyWest property will owe the company the amount equal to the replacement of such property.

# EXHIBIT "P"

EXHIBIT
35

SkyWest AIRLINES

# REVIEW BOARD SUMMATION FOR ANDREW CALLAWAY

| October 24, 2003 | Salt Lake City, UT |
|---|---|
| **MANAGEMENT** | |
| Jon Tenpas - LAX Chief Pilot | Bill Dykes - SLC Manager of Maintenance |
| **PEERS** | |
| Robert Donohoe – SMF RJ Captain | John Wangensteen – PDX EMB Captain |
| **MODERATOR** | |
| Jacqueline Nielsen - Employee Relations Manager | |

## BACKGROUND

Date of Hire: January 13, 1999
Date of Termination: October 1, 2003

Reason for Termination: Due to a pattern of attitudinal and interpersonal conflicts with supervisors and other SkyWest employees.

## COMPANY'S PRESENTATION

SLC Chief Pilot Kelvin Hyatt presented for the company. Captain Hyatt presented a history of Andy's employment with SkyWest:

- No showed to ground school on February 2, 1998.
- After numerous letters from Andy and a new application, Andy was allowed to come to training in January 1999.
- In June 2000 Andy was summoned to Headquarters to meet with Brad Holt and Jim Breeze because of comments made on the company website. And because of behavior towards crew schedulers such as berating the schedulers over scheduling or pay issues.
- At the end of 2000, Captain Hyatt met with Andy about his behavior towards a crew scheduler. Andy was arguing about open time.
- Once again Andy met with Brad Holt and Jim Breeze to go over his behavior with crew schedulers.
- In approximately October 2001, Human Resources received phone calls from neighbors of Andy's in SLC complaining about Andy's party house. The neighbors knew Andy was a pilot for SkyWest. The police department was called to Andy's house numerous times for loud party and disturbance.
- Andy violated SP 307.2.A. – "Your personal conduct and appearance, both on and off duty, shall be such as to maintain or improve the image of the Company."
- On November 13, 2001, Andy met with Brad Holt, Bill Boice and Tony Thompson because of Andy's behavior in upgrade training and at the Butte station. Captain Hyatt read Tony Thompson's write up from the meeting.
- November 30, 2001 Andy received a counseling statement for inappropriate behavior towards

Security Screeners and Butte agents. Andy received three weeks off without pay.

- There was a review board for the counseling statement. The counseling statement was upheld. The only change was to strike extremely from the statement.
- On March 26, 2002 Andy received a SAD.
- All pilots needed to be fingerprinted, and Andy had a conviction which Captain Hyatt informed Andy SkyWest had that information.
- Andy received another SAD on June 30, 2003.
- On August 12, 2003, Flight Attendant Kristen Wiley told Captain Hyatt she had concerns she was receiving threatening emails from Andy regarding money he said she owed him. Andy had invited Kristen to go with him and a group of people to Spain. According to Kristen, Andy told her she only needed to worry about her plane ticket and food, and everything else would be paid for. Now almost a year later, Andy was using skywestonline.com to send messages demanding payment of the shared expenses from the trip. Kristen felt threatened to even check her messages, and asked Captain Hyatt if there was anything he could do to stop these messages. Captain Hyatt said he would look into this matter.
- Captain Hyatt sent a message to Andy asking for explanation. Andy responded saying the matter was a personal and private matter and didn't concern SkyWest. Captain Hyatt read the email. Kristen felt threatened and harassed because of the emails sent by Andy.
- Captain Hyatt read a letter by the Assistant Chief Pilot Don Watkins. Captain Watkins was in a hotel when the person next door, speaking loudly made comments about SkyWest. Captain Watkins listened to the conversation, wrote his letter and gave to management. Andy was the person in the room next to Captain Watkins.
- Andy was terminated because of attitudinal and interpersonal conflicts with others. Management reviewed everything, and the only thing left was to terminate employment.

Panel Member Question Period.

## ANDREW CALLAWAY'S PRESENTATION

Andrew Callaway presented for himself. Andy thanked everyone for coming. Andy started with going over the package Captain Hyatt presented.

- The verbal warning from Jim Breeze, Andy was not aware of. Andy did go to St. George, and did admit his comments could have been misconstrued and may have been a little abrasive. Andy remembers going to St. George in December 2000 and not June 2000.
- Andy went over his counseling statement, but he was not rude and arrogant to security or to crew scheduling. He apologized if he was, but he only asked security questions, and never was rude to crew scheduling.
- Regarding the letter from Kelly Dixon, Andy apologized for appearing like he was not interested in the class. He did not think his posture would look this way.
- Andy went over the complaints from his neighbors. Andy purchased his home in October 2000. There was a lawsuit brought against the neighbor and city. The neighbor was evicted from her home, and the lawsuit settled with the city.
- Andy felt like the letter from Tony Thompson was cut off.
- Andy went over the SAD. He was sick and should have called crew scheduling to take him off. Andy admitted he was at fault for the SAD.
- The background check Captain Hyatt went over with Andy, Andy said the DUI was dismissed and he didn't understand why it did not come up as dismissed.
- Andy explained his no show to class. His father was diagnosed with cancer, and Andy did not find out until his father was placed in the hospital. Apparently there was a miscommunication.

Larraine Caldwell, who doesn't work at SkyWest anymore, did tell Andy there was a miscommunication between the hangar and St. George regarding his no show. As soon as that was clarified, a class date was scheduled.

- Andy accepted the SAD received in June 2003. Andy was in court, but as soon as he received the call from scheduling, he explained the situation and was told to call every half hour. At 4:30 he noticed the SAD. Andy explained why Lew Bodkin or Kelvin Hyatt did not receive the signed verbal warning. Andy's show times were before the office opened, and Andy did fax it at one time, but was never received. Andy showed a log of his fax machine.
- Andy explained the situation regarding Kristen Wiley. Andy did not intend for this situation to happen. Andy was simply intending to collect a personal debt, and this had nothing to do with SkyWest. Andy felt he perhaps had a lapse in judgment by using company resources such as skywestonline.com to contact Kristen. Andy did not intend to create a hostile work environment. Kristen is a friend of Andy's, and did not tell him she was intimidated by the emails. Andy would have stopped. This was a last resort in trying to contact Kristen. Andy was simply trying as a friend to give her one last chance to pay the debt and retain her integrity. Taking Kristen to court was an option Andy reluctantly pursued. While Andy won the judgment, he sadly lost a friendship and his job in the process.
- On the response to Captain Hyatt, Andy was using the policies quoted him. He was not aware of an email policy. Andy went over the emails from Kristen. Andy denies harassing Kristen on the emails.
- The Don Watkins letter references matters Andy has no knowledge of and Andy provided a receipt from Appleby's where he was at getting a quick snack. The receipt provided a time.

Andy stated he has been a dedicated SkyWest employee for almost five years, and during that time he has performed his duties as a first officer and captain flawlessly. His training records will show he approached his duties as a pilot very seriously. As a result he was never been involved with any safety related or FAR violation nor caused unnecessary tension for his crew or company. During his employment at SkyWest, Andy has made many friends. Andy provided character references. Unfortunately there are a few individuals Andy may have offended or his demeanor or personality may have been misinterpreted as arrogant, rude, intimidating, harassing or rude. These opinions were formed during brief contacts with the individuals. Andy does love his job with SkyWest. Andy has never been intentionally rude to anyone. There are many who do not see Andy this way. Andy feels he is a nice guy, but he is direct, and people misconstrue that. He wants his job back. Andy did mention being interviewed by Jet Blue. The interview was unsuccessful.

Panel Member Question Period.

**REBUTTAL**

Kelvin: Andy was terminated because of continual behavior that was not acceptable, not because of one incident. Andy did not accept responsibility for any of his behavior. The company did not have any place to go, but to terminate. The letter from Tony Thompson is only one page. Regarding the SAD, Andy said he would do the trip, but he put conditions on what he would do. This is not how the company runs. The background check was down in 2002, and if this has been expunged then Andy needs to look into that. Larraine Caldwell does still work for SkyWest in the People Department. Kelvin spoke with her, and she recalls receiving no phone calls in St. George indicating why Andy no showed for class. The information about why Andy no showed came in letters received after the class started. Regarding the letter from Donley Watkins, Donley called his Chief Pilot Bob Venturella explaining what he had heard. Donley is an Assistant Chief Pilot, and as this is part of management, he can call the front desk to ask for information on a SkyWest crewmember. Andy has coworkers who like him and coworkers who do not. He has been talked to and counseled about his behavior, and

chose not to change. Therefore, SkyWest had no alternative, but to terminate.

Andrew: Andy hasn't had any run ins with anyone. Andy called the Marriott for their policy about releasing information, and they do not give any out. Regarding the SAD, Andy did not put any pressure on the scheduler. He just wanted to stay close to home. The letter from the crew scheduler may have him confused with someone else. Andy claims he has never used abusive language with a crew scheduler. He has accepted the responsibility of the SAD's and the counseling statement.

Panel Member Question Period.

## DECISION

After careful consideration, the panel members upheld the termination, but Andy was given the option to resign and be made eligible for rehire. Andy did not agree to the modified solution.